No. 16-7067

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

MATTHEW GRACE, *et al.*,
APPELLEES,

V.

DISTRICT OF COLUMBIA, *et al.*,
APPELLANTS.

ON APPEAL FROM AN ORDER OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

## JOINT APPENDIX

KARL A. RACINE
Attorney General for the District of Columbia

TODD S. KIM
Solicitor General

LOREN L. ALIKHAN
Deputy Solicitor General

HOLLY M. JOHNSON
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 600S
Washington, D.C. 20001
(202) 442-9890
holly.johnson@dc.gov

# TABLE OF CONTENTS

1. Docket .................................................................................................1

2. Complaint .........................................................................................11

3. Declaration of Matthew Grace .....................................................29

4. Notice of Denial of Concealed Carry Pistol License Application ..............33

5. Declaration of Gwendolyn S. Patton..........................................35

6. Concealed Carry Pistol License Application (blank)...................38

7. Kleck & Gertz, *Armed Resistance to Crime*, 86 Crim. L. & Criminology 150 (1995)..............................................................44

8. Kleck & Gertz, *Carrying Guns for Protection*, 35 J. of Res. in Crime & Delinq. 193 (1998) ....................................................84

9. Committee on the Judiciary and Public Safety, D.C. Council, Report on Bill 20-930 (2014) ...............................................119

10. Donohue, *The Impact of Right to Carry Laws and the NRC Report (2014)* ..............................................................................251

11. Ludwig, *Concealed-Gun-Carrying Laws and Violent Crime*, 18 Int'l L. Rev. L. & Econ. 239 (1998)...................................359

12. Dezhbakhsh & Rubin, *Lives Saved or Lives Lost? The Effects of Concealed-Handgun Laws on Crime*, 88 Am. Econ. Rev. 468 (1998)......375

13. Cook & Ludwig, *The Social Costs of Gun Ownership*, 90 J. Pub. Econ. 379 (2006) ...................................................................382

14. Branas, *et al.*, *Investigating the Link Between Gun Possession and Gun Assault*, 99 Amer. J. Pub. Health 2034 (2009) ...............395

15. Cook, *et al.*, *Criminal Records of Homicide Offenders*, 294 JAMA 598 (2005) ...................................................................402

16. Minnesota Drug & Violent Crime Task Forces, 2011 Annual Report .......406

17. David B. Mustard, Comment, in *Evaluating Gun Policy* (Jens Ludwig & Philip J. Cook eds., 2003)..........................................................424

18. Letter from Thomas Jefferson to Peter Carr (1785)...................................434

19. John Adams, *First Day's Speech in Defense of the British Soldiers Accused of Murdering Attucks, Gray, and Others, in the Boston Riot of 1770* ........................................................................................................436

20. Benjamin Ogle Tayloe, *In Memoriam* (1872) ...........................................437

21. Declaration of Twana V. Smalls ................................................................440

22. Concealed Carry Pistol License Application of Matthew Grace ..............446

23. Transcript of Oral Argument in the District Court, Feb. 2, 2015..............452

24. Memorandum Opinion ..............................................................................530

25. Order Entering Preliminary Injunction .....................................................576

APPEAL,TYPE-E

# U.S. District Court
# District of Columbia (Washington, DC)
# CIVIL DOCKET FOR CASE #: 1:15-cv-02234-RJL

GRACE et al v. DISTRICT OF COLUMBIA et al
Assigned to: Judge Richard J. Leon
 Case: 1:15-cv-00162-CKK
Case in other court: 16-07067
Cause: 28:2201 Constitutionality of State Statute(s)

Date Filed: 12/22/2015
Jury Demand: Defendant
Nature of Suit: 950 Constitutional - State
Statute
Jurisdiction: Federal Question

**Plaintiff**

**MATTHEW GRACE**                    represented by  **Charles Justin Cooper**
                                                      COOPER & KIRK, PLLC
                                                      1523 New Hampshire Avenue, NW
                                                      Washington, DC 20036
                                                      (202) 220-9660
                                                      Fax: (202) 220-9601
                                                      Email: ccooper@cooperkirk.com
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **David Henry Thompson**
                                                      COOPER & KIRK, PLLC
                                                      1523 New Hampshire Ave, NW
                                                      Washington, DC 20036
                                                      (202) 220-9600
                                                      Fax: (202) 220-9601
                                                      Email: dthompson@cooperkirk.com
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Peter A. Patterson**
                                                      COOPER & KIRK, PLLC
                                                      1523 New Hampshire Ave, NW
                                                      Washington, DC 20036
                                                      (202) 220-9600
                                                      Fax: (202) 220-9601
                                                      Email: ppatterson@cooperkirk.com
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**PINK PISTOLS**                     represented by  **Charles Justin Cooper**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

JA 1

**David Henry Thompson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter A. Patterson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**DISTRICT OF COLUMBIA**              represented by  **Andrew J. Saindon**
D.C. OFFICE OF ATTORNEY
GENERAL
441 4th Street, NW
Sixth Floor South
Washington, DC 20001-2714
(202) 724-6643
Fax: (202) 730-1470
Email: andy.saindon@dc.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Holly Michelle Johnson**
DISTRICT OF COLUMBIA
ATTORNEY GENERAL
441 4th Street, NW
Suite 6S-101
Washington, DC 20001-2714
(202) 442-9890
Fax: (202) 715-7713
Email: holly.johnson@dc.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Chad Alan Naso**
OFFICE OF THE ATTORNEY
GENERAL, DISTRICT OF
COLUMBIA
Public Interest Division, Equity Section
441 Fourth Street, NW
600 South
Washington, DC 20001
(202) 724-7854
Email: chad.naso@dc.gov
*TERMINATED: 05/19/2016*

**JA 2**

**Defendant**

**CATHY LANIER**
*in her official capacity as Chief of Police
for the Metropolitan Police Department*

represented by **Andrew J. Saindon**
(See above for address)
*LEAD ATTORNEY
ATTORNEY TO BE NOTICED*

**Holly Michelle Johnson**
(See above for address)
*LEAD ATTORNEY
ATTORNEY TO BE NOTICED*

**Chad Alan Naso**
(See above for address)
*TERMINATED: 05/19/2016*

**Amicus**

**NATIONAL RIFLE ASSOCIATION
OF AMERICA**

represented by **Erin Elizabeth Murphy**
BANCROFT PLLC
500 New Jersey Avenue, NW
Seventh Floor
Washington, DC 20001
(202) 234-0090
Fax: (202) 234-2806
Email: emurphy@bancroftpllc.com
*LEAD ATTORNEY
ATTORNEY TO BE NOTICED*

**Paul Clement**
BANCROFT PLLC
500 New Jersey Avenue, NW
Seventh Floor
Washington, DC 20001
(202) 234-0090
Fax: (202) 234-2806
Email: pclement@bancroftpllc.com
*LEAD ATTORNEY
ATTORNEY TO BE NOTICED*

**Amicus**

**EVERYTOWN FOR GUN SAFETY**

represented by **Deepak Gupta**
GUPTA BECK PLLC
1735 20th Sreet, NW
Washington, DC 20009
(202) 888-1741
Email: deepak@guptawessler.com
*LEAD ATTORNEY
ATTORNEY TO BE NOTICED*

**Amicus**

**JA 3**

**BRADY CENTER TO PREVENT**              represented by   **Adam K. Levin**
**GUN VIOLENCE**                                         HOGAN LOVELLS US LLP
                                                         555 13th Street, NW
                                                         Washington, DC 20004
                                                         (202) 637-6846
                                                         Fax: (202) 637-5910
                                                         Email: adam.levin@hoganlovells.com
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/22/2015 | 1 | COMPLAINT against All Defendants ( Filing fee $ 400 receipt number 0090-4358488) filed by MATTHEW GRACE, PINK PISTOLS. (Attachments: # 1 Civil Cover Sheet 1, # 2 Exhibit 2, # 3 Summons 3)(Thompson, David) (Entered: 12/22/2015) |
| 12/22/2015 | 2 | NOTICE of Appearance by Peter A. Patterson on behalf of All Plaintiffs (Patterson, Peter) (Entered: 12/22/2015) |
| 12/22/2015 | | Case Assigned to Judge Richard J. Leon. (sth) (Entered: 12/22/2015) |
| 12/22/2015 | 3 | SUMMONS (4) Issued Electronically as to CATHY LANIER, METROPOLITAN POLICE DEPARTMENT, District of Columbia Attorney General, and the District of Columbia Mayor. (Attachments: # 1 Summons)(sth) (Entered: 12/22/2015) |
| 12/23/2015 | 4 | NOTICE of Appearance by Andrew J. Saindon on behalf of All Defendants (Saindon, Andrew) (Entered: 12/23/2015) |
| 12/28/2015 | 5 | NOTICE of Appearance by Charles Justin Cooper on behalf of All Plaintiffs (Cooper, Charles) (Entered: 12/28/2015) |
| 12/28/2015 | 6 | MOTION for Preliminary Injunction *and/or*, MOTION for Permanent Injunction by MATTHEW GRACE, PINK PISTOLS (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order, # 3 Declaration Matthew Grace, # 4 Exhibit Denial Letter, # 5 Declaration Gwendolyn S. Patton, # 6 Exhibit Sample Application, # 7 Exhibit 7, # 8 Exhibit 8)(Cooper, Charles) (Entered: 12/28/2015) |
| 12/29/2015 | 7 | Consent MOTION for Briefing Schedule *for Plaintiffs' Application for a Preliminary and/or Permanent Injunction* by MATTHEW GRACE, PINK PISTOLS (Attachments: # 1 Text of Proposed Order)(Cooper, Charles) (Entered: 12/29/2015) |
| 12/29/2015 | 8 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the District of Columbia Attorney General. Date of Service Upon District of Columbia Attorney General 12/23/2015. Answer due for ALL D.C. DEFENDANTS by 1/13/2016. (Cooper, Charles) (Entered: 12/29/2015) |
| 12/29/2015 | 9 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on the Mayor of the District of Columbia. Date of Service Upon the Mayor for the District of Columbia on 12/23/2015. (Cooper, Charles) (Entered: 12/29/2015) |
| 12/29/2015 | 10 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. |

**JA 4**

| | | CATHY LANIER served on 12/23/2015 (Cooper, Charles) (Entered: 12/29/2015) |
|---|---|---|
| 12/29/2015 | 11 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. DISTRICT OF COLUMBIA served on 12/23/2015 (Cooper, Charles) (Entered: 12/29/2015) |
| 12/29/2015 | | MINUTE SCHEDULING ORDER: It is hereby ORDERED that the parties' 7 Consent Motion to Establish Schedule for Plaintiffs' Application for a Preliminary and/or Permanent Injunction is GRANTED. The following schedule shall govern the above-captioned case: (1) Defendants' opposition to plaintiffs' 6 Application for a Preliminary and/or Permanent Injunction, if any, is due on or before January 15, 2016; (2) Plaintiffs' reply, if any, is due on or before January 22, 2016. Signed by Judge Richard J. Leon on 12/29/2015. (lcrjl2, ) (Entered: 12/29/2015) |
| 12/29/2015 | 12 | STANDING ORDER. Signed by Judge Richard J. Leon on 12/29/2015. (lcrjl2, ) (Entered: 12/29/2015) |
| 12/29/2015 | | Set/Reset Deadlines: Defendants' opposition to plaintiffs' Application for a Preliminary and/or Permanent Injunction, if any, is due on or before 1/15/2016; Plaintiffs' reply, if any, is due on or before 1/22/2016. (kt) (Entered: 12/29/2015) |
| 01/04/2016 | 13 | Amicus Curiae APPEARANCE entered by Paul Clement on behalf of The National Rifle Association of America, Inc.. (Clement, Paul) (Entered: 01/04/2016) |
| 01/04/2016 | 14 | Amicus Curiae APPEARANCE entered by Erin Elizabeth Murphy on behalf of The National Rifle Association of America, Inc.. (Murphy, Erin) (Entered: 01/04/2016) |
| 01/04/2016 | 15 | MOTION for Leave to File *Amicus Curiae Brief* by The National Rifle Association of America, Inc. (Clement, Paul) (Entered: 01/04/2016) |
| 01/12/2016 | 16 | ANSWER to Complaint with Jury Demand by DISTRICT OF COLUMBIA, CATHY LANIER.(Naso, Chad) (Entered: 01/12/2016) |
| 01/15/2016 | 17 | NOTICE of Appearance by Deepak Gupta on behalf of EVERYTOWN FOR GUN SAFETY (Gupta, Deepak) (Entered: 01/15/2016) |
| 01/15/2016 | 18 | MOTION for Leave to File *Amicus Curiae Brief* by EVERYTOWN FOR GUN SAFETY (Attachments: # 1 Exhibit Amicus Brief, # 2 Appendix Appendix Part 1, # 3 Appendix Appendix Part 2, # 4 Appendix Appendix Part 3, # 5 Text of Proposed Order Proposed Order)(Gupta, Deepak) (Entered: 01/15/2016) |
| 01/15/2016 | 19 | Memorandum in opposition to re 6 MOTION for Preliminary Injunction *and/or* MOTION for Permanent Injunction filed by DISTRICT OF COLUMBIA, CATHY LANIER. (Attachments: # 1 Appendix, # 2 Text of Proposed Order)(Saindon, Andrew) (Entered: 01/15/2016) |
| 01/15/2016 | 20 | Memorandum in opposition (Corrected) to re 6 MOTION for Preliminary Injunction *and/or* MOTION for Permanent Injunction filed by DISTRICT OF COLUMBIA, CATHY LANIER. (Saindon, Andrew) Modified on 1/19/2016 (znmw). (Entered: 01/15/2016) |
| 01/19/2016 | | MINUTE ORDER granting 15 Motion for Leave to File Amicus Curiae Brief in Support of Plaintiffs by the NATIONAL RIFLE ASSOCIATION OF AMERICA, INC. It is hereby ORDERED that the motion is GRANTED. Signed by Judge Richard J. Leon on 1/19/16. (lcrjl2, ) (Entered: 01/19/2016) |

| 01/19/2016 | | MINUTE ORDER granting 18 Motion for Leave to File Amicus Curiae Brief in Support of Defendants by EVERYTOWN FOR GUN SAFETY. It is hereby ORDERED that the motion is GRANTED. Signed by Judge Richard J. Leon on 1/19/16. (lcrjl2, ) (Entered: 01/19/2016) |
|---|---|---|
| 01/19/2016 | 21 | AMICUS BRIEF by NATIONAL RIFLE ASSOCIATION OF AMERICA. (znmw) (Entered: 01/20/2016) |
| 01/19/2016 | 22 | AMICUS BRIEF by EVERYTOWN FOR GUN SAFETY. (Attachments: # 1 Appendix Part 1, # 2 Appendix Part 2, # 3 Appendix Part 3)(znmw) (Entered: 01/20/2016) |
| 01/20/2016 | | MINUTE SCHEDULING ORDER: It is hereby ORDERED that a hearing on plaintiffs' [Dkt. #6] Application for a Preliminary and/or Permanent Injunction shall be held before the undersigned on February 2, 2016 at 2:30 PM in Courtroom 18. It is further ORDERED that the following schedule shall govern the presentation of oral argument at the hearing: (1) each side shall have a total of 40 minutes; (2) each side may allocate up to 10 minutes of its time to amici; and (3) plaintiffs may reserve up to 10 minutes of their time for rebuttal. Signed by Judge Richard J. Leon on 1/20/16. (lcrjl2, ) (Entered: 01/20/2016) |
| 01/20/2016 | | Set/Reset Hearings: Preliminary Injunction Hearing set for 2/2/2016 at 02:30 PM in Courtroom 30A before Judge Richard J. Leon. (tb) (Entered: 01/20/2016) |
| 01/22/2016 | | Set/Reset Hearings: Preliminary Injunction Hearing set for 2/2/2016 at 02:30 PM in Courtroom 18 before Judge Richard J. Leon. (tb) (Entered: 01/22/2016) |
| 01/22/2016 | 23 | REPLY to opposition to motion re 6 MOTION for Preliminary Injunction *and/or* MOTION for Permanent Injunction filed by MATTHEW GRACE, PINK PISTOLS. (Attachments: # 1 Exhibit 1)(Cooper, Charles) (Entered: 01/22/2016) |
| 01/22/2016 | 24 | NOTICE of Appearance by Adam K. Levin on behalf of BRADY CENTER TO PREVENT GUN VIOLENCE (Levin, Adam) (Main Document 24 replaced on 1/25/2016) (znmw). (Entered: 01/22/2016) |
| 01/22/2016 | 25 | MOTION for Leave to File *Amicus Curiae Brief* by BRADY CENTER TO PREVENT GUN VIOLENCE (Attachments: # 1 Exhibit Amicus Brief, # 2 Exhibit Proposed Order)(Levin, Adam) (Entered: 01/22/2016) |
| 01/26/2016 | 26 | Unopposed MOTION to Reschedule PI Hearing by DISTRICT OF COLUMBIA, CATHY LANIER (Attachments: # 1 Text of Proposed Order)(Saindon, Andrew) (Entered: 01/26/2016) |
| 01/26/2016 | 27 | RESPONSE re 25 MOTION for Leave to File *Amicus Curiae Brief and Motion in the Alternative for Leave to File a Short Response Brief* filed by MATTHEW GRACE, PINK PISTOLS. (Attachments: # 1 Text of Proposed Order, # 2 Proposed Memorandum in Reponse, # 3 Text of Proposed Order)(Cooper, Charles) (Entered: 01/26/2016) |
| 01/26/2016 | 29 | MOTION for Leave to File Short Response Brief by MATTHEW GRACE, PINK PISTOLS. (See Docket Entry 27 to view document). (znmw) (Entered: 01/29/2016) |
| 01/27/2016 | | MINUTE ORDER: Upon consideration of the defendant's 26 Motion to Reschedule Hearing; it is hereby ordered that the motion is GRANTED IN PART; and it is further order that the preliminary injunction hearing will commence at 1:30 p.m. on |

| | | 02/02/16 before Judge Richard Judge Leon. SO ORDERED - Judge Richard J. Leon on 01/27/16. (tb) (Entered: 01/27/2016) |
|---|---|---|
| 01/28/2016 | 28 | RESPONSE re 27 and 29 Motion for Leave to File *Opposition to Motion for Leave to File Short Response* filed by DISTRICT OF COLUMBIA, CATHY LANIER. (Attachments: # 1 Text of Proposed Order)(Saindon, Andrew) Modified link on 1/29/2016 (znmw). (Entered: 01/28/2016) |
| 01/29/2016 | 30 | NOTICE of Appearance by Holly Michelle Johnson on behalf of All Defendants (Johnson, Holly) (Entered: 01/29/2016) |
| 01/29/2016 | | MINUTE ORDER granting 25 Motion for Leave to File Amicus Curiae Brief in Support of Defendants by BRADY CENTER TO PREVENT GUN VIOLENCE. It is hereby ORDERED that the motion is GRANTED. Signed by Judge Richard J. Leon on 1/29/2016. (lcrjl2, ) (Entered: 01/29/2016) |
| 01/29/2016 | | MINUTE ORDER granting 29 plaintiffs' Motion for Leave to File Short Response to the Brady Center to Prevent Gun Violence's Amicus Curiae Brief. It is hereby ORDERED that the motion is GRANTED. It is further ORDERED that [27-2] plaintiffs' proposed memorandum in response is deemed filed in the above-captioned case. Signed by Judge Richard J. Leon on 1/29/2016. (lcrjl2, ) (Entered: 01/29/2016) |
| 01/29/2016 | 31 | AMICUS BRIEF by BRADY CENTER TO PREVENT GUN VIOLENCE. (znmw) (Entered: 02/01/2016) |
| 01/29/2016 | 32 | RESPONSE re 31 Amicus Brief filed by MATTHEW GRACE, PINK PISTOLS. (znmw) (Entered: 02/01/2016) |
| 02/02/2016 | | Minute Entry: Motion Hearing held on 2/2/2016 before Judge Richard J. Leon re 6 MOTION for Preliminary Injunction and/or MOTION for Permanent Injunction filed by MATTHEW GRACE, PINK PISTOLS; Motion heard and taken under advisement. Parties may file supplemental briefs within two weeks from receipt of the transcript. Plaintiffs' motion for consolidation, if any, is due within two weeks of the hearing. (Court Reporter William Zaremba) (tb) Modified on 2/3/2016 (ztb). (Entered: 02/03/2016) |
| 02/04/2016 | | MINUTE ORDER. At the Hearing in this matter held on February 2, 2016, the Court allowed the parties to submit supplemental briefs within two (2) weeks of receipt of the transcript. Upon consideration thereof, it is ORDERED that the parties supplemental briefs may not exceed fifteen (15) pages in length. SO ORDERED. By Judge Richard J. Leon on 2/4/16. (jth) (Entered: 02/04/2016) |
| 02/10/2016 | 33 | TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS before Judge Richard J. Leon held on February 2, 2016; Page Numbers: 1-78. Date of Issuance: February 10, 2016. Court Reporter/Transcriber: William Zaremba; Telephone number: (202) 354-3249. Transcripts may be ordered by submitting the Transcript Order Form. <br><br> For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, PDF or ASCII) may be purchased from the court reporter. |

## JA 7

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 3/2/2016. Redacted Transcript Deadline set for 3/12/2016. Release of Transcript Restriction set for 5/10/2016.(wz) (Entered: 02/10/2016)

| | | |
|---|---|---|
| 02/11/2016 | 34 | NOTICE OF RELATED CASE by All Defendants. Case related to Case No. 15-162. (Naso, Chad) (Entered: 02/11/2016) |
| 02/11/2016 | 35 | RESPONSE re 34 Notice of Related Case filed by MATTHEW GRACE, PINK PISTOLS. (Cooper, Charles) (Entered: 02/11/2016) |
| 02/16/2016 | 36 | RESPONSE re 35 Response to Document filed by DISTRICT OF COLUMBIA, CATHY LANIER. (Saindon, Andrew) (Entered: 02/16/2016) |
| 02/16/2016 | 37 | MOTION To Consolidate the Preliminary Injunction Proceedings with the Determination on the Merits by MATTHEW GRACE, PINK PISTOLS (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Cooper, Charles) (Entered: 02/16/2016) |
| 02/24/2016 | 38 | MEET AND CONFER STATEMENT. (Attachments: # 1 Text of Proposed Order Defendants' Proposed Order, # 2 Text of Proposed Order Plaintiffs' Proposed Order) (Cooper, Charles) (Entered: 02/24/2016) |
| 02/24/2016 | 39 | SUPPLEMENTAL MEMORANDUM to *Defendants Opposition to Preliminary Injunction* filed by DISTRICT OF COLUMBIA, CATHY LANIER. (Attachments: # 1 Exhibit Founding Fathers statements, # 2 Exhibit Small Declaration, # 3 Exhibit Grace application)(Saindon, Andrew) (Entered: 02/24/2016) |
| 02/24/2016 | 40 | SUPPLEMENTAL MEMORANDUM to re 6 MOTION for Preliminary Injunction *and/or* MOTION for Permanent Injunction filed by MATTHEW GRACE, PINK PISTOLS. (Cooper, Charles) (Entered: 02/24/2016) |
| 03/04/2016 | 41 | Memorandum in opposition to re 37 MOTION To Consolidate the Preliminary Injunction Proceedings with the Determination on the Merits filed by DISTRICT OF COLUMBIA, CATHY LANIER. (Attachments: # 1 Declaration Rule 56(d), # 2 Text of Proposed Order)(Saindon, Andrew) (Entered: 03/04/2016) |
| 03/07/2016 | 42 | NOTICE OF SUPPLEMENTAL AUTHORITY by DISTRICT OF COLUMBIA, CATHY LANIER (Attachments: # 1 Exhibit Wrenn Order denying PI)(Saindon, Andrew) (Entered: 03/07/2016) |
| 03/14/2016 | 43 | REPLY to opposition to motion re 37 MOTION To Consolidate the Preliminary Injunction Proceedings with the Determination on the Merits filed by MATTHEW GRACE, PINK PISTOLS. (Cooper, Charles) (Entered: 03/14/2016) |
| 03/25/2016 | 44 | NOTICE OF SUPPLEMENTAL AUTHORITY by MATTHEW GRACE, PINK PISTOLS (Attachments: # 1 Exhibit 1 - Caetano v. Massachusetts)(Cooper, Charles) (Entered: 03/25/2016) |

**JA 8**

| 05/17/2016 | 45 | MEMORANDUM OPINION. Signed by Judge Richard J. Leon on 05/17/16. (tb) Modified on 5/17/2016 (tb). (Main Document 45 replaced on 5/17/2016) (jf). (Entered: 05/17/2016) |
|---|---|---|
| 05/17/2016 | 46 | ORDER: For the reason set forth in accompanying Memorandum Opinion entered this date, it is hereby ordered that the plaintiff's 6 Motion for Preliminary Injunction is GRANTED; and it is further ordered that plaintiff's 6 Motion for Permanent Injunction is DENIED WITHOUT PREJUDICE; and it is further ordered that plaintiff's 37 Motion to Consolidate the Preliminary Injunction Proceedings with the Determination on the Merits is DENIED. SEE ORDER FOR FULL DETALS. Signed by Judge Richard J. Leon on 05/17/16. (tb) (Entered: 05/17/2016) |
| 05/19/2016 | 47 | ENTERED IN ERROR.....NOTICE OF WITHDRAWAL OF APPEARANCE as to DISTRICT OF COLUMBIA, CATHY LANIER. Attorney Chad Alan Naso terminated. (Naso, Chad) Modified on 5/20/2016 (znmw). (Entered: 05/19/2016) |
| 05/19/2016 | 48 | MOTION to Stay re 46 Order on Motion for Miscellaneous Relief, Order on Motion for Preliminary Injunction, Order on Motion for Permanent Injunction,,,,,, 45 Memorandum & Opinion *and Motion for Immediate Administrative Stay* by DISTRICT OF COLUMBIA, CATHY LANIER (Attachments: # 1 Text of Proposed Order)(Saindon, Andrew) (Entered: 05/19/2016) |
| 05/20/2016 | | NOTICE OF ERROR re 47 Notice of Withdrawal of Appearance; emailed to chad.naso@dc.gov, cc'd 28 associated attorneys -- The PDF file you docketed contained errors: 1. Incorrect header/caption/case number, 2. Please refile document, 3. Entered in error; Incorrect case number and captionl; Please Refile. (znmw, ) (Entered: 05/20/2016) |
| 05/20/2016 | 49 | NOTICE *of Withdrawal of Chad A. Naso as counsel for defendants* by DISTRICT OF COLUMBIA, CATHY LANIER (Saindon, Andrew) (Entered: 05/20/2016) |
| 05/23/2016 | 50 | Memorandum in opposition to re 48 MOTION to Stay re 46 Order on Motion for Miscellaneous Relief, Order on Motion for Preliminary Injunction, Order on Motion for Permanent Injunction,,,,,, 45 Memorandum & Opinion *and Motion for Immediate Administrative Stay* filed by MATTHEW GRACE, PINK PISTOLS. (Attachments: # 1 Text of Proposed Order)(Cooper, Charles) (Entered: 05/23/2016) |
| 05/24/2016 | 51 | REPLY to opposition to motion re 48 MOTION to Stay re 46 Order on Motion for Miscellaneous Relief, Order on Motion for Preliminary Injunction, Order on Motion for Permanent Injunction,,,,,, 45 Memorandum & Opinion *and Motion for Immediate Administrative Stay* filed by DISTRICT OF COLUMBIA, CATHY LANIER. (Saindon, Andrew) (Entered: 05/24/2016) |
| 05/26/2016 | 52 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 46 Order on Motion for Miscellaneous Relief, Order on Motion for Preliminary Injunction, Order on Motion for Permanent Injunction,,,,,, 45 Memorandum & Opinion by CATHY LANIER, DISTRICT OF COLUMBIA. Fee Status: No Fee Paid. Parties have been notified. (Saindon, Andrew) (Entered: 05/26/2016) |
| 05/26/2016 | | USCA Case Number 16-7067 for 52 Notice of Appeal to DC Circuit Court, filed by DISTRICT OF COLUMBIA, CATHY LANIER. (vt) (Entered: 05/26/2016) |
| 05/27/2016 | 53 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the fee |

## JA 9

| | | was an Appeal by the DC Government re 52 Notice of Appeal to DC Circuit Court. (znmw) (Entered: 05/27/2016) |
| 05/27/2016 | | MINUTE ORDER denying 48 Motion to Stay. In light of the Court of Appeals' issuance this afternoon of an administrative stay of this Court's order granting plaintiffs' motion for a preliminary injunction, defendants' Motion to Stay is hereby DENIED AS MOOT. Signed by Judge Richard J. Leon on 5/27/2016. (lcrjl2, ) (Entered: 05/27/2016) |

## PACER Service Center

### Transaction Receipt

#### 06/08/2016 16:33:30

| PACER Login: | us7107:2656424:0 | Client Code: | |
| --- | --- | --- | --- |
| Description: | Docket Report | Search Criteria: | 1:15-cv-02234-RJL |
| Billable Pages: | 7 | Cost: | 0.70 |

**JA 10**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MATTHEW GRACE<br>1449 Lawrence Street, N.E.<br>Washington, D.C. 20017,<br><br>and<br><br>PINK PISTOLS<br>163 N. Whitehall Road<br>Jeffersonville, PA 19403,<br><br>       Plaintiffs,<br><br>   v.<br><br>DISTRICT OF COLUMBIA<br>Serve: Mayor Muriel Bowser<br>c/o Office of Attorney General<br>441 4th Street, N.W.<br>Washington, D.C. 20001,<br><br>and<br><br>CATHY LANIER, in her official capacity as<br>Chief of Police for the Metropolitan Police<br>Department<br>300 Indiana Avenue, N.W.<br>Washington, D.C. 20001,<br><br>       Defendants. | )<br>)<br>)<br>)<br>)  Civil Action No. 15-2234<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

NOW COME the Plaintiffs, MATTHEW GRACE and PINK PISTOLS, by and through

undersigned counsel, as and for their Complaint against Defendants the DISTRICT OF

COLUMBIA and CATHY LANIER, and state as follows:

      1.     In a recent appearance on the television show 60 Minutes, Defendant Lanier made

clear that swift civilian intervention may be the key to saving lives in a potential mass shooting

1

**JA 11**

incident: "If you're in a position to try and take the gunman down, to take the gunman out, it's the best option for saving lives before police can get there." Residents of the District of Columbia, however, are very unlikely to be in a position to intervene to stop an armed gunman or other violent criminal because the District of Columbia prohibits typical, law-abiding citizens from carrying firearms outside the home. Indeed, the District purports to limit the right to carry a firearm in public to individuals the District deems to have a "proper reason" to exercise this fundamental, constitutional right. And District law makes clear that the District does not consider the general desire of a law-abiding, responsible citizen to carry a firearm for self-defense to be a proper reason. The effect of the District's law thus is to strip law-abiding citizens of their right to bear arms. Plaintiffs bring this action to end this unconstitutional infringement of Second Amendment rights.

## THE PARTIES

2.      Plaintiff Matthew Grace is a citizen of the United States and a resident and citizen of Washington, D.C.

3.      Plaintiff Pink Pistols is a shooting group that honors diversity and is open to all shooters regardless of sexual orientation. There are dozens of Pink Pistols chapters located across the country. The organization advocates the use of lawfully owned, lawfully concealed carry firearms for the self-defense of the sexual minority community. Indeed, the formation of Pink Pistols was inspired by a statement by Jonathan Rauch published in Salon Magazine in 2000: "[H]omosexuals should embark on organized efforts to become comfortable with guns, learn to use them safely and carry them. They should set up Pink Pistols task forces, sponsor shooting courses and help homosexuals get licensed to carry. And they should do it in a way that gets as much publicity as possible." Pink Pistols believes that the right to bear arms is particularly

2

important for members of discriminated against minorities, as Justice Alito recognized in his controlling opinion in *McDonald v. City of Chicago*: "*Amici* supporting incorporation of the right to keep and bear arms contend that the right is especially important for women and members of other groups that may be especially vulnerable to violent crime." 561 U.S. 742, 790 & n.33 (2010) (citing, among other things, Brief for Pink Pistols et al. as *Amici Curiae* in *District of Columbia v. Heller*, O.T. 2007, No. 07-290). The District of Columbia's restrictive carry laws are a direct affront to Pink Pistols' central mission. Pink Pistols has members who reside in Washington, D.C.

4.      Defendant District of Columbia is a municipal entity organized under the Constitution and laws of the United States.

5.      Defendant Cathy Lanier is being sued solely in her official capacity as the Police Chief for the Metropolitan Police Department of the District of Columbia. Ms. Lanier is the head and chief of the police force and is responsible for enforcing the laws of the District of Columbia that are at issue in this lawsuit. *See* D.C. CODE §§ 5-127.03, 7-2509.11, and 22-4506.

## JURISDICTION

6.      Jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343.

7.      This action seeks relief pursuant to 28 U.S.C. §§ 2201 and 2202 and 42 U.S.C. §§ 1983 and 1988.

8.      Venue lies in this Court pursuant to 28 U.S.C. § 1391(b).

## BACKGROUND

9.      Before a recent decision of this Court, the District of Columbia generally banned law-abiding, responsible citizens from carrying firearms outside the home. In *Palmer v. District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014), however, this Court held that the District's ban

violated the Second Amendment. In response, the District enacted legislation creating a

concealed carry licensing system that continues to deny typical, law-abiding citizens the right to

carry firearms in public.

10.     District of Columbia law now provides that "[n]o person shall carry within the

District of Columbia either openly or concealed on or about their person, a pistol, *without a*

*license issued pursuant to District of Columbia law . . . .*" D.C. CODE § 22-4504(a) (emphasis

added). First-time offenders who violate this provision by carrying a handgun in public face up

to five years in prison. *Id.* § 22-4504(a)(1). District of Columbia law also generally prohibits the

carrying of a rifle or a shotgun in public. *Id.* § 22-4504(a-1).

11.     Chief Lanier "may" issue a concealed carry license only "if it appears that the

applicant has good reason to fear injury to his or her person or property or has any other proper

reason for carrying a pistol . . . ." *Id.* § 22-4506(a). Thus, while Chief Lanier apparently is in no

event *required* to issue a concealed carry license, she may only exercise her discretion to *grant* a

license if she deems the "proper reason" requirement satisfied.

12.     Furthermore, the District of Columbia does not consider a typical, law-abiding

citizen to have a "proper reason" for carrying a handgun. Indeed, the law expressly directs Chief

Lanier to issue rules establishing that the phrase "good reason to fear injury to his or her

person . . . shall at a minimum require a showing of a *special need for self-protection*

*distinguishable from the general community* as supported by evidence of specific threats or

previous attacks that demonstrate a special danger to the applicant's life." *Id.* § 7-2509.11(1)(A)

(emphasis added). Similarly, the phrase "any other proper reason for carrying a concealed

pistol . . . shall at a minimum include types of employment that require the handling of cash or

4

other valuable objects that may be transported upon the applicant's person." *Id.* § 7-2509.11(1)(B).

13.     According to these provisions, typical, law-abiding citizens effectively remain subject to a flat ban on carrying firearms outside the home. This conclusion is reinforced by the following rules issued by Chief Lanier:

- "A person shall demonstrate a good reason to fear injury to his or her person by **showing a special need for self-protection distinguishable from the general community** as supported by evidence of specific threats or previous attacks which demonstrate a special danger to the applicant's life." D.C. MUN. REGS. tit. 24, § 2333.1 (emphasis added).

- "For the purposes of satisfying the specifications of § 2333.1, a person shall allege, in writing, **serious threats of death or serious bodily harm, any attacks on his or her person, or any theft of property from his or her person**. The person shall also allege that the threats are of a nature that the legal possession of a pistol is necessary as a reasonable precaution against the apprehended danger." *Id.* § 2333.2 (emphasis added).

- "The person shall provide all evidence of contemporaneous reports to the police of such threats or attacks, and disclose whether or not the applicant has made a sworn complaint to the police or the courts of the District of Columbia concerning any threat or attack." *Id.* § 2333.3.

- "**The fact that a person resides in or is employed in a high crime area shall not by itself establish a good reason to fear injury to person or property for the issuance of a concealed carry license.**" *Id.* § 2333.4 (emphasis added).

5

- "A person may allege any other proper reason that the Chief may accept for

  obtaining a concealed carry license which may include: (a) Employment of a type

  that requires the handling of large amounts of cash or other highly valuable

  objects that must be transported upon the applicant's person; or (b) The need for a

  parent, son, daughter, sibling, or other adult member of the immediate family to

  provide protection of a family member who is physically or mentally

  incapacitated to a point where he or she cannot act in defense of himself or

  herself, and the family member who is physically or mentally incapacitated can

  demonstrate a good reason to fear injury to his or her person by showing a special

  need for self-protection distinguishable from the general community as supported

  by evidence of specific threats or previous attacks which demonstrate a special

  danger to the applicant's life in the manner described in § 2333." *Id.* § 2334.1.

14.     These limitations are further reflected in the application form for a concealed

carry license. For example, the application form states that "an applicant must demonstrate that

either they have good reason to fear injury to himself or herself or property or they have another

proper reason for carrying a concealed pistol." And an attachment to the application form makes

clear that "[p]ursuant to District of Columbia law, the fact that you live or work in a high crime

area shall not by itself establish a good reason to fear injury to yourself or your property for the

issuance of a concealed carry license."

15.     In summary, the District of Columbia restricts concealed-carry licenses to

individuals the District deems to have a "proper reason" to carry a firearm in public, and the

District does not consider the general desire to carry a firearm for self-defense to be a "proper

reason." The result is that typical, law-abiding citizens of the District of Columbia effectively are

6

**JA 16**

barred from carrying firearms in public, a result that cannot be squared with the rights guaranteed by the Second Amendment.

## STATEMENT OF FACTS

16.     Plaintiff Matthew Grace is a law-abiding, responsible, adult resident of the District of Columbia. He attended school in the District at Gonzaga College High School and The Catholic University of America. Mr. Grace works as a financial advisor and he also is an owner of a company that owns and manages rental real estate in the District. He is a member of Pink Pistols.

17.     Mr. Grace owns four handguns that are lawfully registered with the District of Columbia. He keeps these handguns in his home, and he desires to carry them outside the home for self-defense. Mr. Grace has completed the firearms training that is required to obtain a District of Columbia concealed carry license.

18.     Although Mr. Grace does not face specific threats that differentiate him from the typical, law-abiding citizen, many events have confirmed that his desire to carry a firearm for self-defense is well-founded. For example, on one occasion gun shots were fired in front of his home; four shell casings were found directly in front of his home on the sidewalk. There was a person carrying a firearm in his neighborhood robbing people at gunpoint who was never caught. And his wife was robbed on a public street in the District in broad daylight.

19.     Despite his desire to carry a firearm to protect himself outside the home, Mr. Grace refrains from doing so for fear of being prosecuted, convicted, and imprisoned for violating the District of Columbia's laws making carrying a firearm in public a crime. Because he has concealed carry permits issued by Virginia and Utah, and in light of state reciprocity rules, Mr. Grace lawfully may carry a firearm in the majority of the States in the United States.

7

But because of the District of Columbia's unconstitutional restrictions on carrying firearms, he cannot do so in his own city.

20.　　In August 2015, Mr. Grace applied for a District of Columbia concealed carry license. Because Mr. Grace does not have a "special need for self-protection distinguishable from the general community" or any other "proper reason" to carry a firearm under District of Columbia law, in the space provided to support his application Mr. Grace cited the Second Amendment right to carry a firearm.

21.　　Mr. Grace's application was denied on October 19, 2015. The denial letter stated that he had failed to "[d]emonstrate a good reason to fear injury to person or property, or other proper reason for a concealed carry license": "Specifically the applicant did not meet the minimum requirement of showing: 'a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks that demonstrate a special danger to the applicant's life,' . . . and did not demonstrate '[e]mployment of a type that requires the handling of large amounts of cash or other highly valuable objects that must be transported upon the applicant's person.' "

22.　　No reason was given for the denial of Mr. Grace's application other than the failure to meet the "proper reason" requirement. Mr. Grace meets all of the other requirements for a concealed carry license, and but for the "proper reason" requirement he would qualify for one.

23.　　In light of the District's denial of his application, Mr. Grace continues to refrain from carrying a firearm outside the home for self-defense in the District. Mr. Grace would carry a firearm in public for self-defense in the District were it lawful for him to do so.

8

**JA 18**

## COUNT ONE

### (U.S. CONST. amend. II, 42 U.S.C. § 1983)

24.    Plaintiffs hereby reallege and incorporate by reference the allegations of each of the preceding paragraphs.

25.    Mr. Grace lawfully owns firearms, and but for the District of Columbia laws and regulations set forth above, he forthwith would carry those firearms outside the home for self-defense.

26.    Mr. Grace applied for a concealed carry license, but his application was denied solely because he failed to satisfy the District of Columbia's restrictive "proper reason" requirement.

27.    At least one member of Pink Pistols has had an application for a carry license denied solely for failure to satisfy the "proper reason" requirement. But for the District of Columbia laws and regulations set forth above, at least one member of Pink Pistols forthwith would carry a firearm outside the home for self-defense.

28.    The Second Amendment guarantees to law-abiding, responsible, adult citizens the fundamental constitutional right to bear arms outside the home, and that right cannot be subjected to the unfettered discretion of a government official or to whether a government official believes they have a "proper reason" to exercise that right. The denial of Second Amendment rights caused by the District's "proper reason" requirement inflicts irreparable harm on law-abiding, responsible citizens including Mr. Grace.

29.    The aforementioned District of Columbia laws and regulations, both facially and as applied to Mr. Grace and members of Pink Pistols, violate the Second Amendment and therefore are invalid.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Honorable Court:

A.     Enter a declaratory judgment that the District of Columbia's concealed carry laws violate the Second Amendment to the extent they grant discretion to deny licenses to individuals who meet the eligibility requirements;

B.     Enter a declaratory judgment that the District of Columbia's "proper reason" requirement for issuance of a concealed carry license violates the Second Amendment;

C.     Enter an injunction forbidding Defendants and their officers, agents, and employees from denying concealed carry licenses to applicants who meet the eligibility requirements;

D.     Enter an injunction forbidding Defendants and their officers, agents, and employees from enforcing the District of Columbia's laws and regulations establishing and further defining the "proper reason" requirement, including D.C. CODE §§ 22-4506(a) and 7-2509.11 and D.C. MUN. REGS. tit. 24, §§ 2332.1, 2333.1, 2333.2, 2333.3, 2333.4, and 2334.1, to deny concealed carry licenses to applicants who desire to carry a handgun in public for self-defense and other lawful purposes;

E.     Enter an injunction directing Defendants and their officers, agents, and employees to issue concealed carry licenses to Mr. Grace and to members of Pink Pistols who, apart from the "proper reason" requirement, are otherwise eligible for a concealed carry license;

F.     Enter an Order awarding Plaintiffs their costs of suit including attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and,

G.     Enter an Order providing any other and further relief that the Court deems just and appropriate.

Dated:  December 22, 2015

Respectfully submitted,

s/ David H. Thompson
David H. Thompson (Bar No. 450503)
Peter A. Patterson (Bar No. 998668)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600

*Attorneys for Plaintiffs*

11

**JA 21**

# EXHIBIT 1

No. 15-2234

## CIVIL COVER SHEET

JS-44 (Rev. 7/13 DC)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Matthew Grace<br>Pink Pistols | District of Columbia<br>Cathy Lanier |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF __11001__<br>(EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT __11001__<br>(IN U.S. PLAINTIFF CASES ONLY)<br>NOTE: IN LAND CONDEMNATION CASES USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
|---|---|

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)<br><br>Cooper & Kirk, PLLC<br>1523 New Hampshire Ave., NW<br>Washington, DC 20036<br>(202) 220-9600 | ATTORNEYS (IF KNOWN) |
|---|---|

### II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

◉ 3 Federal Question (U.S. Government Not a Party)

○ 2 U.S. Government Defendant

○ 4 Diversity (Indicate Citizenship of Parties in item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

### IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place an X in one category, A-N, that best represents your Cause of Action and one in a corresponding Nature of Suit)

**○ A. Antitrust**

☐ 410 Antitrust

**○ B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability
☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**Other Statutes**
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**◉ E. General Civil (Other)  OR  ○ F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 27 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Conditions
☐ 560 Civil Detainee – Conditions of Confinement

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant)
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 690 Other

**Other Statutes**
☐ 375 False Claims Act
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation
☐ 462 Naturalization Application
☐ 465 Other Immigration Actions
☐ 470 Racketeer Influenced & Corrupt Organization

☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 850 Securities/Commodities/ Exchange
☐ 896 Arbitration
☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
☒ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act)

## JA 23

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/Privacy Act* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus – General<br>☐ 510 Motion/Vacate Sentence<br>☐ 463 Habeas Corpus – Alien Detainee | ☐ 442 Civil Rights – Employment (criteria: race, gender/sex, national origin, discrimination, disability, age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loan (excluding veterans) |
| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 740 Labor Railway Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 440 Other Civil Rights<br>☐ 445 Americans w/Disabilities – Employment<br>☐ 446 Americans w/Disabilities – Other<br>☐ 448 Education | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights – Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi-district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

Challenge to D.C. law based on Second Amendment of U.S. Constitution and 42 U.S.C. § 1983.

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** **JURY DEMAND:** | Check YES only if demanded in complaint YES ☐  NO ☒ |
|---|---|---|---|

| **VIII. RELATED CASE(S) IF ANY** | (See instruction) | YES ☐  NO ☒ | If yes, please complete related case form See Attachment |
|---|---|---|---|

| DATE: 12/22/2015 | SIGNATURE OF ATTORNEY OF RECORD   s/ David H. Thompson |
|---|---|

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
**Authority for Civil Cover Sheet**

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and services of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the cover sheet.

I.     COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff if resident of Washington, DC. 88888 if plaintiff is resident of United States but not Washington, DC, and 99999 if plaintiff is outside the United States.

III.     CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.     CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of the case.

VI.     CAUSE OF ACTION: Cite the U.S. Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.     RELATED CASE(S), IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

**JA 24**

## ATTACHMENT TO CIVIL COVER SHEET

Plaintiffs' counsel is aware of another case pending in this district challenging the District of Columbia's concealed carry laws: *Wrenn v. District of Columbia*, No. 1:15-cv-00162-FJS. That case, however, has different plaintiffs than this one and involves the denials of different concealed carry applications. Furthermore, to the extent Plaintiffs' case could be deemed related to *Wrenn*, it should not be assigned to the judge presiding over that case. The *Wrenn* case is assigned to the Honorable Frederick J. Scullin, Jr., a senior judge from the Northern District of New York. The D.C. Circuit recently held that Judge Scullin lacks jurisdiction over *Wrenn* because it was not among the specific and enumerated cases he was designated to hear in this district. *See Wrenn v. District of Columbia*, -- F.3d --, 2015 WL 8746334 (D.C. Cir. Dec. 15, 2015). Plaintiffs' case, of course, likewise is not on that list.

# EXHIBIT 2

No. 15-2234

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MATTHEW GRACE and )
PINK PISTOLS, )
     )
        Plaintiffs, )
     )   Civil Action No. 15-2234
       v. )
     )
DISTRICT OF COLUMBIA and )
CATHY LANIER, in her official capacity as )
Chief of Police for the Metropolitan Police )
Department, )
     )
        Defendants. )

## CORPORATE DISCLOSURE STATEMENT

I, the undersigned, counsel of record for Pink Pistols, certify that to the best of my knowledge and belief, Pink Pistols is an unincorporated association, has no stock, and has no parent companies, subsidiaries, or affiliates.

These representations are made in order that judges of this Court may determine the need for recusal.

Dated:  December 22, 2015

                         Respectfully submitted,

                         s/ David H. Thompson
                         David H. Thompson (Bar No. 450503)
                         COOPER & KIRK, PLLC
                         1523 New Hampshire Avenue, N.W.
                         Washington, D.C. 20036
                         (202) 220-9600
                         (202) 220-9601 (fax)
                         dthompson@cooperkirk.com

                         *Attorney for Pink Pistols*

# EXHIBIT 3

No. 15–2234

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MATTHEW GRACE and<br>PINK PISTOLS, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 15-2234 (RJL) |
| v. | ) | |
| | ) | |
| DISTRICT OF COLUMBIA and<br>CATHY LANIER, in her official capacity as<br>Chief of Police for the Metropolitan Police<br>Department, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

### DECLARATION OF MATTHEW GRACE

I, Matthew Grace, am competent to state, and declare the following based on my personal knowledge:

1.     I am a citizen of the United States and a resident of Washington, D.C.

2.     I am a law-abiding, responsible person over 21 years of age. I attended school in the District at Gonzaga College High School and The Catholic University of America. I work as a financial advisor and I am also an owner of a company that owns and manages rental real estate in the District. I am a member of Pink Pistols.

3.     I am fully qualified to possess handguns under federal and District of Columbia law. I currently own four handguns that are lawfully registered with the District of Columbia. I keep these handguns in my home, and I desire to carry them outside the home for self-defense. I have completed the firearms training that is required to obtain a District of Columbia concealed carry license.

4.      I hold concealed carry permits issued by Virginia and Utah. In light of State reciprocity rules, I lawfully may carry a firearm in the majority of the States in the United States. But because of the District of Columbia's restrictions on carrying firearms, I cannot do so in my home city, the District of Columbia.

5.      On one occasion, gun shots were fired in front of my home and four shell casings were found directly in front of my home on the sidewalk. There was a person carrying a firearm in my neighborhood robbing people at gunpoint who was never caught. My wife was robbed on a public street in the District in broad daylight.

6.      I currently refrain from carrying a firearm for fear of being prosecuted, convicted, and imprisoned for violating the District of Columbia's laws making carrying a firearm in public a crime.

7.      In August 2015, I applied for a District of Columbia concealed carry license. I did not then, and do not now, have a "special need for self-protection distinguishable from the general community" or any other "proper reason" to carry a firearm, as defined by District of Columbia laws. In the space provided to support my application, I cited the Second Amendment right to carry a firearm.

8.      The District denied my application on October 19, 2015. A true and correct copy of the letter denying my concealed carry application is attached as Exhibit 4 to the application for a preliminary injunction.

9.      The denial letter stated that I had failed to "[d]emonstrate a good reason to fear injury to person or property, or other proper reason for a concealed carry license."  The letter stated: "Specifically the applicant did not meet the minimum requirement of showing: 'a special need for self-protection distinguishable from the general community as supported by evidence of

2

**JA 30**

specific threats or previous attacks that demonstrate a special danger to the applicant's life,' . . . and did not demonstrate '[e]mployment of a type that requires the handling of large amounts of cash or other highly valuable objects that must be transported upon the applicant's person.' "

10.     No reason was given for the denial of my application other than the failure to meet the "proper reason" requirement. I meet all of the other requirements for a concealed carry license.

11.     In light of the District's denial of my application, I continue to refrain from carrying a firearm outside the home for self-defense in the District. I would carry a firearm in public for self-defense in the District were it lawful for me to do so.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __23rd__ day of December, 2015 in __Washington__, __DC__.

_____
Matthew Grace

# EXHIBIT 4

No. 15–2234



# Concealed Carry Pistol License Application
## Notice of Denial

Metropolitan Police Department · Firearms Registration · 300 Indiana Ave, NW · Washington, DC 20001 · (202) 727-4275

## Applicant Information

| Grace | Matthew | J. | |
|---|---|---|---|
| *Last Name* | *First Name* | *Middle Initial* | |
| **1449 Lawrence Street, NE** | **Washington** | **DC** | **20017** |
| *Home Street Address* | *City* | *State* | *ZIP Code* |

October 19, 2015

Dear applicant:

The Firearms Regulations Control Act of 1975, (D.C. Official Code § 7-2501 et seq.), and Chapter 23 (Guns and Other Weapons) of Title 24 (Public Space and Safety) of the District of Columbia Municipal Regulations (DCMR), establish the qualifications and procedures for the issuance of a license to carry a concealed pistol. Based on these criteria, your application has been **denied**. The applicant did not:

     Meet the basic eligibility requirements for registering a firearm or obtaining a license to carry a concealed pistol.

     Meet the standards of suitability required to obtain a concealed carry license.

XX     Demonstrate a good reason to fear injury to person or property, or other proper reason for a concealed carry license.

Specifically, the applicant did not meet the minimum requirement of showing: "a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks that demonstrate a special danger to the applicant's life," (D.C. Official Code § 7-2509.11(1)(A)) and did not demonstrate "Employment of a type that requires the handling of large amounts of cash or other highly valuable objects that must be transported upon the applicant's person." (D.C. Official Code § 7-2509.11(1)(B)) , therefore the applicant did not receive further consideration.

You may appeal this decision by submitting a written request to the Concealed Pistol Licensing Review Board to review the decision within fifteen (15) days after receipt of this notice. The request should be mailed to: *Office of the City Administrator, Concealed Pistol Licensing Review Board // 1350 Pennsylvania Avenue, NW, Suite 513 // Washington, DC 20004*. Details of this process are included in the enclosed materials.

Scanned by CamScanner

# EXHIBIT 5

No. 15–2234

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MATTHEW GRACE and<br>PINK PISTOLS,<br><br>       Plaintiffs,<br><br>    v.<br><br>DISTRICT OF COLUMBIA and<br>CATHY LANIER, in her official capacity as<br>Chief of Police for the Metropolitan Police<br>Department,<br><br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 15-2234 (RJL) |

## DECLARATION OF GWENDOLYN S. PATTON

I, Gwendolyn S. Patton, am competent to state, and declare the following based on my personal knowledge:

1.     I am an adult citizen of the United States and a resident of Pennsylvania. I am the First Speaker of Pink Pistols and am authorized to speak on behalf of the organization. I submit this declaration in support of Pink Pistols' motion for a preliminary injunction in this case.

2.     Pink Pistols was established in 2000. Pink Pistols is a shooting group that honors diversity and is open to all shooters regardless of sexual orientation. There are dozens of Pink Pistols chapters located across the country, including Dallas, New York City, Northern Virginia, San Francisco, Seattle, and Las Vegas, among other locations.

3.     Pink Pistols advocates the use of lawfully owned, lawfully concealed carry firearms for the self-defense of the sexual minority community. Pink Pistols believes that the right to bear arms is particularly important for members of discriminated against minorities.

1

**JA 35**

4.     The formation of Pink Pistols was inspired by a statement by Jonathan Rauch published in Salon Magazine in 2000: "[H]omosexuals should embark on organized efforts to become comfortable with guns, learn to use them safely and carry them. They should set up Pink Pistols task forces, sponsor shooting courses and help homosexuals get licensed to carry. And they should do it in a way that gets as much publicity as possible."

5.     The District of Columbia's restrictive carry laws are a direct affront to Pink Pistols' central mission.

6.     Pink Pistols has members who reside in Washington, D.C., including Matthew Grace.

7.     At least one member of Pink Pistols has had an application for a carry license denied solely for failure to satisfy the "proper reason" requirement. But for the District of Columbia laws and regulations set forth above, at least one member of Pink Pistols forthwith would carry a firearm outside the home for self-defense.


I declare under penalty of perjury that the foregoing is true and correct.


Executed this _23_ day of December, 2015 in _Jeffersonville, PA_.


_____
Gwendolyn S. Patton

2

**JA 36**

# EXHIBIT 6

No. 15–2234



# Concealed Carry Pistol License Application

## Metropolitan Police Department

Firearms Registration Section · 300 Indiana Avenue, NW · Washington, DC 20001 · 202-727-4275

## Applicant Information

Last Name | First Name | Middle Name

Home Street Address | City | State | ZIP Code

Occupation /Name of Business

If Applying as a Business Owner: Business/Occupation Street Address | City | State | ZIP Code

Home Phone Number | Work Phone Number | Email Address (Optional)

Date of Birth (mm/dd/yyyy) | Place of Birth

Driver's License State & ID Number or Other Government-Issued Photo Identification Description & ID Number

Sex | Race | Height | Weight | Eye Color | Hair Color

## Statement of Eligibility

**Please answer each of the following questions by marking the appropriate box.**

1. ☐Yes ☐No   Have you ever been convicted of a crime of violence, weapons offense, any other violation of the Firearms Control Regulation Act of 1975, or a felony in any jurisdiction (including any crime punishable by imprisonment for a term exceeding one year)?

2. ☐Yes ☐No   Are you under indictment for a crime of violence or a weapons offense?

3. ☐Yes ☐No   Have you been convicted within the past five years for a narcotics or dangerous drug offense, a threat to do bodily harm, or for assault?

4. ☐Yes ☐No   Have you been acquitted of any criminal charge by reason of insanity or adjudicated a chronic alcoholic by any court within the past five years?

5. ☐Yes ☐No   Have you been voluntarily or involuntarily committed to any mental hospital or institution within the past five years?

6. ☐Yes ☐No   Do you suffer from any physical defect that would make it unsafe for you to possess and use a firearm safely and responsibly?

**JA 38**

7. ☐ Yes ☐ No    Have you been found negligent in any firearm related mishap causing death or injury to another person?

8. ☐ Yes ☐ No    Have you provided accurate and true facts on this application?

9. ☐ Yes ☐ No    Have you ever been dishonorably discharged from the U.S. Armed Forces?

10. ☐ Yes ☐ No   Were you a citizen of the United States who has renounced his or her citizenship?

11. ☐ Yes ☐ No   Are you legally blind? (Legally blind means your vision is not impaired more than 20/200 visual acuity in the better eye, or your vision cannot be improved to be better than 20/200, or you do not have a loss of vision due wholly or in part to impairment of field vision or to other factors which affect the usefulness of vision to a like degree. If the Firearms Registration Section determines there are reasonable grounds to believe that the certification provided is not accurate, you may be required to obtain a certification from a licensed optometrist that you meet the vision requirements as stated above.)

12. ☐ Yes ☐ No   Have you been convicted of two or more violations for driving under the influence within the past five years?

13. ☐ Yes ☐ No   Have you been the subject of a civil protection order within the past five years?

14. ☐ Yes ☐ No   Have you been convicted of a misdemeanor intrafamily offense?

15. ☐ Yes ☐ No   Are you an alcoholic, addict, or habitual user of a controlled dangerous substance?

*If you answer yes to any of the next five questions, you must attach the additional documentation as described on the Instructions form.*

16. ☐ Yes ☐ No   Are you seeking to register a pistol concurrently with this application?

17. ☐ Yes ☐ No   Do you currently suffer – or have you suffered in the past five years – from any mental illness or condition that creates a substantial risk that you are a danger to yourself or others?

18. ☐ Yes ☐ No   Do you have a bona fide residence in the District of Columbia?

19. ☐ Yes ☐ No   Do you have a bona fide place of business in the District of Columbia?

20. ☐ Yes ☐ No   Do you have a bona fide residence or place of business in the United States and are licensed to carry a concealed pistol by another State?

## Firearms Training Background

1. Have you completed at least 16 hours of training from an MPD-certified firearms training instructor?
   ☐ Yes    ☐ No

2. Have you completed at least two hours of range training from an MPD-certified firearms training instructor?
   ☐ Yes    ☐ No

3. Have you completed training in District of Columbia laws on firearms and self-defense? (There is no exemption from this requirement.)
   ☐ Yes    ☐ No

**If you answered "Yes" to <u>all</u> three questions above, you can skip the next three questions.**

4. Are you requesting an exemption from the firearms training course requirements in either Question 1 or 2 above?
   ☐ Yes    ☐ No

5. Which requirement(s) are you requesting an exemption:
   ☐ 16 hours of firearms training    ☐ 2 hours of range training

6. If you answered "No" to Question 4, do you intend to complete the firearms training requirements within 45 days if your application is preliminarily approved by MPD?
   ☐ Yes    ☐ No

**JA 39**

## Basis for Request for a Concealed Carry Pistol

Under District law, an applicant must demonstrate that either they have good reason to fear injury to himself or herself or property or they have another proper reason for carrying a concealed pistol.

***Please check the box below that is the basis of your application and attach the additional documentation as described on the Instructions form.***

☐ **Good reason to fear injury to person or property**: You fear injury to yourself and can show a special need for self-protection, such as evidence of specific threats or previous attacks which demonstrate a special danger to your life.

☐ **Other proper reason to carry a concealed pistol**: Your employment requires that you handle large amounts of cash or valuables that you must transport on your person. Or you are the adult member of a family that needs to provide protection for a family member who is physically or mentally incapacitated to a point where he or she cannot act in defense of himself or herself or his or her property.

## Authorization to Disclose Mental Health Records

If you checked "Yes" on Question 17 on page 2 of this application, you must authorize the D.C. Department of Behavioral Health, or any other similar agency or department of another state, to disclose to the Metropolitan Police Department information on whether you: (1) Suffer from a mental disorder and have a history of violence; or (2) Have been voluntarily or involuntarily committed to a mental health facility or an institution that provides treatment or services for individuals with mental disorders.

By signing here, you hereby make the authorization stated in the preceding paragraph.

_____          _____
Applicant's signature                                                     Date

## Applicant Affirmation

In signing this Concealed Carry Pistol License Application, I am affirming under oath each of the following declarations:

- I have provided true and accurate information in this document and any supporting documents attached to this application.
- I understand that any knowing material omission or false statement made by or provided by me as part of this application may be considered grounds for denial of a concealed carry license or revocation for a license falsely obtained.
- I understand that making a false statement is punishable by criminal penalties under D.C. Official Code § 22-2405.
- I am not prohibited under federal or District of Columbia law (or the law of the state of my residence) from possessing a firearm.
- I shall be responsible for compliance with all federal and District of Columbia laws, rules, regulations, and procedures that are applicable to a Concealed Carry Pistol License.

_____          _____
Applicant's signature                                                     Date

## JA 40



# Concealed Carry Pistol License Application
## Basis for Request for a Concealed Carry Pistol

**Metropolitan Police Department · Firearms Registration Section · 300 Indiana Avenue, NW
Washington, DC 20001 · 202-727-4275**

## Applicant Information

| | | |
|---|---|---|
| *Last Name* | *First Name* | *Middle Name* |

| | | | |
|---|---|---|---|
| *Home Street Address* | *City* | *State* | *ZIP Code* |

District of Columbia law requires you to demonstrate either that: (1) you have good reason to fear injury to yourself or your property; or (2) you have another proper reason for carrying a concealed pistol.

## Demonstration of Good Reason to Fear Injury to Person or Property

To demonstrate a good reason to fear injury to yourself, you must:

- Show a special need for self-protection distinguishable from the general community, as supported by evidence of specific threats or previous attacks which demonstrate a special danger to your life.
- Allege serious threats of death or serious bodily harm, any attacks on yourself, or any theft of property from your person.
- Allege that the threats are of a nature that the legal possession of a pistol is necessary as a reasonable precaution against the apprehended danger.
- Provide all evidence of contemporaneous reports to the police of such threats or attacks, and disclose whether or not you made a sworn complaint to the police or the courts of the District of Columbia concerning any threat or attack.

***Pursuant to District of Columbia law, the fact that you live or work in a high crime area shall not by itself establish a good reason to fear injury to yourself or your property for the issuance of a concealed carry license.***

You can also include any supporting statements from third parties, **but the statements must be made under oath and before a notary**.

## Demonstration of Other Proper Reason for a Concealed Carry License

This may include: (1) employment of a type that requires the handling of large amounts of cash or other highly valuable objects that must be transported on your person; or (2) the need for you to provide protection of a family member who is physically or mentally incapacitated to a point where that family member cannot act in defense of himself or herself, or his or her property. You can include any documents (such as police reports or court documents) and/or personal statements to demonstrate that you have a proper reason to be issued a Concealed Carry License.

**You may provide a separate document with your personal statement or you may use the reverse side of this document. If you use the reverse side of this document to have a third party provide their statement, their statement must be made under oath, before a notary, and signed by the notary, including the notary's seal.**

## Statement

Name of person applying for a Concealed Carry Pistol License: _____

Name of Person providing this statement: _____

Signature of person providing this statement: _____

Date: _____

**JA 42**

# EXHIBIT 7

No. 15–2234

0091-4169/95/8601-0150
THE JOURNAL OF CRIMINAL LAW & CRIMINOLOGY
Copyright © 1995 by Northwestern University, School of Law

Vol. 86, No. 1
Printed in U.S.A.

# ARMED RESISTANCE TO CRIME: THE PREVALENCE AND NATURE OF SELF-DEFENSE WITH A GUN*

## GARY KLECK
## MARC GERTZ

### I. INTRODUCTION

Crime victims used to be ignored by criminologists. Then, begin-ning slowly in the 1940s and more rapidly in the 1970s, interest in the victim's role in crime grew. Yet a tendency to treat the victim as either a passive target of another person's wrongdoing or as a virtual accom-plice of the criminal limited this interest. The concept of the victim-precipitated homicide[1] highlighted the possibility that victims were not always blameless and passive targets, but that they sometimes initi-ated or contributed to the escalation of a violent interaction through their own actions, which they often claimed were defensive.

Perhaps due to an unduly narrow focus on lower-class male-on-male violence, scholars have shown little openness to the possibility that a good deal of "defensive" violence by persons claiming the moral status of a victim may be just that. Thus, many scholars routinely as-sumed that a large share of violent interactions are "mutual combat" involving two blameworthy parties who each may be regarded as both offender and victim. The notion that much violence is one-sided and that many victims of violence are largely blameless is dismissed as naive.

A few criminologists have rejected the simplistic mutual combat model of violence, though they sometimes limit its rejection to a few special subtypes of violence, especially family violence, rape, and, more generally, violence of men against women and of adults against

---

* The authors wish to thank David Bordua, Gary Mauser, Seymour Sudman, and James Wright for their help in designing the survey instrument. The authors also wish to thank the highly skilled staff responsible for the interviewing: Michael Trapp (Supervisor), David Antonacci, James Belcher, Robert Bunting, Melissa Cross, Sandy Hawker, Dana R. Jones, Harvey Langford, Jr., Susannah R. Maher, Nia Mastin-Walker, Brian Murray, Miranda Ross, Dale Sellers, Esty Zervigon, and for sampling work, Sandy Grguric.

[1] MARVIN E. WOLFGANG, PATTERNS IN CRIMINAL HOMICIDE 245 (1958).

Copyright © 2004   All Rights Reserved

children.[2] However, the more one looks, the more exceptions become evident, such as felony killings linked with robberies, burglaries, or sexual assaults, contract killings, mass killings, serial murders, and homicides where the violence is one-sided. Indeed, it may be more accurate to see the mutual combat common among lower-class males to be the exception rather than the rule. If this is so, then forceful actions taken by victims are easier to see as genuinely and largely defensive.

Once one turns to defensive actions taken by the victims of property crimes, it is even easier to take this view. There are few robberies, burglaries, larcenies, or auto thefts where it is hard to distinguish offender from victim or to identify one of the parties as the clear initiator of a criminal action and another party as a relatively legitimate responder to those initiatives. The traditional conceptualization of victims as either passive targets or active collaborators overlooks another possible victim role, that of the active resister who does not initiate or accelerate any illegitimate activity, but uses various means of resistance for legitimate purposes, such as avoiding injury or property loss.

Victim resistance can be passive or verbal, but much of it is active and forceful. Potentially, the most consequential form of forceful resistance is armed resistance, especially resistance with a gun. This form of resistance is worthy of special attention for many reasons, both policy-related and scientific. The policy-related reasons are obvious: if self-protection with a gun is commonplace, it means that any form of gun control that disarms large numbers of prospective victims, either altogether, or only in certain times and places where victimization might occur, will carry significant social costs in terms of lost opportunities for self-protection.

On the other hand, the scientific reasons are likely to be familiar only to the relatively small community of scholars who study the consequences of victim self-protection: the defensive actions of crime victims have significant effects on the outcomes of crimes, and the effects of armed resistance differ from those of unarmed resistance. Previous research has consistently indicated that victims who resist with a gun or other weapon are less likely than other victims to lose their property in robberies[3] and in burglaries.[4] Consistently, research also has

---

[2] Richard A. Berk et al., *Mutual Combat and Other Family Violence Myths*, in THE DARK SIDE OF FAMILIES 197 (David Finkelhor et al. eds., 1983).

[3] *See generally* MICHAEL J. HINDELANG, CRIMINAL VICTIMIZATION IN EIGHT AMERICAN CITIES (1976); Gary Kleck, *Crime Control Through the Private Use of Armed Force*, 35 SOC. PROBS. 1 (1988); Gary Kleck & Miriam A. DeLone, *Victim Resistance and Offender Weapon Effects in Robbery*, 9 J. QUANTITATIVE CRIMINOLOGY 55 (1993); Eduard A. Ziegenhagen & Dolores

Copyright © 2001. All Rights Reserved.

indicated that victims who resist by using guns or other weapons are less likely to be injured compared to victims who do not resist or to those who resist without weapons. This is true whether the research relied on victim surveys or on police records, and whether the data analysis consisted of simple cross-tabulations or more complex multivariate analyses. These findings have been obtained with respect to robberies[5] and to assaults.[6] Cook[7] offers his unsupported personal opinion concerning robbery victims that resisting with a gun is only prudent if the robber does not have a gun. The primary data source on which Cook relies flatly contradicts this opinion. National Crime Victimization Survey (NCVS) data indicate that even in the very disadvantageous situation where the robber has a gun, victims who resist with guns are still substantially less likely to be injured than those who resist in other ways, and even slightly less likely to be hurt than those who do not resist at all.[8]

With regard to studies of rape, although samples typically include too few cases of self-defense with a gun for separate analysis, McDermott,[9] Quinsey and Upfold,[10] Lizotte,[11] and Kleck and Sayles[12] all found that victims who resisted with some kind of weapon were less likely to have the rape attempt completed against them. Findings concerning the impact of armed resistance on whether rape victims suffer additional injuries beyond the rape itself are less clear, due to a lack of information on whether acts of resistance preceded or followed the rapist's attack. The only two rape studies with the necessary sequence information found that forceful resistance by rape victims usually follows, rather than precedes, rapist attacks inflicting additional injury, undercutting the proposition that victim resistance increases the likelihood that the victim will be hurt.[13] This is consistent with findings on robbery and assault.[14]

---

Brosnan, *Victim Responses to Robbery and Crime Control Policy*, 23 CRIMINOLOGY 675 (1985).

[4] *See generally* Philip J. Cook, *The Technology of Personal Violence*, 14 CRIME & JUST.: ANN. REV. RES. 1, 57 (1991).

[5] Ziegenhagen & Brosnan, *supra* note 3; Kleck *supra* note 3; Kleck & DeLone, *supra* note 3.

[6] Kleck, *supra* note 3.

[7] Cook, *supra* note 4, at 58.

[8] Kleck & DeLone, *supra* note 3, at 75.

[9] JOAN M. MCDERMOTT, RAPE VICTIMIZATION IN 26 AMERICAN CITIES (1979).

[10] Quinsey & Upfold, *Rape Completion and Victim Injury as a Function of Female Resistance Strategy*, 17 CAN. J. BEHAV. SCI. 40 (1985).

[11] Alan J. Lizotte, *Determinants of Completing Rape and Assault*, 2 J. QUANTITATIVE CRIMINOLOGY 203 (1986).

[12] Gary Kleck & Susan Sayles, *Rape and Resistance*, 37 SOC. PROBS. 149 (1990).

[13] Quinsey & Upfold, *supra* note 10, at 46-47. *See generally* Sarah E. Ullman & Raymond A. Knight, *Fighting Back: Women's Resistance to Rape*, 7 J. INTERPERSONAL VIOLENCE 31 (1992).

[14] *See* Kleck, *supra* note 3, at 9.

Copyright © 2001. All Rights Reseved.

## II. The Prevalence of Defensive Gun Use (DGU) in Previous Surveys

### A. The National Crime Victimization Survey (NCVS)

However consistent the evidence may be concerning the effectiveness of armed victim resistance, there are some who minimize its significance by insisting that it is rare.[15] This assertion is invariably based entirely on a single source of information, the National Crime Victimization Survey (NCVS).

Data from the NCVS imply that each year there are only about 68,000 defensive uses of guns in connection with assaults and robberies,[16] or about 80,000 to 82,000 if one adds in uses linked with household burglaries.[17] These figures are less than one ninth of the estimates implied by the results of at least thirteen other surveys, summarized in Table 1, most of which have been previously reported.[18] The NCVS estimates imply that about 0.09 of 1% of U.S. households experience a defensive gun use (DGU) in any one year, compared to the Mauser survey's estimate of 3.79% of households over a five year period, or about 0.76% in any one year, assuming an even distribution over the five year period, and no repeat uses.[19]

The strongest evidence that a measurement is inaccurate is that it is inconsistent with many other independent measurements or observations of the same phenomenon; indeed, some would argue that this is ultimately the *only* way of knowing that a measurement is wrong. Therefore, one might suppose that the gross inconsistency of the NCVS-based estimates with all other known estimates, each derived from sources with no known flaws even remotely substantial enough to account for nine-to-one, or more, discrepancies, would be sufficient to persuade any serious scholar that the NCVS estimates are unreliable.

Apparently it is not, since the Bureau of Justice Statistics continues to disseminate their DGU estimates as if they were valid,[20] and scholars continue to cite the NCVS estimates as being at least as rea-

---

[15] Cook, *supra* note 4; David McDowall & Brian Wiersema, *The Incidence of Defensive Firearm Use by U.S. Crime Victims, 1987 Through 1990*, 84 Am. J. Pub. Health 1982 (1994); Understanding and Preventing Violence 265 (Albert J. Reiss & Jeffrey A. Roth eds., 1993).

[16] Kleck, *supra* note 3, at 8.

[17] Cook, *supra* note 4, at 56; Michael R. Rand, Bureau of Justice Statistics, Guns and Crime (Crime Data Brief) (1994).

[18] *See* Kleck, *supra* note 3, at 3; Gary Kleck, Point Blank: Guns and Violence in America 146 (1991).

[19] Gary A. Mauser, Firearms and Self-Defense: The Canadian Case, Presented at the Annual Meetings of the American Society of Criminology (Oct. 28, 1993).

[20] Rand, *supra* note 17.

Copyright © 2001. All Rights Reseved.

sonable as those from the gun surveys.[21]  Similarly, the editors of a
report on violence conducted for the prestigious National Academy of
Sciences have uncritically accepted the validity of the NCVS estimate
as being at least equal to that of all of the alternative estimates.[22]  In
effect, even the National Academy of Sciences gives no more weight to
estimates from numerous independent sources than to an estimate
derived from a single source which is, as explained below, singularly
ill-suited to the task of estimating DGU frequency.

This sort of bland and spurious even-handedness is misleading.
For example, Reiss and Roth withheld from their readers that there
were at least *nine* other estimates contradicting the NCVS-based esti-
mate; instead they vaguely alluded only to "a number of surveys,"[23] as
did Cook,[24] and they downplayed the estimates from the other surveys
on the basis of flaws which they only speculated those surveys *might*
have.  Even as speculations, these scholars' conjectures were conspicu-
ously one-sided, focusing solely on possible flaws whose correction
would bring the estimate down, while ignoring obvious flaws, such as
respondents (Rs) forgetting or intentionally concealing DGUs, whose
correction would push the estimate up.  Further, the speculations,
even if true, would be wholly inadequate to account for more than a
small share of the enormous nine-to-one or more discrepancy be-
tween the NCVS-based estimates and all other estimates.  For exam-
ple, the effects of telescoping can be completely cancelled out by the
effects of memory loss and other recall failure, and even if they are
not, they cannot account for more than a tiny share of a discrepancy
of nine-to-one or more.

Equally important, those who take the NCVS-based estimates seri-
ously have consistently ignored the most pronounced limitations of
the NCVS for estimating DGU frequency.  The NCVS is a nona-
nonymous national survey conducted by a branch of the federal gov-
ernment, the U.S. Bureau of the Census.  Interviewers identify
themselves to Rs as federal government employees, even displaying, in
face-to-face contacts, an identification card with a badge.  Rs are told
that the interviews are being conducted on behalf of the U.S. Depart-
ment of Justice, the law enforcement branch of the federal govern-
ment.  As a preliminary to asking questions about crime victimization
experiences, interviewers establish the address, telephone number,
and full names of all occupants, age twelve and over, in each house-

---

[21] Cook, *supra* note 4, at 56; McDowall & Wiersema, *supra* note 15.

[22] UNDERSTANDING AND PREVENTING VIOLENCE, *supra* note 15, at 265-66.

[23] *Id.* at 265.

[24] Cook, *supra* note 4, at 54.

Copyright © 2001  All Rights Reserved

hold they contact.[25]  In short, it is made very clear to Rs that they are, in effect, speaking to a law enforcement arm of the federal government, whose employees know exactly who the Rs and their family members are, where they live, and how they can be recontacted.

Even under the best of circumstances, reporting the use of a gun for self-protection would be an extremely sensitive and legally controversial matter for either of two reasons. As with other forms of forceful resistance, the defensive act itself, regardless of the characteristics of any weapon used, might constitute an unlawful assault or at least the R might believe that others, including either legal authorities or the researchers, could regard it that way. Resistance with a gun also involves additional elements of sensitivity. Because guns are legally regulated, a victim's possession of the weapon, either in general or at the time of the DGU, might itself be unlawful, either in fact or in the mind of a crime victim who used one. More likely, lay persons with a limited knowledge of the extremely complicated law of either self-defense or firearms regulation are unlikely to know for sure whether their defensive actions or their gun possession was lawful.

It is not hard for gun-using victims interviewed in the NCVS to withhold information about their use of a gun, especially since they are *never directly asked whether they used a gun for self-protection.* They are asked only general questions about whether they did anything to protect themselves.[26]  In short, Rs are merely given the opportunity to volunteer the information that they have used a gun defensively. All it takes for an R to conceal a DGU is to simply refrain from mentioning it, i.e., to leave it out of what may be an otherwise accurate and complete account of the crime incident.

Further, Rs in the NCVS are not even asked the general self-protection question unless they already independently indicated that they had been a victim of a crime. This means that any DGUs associated with crimes the Rs did not want to talk about would remain hidden. It has been estimated that the NCVS may catch less than one-twelfth of spousal assaults and one-thirty-third of rapes,[27] thereby missing nearly all DGUs associated with such crimes.

In the context of a nonanonymous survey conducted by the fed-

[25]  U.S. BUREAU OF THE CENSUS, NATIONAL CRIME SURVEY: INTERVIEWER'S MANUAL, NCS-550, PART D - HOW TO ENUMERATE NCS (1986).

[26]  U.S. BUREAU OF JUSTICE STATISTICS, CRIMINAL VICTIMIZATION IN THE UNITED STATES 1992, at 128 (1994).

[27]  Colin Loftin & Ellen J. MacKenzie, Building National Estimates of Violent Victimization 21-23 (April 1-4, 1990) (unpublished background paper prepared for the Symposium on the Understanding and Control of Violent Behavior, sponsored by the National Research Council).

Copyright © 2001. All Rights Reseved.

eral government, an R who reports a DGU may believe that he is placing himself in serious legal jeopardy. For example, consider the issue of the location of crimes. For all but a handful of gun owners with a permit to carry a weapon in public places (under 4% of the adult population even in states like Florida, where carry permits are relatively easy to get)[28], the mere possession of a gun in a place other than their home, place of business, or in some states, their vehicle, is a crime, often a felony. In at least ten states, it is punishable by a punitively mandatory minimum prison sentence.[29] Yet, 88% of the violent crimes which Rs reported to NCVS interviewers in 1992 were committed away from the victim's home,[30] i.e., in a location where it would ordinarily be a crime for the victim to even possess a gun, never mind use it defensively. Because the question about location is asked before the self-protection questions,[31] the typical violent crime victim R has already committed himself to having been victimized in a public place before being asked what he or she did for self-protection. In short, Rs usually could not mention their defensive use of a gun without, in effect, confessing to a crime to a federal government employee.

Even for crimes that occurred in the victim's home, such as a burglary, possession of a gun would still often be unlawful or of unknown legal status; because the R had not complied with or could not be sure he had complied with all legal requirements concerning registration of the gun's acquisition or possession, permits for purchase, licensing of home possession, storage requirements, and so on. In light of all these considerations, it may be unrealistic to assume that more than a fraction of Rs who have used a gun defensively would be willing to report it to NCVS interviewers.

The NCVS was not designed to estimate how often people resist crime using a gun. It was designed primarily to estimate national victimization levels; it incidentally happens to include a few self-protection questions which include response categories covering resistance with a gun. Its survey instrument has been carefully refined and evaluated over the years to do as good a job as possible in getting people to report illegal things which *other* people have done *to* them. This is the exact opposite of the task which faces anyone trying to get good DGU estimates—to get people to admit controversial and possibly illegal

---

[28] Patrick Blackman, Carrying Handguns for Personal Protection 31 (1985) (unpublished paper presented at the annual meetings of the American Society of Criminology) (Nov. 13-16, 1985); KLECK, *supra* note 18, at 412.

[29] Kent M. Ronhovde & Gloria P. Sugars, *Survey of Select State Firearm Control Laws, in* FEDERAL REGULATION OF FIREARMS 204-05 (H. Hogan ed., 1982) (report prepared for the U.S. Senate Judiciary Committee by the Congressional Research Service).

[30] U.S. BUREAU OF JUSTICE STATISTICS, *supra* note 26, at 75.

[31] *Id.* at 124, 128.

Copyright © 2001. All Rights Reserved.

things which the *Rs themselves have done.* Therefore, it is neither surprising, nor a reflection on the survey's designers, to note that the NCVS is singularly ill-suited for estimating the prevalence or incidence of DGU. It is not credible to regard this survey as an acceptable basis for establishing, in even the roughest way, how often Americans use guns for self-protection.

## B. THE GUN SURVEYS

At least thirteen previous surveys have given a radically different picture of the frequency of DGUs. The surveys, summarized in Table 1, can be labelled the "gun surveys" because they were all, at least to some extent, concerned with the ownership and use of guns. Some were primarily devoted to this subject, while others were general purpose opinion surveys which happened to include some questions pertaining to guns. They are an extremely heterogeneous collection, some conducted by academic researchers for scholarly purposes, others by commercial polling firms. Moreover, their sponsors differed; some were sponsored by pro-gun control organizations (Cambridge Reports, Hart), others were sponsored by anti-control organizations (DMIa, DMIb), while still others were paid for by news media organizations, governments, or by research grants awarded to independent academics.

None of the surveys were meant as exclusive studies of DGU. Indeed, they each contained only one or two questions on the subject. Consequently, none of them are very thorough or satisfactory for estimating DGU frequency, even though they otherwise seem to have been conducted quite professionally. Some of the surveys were flawed by asking questions that used a lifetime recall period ("Have you ever . . .?"), making it impossible to estimate uses within any specified time span.[32] Some surveys limited coverage to registered voters, while others failed to exclude defensive uses against animals, or occupational uses by police officers, military personnel, or private security guards.[33] Some asked the key questions with reference only to the R, while others asked Rs to report on the experiences of all of the members of their households, relying on second-hand reports.[34] Methodological research on the NCVS indicates that substantially fewer crime incidents are reported when one household member reports for all household members than when each person is interviewed separately about their own experiences.[35] The same should also be true of those

---

[32] *See* Table 1, row labelled "Time Span of Use."

[33] *Id.* at row labelled "Excluded military, police uses."

[34] *Id.* at row labelled "Defensive question refers to."

[35] U.S. BUREAU OF JUSTICE STATISTICS, *supra* note 26, at 144.

Copyright © 2001. All Rights Reseved.

crime incidents that involve victims using guns.

The least useful of the surveys did not even ask the defensive use question of all Rs, instead it asked it only of gun owners, or, even more narrowly, of just handgun owners or just those who owned handguns for protection purposes.[36] This procedure was apparently based on the dubious assumption that people who used a gun defensively no longer owned the gun by the time of the survey, or that the gun belonged to someone else, or that the R owned the gun for a reason other than protection or kept it outside the home.

Most importantly, the surveys did not ask enough questions to establish exactly what was done with the guns in reported defensive use incidents. At best, some of the surveys only established whether the gun was fired. The lack of such detail raises the possibility that the guns were not actually "used" in any meaningful way. Instead, Rs might be remembering occasions on which they merely carried a gun for protection "just in case" or investigated a suspicious noise in their backyard, only to find nothing.

Nevertheless, among these imperfect surveys, two were relatively good for present purposes. Both the Hart survey in 1981 and the Mauser survey in 1990 were national surveys which asked carefully worded questions directed at all Rs in their samples. Both surveys excluded uses against animals and occupational uses. The two also nicely complemented each other in that the Hart survey asked only about uses of handguns, while the Mauser survey asked about uses of all gun types. The Hart survey results implied a minimum of about 640,000 annual DGUs involving handguns, while the Mauser results implied about 700,000 involving any type of gun.[37] It should be stressed, contrary to the claims of Reiss and Roth,[38] that neither of these estimates entailed the use of "dubious adjustment procedures." The percent of sample households reporting a DGU was simply multiplied by the total number of U.S. households, resulting in an estimate of DGU-involved households. This figure, compiled for a five year period, was then divided by five to yield a per-year figure.

In effect, each of the surveys summarized in Table 1 was measuring something different; simple estimates derived from each of them is not comparable in any straight-forward way. The figures in the bottom row reflect adjustments designed to produce estimates which are

---

[36] CAMBRIDGE REPORTS, INC., AN ANALYSIS OF PUBLIC ATTITUDES TOWARDS HANDGUN CONTROL (1978); THE OHIO STATISTICAL ANALYSIS CENTER, OHIO CITIZEN ATTITUDES CONCERNING CRIME AND CRIMINAL JUSTICE (1982); H. Quinley, Memorandum reporting results from Time/CNN Poll of Gun Owners, dated Feb. 6, 1990 (1990).

[37] KLECK, *supra* note 18, at 106-07.

[38] UNDERSTANDING AND PREVENTING VIOLENCE, *supra* note 15, at 266.

## JA 52

Copyright © 2004 All Rights Reserved

roughly comparable across surveys. The adjustments were based on a single standard, the Mauser survey. That is, all survey results were adjusted to approximate what they would have been had the surveys all been, like the Mauser survey, national surveys of noninstitutionalized U.S. adult residents in 1990, using the same question Mauser used. The question was addressed to all Rs; it concerned the experiences of all household members; it pertained to the use of any type of gun; and it excluded uses against animals. The full set of adjustments is explained in detail elsewhere.[39]

Eleven of the surveys permitted the computation of a reasonable adjusted estimate of DGU frequency. Two surveys for which estimates could not be produced were the Cambridge Reports and the Time/CNN. Neither asked the DGU question of all Rs; thus, it would be sheer speculation what the responses would have been among those Rs not asked the DGU question. All of the eleven surveys yielded results that implied over 700,000 uses per year. None of the surveys implied estimates even remotely like the 65,000 to 82,000 figures derived from the NCVS. To date, there has been no confirmation of even the most approximate sort of the NCVS estimates. Indeed, no survey has ever yielded an estimate which is of the same magnitude as those derived from the NCVS.

However, even the best of the gun surveys had serious problems. First, none of them established how many times Rs used a gun defensively within the recall period. It was necessary to conservatively assume that each DGU-involved person or household experienced only one DGU in the period, a figure which is likely to be an underestimation. Second, although the Mauser and Hart surveys were the best available surveys in other respects, they asked Rs to report for their entire households, rather than speaking only for themselves. Third, while these two surveys did use a specific recall period, it was five years, which encouraged a greater amount of both memory loss and telescoping. The longer the recall period, the more memory loss predominates over telescoping as a source of response error,[40] supporting the conclusion that a five year recall period probably produces a net underreporting of DGUs. Fourth, while the surveys all had acceptably large samples by the standards of ordinary national surveys, mostly in the 600 to 1500 range, they were still smaller than one would prefer for estimating a phenomenon which is fairly rare. While on average the sample size has no effect on the point estimate of DGU

---

[39] Gary Kleck, Guns and Self-Defense (1994) (unpublished manuscript on file with the School of Criminology and Criminal Justice, Florida State University, Tallahassee, FL).

[40] Seymour Sudman & Norman M. Bradburn, *Effects of Time and Memory Factors on Response in Surveys*, 68 J. AM. STAT. ASS'N 808 (1973).

Copyright © 2001. All Rights Reseved.

frequency, it will affect the amount of sampling error. Finally, none of the surveys established exactly what Rs did with their guns in reported DGUs, making it impossible to be certain that they were actually used in any meaningful way. In sum, while the gun surveys are clearly far superior to the NCVS for estimating DGU frequency, they have significant shortcomings. These are discussed in greater detail elsewhere.[41]

It was the goal of the research reported here to remedy those flaws, to develop a credible estimate of DGU frequency, and to learn something about the nature of DGU incidents and the people who defend themselves with guns.

### C. THE NATIONAL SELF-DEFENSE SURVEY

#### 1. Methods

The present survey is the first survey ever devoted to the subject of armed self-defense. It was carefully designed to correct all of the known correctable or avoidable flaws of previous surveys which critics have identified. We use the most anonymous possible national survey format, the anonymous random digit dialed telephone survey. We did not know the identities of those who were interviewed, and made this fact clear to the Rs. We interviewed a large nationally representative sample covering all adults, age eighteen and over, in the lower forty-eight states and living in households with telephones.[42] We asked DGU questions of all Rs in our sample, asking them separately about both their own DGU experiences and those of other members of their households. We used both a five year recall period and a one year recall period. We inquired about uses of both handguns and other types of guns, and excluded occupational uses of guns and uses against animals. Finally, we asked a long series of detailed questions designed to establish exactly what Rs did with their guns; for example, if they had confronted other humans, and how had each DGU connected to a specific crime or crimes.

We consulted with North America's most experienced experts on gun-related surveys, David Bordua, James Wright, and Gary Mauser, along with survey expert Seymour Sudman, in order to craft a state-of-the-art survey instrument designed specifically to establish the frequency and nature of DGUs.[43] A professional telephone polling firm,

---

[41] Kleck, *supra* note 39.

[42] Completed interviews, n=4,977.

[43] *See, e.g.,* DAVID J. BORDUA ET AL., ILLINOIS LAW ENFORCEMENT COMMISSION, PATTERNS OF FIREARMS OWNERSHIP, REGULATION AND USE IN ILLINOIS (1979); SEYMORE SUDMAN & NORMAN BRADBURN, RESPONSE EFFECTS IN SURVEYS (1974); JAMES WRIGHT & PETER ROSSI, ARMED AND CONSIDERED DANGEROUS (1986); Alan J. Lizotte & David J. Bordua, *Firearms Ownership for Sport and Protection,* 46 AM. SOC. REV. 499 (1980); Gary Mauser, *A Comparison of Canadian*

Copyright © 2001 All Rights Reseved.

Research Network of Tallahassee, Florida, carried out the sampling and interviewing. Only the firm's most experienced interviewers, who are listed in the acknowledgements, were used on the project. Interviews were monitored at random by survey supervisors. All interviews in which an alleged DGU was reported by the R were validated by supervisors with call-backs, along with a 20% random sample of all other interviews. Of all eligible residential telephone numbers called where a person rather than an answering machine answered, 61% resulted in a completed interview. Interviewing was carried out from February through April of 1993.

The quality of sampling procedures was well above the level common in national surveys. Our sample was not only large and nationally representative, but it was also stratified by state. That is, forty-eight independent samples of residential telephone numbers were drawn, one from each of the lower forty-eight states, providing forty-eight independent, albeit often small, state samples. Given the nature of randomly generated samples of telephone numbers, there was no clustering of cases or multistage sampling as there is in the NCVS;[44] consequently, there was no inflation of sampling error due to such procedures. To gain a larger raw number of sample DGU cases, we oversampled in the south and west regions, where previous surveys have indicated gun ownership is higher.[45] We also oversampled within contacted households for males, who are more likely to own guns and to be victims of crimes in which victims might use guns defensively.[46] Data were later weighted to adjust for oversampling.

Each interview began with a few general "throat-clearing" questions about problems facing the R's community and crime. The interviewers then asked the following question: "Within the past *five years*, have you yourself or another member of your household *used* a gun, even if it was not fired, for self-protection or for the protection of property at home, work, or elsewhere? Please do *not* include military service, police work, or work as a security guard." Rs who answered "yes" were then asked: "Was this to protect against an animal or a person?" Rs who reported a DGU against a person were asked: "How many incidents involving defensive uses of guns against persons happened to members of your household in the past five years?" and "Did this incident [any of these incidents] happen in the *past twelve*

---

and American Attitudes Towards Firearms, 32 CAN. J. CRIMINOLOGY 573 (1990); Gary Mauser, 'Sorry, Wrong Number': Why Media Polls on Gun Control Are Often Unreliable, 9 POL. COMM. 69 (1992); Mauser, supra note 16.

[44] U.S. BUREAU OF JUSTICE STATISTICS, supra note 26, at 141-42.

[45] KLECK, supra note 18, at 57.

[46] Id. at 56.

Copyright © 2001. All Rights Reseved.

*months?*" At this point, Rs were asked "Was it *you* who used a gun defensively, or did someone else in your household do this?"

All Rs reporting a DGU were asked a long, detailed series of questions establishing exactly what happened in the DGU incident. Rs who reported having experienced more than one DGU in the previous five years were asked about their most recent experience. When the original R was the one who had used a gun defensively, as was usually the case, interviewers obtained his or her firsthand account of the event. When the original R indicated that some other member of the household was the one who had the experience, interviewers made every effort to speak directly to the involved person, either speaking to that person immediately or obtaining times and dates to call back. Up to three call-backs were made to contact the DGU-involved person. We anticipated that it would sometimes prove impossible to make contact with these persons, so interviewers were instructed to always obtain a proxy account of the DGU from the original R, on the assumption that a proxy account would be better than none at all. It was rarely necessary to rely on these proxy accounts—only six sample cases of DGUs were reported through proxies, out of a total of 222 sample cases.

While all Rs reporting a DGU were given the full interview, only a one-third random sample of Rs not reporting a DGU were interviewed. The rest were simply thanked for their help. This procedure helped keep interviewing costs down. In the end, there were 222 completed interviews with Rs reporting DGUs, another 1,610 Rs not reporting a DGU but going through the full interview by answering questions other than those pertaining to details of the DGUs. There were a total of 1,832 cases with the full interview. An additional 3,145 Rs answered only enough questions to establish that no one in their household had experienced a DGU against a human in the previous five years (unweighted totals). These procedures effectively undersampled for non-DGU Rs or, equivalently, oversampled for DGU-involved Rs. Data were also weighted to account for this oversampling.

Questions about the details of DGU incidents permitted us to establish whether a given DGU met all of the following qualifications for an incident to be treated as a genuine DGU: (1) the incident involved defensive action against a human rather than an animal, but not in connection with police, military, or security guard duties; (2) the incident involved actual contact with a person, rather than merely investigating suspicious circumstances, etc.; (3) the defender could state a specific crime which he thought was being committed at the time of the incident; (4) the gun was actually used in some way—at a minimum it had to be used as part of a threat against a person, either by

Copyright © 2004. All Rights Reseved.

verbally referring to the gun (e.g., "get away—I've got a gun") or by pointing it at an adversary. We made no effort to assess either the lawfulness or morality of the Rs' defensive actions.

An additional step was taken to minimize the possibility of DGU frequency being overstated. The senior author went through interview sheets on every one of the interviews in which a DGU was reported, looking for any indication that the incident might not be genuine. A case would be coded as questionable if even just one of four problems appeared: (1) it was not clear whether the R actually confronted any adversary he saw; (2) the R was a police officer, member of the military or a security guard, and thus might have been reporting, despite instructions, an incident which occurred as part of his occupational duties; (3) the interviewer did not properly record exactly what the R had done with the gun, so it was possible that he had not used it in any meaningful way; or (4) the R did not state or the interviewer did not record a specific crime that the R thought was being committed against him at the time of the incident. There were a total of twenty-six cases where at least one of these problematic indications was present. It should be emphasized that we do not know that these cases were *not* genuine DGUs; we only mean to indicate that we do not have as high a degree of confidence on the matter as with the rest of the cases designated as DGUs. Estimates using all of the DGU cases are labelled herein as "*A*" estimates, while the more conservative estimates based only on cases devoid of any problematic indications are labelled "*B*" estimates.

### 2.  *Results*

Table 2 displays a large number of estimates of how often guns are used defensively. These estimates are not inconsistent with each other; they each measure different things in different ways. Some estimates are based only on incidents which Rs reported as occurring in the twelve months preceding the interview, while others are based on incidents reported for the preceding five years. Both telescoping and recall failure should be lower with a one year recall period, so estimates derived from this period should be superior to those based on the longer recall period. Some estimates are based only on incidents which Rs reported as involving themselves, (person-based estimates), while others were based on all incidents which Rs reported as involving anyone in their household (household-based estimates). The person-based estimates should be better because of its first-hand character. Finally, some of the figures pertain only to DGUs involving use of handguns, while others pertain to DGUs involving any type of gun.

Copyright © 2001. All Rights Reseved.

The methods used to compute the Table 2 estimates are very simple and straight-forward. Prevalence ("% Used") figures were computed by dividing the weighted sample frequencies in the top two rows of numbers by the total weighted sample size of 4,977. The estimated number of persons or households who experienced a DGU, listed in the third and fourth rows, was then computed by multiplying these prevalence figures by the appropriate U.S. population base, age eighteen and over for person-based estimates, and the total number of households for household-based estimates. Finally, the estimated number of defensive uses was computed by multiplying the number of DGU-involved persons or households by the following estimates of the number of all-guns DGU incidents per DGU-involved person or household, using a past-five-years recall period: person-based, A—1.478; person-based, B—1.472; household-based, A—1.531; household-based, B—1.535. We did not establish how many DGUs occurred in the past year, and for past-five-years DGUs, we did not separately establish how many of the DGUs involved handguns and how many involved other types of guns. Therefore, for all past-year estimates, and for past-five-years handgun estimates, it was necessary to conservatively assume that there was only one DGU per DGU-involved person or household.

The most technically sound estimates presented in Table 2 are those based on the shorter one-year recall period that rely on Rs' firsthand accounts of their own experiences (person-based estimates). These estimates appear in the first two columns. They indicate that each year in the U.S. there are about 2.2 to 2.5 million DGUs of all types by civilians against humans, with about 1.5 to 1.9 million of the incidents involving use of handguns.

These estimates are larger than those derived from the best previous surveys, indicating that technical improvements in the measurement procedures have, contrary to the expectations of Cook,[47] Reiss and Roth,[48] and McDowall and Wiersema,[49] *increased* rather than decreased estimates of the frequency that DGUs occur. Defensive gun use is thus just another specific example of a commonplace pattern in criminological survey work, which includes victimization surveys, self-report surveys of delinquency, surveys of illicit drug use, etc.: the better the measurement procedures, the higher the estimates of controversial behaviors.[50]

The present estimates are higher than earlier ones primarily due

[47] Cook, *supra* note 4.
[48] UNDERSTANDING AND PREVENTING VIOLENCE, *supra* note 15.
[49] McDowall & Wiersema, *supra* note 15.
[50] *See, e.g.,* MICHAEL HINDELANG ET AL., MEASURING DELINQUENCY (1981).

Copyright © 2001. All Rights Reseved.

to three significant improvements in the present survey: (1) a shorter recall period; (2) reliance on person-based information rather than just household-based information; and (3) information on how many household DGUs had been experienced in the recall period by those Rs reporting any such experiences. Using a shorter recall period undoubtedly reduced the effects of memory loss by reducing the artificial shrinkage to which earlier estimates were subject. Although telescoping was also undoubtedly reduced, and this would, by itself, tend to reduce estimates, the impact of reducing telescoping was apparently smaller than the impact of reducing case loss due to forgetting. Evidence internal to this survey directly indicates that a one year recall period yields larger estimates than a five year recall period; compare figures in the right half of Table 2 with their counterparts in the left half. This phenomenon, where less behavior is reported for a longer recall period than would be expected based on results obtained when using a shorter period, also has been observed in surveys of self-reported use of illicit drugs.[51]

Furthermore, basing estimates on Rs reports about DGUs in which they were personally involved also increases the estimates. One of the surprises of this survey was how few Rs were willing to report a DGU which involved some other member of their household. Eighty-five percent of the reports of DGUs we obtained involved the original R, the person with whom the interviewer first spoke. Given that most households contain more than one adult eligible to be interviewed, it was surprising that in a DGU-involved household the person who answered the phone would consistently turn out to be the individual who had been involved in the DGU. Our strong suspicion is that many Rs feel that it is not their place to tell total strangers that some other member of their household has used a gun for self-protection. Some of them are willing to tell strangers about an incident in which they were themselves involved, but apparently few are willing to "inform" on others in their household. Still others may not have been aware of DGUs involving other household members. Evidence internal to the present survey supports this speculation, since person-based estimates are 66 to 77% higher than household-based estimates; a figure that suggests that there was more complete reporting of DGUs involving the original respondent than those involving other household members.[52] For this reason, previous surveys including those which yielded only household-based estimates, four of the six gun surveys which yielded usable annual estimates, and all of those which

---

[51] *See* Jerald Bachman & Patrick O'Malley, *When Four Months Equal a Year: Inconsistencies in Student Reports of Drug Use*, 45 PUB. OPINION Q. 536, 539, 543 (1981).

[52] *See* Table 2.

Copyright © 2001. All Rights Reseved.

were national in scope, probably substantially underestimated DGUs.

We also had information on the number of times that DGU-involved households had experienced DGUs during the five year recall period. While it was necessary in computing previous estimates to conservatively assume that each DGU-involved person or household had experienced only one DGU, our evidence indicates that repeat experiences were not uncommon, with 29.5% of DGU-involved households reporting more than one DGU within the previous five years. The average number of DGUs in this time span was 1.5 per DGU-involved household. This information alone could account for a roughly 50% increase in DGU incidence estimates based on the five year recall period.

Finally, our survey was superior to the NCVS in two additional ways: it was free of the taint of being conducted by, and on behalf of, employees of the federal government, and it was completely anonymous.

It would be incorrect to say that the present estimates are inconsistent with those derived from the earlier gun surveys. Avoiding apples-and-oranges comparisons, compare figures from Table 2 with earlier results summarized in Table 1. The household prevalence figures from the national Hart and Mauser surveys, which used a DGU question most similar to the one used in the present survey, indicate that in 1990, 3.8% of households reported a DGU involving a gun of any kind in the previous five years[53] and in 1981, 4% reported a DGU involving a handgun in the previous five years.[54] The past-five-years, household-based "% Used" figures in Table 2 indicate 3.9% for all guns, and 3.0% for handguns. Where directly comparable, the present results are within sampling error of the results of the best two previous surveys. Indeed, the consistency is remarkable given the substantial differences among the surveys and the twelve year difference between the Hart survey and the current one. Further, the only prior survey with person-based estimates and a *one* year recall period, the 1976 Field poll in California, yielded a 1.4% prevalence figure for handguns,[55] compared to 1.0% in the present survey.[56]

With a sample size of 4,977, random sampling error of the estimates is small. For example, the all-guns prevalence percent used *A* estimates, with a 95% confidence interval, are plus or minus 0.32% for past year, person; 0.35% for past year, household; 0.50% for past five

---

[53] Mauser, *supra* note 19.

[54] Peter D. Hart Research Associates, Inc., Questionnaire used in October 1981 Violence in America Survey, with marginal frequencies (1981).

[55] *See* Table 1, note A.

[56] *See* Table 2, second column.

Copyright © 2004. All Rights Reserved.

years, person; and 0.54% for past five years, household. Given how small these are already, even increasing samples to the size of the enormous ones in the NCVS could produce only slight reductions in sampling error.

Are these estimates plausible? Could it really be true that Americans use guns for self-protection as often as 2.1 to 2.5 million times a year? The estimate may seem remarkable in comparison to expectations based on conventional wisdom, but it is not implausibly large in comparison to various gun-related phenomena. There are probably over 220 million guns in private hands in the U.S.,[57] implying that only about 1% of them are used for defensive purposes in any one year—not an impossibly high fraction. In a December 1993 Gallup survey, 49% of U.S. households reported owning a gun, and 31% of adults reported personally owning one.[58] These figures indicate that there are about 47.6 million households with a gun, with perhaps 93 million, or 49% of the adult U.S. population living in households with guns, and about 59.1 million adults personally owning a gun. Again, it hardly seems implausible that 3% (2.5 million/93 million) of the people with immediate access to a gun could have used one defensively in a given year.

Huge numbers of Americans not only have access to guns, but the overwhelming majority of gun owners, if one can believe their statements, are willing to use a gun defensively. In a December 1989 national survey, 78% of American gun owners stated that they would not only be willing to use a gun defensively in some way, but would be willing to *shoot* a burglar.[59] The percentage willing to use a gun defensively in *some* way, though not necessarily by shooting someone, would presumably be even higher than this.

Nevertheless, having access to a gun and being willing to use it against criminals is not the same as actually doing so. The latter requires experiencing a crime under circumstances in which the victim can get to, or already possesses, a gun. We do not know how many such opportunities for crime victims to use guns defensively occur each year. It would be useful to know how large a fraction of crimes with direct offender-victim contact result in a DGU. Unfortunately, a large share of the incidents covered by our survey are probably outside the scope of incidents that realistically are likely to be reported to either the NCVS or police. If the DGU incidents reported in the present survey are not entirely a subset within the pool of cases

---

[57] KLECK, *supra* note 18, at 50 (extrapolating up to 1994, from 1987 data).

[58] David W. Moore & Frank Newport, *Public Strongly Favors Stricter Gun Control Laws*, 340 THE GALLUP POLL MONTHLY 18 (1994).

[59] Quinley, *supra* note 36.

Copyright © 2001. All Rights Reseved.

covered by the NCVS, one cannot meaningfully use NCVS data to estimate the share of crime incidents which result in a DGU. Nevertheless, in a ten state sample of incarcerated felons interviewed in 1982, 34% reported having been "scared off, shot at, wounded or captured by an armed victim."[60] From the criminals' standpoint, this experience was not rare.

How could such a serious thing happen so often without becoming common knowledge? This phenomenon, regardless of how widespread it really is, is largely an invisible one as far as governmental statistics are concerned. Neither the defender/victim nor the criminal ordinarily has much incentive to report this sort of event to the police, and either or both often have strong reasons *not* to do so. Consequently, many of these incidents never come to the attention of the police, while others may be reported but without victims mentioning their use of a gun. And even when a DGU is reported, it will not necessarily be recorded by the police, who ordinarily do not keep statistics on matters other than DGUs resulting in a death, since police record-keeping is largely confined to information helpful in apprehending perpetrators and making a legal case for convicting them. Because such statistics are not kept, we cannot even be certain that a large number of DGUs are *not* reported to the police.

The health system cannot shed much light on this phenomenon either, since very few of these incidents involve injuries.[61] In the rare case where someone is hurt, it is usually the criminal, who is unlikely to seek medical attention for any but the most life-threatening gunshot wounds, as this would ordinarily result in a police interrogation. Physicians in many states are required by law to report treatment of gunshot wounds to the police, making it necessary for medically treated criminals to explain to police how they received their wounds.

Finally, it is now clear that virtually none of the victims who use guns defensively tell interviewers about it in the NCVS. Our estimates imply that only about 3% of DGUs among NCVS Rs are reported to interviewers.[62] Based on other comparisons of alternative survey estimates of violent events with NCVS estimates, this high level of underreporting is eminently plausible. Loftin and Mackenzie reported that rapes might be thirty-three times as frequent as NCVS estimates indicate, while spousal violence could easily be twelve times as high.[63]

There is no inherent value to knowing the exact number of

---

[60] WRIGHT & ROSSI, *supra* note 43, at 155.

[61] *See* Table 3, Panels A, E.

[62] The 85,000 DGUs estimated from the NCVS, divided by the 2.5 million estimate derived from the presented survey equals .03.

[63] Loftin & MacKenzie, *supra* note 27, at 22-23.

Copyright © 2001. All Rights Reserved.

DGUs any more than there is any value to knowing the exact number of crimes which are committed each year. The estimates in Table 2 are at best only rough approximations, which are probably too low. It is sufficient to conclude from these numbers that DGU is very common, far more common than has been recognized to date by criminologists or policy makers, and certainly far more common than one would think based on any official sources of information.

What does "very common" mean? One natural standard of comparison by which the magnitude of these numbers could be judged is the frequency with which guns are used for criminal purposes. The highest annual estimate of criminal gun use for the peak year of gun crime is the NCVS estimate for 1992, when there were an estimated 847,652 violent crime incidents in which, according to the victim, at least one offender possessed a gun.[64] This NCVS figure is not directly comparable with our DGU estimates because our DGU estimates are restricted only to incidents in which the gun was actually used by the defender, as opposed to incidents in which a victim merely possessed a gun. Many of the "gun crimes" in the NCVS, on the other hand, do not involve the gun actually being used by the criminal. Thus, the NCVS estimate of "gun crimes" overstates the number of crimes in which the offender actually used the gun. The only "gun crimes" reported in NCVS interviews that one can be confident involved offenders actually using guns are those in which they shot at a victim; but these were only 16.6% of "handgun crimes" reported in the NCVS from 1987 to 1992.[65]

Another 46.8% of the "handgun crimes" are labelled "weapon present" cases by the Bureau of Justice (BJS)[66] and an unknown fraction of these *could* involve actual use of a gun in a threat; but NCVS data do not permit us to know just how large a fraction. For these cases, the relevant NCVS interview items are ambiguous as to whether the gun was used to threaten a victim. Response category four of question fourteen ("How were you threatened?") of the NCVS Crime Incident Report reads: "Weapon present or threatened with weapon"[67] When this category is recorded by the interviewer, it is impossible to determine whether the victim was actually threatened with a gun or merely reported that the offender possessed a gun. In the remaining 36.6% of the "handgun crimes,"[68] there is no indica-

---

[64] Computed from U.S. BUREAU OF JUSTICE STATISTICS, *supra* note 26, at 82-83.

[65] RAND, *supra* note 17, at 2.

[66] *Id.*

[67] U.S. BUREAU OF JUSTICE STATISTICS, *supra* note 26, at 126.

[68] 100%, minus the 16.6% where the victim was shot at, minus the 46.8% where the victim reported a "weapon present or threatened with a weapon" = 36.6%.

Copyright © 2001. All Rights Reseved.

tion at all that the gun allegedly possessed by the offender was actually used.

Even the presence of a weapon is debatable, since victims are not asked why they thought the offender possessed a gun or if they saw a gun. This raises the possibility that some victims assumed that the offender had a gun, or inferred it from a bulge in the offender's clothing, or accepted the word of an offender who was bluffing about having a gun.

Thus, somewhere between 16.6% and 63.4%[69] of NCVS-defined "handgun crime" victimizations involve the gun actually being used in an attack or threat. Applying these figures to the estimates of 847,652 gun crime incidents and 689,652 handgun crime incidents, we can be confident that in 1992 there were at least 140,710 nonfatal crime incidents in which offenders used guns, 114,482 with handguns or about 157,000 total gun crime incidents, and 129,000 with handguns, when one includes gun homicides.[70] Or, generously assuming that all of the ambiguous "weapon present" cases involved guns being used to threaten the victim, estimates of 554,000 total, fatal and nonfatal, gun crime incidents and 451,000 handgun crime incidents are obtained.

All of these estimates are well short of even the most conservative estimates of DGUs in Table 2. The best estimates of DGUs (first two columns), even if compared to the more generous estimates of gun crimes, are 4.6 times higher than the crime counts for all guns, and 4.2 times higher for handguns, or 3.9 and 3.4, respectively, if the more conservative *B* estimates of DGU are used. In sum, DGUs are about three to five times as common as criminal uses, even using generous estimates of gun crimes.

There is good reason to believe that survey estimates of both criminal and defensive gun uses, including the DGU estimates presented here, are too low. Cook has shown that NCVS estimates of gunshot wounds are far too low.[71] Our estimates of DGUs are probably also too low, partly because, unlike the NCVS, our survey did not cover adolescents, the age group most frequently victimized in violence. Furthermore, our use of telephone surveying excludes the 5% of the nation's households without telephones, households which are disproportionately poor and/or rural. Low income persons are more likely to be crime victims,[72] while rural persons are more likely to own

---

[69] 16.6% plus the 46.8% in the ambiguous "weapon present" category.

[70] FEDERAL BUREAU OF INVESTIGATION, U.S. DEPARTMENT OF JUSTICE, CRIME IN THE UNITED STATES 1992—UNIFORM CRIME REPORTS 18, 58 (1993).

[71] Philip J. Cook, *The Case of the Missing Victims: Gunshot Woundings in the National Crime Survey*, 1 J. QUANTITATIVE CRIMINOLOGY 91 (1985).

[72] U.S. BUREAU OF JUSTICE STATISTICS, *supra* note 26, at 33.

Copyright © 2001. All Rights Reserved.

guns and to be geographically distant from the nearest police officer.[73] Both groups therefore may have more opportunities to use guns for self-protection and excluding them from the sample could contribute to an underestimation of DGU.

Both parameters also are subject to underestimation due to intentional respondent underreporting. It is also probable that typical survey Rs are more reluctant to tell interviewers about questionable acts that they themselves have committed, such as threatening another person with a gun for purportedly defensive reasons, than they are to report criminal acts that other people have committed *against* them. Assuming this is correct, it would imply that DGUs, even in the best surveys, are underreported more than gun crime victimizations, and that correcting for underreporting would only increase the degree to which DGUs outnumber gun crimes.

The only known significant source of overestimation of DGUs in this survey is "telescoping," the tendency of Rs to report incidents which actually happened earlier than the recall period, such as reporting a six year old incident as having happened in the past five years. It is likely that telescoping effects are more than counterbalanced by Rs who actually experienced DGUs failing to report them. Nevertheless, it is worth discussing how much effect telescoping could have on these estimates. In evaluating the ability of crime victims to recall crime events in victim surveys, the U.S. Census Bureau selected a sample of crimes that were reported to the police, and then interviewed the victims of these known crime events. Using a twelve month recall period (the same as we used in the present survey), they surveyed victims who had been involved in crimes which had actually occurred *thirteen to fourteen* months before the interview, i.e., one or two months before the recall period. Of these ineligible crimes, 21% were telescoped forward—wrongly reported as having occurred in the twelve month recall period.[74]

Since the months just before the start of the recall period will show the highest rates of telescoping, the rate should be even smaller for crimes which occurred earlier. Nevertheless, even if it is assumed that the 21% rate applied to events that occurred as much as one year earlier, thirteen to twenty-four months before the interview, telescoping could inflate the DGU estimates for a one year recall period by only 21%. Adjusting the 2.5 million DGU estimate downward for telescoping effects of this magnitude would reduce it to about 2.1 mil-

---

[73] KLECK, *supra* note 18, at 57.

[74] Richard W. Dodge, *The Washington, D.C. Recall Study, in* 1 THE NATIONAL CRIME SURVEY: WORKING PAPERS: CURRENT AND HISTORICAL PERSPECTIVES 14 (Robert G. Lehnen & Wesley G. Skogan eds., 1981).

Copyright © 2001. All Rights Reseved.

lion (2.5 million/1.21=2.1 million), an adjustment which would have
no effect on any of our conclusions. Telescoping would inflate esti-
mates based on the five year recall period even less, since the ratio of
memory loss errors over telescoping errors increases as the recall pe-
riod lengthens.[75]   Nevertheless, it should be stressed that this is just a
numerical demonstration. There is no reason to believe that these
modest telescoping effects outweigh the effects of Rs failing to report
DGUs, and therefore, no reason to believe that these estimates are
even slightly too high.

### III. THE NATURE OF DEFENSIVE GUN USE

A total of 222 sample cases of DGUs against humans were ob-
tained. For nine of these, the R broke off discussion of the incident
before any significant amount of detail could be obtained, other than
that the use was against a human. This left 213 cases with fairly com-
plete information. Although this dataset constitutes the most detailed
body of information available on DGU, the sample size is nevertheless
fairly modest. While estimates of DGU frequency are reliable because
they are based on a very large sample of 4,977 cases, results pertaining
to the details of DGU incidents are based on 213 or fewer sample
cases, and readers should treat these results with appropriate caution.

Apart from the sample size, the results of this survey also are af-
fected by sample censoring. Beyond the incidents our interviewers
were told about, there were almost certainly other DGUs which oc-
curred within the recall period but which Rs did not mention to inter-
viewers. In debriefings by the authors, almost all of our interviewers
reported that they had experienced something like the following: they
asked the key DGU question, which was followed by a long silence on
the other end of the line, and/or the R asking something like "Who
wants to know?" or "Why do you want to know?" or some similarly
suspicious remark, followed by a "no" answer. In contrast, only one
interviewer spoke with a person he thought was inventing a nonexis-
tent incident. One obvious implication is that the true frequency of
DGU is probably even higher than our estimates indicate. Another is
that the incidents which were reported might differ from those that
were not.

We believe that there are two rather different kinds of incidents
that are especially likely to go unreported: (1) cases that Rs do not
want to tell strangers on the phone, because the Rs deem them legally

---

[75] Henry S. Woltman et al., *Recall Bias and Telescoping in the National Crime Survey*, in 2
THE NATIONAL CRIME SURVEY: WORKING PAPERS: METHODOLOGICAL STUDIES 810 (Robert G.
Lehnen & Wesley G. Skogan eds., 1984); Sudman & Bradburn, *supra* note 40.

Copyright © 2001  All Rights Reserved

or morally dubious or they think the interviewer would regard them that way; and (2) relatively minor cases that Rs honestly forget about or did not think were serious enough to qualify as relevant to our inquiries. Thus, in addition to the mostly legitimate and serious cases covered in our sample, there are still other, less legitimate or serious DGU incidents that this or any other survey are likely to miss. This supposition would imply two kinds of bias in our descriptive results: (1) our DGUs would look more consistently "legitimate" than the entire set of all DGUs actually are; and (2) our DGUs would look more serious, on average, than the entire set of DGUs really are. These possibilities should be kept in mind when considering the following descriptive information.

Table 3 summarizes what our sample DGU incidents were like. The data support a number of broad generalizations. First, much like the typical gun crime, many of these cases were relatively undramatic and minor compared to fictional portrayals of gun use. Only 24% of the gun defenders in the present study reported firing the gun, and only 8% report wounding an adversary.[76] This parallels the fact that only 17% of the gun crimes reported in the NCVS involve the offender shooting at the victim, and only 3% involve the victim suffering a gunshot wound.[77]

Low as it is, even an 8% wounding rate is probably too high, both because of the censoring of less serious cases, which in this context would be cases without a wounding, and because the survey did not establish how Rs knew they had wounded someone. We suspect that in incidents where the offender left without being captured, some Rs "remembered with favor" their marksmanship and assumed they had hit their adversaries. If 8.3% really hit their adversaries, and a total of 15.6% fired at their adversaries, this would imply a 53% (8.3/15.6) "incident hit rate," a level of combat marksmanship far exceeding that typically observed even among police officers. In a review of fifteen reports, police officers inflicted at least one gunshot wound on at least one adversary in 37% of the incidents in which they intentionally fired at someone.[78] A 53% hit rate would also be triple the 18% hit rate of criminals shooting at crime victims.[79] Therefore, we believe that even the rather modest 8.3% wounding rate we found is probably too high, and that typical DGUs are less serious or dramatic in their consequences than our data suggest. In any case, the 8.3% figure was pro-

<hr>

[76] *See* Table 3, panel A.

[77] RAND, *supra* note 17.

[78] WILLIAM A. GELLER & MICHAEL S. SCOTT, POLICE EXECUTIVE RESEARCH FORUM, DEADLY FORCE: WHAT WE KNOW 100-106 (1993).

[79] RAND, *supra* note 17.

Copyright © 2001. All Rights Reseved.

duced by just seventeen sample cases in which Rs reported that they wounded an offender.

About 37% of these incidents occurred in the defender's home, with another 36% near the defender's home.[80] This implies that the remaining 27% occurred in locations where the defender must have carried a gun through public spaces. Adding in the 36% which occurred *near* the defender's home and which may or may not have entailed public carrying, 36 to 63% of the DGUs entailed gun carrying.

Guns were most commonly used for defense against burglary, assault, and robbery.[81] Cases of "mutual combat," where it would be hard to tell who is the aggressor or where both parties are aggressors, would be a subset of the 30% of cases where assault was the crime involved. However, only 19% of all DGU cases involved *only* assault and no other crime where victim and offender could be more easily distinguished. Further, only 11% of all DGU cases involved only assault and a male defender—we had no information on gender of offenders—some subset of these could have been male-on-male fights. Thus, very few of these cases fit the classic mutual combat model of a fight between two males. This is not to say that such crimes where a gun-using combatant might claim that his use was defensive are rare, but rather that few of them are in this sample. Instead, cases where it is hard to say who is victim and who is aggressor apparently constitute an additional set of questionable DGUs lying largely outside of the universe of more one-sided events that our survey methods could effectively reach.

This survey did not attempt to compare the effectiveness of armed resistance with other forms of victim self-protection, since this sort of work has already been done and reviewed earlier in this paper. Panels D and E nevertheless confirm previous research on the effectiveness of self-defense with a gun—crime victims who use this form of self-protection rarely lose property and rarely provoke the offender into hurting them. In property crime incidents where burglary, robbery, or other thefts were attempted, victims lost property in just 11% of the cases. Gun defenders were injured in just 5.5% of all DGU incidents. Further, in 84% of the incidents where the defender was threatened or attacked, it was the offender who first threatened or used force. In *none* of the eleven sample cases where gun defenders were injured was the defender the first to use or to threaten force. The victim used a gun to threaten or attack the offender only *after* the offender had already attacked or threatened them and usually after

---

[80] *See* Table 3, Panel B.

[81] *Id.* at Panel C.

Copyright © 2001  All Rights Reserved

the offender had inflicted the injury. There is no support in this sample for the hypothesis that armed resistance provokes criminals into attacking victims; this confirms the findings of prior research.[82]

While only 14% of *all* violent crime victims face offenders armed with guns,[83] 18% of the gun-using victims in our sample faced adversaries with guns.[84] Although the gun defenders usually faced unarmed offenders or offenders with lesser weapons, they were more likely than other victims to face gun-armed criminals. This is consistent with the perception that more desperate circumstances call forth more desperate defensive measures. The findings undercut the view that victims are prone to use guns in "easy" circumstances which are likely to produce favorable outcomes for the victim regardless of their gun use.[85] Instead, gun defenders appear to face more difficult circumstances than other crime victims, not easier ones.

Nevertheless, one reason crime victims are willing to take the risks of forcefully resisting the offender is that most offenders faced by victims choosing such an action are unarmed, or armed only with less lethal weapons. Relatively few victims try to use a gun against adversaries who are themselves armed with guns. According to this survey, offenders were armed with some kind of weapon in 48% of DGU incidents but had guns in only 18% of them.[86]

The distribution of guns by type in DGUs is similar to that of guns used by criminals. NCVS and police-based data indicate that about 80% of guns used in crime are handguns,[87] and the present study indicates that 80% of the guns used by victims are handguns.[88]

Incidents where victims use a gun defensively are almost never gunfights where both parties shoot at one another. Only 24% of the incidents involved the defender firing their gun, and only 16% involved the defender shooting *at* their adversary.[89] In only 4.5% of the cases did the offender shoot at the defender.[90] Consequently, it is not surprising that only 3% of all the incidents involved both parties shooting at each other.

Among our sample cases, the offenders were strangers to the de-

---

[82] Kleck, *supra* note 3, at 7-9; Kleck & DeLone, *supra* note 3, at 75-77.

[83] U.S. BUREAU OF JUSTICE STATISTICS, *supra* note 26, at 83.

[84] *See* Table 3, Panel F.

[85] For a related speculation, see UNDERSTANDING AND PREVENTING VIOLENCE, *supra* note 15, at 266.

[86] *Id.*

[87] U.S. BUREAU OF JUSTICE STATISTICS, *supra* note 26, at 83; U.S. FEDERAL BUREAU OF INVESTIGATION, *supra* note 70, at 18.

[88] *See* Table 3, Panel H.

[89] *Id.* at Panel A.

[90] *Id.* at Panel G.

Copyright © 2001. All Rights Reserved.

fender in nearly three quarters of the incidents.[91] We suspect that this
again reflects the effects of sample censoring. Just as the NCVS appears to detect less than a tenth of domestic violence incidents,[92] our
survey is probably missing many cases of DGU against family members
and other intimates.

While victims face multiple offenders in only about 24% of *all*
violent crimes,[93] the victims in our sample who used guns faced multiple offenders in 53% of the incidents.[94] This mirrors the observation
that criminals who use guns are also more likely than unarmed
criminals to face multiple victims.[95] A gun allows either criminals or
victims to handle a larger number of adversaries. Many victims facing
multiple offenders probably would not resist at all if they were without
a gun or some other weapon. Another possible interpretation is that
some victims will resort to a defensive measure as serious as wielding a
gun only if they face the most desperate circumstances. Again, this
finding contradicts a view that gun defenders face easier circumstances than other crime victims.

Another way of assessing how serious these incidents appeared to
the victims is to ask them how potentially fatal the encounter was. We
asked Rs: "If you had *not* used a gun for protection in this incident,
how likely do you think it is that you or someone else would have been
*killed?* Would you say almost certainly *not*, probably not, might have,
probably would have, or almost certainly would have been killed?"
Panel K indicates that 15.7% of the Rs stated that they or someone
else "almost certainly would have" been killed, with another 14.2%
responding "probably would have" and 16.2% responding "might
have."[96] Thus, nearly half claimed that they perceived some significant chance of someone being killed in the incident if they had not
used a gun defensively.

It should be emphasized that these are just stated perceptions of
participants, not objective assessments of actual probabilities. Some
defenders might have been bolstering the justification for their actions by exaggerating the seriousness of the threat they faced. Our
cautions about sample censoring should also be kept in mind----minor, less life-threatening events are likely to have been left out of this
sample, either because Rs forgot them or because they did not think
them important enough to qualify as relevant to our inquiries.

---

91 *Id.* at Panel I.

92 Loftin & MacKenzie, *supra* note 27, at 22-23.

93 U.S. BUREAU OF JUSTICE STATISTICS, *supra* note 26, at 82.

94 *See* Table 3, Panel J.

95 Cook, *supra* note 4.

96 *See* Table 3, Panel K.

Copyright © 2001. All Rights Reseved.

If we consider only the 15.7% who believed someone almost certainly would have been killed had they not used a gun, and apply this figure to estimates in the first two columns of Table 2, it yields national annual estimates of 340,000 to 400,000 DGUs of any kind, and 240,000 to 300,000 uses of handguns, where defenders stated, if asked, that they believed they almost certainly had saved a life by using the gun. Just how many of these were truly life-saving gun uses is impossible to know. As a point of comparison, the largest number of deaths involving guns, including homicides, suicides, and accidental deaths in any one year in U.S. history was 38,323 in 1991.[97]

Finally, we asked if Rs had reported these incidents to the police, or if the police otherwise found out about them; 64% of the gun-using victims claimed that the incidents had become known to the police. This figure should be interpreted with caution, since victims presumably want to present their use of guns as legitimate and a willingness to report the incident to the police would help support an impression of legitimacy. Rs who had in fact not reported the incident to the police might have wondered whether a "no" reply might not lead to discomforting follow-up questions like "why not?" (as indeed it does in the NCVS). Further, it is likely that some Rs reported these incidents but did not mention their use of a gun.

## IV.  WHO IS INVOLVED IN DEFENSIVE GUN USE?

Finally, this Article will consider what sorts of people use guns defensively, and how they might differ from other people. Table 4 presents comparisons of five groups: (1) "defenders," i.e., people who reported using a gun for defense; (2) people who personally own guns but did not report a DGU; (3) people who do not personally own a gun; (4) people who did not report a DGU, regardless of whether they own guns; and (5) all people who completed the full interview.

Some of the earlier gun surveys asked the DGU question only of Rs who reported owning a gun. The cost of this limitation is evident from the first two rows of Table 4. Nearly 40% of the people reporting a DGU did not report personally owning a gun at the time of the interview. They either used someone else's gun, got rid of the gun since the DGU incident, or inaccurately denied personally owning a gun. About a quarter of the defenders reported that they did not even have a gun in their household at the time of the interview. Another possibility is that many gun owners were falsely denying their ownership of the "incriminating evidence" of their DGU.

---

[97] NATIONAL SAFETY COUNCIL, ACCIDENT FACTS 11 (1994). This assumes that 95% of "legal intervention" deaths involved guns.

Copyright © 2001. All Rights Reseved.

Many of the findings in Table 4 are unsurprising. Gun defenders are more likely to carry a gun for self-protection, consistent with the large share of DGUs which occurred away from the defender's home. Obviously, they were more likely to have been a victim of a burglary or robbery in the past year, a finding which is a tautology for those Rs whose DGU was in connection with a robbery or burglary committed against them in the preceding year. They were also more likely to have been a victim of an assault since becoming an adult.

Defenders are more likely to believe that a person must be prepared to defend their homes against crime and violence rather than letting the police take care of it compared to either gun owners without a DGU and nonowners. Whether this is cause or consequence of defenders' defensive actions is impossible to say with these data.

Some might suspect that DGUs were actually the aggressive acts of vengeful vigilantes intent on punishing criminals. If this were true of gun defenders as a group, one might expect them to be more supportive of punitive measures like the death penalty. In fact, those who reported a DGU were no more likely to support the death penalty than those without such an experience, and were somewhat *less* likely to do so compared with gun owners as a group. Similarly, gun defenders were no more likely than other people to endorse the view that the courts do not deal harshly enough with criminals.

Perhaps the most surprising finding of the survey was the large share of reported DGUs that involved women. Because of their lower victimization rates and lower gun ownership rates, one would expect women to account for far less than half of DGUs. Nevertheless, 46% of our sample DGUs involved women. This finding could be due to males reporting a lower fraction of actual DGUs than women. If a larger share of men's allegedly DGUs were partly aggressive actions, a larger share would be at the "illegitimate" end of the scale and thus less likely to be reported to interviewers. Further, women may be more likely than men to report their DGUs because they are less afraid of prosecution. Consequently, although there is no reason to doubt that women use guns defensively as often as this survey indicates, it is probable that males account for a larger number and share of DGUs than these data indicate.

A disproportionate share of defenders are African-American or Hispanic compared to the general population and especially compared to gun owners. Additionally, defenders are disproportionately likely to reside in big cities compared to other people, and particularly when compared to gun owners, who reside disproportionately in rural areas and small towns. Finally, defenders are disproportionately likely to be single. These patterns are all presumably due to the higher rates

Copyright © 2004. All Rights Reserved.

of crime victimization among minorities, big city dwellers, and single persons.[98] On the other hand, defenders are not likely to be poor. The effect of higher victimization among poor people may be cancelled out by the lower gun ownership levels among the poor.[99]

One might suspect that, despite instructions not to report such events, some of the Rs reporting a DGU might have been describing an event which occurred as part of their occupational activities as a police officer, a member of the military, or a security guard. This could not have been true for more than a handful of our DGU cases, since only 2.4% (five sample cases) involved a person who had this type of occupation. Even these few cases may have occurred off-duty and thus would not necessarily be occupational DGUs. Gun defenders were in fact somewhat *less* likely to have a gun-related occupation than other gun owners.

### V.  CONCLUSION

If one were committed to rejecting the seemingly overwhelming survey evidence on the frequency of DGU, one could speculate, albeit without any empirical foundation whatsoever, that nearly all of the people reporting such experiences are simply making them up. We feel this is implausible. An R who had actually experienced a DGU would have no difficulty responding with a "no" answer to our DGU question because a "no" response was not followed up by further questioning. On the other hand, lying with a false "yes" answer required a good deal more imagination and energy. Since we asked as many as nineteen questions on the topic, this would entail spontaneously inventing as many as nineteen plausible and internally consistent bits of false information and doing so in a way that gave no hint to experienced interviewers that they were being deceived.

Suppose someone persisted in believing in the anomalous NCVS estimates of DGU frequency and wanted to use a "dishonest respondent" hypothesis to account for estimates from the present survey that are as much as thirty times higher. In order to do this, one would have to suppose that twenty-nine out of every thirty people reporting a DGU in the present survey were lying. There is no precedent in criminological survey research for such an enormous level of intentional and sustained falsification.

The banal and undramatic nature of the reported incidents also undercuts the dishonest respondent speculation. While all the incidents involved a crime, and usually a fairly serious one, only 8% of the

---

[98] U.S. BUREAU OF JUSTICE STATISTICS, *supra* note 26, at 25-26, 31, 38-39.

[99] KLECK, *supra* note 18, at 56.

Copyright © 2001. All Rights Reserved.

alleged gun defenders claimed to have shot their adversaries, and only 24% claim to have fired their gun. If large numbers of Rs were inventing their accounts, one would think they would have created more exciting scenarios.

By this time there seems little legitimate scholarly reason to doubt that defensive gun use is very common in the U.S., and that it probably is substantially more common than criminal gun use. This should not come as a surprise, given that there are far more gun-owning crime victims than there are gun-owning criminals and that victimization is spread out over many different victims, while offending is more concentrated among a relatively small number of offenders.

There is little legitimate reason to continue accepting the NCVS estimates of DGU frequency as even approximately valid. The gross inconsistencies between the NCVS and all other sources of information make it reasonable to suppose that all but a handful of NCVS victims who had used a gun for protection in the reported incidents refrained from mentioning this gun use. In light of evidence on the injury-preventing effectiveness of victim gun use, in some cases where the absence of victim injury is credited to either nonresistance or some unarmed form of resistance, the absence of injury may have actually been due to resistance with a gun, which the victim failed to mention to the interviewer.

The policy implications of these results are straightforward. These findings do *not* imply anything about whether moderate regulatory measures such as background checks or purchase permits would be desirable. Regulatory measures which do not disarm large shares of the general population would not significantly reduce beneficial defensive uses of firearms by noncriminals. On the other hand, prohibitionist measures, whether aimed at all guns or just at handguns, are aimed at disarming criminals and noncriminals alike. They would therefore discourage and presumably decrease the frequency of DGU among noncriminal crime victims because even minimally effective gun bans would disarm at least some noncriminals. The same would be true of laws which ban gun carrying. In sum, measures that effectively reduce gun availability among the noncriminal majority also would reduce DGUs that otherwise would have saved lives, prevented injuries, thwarted rape attempts, driven off burglars, and helped victims retain their property.

Since as many as 400,000 people a year use guns in situations where the defenders claim that they "almost certainly" saved a life by doing so, this result cannot be dismissed as trivial. If even one-tenth of these people are accurate in their stated perceptions, the number of lives saved by victim use of guns would still exceed the total number

Copyright © 2001. All Rights Reseved.

of lives taken with guns. It is not possible to know how many lives are actually saved this way, for the simple reason that no one can be certain how crime incidents would have turned out had the participants acted differently than they actually did. But surely this is too serious a matter to simply assume that practically everyone who says he believes he saved a life by using a gun was wrong.

This is also too serious a matter to base conclusions on silly statistics comparing the number of lives taken with guns with the number of criminals *killed* by victims.[100] Killing a criminal is not a benefit to the victim, but rather a nightmare to be suffered for years afterward. *Saving* a life through DGU would be a benefit, but this almost never involves killing the criminal; probably fewer than 3,000 criminals are lawfully killed by gun-wielding victims each year,[101] representing only about 1/1000 of the number of DGUs, and less than 1% of the number of purportedly life-saving DGUs. Therefore, the number of justifiable homicides cannot serve as even a rough index of life-saving gun uses. Since this comparison does not involve any measured benefit, it can shed no light on the benefits and costs of keeping guns in the home for protection.[102]

---

[100] Arthur L Kellermann & Donald T. Reay, *Protection or Peril?*, 314 NEW ENG. J. MED. 1557 (1986).

[101] KLECK, *supra* note 18, at 111-117.

[102] *See id.* at 127-129 for a more detailed critique of these "junk science" statistics. *See* UNDERSTANDING AND PREVENTING VIOLENCE, *supra* note 15, at 267 for an example of a prestigious source taking such numbers seriously.

Copyright © 2001. All Rights Reseved.

Copyright © 2004. All Rights Reserved.

JA 76

**Table 1**
FREQUENCY OF DEFENSIVE GUN USE IN PREVIOUS SURVEYS[80]

| Survey: | Field | Bordua | Cambridge Reports | DMIa | DMIb | Hart | Ohio |
|---|---|---|---|---|---|---|---|
| Area: | California | Illinois | U.S. | U.S. | U.S. | U.S. | Ohio |
| Year of Interviews: | 1976 | 1977 | 1978 | 1978 | 1978 | 1981 | 1982 |
| Population covered: | Noninst. adults | Noninst. adults | Noninst. adults | Registered voters | Registered voters | Registered voters | "Residents" |
| Gun Type Covered: | Handguns | All guns | Handguns | All guns | All guns | Handguns | Handguns |
| Recall Period: | Ever/1,2 yrs. | Ever | Ever | Ever | Ever | 5 yrs. | Ever |
| Excluded Uses Against Animals? | No | No | No | No | Yes | Yes | No |
| Excluded Military, Police Uses? | Yes | No | No | Yes | Yes | Yes | No |
| Defensive question asked of: | All Rs | All Rs | Protection hgun owners | All Rs | All Rs | All Rs | Rs in hgun households |
| Defensive question refers to: | Respondent | Respondent | Respondent | Household | Household | Household | Respondent |
| % Who Used | 1.4/3/8.6[a] | 5.0 | 18 | 15 | 7 | 4 | 6.5 |
| % Who Fired Gun | 2.9 | n.a. | 12 | 6 | n.a. | n.a. | 2.6 |
| Implied number of def. gun uses[b] | 3,052,717 | 1,414,544 | n.a. | 2,141,512 | 1,098,409 | 1,797,461 | 771,043 |

[80] FIELD INSTITUTE, TABULATIONS OF THE FINDINGS OF A STUDY OF HANDGUN OWNERSHIP AND ACCESS AMONG A CROSS SECTION OF THE CALIFORNIA ADULT PUBLIC (1976); BORDUA ET AL., *supra* note 43; CAMBRIDGE REPORTS, *supra* note 36; DMI (DECISION/MAKING/INFORMATION), ATTITUDES OF THE AMERICAN ELECTORATE TOWARD GUN CONTROL (1979); Peter D. Hart Research Associates, Inc., *supra* note 54; Ohio, *supra* note 36; Quinley, *supra* note 36; Mauser, *supra* note 19; the Gallup polls of 1991 and 1993, L.A. Times poll, and Tarrance poll were taken from a search of the DIALOG Public Opinion online computer database.

Copyright © 2001. All Rights Reserved.

### Table 1 (continued)
#### FREQUENCY OF DEFENSIVE GUN USE IN PREVIOUS SURVEYS

| Survey: | Time/CNN | Mauser | Gallup | Gallup | L.A. Times | Tarrance |
|---|---|---|---|---|---|---|
| Area: | U.S. | U.S. | U.S. | U.S. | U.S. | U.S. |
| Year of Interviews: | 1989 | 1990 | 1991 | 1993 | 1994 | 1994 |
| Population covered: | "Firearm owners" | Residents | Noninst. Adults | Noninst. Adults | Noninst. Adults | Noninst. Adults |
| Gun Type Covered: | All guns | All guns | All guns | All guns | All guns | All guns |
| Recall Period: | Ever | 5 years | Ever | Ever | Ever | 5 years |
| Excluded Uses Against Animals? | No | Yes | No | No | No | Yes |
| Excluded Military, Police Uses? | Yes | Yes | No | Yes | Yes | Yes |
| Defensive question asked of: | Gun owners | All Rs | Rs in hgun hshlds | Gun owners | All | All |
| Defensive question refers to: | Respondent | Hshld. | Respondent | Respondent | Respondent | Respondent/ Household |
| % Who Used | n.a. | 3.79 | 8 | 11 | 8[c] | 1/2[d] |
| % Who Fired Gun | 9-16[e] | n.a. | n.a. | n.a. | n.a. | n.a. |
| Implied number of def. gun uses[b] | n.a. | 1,487,342 | 777,153 | 1,621,377 | 3,609,682 | 764,036 |

Notes:
a. 1.4% in past year, 3% in past two years, 8.6% ever.
b. Estimated annual number of defensive uses of guns of all types against humans, excluding uses connected with military or police duties, after any necessary adjustments were made, for U.S., 1993. Adjustments are explained in detail in Kleck (1994).
c. Covered only uses outside the home.
d. 1% of respondents, 2% of households.
e. 9% fired gun for self-protection, 7% used gun "to scare someone."
   An unknown share of the latter could be defensive uses not overlapping with the former.

**Table 2**

PREVALENCE AND INCIDENCE OF CIVILIAN DEFENSIVE GUN USE, U.S., 1988-1993[a]

| Recall Period: | | Past Year | | | | Past Five Years | | | |
|---|---|---|---|---|---|---|---|---|---|
| Base: | | Person | | Household | | Person | | Household | |
| Gun Types: | | All Guns | Handguns | All Guns | Handguns | All Guns | Handguns | All Guns | Handguns |
| Weighted | A:[c] | 66 | 49 | 79 | 55 | 165 | 132 | 194 | 148 |
| Sample Cases | B:[c] | 56 | 40 | 68 | 46 | 148 | 115 | 172 | 129 |
| % Used[b] | A: | 1.326 | 0.985 | 1.587 | 1.105 | 3.315 | 2.652 | 3.898 | 2.974 |
| | B: | 1.125 | 0.804 | 1.366 | 0.924 | 2.974 | 2.311 | 3.456 | 2.592 |
| Persons/ | A: | 2,549,862 | 1,893,079 | 1,540,405 | 1,072,434 | 6,374,655 | 5,099,724 | 3,782,767 | 2,885,822 |
| Households | B: | 2,163,519 | 1,545,371 | 1,325,918 | 896,945 | 5,717,872 | 4,442,941 | 3,353,794 | 2,515,345 |
| Annual Uses | A: | 2,549,862 | 1,893,079 | 1,540,405 | 1,072,434 | 1,884,348 | 1,442,941 | 1,158,283 | 515,345 |
| | B: | 2,163,519 | 1,545,371 | 1,325,918 | 896,945 | 1,683,342 | 888,588 | 1,029,615 | 505,069 |

*Population Bases:* Estimated resident population, age eighteen and over, U.S., April, 1993: 190,538,000; estimated households (assuming the 1992-1993 percentage increase was the same as the 1991-1992 increase): 97,045,525 (U.S. Bureau of the Census 1993, at 17, 55).

*Notes:*

a. Defensive uses of guns against humans by civilians (i.e. excluding uses by police officers, security guards or military personnel). All figures are based on weighted data (see text).

b. Percent of persons (households) with at least one defensive gun use during the five years (one year) preceding the interview.

c. *A* estimates are based on all reported defensive gun uses reported in the survey. *B* estimates are based on only cases with no indications that the case might not be a genuine defensive gun use.

Copyright © 2004. All Rights Reserved.

JA 78

*KLECK & GERTZ*

[Vol. 86

## Table 3

### THE NATURE OF DEFENSIVE GUN USE INCIDENTS[a]

|  | % |
|---|---|
| **A.** **What the Defender Did with the Gun**[b] | |
| Brandished or showed gun | 75.7 |
| Verbally referred to gun | 57.6 |
| Pointed gun at offender | 49.8 |
| Fired gun (including warning shots) | 23.9 |
| Fired gun at offender, trying to shoot him/her | 15.6 |
| Wounded or killed offender | 8.3 |
| **B.** **Location of Incident** | |
| In defender's home | 37.3 |
| Near defender's home | 35.9 |
| At, in, near home of friend, relative, neighbor | 4.2 |
| Commercial place (bar, gas station, office, factory) | 7.5 |
| Parking lot, commercial garage | 4.5 |
| School (in building, on school property, playground) | 0.3 |
| Open area, on street or public transportation | 7.4 |
| Other locations | 2.3 |
| **C.** **Type of Crime Defender Thought Was Being Committed**[b] | |
| Burglary | 33.8 |
| Robbery | 20.5 |
| Other theft | 6.2 |
| Trespassing | 14.8[c] |
| Rape, sexual assault | 8.2 |
| Other assault | 30.4 |
| Other crime | 9.5 |
| **D.** **Did Offender Get Away with Money or Property?** | |
| % of property crimes with property loss: | 11.0 |
| **E.** **Violence Directed at Defender** | |
| No threat or attack | 46.8 |
| Threatened only | 32.3 |
| Attacked but not injured | 15.3 |
| Attacked and injured | 5.5 |
| (In incidents where defender was threatened or attacked): Who was first to threaten or use force? | |
| Defender | 15.3 |
| Offender | 83.5 |
| Someone else | 1.3 |
| **F.** **Offender's Weapons**[b] | |
| None (unarmed) | 51.9 |
| Weapon | 48.1 |
| Handgun | 13.4 |
| Other gun | 4.5 |
| Knife | 17.8 |
| Other sharp object | 2.0 |
| Blunt object | 9.9 |
| Other weapon | 5.9 |
| **G.** **Shooting** | |
| Did offender shoot at defender? | |
| % of all incidents | 4.5 |
| % of incidents with offender armed with gun | 26.2 |
| Did both parties shoot? | |
| % of all incidents | 3.1 |
| **H.** **Type of Gun Used by Defender** | |
| Revolver | 38.5 |
| Semi-automatic pistol | 40.1 |
| Other, unspecified handgun | 1.1 |
| Rifle | 6.4 |
| Shotgun | 13.9 |

## JA 79

Copyright © 2001. All Rights Reseved.

| | | |
|---|---|---|
| **I.** | **Relationship of Offender to Defender** | |
| | Stranger | 73.4 |
| | Casual acquaintance | 8.3 |
| | Neighbor | 1.3 |
| | Boyfriend, girlfriend | 1.0 |
| | Other friend, coworker | 1.0 |
| | Brother, sister | 0.0 |
| | Son, daughter | 0.5 |
| | Husband, wife | 3.1 |
| | Other relationship | 4.2 |
| | Unknown | 7.3 |
| **J.** | **Number of Offenders** | |
| | 1 | 47.2 |
| | 2 | 26.1 |
| | 3-4 | 17.6 |
| | 5-6 | 4.0 |
| | 7 or more (includes 3 cases where defender could only say there was a very large number) | 5.0 |
| **K.** | **Defender's Perceived Likelihood that Someone Would Have Died Had Gun Not Been Used for Protection** | |
| | Almost certainly not | 20.8 |
| | Probably not | 19.3 |
| | Might Have | 16.2 |
| | Probably would have | 14.2 |
| | Almost certainly would have | 15.7 |
| | Could not say | 13.7 |
| **L.** | **Were Police Informed of Incident or Otherwise Find Out?** | 64.2 |

*Notes:*
a. Table covers only defensive uses against persons, and excludes nine cases where respondents refused to provide enough detail to confirm incidents as genuine defensive uses.
b. Percentages will sum to more than 100% because respondents could legitimately select or report more than one category.
c. Only 3.7% of incidents involved trespassing as *only* crime.

# JA 80

Copyright © 2004. All Rights Reserved.

### Table 4
COMPARISON OF DEFENDERS WITH OTHER PEOPLE
(WEIGHTED PERCENTAGES)

| | | Sample[a] | | | |
|---|---|---|---|---|---|
| | Defenders | No-DGU Gun owners | Non-owners | No DGU | All Persons |
| Personally owns gun | 59.5 | 100.0 | 0.0 | 23.9 | 25.5 |
| Gun in household | 79.0 | 100.0 | 16.3 | 36.3 | 37.9 |
| Carries gun for protection | 47.3 | 23.3 | 2.1 | 7.3 | 8.8 |
| Burglary victim, past year | 19.3 | 4.5 | 4.9 | 4.9 | 5.5 |
| Robbery victim, past year | 12.9 | 1.9 | 2.0 | 2.1 | 2.5 |
| Assault victim as adult | 46.8 | 29.3 | 18.3 | 21.5 | 22.5 |
| Nights away from home, monthly average | | | | | |
| 0 | 8.2 | 5.2 | 8.9 | 8.2 | 8.2 |
| 1-6 | 27.5 | 24.1 | 33.4 | 31.5 | 31.2 |
| 7-13 | 23.2 | 28.2 | 22.7 | 23.8 | 23.9 |
| 14+ | 42.0 | 42.5 | 35.0 | 36.8 | 36.6 |
| Must depend on self rather than cops | 77.0 | 69.7 | 50.0 | 55.0 | 55.8 |
| Supports death penalty | 72.4 | 85.2 | 65.8 | 70.5 | 70.6 |
| Courts not harsh enough | 75.2 | 78.9 | 71.5 | 74.0 | 74.0 |
| Gender (% male) | 53.7 | 75.4 | 37.1 | 46.4 | 46.7 |
| Age | | | | | |
| 18-24 | 25.7 | 10.2 | 14.3 | 13.1 | 13.5 |
| 25-34 | 36.9 | 21.6 | 22.6 | 22.1 | 22.6 |
| 35-44 | 20.6 | 26.8 | 25.2 | 25.5 | 25.4 |
| 45-64 | 14.2 | 30.6 | 25.9 | 27.3 | 26.8 |
| 65+ | 2.6 | 10.9 | 12.1 | 12.0 | 11.7 |
| Race | | | | | |
| White | 72.4 | 90.3 | 83.0 | 84.6 | 84.1 |
| Black | 16.8 | 5.1 | 9.7 | 8.6 | 8.9 |
| Hispanic | 8.0 | 3.2 | 4.9 | 4.6 | 4.8 |
| Other | 2.8 | 1.3 | 2.4 | 2.2 | 2.1 |
| Place of Residence | | | | | |
| Large City (over 500,000) | 32.5 | 14.7 | 24.7 | 22.2 | 22.6 |
| Small city | 29.8 | 32.2 | 27.7 | 29.4 | 29.3 |
| Suburb of large city | 25.5 | 28.1 | 32.6 | 31.3 | 31.1 |
| Rural area | 12.2 | 24.9 | 15.1 | 17.2 | 17.0 |
| Marital Status | | | | | |
| Married | 50.3 | 69.1 | 57.5 | 60.5 | 60.1 |
| Widowed | 0.6 | 2.2 | 6.5 | 6.2 | 6.0 |
| Divorced/Separated | 15.3 | 10.9 | 11.2 | 11.8 | 12.0 |
| Never married | 33.3 | 17.8 | 24.8 | 21.4 | 21.9 |
| Annual Household Income | | | | | |
| Under $15,000 | 12.3 | 7.4 | 15.3 | 13.6 | 13.5 |
| $15,000-29,999 | 30.1 | 23.2 | 27.9 | 26.9 | 27.2 |
| $30,000-44,999 | 22.2 | 30.3 | 23.0 | 24.5 | 24.4 |
| $45,000-59,999 | 18.5 | 17.8 | 20.0 | 19.2 | 19.2 |
| $60,000-79,999 | 7.9 | 12.1 | 8.0 | 8.9 | 8.9 |
| $80,000 or more | 8.8 | 9.2 | 5.8 | 6.8 | 6.9 |
| Gun-related Occupation | 2.4 | 4.9 | 2.0 | 3.2 | 3.1 |

*Notes:*

a. "Defenders" are persons who reported a defensive gun use against another person in the preceding five years, excluding uses in connection with military, police, or security guard duties. This sample includes nine cases where such a use was reported, but the respondent did not provide further details.

"No-DGU gun owners" are persons who report personally owning a gun but did not report a defensive gun use.

"Nonowners" are persons who did not report personally owning a gun and who did not report a defensive gun use. These persons may, however, live in a household where others own a gun.

"No DGU" are persons who did not report a defensive gun use, regardless of whether they reported owning a gun.

## JA 81

Copyright © 2001. All Rights Reserved.

# EXHIBIT 8

No. 15–2234

# Journal of Research in Crime and Delinquency

http://jrc.sagepub.com/

**Carrying Guns for Protection: Results from the National Self-Defense Survey**

GARY KLECK and MARC GERTZ

*Journal of Research in Crime and Delinquency* 1998 35: 193
DOI: 10.1177/0022427898035002004

The online version of this article can be found at:

http://jrc.sagepub.com/content/35/2/193

Published by:

**$SAGE**

http://www.sagepublications.com

On behalf of:

School of Criminal Justice, Rutgers - Newark

**Additional services and information for *Journal of Research in Crime and Delinquency* can be found at:**

**Email Alerts:** http://jrc.sagepub.com/cgi/alerts

**Subscriptions:** http://jrc.sagepub.com/subscriptions

**Reprints:** http://www.sagepub.com/journalsReprints.nav

**Permissions:** http://www.sagepub.com/journalsPermissions.nav

**Citations:** http://jrc.sagepub.com/content/35/2/193.refs.html

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

**JA 83**

# CARRYING GUNS FOR PROTECTION: RESULTS FROM THE NATIONAL SELF-DEFENSE SURVEY

## GARY KLECK
## MARC GERTZ

*The article reviews research on gun carrying and reports new findings from the National Self-Defense Survey on the prevalence, incidence, and patterns of adult gun carrying for protection. About 8.8 percent of adults carried guns in the preceding year, 3.7 percent carried guns on their person, and 6.5 percent carried guns in a vehicle. Within a given year, about 16.8 million U.S. adults carry a gun, 7.1 million who carry do so on the person and 12.4 million do so in a vehicle. On an average day, 2.7 million U.S. adults carry a gun for protection on their person and 5.0 million carry one in a vehicle. Less than one in a thousand instances of gun carrying involves a violent gun crime. Carrying was more common among males, Blacks, people in the South and West, people with a job requiring a gun, those who know someone who was recently the victim of a crime, believe that crime is above average in their neighborhood, have been a robbery victim, or believe people must depend on themselves for protection.*

Millions of Americans carry firearms in public places, both on their person and in their vehicles. Most of this carrying violates gun carry laws, yet it is not necessarily done by people intending, or even likely, to commit some other crime with the gun. By 1995, at least 31 states had passed laws making it easy for adult residents without a criminal conviction to get a license to carry a concealed firearm (U.S. Bureau of Justice Statistics 1996b:120-1). Yet, because of a narrow research focus on carrying by juveniles, virtually nothing is known about gun carrying by adults. This article reviews research on gun carrying and reports findings from a national survey on the prevalence and incidence of carrying among adults and on the kinds of people who carry.

JOURNAL OF RESEARCH IN CRIME AND DELINQUENCY, Vol. 35 No. 2, May 1998  193-224
© 1998 Sage Publications, Inc.

193

Downloaded from jrc.sagepub.com at GEORGA WASHINGTON UNIVERSITY on February 24, 2011

JA 84

from the SAGE Social Science Collections  All Rights Reserved

## WHY GUN CARRYING MATTERS

### Criminogenic Effects of Gun Carrying

Carrying guns in public places, as distinct from merely keeping them in private homes, can have significant implications for both legal and illegal activities associated with crime. The frequency of carrying will affect how often criminals have guns available for criminal uses. Occasional carrying may be a part of planned crimes, whereas routine daily carrying may facilitate the commission, or influence the outcomes, of unplanned crimes, such as spontaneous fights or opportunistic robberies committed impulsively in response to contact with vulnerable or lucrative victims. In 1993, there were about 1.02 million crime incidents committed by offenders who possessed guns (but only some of whom actually used the guns) (U.S. Bureau of Justice Statistics 1996a:72). About 77 percent of all violent crimes in 1993 were committed in public places (p. 67) where the offender would have had to carry a gun to use it in the crime.

When guns are used in violent crimes, it increases the likelihood the crime will be completed (e.g., property is taken in a robbery or burglary), reduces the likelihood that the offender will attack and injure the victim, but increases the likelihood that any injury inflicted will be fatal (Cook 1991; Kleck 1991, chap. 5; Kleck and McElrath 1991). Thus, increased gun carrying by those with criminal propensities could contribute to increases in robberies and other violent crimes, such as assaults, committed in public places, and to higher fatality rates in those crimes.

## DEFENSIVE USES OF GUNS CARRIED IN PUBLIC PLACES

On the other hand, the frequency of carrying also affects how often prospective crime victims, both criminal and noncriminal, will have guns available for self-defense. It is a mistake to think of gun carrying as something done largely for criminal purposes, except in the definitional sense that most concealed carrying without a permit is itself a crime. As will be documented, most nonrecreational carrying is done for noncriminal purposes of self-defense. Self-defense gun carrying is worth taking seriously for two reasons. First, the empirical literature is unanimous in portraying defensive gun use as effective, in the sense that gun-wielding victims are less likely to be injured, lose property, or otherwise have crimes completed against them than victims who either do nothing to resist or who resist without weapons (for reviews, see Kleck 1997, chap. 5; Kleck and DeLone 1993).

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

Second, the literature is nearly unanimous (with a single dissenting source of survey information) in indicating that defensive gun use (DGU) is commonplace, though largely invisible to governments.[1] At least 15 surveys have yielded results implying anywhere from 760,000 to 3.6 million DGUs per year, with evidence from the first survey specifically designed to estimate DGU frequency, the National Self-Defense Survey (NSDS), indicating about 2.5 million instances of DGU per year (Kleck and Gertz 1995; for a recent confirming estimate, see Cook and Ludwig 1997:61-3).[2]

More specifically relevant to current concerns, the NSDS indicated that 26.8 percent of those 2.5 million DGUs occurred in some location away from the user's home, and another 35.9 percent occurred in places near the defender's home (yard, carport, street adjacent to home, etc.) where possession of the gun could be regarded in legal terms as carrying. Thus, anywhere from 670,000 to 1,570,000 DGUs a year occur in connection with gun carrying in a public place. To put this in perspective, in 1993 there were about 1.02 million crime incidents committed by offenders who appeared to possess guns (U.S. Bureau of Justice Statistics 1996a). Because some of these crimes, such as cases of domestic violence, were committed in the offender's home and thus did not entail gun carrying, the estimated number of crimes involving gun carrying would be less than 1 million. Thus, there appear to be about as many defensive uses of guns connected with carrying by victims as there are criminal uses by gun carrying offenders.

## DETERRENT EFFECTS OF GUN CARRYING BY PROSPECTIVE VICTIMS

Widespread gun carrying by potential victims may also exert a deterrent effect on rates of criminal behavior, especially for types of crimes commonly committed in public places, such as robberies. That is, quite apart from their effects in disrupting crimes that have already been initiated, gun carrying among prospective victims may discourage some crimes from being attempted in the first place, due to criminals anticipating greater risks of injury to themselves and lower rates of success completing the crimes. Consistent with this hypothesis, Kleck and Patterson (1993:269) found that cities with higher gun prevalence (and presumably higher gun-carrying rates) had lower rates of robbery, a crime typically committed in public places. This association was not significant for total and gun robberies but was significant for nongun robberies. This fits closely with the expectation that robbers lacking guns themselves would be the ones most likely to be deterred by the prospect of victims with guns. Deterring these robbers is especially important in light

Downloaded from jrc.sagepub.com at GEORGIA WASHINGTON UNIVERSITY on February 24, 2011

of the fact that prior research has consistently indicated that unarmed robbers are more likely to injure victims than are armed robbers (see findings of Kleck and DeLone 1993, and 16 earlier studies summarized on p. 62 of that article).

Likewise, in a comprehensive pooled cross-sections time series analysis of virtually all 3,141 U.S. counties, Lott and Mustard (1997) found that robbery rates, as well as homicide (both with and without guns), rape, and aggravated assaults, declined after states passed laws making it easier for noncriminals to obtain carry permits. They interpreted the results as indicating that allowing more citizens to legally carry guns reduced rates of crimes involving direct offender-victim contact by raising robbers' perception of risk from armed victims. Although it is debatable how much of this pattern reflected causal effects of new laws (Kleck 1997, chap. 6), the results strongly undercut the conclusions of McDowall, Loftin, and Wiersema (1995), based on univariate (or bivariate) analyses of homicide trends in just seven nonrandomly selected counties (clustered into five areas), that such laws increase gun homicides, supposedly because they indirectly stimulate offender gun carrying (see Britt, Kleck, and Bordua 1996 for a critique of interrupted time series evaluations of legal interventions).

## PURPOSES AND MOTIVES FOR CARRYING GUNS

Most of the nonrecreational carrying of guns by civilians, whether resulting in a DGU or not, is very likely illegal. Although national surveys of the general population (to be reviewed later) indicate that perhaps 5-11 percent of U.S. adults admit to carrying guns on their person for self-protection, only about 1 percent of the population has a permit to carry a concealed weapon, and only about 2 percent even in states like Florida where it is relatively easy to get one. All but one of the states either prohibit civilians altogether from concealed carrying on the person or require a permit to do so (Cramer and Kopel 1994; National Rifle Association 1996). Therefore, probably about 80-90 percent of those who report carrying guns on their person away from their homes do so illegally. This suggests that there are probably still more carriers who are unwilling to report their illegal activity to surveyors. We assume that this defensive carrying is nearly all concealed, in the absence of any reports of widespread open carrying of guns.

On the other hand, very little of this enormous amount of generally unlawful gun carrying is done for purposes of committing a crime (apart from violations of gun laws themselves). Only a tiny fraction of gun carrying results in a crime committed with a gun. We later present an estimate of 975 million

Downloaded from jrc.sagepub.com at GEORGA WASHINGTON UNIVERSITY on February 24, 2011

instances (person-days) of adult gun carrying on the person per year. There are less than a million violent crimes committed with guns (based on victim surveys, and counting both crimes reported to the police and those unreported), and 81 percent of persons arrested for violent crimes in 1994 were aged 18 or older (U.S. Federal Bureau of Investigation 1995:227), implying about 800,000 gun crimes committed by adults. Even if we assumed, somewhat implausibly, that all of these gun crimes involved gun carrying (i.e., occurred in places requiring carrying for a gun to be present), it is still clear that less than one in one thousand instances of gun carrying on the person result in a crime committed with a gun.

If carrying guns is rarely done for the purpose of committing a crime, this suggests that self-protection is a more common motive for any one instance of carrying, among criminals and noncriminals alike. Prior research has found either that most of both illegal carriers and legally permitted carriers express protection-related motives for carrying or that the carrying is associated with crime-related variables such as anticipation of future victimization, prior victimization, fear of crime, or exposure to risk factors for victimization, such as drug-selling or gang membership. These patterns are evident among adults in the general population (Bryant and Shoemaker 1988; Hassinger 1985), juveniles in the general population (Arria, Wood, and Anthony 1995; Bjerregaard and Lizotte 1995; Callahan and Rivara 1992; Fagan 1990; Sheley and Brewer 1995; Sheley, McGee, and Wright 1992; Smith and Sheley 1995; Webster, Gainer, and Champion 1993), adult offenders (Schultz 1962; Wright and Rossi 1986), and juvenile offenders (Ash et al. 1996; Callahan, Rivara, and Farrow 1993; Knox et al. 1994; Sheley 1994; Sheley and Wright 1993, 1995).

None of this implies that gun carrying cannot contribute to crime increases. Some gun crimes are committed in public places by offenders who did not plan the crime but who possessed a gun at the time of the offense only because they were carrying for self-protection. Criminals have a far higher-than-average risk of victimization themselves, and thus should be especially likely to carry guns for defensive reasons (Wright and Rossi 1986). Some of this defensively motivated carrying could increase the number or seriousness of unplanned crimes committed in public places. Gun carrying among criminals could, however, also deter victimization attempts by other criminals just as carrying among noncriminals may do.

The fact that most gun carrying, even by criminals, is done without a concomitant violent crime also does not mean that criminals do not carry guns for criminal purposes. When criminals commit crimes, they often find guns useful for intimidating and controlling their victims, and even for avoiding hurting them (Sheley and Wright 1995:67-9; Wright and Rossi 1986:127-31).

Downloaded from jrc.sagepub.com at GEORGA WASINGTON UNIVERSITY on February 24, 2011

Thus, two perfectly consistent assertions are supported by the evidence: (a) Only a small share of incidents of gun carrying, even by criminals, is done for the purpose of committing violent crimes and (b) on those less frequent occasions when offenders *do* commit violent crimes, they often commit them with guns that were carried to the scene, either because the offenders believed that weapons would be useful in controlling victims and otherwise ensuring a successful outcome of the crime or because the offenders were initially carrying guns for self-protection (or "just in case") but became involved in an unplanned crime.

## SOME CONCEPTUAL DISTINCTIONS

Gun carrying can be divided up into categories according to the carrier's dominant motivation. Thus, carrying is sometimes done by criminals specifically for the purpose of ensuring that a gun will be available to help carry out a crime. Far more common, even among criminals, is carrying for reasons of self-protection (Sheley and Wright 1995; Wright and Rossi 1986). There is also "carrying" of guns for purely recreational reasons or other reasons unrelated to crime, such as hunting or target shooting. Although this is probably not the sort of carrying that interests most researchers or policymakers, it may well be the kind of carrying that some survey respondents (Rs) have in mind when they report, in response to imprecisely worded questions, that they "carry" guns. This problem will be discussed later at greater length.

Among juveniles, there may also be another common motive that can, for lack of a better term, be labeled "showing off." A typical scenario might be something like the following: A noncriminal adolescent boy sneaks a parent's handgun out of the home and takes it to school or to a friend's house, where he shows it off to his friends. The gun is then returned home without incident. Although this sort of thing is unlikely to be a reason for routine or frequently repeated carrying, or an important or common motive for carrying among adults, it could be a common motive for isolated instances of relatively inconsequential carrying by noncriminal adolescents.

Carrying guns may also be categorized according to the manner in which it is done. Very likely the gun carrying that most researchers are primarily concerned with is concealed carrying of handguns (and primarily loaded handguns), rather than carrying of long guns or the open carrying of handguns. Although some might automatically assume that concealed handgun carrying refers only to carrying on the person, a Gallup survey of adults in 1993 indicated that carrying guns for protection in motor vehicles, which would often include carrying in a glove compartment or similar hidden

Downloaded from jrc.sagepub.com at GEORGA WASHINGTON UNIVERSITY on February 24, 2011

location, is even more common than carrying on the person (Table 1). This may be partly due to the fact that the criminal law in many states is less restrictive concerning gun possession in vehicles, in effect treating citizens' vehicles as extensions of their homes (National Rifle Association 1996; Wright, Rossi, and Daly 1983:252-3). Previous surveys usually do not distinguish between carrying in vehicles and carrying on the person, despite the fact that the former is often legal whereas the latter usually is not.

## PRIOR RESEARCH

Gun carrying received very little scholarly or public attention before the 1990s. This changed after 1987, when Florida's legislature passed a law making it easier for adult residents without a criminal conviction to get a carry permit, followed by a wave of similar "shall issue" or nondiscretionary carry permit laws enacted elsewhere. By 1996, 31 states had "shall issue" carry laws (U.S. Bureau of Justice Statistics 1996b:120-1). A wave of studies, many funded by the federal Centers for Disease Control and Prevention (CDC) or the Justice Department, soon appeared, beginning around 1992.

Almost all of the resulting publications, however, concerned juveniles (Arria et al. 1995; Ash et al. 1996; Callahan and Rivara 1992; Callahan et al. 1993; Knox et al. 1994; Lizotte et al. 1994; Sheley 1994; Sheley and Brewer 1995; Sheley et al. 1992; Sheley and Wright 1993, 1995; Smith and Sheley 1995; Webster et al. 1993). This was an unfortunately narrow focus, given that the vast majority of carrying is done by adults and the vast majority of gun crimes, presumably including the bulk of those involving gun carrying, are committed by adults—77 percent of persons arrested for weapons violations and 81 percent of persons arrested for violent crimes in 1995 were aged 18 or older (U.S. Federal Bureau of Investigation 1996:224).

Furthermore, with respect to law-making, there is very little at stake in connection with juvenile gun carrying. All concealed carrying of handguns in public places by minors has long been completely illegal virtually everywhere in the United States (excepting Vermont), in that such carrying is, depending on the state, either prohibited for civilians of any age or requires a carry permit that minors are not eligible to receive (National Rifle Association 1996; Sheley and Wright 1995:150). Although there is certainly room for improvement in the enforcement of existing carry laws (Kleck 1991:347-53, 441-2), laws permitting the confiscation of guns from juveniles are already "almost universal" (Blumstein 1995:32-3). This did not, however, prevent at least 18 state legislatures in the early 1990s from passing largely redundant bans on juvenile gun carrying anyway (Toch 1993).

Downloaded from jrc.sagepub.com at GEORGA WASHINGTON UNIVERSITY on February 24, 2011

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

200

**TABLE 1:   Prevalence of Gun Carrying in Recent National Surveys**

*A. Adults*

| Date Fielded | Survey Firm | On Person or in Vehicle? | Protection?[a] | Question Asked of: | Percentage Carry[b] |
|---|---|---|---|---|---|
| February 7-10, 1991 | Princeton | Any | No | All Rs | 10 |
| May 16-19, 1991 | Gallup | Vehicle | No | Personal handgun owners | 8.2 |
| August 18-22, 1991 | CBS/NY Times | Any | No | All Rs | 5 |
| April 3-12, 1993 | LH Research | Person | No | Rs in gun households | 10.5 |
| December 17-19, 1993 | Gallup | Vehicle | Yes | Personal gun owners | 7.75 |
|  |  | Person | Yes | Personal gun owners | 5.27 |
| April 16-19, 1994 | L.A. Times | Any | Yes | All Rs | 11 |
| November 12, 1994 | Chilton | Any | Yes | Personal gun owners | 7.5 |

*B. Youth*

| Year Fielded | Survey | Sample[c] | Recall Period | Protection?[a] | Weapon | Gun | Percentage Carried | |
|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  | Weapon on School Property | Gun to School |
| 1989 | NCVS | A 12-19 | 6 months | Yes |  |  | 2 | .05 |
| 1990 | YRBS | G 9-12 | Past 30 days | Yes | 19.6 | 4.1[d] |  |  |
| 1991 | YRBS | G 9-12 | Past 30 days | No | 26.1 | 2.9[e] |  |  |

Downloaded from jrc.sagepub.com at GEORGETOWN UNIVERSITY on February 24, 2011

| 1992 | YRBS | A 14-17 | Past 30 days | No | 17.1 | | | |
| | | A 12-19 | Past 30 days | No | 15.7 | | | |
| 1993 | NCES | G 6-12 | School year | Yes | | | 3.2 | .19 |
| 1993 | LHRI | G 6-12 | c. 8 months | No | | | 15-22 | 4 |
| | | | Past 30 days | No | | 15 | | |
| 1993[f] | YRBS | G 9-12 | Past 30 days | No | 22.1 | 7.9 | 11.8 | |
| 1995[f] | YRBS | G 9-12 | Past 30 days | No | 20.0 | 7.6 | 9.8 | |

SOURCES: DIALOG (1995), Bastian and Taylor (1991), U.S. Centers for Disease Control and Prevention (1991, 1992, 1994a, 1994b, 1995, 1996), LH Research (1993a, 1993b), Cook and Ludwig (1997), U.S. National Center for Education Statistics (1996).

NOTE: NCVS = National Crime Victimization Survey, YRBS = Youth Risk Behavior Surveillance, NCES = U.S. National Center for Education Statistics, LHRI = LH Research, Inc.

a. Did question specify carrying for protection against crime?

b. Percentage of entire sample reporting carrying.

c. A = ages, G = grades.

d. Students were counted as gun carriers only if a gun was the weapon they "usually" carried.

e. Students were counted as gun carriers only if they carried guns more often than any other weapon.

f. The 1993 and 1995 YRBS surveys were the first pair of YRBS surveys whose carry results are directly comparable.

One would expect adult carrying to look very different from juvenile carrying. Some of the former is legally authorized, whereas very little of the latter is. Much adult carrying is done in vehicles, whereas low driving rates among juveniles younger than age 16 would imply less juvenile carrying in vehicles. Whereas some carrying of guns by juveniles might be done in schools, very little by adults is done there. A significant minority of adult carrying might be linked to jobs requiring a gun (police officer, security guard), whereas virtually none of juvenile carrying would be so linked. Conversely, a good deal of juvenile carrying would be linked to membership in street gangs (Bjerregaard and Lizotte 1995; Callahan and Rivara 1992; Decker and Pennell 1995), whereas among adults such links are likely to be limited to a few younger adults. Consequently, one might expect the correlates of adult gun carrying to differ from the correlates of juvenile carrying. Broadly speaking, adult carrying is likely to look more legitimate.

The few studies of adult carrying have typically relied on less satisfactory types of samples. Some confined their analyses to small nonprobability samples of carry permit holders or applicants (Hassinger 1985; Northwood, Westgard, and Barb 1978). Because no noncarriers were studied, these studies could shed little light on how carriers differ from noncarriers. Further, permit holders are likely to be especially legitimate gun carriers, unrepresentative of all carriers. For example, Hassinger (1985) found, contrary to the typical profiles of either criminals or crime victims, that permit holders typically were married, well-educated, middle-aged, upper-middle-class Whites.

On the other hand, another study used a sample of 50 persons arrested for weapons carrying (Schultz 1962), cases confined to the opposite end of the legitimacy continuum, resulting in the opposite sample bias. Nevertheless, what permit holders and arrestees had in common is that both were likely to carry weapons because of concerns about future victimization. Among Hassinger's permit holders, the most frequently endorsed reason for carrying a pistol was, "I understand the police cannot be everywhere; the pistol is a prudent precaution" (1985:192). Likewise, 70 percent of Schultz's arrestees carried weapons mainly because they were "anticipating attack," by far the most commonly endorsed reason (1962:477). Note that concerns about future victimization do not necessarily imply either past victimization or fear. Northwood and his colleagues found that only 18.5 percent of their permit applicants claimed prior victimization as a reason for carrying. Likewise, research on handgun ownership indicates an association with residence in high-crime areas and anticipation of future victimization but little consistent relationship with fear or prior victimization (see studies reviewed in Kleck 1997, chap. 3).

Three studies of adult gun carrying used probability samples of state populations. Bryant and Shoemaker (1988) found no association between

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

gun carrying and prior victimization or fear of crime in a 1984 mail survey of Virginia motor vehicle registrants. The only two significant correlates found were sex and community size: Males and persons from smaller communities were more likely to carry. With a return rate of only 33 percent, it is questionable whether the survey's sample was representative. A mail survey of Louisiana driver's licensees (c. 1985) had the same problem (Bankston and Thompson 1989; Bankston et al. 1990). Although national surveys indicate that only 5-11 percent of adults carry guns for protection (and, according to the present survey, 20 percent of households in the West South Central region of Louisiana, Texas, Oklahoma, Arkansas), 34 percent of the households in this sample reported carrying for protection, suggesting pronounced sample bias. Paralleling the Virginia findings, Bankston and Thompson (1989) found gun carrying to be significantly more common among males, younger persons, and those who perceived guns as effective in reducing crime. Carrying was only weakly and indirectly related to fear or a perception of being at greater risk of future victimization, and was unrelated to prior victimization (see also Bankston et al. 1990).

Finally, Nelson and his colleagues (1996) surveyed Oregon adults by telephone in 1992 to 1993 and found, like Bryant and Shoemaker, carrying a loaded gun to be significantly more common among males in less densely populated areas. They did not measure fear, prior victimization, or similar crime-related variables.

## THE MEANING OF GUN "CARRYING" IN SURVEYS

Table 1 summarizes estimates of gun and weapon carrying prevalence in recent national surveys using probability samples. Perhaps even more than with other phenomena, estimates of the frequency of gun carrying appear to be radically affected by seemingly minor variations in question wording. For many survey Rs, imprecisely worded questions about "carrying" guns can be interpreted literally, as referring to any and all physical conveying of guns. Thus, moving a gun from one room of the owner's home to another room, from a drawer to a gun cabinet, or from the cabinet to the owner's vehicle would all entail physically carrying the gun. Even a question confined to locations away from the owner's home could still encompass carrying guns from a gun store to the owner's home, or carrying for recreational purposes such as target shooting or licensed hunting during appropriate hunting seasons. It is unlikely that either the authors of the survey questions or the consumers of research results had these kinds of gun carrying in mind. Whereas

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

some Rs might guess the surveyors' intended meaning, one would not be justified in assuming that all of them do.

In surveys where the question wordings do not specify the more problematic and often unlawful types of carrying, that is, carrying for criminal or defensive purposes, it is quite possible that the *majority* of Rs reporting carrying may be referring only to recreational or other innocuous types of carrying. Consider, for example, a large-scale national survey of high school students. The 1995 Youth Risk Behavior Surveillance (YRBS) survey, fielded by CDC, found that 7.6 percent of the students reported carrying a gun (anywhere, not just in school) in the preceding 30 days. The carry question did not specify carrying for protection, and thus a student who had done some target shooting or hunting in the previous 30 days could accurately answer "yes." A 1991 national survey indicated that 10 percent of persons aged 16 to 17 had hunted in the previous year (U.S. Fish and Wildlife Service 1993:75), and a 1989 national survey indicated that 12.9 percent of persons aged 12 to 17 had engaged in target shooting in the previous year (American Sports Data Inc. 1989:237). Similarly, among adults, about 8.5 percent hunted with firearms in 1993 (U.S. Bureau of the Census 1995:260) and 7.2 percent engaged in target shooting (American Sports Data Inc. 1989:237). Thus, there are easily enough recreational shooters to potentially account for *all* of those reporting gun carrying in surveys not excluding carrying for recreation (Table 1).

Even a question specifying "for protection" is ambiguous if it does not further specify "against crime or criminals," or words to that effect, because people in rural areas carry guns for protection against poisonous snakes and other dangerous animals. The 1990 YRBS, for example, asked about protection but did not limit the question to protection against human threats. Due to crucial variations in question wordings, none of the carry estimates in Table 1 up through 1993 are strictly comparable with any of the others; even the earlier YRBS surveys each used different question wordings concerning gun carrying. Thus, people who used the YRBS results to judge trends in youth gun carrying are mistaken. For example, Ash et al. (1996:1754) interpreted the 1990 and 1993 YRBS surveys to indicate huge increases in youth gun carrying. Actually, the difference in self-reported carry rates may have been due to nothing more than the fact that the 1990 question was limited to protection-related carrying whereas the 1993 question was not. Further, the 1990 survey only counted gun carriers who carried guns more often than other weapons, whereas the 1993 survey counted all gun carriers (based on unpublished copies of YRBS survey instruments). The first pair of surveys whose results could be directly compared, the 1993 and 1995 YRBS surveys, indicated that weapon and gun carrying among youths was declining slightly (Table 1).

Downloaded from jrc.sagepub.com at GEORGA WASHINGTON UNIVERSITY on February 24, 2011

## PREVALENCE OF GUN CARRYING
## IN PREVIOUS NATIONAL STUDIES

The focus here is on national surveys of probability samples of the U.S. population. None of the national surveys of adults (Table 1, panel A) is satisfactory for estimating the prevalence of gun carrying. Some of the surveys did not specify carrying for protection against crime, so they could include a good deal of carrying linked with recreational uses of guns. Two of the surveys that did specifically ask about carrying for protection asked the question only of Rs reporting that they personally owned guns. This procedure excludes people who carry guns belonging to other members of their household, a practice likely to be more common among women. The estimates indicate that between 5 and 11 percent of U.S. adults at least occasionally carry guns in public places. None of the surveys asking carry questions of all adults asked how often carriers carried their guns, so it is not possible to estimate the incidence of carrying or what fraction of the population is carrying on any given day.

One survey fielded after ours yielded national carry prevalence estimates, but they are flawed in important ways. Due to errors in the questionnaire, a Police Foundation (PF) survey fielded in November-December 1994 asked the gun carrying questions only of Rs who reported personally owning a gun (Chilton Research Services 1994). Because our survey indicated that nearly a quarter of carriers claimed (accurately or not) to not personally own a gun, that flaw alone could have caused the PF survey to miss about a quarter of gun carriers. Furthermore, the PF questions pertaining to whether guns were carried on the person or in a vehicle were not asked of persons who carried guns while commuting to and from their jobs or for other work-related reasons (about 28 percent of carrying was for "work-related" reasons in the PF survey—Cook and Ludwig 1997:54-5). Thus, that survey did not yield estimates of all gun carrying on the person or in vehicles and cannot be compared with ours. The PF survey was also afflicted by an unacceptably low interview completion rate of 42 percent (completions divided by completions plus refusals—see Cook and Ludwig 1997:7), compared to, for example, 61 percent (computed the same way) in the present survey.

## THE NATIONAL SELF-DEFENSE SURVEY

### Methods

The data presented here are drawn from the National Self-Defense Survey, the first national survey ever devoted to the subject of armed self-defense. We

Downloaded from jrc.sagepub.com at GEORGA WASHINGTON UNIVERSITY on February 24, 2011

**JA 96**

used the most anonymous possible national survey format, that of the anonymous random digit dialed telephone survey. We did not know the identities of those who were interviewed and made this fact clear to the Rs. We interviewed a large, nationally representative sample covering all adults (aged 18 and over) in the lower 48 states and living in households with telephones. The quality of sampling procedures was well above the level common in national surveys. Our sample was not only large and nationally representative, but it was also stratified by state. That is, 48 independent samples of residential telephone numbers were drawn, one from each of the lower 48 states, providing 48 independent, albeit often small, state samples. To gain a larger raw number of sample DGU cases, we oversampled in the South and West regions, where previous surveys have indicated gun ownership is higher. We also oversampled within contacted households for males, who are more likely to own and carry guns, by initially asking to speak to the male head of household. Finally, because the survey was designed to yield information on defensive use of guns, we oversampled for persons who reported, early in the interview, a DGU by interviewing all of them whereas interviewing only a randomly selected one in three of all other Rs. Data were later weighted to adjust for oversampling by region, sex, and involvement in a DGU. The results reported here are based on responses of all 1,832 persons who were given the full interview.

A professional telephone polling firm, Research Network, of Tallahassee, Florida, did the sampling and interviewing. Interviews were conducted from February through April of 1993. Only the firm's most experienced interviewers were used on the project. Interviews were monitored at random by survey supervisors. Up to 10 calls were made in an attempt to contact initial sample members. Of all eligible residential telephone numbers called where a person (rather than an answering machine) answered, 61 percent resulted in a completed interview (i.e., a 39 percent refusal rate among persons contacted). A 20 percent random sample of interviews was validated by supervisors with call-backs. Our sample's demographic distribution (weighted) closely resembled that of the U.S. adult (18+) population: 47 percent male (48 percent in the U.S. population), 84 percent White and 9 percent Black (85 percent and 11 percent, respectively, in the population), and 14 percent aged 18-24 (14 percent), 23 percent aged 25-34 (23 percent), 25 percent aged 35-44 (21 percent), 27 percent aged 45-64 (26 percent), and 12 percent aged 65 and older (17 percent). A fuller description of the methods is in Kleck and Gertz (1995), and a full copy of the questionnaire and the data can be obtained from the senior author.

Following directly after questions about gun ownership, the questions on gun carrying were phrased as follows: *"In the last 12 months, have you ever*

Downloaded from jrc.sagepub.com at GEORGA WASHINGTON UNIVERSITY on February 24, 2011

JA 97

*carried* a gun away from home, either on your person or in a vehicle, for protection against crime? Do not count carrying for recreation or in connection with duties in law enforcement, work as a security guard, or in the armed forces" (emphases in original survey instrument). Those who replied "yes" were then asked, "Was this carrying done on your person—for example, in a pocket, holster, or bag—or was it only in a motor vehicle?" Those responding "on person" or "both" were then asked, "About how many days in the past 12 months did you carry a gun on your person for protection against crime?" Those responding "in vehicle" or "both" were asked, "About how many days in the past year did you carry a gun in a motor vehicle for protection against crime?" The frequency questions were open-ended—interviewers recorded the number of days Rs reported, from 0 to 365.

Because this was a survey of the general population of adults, it is unlikely to include many Rs who carry guns for criminal purposes. Thus, this study contributes information primarily about the largest, but least studied, segment of the carrying population, largely noncriminal adults. In this way, it adds to, but is distinct from, the substantial body of knowledge concerning carrying among adolescents and criminal adults.

### *Results—Prevalence and Incidence of Protective Gun Carrying among U.S. Adults*

Table 2 presents the data pertaining to the frequency of gun carrying among U.S. adults. There were 1,832 total Rs, and 1,799 who answered the initial question about carrying, of whom 159 (8.8 percent) reported gun carrying and 1,640 did not. Of the 159 carriers, 29 carried on the person but not in a vehicle, 39 carried both ways (for a total of 68 who carried on the person), 80 carried only in a vehicle (for a total of 119 who carried in a vehicle), and 11 carried a gun but would not say whether they carried on their person or in a vehicle (weighted frequencies). The weighted prevalence results indicate that 8.8 percent of U.S. adults carry a gun in some way for protection each year (95 percent confidence interval: 7.5-10.1 percent), 3.8 percent carry on their person (2.9-4.7 percent), 6.6 percent do so in a vehicle (5.5-7.8 percent), and 2.1 percent carry in both ways (these last are a subset of the previous two segments, not an additional segment). Applying these percentages to the estimated 1993 U.S. resident adult (age 18+) population of 190,673,523 (U.S. Bureau of the Census 1995:13) indicates that about 16.8 million adults carried guns for protection that year, 7.1 million adults carried on their person, 12.4 million carried guns in a vehicle, and 4.0 million did both. In comparison, applying the 1993 YRBS estimate of high school–aged gun carrying prevalence (7.9 percent) to the estimated U.S. population aged 13-17 of

Downloaded from jrc.sagepub.com at GEORGA WASHINGTON UNIVERSITY on February 24, 2011

TABLE 2:   Prevalence and Incidence of Adult Gun Carrying in the United States, 1993—Results from the National Self-Defense Survey

|  | Type of Carrying | | | |
|  | On Person | In Vehicle | Both | Any |
| --- | --- | --- | --- | --- |
| Prevalence— | | | | |
| percentage who carry | 3.8 | 6.6 | 2.1 | 8.8[a] |
| Estimated number of | | | | |
| carriers in population | 7,054,920 | 12,393,779 | 4,004,144 | 16,779,270 |
| Mean number of days | | | | |
| per carrier per year | 138.18 | 145.92 | | |
| Annual person-days | | | | |
| of carrying | 974,848,894 | 1,808,500,232 | | |
| Estimated number | | | | |
| carrying on average day | 2,670,819 | 4,954,795 | | |

a. Includes persons who carry but would not say whether it was on the person or in a vehicle.

17,746,048 (pp. 12-13) implies only about 1.4 million adolescent carriers in the past month, only a fraction of whom carry for protection. Even taking account of the difference in recall periods, adults almost certainly account for the vast majority of defensive gun carrying.

As with most surveys, Rs can fail to report events that did occur or report events that occurred prior to the recall period, that is, "telescope" events into the recall period. Based on technical studies of the National Crime Victimization Survey (NCVS), Kleck and Gertz reported that reports of crime victimization experiences could be no more than 21 percent too high due to telescoping. This problem, however, is balanced out by a roughly equal amount of failure to recall events that did occur (1995:171-2). Assuming reports of gun carrying are the same as reporting of crime incidents in this respect, there is no reason to believe that telescoping was common enough to make carry estimates too high.

It is worth stressing that we told Rs not to include carrying done as part of their work duties as police officers, security guards, or in the military. However, even if one speculated that some Rs ignored this instruction and reported such carrying anyway (and we have no reason to believe that any Rs did this), it could inflate our prevalence estimates by no more than a factor of 1.07, in that only 7 percent of the gun carriers ($n = 11$) had such an occupation (Table 3).

The data on frequency of carrying, among those who carry guns, indicate that those who carry on the person do so an average of about 138 days a year,

Downloaded from jrc.sagepub.com at GEORGA WASHINGTON UNIVERSITY on February 24, 2011

JA 99

**TABLE 3:   Comparison of Gun Carriers with Other People (weighted percentages)**

| | Sample | | | | | |
|---|---|---|---|---|---|---|
| | All Gun Carriers | Carry on Person | Carry in Vehicle | Own Gun, No Carry | No Carry | All Persons |
| Personally owns gun | 76.1 | 82.4 | 79.0 | 100.0 | 19.6 | 24.6 |
| Gun in household | 81.1 | 86.8 | 84.9 | 100.0 | 32.6 | 36.9 |
| Burglary victim, past year | 11.4 | 7.4 | 10.2 | 4.0 | 4.9 | 5.5 |
| Robbery victim, past year | 5.1 | 6.5 | 4.2 | 1.6 | 2.3 | 2.6 |
| Assault victim as adult | 31.0 | 41.2 | 30.5 | 31.0 | 21.5 | 22.4 |
| Know crime victim? | 50.0 | 54.4 | 47.5 | 33.6 | 28.1 | 30.1 |
| Nights away from home, monthly average | | | | | | |
| 0 | 8.4 | 7.5 | 6.8 | 5.6 | 8.2 | 8.2 |
| 1-6 | 27.9 | 25.4 | 31.4 | 24.7 | 31.5 | 31.2 |
| 7-13 | 24.7 | 19.4 | 27.1 | 27.5 | 23.7 | 23.8 |
| 14+ | 39.0 | 47.8 | 34.7 | 42.2 | 36.6 | 36.8 |
| Must depend on self rather than cops | 85.4 | 88.2 | 84.0 | 64.7 | 52.8 | 55.7 |
| Supports death penalty | 82.9 | 83.8 | 85.7 | 82.2 | 69.3 | 70.5 |
| Courts not harsh enough | 82.8 | 91.2 | 84.7 | 76.4 | 73.2 | 74.0 |
| Gender (percentage male) | 62.9 | 70.6 | 63.9 | 76.1 | 44.9 | 46.7 |
| Age | | | | | | |
| 18-24 | 11.3 | 11.8 | 10.1 | 11.8 | 14.0 | 13.7 |
| 25-34 | 27.7 | 25.0 | 30.3 | 22.0 | 22.3 | 22.8 |
| 35-44 | 27.0 | 32.4 | 26.9 | 23.9 | 25.1 | 25.3 |
| 45-64 | 28.3 | 29.4 | 26.9 | 30.1 | 26.4 | 26.5 |
| 65+ | 5.7 | 1.5 | 5.9 | 12.1 | 12.2 | 11.6 |
| Race | | | | | | |
| White | 79.9 | 79.1 | 83.9 | 90.6 | 84.4 | 84.0 |
| Black | 11.9 | 11.9 | 9.3 | 5.0 | 8.8 | 9.1 |
| Hispanic | 4.4 | 4.5 | 4.2 | 3.8 | 4.8 | 4.7 |
| Other | 3.8 | 4.5 | 2.5 | .6 | 2.1 | 2.3 |
| Place of residence | | | | | | |
| Large city (more than 500,000) | 24.7 | 27.9 | 22.0 | 14.0 | 22.4 | 22.6 |
| Small city | 31.6 | 29.4 | 29.7 | 31.5 | 29.1 | 29.4 |
| Suburb of large city | 26.6 | 23.5 | 30.5 | 28.7 | 31.4 | 31.0 |
| Rural area | 17.1 | 19.1 | 17.8 | 25.9 | 17.1 | 17.1 |
| Marital status | | | | | | |
| Married | 65.4 | 64.2 | 66.7 | 67.2 | 59.3 | 59.8 |
| Widowed | 4.5 | 3.0 | 6.8 | 1.9 | 6.1 | 6.0 |
| Divorced/separated | 12.1 | 13.5 | 10.2 | 15.8 | 12.1 | 12.1 |
| Never married | 17.9 | 19.4 | 16.2 | 15.2 | 22.5 | 22.1 |

*(continued)*

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

**JA 100**

**TABLE 3:  Continued**

| | Sample | | | | | |
|---|---|---|---|---|---|---|
| | All Gun Carriers | Carry on Person | Carry in Vehicle | Own Gun, No Carry | No Carry | All Persons |
| Annual household income | | | | | | |
| Less than $15,000 | 9.1 | 11.5 | 8.2 | 8.1 | 14.0 | 13.5 |
| $15,000-29,999 | 23.1 | 14.8 | 22.7 | 25.7 | 27.5 | 27.1 |
| $30,000-44,999 | 25.2 | 27.9 | 27.3 | 30.6 | 24.4 | 24.4 |
| $45,000-59,999 | 17.5 | 18.0 | 19.1 | 18.0 | 19.3 | 19.2 |
| $60,000-79,999 | 11.9 | 11.5 | 11.8 | 10.9 | 8.6 | 8.9 |
| $80,000 or more | 13.3 | 16.4 | 10.9 | 6.7 | 6.2 | 6.9 |
| Gun-related occupation | 7.0 | 13.2 | 5.9 | 4.1 | 2.8 | 3.2 |

or 38 percent of the days, whereas those who carry in vehicles do so about 146 days a year, or 40 percent of the days. The figures imply that each year in the United States, there are about 980 million person-days of carrying on the person and about 1.8 billion person-days of carrying in vehicles. It was impossible to tell from our results how much overlap there was between these two sets of numbers, though there almost certainly were more than a billion person-days of carrying total. Because the annual number of crimes committed by persons with guns is less than 1 million, there are less than a million person-days of carrying linked with gun crimes, implying that less than one in a thousand instances of gun carrying involve a violent crime committed with a gun.

One might speculate that some instances of carrying were done by persons ready and willing to commit crime but that they just did not come across a provocation or suitable opportunity for doing so. Although this is undoubtedly true for some carrying, the only way it could reasonably be thought to characterize much carrying is if one assumed that persons of this sort came across criminal opportunities or provocations, by plan or by chance, less than one in a thousand times. We think the one-in-a-thousand figure is more compatible with the interpretation that most of this carrying is done without any intention of committing a crime or even any inclination to do so.

Note also that it was estimated that there are about 670,000 to 1,570,000 DGUs connected with instances of gun carrying (Kleck and Gertz 1995:174, 184-5). This implies that there are more than a thousand times as many instances of carrying guns outside the home as would be needed to account for all of the DGUs away from the home, thereby strengthening the plausibility of the DGU estimates.

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

*Results—Gun Carriers Compared to Other People*

Table 3 shows how persons who carry guns for protection in various ways differ from those who personally own a gun but who do not carry, from all those who do not carry (regardless of gun ownership), and from the adult population as a whole. Three groups of carriers are distinguished: all who carry guns in any way, those who carry on the person (including some who also carry in a vehicle), and those who carry in a vehicle (including some who also carry on the person).

An example will aid in interpretation. The first row of Table 3 shows that 76.1 percent of gun carriers reported personally owning a gun, compared to 24.6 percent of the entire sample. The fact that considerably less than 100 percent of gun carriers personally own a gun shows why the PF survey, which asked the carry question only of Rs reporting personal gun ownership, missed many gun carriers, and it indicates that some carriers apparently carry guns belonging to other people, such as a spouse. The fact that 19 percent of gun carriers claim there was no gun belonging to anyone in their household could indicate either that some were carrying guns belonging to people outside their household (e.g., guns borrowed from a friend or relative) or that some carriers were falsely denying gun ownership. Some may also have understood the gun ownership question as pertaining only to guns kept inside the home and failed to report guns kept in a vehicle or place of business.

Gun carriers were more likely to have been the victim of a burglary, robbery, or assault than noncarriers, though they were the same as noncarrying gun owners with respect to assaults. Those who carried on their person, but not vehicle carriers, spent more nights away from home than noncarriers, and thus were more at risk of crimes committed in public places. Not surprisingly, carriers are more likely to believe they have to depend on themselves for protection rather than on the police, even compared to gun owners who do not carry.

Two measures of punitiveness toward criminals were included: whether Rs supported the death penalty for murderers and whether they thought the courts were not harsh enough toward criminals. Gun owners are more likely to endorse the punitive views, regardless of whether they carry. Carriers are only slightly more likely to support capital punishment than noncarrying gun owners. On the other hand, carriers were more likely to believe that the courts are not harsh enough, compared to noncarrying gun owners. Whether this association reflects a causal effect will have to await results of the multivariate analysis.

Although gun owners in general are overwhelmingly male, this is much less true for those who carry guns, as 37 percent of carriers are women. This means that given personal ownership of a gun, women are more likely to

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

carry it for protection than are men. This is consistent with an observation of Lizotte and Bordua (1980) that women gun owners are especially likely to own primarily for defensive reasons. It also mirrors, and helps explain, the finding from the present survey that women account for a surprisingly large 46 percent of reported DGUs (Kleck and Gertz 1995:178).

The age distribution of gun carriers resembles that of gun owners and the general population, except that the elderly account for much less than their share of carrying, especially carrying on the person. This may reflect a lower level of activity outside the home.

Blacks are less likely than Whites to own guns, but they claim more than their share of carrying. Thus, given gun ownership, Blacks are more likely to carry a gun. Paralleling the findings for women, this reflects the larger share of Black gun ownership that is due to defensive motives (Lizotte and Bordua 1980).

Unlike the distribution of crime, gun ownership is more common in rural areas and small towns. Carrying of guns, however, is much more common in big cities than one would expect based on gun ownership levels. Compared to noncarrying gun owners, carriers are more likely to live in big cities.

Mirroring the findings from studies of carry permit holders, results indicate carriers are disproportionately likely to be married and to have higher incomes, contrary to what one would expect based on the distribution of crime victimization. This may simply reflect the fact that gun ownership is higher among those better able to afford to buy them, an idea that can be tested in the multivariate analysis by controlling for income.

Finally, although persons with gun-related occupations such as police officer, security guard, or member of the military account for only 7.0 percent of the carriers, and 13.2 percent of those who carry on the person, they are much more likely to carry than either noncarrying gun owners or the general population. Given that Rs were instructed not to report job-related carrying, carrying among these Rs should reflect carrying off the job, but it could also reflect either Rs who carry job-related guns to and from work or Rs simply failing to follow instructions.

Table 4 displays carry prevalence rates in subsets of the U.S. adult population. They are interesting and potentially useful in their own right but nonetheless reflect simple bivariate associations and should not be interpreted as necessarily indicating causal effects. Tentative causal interpretations should await the multivariate analysis. Some of the associations survive multivariate controls, whereas others do not. In particular, many of the patterns in this table are likely to primarily reflect patterns of gun ownership, without necessarily revealing anything useful about gun carrying itself.

Carrying guns for protection is more common among gun owners (though not nonexistent among nonowners); men; Blacks; younger adults; separated

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

**TABLE 4:   Carry Prevalence Rates by Population Subgroups**

|  | Percentage Who Carry | | |
|---|---|---|---|
|  | Any Way | On Person | In Vehicle |
| Entire population | 8.8 | 3.7 | 6.5 |
| Gun in household? | | | |
|   Yes | 19.5 | 8.8 | 15.1 |
|   No | 2.6 | .8 | 1.5 |
| Personally own gun? | | | |
|   Yes | 27.3 | 12.5 | 21.0 |
|   No | 2.8 | .9 | 1.8 |
| Sex | | | |
|   Male | 12.0 | 5.6 | 8.9 |
|   Female | 6.1 | 2.0 | 4.4 |
| Race | | | |
|   Black | 11.8 | 5.0 | 6.9 |
|   White | 8.5 | 3.5 | 6.5 |
|   Hispanic | 8.3 | 3.5 | 5.8 |
|   Other | 15.4 | 7.7 | 7.3 |
| Age | | | |
|   18-24 | 7.4 | 3.3 | 4.9 |
|   25-34 | 10.8 | 4.2 | 8.8 |
|   35-44 | 9.6 | 4.8 | 7.0 |
|   45-64 | 9.5 | 4.1 | 6.6 |
|   65+ | 4.3 | .5 | 3.3 |
| Marital status | | | |
|   Married | 9.6 | 4.0 | 7.2 |
|   Widowed | 6.5 | 1.8 | 7.3 |
|   Divorced | 8.0 | 3.7 | 4.9 |
|   Separated | 11.3 | 5.6 | 7.4 |
|   Never married | 7.1 | 3.3 | 4.8 |
| Income | | | |
|   $0-15,000 | 6.3 | 3.3 | 4.3 |
|   15,001-30,000 | 8.0 | 2.1 | 6.0 |
|   30,001-45,000 | 9.6 | 4.5 | 8.0 |
|   45,001-60,000 | 8.5 | 3.7 | 7.1 |
|   60,001-80,000 | 12.5 | 5.1 | 9.5 |
|   80,000+ | 18.1 | 9.4 | 11.3 |
| Region | | | |
|   New England | 3.2 | 2.1 | .0 |
|   Middle Atlantic | 5.1 | 3.2 | 2.5 |
|   East North Central | 2.2 | 1.3 | 1.6 |
|   West North Central | 3.0 | .7 | 3.0 |
|   South Atlantic | 11.9 | 4.7 | 8.7 |
|   East South Central | 14.3 | 3.6 | 11.5 |
|   West South Central | 20.0 | 7.1 | 16.2 |

(continued)

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

**JA 104**

**TABLE 4:** Continued

| | Percentage Who Carry | | |
| | Any Way | On Person | In Vehicle |
|---|---|---|---|
| Region | | | |
| Mountain | 17.9 | 9.4 | 13.4 |
| Pacific | 8.0 | 3.6 | 6.4 |
| Size of place | | | |
| City of 500,000+ | 9.7 | 4.6 | 6.3 |
| Suburb of large city | 7.6 | 2.8 | 6.4 |
| Small city | 9.5 | 3.7 | 6.6 |
| Rural area, place < 10,000 | 8.8 | 4.2 | 6.8 |
| Gun occupation? | | | |
| Yes | 19.6 | 15.8 | 12.3 |
| No | 8.5 | 3.4 | 6.4 |
| Robbery victim? | | | |
| Yes | 17.4 | 6.5 | 10.9 |
| No | 8.6 | 3.6 | 6.3 |
| Assault victim? | | | |
| Yes | 12.2 | 6.8 | 8.8 |
| No | 7.8 | 2.8 | 5.8 |
| Burglary victim? | | | |
| Yes | 18.4 | 5.0 | 12.0 |
| No | 8.2 | 3.6 | 6.1 |
| Must depend on self? | | | |
| Yes | 13.5 | 5.9 | 9.8 |
| No | 2.9 | 1.8 | 2.3 |
| Favor death penalty? | | | |
| Yes | 10.4 | 4.5 | 8.0 |
| No | 5.1 | 2.1 | 3.2 |
| Courts not harsh enough? | | | |
| Yes | 10.0 | 4.7 | 7.5 |
| No | 5.9 | 1.3 | 3.9 |

persons; wealthier people; those living in the South and West; people with a job requiring a gun (police, security guards, military); people who have been victims of robbery, assault, or burglary; those who believe they must rely on themselves, rather than the police, for protection; supporters of the death penalty for murder; and those who feel the courts are not harsh enough toward criminals.

### Results—Multivariate Analysis of Gun Carrying

A logistic regression analysis was performed to estimate separate causal effects on gun carrying of the attributes discussed in the previous section.

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

**JA 105**

**TABLE 5:   Variables Used in Logistic Regression Analysis[a]**

| Variable Name | Description[b] | Mean | SD |
|---|---|---|---|
| CARRY | Carries gun for protection | 1.09 | .28 |
| CARYPERS | Carries gun on person | 1.04 | .19 |
| CARYVEH | Carries gun in vehicle | 1.06 | .25 |
| MALE | R is male | 1.47 | .50 |
| BLACK | R is African American | 1.09 | .29 |
| AGE | Age in years | 42.10 | 15.72 |
| MARRIED | R is presently married | 1.60 | .49 |
| INCOME | Household income (six-point scale) | 3.03 | 1.41 |
| SOUTH | R lives in South | 1.34 | .48 |
| WEST | R lives in West | 1.21 | .40 |
| BIGCITY | R lives in city with more than 500,000 population | 1.23 | .42 |
| GUNHSLD | R lives in household with gun(s) | 1.36 | .48 |
| GUNOCC | Employed as police officer, security guard, or in military | 1.03 | .17 |
| ROBVICT | Victim of robbery in past year | 1.03 | .16 |
| ASLTVICT | Victim of assault as adult | 1.22 | .42 |
| BURGVICT | Victim of burglary in past year | 1.05 | .23 |
| KNOWVICT | R knows victim of serious crime | 1.30 | .46 |
| CRIMNBHD | R sees crime higher/lower in neighborhood? (five-point scale) | 2.18 | 1.03 |
| CRIMWORK | R sees crime higher/lower in area where R works? (five-point scale) | 2.52 | 1.12 |
| MUSTDEP | R believes must depend on self for protection rather than police | 1.56 | .50 |
| FAVORDP | R favors death penalty for murder | 1.71 | .46 |
| CRTSNHE | R feels courts not harsh enough | 1.74 | .44 |

a. Descriptive statistics are based on weighted data for all cases with valid data on a given variable.
b. Except where noted, variables were coded 2 for cases with the indicated attribute, 1 for cases without.

Table 5 lists the variables used in the analysis, and Table 6 shows the resulting parameter estimates. Any variables shown in Table 5 but not appearing in Table 6 were found to not be significantly associated at the .20 level with any form of gun carrying, controlling for the other variables in the equations.

It should be stressed that all analyses control for whether there was a gun in the R's household. Failing to do this would result in findings that could reflect patterns of gun ownership rather than carrying. Thus, the findings in Table 6 show how variables are associated with carrying, controlling for gun ownership. All Rs with the requisite data were included in the samples analyzed, regardless of whether they owned guns, because people can carry guns belonging to others.

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

There were three analyses: one for all forms of gun carrying combined, one for carrying on the person, and one for carrying in a vehicle. Note that some Rs reported carrying a gun but would not say whether they carried it on their person or in a vehicle. These Rs would be coded as carriers on the variable measuring any kind of carrying but would be missing on the two more specific carry measures.

Gun carriers are, other things being equal, more likely to be male, from the South or West, to hold a job requiring a gun, to be Black, or to believe that people must depend on themselves for protection rather than on the police. Whether a belief in self-reliance for protection encourages gun carrying or is a view strengthened by the experience of carrying, or both, is impossible to tell in a one-time survey.

Carriers are not more likely to have been crime victims than noncarriers. The one minor exception is that prior assault victimization shows a near-significant association with carrying guns on the person. These findings also raise the issue of causal order—it is possible that victimization stimulates gun carrying, but that once initiated, the carrying deters further victimization. The result would be that in a cross-sectional survey conducted at a single point in time, the prior victimization experiences of carriers would look much like those of noncarriers. The same issue has been raised in connection with the link between gun ownership and fear and victimization (Kleck 1991:29; Wright et al. 1983:129).

Once other correlated predictors are controlled, the measures of punitiveness do not show consistent significant associations with gun carrying. Persons who carry guns on the person are significantly more likely to believe that the courts are not harsh enough, whereas persons who carry in a vehicle are not. Support for the death penalty is unrelated to carrying on the person (whether or not the courts' harshness measure was included in the model) while showing a near-significant association with carrying in a vehicle. Thus, a view of gun carriers as vengeful vigilantes set on punishing criminals receives weak, mixed support at best.

Finally, controlling for other determinants of carrying, residents of big cities (a half million or more people) are significantly more likely to carry guns on the person. Given that robbery rates of big cities exceed those of smaller places to an especially pronounced degree, even more than with other crime types (U.S. Federal Bureau of Investigation 1995:196-7), this association may reflect higher rates of robbery and other violent crimes committed in public places. The fact that big city residents are more likely to carry on the person but not in vehicles may reflect the greater amount of walking and lower motor vehicle ownership among people living in densely populated areas.

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

TABLE 6:   Multivariate Correlates of Gun Carrying—Logistic Regression Estimates

| Dependent Variable: Independent Variable | Carrying | | | | | |
|---|---|---|---|---|---|---|
| | Any Way | OR[a] | On Person | OR | In Vehicle | OR |
| GUNHSHLD | 1.8976 (.227) | 6.67 | 2.2147 (.378) | 9.16 | 2.0227 (.274) | 7.56 |
| SOUTH | 1.1719 (.244) | 3.23 | .5635 (.337) | 1.76 | 1.6039 (.301) | 4.97 |
| WEST | .9757 (.279) | 2.65 | .8297 (.374) | 2.29 | 1.3825 (.336) | 3.98 |
| MUSTDEP | 1.1775 (.247) | 3.25 | 1.4167 (.414) | 4.12 | .9630 (.269) | 2.62 |
| BLACK | .6903 (.320) | 1.99 | .6483 (.440) | 1.91 | | |
| MALE | .4559 (.193) | 1.58 | .6117 (.288) | 1.84 | .4556 (.216) | 1.58 |
| GUNOCC | .9681 (.407) | 2.63 | 1.7799 (.466) | 5.93 | .6521[b] (.471) | 1.92 |
| KNOWVICT | .6013 (.189) | 1.82 | .7056 (.270) | 2.03 | .4939 (.209) | 1.64 |
| CRIMAREA | .2256 (.087) | 1.25 | | | | |
| FAVORDP | .3988[b] (.251) | 1.49 | | | .4527[b] (.289) | 1.57 |
| CRTSNHE | | | .9332 (.443) | 2.54 | | |
| BIGCITY | | | .5718 (.305) | 1.77 | | |
| Constant | −14.7846 | | −18.1646 | | −14.5416 | |
| −2 log likelihood | 790.873 | | 428.448 | | 660.485 | |
| Model chi-square improvement | 252.715 | | 138.829 | | 202.850 | |
| Sample size | 1,712 | | 1,726 | | 1,772 | |

NOTE: Estimates of coefficients, with standard errors in parentheses. Variables appearing in Table 5 but not appearing in this table were found to have no significant association with any form of gun carrying at even the .20 level (one-tailed).
a. OR = Odds ratio. For example, the odds ratio of 6.67 for GUNHSHLD in the Carrying Any Way equation means that persons in a household with a gun are 6.67 times more likely, other things being equal, to carry a gun than persons in a household without a gun.
b = $.05 < p < .20$, one-tailed. All other coefficients: $p < .05$.

As suggested earlier, the higher levels of carrying among higher income persons disappears once gun ownership is controlled, indicating that, whereas having more money increases one's ability to purchase guns, it otherwise has no net effect on gun carrying.

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

When the 11 gun carriers with gun carrying occupations were removed from the sample and the multivariate estimations were repeated, the results were almost all substantively identical (i.e., no change in the sign of the coefficient or whether it was significant). The only exceptions were in the equation for carrying on the person, where the marginally significant results for courts' harshness and big city residence became definitely nonsignificant (results available from senior author).

Two limitations should be especially salient in interpreting these results. First, given that most gun carrying, especially on the person, is unlicensed and usually illegal, many Rs probably falsely denied carrying. A large body of research on the validity of self-reports in surveys addressing illegal behavior indicates that it is usually underreported, that is, that false negative responses outnumber false positives (see studies reviewed in Kleck and Gertz 1997). Leaving aside one-sided speculation about false positives (e.g., Hemenway 1997), there is no basis for believing that survey reporting of (mostly illegal) gun carrying or defensive use of guns is any different in this respect. Therefore, on the assumption that illegal gun carrying is like other illegal behaviors in this respect, false reports of carrying should be less common than false denials, and the prevalence and incidence estimates should be regarded as conservative.

Second, all patterns observed in any survey reflect both reality and patterns of response bias. We suspect that underreporting of carrying is not random, but rather is likely to be highest among persons who perceive themselves as especially vulnerable to arrest and punishment for unlawful behavior. Thus, underreporting may be most common among lower income persons, members of racial and ethnic minorities, people in areas where carry laws are more aggressively enforced, and perhaps males in general. If this suspicion is correct, it means that carry rates are higher than reported in these groups and patterns of carrying are accordingly distorted to some degree.

## CONCLUSION

Carrying guns in public places is common in the United States, is primarily done for protection, and is rarely done for purposes of committing a violent crime. About 17 million U.S. adults report carrying a gun for protection in the past year, carrying firearms on more than a billion different person-days, whereas fewer than a million instances of gun carrying result in the carrier committing a violent crime with the gun. There are about as many defensive uses of guns by crime victims carrying guns as there are violent crimes committed by gun-carrying criminals. Nevertheless, most of the carrying is

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

probably illegal, done by persons lacking the permit required to carry a concealed weapon.

Controlling for gun ownership, gun carrying for protection is more common among males, Blacks, residents of the South and West regions, and persons who have a gun-related occupation such as police officer or security guard. Carrying on the person is also more common in big cities. There are only weak, inconsistent hints that gun carrying is associated with greater punitiveness toward criminals. Generally, carrying is not associated with prior victimization, though causal order assumptions are clouded by the possibility that past carrying deterred past victimization attempts.

The present survey of the general population reveals at least 17 million adults carrying guns for protection in public, only a small fraction of whom have permits allowing them to do this legally. Almost none of the billion-plus instances of gun carrying are done in connection with committing a violent crime with a gun. This suggests some difficulties in enforcing laws prohibiting unlicensed carrying of guns, in that those violating the laws are almost never carrying the gun on the way to committing a violent crime. Technological developments are making it easier for concealed guns to be detected at a distance (Sherman and Rogan 1994), but these cannot distinguish guns carried for criminal purposes from those carried for genuinely defensive ones. Unless police officers are very good at distinguishing, on the basis of visible cues alone, those suspects who are unlawfully carrying guns for criminal purposes from those who are carrying unlawfully, but solely for purposes of self-protection, this implies that most of those stopped and frisked for weapons will be guilty of a weapons charge, but otherwise innocent of violent intentions. This in turn suggests limits on the value of enforcing carry laws.

Many have advocated increased enforcement of carry laws as a way of reducing violent crime (Blumstein 1995:32-3; Kleck 1991:441-2; Sherman and Rogan 1994; Wilson 1994). One component of such a policy would be seizure of guns carried in the streets, in addition to making arrests for unlawful carrying. Sherman and Rogan (1994) claimed that in a 1992 police experiment, police seizure of just 29 more guns than normal caused a 49 percent drop in gun crimes in a single police beat of Kansas City, allegedly with no displacement to surrounding areas. The results are, however, less impressive than portrayed by the authors, in that the drop of 83 gun crimes in the target area was in fact accompanied by an increase of 52 gun crimes in contiguous beats, with the possibility of other crimes displaced to noncontiguous beats. Furthermore, their detailed trend data suggest that the seemingly impressive drop was little more than a return to the average gun crime level that had prevailed up until about a year before the beginning of the experiment. The year immediately preceding the start of the experiment (June 1991 to June 1992)

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

had an unusually high gun crime rate, which exaggerated the postexperiment drop. Excluding this anomalous period, the postintervention gun crime level was no lower than the preintervention level. Whether either increased gun seizures or increased carry arrests can actually reduce gun crime therefore remains to be seen.

Although those recommending improved enforcement have addressed the issue of successfully identifying which potential suspects are carrying weapons, they have not taken full account of the sheer volume of carrying that is unlicensed but done for otherwise noncriminal purposes. If a large share of carry arrests are of generally noncriminal, albeit unlicensed, gun carriers, this is a serious cost that may deter some police departments from pursuing an increased enforcement policy as aggressively as advocates might like. Some hints of what may happen are provided by research on a 1976 Massachusetts law that established a mandatory penalty for unlicensed carrying. Interviews with Boston police officers indicated that 89 percent of them became more selective about whom to frisk for weapons because they did not want to risk having to arrest "otherwise innocent" persons (Carlson 1982:6). At a minimum, this suggests an awareness by police officers that many of those they might arrest for unlawful carrying are otherwise not serious public threats. Nevertheless, even after Boston police became more selective about searches, 33 percent of those charged with carry violations had no prior court record (Beha 1977:133).

One way out of this dilemma is to sharpen the distinction between carriers the police would want to arrest, because they represent a significant threat to public safety, and those they would not want to arrest, by increasing the share of noncriminal carriers that have carry permits. Violence among carry permit holders appears to be extremely low. Nine years after Florida made permits easily available to noncriminal adult residents, after 239,666 persons had been issued permits (excluding renewals), a total of 72 had had their permits revoked for convictions for crimes in which a firearm was used, or about 1 in 3,329 persons ever issued a permit. This was about eight gun crime revocations per year, that is, 1 in 24,294 of the permits valid as of October 31, 1996 (Florida Department of State 1996), or about 4.12 per 100,000.

Likewise, expanding noncriminal access to carry permits is not generally followed by violence increases. Based on a sophisticated multivariate pooled cross-sections time series analysis of virtually all U.S. counties, Lott and Mustard (1997) found that state laws loosening access to carry permits for adult residents without a criminal record were generally followed by *decreases* in violence, including gun violence. These laws did not necessarily increase the total number of carriers but may instead have allowed more noncriminal carriers to legitimate their carrying. The higher the share of

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

noncriminal carriers who have licenses to carry, the less cost there will be to increased enforcement of laws forbidding unlicensed carrying and the more enforcement of carry laws can be concentrated on persons likely to use guns to commit violent crimes.

## NOTES

1. The single survey supposedly indicating few defensive uses of guns (DGU) is the National Crime Victimization Survey (NCVS), which does not, however, directly ask about DGUs. For a detailed explanation of why the NCVS estimate is grossly inaccurate, see Kleck and Gertz (1995):

> One assertion made in defense of the NCVS estimates is that they are based on enormous sample sizes. Larger samples have no implications with respect to whether a prevalence estimate will be larger or smaller, but rather is relevant only to the precision of the estimate. For example, Kleck's (1988) analysis of the 1979-1985 NCVSs was based on interviews in about 400,000 households with about 700,000 persons, while the cumulative sample size of the 15 gun use surveys on which Kleck and Gertz based their DGU estimates is slightly more than 20,000. If one estimates the frequency of a behavior with a 1.3% annual prevalence (as was estimated for DGUs) using a sample of 700,000 cases, the 95% confidence interval estimate, assuming simple random sampling, would be $1.3\% \pm 0.03\%$. However, with a sample of 20,000 cases, it is $1.3\% \pm 0.16\%$. In short, the gain in estimation precision from increasing sample size from 20,000 to 700,000 is negligible, especially in comparison with nonsampling errors. (Pp. 153-7)

2. There has been virtually no empirically based challenge to the claim that DGUs are common. Challenges instead have consisted almost entirely of one-sided speculations about possible sources of overestimation (e.g., Cook and Ludwig 1996; Cook, Ludwig, and Hemenway 1997; Hemenway 1997). A detailed rebuttal of these critiques may be found in Kleck and Gertz (1997).

## REFERENCES

American Sports Data Inc. 1989. *American Sports Analysis—Summary Report, 1989*. Unpublished report of 1989 national survey on sports participation, American Sports Data Inc.

Arria, Amelia M., Nollie P. Wood, and James C. Anthony. 1995. *Archives of Pediatric and Adolescent Medicine* 149:1345-50.

Ash, Peter, Arthur L. Kellermann, Dawna Fuqua-Whitley, and Amri Johnson. 1996. "Gun Acquisition and Use by Juvenile Offenders." *Journal of the American Medical Association* 275:1754-8.

Bankston, William B. and Carol Y. Thompson. 1989. "Carrying Firearms for Protection." *Sociological Inquiry* 59:75-87.

Bankston, William B., Carol Y. Thompson, Quentin A. Jenkins, and Craig J. Forsyth. 1990. "The Influence of Fear of Crime, Gender, and Southern Culture on Carrying Firearms for Protection." *Sociological Quarterly* 31:287-305.

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

Bastian, Lisa D. and Bruce M. Taylor. 1991. *School Crime*. Washington, DC: Government Printing Office.

Beha, James A., II. 1977. " 'And Nobody Can Get You Out.' " *Boston University Law Review* 57:96-146.

Bjerregaard, Beth and Alan J. Lizotte. 1995. "Gun Ownership and Gang Membership." *Journal of Criminal Law and Criminology* 86:37-58.

Blumstein, Alfred. 1995. "Youth Violence, Guns, and the Illicit-Drug Industry." *Journal of Criminal Law and Criminology* 86:10-36.

Britt, Chester, Gary Kleck, and David J. Bordua. 1996. "A Reassessment of the D.C. Gun Law: Some Cautionary Notes on the Use of Interrupted Time Series Designs for Policy Impact Assessment." *Law & Society Review* 30:361-80.

Bryant, Clifton D. and Donald J. Shoemaker. 1988. "Gun Ownership and Carrying." *Psychological Reports* 62:61-2.

Callahan, Charles M. and Frederick P. Rivara. 1992. "Urban High School Youth and Handguns." *Journal of the American Medical Association* 267:3038-42.

Callahan, Charles M., Frederick P. Rivara, and James A. Farrow. 1993. "Youth in Detention and Handguns." *Journal of Adolescent Health* 14:350-5.

Carlson, Kenneth. 1982. "Mandatory Sentencing: The Experience of Two States." Washington, DC: National Institute of Justice.

Chilton Research Service. 1994. *Questionnaire Used in Study #5384, "National Gun Ownership Survey."* Radnor, PA: Chilton Research Services.

Cook, Philip. 1991. "The Technology of Personal Violence." Pp. 1-71 in *Crime and Justice: A Review of Research*. Vol. 14. Edited by Michael Tonry. Chicago: University of Chicago Press.

Cook, Philip and Jens Ludwig. 1996. "You Got Me: How Many Defensive Gun Uses Per Year?" Paper presented at the annual meeting of the American Society of Criminology, Chicago.

———. 1997. *Guns in America*. A report to the Police Foundation, issued May 1997. Washington, DC: Police Foundation.

Cook, Philip, Jens Ludwig, and David Hemenway. 1997. "The Gun Debate's New Mythical Number." *Journal of Policy Analysis and Management* 16:463-9.

Cramer, Clayton E. and David B. Kopel. 1994. *"Shall Issue": The New Wave of Concealed Handgun Permit Laws*. Golden, CO: Independence Institute.

Decker, Scott and Susan Pennell. 1995. "Arrestees and Guns." National Institute of Justice Research Preview. Washington, DC: Government Printing Office.

DIALOG. 1995. Search of POLL file of public opinion survey results in DIALOG online database. [Available from author.]

Fagan, Jeffrey. 1990. "Social Processes of Delinquency and Drug Use among Urban Gangs." Pp. 183-219 in *Gangs in America*, edited by C. Ronald Huff. Newbury Park, CA: Sage.

Florida Department of State. 1996. *Concealed Weapons/Firearms License Statistical Report for Period 10/01/87—09/30/95*. Tallahassee, FL, Department of State, Division of Licensing.

Hassinger, James. 1985. "Fear of Crime in Public Environments." *Journal of Architectural Planning and Research* 2:289-300.

Hemenway, David. 1997. "Survey Research and Self-Defense Gun Use." *Journal of Criminal Law and Criminology* 87:1430-1445.

Kleck, Gary. 1988. "Crime control through the private use of armed force." *Social Problems* 35:1-21.

———. 1991. *Point Blank: Guns and Violence in America*. New York: de Gruyter.

———. 1997. *Targeting Guns: Firearms and their Control*. New York: de Gruyter.

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

Kleck, Gary and Miriam DeLone. 1993. "Victim Resistance and Offender Weapon Effects in Robbery." *Journal of Quantitative Criminology* 9:55-82.

Kleck, Gary and Marc Gertz. 1995. "Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun." *Journal of Criminal Law and Criminology* 86:150-87.

———. 1997. "The Illegitimacy of One-Sided Speculation: Getting the Defensive Gun Use Estimate Down." *Journal of Criminal Law and Criminology* 87:1446-1461.

Kleck, Gary and Karen McElrath. 1991. "The Effects of Weaponry on Human Violence." *Social Forces* 69:1-21.

Kleck, Gary and E. Britt Patterson. 1993. "The Impact of Gun Control and Gun Ownership Levels on Violence Rates." *Journal of Quantitative Criminology* 9:249-88.

Knox, George, James G. Houston, John A. Laskey, Thomas F. McCurrie, Edward D. Tromanhauser, and David L. Laske. 1994. *Gangs and Guns*. Task Force Report. Chicago: National Gang Crime Research Center.

LH Research, Inc. 1993a. *A Survey of Experiences, Perceptions, and Apprehensions about Guns among Young People in America*. Report prepared for the Harvard School of Public Health under a grant from the Joyce Foundation. New York: LH Research, Inc.

———. 1993b. *A Survey of the American People on Guns as a Children's Health Issue*. Report prepared for the Harvard School of Public Health under a grant from the Joyce Foundation. New York: LH Research, Inc.

Lizotte, Alan J. and David J. Bordua. 1980. "Firearms Ownership for Sport and Protection." *American Sociological Review* 45:229-44.

Lizotte, Alan J., James M. Tesoriero, Terence P. Thornberry, and Marvin D. Krohn. 1994. "Patterns of Adolescent Firearms Ownership and Use." *Justice Quarterly* 11:51-73.

Lott, John R. Jr. and David B. M. Mustard. 1997. "Crime, Deterrence, and Right-to-Carry Handguns." *Journal of Legal Studies* 26:1-68.

McDowall, David, Colin Loftin, and Brian Wiersema. 1995. "Easing Concealed Firearms Laws." *Journal of Criminal Law and Criminology* 86:193-206.

National Rifle Association. 1996. "NRA State Firearms Law Summaries. ILA Research and Information Division Fact Sheet" [On-line]. Available: http://www.nra.org/research/riflaws.html.

Nelson, David E., Joyce A. Grant-Worley, Kenneth Powell, James Mercy, and Deborah Holtzman. 1996. "Population Estimates of Household Firearm Storage Practices and Firearm Carrying in Oregon." *Journal of the American Medical Association* 275:1744-8.

Northwood, Lawrence K., Richard Westgard, and Charles E. Barb Jr. 1978. *Society* 16:69-74.

Schultz, Leroy G. 1962. "Why the Negro Carries Weapons." *Journal of Criminal Law, Criminology, and Police Science* 53:476-83.

Sheley, Joseph F. 1994. "Drug Activity and Firearms Possession and Use by Juveniles." *Journal of Drug Issues* 24:363-82.

Sheley, Joseph F. and Victoria E. Brewer. 1995. "Possession and Carrying of Firearms among Suburban Youth." *Public Health Reports* 110:18-26.

Sheley, Joseph F., Zina T. McGee, and James D. Wright. 1992. *American Journal of Diseases of Children* 146:677-82.

Sheley, Joseph F. and James D. Wright. 1993. "Motivations for Gun Possession and Carrying among Serious Juvenile Offenders." *Behavioral Sciences and the Law* 11:375-88.

———. 1995. *In the Line of Fire: Youth, Guns, and Violence in Urban America*. New York: de Gruyter.

Sherman, Lawrence W. and Dennis P. Rogan. 1994. "The Kansas City Gun Experiment." Presented at the annual meetings of the American Society of Criminology, November 12, Miami, FL.

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

Smith, M. Dwayne and Joseph F. Sheley. 1995. "The Possession and Carrying of Firearms among a Sample of Inner-City High School Females." *Journal of Crime and Justice* 18:109-28.

Toch, Thomas. 1993. "Violence in the Schools." *U.S. News and World Report*, November 8, pp. 31-6.

———. 1995. *Statistical Abstract of the United States, 1995*. Washington, DC: Government Printing Office.

U.S. Bureau of Justice Statistics. 1996a. *Criminal Victimization in the United States, 1993*. Washington, DC: Government Printing Office.

———. 1996b. *Sourcebook of Criminal Justice Statistics 1995*. Washington, DC: Government Printing Office.

U.S. Centers for Disease Control and Prevention. 1991. "Weapon-Carrying among High School Students—United States, 1990." *Morbidity and Mortality Weekly Report* 40 (40): 681-4.

———. 1992. "Behaviors Related to Unintentional and Intentional Injuries among High School Students—United States, 1991." *Morbidity and Mortality Weekly Report* 41 (41): 760-72.

———. 1994a. "Health Risk Behaviors among Adolescents Who Do and Do Not Attend School—United States, 1992." *Morbidity and Mortality Weekly Report* 43 (8): 129-32.

———. 1994b. "Health Risk Behaviors among Persons Aged 12-21 Years—United States, 1992." *Morbidity and Mortality Weekly Report* 43 (13): 231-5.

———. 1995. "Youth Risk Behavior Surveillance—United States, 1993." CDC Surveillance Summaries. *Morbidity and Mortality Weekly Report* 44 (SS-1).

———. 1996. "Youth Risk Behavior Surveillance—United States, 1995." CDC Surveillance Summaries. *Morbidity and Mortality Weekly Report* 45 (SS-4).

U.S. Federal Bureau of Investigation. 1995. *Crime in the United States, 1994* (Uniform Crime Reports). Washington, DC: Government Printing Office.

———. 1996. *Crime in the United States, 1995* (Uniform Crime Reports). Washington, DC: Government Printing Office.

U.S. Fish and Wildlife Service. 1993. *1991 National Survey of Fishing, Hunting, and Wildlife-Associated Recreation*. Washington, DC: Government Printing Office.

U.S. National Center for Education Statistics (NCES). 1996. *1991, 1993, and 1995 Surveys—Data Files and Electronic Codebook* [Machine-readable data file]. NCES 96-827. Office of Educational Research and Improvement. Washington, DC: U.S. Department of Education.

Webster, Daniel W., Patricia S. Gainer, and Howard R. Champion. 1993. "Weapon Carrying among Inner-City Junior High School Students: Defensive Behavior vs Aggressive Delinquency." *American Journal of Public Health* 83:1604-8.

Wilson, James Q. 1994. "Just Take Away Their Guns." *New York Times Magazine*, March 20, pp. 46-7.

Wright, James D. and Peter H. Rossi. 1986. *Armed and Considered Dangerous: A Survey of Felons and Their Firearms*. New York: de Gruyter.

Wright, James D., Peter H. Rossi, and Kathleen Daly. 1983. *Under the Gun*. New York: de Gruyter.

Downloaded from jrc.sagepub.com at GEORGE WASHINGTON UNIVERSITY on February 24, 2011

**JA 115**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MATTHEW GRACE, *et al.,*<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>DISTRICT OF COLUMBIA, *et al.,*<br><br>　　　　　Defendants. | Civ. Action No. 15-2234 (RJL) |

## DEFENDANTS' APPENDIX

KARL A. RACINE
Attorney General for the District of Columbia

ELIZABETH SARAH GERE
Acting Deputy Attorney General
Public Interest Division

/s/ Toni Michelle Jackson
TONI MICHELLE JACKSON (#453765)
Chief, Equity Section

/s/ Andrew J. Saindon
ANDREW J. SAINDON (#456987)
Senior Assistant Attorney General
441 Fourth Street, N.W., Sixth Floor South
Washington, D.C. 20001
Telephone: (202) 724-6643
Email: andy.saindon@dc.gov

　　　/s/ Chad A. Naso
CHAD A. NASO (#1001694)
Assistant Attorney General
Office of the Attorney General, DC
441 Fourth Street, N.W., Sixth Floor South
Washington, D.C. 20001
Telephone: (202) 724-7854
Email: chad.naso@dc.gov

# TABLE OF CONTENTS

Committee on the Judiciary and Public Safety, D.C. Council, Report on Bill 20-930 (Nov. 26, 2014) (some attachments omitted) ...........................................1

John Donohue, *The Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the Empirical Evaluation of Law and Policy* (2014)...........133

Jens Ludwig, *Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State Panel Data*, 18 Int'l L. Rev. L. & Econ. 239 (1998).......................241

Hashem Dezhbakhsh & Paul Rubin, *Lives Saved or Lives Lost? The Effects of Concealed-Handgun Laws on Crime*, 88 Am. Econ. Rev. 468 (1998) .........257

Philip Cook & Jens Ludwig, *The Social Costs of Gun Ownership*, 90 J. Pub. Econ. 379 (2006).................................................................264

Charles Branas, *et al.*, *Investigating the Link Between Gun Possession and Gun Assault*, 99 Amer. J. Pub. Health 2034 (2009) ...........................................277

Philip Cook, *et al.*, *Criminal Records of Homicide Offenders*, 294 JAMA 598 (2005) .................................................................284

Minnesota Drug & Violent Crime Task Forces, 2011 Annual Report...............288

District of Columbia Organic Act, 2 Stat. 103 (1801) ......................................305

D.C. Code of 1803 at 18-19 ..............................................................311

D.C. Code of 1818 at 253-54 ............................................................314

D.C. Code of 1855 at 567-68 ............................................................316

An Act to Prevent the Carrying of Dangerous Weapons in the City of Washington (Nov. 4, 1857) .................................................................320

An Act to Prevent the Carrying of Concealed and Dangerous Weapons in the City of Washington (Nov. 18, 1858) ...................................................321

An Act to punish the carrying or selling of deadly or dangerous weapons, 27 Stat. 116 (1892)...........................................................................322

An Act to control the possession, sale, transfer and use of pistols and other dangerous weapons, 47 Stat. 651, ch. 465, § 4 (1932) ......................................324

An Act to amend the law of the District of Columbia relating to the carrying of concealed weapons, 57 Stat. 586, ch. 296 (1943) .........................................329

**JA 118**

# COUNCIL OF THE DISTRICT OF COLUMBIA
# COMMITTEE ON THE JUDICIARY AND PUBLIC SAFETY
# COMMITTEE REPORT
1350 Pennsylvania Avenue, NW, Washington, DC 20004

*2014 NOV 26 PM 2: 24*

*OFFICE OF THE SECRETARY*

**TO:**      All Councilmembers

**FROM:**   Councilmember Tommy Wells, Chairperson
               Committee on the Judiciary and Public Safety

**DATE:**    November 25, 2014

**SUBJECT:**  Report on Bill 20-930, "License to Carry a Pistol Amendment Act of 2014"

The Committee on the Judiciary and Public Safety, to which Bill 20-930, the "License to Carry a Pistol Amendment Act of 2014" was referred, reports favorably thereon, with amendments, and recommends approval by the Council.

## CONTENTS

I.       Background And Need ................................................................. 1
II.      Legislative Chronology ............................................................ 19
III.     Position Of The Executive ....................................................... 20
IV.   Comments Of Advisory Neighborhood Commissions ............ 21
V.     Summary Of Testimony ........................................................... 21
VI.   Impact On Existing Law ......................................................... 26
VII.  Fiscal Impact .......................................................................... 26
VIII. Section-By-Section Analysis ................................................. 27
IX.   Committee Action .................................................................. 35
X.    Attachments ............................................................................ 36

Bill 20-930, the License to Carry a Pistol Amendment Act of 2014, was introduced on September 23, 2014, by Chairman Mendelson and Councilmember Wells, co-sponsored by Councilmembers Orange, Barry, and Bonds, and referred to the Committee on the Judiciary and Public Safety.[1] On October 16, 2014, the Committee held a public hearing on the bill; a summary of the testimony provided at the hearing is found below in section V.

## I.   BACKGROUND AND NEED

On July 24, 2014, the U.S. District Court for the District of Columbia ruled in *Palmer v. District of Columbia* that the District's total ban on the carrying of handguns outside the home is unconstitutional.[2] The Court also prohibited the District from "completely banning the carrying

---

[1] On October 20, 2014, Bill 20-930 was re-referred sequentially to the Committee on the Judiciary and Public Safety and then to the Committee of the Whole.

[2] *Tom G. Palmer v. District of Columbia*, July 24, 2014 (docket entry 51 on July 26, 2014), case no. 1:09-cv-01482-FJS, U.S. District Court for the District of Columbia.

of handguns in public for self-defense by otherwise qualified non-residents based solely on the fact that they are not residents of the District."[3]

The executive and the Council worked closely on the District's legislative response to *Palmer*, in order to ensure that the District's laws and regulations would be in compliance with the decision while also balancing the government's interest in public safety. This interest is heightened given the District's role as the nation's capital. The result was emergency legislation,[4] passed by the Council on September 23, 2014, and Bill 20-930. Both the emergency and permanent legislation follow the models of states such as New York, New Jersey, and Maryland, which have adopted a similar licensing scheme and which have withstood Constitutional challenges in federal courts of appeal.

Bill 20-930 is sound legislation that will enhance public safety in the District, while comporting with the requirements of the Second Amendment of the U.S. Constitution. The main provisions of this legislation are discussed in greater detail below.

## SUMMARY OF GUN CONTROL IN THE DISTRICT OF COLUMBIA

The process of regulating the carrying of pistols in the District of Columbia dates back to at least 1857. The common law regulated the carry of pistols when a person was "without reasonable cause to fear an assault or other injury or violence to his person . . . ."[5] Some 75 years later, and two years before adoption of the National Firearms Act of 1934, Congress enacted An Act To control the possession, sale, transfer and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes ("Pistols and Other Dangerous Weapons Act").[6]

The then-newly elected Council of the District of Columbia adopted the Firearms Control Regulations Act of 1975.[7]  Codified as chapter 25 of Title 7, the Firearms Control Regulations Act imposes a broad regulatory scheme on the acquisition, possession, and transfer of firearms. The act requires registration of all firearms, restricts who may register a firearm, and prohibits certain firearms entirely. Until 2008, the act also prohibited all private individuals from registering a handgun. In 2008, the Supreme Court, in *District of Columbia v. Heller*, held that the Second Amendment of the Constitution guarantees an individual's right to possess a firearm for the lawful purpose of self-defense within the home, thereby invalidating the District's then-total ban on handguns.[8] It also struck down the District's safe storage provision[9] – a provision

---

[3] *Id.* at p. 17.
[4] License to Carry a Pistol Emergency Amendment Act of 2014, Act 20-447 (expires Jan. 7, 2015).
[5] Revised Code of the District of Columbia Prepared Under the Authority of the Act of Congress at 570 (A.O.P. Nicholson, Washington 1857).
[6] 47 Stat. 650 (approved July 8, 1932) (codified at D.C. OFFICIAL CODE § 22-4501 *et seq.*). Although amended periodically during the last 70 years, this act remains in effect and is codified as Chapter 45 of Title 22 of the D.C. Official Code.
[7] D.C. Law 1-85, effective September 24, 1976 (codified at D.C. OFFICIAL CODE § 7-2501.01 *et seq.*).
[8] 554 U.S. 570, 635 (2008).
[9] *Id.* at 571.

that required all firearms, including rifles and shotguns be kept unloaded and disassembled or bound by a trigger lock because it lacked an explicit exception for self-defense.

Following the *Heller* case, the Council revised the 1975 Firearms Control Regulations Act through the Firearms Control Amendment Act of 2008[10], "seeking to accommodate that constitutional right while also protecting the community from gun violence."[11] The 2008 act included registration requirements for handguns and clarification regarding safe storage. It also included several strong public safety measures, including the prohibition of possession of dangerous assault weapons and large-capacity ammunition magazines – military-style devices commonly employed in mass shootings. Other changes included limiting the number of handguns any one individual may register at one time, though not the total that an individual may possess, and adding being convicted of an intrafamily offense to the list of disqualifications to registration.[12]

These changes were subsequently challenged in *Heller v. District of Columbia* (known as *Heller II*), where the plaintiffs argued that the registration requirements were unconstitutional restrictions on their Second Amendment rights.[13,14] The District Court upheld the constitutionality of the law; on appeal, the D.C. Circuit upheld most aspects of the 2008 act, including the District's ban on assault weapons and large-capacity ammunition magazines, and the registration requirement as it applied specifically to handguns.[15] The rest of the case was sent back to the District Court in order to gather more facts.[16] On May 15, 2014, the District Court, in a memorandum opinion, held that the District's efforts to "combat gun violence and promote public safety were done so in a constitutionally permissible manner."[17]

While *Heller II* was being litigated, another case challenging the District's gun laws was being argued. In 2009, several plaintiffs joined together in *Palmer v. District of Columbia* to file suit against the District because they were denied a permit to carry a handgun outside their homes, or because they were denied carry permits because they were not District residents.[18] On July 24, 2014, the District Court for the District of Columbia issued the *Palmer* decision, ruling that the District's "complete ban on the carrying of handguns in public is unconstitutional."[19] The Court also prohibited the District from "completely banning the carrying of handguns in

---

[10] D.C. Law 17-0372, effective March 31, 2009.

[11] *Heller v. District of Columbia*, ___ F.Supp.2d ----, 2014 WL 1978073 (D.D.C.) at *1.

[12] The Council also revisited firearms regulation in 2012, eliminating vision requirements, except for the legally blind; modifying the training requirements; and eliminating most limitations on what ammunition a registrant may possess. *See* D.C. Law 19-170, Firearms Amendment Act of 2012 (effective Sept. 26, 2012).

[13] *See Heller v. District of Columbia*, 698 F.Supp.2d 179, 181 (D.D.C.2010).

[14] The Committee notes that since the *Heller* decision, there have been 3,307 handguns and 1,814 long guns registered in the District (as of October 3, 2014; data provided by Chief Lanier during questioning at Oct. 16, 2014 hearing for Bill 20-930).

[15] *Heller v. District of Columbia (Heller II)*, 670 F3d 1244, 1264 (D.C.Cir.2011).

[16] *Id.*

[17] *Heller v. District of Columbia*, ___ F.Supp.2d ___, 2014 WL 1978073 (D.D.C.) at *1.

[18] *Palmer v. District of Columbia, supra* n.1.

[19] *Id.* at 16.

public for self-defense by otherwise qualified non-residents based **solely** on the fact that they are not residents of the District."[20] (emphasis in original)

It is with this background that Bill 20-930 was developed and is considered. The Committee notes that none of these cases, not even *Palmer*, stand for unregulated and absolute gun ownership, carrying, or use.[21] These decisions have recognized that sensible regulation of gun ownership and behavior designed to protect the public and law enforcement officers that does not prohibit gun use by responsible individuals is within the scope of the Second Amendment.

## UNIQUENESS OF THE DISTRICT

Before the Committee discusses the provisions of Bill 20-930, the context within which the District's firearms law and regulations operate is also useful.

Cities across the country are grappling with gun violence. The problem is not limited to violent crime, but includes accidental shootings and suicide. It is a substantial problem, both as a matter of public safety and public health. Dense, urban jurisdictions have higher rates of violent crime than suburbs and rural areas, and when it comes to crime, handguns are very effective. As a result, major cities such as New York and Chicago utilize a variety of gun control regulations. Washington, D.C. is no different and has been regulating firearms since the Congressional act of 1932.

While the District of Columbia shares the problem of gun violence with other dense, urban jurisdictions, its public safety and national security concerns are greater. It is the home of the President of the United States; four U.S. presidents have been assassinated by gunfire (two in the District), and at least five others have been shot at, including Ronald Reagan who was seriously wounded outside a local hotel in 1981. The Secret Service will not disclose all incidents where it has recovered firearms associated with threats on the President, but we do know they happen; indeed, just two years ago someone hit the White House with gun fire. The consequences of an assassination would be grave to the nation.

The District is home to all high-ranking federal officials and members of Congress. The January 2011 assassination attempt of then-Congresswoman Gabrielle Giffords highlights the concern, as well as the heavy security protecting a number of Cabinet Secretaries including the Secretary of State and the Attorney General. All of the Congressional leadership (e.g., the Speaker of the House and the majority and minority leaders of both the House and Senate) are under constant protection by the Capitol Police. The Capitol Police will not disclose all incidents where they have recovered firearms associated with threats on members of Congress, but we do know they happen. In 1998 two Capitol Police officers were killed trying to stop a shooter; in 1970 and 1983 bombs exploded in the Capitol; in 1954, five Congressmen were shot by Puerto

---

[20] *Id.* at 16-17.
[21] *See*, e.g. *Palmer* at 15: stating that the government can "place some reasonable restrictions on carrying of handguns."

Rican nationalists. These incidents speak to the constancy of security needs far greater than present in any other U.S. city.

The District also is home to a diplomatic corps more extensive and omnipresent than anywhere else in the country. Virtually every nation has a presence in the District, as do foreign missions. As outlined in this Committee's report on Bill 19-614 (the "Firearms Amendment Act of 2012"), threats are a constancy for the diplomatic corps. Although the Secret Service did not provide Committee requests for details, it requested that the emergency legislation preceding Bill 20-930 prohibit carrying within a buffer surrounding every embassy and chancery in the District. Here again, the security presence speaks to the difference between the District and other major U.S. cities.

In her testimony before the Committee on Bill 20-930, Chief Cathy Lanier stated that the frequency of movements and security details makes it both difficult and undesirable to provide protection in the same manner as in other cities – namely, to clear the streets. For instance, in other cities streets are cleared of automobiles, essentially closed off, to accommodate a Presidential visit, while in the District the President travels so frequently and on so many different routes that, while traffic may be stopped (for the President, but not other dignitaries), the streets are not cleared.

The District presents a "unique attraction to mentally ill persons who are a danger to themselves and to others . . . this is not rural Oklahoma or open-sky Montana. It isn't every-kid-grows-up-hunting Kentucky. This is the crowded national capital city filled with high-value security targets,"[22] as evidenced this fall when a mentally disturbed man broke his way into the East Room of the White House, just minutes after the President left.

Police Chief Cathy Lanier discussed the uniqueness of the District in her testimony before the Committee on Bill 20-930:

> The proposed law would prohibit concealed carry licensees from carrying handguns in the types of places that firearms have been traditionally prohibited such as government buildings, premises where alcohol is sold and served, schools and universities, and in circumstances where protection of public officials, visiting dignitaries, and demonstrators is paramount. The latter is critical here in the District of Columbia. As the Supreme Court noted in *Heller*, "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" are constitutional.

> As I have testified before, the District of Columbia, as the seat of the federal government, with its multitude of critical official and symbolic buildings, monuments, and events, and high-profile public officials traversing its streets every day, is a city filled with sensitive places from a public safety perspective. Our laws should reflect that reality. Government facilities, dignitaries, and public servants are prime targets for terrorists, both foreign and domestic. Protecting government officials and infrastructure is a challenge for every city

---

[22] Testimony of Rev. Robert Schenck, public witness, at the public hearing on Bill 20-930 on Oct. 16, 2014, p. 2.

in the United States. But in the District the likelihood of attack is higher, and the challenges to protecting the city are greater. As recently as 2011, we saw an assassination attempt on the president – where fortunately the only thing the shooter hit was the White House – and another shooter firing at military installations. Both of these incidents were carried out by a lone gunman, angry at one facet or another of the U.S. government.

The high-profile human targets—from the nation's top elected leaders to the more than 400 foreign dignitaries that make official visits to DC each year—are an obvious and potentially attractive target. The District is also vulnerable due to the sheer volume of secure motorcades traveling in Washington on any given day. The daily movements around the city of the President, Vice President, and their families, and the approximately 3,000 foreign dignitaries spending time in our city each year means that all of our roadways are a challenge to secure. And as the September 19th incident earlier this year at the White House demonstrated, even the home and office of the President of the United States are not easy to secure. Law enforcement needs to be able to prohibit guns from entering the perimeter of a secure area in order to be able to lessen the likelihood that an armed gunman will be able to make it close to protected targets.[23]

The Chief testified that the threat level for dignitaries can change frequently; for example, certain dignitaries consistently require higher levels of security similar to what is provided for presidential movements, such as shutting down areas around hotels and using full motorcade security, particularly when those visits coincide with times of conflict. Because of the consistent presence of a variable number of high-value targets, there is a threat level and a coincident level of concern on behalf of law enforcement that simply does not exist elsewhere.

In addition to assisting the Secret Service with daily movements of the President, Vice President, and foreign dignitaries around the city, MPD also provides security support for more than 4,000 special events annually. The District is also unique because of what the buildings and location represent all around the world:

Symbolically, we stand out with so many targets like the White House, the Monument, or the Capitol. That backdrop stands out for people who want to do harm to the United States government.[24]

The District's unique status is also reflected in the type of training the Metropolitan Police Department receives. Chief Lanier testified the Department receives training with the

---

[23] Testimony of Cathy L. Lanier, Chief of Police, Metropolitan Police Department, at the public hearing on Bill 20-930 on Oct. 16, 2014 [hereinafter Chief Lanier Oct.16, 2014 testimony].

[24] Chief Lanier Oct. 16, 2014 verbal testimony. The Chief has previously noted that the Federal Government considers the Supreme Court building to be so sensitive that, no matter who one is, he or she cannot wear their firearm in the building. "I would argue that similar caution should apply to the District of Columbia. [T]he District of Columbia, as the seat of the Federal government, with its multitude of critical official and symbolic buildings, monuments, and events, and high-profile public officials traversing its streets every day, is a city filled with "sensitive" places. Our laws should reflect that reality." Testimony of Cathy L. Lanier, Chief of Police, Metropolitan Police Department, at the hearing on the "Impact of Proposed Legislation on the District of Columbia's Gun Laws" before the U.S. House of Representatives Committee on Oversight & Government Reform on Sept. 9, 2008.

Secret Service, as well as training involving very large demonstrations, dignitary protection, and other events related to the activities and circumstances that exist here – training that other city police departments do not receive.[25] Both the United States Capitol Police and the United States Secret Service submitted recommendations to the Committee on Bill 20-930, further exemplifying the special nature of the District of Columbia.[26] The Secret Service cited its "unique protective mission responsibilities in the District of Columbia" as the reason for its high interest in Bill 20-930:

> While the Secret Service's protective operations occur around the world, given that the President, First Family, Vice President, foreign leaders, and other protectees reside, visit and work here, we maintain a particularly high level of protection-related activities with the District . . .[27]

Because DC has so many high-value targets, it is also heavily patrolled and protected by the more than two dozen law enforcement entities that operate here. The District's distinctive geography is helpful in this regard. At just 68 square miles – and 10 percent water – the District is completely contained in a dense urban setting. At some point the presence of law enforcement crosses a psychological line between providing public safety and infringing upon a sense of freedom. Citizens of the United States take pride in the freedom granted to them through the Constitution – freedom of expression, freedom of movement. But increasing the posting of armed officers, or clearing streets of all automobiles and restricting pedestrian movement except through checkpoints, tips society away from the freedom and openness we value in our society. At some point the Second Amendment infringes on the First Amendment.

It must be noted that when the Founding Fathers and the states drafted and ratified the Second Amendment, they were not considering today's armament. Today's firearms were inconceivable to the Founding Fathers; today's pistols are similar to their 18th Century counterparts in name only. Flintlock pistols were unreliable, inaccurate, unrifled, single-shot, ball-shot, and slow to load. Breachloading firearms were four generations away, and semiautomatic firing mechanisms with hollow-point bullets were unimaginable. The Founding Fathers were not oblivious to public safety, and the then-unimaginable lethality of today's firearms requires restrictions in the nation's capital such as provided by Bill 20-930.

It must also be noted, because the District's response to gun control has engendered criticism from gun enthusiasts across the country, that the regulation of firearms must differ between jurisdictions. The circumstances unique to the District require a regulatory system different than perhaps any other jurisdiction, and especially, far different than what would be necessary for public safety in a rural place.

---

[25] Chief Lanier Oct. 16, 2014 verbal testimony.
[26] *See* submitted statements in section V.
[27] *See* letter dated November 14, 2014 from A.T. Smith, Deputy Director, United States Secret Service, to the Honorable Tommy Wells, Chairman, Committee on the Judiciary and Public Safety (p. 1).

## SPECIFIC PROVISIONS OF BILL 20-930

The development of Bill 20-930 has been guided by the analysis and decisions in other urban areas and reflects the District's significant interests in protecting public safety and preventing crime,[28] while providing a mechanism for those individuals who have a specialized need for self-defense.

To achieve this balance, Bill 20-930 revives the District's longstanding concealed carry law, with minor amendment, as section 3(b) of the bill.[29] Section 6 of the Pistols and Other Dangerous Weapons Act was approved July 8, 1932 and provided the parameters for issuing licenses to carry:

> The superintendent of police of the District of Columbia may . . . issue a license to such person to carry a pistol within the District of Columbia for not more than one year from date of issue, if it appears that the *applicant has a good reason to fear injury to his person or property or has any other proper reason for carrying a pistol and that he is a suitable person to be so licensed.*[30] (emphasis added)

The District's previous regulations implementing the Pistols and Other Dangerous Weapons Act stated that for the purposes of satisfying the "have reason to fear injury to his or her person or property or any other proper reason" clause, the applicant "shall allege serious threats of death or serious bodily harm to his or her person or theft or destruction of property in writing, under oath. The applicant shall also allege that the threats are of a nature that the legal possession of a pistol would provide adequate protection."[31]

This revival of the original concealed carry law reinstates the District as a "may issue" jurisdiction – where the issuing authority has discretion in granting permits to carry concealed handguns.[32] Of the 50 states, four do not require a permit to carry. The other 46 have permit requirements, but the mechanisms differ: Nine states have "may issue" laws; the remaining 37 states have "shall issue" laws, which require the issuing authority to grant most permits, though at least 20 of these provide the issuing authority with some discretion.[33] For example, in Georgia,

---

[28] There can be little question that preventing crime and promoting public safety are important government goals. *See, e.g., United States v. Salerno,* 481 U.S. 739, 750 (2nd Cir. 1987); *Schall v. Martin,* 467 U.S. 252, 264 (1984).

[29] Under *Heller,* "longstanding" prohibitions are presumptively lawful. *Kachalsky v. County of Westchester,* 701 F.3d 81 at 90, n. 11.

[30] 47 Stat. 650 at 651.

[31] 24 DCMR 2303.11; previously contained in Article 52 of the Police Regulations, 1955 Edition-1968 Reprint, Title 35, District of Columbia Rules and Regulations (DCRR the predecessor of the DCMR).

[32] Gun Control States' Laws and Requirements for Concealed Carry Permits Vary across the Nation, U.S. Government Accountability Office, Report to Congressional Requesters (July 2012) GAO-12-717, p. 5 (accessed Oct. 19, 2014 at http://www.gao.gov/assets/600/592552.pdf).

[33] Information compiled at Law Center to Prevent Gun Violence, http://smartgunlaws.org/concealed-weapons-permitting-policy-summary/ (accessed Oct. 19, 2014).

a "shall issue" state, issuing authorities may deny the permit if they determine, among other things, that the applicant is not of good moral character.[34]

In the "may issue" states, issuing authorities may issue a permit to eligible individuals after considering additional requirements, such as the applicant's history and personal character.[35] Maryland, for example, issues handgun permits to residents who can demonstrate a good and substantial reason for needing a permit. Maryland's issuing authority is responsible for making the determination of what constitutes a good and substantial reason, "such as a finding that the permit is necessary as a reasonable precaution against apprehended danger."[36] In New Jersey, a Superior Court judge issues permits if he or she believes that the applicant satisfies the requirement of good character, familiarity with safe handling, and a justifiable need to carry a handgun.[37] New York requires "proper cause," which is demonstrated by "a special need for self-protection" that is distinguishable from that of the general community.[38] These provisions all have been upheld in federal court as constitutional.[39]

### Application requirements

Section 902[40] enumerates the requirements for applicants who wish to carry a concealed weapon. The applicant must certify and demonstrate to the satisfaction of the Chief that he or she is (1) at least 21 years of age; (2) meets all the requirements for a person registering a firearm under existing law; (3) does not currently suffer nor has suffered in the previous five years from any mental illness or condition that creates a substantial risk that he or she is a danger to himself or herself or others; (4) has completed at least 16 hours of firearms training, conducted by a certified instructor, that covers enumerated topics; (5) has completed at least two hours of range training; and (6) any procedures the Chief may establish by rule.

---

[34] *See* Ga. Code Ann. § 16-11-129(d)(4): ". . . the judge of the probate court shall issue an applicant a license or renewal license to carry any weapon unless facts establishing ineligibility have been reported or unless the judge determines such applicant has not met all the qualifications, is not of good moral character, or has failed to comply with any of the requirements contained in this Code section."

[35] GAO, *supra* n. 22, at p.13.

[36] Md. Code Ann. Pub. Safety § 5-306(a)(6).

[37] NJAC 13:54-2.3. "Justifiable Need" is defined as "the urgent need for self-protection, as evidenced by specific threats or previous attacks which demonstrate a special danger to the applicant's life that cannot be avoided by means other than by issuance of a permit to carry a handgun." (NJ Admin Code 13:54-2.4(d)(1)).

[38] N.Y. Penal Law § 400.00(2)(f). Examples include employment that requires handling cash/valuable negotiable objects; threats documented in police reports; other documentation of a specific threat to the applicant; target practice; and hunting.

[39] *Woolard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013) (upholding Maryland's "good and substantial reason standard"); *Drake v. Filko*, 724 F.3d 426 (3rd Cir. 2013) (cert denied- May 5, 2014) (upholding New Jersey's "justifiable need" standard stating it qualifies as a "presumptively lawful, longstanding regulation and therefore does not burden conduct within the scope of the Second Amendment's guarantee."); *Kachalsky v. County of Westchester*, 701 F.3d 81 (2nd Cir. 2012) (upholding New York's "proper cause" standard: "Limiting Handgun possession to persons who have an articulable basis for believing they will need the weapon for self defense is in the best interest of public safety and outweighs the need to have a handgun for an unexpected confrontation.").

[40] For the purposes of discussing the provisions of Bill 20-930, the committee report refers directly to the individual sections created in the new Title IX, found in subsection 2(e) of Bill 20-930 (i.e. "section 907").

Existing firearm registration requirement. In order to legally possess a firearm in the District of Columbia, an individual must have registered the weapon, pursuant to The Firearms Control Regulations Act of 1975, effective September 24, 1976 (D.C. Law 1-85; D.C. Official Code § 7-2501.01 et seq.). Accordingly, in order for an applicant to qualify for a carry permit, the applicant must first meet the requirements to possess a firearm in the District, which section 902(a)(2) makes clear. This requirement ensures compliance with District registration laws, and verifies an applicant's eligibility to possess and ultimately carry a firearm. It also ensures that nonresidents who apply for a carry permit do so understanding what weapons are allowed in the District.

Mental health requirement. Forty-four states regulate the possession of a firearm by the mentally ill. Bill 20-930 reaffirms the District's longstanding carry regulations, which required the applicant be of sound mind and free of mental illness or disorder for the past five years.[41] The committee print expands section 902(a)(3) to provide the Chief with the authority to consider information that the applicant who has suffered in the previous five years from such a condition no longer suffers from that condition, echoing a provision in the original carry regulations. Section 902(a)(3)(A) requires that the applicant "does not currently suffer from any mental illness or condition that creates a substantial risk that he or she is a danger to himself or herself or others," a standard that exists explicitly in several states and is reflected indirectly in the others.[42]

Training requirement. The Committee believes training in the safe handling and use of firearms is essential for any owner, but is particularly critical for those who carry in public, where untrained use of a firearm may result in injury to innocent bystanders. Section 902(a)(4) requires a carry permit applicant to have completed at least 16 hours of training by a certified instructor, which includes principles of safety, marksmanship, care and use, local law, situational awareness, conflict management, and the use of deadly force. Section 902(a)(5) requires that the applicant has completed at least two hours of range training conducted by a certified instructor, including shooting a qualification course of 50 rounds of ammunition from a maximum distance of 45 feet.

Such training requirements are not unusual[43] or burdensome.[44] More than half of the states require a carry applicant to demonstrate they have received training in firearm use and/or safety. Federal courts have agreed that such training is essential for public safety. As Judge Richard Posner, writing for the U.S. Court of Appeals for the Seventh Circuit, noted, "some states sensibly require an applicant for a handgun permit establish his competence in handling

---

[41] 24 DCMR 2303.4 and 2303.5.

[42] See, e.g. Ariz. Rev. Stat. §§13-3101-02; Cal. Welfare and Inst. Code §§ 8100 – 8108; Md. Pub. Safety Code § 5-133; Neb. Rev. Stat. § 69-2433; and S.D. Codified Laws § 23-7-7.1.

[43] See, e.g. Md. PUBLIC SAFETY Code Ann. § 5-306 (5).

[44] Some media outlets, reporting on the emergency regulations issued pursuant to the post-Palmer emergency Act 20-447, have implied that the District has set up a barrier by requiring training but not having any certified trainers. However, as detailed in the emergency regulations and application instructions, individuals can request preliminary approval from MPD for their concealed pistol license application, and, if granted, will then have 45 days to meet the training requirements. In addition, some applicants for a concealed pistol license may be eligible for an exemption from most of the firearms training requirements.

firearms. A person who carries a gun in public but is not well trained in the use of firearms is a menace to himself and others."[45] Indeed, one concealed carry proponent – himself a plaintiff in *Heller* and *Palmer* – testified regarding the importance of carry applicants being properly trained:

> What they need to do is practice. 16 hours is a good start, I would encourage more. We encourage people to do "dry fire" practice, practicing presses, reloading and drawing with an empty firearm. These are skills that you lose if you don't practice them over time. If someone doesn't practice for a couple of months they're going to be rusty.[46]

As with existing training requirements for the registration to possess a firearm, section 902(c) exempts from the carrying training requirement an individual who can demonstrate that he or she has received firearms training in the U.S. military or can otherwise demonstrate that a firearms training or safety course has been completed that is at least equal to that required by section 902(a)(4) and (5).

Additionally, under section 902(d), any applicant may satisfy the training component by demonstrating the applicant has met similar requirements in his or her own residence. This provision ensures that Bill 20-930's training requirements are not repetitive for nonresidents – or new residents – who possess such training and seek a carry permit in the District. The 1932 Pistols and Other Dangerous Weapons Act also allowed for carry permits for nonresidents, provided they met the other requirements of the law, including the good reason to fear injury provision.

<u>In-person application</u>. Section 907(f) requires an applicant to appear for an in-person interview at MPD headquarters, for purposes including verification of the applicant's identity and verification of the information submitted as part of the applicant process for a carry license. At a minimum, the in-person application is essential to verify the applicant's identity and ensure there is no fraud. This requirement is also not unusual. A cursory review finds similar standards in counties in California, Nebraska, North Carolina, and Pennsylvania. Additionally, the in-person discussion will assist both the Chief and the applicant in the consideration of good cause for a carry permit.

***Licensee duties***

Section 904 enumerates the duties of concealed carry licensees. Section 904(b) requires a licensee to notify the Chief of the loss, theft, or destruction of the license and any change in name or address. Subsection (c) requires the licensee to carry the license and the registration certificate whenever the licensee carries the pistol. Subsection (d) dictates what a licensee must do when stopped by a law enforcement officer, specifically that the licensee must disclose to the officer that he or she is carrying a concealed pistol, present the license and registration, identify the pistol's location, and comply with all lawful orders and directions from the officer. Chief

---

[45] *Moore v. Madigan*, 702 F.3d 933, 941 (7th Cir. 2012) (striking down the Illinois ban on carrying in public).
[46] Verbal testimony of George L. Lyon, Jr., President, DC Chapter, Community Association for Firearms Education, at the public hearing on Bill 20-930 on Oct. 16, 2014.

Lanier testified at the public hearing for Bill 20-930 that federal law allows sworn officers to carry their weapons off duty and outside their sworn jurisdiction, but requires the sworn officers to disclose to other law enforcement who they are and how they are carrying. She stated that the requirements in Bill 20-930 are modeled on the federal requirements and are reasonable procedures to protect both law enforcement and the licensees.[47]

### Revocation and suspension of licenses

Section 905 includes a provision for the revocation of a license upon a finding that the licensee no longer meets the standards and requirements of the law, and includes the ability to appeal to the Concealed Pistol Licensing Review Board. The committee print for Bill 20-930 amends this section to include summary suspension, without a hearing, when the Chief has determined that the conduct of a licensee presents an imminent danger to the health and safety of the public or a member of the public. The provision includes the right to a hearing within 72 hours of a timely request and then a decision within 72 hours of such a hearing. These provisions are in addition to section 906, which details that a licensee may not carry a pistol while impaired.

### Sensitive places

In *Heller*, the Supreme Court pointed out that "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" are presumptively lawful.[48] Almost every state places some restrictions on where concealed firearms may be carried. The most common areas identified as sensitive and in need of this prohibition include schools, jails, courthouses, and other government buildings.[49] Restrictions exist for a wide range of other locations. For example, prohibitions on carrying exist for college campuses (20 states) [50], establishments that serve alcohol (17 states), places of worship (12 states), polling places (10 states), and public sporting events (six states), among others.[51] States also permit private businesses and other private institutions to ban guns from their premises.[52]

Bill 20-930 aims to be as clear as possible regarding prohibitions on concealed carry; licensees must be able to easily understand where they can and cannot carry their firearms. Section 907 approaches this in three ways: sensitive locations, sensitive circumstances, and presumptions.

---

[47] Section 901(2) defines law enforcement officer for the purposes of Title IX to include MPD reserve officers, special police officers appointed pursuant to D.C. Official Code § 5-129.02, and campus and university special police officers appointed pursuant to 6A DCMR § 1200 *et seq.*; however, it should not be construed to designate these entities as law enforcement agencies.

[48] *Heller*, 554 U.S. at 626 (n. 26 states, "We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive.").

[49] Law Center to Prevent Gun Violence, *supra* n. 22.

[50] "Guns on Campus: Overview", National Conference of State Legislatures, March 7, 2014, http://www.ncsl.org/research/education/guns-on-campus-overview.aspx (accessed Oct. 19, 2014); 23 other states allow each college or university to make the decision to ban or allow concealed carry on campus.

[51] Law Center to Prevent Gun Violence, *supra* n. 22.

[52] *Supra*, n. 40 (Posner noting existing limits on carrying concealed weapons).

Locations. In the bill as introduced, the list of sensitive places where carrying is prohibited was limited to 14 categories or circumstances, which primarily reflected government buildings and property, facilities that serve children or other vulnerable populations, businesses that serve alcohol, confined spaces such as buses and sports arenas, large gatherings, and sensitive locations unique to the District. The committee print expands this list by two. The print also includes "any polling place while voting takes place" to ensure that residents may exercise their fundamental right to vote without fear or intimidation, something protected even in states with high rates of gun ownership, such as Texas, Arkansas, and South Carolina.[53] The final addition is the U.S. Naval Observatory and its grounds, which is the home of the Vice President of the United States, and was included at the request of the U.S. Secret Service.[54]

Two witnesses at the public hearing on Bill 20-930 raised concerns about the prohibition of carrying on public transportation, section 907(a)(6) of the introduced bill. Public transportation in the District is particularly crowded and the use of a weapon in such a confined space would most certainly result in injury to innocent bystanders.[55] Additionally, the Washington Metropolitan Area Transit Authority ("WMATA") specifically requested inclusion of its vehicles and Metrorail stations.[56] Accordingly, the committee print retains this prohibition in section 907(a)(8), but does make two changes to the paragraph. First, the print adds Metrorail transit stations, to make it explicit that concealed pistols are not allowed therein, as requested by WMATA.[57] Second, the print strikes the phrase "but not including taxicab operators." The committee believes that taxi drivers are no more likely to be subject to specific threats or previous attacks than any other resident. An individual taxi operator may still apply with a specific need. In addition, the committee print defines public transportation in section 907(g)(3) as "any publicly owned or operated commercial vehicle, including any DC Circulator bus, DC Streetcar, MetroAccess vehicle, Metrobus, or Metrorail train."[58]

Circumstances. Bill 20-930 also takes into consideration two circumstances unique to the District: movements of dignitaries and high-ranking officials, and demonstrations in public places. As introduced, the bill prohibited concealed carry in these circumstances, requiring a buffer zone up to 1,000 feet, and specifying that no criminal penalty would attach unless the licensee was advised by a law enforcement officer that the movement or demonstration was occurring and the licensee was ordered to leave the area until he or she removed the pistol and the licensee did not comply.

---

[53] Testimony of Tracy Zorpette, Washington, D.C. Chapter Advocacy Lear, Moms Demand Action for Gun Sense in America, at the public hearing on Bill 20-930 on Oct. 16, 2014 (p. 2).
[54] Supra, n. 25 at p. 2.
[55] Other jurisdictions have similar prohibitions. See e.g. 430 Ill. Comp. Stat. 66/65(a)(8) (Prohibiting carrying on any bus, train, or form of transportation paid for in whole or in part with public funds, and any building, real property, and parking area under the control of a public transportation facility paid for in whole or in part with public funds).
[56] WMATA meeting with council staff, Aug. 25, 2014; see also Letter dated Oct. 30, 2014 from Ronald A. Pavlik, Jr., Chief, Metro Transit Police.
[57] The Committee notes that this addition extends to Metrorail transit stations only, not to bus stops or bus shelters; someone carrying a pistol should not be prohibited from seeking shelter from the rain, for instance.
[58] The committee does not intend for this definition to extend to Capital Bikeshare.

One witness at the public hearing said the 1000-foot buffer zone is overbroad and irrational.[59] The Committee disagrees. First, the language read "within 1,000 feet, or other lesser distance designated by the Chief," which means the perimeter is set by the Chief for the particular movement or demonstration. In many situations, the perimeter will not be that large, but law enforcement may need such a distance for other circumstances that require additional security. Second, the 1,000-foot buffer has been used previously in District law to draw drug-free and gun-free zones around areas of particular sensitivity, such as day care centers, schools, and public libraries.[60]

The Committee agrees, however, with the Chief's testimony that it would be difficult for the police to comply with the personal notification requirement in Bill 20-930 as introduced.[61] The committee print amends these sections to reflect common sense notification: a licensee should not carry where the "law enforcement agency provides notice of the perimeter by the presence of signs, law enforcement vehicles or officers acting as a perimeter, or other means to make the area of protection obvious" in the event of protected movements, and in the event of demonstrations, where the "law enforcement agency provides notice of the perimeter by the presence of signs, law enforcement vehicles or officers acting as a perimeter, or other means to make the area of the demonstration obvious". This alleviates the personal notification burden on police and relies on posted signs or other obvious signs of police perimeters. However, although a licensee is prohibited from carrying within these designated areas, no criminal penalty applies unless (a) the above presence or notice has occurred, or (b) the licensee is informed by an officer that it is a designated area and fails to leave.

<u>Presumptions</u>. Bill 20-930, as introduced, also contains two presumptions in section 907(b): (1) private residences are presumed to prohibit concealed carry unless the property owner or person in control of the premises communicates authorization personally to the licensee in advance, and (2) non-residential private property is presumed to allow concealed carry, unless posted with conspicuous signage prohibiting carry or unless the owner or authorized agent communicates the prohibition personally to the licensee. The committee print of Bill 20-930 adds an additional presumption, providing a presumed prohibition in places of worship, unless the property is posted with conspicuous signage allowing concealed pistols, or the owner or person in control of the premises communicates authorization personally to the licensee in advance.[62] There are at least a dozen stated that include houses of worship on a prohibited locations list or as presumptively prohibited locations.[63] The Committee received testimony in support of this addition at the public hearing, as well as in submitted statements.[64]

---

[59] *See* George Lyon Oct. 16, 2014 testimony (p. 4).
[60] D.C. Official Code § 48-904.07a and § 22-4502.01, respectively.
[61] Chief Lanier Oct. 16, 2014 testimony (p. 3).
[62] However, such places of worship may not authorize concealed carry when services are conducted in locations already prohibited by section 907(a).
[63] *See, e.g.* A.C.A. §5-73-306(16)(A); O.C.G.A. §16-11-127(b)(4); La. R.S. §40:1379.3(N)(8); MCLS §§28.425o(e); Miss. Code Ann. §45-9-101(13); R.R.S. Neb. §69-2441(1)(a); Ohio Rev. Code Ann. §2923.126(B)(6).
[64] *See, e.g.* submitted statement from Terry Lynch, Executive Director, The Downtown Cluster of Congregations; *see also* testimony at the public hearing on Bill 20-930 on Oct. 16, 2014 by Dean Gary Hall, Washington National Cathedral; Bishop Mariann Budde, Episcopal Diocese of Washington; Patricia Riley Johnson, Canon Missioner at the Washington National Cathedral; Rev. Rebecca Justice Schunior, St. Mark's Episcopal Church, Capitol Hill; Rev.

*Review process*

Bill 20-930, as introduced, includes section 908, which establishes the Concealed Carry Licensing Review Board for the purposes of hearing appeals from a denial of any application or renewal application for a carry license, as well as a revocation of a carry license. The committee print also provides the Review Board with the authority to hear appeals from summary suspensions, consistent with the new subsection 905(b). The committee print expands the membership of the Review Board from five to seven members, and changes the makeup of the Review Board to (1) remove the Chief Judge of the Superior Court or his or her designee (at the request of the sitting Chief Judge); and (2) include three public members, one who is a mental health professional and two District residents with experience in the operation, care, and handling of firearms. The Committee believes the addition of these public members will provide other important perspectives to the Review Board.

The remaining provisions of section 908 remain substantially the same, though reworded for clarity and consistency. The committee print clarifies that the Review Board may conduct hearings using three member panels; for those panels, two members shall constitute a quorum, and the decisions of the panels will be considered final decisions of the Review Board. This clarification was made to ensure the Review Board could provide timely response to any request for a hearing. One final subsection, 905(g), was included to ensure any party – including the Chief of Police – aggrieved by a final action of the Review Board may file an appeal.

*Privacy concerns*

When the Council considered the License to Carry a Pistol Emergency Amendment Act[65] of 2014, there was discussion on the dais related to the emergency bill's exemption of concealed carry license information from the Freedom of Information Act.[66] Upon amendment, that section was removed from the emergency legislation.[67] However, under current MPD policy, personally identifiable information provided by applicants on firearms-registration forms is considered exempt from disclosure to the public as "a clearly unwarranted invasion of personal privacy."[68] During discussion at the public hearing on Bill 20-930, Chief Lanier testified that the Department releases general information only, such as the number of guns registered per zip code, and stated her concerns on publicizing personal information:

> Suppose that person is someone who has obtained that permit because they transport large amounts of cash or valuables. By making that a public record, you're now letting people know they carry large amounts of cash and valuables. Same thing for a victim of

---

Dr. Crystal A. Kuykendall, Esq., Associate Minister, Shiloh Baptist Church; and Tracy Zorpette Washington, D.C. Chapter Advocacy Lear, Moms Demand Action for Gun Sense in America.
[65] Act 20-447 (expires Jan. 7, 2015).
[66] Freedom of Information Act of 1976, effective March 25, 1977 (D.C.Law 1-96; D.C. Official Code § 2-532); *see generally,* video of Sep. 23, 2014 discussion at Bill History, http://lims.dccouncil.us/Legislation/B20-0926 (accessed Nov. 1, 2014).
[67] *See* Amendment #3 (Grosso) at Bill History, http://lims.dccouncil.us/Legislation/B20-0926 (accessed Nov. 1, 2014).
[68] *Heller II* at *2.

domestic violence . . . I don't think making that public serves the interest of public safety, and it could increase the risk for somebody who has already demonstrated that they have a specific threat.[69]

The Committee shares the concerns about the impact such disclosure might have on licensees. Accordingly, the committee print for Bill 20-930 retains section 909.

### *Rulemaking*

Legislation routinely delegates reasonable implementation rulemaking to the Mayor in a *pro forma* clause. Bill 20-930, however, sets out minimum standards to ensure that the implementing regulations appropriately address a number of significant provisions. Section 908(e) directs the Mayor to issue rules establishing procedures for a contested case review of any appeal, including the manner and time of appeals, and procedures for the Review Board to assign panels of three Review Board members to conduct hearings and issue final decisions.

Section 911 directs the Chief of Police to issue rules to implement the provisions of Bill 20-930. Specifically, the rules must (1) establish criteria for meeting the good or other proper reason for carrying a concealed pistol requirement, and the applicant's suitability to carry a concealed pistol requirement; (2) establish the type and amount of ammunition that may be carried concealed; (3) establish the methods by which a pistol may be carried; (4) establish all application forms, investigation procedures, background checks, and fees necessary to process an application; (5) specify procedures or requirements specific to non-residents; (6) specify requirements for signage on any private property prohibiting concealed carry therein; and (7) establish renewal procedures.

### *Non-residents*

The *Palmer* decision stated that the District could not ban otherwise qualified non-residents from public carrying for self-defense based solely on the fact that they are not residents of the District. Bill 20-930 addresses this concern by providing a mechanism for non-residents to obtain carry licenses. In section 3(b), the bill revives Section 6 of the License to Carry a Pistol Amendment Act, which specifies that any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his or her person issued by the lawful authorities of any State or subdivision of the United States may apply for a concealed carry license, so long as the applicant "has good reason to fear injury to his or her person or property or has any other proper reason for carrying a pistol, and that he or she is a suitable person to be so licensed." For the non-resident who lives in a state that does not require a license to carry a concealed pistol, he or she may also apply for a carry license, provided that he or she meets the same requirements.

---

[69] Chief Lanier Oct. 16, 2014 verbal testimony; the Chief's concerns were shared by George L. Lyon, Jr., who testified that making the identity of carry license holders public was an "utterly dangerous idea" that would "put innocent victims of stalking and crime at such risk."

Additionally, under section 902(d), any applicant may satisfy the training component by demonstrating the applicant has met similar requirements in his or her own state of residence. This provision ensures that the training requirements of Bill 20-930 are not repetitive for nonresidents or new residents who possess such training and seek a carry permit in the District.

## CONCLUSION

### General Observations

The Committee has felt far greater opposition to Bill 20-390 than support, both from councilmembers and the public. Nonetheless, the court has made clear that a complete ban on carrying is inconsistent with the Second Amendment. Despite criticism, the Committee believes a regulatory scheme is possible that: (1) Sufficiently vets applicants to ensure that licensees are presumably safe people – knowledgeable about gun safety and use, no proclivity to violence, and no issue with mental illness; and (2) Minimizes the need for law enforcement (MPD, Secret Service, Capitol Police, etc.) to turn the District into a semi-police state with restricted freedom for its citizens.

Second Amendment supporters criticize the Bill as not going far enough to permit un-infringed carrying. Although the legality of gun regulation must be viewed in light of Second Amendment jurisprudence, the criticism should still be discussed. The most common criticism is that the District will be a safer place with gun carrying citizens:

> The notion stems from a paper published in 1997 by economists John Lott and David Mustard, who looked at county-level crime data from 1977 to 1992 and concluded that "allowing citizens to carry concealed weapons deters violent crimes and it appears to produce no increase in accidental deaths."[70]

There has been significant research since the Lott and Mustard study. A 2004 analysis from the National Research Council concluded that there was no credible statistical evidence that right-to-carry laws reduced crime. Most recently, an analysis out of Stanford University finds that:

> The totality of the evidence based on educated judgments about the best statistical models suggests that right-to-carry laws are associated with substantially higher rates of aggravated assault, rape, robbery and murder. (internal quotation marks omitted)[71]

---

[70] Christopher Ingraham, *More guns, more crime: New research debunks a central thesis of the gun rights movement*, WASHINGTON POST, WONKBLOG, November 14, 2014, http://www.washingtonpost.com/blogs/wonkblog/wp/2014/11/14/more-guns-more-crime-new-research-debunks-a-central-thesis-of-the-gun-rights-movement/.

[71] Clifton B. Parker, *Right-to-carry gun laws linked to increase in violent crime, Stanford research shows*, STANFORD REPORT, November 14, 2014, http://news.stanford.edu/news/2014/november/donohue-guns-study-111414.html.

This is consistent with anecdotal observations by Chief Lanier at the October 16 public hearing on Bill 20-930. In response to questions she stated that she had not seen a reduction in crime as a result of the reinstatement of handgun registration in the District following the *Heller* decision. She noted that burglaries had gone up after *Heller*; she was not suggesting a cause and effect, rather, that the ability of residents to now possess guns in their home did not seem to deter burglaries.

In this regard, the Committee notes its own observation that much of the District's violent crime is the result of gang members carrying guns. It may be that they are illegal, but the fact that they are carrying provokes gun violence, rather than lessens it, between gang members.

In addition, a study published in The New England Journal of Medicine in 1991 looked specifically at the effect of gun control in the District and concluded that:

> Restrictive licensing of handguns was associated with a prompt decline in homicides and suicides by firearms in the District of Columbia. No such decline was observed for homicides or suicides in which guns were not used, and no decline was seen in adjacent metropolitan areas where restrictive licensing did not apply. [72]

### *Reasonable Regulation*

It is clear from the caselaw that reasonable regulations are permissible under the Second Amendment. Even in *Palmer*, the Court noted that under *Heller* and its progeny, the Second Amendment right is "not unlimited":

> Furthermore, it is not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. Rather, it is a right subject to traditional restrictions, which themselves and this is a critical point tend to show the scope of the right. (For now, we state that a longstanding presumptively lawful regulatory measure . . . would likely [burden conduct] outside the ambit of the Second Amendment.) (citations, internal quotations omitted) [73]

It is undeniable that introducing a gun into any conflict can escalate a limited danger into a lethal situation. In response to a question by Council Chairman Phil Mendelson about the inclusion of training on situational awareness, conflict management, and the decisions on use of deadly force, *Heller* and *Palmer* plaintiff George L. Lyons, Jr. replied that "any confrontation or fight that you have could end up escalating into a deadly force encounter." When the deadly force being used is a gun, the danger extends to bystanders and the public at large. When considering concealed carry in a densely populated city, it is clear that the balancing equation must include the District's substantial governmental interest in public safety and crime prevention.

---

[72] Colin Loftin, Ph.D., David McDowell, Ph.D., Brian Wiersema, and Talbert J. Cottey, M.S., Effects of Restrictive Licensing of Handguns on Homicide and Suicide in the District of Columbia, *The New England Journal of Medicine*, Vol. 325, No. 23 at 1615 (1991).
[73] *Palmer, supra* n. 16 at 11.

A law to regulate the carrying of firearms in our city . . . provides a unique opportunity to press the public safety purpose of regulating gun use to its utmost, where it is most needful of such regulation: outside the home, in a densely populated area that also happens to be our Nation's capital; where danger to members of the public and vulnerability of government officials to armed attack is particularly sensitive; where we all have a right to be free from criminal and negligent gunfire; and where responsible gun use requires the strictest level of supervision while respecting our Constitution, mindful of the posture of the Supreme Court.[74]

The jurisprudence is unclear whether the Second Amendment confers a right of self-defense outside the home. The Committee notes, however, that the government's role in protecting citizens and promoting public safety has evolved dramatically in 225 years. A handful of constables who may have been on duty in 1789 have since been replaced by a Metropolitan Police Department with approximately 4,000 sworn (and armed) officers – and MPD is but one of over two-dozen police forces operating within the District of Columbia. Further, as with all rights protected under the Bill of Rights, the Second Amendment is not unfettered and must be balanced against other rights: the right of citizens to associate freely without fear either of an omnipresent police force or of an armed citizen who is a little too quick to shoot.

Bill 20-930 offers a reasonable, balanced approach to protecting the public safety and meeting an individual's specific need for self-defense. Built-in safeguards to the Chief's discretion, including the Concealed Carry Licensing Review Board and the right to appeal, further this balanced approach. For all the reasons explained above, the Committee recommends approval of Bill 20-930, as amended.

## II.  LEGISLATIVE CHRONOLOGY

September 23, 2014  Bill 20-930, "License to Carry a Pistol Amendment Act of 2014", is introduced by Chairman Mendelson and Councilmember Wells.

September 23, 2014  Bill 20-930 is referred to the Committee on the Judiciary and Public Safety.

September 26, 2014  Abbreviated Notice of Intent to act on Bill 20-930 is published in the *District of Columbia Register.*

September 26, 2014  Notice of a Public Hearing is published in the *District of Columbia Register.*

October 16, 2014  The Committee on the Judiciary and Public Safety holds a public hearing on Bill 20-930.

---

[74] Testimony of Doug Pennington, public witness, at the hearing on Bill 20-930 on Oct. 16, 2014 (p. 5).

October 20, 2014      Bill 20-930 is re-referred sequentially to the Committee on the Judiciary
                      and the Public Safety and the Committee of the Whole.

October 24, 2014      The re-referral is published.

November 25, 2014    The Committee on the Judiciary and Public Safety marks-up Bill 20-930.

### III.   POSITION OF THE EXECUTIVE

*Cathy Lanier, Chief, Metropolitan Police Department*, testified on behalf of the
executive in support of Bill 20-930. She stated that the legislation maintains the District's
"commitment to keeping guns out of wrong hands, while fully respecting the Second
Amendment of the U.S. Constitution." Chief Lanier provided a brief overview of the *Palmer*
ruling, the joint effort by the Executive, Council Chairman Phil Mendelson, and Councilmember
Tommy Wells to develop the legislative response, and the key elements of the bill. She also
discussed the uniqueness of the District of Columbia, stating that as the seat of the federal
government, it is "a city filled with sensitive places from a public safety perspective." She stated
that protecting government officials and infrastructure is challenging in every city, but "in the
District the likelihood of attack is higher, and the challenges to protecting the city are greater,"
with so many critical official and symbolic buildings, monuments, events, public officials,
dignitaries, and public servants present in the city every day. She cited the recent security
breaches into the White House as examples of the importance of prohibiting guns from entering
the perimeter of a secure area.

Chief Lanier also urged the Council to make three changes to the list of places where
carrying handguns would be prohibited First, she urged the Council to expand the prohibition of
handguns in government buildings to also include the surrounding grounds and parking lots. She
cited two examples of law enforcement officers in Virginia and Pennsylvania gunned down in
police parking lots. Second, she urged the Council to remove the requirements that a law
enforcement officer advised a licensee that a public gathering, dignitary movement, or
demonstration is occurring and ordered the licensee to leave before criminal penalties apply.
Instead, she argued, notice should be satisfied by signs at event entrances, in advertisements, and
tickets. Third, she urged the Council to preclude taxi drivers from being able to obtain a carry
permit based only on their status as a taxi driver.

Chief Lanier further made it known that the police department was presently at work on
emergency regulations to issue no later than October 22nd. She stated that these regulations
would be based in part of prior District regulations, and in part on models from Maryland, New
York, and New Jersey, whose licensing programs have been found to be constitutional by their
respective federal Courts of Appeal. Finally, she concluded her remarks by explaining that any
trainer already certified to provide firearm training for special police officers will be able to be
certified to train new licensees simply by providing training curriculum for initial certification.

## IV.  COMMENTS OF ADVISORY NEIGHBORHOOD COMMISSIONS

The Committee did not receive testimony from any Advisory Neighborhood Commission.

## V.  SUMMARY OF TESTIMONY AND STATEMENTS

The Committee on the Judiciary and Public Safety held a public hearing on Bill 20-930 on Thursday, October 16, 2014. The testimony summarized briefly below is from that hearing. A copy of the witness list is attached to this report and the hearing record, including copies of the full testimony, is available from the Office of the Secretary.

*Brian Wrenn, Public Witness:* Mr. Wrenn testified in opposition to the bill. He expressed a belief that the bill is overly restrictive of where a licensee may carry a firearm. In particular, he cited the restriction against being within 1,000 of a dignitary, as their movements are unpredictable, and the restriction against public transit, as many people ride Metro or Metrobus. Mr. Wrenn further postulated reasons why the bill violates the *Palmer* decision, and why allow "non-criminals" to carry firearms would make the city safer. He further stated that with advances in technology, including 3D printers, there will be an increase in illegally obtained or possessed firearms everywhere.

*Dr. Ankoor Shah, Pediatrician and Member, DC Chapter of the American Academy of Pediatrics:* Dr. Shah shared the story of a five year old girl who accidentally shot herself in the head and died using her father's gun, that had been left loaded and unlocked in a bedroom. He stated that over 2,000 children 18 years old and younger were unintentionally injured by a firearm in 2013. He noted that the bill's language of "on or about a person" with regard to a carried firearm implies a potential danger for children. A firearm should only be allowed on a person's body or in a locked box; anything short of that will endanger children.

*Reverend Crystal Kuykendall, Shiloh Baptist Church:* Rev. Kuykendall spoke her personal experiences with gun violence, and urged the Council to enact a law that gives discretion to the Chief of Police to issue carry permits; requires the Chief to affirm that an applicant has a legitimate need to carry a loaded, hidden handgun; requires the applicant to be cleared through the National Instant Background Check System; requires the applicant to have at least 16 hours of training; and includes houses or worship as locations in which the carrying of load, hidden handguns is prohibited.

*Reverend Rebecca Justice Schunior, Associate Rector, St. Mark's Episcopal Capitol Hill:* Rev. Schunior testified about the nature of violence, the ability of any person to commit it, and the importance of prohibiting firearms from houses of worship, where people "we bring our deepest passions."

*Patricia Johnson, Canon Missioner, Washington National Cathedral:* Ms. Johnson testified on behalf of Dean Gary Hall of the Washington National Cathedral and Bishop Mariann Budde of the Episcopal Diocese of Washington. Ms. Johnson requested the Council include houses of worship in the list of prohibited locations.

**Reverend Robert Schenck, Public Witness:** Rev. Schenck testified in favor of the bill, but recommended removal of the requirement that applicants must prove they have good reason to fear for their lives or safety. He also spoke about DC's unique attraction to mentally ill and delusional persons owing to the concentration of government institutions and workers. He also stated that data demonstrates that the presence of lethal weapon in the home greatly increases the potential of deadly domestic violence, successful suicide, and grave injury or death to children, and that requiring 16 hours of training is only the beginning of mastering one's emotions, intellect, bodies, and souls to yield the lethal power safely.

**Kris Hammond, Public Witness:** Mr. Hammond is a Ward 5 resident and testified that the high standards imposed on a person seeking a handgun carry permit would place DC outside the mainstream of American law today. He expressed disagreement with certain of the prohibited locations and requested the Council provide rationales for each prohibition, including in government owned or controlled buildings and at permitted public gatherings. He concluded by opining that law abiding registrants do not commit gun crime.

**Antonio Goicochea, Public Witness:** Mr. Goicochea, of McLean, VA, testified in opposition to the bill and called it "deliberately burdensome." He also asserted that concealed carry reduces crime. He recommended that the District enact legislation more in line with laws in Alaska, Arkansas, Arizona, Wyoming, and Vermont.

**Doug Pennington, Public Witness:** Mr. Pennington, a Ward 5 resident, testified about the legal backdrop upon which the bill is written. He made three recommendations for the bill, including (1) enacting a "Barney Fife" rule to automatically and temporarily suspend gun carry licenses of those who fire their weapons accidentally; (2) before issuing a gun carry license, investigate applications who were respondents in any domestic violence complaint but in which no civil protection order or criminal conviction results; and (3) include a specific provision to prohibit an applicant convicted of any stalking offense from being issued a gun carry license.

**George L. Lyon, Jr., President, DC Chapter of Community Association for Firearms Education:** Mr. Lyon testified in opposition to the bill. He discussed his background as a DC resident, firearms enthusiast, and legal party in the *District of Columbia v. Heller* case. He strongly criticized the proposition to publish the identities of carry license holders and the requirement that applicants prove their specific need for self-protection. He further criticized the prohibition on restaurants and public transportation, saying that such prohibitions go even beyond the laws in other restrictive, shall issue states like California, Hawaii, Maryland, Massachusetts, New Jersey, and New York. He urged the legalization of drugs, the improvement of the mental health system, and the loosening up of the carry requirements and restrictions. He also argued that allowing increased carry permits does not increase crime and provided statistics.

**Tracy Zorpette, Advocacy Lead, DC Chapter Advocate Lead, Moms Demand Action for Gun Sense in America:** Ms. Zorpette testified in favor of the bill. She stated her belief that the bill borrows the best provisions from the concealed carry laws in other jurisdictions and will provide a model for the nation. Additionally, she suggested three changes to the bill to reverse the presumption allowing guns on private property, to add houses of worship and polling places

to the prohibited locations list, and to allow journalists and scholars to FOIA records on licenses for scholarship purposes.

**Matthew Bergstrom, Managing Partner, Arsenal Attorneys**: Mr. Bergstrom testified that his law firm represents thousands of gun owners across America and that he was speaking on behalf of "the many clients who have contacted [him] with their concerns about Bill 20-930." He called the bill vague and inconsistent, setting up subjective standards and creating overly complex compliance requirements. He also commented on the wisdom of a shall issue scheme.

**Ron Campbell, Public Witness:** Mr. Campbell testified in opposition to the bill. He spoke about his experiences with gun violence as the owner of an automotive shop in DC.

**Martin Moulton, Public Witness:** Mr. Moulton spoke about his personal experience of gun violence in and around Shaw and asserted that ending the war on drugs, regulating and licensing all drugs like alcohol and tobacco would go a long way toward decreasing criminal gun violence.

**Jackie, Public Witness:** Jackie testified at the public hearing in opposition to Bill 20-930, but did not provide a written statement.

In addition to the testimony above, the following statements were submitted for the record:

**Lee F. Satterfield, Chief Judge, Superior Court of the District of Columbia**, submitted a letter to the Chairman declining to serve as a member of the Concealed Pistol Licensing Review Board or designating another Superior Court associate or senior judge to serve in his stead. Chief Judge Satterfield cited Rule 3.9 of the Code of Judicial Conduct, which states that a judge "shall not . . . perform other judicial functions apart from the judge's official" and suggested it would be more appropriate to appoint a retired Superior court judge to serve on the Board.

**Kim C. Dine, Chief of Police, United States Capitol Police**, submitted comments for the record. Chief Dine highlighted the U.S. Capitol Police's (USCP) daily partnership with the MPD and stated that Bill 20-930 directly impacts the USCP's law enforcement duties and responsibilities in maintaining security and safety within DC. On behalf of the USCP, Chief Dine requested three amendments: (1) the addition of the phrase "including U.S. Capitol Buildings and Grounds" in section 907(a)(10); the addition of a phrase detailing additional prohibitions related to the work of the USCP for protected movements in section 907(a)(12); and the addition of the phrase "other than federal property" in the prohibition in section 907(a)(13). Chief Dine stated that "given the statutory responsibilities of the U.S. Capitol Police and federal statutes prohibiting firearms on federal property, as well as the specific Capitol Buildings and Ground prohibitions enumerated in federal and D.C. statutes, these edits are essential to effective law enforcement within the District of Columbia."

**Ronald A. Pavlik, Jr., Chief, Metro Transit Police**, submitted written testimony urging an amendment to the bill that would clearly prohibit firearms from any WMATA Metrorail station or building.

*A.T. Smith, Deputy Director, United States Secret Service*, submitted comments for the record supporting the Council's efforts to clearly define the circumstances surrounding an individual's ability to carry a concealed weapon in the District. Deputy Director Smith outlined the unique nature of the District, and made two recommendations specific to the Secret Service's protective mission. First, he requested adding the Vice Presidents residence and surrounding area to the list of locations where carrying a pistol is prohibited. Second, he requested the provision related to high-ranking officials moving under MPD protection be expanded to include where a protectee has arrived at his or her intended destination or had temporarily stopped en route to that destination.

*Terry Lynch, Executive Director, The Downtown Cluster of Congregations*, submitted a letter requesting that houses of worship and their related facilities be included among the locations where concealed carry is prohibited. He noted that he believe at least 14 states have such a prohibition, including Kansas, Louisiana, Michigan, Mississippi, Missouri, Nebraska, North Dakota, South Carolina, Texas, Utah, Virginia and Wyoming. Mr. Lynch wrote that it "is popularly understood houses of worship serve as sanctuaries - places where there should be freedom from threats, violence and danger. Persons should be able to attend worship services of their choice secure in the knowledge that they are indeed sanctuaries."

*Rev. Alfonso Harrod-McKendrie, Simms Brookland UMC; Dr. Helen S. Fleming, Douglas Memorial UMC; Dr. Bernard Hillen Beaad, Foundry UMC; Rev. Joe Liles Sr., Bright Light Church; Rev. Donald Robinson, First Baptist Church; Rev. Charles B. Jackson, St. John Baptist; Rev. Monica M. Lowe Howard, New Day Church of Christ; Dr. Lewis T. Tait Jr., Faith Bible Church; Andre H. Owen, St. Phillips Baptist Church; Joyce McKeithon, St. John Baptist Church; Dr. Earl D. Trent Jr., Florida Ave Baptist Church; Rev. Raymond Bell, Solad Baptist Church; Rev. Eldridge Spearman, Mt. Jezreel Baptist Church; Patricia R. Johnson, Washington National Cathedral; Preston Horribal, Washington National Cathedral; Jan Core, Washington National Cathedral* submitted a sign-on letter requesting that houses of worship be on the list of prohibited places.

*Rev. Dr. Barbara A. Reynolds, Chaplain, Black Women for Positive Change*, submitted written testimony opposing allowing the carry law to permit the carrying of firearms into churches.

*DC residents Meghan Abrams, Miriam Szubin, Aliza Glasner, Anna Ravvin, Cheryl Aaron, Josh, Rachel Brandenburg, and Stacey Apter*, each submitted statements opposing the section 907(b) presumption that businesses and private property allow concealed carry. All urged the Council to reverse the presumption and instead require establishments that want to allow guns to put conspicuous signs up. As frequent patrons of retail stores and restaurants, they stated they should feel safe inside establishments. Also, sharing the perspective as parents of young children, they want to know what new precautions they will have to take before taking their children out.

*Katerina Herodotou, Partner, Meeps Vintage*, submitted a statement in opposition to the presumption for businesses. She wrote that requiring businesses across the District to post

conspicuous signage is undesirable and a better policy would reverse the presumption. She also posed several questions, including: (1) Where is the immunity clause? (2) What if a business does not post a conspicuous sign and something goes wrong? (3) Can the business be held liable? She concluded that guns have no business in small, crowded, and enclosed areas, which describes most of the businesses in DC's dense urban setting.

**Barbara Ward, DC Resident**, submitted testimony that she opposes allowing concealed weapons on the business property and premises in Adams Morgan.

**Dr. Jodi Zender**, no residency listed, submitted testimony opposing the bill for several reasons. She asserted that "may issue" means that getting a gun could be too late for many with specific threats against applicants. She also criticizes the bill's training requirement, the in-person interview, the delegation of rulemaking, the 1000-foot limitations, and the "numerous and unprecedented hurdles to acquiring a license to carry under this bill." Moreover, she wrote that MPD would have "essentially unfettered discretion."

**Marshall Brinson, Pensacola, FL**, submitted testimony in opposition to the bill, finding it unresponsive to *Palmer*. He also stated that he wants to know how the bill will allow nonresidents to receive concealed carry permits.

**Dawn Longenecker, Director, Discipleship Year Program at the Festival Center, Inc., and Joseph P. Deck III, Festival Center Executive Director**, submitted testimony opposing any legislation allowing people to carry concealed weapons.

**Michael Scott, Director, D.C. Catholic Conference**, submitted written testimony in favor of the bill, however requested the Council include houses of worship in the list of prohibited locations.

**Joe Sternlieb, President, and Natalie Avery, Executive Director, DC BID Council**, submitted a joint letter expressing serious concerns about the bill's presumption that any private property that is not a residence permits licensees to carry a pistol onto the property. The authors expressed concern that businesses posting a conspicuous sign prohibiting guns would negatively change the look and feel of the city's commercial districts and place an undue burden on the businesses.

**Adam Crain, Secretary of the Board, Adams Morgan Partnership Business Improvement District ("AMPBID")**, submitted a resolution unanimously passed by AMPBID expressing their opposition to the bill's presumption that any private property that is not a residence permits licensees to carry a pistol onto the property.

**Everytown for Gun Safety** submitted comments on Bill 20-930, stating the bill "strikes an appropriate balance between granting handgun permits to those persons known to be in need of self-protection and precluding a dangerous proliferation of handguns on the streets" of the nation's capital (citing *Woollard v. Gallagher*). The organization further commended the Council for "striking an appropriate, fully constitutional balance between allowing law-abiding gun owners to carry concealed weapons in public and protecting residents and visitors in the

District." The organization also recommended that the provisions regarding FOIA be amended to allow aggregate or general information to be released to persons conducting journalist or academic research.

*Brian Malte, Senior National Policy Director, Brady Campaign to Prevent Gun Violence:* Law enforcement discretion is important b/c it provides law enforcement with the ability to prevent dangerous and potentially violent people from carrying a concealed handgun in public. B20-930 respects the balance between public safety and the Second Amendment.

*Juliet A. Leftwich, Legal Director, Law Center to Prevent Gun Violence*, submitted comments on the bill, stating the Law Center believes B20-930 creates a lawful, common sense regulatory scheme to govern the issuance of concealed weapons licenses in the District and to protect public safety. The Law Center proposed several amendments, including (1) clarifying that persons seeking to carry a loaded handgun to and from their place of business must obtain a concealed weapons license; (2) narrowing the FOIA exception so that it prohibits the disclosure of personal information regarding individuals who have applied for, received, or had a license revoked, while permitting disclosure of aggregate information regarding such individuals; (3) adding places of worship to the prohibited places; and (4) clarifying the meaning of the term "defensive pistol and ammunition selection" in the provision governing safety training. Ms. Leftwich further stated that the possession of loaded, hidden guns in public created a significant threat to public safety, and that many states take reasonable steps to minimize the risks created by the presence of hidden guns in public by limiting licenses only to those with specific need, requiring safety training and testing, restricting the locations where guns may be carried, and limiting the duration of the license.

## VI.   IMPACT ON EXISTING LAW

Bill 20-930 amends the Firearms Control Regulations Act of 1975 to make several conforming amendments related to carrying concealed pistols and adds a new Title IX to provide the related definitions, application requirements, license expiration and renewal provisions, duties of licensees, revocation and suspension of licenses provisions, prohibitions on carrying while impaired, a list of locations and circumstances where carrying a concealed pistol is prohibited, for the establishment of a Review Board, an exception to the Freedom of Information Act, penalties, and a rulemaking provision.

The bill also amends revives section 6 of An Act To control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes; and to make conforming amendments therein related to carrying concealed pistols.

Finally, Bill 20-930 repeals section 101 of the Omnibus Public Safety and Justice Amendment act of 2009.

## VII.   FISCAL IMPACT

The attached November 25, 2014 Fiscal Impact Statement from the Chief Financial Officer states that funds are sufficient to implement Bill 20-930.

## VIII.   SECTION-BY-SECTION ANALYSIS

Section 1      States the short title of Bill 20-930.

Section 2      Amends the Firearms Control Regulations Act of 1975 as follows:

(a) Adds "place of business of the registrant" to where a person may temporarily possess a firearm registered to another person provided that person is not otherwise prohibited from possessing a firearm and reasonably believes such possession is necessary to prevent imminent death or great bodily harm to himself or herself.

(b) Amends the exceptions for prohibitions on registering a pistol to include self-defense within a person's place of business or as part of the license to carry application.

(c) Adds stalking offenses to the list of offenses that disqualify an applicant from receiving a firearm registration.

(d) Provides that records related to registration are not to be made available under the Freedom of Information Act.

(e) Adds a conforming reference in the penalties section to the new Title IX, created below.

(f) Adds a new Title IX – License to Carry a Pistol as follows:
-   Section 901 provides definitions.

-   Section 902 provides application requirements:
    (a) The applicant shall certify and demonstrate to the Chief's satisfaction that the applicant:
    o   (1) Is at least 21 years of age;
    o   (2) Meets all existing requirements for registering a firearm and has a registration certificate for the pistol the applicant wants to carry concealed;
    o   (3) Has not suffered from any mental illness or condition in the previous 5 years that created risk of danger to self or others; or has been cleared from such illness or condition;
    o   (4) Has completed a firearms training course or combination of courses that meets specific requirements;
    o   (5) Has completed at least 2 hours of range training;
    o   (6) Follows any procedures established by rule.

(b) Requires that the applicant have certification from the firearms instructor stating that the applicant (1) Demonstrated satisfactory completion of the requirement; and (2) Possesses the proper knowledge, skills, and attitude to carry a concealed pistol.

(c) Provides that the training requirements may be satisfied if the applicant submits evidence that he or she has already received, as determined by the Chief, is equal or greater training than required in subsection (a)(4)(5).

(d) Provides that any component of the training requirement may be satisfied by demonstrating to the satisfaction of the Chief, that the applicant has already met that component as part of a successful application to carry elsewhere in the United States.

(e) Requires the applicant to attest to the truth of the information required under penalty of perjury.

(f) Requires an in-person interview at MPD for purposes including verification of the applicant's identity and verification of the information submitted as part of the application process.

- Section 903 provides for expiration and renewal of licenses:
  (a) States licenses expire no later than 2 years, unless revoked.

  (b) Explains what is required of the applicant to be eligible for renewal, including continuing to meet all of the initial application requirements, (except that only 4 hours of training and 2 hours of range practice within the previous 12 months are required) and any other procedures the Chief may establish by rule); and that timely renewal is the licensee's responsibility.

  (c) Provides that persons who have renewal applications denied by appeal to the Concealed Pistol Licensing Review Board within 15 days of notice of the denial.

- Section 904 provides the duties of licensees:
  (a) Requires the licensee to comply with all limits and conditions stated in the issuance of the license;

  (b) Requires the licensee to notify the Chief in writing (1) immediately upon discovery of the loss, theft, or destruction of the license; and (2) within 30 days of a change in the licensee's name or address as it appears on the license.

**JA 146**

(c) Requires the licensee to carry the license to carry and the registration of the pistol, each time the pistol is carried.

(d) Requires the licensee, when stopped by the police for an investigative stop, to disclose he or she is carrying a pistol, present the license and registration, disclose where the pistol is located, and comply with all lawful directions and orders from the officer, including giving the pistol to the officer for so long as necessary for the safety of the officer or the public.

(e) Provides that these duties are in addition to any other requirements imposed by this act or applicable law.

(f) Provides that violating this section subjects the licensee to revocation of the license and any other penalty provided by law.

- Sec. 905. Revocation of licenses.
(a) Chief can revoke if the licensee no longer meets the standards and requirements.

(b) Anybody (including USAO & OAG) can apply to MPD for revocation. Any person who knows a licensee no longer meets requirements can notify the Chief or officer (who may then take action as appropriate).

(c) Any person whose license has been revoked may, within 15 days of notice of the revocation, appeal to the Review Board.

- Sec. 906. Carrying while impaired.
(a) Prohibits a licensee from carrying while impaired.

(b) Provides that failure to submit to field sobriety, breathalyzer, or urine tests after reasonable suspicion has been established are grounds for immediate revocation and seizure of the license.

(c) Provides that a violation of this section subjects the licensee to any existing penalties and license revocation.

(d) Defines "impaired" to mean that a licensee has consumed alcohol or a drug or a combination thereof and that it has affected the licensee's behavior in a way that can be perceived or noticed.

- Sec. 907. Prohibitions on carrying licensed pistols.
(a) Provides a list of locations and circumstances where licensees are prohibited to carry:

 (1) Any building or office occupied by the District government, its agencies, or instrumentalities;

 (2) The buildings and grounds, including any adjacent parking lot, of any childcare facility, preschool, public or private elementary or secondary school, or any public or private college or university;

 (3) Any hospital or any office where medical or mental health services are the primary services provided;

 (4) Any penal institution, secure juvenile residential facility, or halfway house;

 (5) Any polling place while voting takes place:

 (6) Any public transportation vehicle, including the Metrorail transit system and its stations;

 (7) Any premises, or portion thereof, licensed as a tavern or nightclub;

 (8) Any stadium or arena;

 (9) Any gathering or special event open to the public; provided that no criminal prosecution shall occur unless the organizer or the District provided notice in advance and by posting signs or the licensee has been ordered by a law enforcement officer to leave and has not complied.

 (10) The public memorials on the National Mall and along the Tidal Basin, and any area where firearms are prohibited under federal law or by a federal agency or entity, including U.S. Capitol buildings and grounds;

 (11) The area around the White House between Constitution Avenue, N.W., and H Street, N.W., and between 15th Street, N.W., and 17th Street, N.W.;

 (12) The U.S. Naval Observatory and its grounds, and from the perimeter of its fence to the curb of Massachusetts Avenue, N.W. from 34th Street, N.W. south on Massachusetts Avenue, N.W. to Observatory Circle, N.W.;

 (13) Within a perimeter designated by the Chief when a dignitary or high-ranking official is moving under protection; provided that no criminal prosecution shall occur unless there was notice of the perimeter or the licensee has been ordered by a law enforcement officer to leave and has not complied;

 (14) Within a perimeter designated by the Chief of a demonstration in a public place; provided that no criminal prosecution shall occur unless there was notice of the perimeter or route, or the licensee has been ordered by a law enforcement officer to leave and has not complied;

 (15) Any prohibited circumstance that the Chief determines by rule; provided, that for spontaneous circumstances, no criminal penalty shall apply unless the licensee has notice of the prohibition and has failed to comply.

(b) Provides presumptions related to concealed carry in specific locations:

(1) Provides that any private residence shall be presumed to prohibit concealed pistols unless the property owner or person in control of the premises otherwise authorized and communicated personally to the licensee in advance of entry.

(2) Provides that any church, synagogue, mosque, or other place where people regularly assemble for religious worship shall be presumed to prohibit concealed pistols unless the property is posted with conspicuous signage allowing concealed pistols, or the owner or authorized agent communicates such allowance personally to the licensee in advance of entry onto the property, provided that such places may not authorize concealed pistols where services are conducted in locations on the list of prohibited places listed in subsection (a).

(3) Provides that any private property that is not a residence shall be presumed to permit a licensee carrying a concealed pistol to enter the property unless conspicuous signage prohibiting concealed pistols is posted, or the owner or authorized agent communicates such prohibition personally to the licensee.

(c) Requires a licensee who approaches any prohibited location or is subject to any prohibited circumstance to (1) secure the pistol in a vehicle if one is available; or (2) immediately leave the prohibited location or circumstance.

(d) Provides that a licensee shall not be in violation of this section (1) while on adjacent roads or sidewalks; or (2) while driving a vehicle into and immediately parking at any location listed in subsection (a)(2) or (3) of this section, for the purpose of picking up or dropping off a student or a child; provided, that the licensee shall secure the concealed weapon, before leaving the parked vehicle.

(e) Prohibits a licensee to carry a pistol openly.

(f) Provides that a licensee who violates this section shall be subject to revocation of his or her license in addition to any other penalty provided by law.

(g) Defines demonstration, public transportation, and residence.

Sec. 908. Concealed Pistol Licensing Review Board.
(a) Establishes a review board to hear appeals from carry application or denials, summary suspension or restriction of a license; or revocation of a license.

(b) Establishes the membership of the Review Board as consisting of seven members (the United States Attorney for the District of

Columbia or his or her designee; the Attorney General for the District of Columbia or his or her designee; and five members appointed by the Mayor: a mental health professional from the Department of Behavioral Health; a former sworn officer of a law enforcement agency other than MPD; one mental health professional; and two District residents with experience in the operation, care, and handling of firearms); establishes the process of appointment, the terms, vacancy appointments, and removal; and states that members shall serve without compensation but may receive actual and necessary expenses incurred in the performance of official duties.

(c) Requires the Mayor to provide hearing facilities and administrative support from existing resources in fiscal year 2015.

(d) Provides that four members shall constitute a quorum, except that two members shall be a quorum when hearing panels of three members are assigned to conduct a hearing and make a final decision; also provides that the hearing panel shall include at least one member from the USAO, OAG, or former law enforcement.

(e) Requires the Mayor to establish hearing procedures by rule.

(f) Provides that Board meetings and hearings shall be confidential and closed to the public.

(g) Provides that any person or the Chief aggrieved by a final action of the Board may file an appeal.

- Sec. 909. Freedom of information exception; report.
 (a) Provides that records related to those who have applied, received, or had revoked any license are not to be made available under the Freedom of Information Act; provided that aggregate data may be used for the purposes of the public report in subsection (b).
 (b) Requires MPD to make public a report, every 2 years, that includes information on the number of licenses issued in the most recent 2-year period; the total number of valid licenses; the number of licensees convicted of a crime involving a pistol in the most recent 2-year period; the number of pistols for which a license was issued that were reported lost or stolen in the reporting period; and the number of pistols for which a license was issued that were found or recovered as stolen that were unreported by a licensee as lost or stolen in the most recent 2-year period.

- Sec. 910. Penalties.

(a) Provides that except as otherwise provided in this title, a person convicted of a violation of a provision of this title, rules or regulations issued under authority of this title, shall be fined according to the Criminal Fine Proportionality Act or imprisoned for not more than 180 days.

(b) Provides that civil fines, penalties, and fees may be imposed as alternative sanctions.

(c) Provides that all prosecutions for violations of this title shall be brought by OAG.

- <u>Sec. 911. Rules.</u>

Requires the Chief to issue rules to implement the provisions of this act, including rules:

(1) To establish criteria for determining when an applicant has:

(A) Demonstrated a good reason to fear injury to his or her person, which shall at a minimum require a showing of a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks which demonstrate a special danger to the applicant's life;

(B) Demonstrated any other proper reason for carrying a concealed pistol, which shall at a minimum include types of employment that require the handling of cash or other valuable objects that may be transported upon the applicant's person; and

(C) Demonstrated the applicant's suitability to carry a concealed pistol, which shall at a minimum include evidence that the applicant meets the requirements of section 902;

(2) To establish the type and amount of ammunition that may be carried concealed by a licensee;

(3) To establish the methods by which a pistol may be carried, including any standards for safe holstering;

(4) To establish all application forms, investigation procedures, background checks, and fees necessary to process an application for a license to carry a concealed pistol;

(5) To specify any procedures or requirements specific to non-residents who apply to carry a concealed pistol, with regard to the registration requirements in this act;

(6) To specify requirements for signage on any private premises where the owner or person in control of the premises prohibits carrying concealed pistols, pursuant to section 907(b); and

(7) To establish procedures for the renewal of licenses.

<u>Section 3</u>        Amends An Act To control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to

prescribe rules of evidence, and for other purposes, approved July 8, 1932 (47 Stat. 650; D.C. Official Code § 22-4501 *et seq.*) as follows:

(a) Amends the lead-in language in Section 4(a) to reflect the addition of the ability to carry concealed; and makes a conforming amendment to reflect a concealed carry license.

(b) Revives section 6, Issuance of a license to carry a pistol, with five subsections:

- Subsection (a) provides that the Chief of Police may issue a concealed carry license to (1) any person with a residence or business in the District; or (2) any person with a residence or business in the United States and a concealed carry license issued by a lawful authority, for not more than 2 years, if the applicant has good reason to fear injury to his or her person or property or has any other proper reason for carrying a pistol, and is otherwise suitable to be so licensed.

- Subsection (b) provides that a non-resident who lives in a state that does not require a carry license may apply for a carry license in the District, provided he or she meets the same reasons and requirements in subsection (a).

- Subsection (c) provides that the Chief may limit the geographic area, circumstances, or times in which the license is effective and may revoke the license for good cause.
- Subsection (d) provides that the license application must be on a form prescribed by the Chief, that includes name, address, description, photograph, and signature of the licensee.
- Subsection (e) provides for an appeal to the Concealed Pistol Licensing Review Board.

Section 4        Repeals section 101 of the Omnibus Public Safety and Justice Amendment act of 2009, effective Dec. 10, 2009 (D.C. Law 18-88; D.C. Official Code § 22-2511), which made it unlawful for a person to be voluntarily in a motor vehicle if that person knows that a firearm is in the vehicle, unless the firearm is being lawfully carried or lawfully transported. This section was held unconstitutional in Conley v. United States, 2013 D.C. App. LEXIS 633, - A.3d – (Sept. 26, 2013).

Section 5        Adopts the fiscal impact statement.

Section 6        Provides the effective date.

## IX.   COMMITTEE ACTION

On November 25, 2014, the Committee met to consider B20-930, the "License to Carry a Pistol Amendment Act of 2014". The meeting was called to order at 10:50 am. After ascertaining a quorum (Chairperson Wells and Councilmembers Bonds, Cheh, and Evans present, with Chairman Mendelson also in attendance), Chairperson Wells made opening remarks, providing background on gun regulation in the District and the impact of the *Heller* and *Palmer* decisions, before discussing changes in the committee print. He then moved the print with leave for staff and the General Counsel to make technical and conforming changes.

Councilmember Cheh began the discussion, commenting that the bill reflected an enormous effort. She then moved an amendment to reverse the presumption for non-residential property from one of permission to carry a concealed pistol on the premises unless otherwise notified of a prohibition, to one of prohibition from carrying a concealed pistol on the premises unless otherwise notified of permission. Chairman Mendelson argued against this amendment, stating that this amendment would essentially prohibit licensees from carrying anywhere. He also stated that the Council has a responsibility to ensure that the bill is not overwhelming stacked against the person allowed to carry. Councilmember Bonds concurred, stating that while the amendment reflected her personal feelings, the Council must address the *Palmer* ruling. Chairperson Wells also stated that the amendment reflected his personal feelings, but that as a Councilmember, he has an obligation to ensure that the District's laws reflect the reality imposed by the *Palmer* court. Chairperson Wells then called for a vote on the amendment, which failed 3-1 (Chairman Mendelson, Chairperson Wells, and Councilmember Bonds voting against; Councilmember Cheh voting for; and Councilmember Evans absent).

Councilmember Cheh then moved a second amendment, which would require MPD to collect and make public aggregate data regarding the number of licenses issued, the number of licensee convicted of a crime involving a pistol, and the number of pistols reported lost or stolen in order to better analyze the consequences of our concealed carry law. Councilmember Cheh stated that having this aggregate, anonymous data would put the District in a better position to glean some basic information about the consequences of the concealed carry law. Chairperson Wells accepted this amendment as friendly.

Following the discussion, the vote on the print was unanimous. Chairperson Wells then moved the report with leave for staff to make technical, editorial, and conforming changes. After an opportunity for discussion, the vote on the report was unanimous.

The meeting adjourned at 11:40 am.

## X.   ATTACHMENTS

1.   Bill 20-930 as introduced
2.   Witness list
3.   1857 law
4.   1932 law
5.   Police Regulations Act 50-55 (1968)
6.   1974 regulations
7.   Statements from the Chief of Police, the U.S. Secret Service, and the U.S. Capitol Police
8.   Christopher Ingraham, *More guns, more crime: New research debunks a central thesis of the gun rights movement*, Washington Post, November 14, 2014
9.   Clifton B. Parker, *Right-to-carry gun laws linked to increase in violent crime, Stanford research shows*, STANFORD REPORT, November 14, 2014
10.  *Effects of Restrictive Licensing of Handguns on Homicide and Suicide in the District of Columbia*, The New England Journal of Medicine, 1991
11.  Fiscal impact statement
12.  Legal sufficiency determination by the General Counsel
13.  Comparative Print
14.  Committee Print for Bill 20-930

# 3

Revised Code of the District of Columbia Prepared
Under the Authority of the Act of Congress
(A.O.P. Nicholson, Washington 1857)

# NOTE.

—

THE undersigned, commissioners appointed by virtue of "An act to improve the laws of the District of Columbia, and to codify the same," approved March 3, 1855, herewith submit the result of their labors.   The framer of that act was the Hon. HENRY MAY, formerly a citizen of this District, who, from an extensive practice in our courts, was made fully aware of the evils, from which it was intended by that law to relieve us.   The people of this District will, in a great degree, be indebted to the exertions of that gentleman for any benefits which may result to them from this Code.

The commissioners were required "to revise, simplify, digest, and codify the laws of said District, and also the rules and principles of practice, of pleadings, of evidence, and conveyancing."   The Code itself is the best commentary on the manner in which that duty has been discharged.   The laws which it was made their duty "to revise and simplify," consisted, in the language of the Maryland declaration of rights, of such of the English statutes as existed at the time of the first emigration to Maryland, and "which by experience have been found applicable to local and other circumstances, and of such others as have been since made in England or Great Britain, and have been introduced, used, and practised by the courts of law and equity;" also of the declaration of rights, constitution, and statutes of Maryland, passed prior to the 27th day of February, 1801, as modified by the constitution and laws of the United States.

Our statute law thus flowing from three distinct sources, is almost necessarily inconsistent in many of its parts.   Much of it is also obsolete.   Much of it is disfigured by the prejudices of a past age. In many cases, the circumstances that called forth the statute have since passed away, or been materially changed.   But perhaps the best founded complaint of all is the entire absence of any statutory provisions in relation to matters which, in the progress of time and development of society, have been made the subjects of legislation in almost every other civilized community.

Digitized by Google

vi

Deeply impressed with these views, the commissioners have endeavored, in the preparation of this Code, to give to the people of this District the benefit of provisions which, in many cases, have even been adopted by those from whom we have derived our present system. In no instance where there has been a departure from former law has any principle or provision been introduced which has not the sanction of modern, and, as we believe, enlightened legislation.

The law of March 3, 1855, required that this Code should be approved by a majority of the board appointed to consider the same. The members of that board have certified to the President of the United States that they have considered the provisions thereof, and do unanimously approve the same. In further pursuance of said law, it is now submitted to the people of this District for their consideration.

ROBT. OULD,
WM. B. B. CROSS.

WASHINGTON CITY,
*November*, 1857.

Digitized by Google

567

SEC. 2. On the trial of every indictment, the party accused shall be allowed to be heard by counsel, and he may defend himself, and he shall have a right to produce witnesses and proofs in his favor, and to be confronted with the witnesses who are produced against him.

SEC. 3. No person indicted for an offence shall be convicted thereof, unless by confession of his guilt in open court, or by admitting the truth of the charge against him by his plea or demurrer, or by the verdict of a jury, accepted and recorded by the court.

SEC. 4. No person shall be held to answer on a second indictment for any offence of which he has been acquitted by the jury, upon the facts and merits, on a former trial; but such acquittal may be pleaded by him in bar of any subsequent prosecution for the same offence, notwithstanding any defect in the form or in the substance of the indictment on which he was acquitted.

SEC. 5. No person who is charged with any offence against the law, shall be punished for such offence, unless he shall have been duly and legally convicted thereof in a court having competent jurisdiction of the cause and of the person.

# CHAPTER 141.

### OF PROCEEDINGS TO PREVENT AND DETECT THE COMMISSION OF CRIMES.

SECTION

1. Officers authorized to keep the peace.
2. Complaint; how made.
3. Arrest.
4. Trial; recognizance to keep the peace.
5. Party; when to be discharged.
6. Refusing to recognise, to be committed.
7. Party, when discharged; and complainant, when to pay costs.
8. Payment of costs in other cases.
9. Appeal allowed.
10. On appeal, witnesses to recognise.
11. Proceedings upon an appeal.
12. Recognizance; when to remain in force.
13. Persons committed for not recognising; how discharged.
14. Recognizances to be transmitted to the court.

SECTION

15. Recognizances; when to be required on view of the court or magistrate.
16. Persons who go armed may be required to find sureties for the peace, &c.
17. Proceedings when person is suspected of selling liquor contrary to law.
18. Surety may surrender his principal, who may recognise anew.

SEARCH WARRANTS.

19. Search warrants for property stolen.
20. In what other cases to be issued.
21. } Warrant; to whom directed, and when
22. } and how executed.
23. Property seized may be kept as evidence, and then restored to owner or destroyed.

Digitized by Google

568

SECTION

CORONERS' INQUESTS.

24. Coroners' inquests; when to be held.
25. Coroner to issue a warrant to constable to summon jury. Form of warrant.
26. Penalty for constable's or juror's neglect.
27. Jurors; how empanneled and sworn.
28. Witness; how summoned, &c.
29. Oath of witnesses.
30. When and how post mortem to be made, or chemical analysis to detect poison; and fees, &c., for same.
31. Testimony of witnesses reduced to writing.
32. Inquisition; how taken, and form thereof.

SECTION

33. Coroner; duty in case of felonious killing, &c.
34. Burial of dead body and payment of costs.
35. Jury to report money, &c., found; and same, how disposed of.
36. When coroner to publish description of deceased.
37. Duty of officer in relation to such money.
38. Coroner, failing to pay over same.
39. Property on body to be sold and disposed of as money.
40. When justice of the peace to act as coroner.

SECTION 1. The judge of the criminal court, or any judge of the circuit court, in vacation as well as in term, and also all justices of the peace, shall have power to cause all laws made for the preservation of the public peace to be kept, and, in the execution of that power, may require persons to give security to keep the peace, or for their good behavior, or both, in the manner provided in this chapter.

SEC. 2. Whenever complaint shall be made to any such magistrate that any person has threatened to commit an offence against the person or property of another, the magistrate shall examine the complainant, and any witness who may be produced, on oath, and reduce such complaint to writing, and cause the same to be subscribed by the complainant. A wife may pray surety of the peace against her husband, or anybody else may pray such surety, in her behalf, against him, and such person shall, in such proceeding, be deemed the complaining witness.

SEC. 3. If, upon examination, it shall appear that such affidavit is made only to secure the protection of the law, and not from anger or malice, and that there is just cause to fear that any such offence may be committed, the magistrate shall issue a warrant under his hand, reciting the substance of the complaint, and requiring the officer to whom it may be directed forthwith to apprehend the person complained of and bring him before such magistrate, or some other magistrate or court having jurisdiction of the cause.

SEC. 4. When the party complained of is brought before the magistrate, he shall be heard in his defence, and he may be required to enter into a recognizance, with sufficient sureties, in such sum as the

Digitized by Google

569

magitrate shall direct, to keep the peace towards all the people of this District, and especially towards the person requiring such security, for such term as the magistrate may order, not exceeding one year, but shall not be bound over to the next court, unless he is also charged with some other offence for which he ought to be held to answer at such court.

Sec. 5. Upon complying with the order of the magistrate, the party complained of shall be discharged.

Sec. 6. If the person so ordered to recognise shall refuse or neglect to comply with such order, the magistrate shall commit him to the county jail during the period for which he was required to give security, or until he shall so recognise; stating in the warrant the cause of commitment, with the sum and the time for which security was required.

Sec. 7. If, upon examination, it shall not appear that there is just cause to fear that any such offence will be committed by the party complained of, he shall be forthwith discharged; and if the magistrate shall deem the complaint unfounded, frivolous, or malicious, he shall order the complainant to pay the costs of prosecution, who shall thereupon be answerable to the magistrate and the officer for their fees as for his own debt.

Sec. 8. When no order respecting the costs is made by the magistrate, they shall be allowed and paid in the same manner as costs before justices in criminal prosecution; but in all cases where a person is required to give security for the peace, or for his good behavior, the court or magistrate may further order that the costs of prosecution, or any part thereof, shall be paid by such person, who shall stand committed until such costs are paid, or he is otherwise legally discharged.

Sec. 9. Any person aggrieved by the order of any justice of the peace requiring him to recognise as aforesaid, may, on giving the security required, appeal to the criminal court at its next session to be discharged therefrom.

Sec. 10. The magistrate from whose order an appeal is so taken shall require such witnesses as he may think necessary to support the complaint, to recognise for their appearance at the court to which the appeal is made.

Sec. 11. The criminal court may affirm the order of the justice or

Digitized by Google

570

discharge the appellant, or may require the appellant to enter into a new recognizance, with sufficient sureties, in such sum and for such time as the court shall think proper, and may also make such order in relation to the costs of prosecution as may be deemed just and reasonable.

SEC. 12. If any party appealing shall fail to prosecute his appeal, his recognizance shall remain in full force and effect, as to any breach of the condition, without an affirmation of the judgment or order of the magistrate, and shall also stand as a security for any costs which shall be ordered by the court appealed to, to be paid by the appellant.

SEC. 13. Any person committed for not finding sureties, or refusing to recognise, as required by the court or magistrate, may be discharged by any judge or justice of the peace on giving such security as was required.

SEC. 14. Every recognizance taken pursuant to the foregoing provisions shall be transmitted by the magistrate to the criminal court on or before the first day of the next term, and shall be there filed by the clerk.

SEC. 15. Every person who shall, in the presence of any officer mentioned in the first section of this chapter, make an affray, or threaten to kill or beat another, or to commit any violence or outrage against his person or property, and every person who, in the presence of such officer, shall contend with hot and angry words, to the disturbance of the peace, may be ordered, without process or any other proof, to recognise for keeping the peace, or being of good behavior, for a term not exceeding one year, and in case of refusal may be committed as before directed.

SEC. 16. If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace for a term not exceeding six months, with the right of appealing as before provided.

SEC. 17. If any justice of the peace suspect any person of selling, by retail, wine or ardent spirits, or a mixture thereof, contrary to law, he shall summon the person and such witnesses as he may think



571

proper, to appear before him; and, upon such person appearing, or failing to appear, if the justice, on examining the witnesses on oath, find sufficient cause, he shall inform the district attorney, or other proper officer, that a prosecution or suit may be instituted, and shall recognise the material witnesses to appear at the next term of the court before which the case is heard. Such justice may also require the person suspected to enter into a recognizance to keep the peace and be of good behavior for any time not exceeding one year. If such recognizance be given, the condition thereof shall be deemed to be broken if, during the period for which it is given, such person shall sell, by retail, wine or ardent spirits, or a mixture thereof, contrary to law.

Sec. 18. Any surety in a recognizance to keep the peace, or for good behavior, or both, shall have authority and right to take and surrender his principal, and, upon such surrender, shall be discharged and exempt from all liability for any act of the principal, subsequent to such surrender, which would be a breach of the condition of the recognizance. Such person may recognise anew, with sufficient sureties, before any justice of the peace, for the residue of the term, and be thereupon discharged.

### SEARCH WARRANTS.

Sec. 19. When complaint shall be made on oath to any magistrate authorized to issue warrants in criminal cases, that personal property has been stolen or embezzled, or obtained by false tokens or pretences, and that the complainant believes that it is concealed in any particular house or place, the magistrate, if he be satisfied that there is reasonable cause for such belief, shall issue a warrant to search for such property.

Sec. 20. Any such magistrate may also, upon a like complaint made on oath, issue search warrants, when satisfied that there is reasonable cause, in the following cases, to wit:

First, to search for and seize any counterfeit or spurious coin, forged bank notes, and other forged instruments, or any tools, machines, or materials, prepared or provided for making either of them;

Secondly, to search for and seize any books pamphlets, ballads, printed papers, or other things containing obscene language, or obscene prints, pictures, figures, or descriptions, manifestly tending



to corrupt the morals of youth, and intended to be sold, loaned, circulated or distributed, or to be introduced into any family, school or place of education;

Thirdly, to search for and seize lottery tickets, or materials for a lottery, unlawfully made, provided, or procured, for the purpose of drawing a lottery;

Fourthly, to search for and seize any gaming apparatus or implements used, or kept and provided to be used, in unlawful gaming, in any gaming house, or in any building, apartment, or place resorted to for the purpose of unlawful gaming;

Fifthly, to search for any harbored runaway slave.

SEC. 21. All search warrants shall be directed to the marshal of the District, or his deputy, or to any constable, commanding such officer to search, in the day time, the house or place where the stolen property or other things, for which he is required to search, are believed to be concealed, which place and property or things to be searched for shall be designated and described in the warrant; and to bring such stolen property or other things, when found, and the persons in whose possession the same shall be found, before the magistrate who issued the warrant, or before some other magistrate or court having cognizance of the case.

SEC. 22. If there be satisfactory evidence that any property stolen or embezzled, or obtained by false tokens or pretences, or that any of the other things for which a search warrant may be issued by the provisions of this chapter, are concealed, kept, prepared or used, in any particular house or place, a warrant may be issued by any two magistrates, to authorize a public officer to search such house or place in the night time, and to bring the property or things described in the warrant, if found, and the persons in whose possession the same shall be found, before either of the magistrates who issued the warrant, or before some other magistrate or court having cognizance of the case.

SEC. 23. If any such search warrant be executed by the seizure of a runaway slave, he shall be returned to the owner, or committed to jail as a runaway, by the justice before whom he is brought; and if it be executed by the seizure of other property, or of any of the things aforesaid, the same shall be safely kept by order of the justice, to be used in evidence; and as soon afterwards as may be, such stolen

Digitized by Google

573

or embezzled property shall be restored to its owner, and the other things specified burnt or otherwise destroyed under the direction of such justice.

### CORONERS' INQUESTS.

SEC. 24. Coroners shall take inquests upon the view of the dead bodies of such persons only as shall be supposed to have come to their death by violence, and not when death is believed to have been occasioned by casualty, or to have happened in a course of nature.

SEC. 25. As soon as the coroner shall have notice of the dead body of any person, supposed to have come to his death by violence, found or lying within this county, he shall make his warrant to a constable requiring him forthwith to summon six good and lawful men of the county to appear before such coroner, at the time and place expressed in the warrant, which may be issued with or without a seal, and in substance as follows:

————— —————, *ss.*

<center>To A B, constable of ———, Greeting :</center>

You are hereby required immediately to summon six good and lawful men of the county of ———, to appear before me, ——— ———, coroner of said county, at the dwelling house of ——— ———, (or at a place called ———,) within the city, (or town, or county) of ———, at the hour of ———, then and there to inquire, upon the view of the body of ——— ———, there lying dead, when, how, and by what means he came to his death.   Hereof fail not.

Given under my hand the ——— day of ———, in the year ———.

<div align="right">——— ———, <i>Coroner.</i></div>

SEC. 26. The constable to whom such warrant shall be directed and delivered shall forthwith execute the same, and shall, at the time mentioned in the warrant, repair to the place where the dead body is, and make return thereof to the coroner, and of his doings thereon, under his hand; and any constable who shall unnecessarily neglect or fail to execute or return such warrant, shall be fined the sum of twenty dollars; and if any person summoned as a juror shall fail to appear, without reasonable excuse therefor, he shall be fined the sum of ten dollars.   If the six jurors returned shall not all appear, the coroner may require the constable, or any other officer whom he shall appoint, to return other jurors, from the body of the county, and not from bystanders, to complete the number.

Digitized by Google

574

Sec. 27. When the jurors who have been summoned appear, the coroner shall call over their names, and then, in view of the body, he shall administer to them the following oath:

You solemnly swear that you will diligently inquire, and true presentment make, on behalf of the United States, when, how, and by what means, the person, whose body lies here dead, came to his death; and you shall return a true inquest thereof, according to your knowledge and such evidence as shall be laid before you: So help you God.

Sec. 28. The coroner may issue subpœnas for witnesses, returnable forthwith, or at such time and place as he shall therein direct; and the attendance of all persons served with such subpœna may be enforced in the same manner, by the coroner, and subject to the same penalties, as if they had been served with a subpœna to attend a court of justice.

Sec. 29. An oath to the following effect shall be administered to the witnesses by the coroner:

You solemnly swear that the evidence which you shall give to this inquest, concerning the death of the person here lying dead, shall be the truth, the whole truth, and nothing but the truth: So help you God.

Sec. 30. The coroner, in all cases where the cause of death shall be doubtful, shall call to his aid some competent surgeon, who, when he may deem the same necessary, shall make a post mortem examination of the body, and report, in writing, signed by him, the condition of the same, together with his opinion as to the cause of death. The coroner shall also cause to be made, by a competent person, an analysis of the stomach and its contents, when poison is supposed to have been taken or administered; and a like report shall be made by the chemist or other person employed, as is required of a surgeon. Fees for said services shall be paid out of the treasury of the United States, and shall, within the following limits, be determined by the judge of the criminal court. For the external examination of the body, from five to ten dollars; for dissection of body before interment, from ten to twenty dollars; for dissection of body after disinterment, from twenty to thirty dollars; for making a chemical analysis, from ten to forty dollars. The expenses of analysis, apart from the fee, shall be paid in like manner, but shall in no case exceed the sum of

Digitized by Google

JA 165

575

ten dollars, unless previously sanctioned by the judge of the criminal court.

SEC. 31. The testimony of all witnesses examined before any inquest shall be reduced to writing by the coroner, or some other person by his direction, and be subscribed by the witnesses.

SEC. 32. The jury, upon the inspection of the dead body, and after hearing the testimony of the witnesses, and making all needful inquiries, shall draw up and deliver to the coroner their inquisition, under their hands, in which they shall find and certify when, how, and by what means the deceased person came to his death, and his name, if it was known, a minute description of his person, together with all the material circumstances attending his death; and if it shall appear that he was killed feloniously, the jurors shall further state who were guilty, either as principals or accessories, if known, or were in any manner the cause of his death; which inquisition may be, in substance, as follows:

—— —— *ss.* An inquisition taken at ——, in the county of ——, on the —— day of ——, in the year ——, before —— ——, corner of the said county, upon the view of the body of —— ——, (or a person,) there lying dead, by the oaths of the jurors whose names are hereunto subscribed, who, being sworn to inquire, on behalf of the United States, when, how, and by what means the said —— —— (or person) came to his death, upon their oaths do say, (then insert description of person, and when, how, and by what persons, means, weapon, or instrument he was killed.) In testimony whereof, the said coroner and the jurors of this inquest have hereunto set their hands, the day and year aforesaid.

SEC. 33. If the jury find that any murder, manslaughter, assault, or other offence has been committed on the person of the deceased, the coroner shall bind over, by recognizance, such witnesses as he shall think proper, to appear and testify at the next session of the criminal court; he shall also return to the same court the inquisition, written evidence, and all recognizances and examinations by him taken, and may commit to jail any witnesses who shall refuse to recognise in such manner as he shall direct.

SEC. 34. If any person charged by the inquest with having committed such offence shall not be in custody, the coroner shall have the same power as a justice of the peace to issue process for his



Digitized by Google

576

apprehension, and such warrant shall be made returnable before any justice of the peace, or other magistrate or court having cognizance of the case, who shall proceed therein as if such person had been arrested on complaint duly made.

Sec. 35. When the coroner shall take an inquest upon the view of the dead body of a stranger, or, being called for that purpose, shall not think it necessary, on view of such body, that any inquest should be taken, he shall cause, in the absence of other provision, the body to be decently buried; and if the coroner shall certify that, to the best of his knowledge and belief, the person found dead was a stranger, not belonging to this District, the expenses of burial, with the coroner's fees, and all the expenses of the inquisition, if any was taken, shall be paid to the coroner from the treasury of the United States, the account of such expenses being first examined and allowed by the judge of the criminal court; in all other cases the expenses of the inquisition only shall be paid, in like manner, by the United States.

Sec. 36. The coroner shall require the jury empanneled, to make a report, signed by them and the coroner, and to be returned with the inquisition, giving the amount of money or other valuables found on or with the dead body, and such money or other property, if there be no person to take charge of the same, shall be placed in the hands of the judge of the orphans' court, and by him paid over to the person authorized to receive the same, on being called for. But so much thereof as may be necessary may, in the event of the deceased being a stranger, be appropriated to paying his burial expenses.

Sec. 37. In case the body shall not be identified, it shall be the duty of the coroner to publish, in some newspaper printed in this District, a description of the deceased, and the amount of money or other valuables found in his possession. And though the body may be identified, if money or other valuables be found thereon, and no person entitled thereto shall claim the same within sixty days, it shall be the duty of the coroner to give public notice, as aforesaid, of the facts. The cost of such advertising shall be paid in like manner as the expense of the inquisition.

Sec. 38. It shall be the duty of the said judge, if said money shall not be called for within one year from the time of his receiving the

577

same, to loan it out on the most advantageous terms he can, taking bond and good security, and the proceeds therefrom shall be applied to the maintenance of the public schools, in the manner hereinbefore provided with regard to fines. Such money, without interest, may be claimed at any time thereafter by the parties entitled to the same.

SEC. 39. If any coroner shall fail to pay to the judge of the orphan's court the money or other property which may come into his hands as aforesaid, within three months of its receipt, it shall be the duty of said judge to sue for and collect the same in his own name, annexing his title, before the circuit court; and for such delinquency the coroner shall be fined a sum not exceeding five hundred dollars.

SEC. 40. The judge of the orphans' court shall cause to be sold, as property is sold on execution, by the marshal, all property found on a dead body and remaining unclaimed sixty days, and the proceeds of such sale shall be disposed of as is required in case of money so found.

SEC. 41. When the coroner shall be absent from the District, or unable to attend, any justice of the peace may hold the inquest, and shall proceed in all respects as coroners are directed by the foregoing provisions, and subject to the same penalties.

## CHAPTER 142.

### OF THE ARREST AND EXAMINATION OF OFFENDERS, COMMITMENT FOR TRIAL, AND TAKING BAIL.

SECTION
1. Officers empowered to act under this chapter.
2. Complaint, warrant, and summonses for witnesses.
3. What officers may bail, and when.
4. Prisoners; when to be brought before magistrate, on arrest, &c.
5. Magistrate, if he take bail, to return the recognizance to court, &c.
6. Magistrate may adjourn the examination, &c.
7. In case of default, magistrate to certify recognizance to criminal court.

SECTION
8. Proceedings when the party fail to recognise.
9.
10.
11.
12. } Manner of conducting the examination.
13.
14.
15. Testimony may be reduced to writing.
16. Prisoner; when to be discharged.
17. Prisoner; when to be bailed, or committed.
18. Witnesses to recognise.

40

Digitized by Google

# 4

An Act To control the possession, sale, transfer and use
of pistols and other dangerous weapons in the District of
Columbia, to provide penalties, to prescribe rules of
evidence, and for other purposes

47 Stat. 650 (approved July 8, 1932)

States, for the purpose of having such communication delivered by the post-office establishment of such foreign country to the post-office establishment of the United States and by it delivered to such addressee in the United States, and as a result thereof such communication is delivered by the post-office establishment of such foreign country to the post-office establishment of the United States and by it delivered to the address to which it is directed in the United States, then such person shall be punished in the same manner and to the same extent as provided in section 1 of this Act: *Provided,* That any person violating this section may be prosecuted either in the district into which such letter or other communication was carried by the United States mail for delivery according to the direction thereon, or in which it was caused to be delivered by the United States mail to the person to whom it was addressed.

*Punishment for.*

*Proviso.*
*Jurisdiction.*

Approved, July 8, 1932.

---

[CHAPTER 465.]

*July 8, 1932.*
*[H. R. 8754.]*
*[Public, No. 275.]*

**AN ACT**

To control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes.

*Unauthorized use, etc., of pistols and other dangerous weapons in District of Columbia.*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

*Definitions.*

**DEFINITIONS**

"Pistol."

"Sawed-off shot-gun."

"Machine gun."

"Person."

"Sell" and "purchase," etc.

"Crime of violence."

SECTION 1. "Pistol," as used in this Act, means any firearm with a barrel less than twelve inches in length.

"Sawed-off shotgun," as used in this Act, means any shotgun with a barrel less than twenty inches in length.

"Machine gun," as used in this Act, means any firearm which shoots automatically or semiautomatically more than twelve shots without reloading.

"Person," as used in this Act, includes, individual, firm, association, or corporation.

"Sell" and "purchase" and the various derivatives of such words, as used in this Act, shall be construed to include letting on hire, giving, lending, borrowing, and otherwise transferring.

"Crime of violence" as used in this Act, means any of the following crimes, or an attempt to commit any of the same, namely: Murder, manslaughter, rape, mayhem, maliciously disfiguring another, abduction, kidnaping, burglary, housebreaking, larceny, any assault with intent to kill, commit rape, or robbery, assault with a dangerous weapon, or assault with intent to commit any offense punishable by imprisonment in the penitentiary.

**COMMITTING CRIME WHEN ARMED**

*Committing crime of violence when armed. Punishment for.*

SEC. 2. If any person shall commit a crime of violence in the District of Columbia when armed with or having readily available any pistol or other firearm, he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than five years; upon a second conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than ten years; upon a third conviction for a crime of violence so committed he may, in addition to the punishment provided for the

crime, be punished by imprisonment for a term of not more than fifteen years; upon a fourth or subsequent conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for an additional period of not more than thirty years.

### PERSONS FORBIDDEN TO POSSESS CERTAIN FIREARMS

SEC. 3. No person who has been convicted in the District of Columbia or elsewhere of a crime of violence shall own or have in his possession a pistol, within the District of Columbia.

*Persons forbidden to possess certain firearms.*
*Convicted of a crime.*

### CARRYING CONCEALED WEAPONS

SEC. 4. No person shall within the District of Columbia carry concealed on or about his person, except in his dwelling house or place of business or on other land possessed by him, a pistol, without a license therefor issued as hereinafter provided, or any deadly or dangerous weapon.

*Illegally carrying, etc., dangerous weapon.*

### EXCEPTIONS

SEC. 5. The provisions of the preceding section shall not apply to marshals, sheriffs, prison or jail wardens, or their deputies, policemen or other duly appointed law-enforcement officers, or to members of the Army, Navy, or Marine Corps of the United States or of the National Guard or Organized Reserves when on duty, or to the regularly enrolled members of any organization duly authorized to purchase or receive such weapons from the United States, provided such members are at or are going to or from their places of assembly or target practice, or to officers or employees of the United States duly authorized to carry a concealed pistol, or to any person engaged in the business of manufacturing, repairing, or dealing in firearms, or the agent or representative of any such person having in his possession, using, or carrying a pistol in the usual or ordinary course of such business or to any person while carrying a pistol unloaded and in a secure wrapper from the place of purchase to his home or place of business or to a place of repair or back to his home or place of business or in moving goods from one place of abode or business to another.

*Exceptions.*
*Law enforcement officers.*
*Army, Navy, or Marine Corps.*
*National Guard, etc., on duty.*
*Other organizations.*
*Carrying to places of assembly, etc.*
*Manufacturer, etc.*

### ISSUE OF LICENSES TO CARRY

SEC. 6. The superintendent of police of the District of Columbia may, upon the application of any person having a bona fide residence or place of business within the District of Columbia or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol within the District of Columbia for not more than one year from date of issue, if it appears that the applicant has good reason to fear injury to his person or property or has any other proper reason for carrying a pistol and that he is a suitable person to be so licensed. The license shall be in duplicate, in form to be prescribed by the Commissioners of the District of Columbia and shall bear the name, address, description, photograph, and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, and the duplicate shall be retained by the superintendent of police of the District of Columbia and preserved in his office for six years.

*Licenses.*

652          72d CONGRESS.  SESS. I.  CH. 465.  JULY 8, 1932.

### SELLING TO MINORS AND OTHERS

Selling to minors or others.

SEC. 7. No person shall within the District of Columbia sell any pistol to a person who he has reasonable cause to believe is not of sound mind, or is a drug addict, or is a person who has been convicted in the District of Columbia or elsewhere of a crime of violence or, except when the relation of parent and child or guardian and ward exists, is under the age of eighteen years.

### TRANSFERS REGULATED

Time, etc., provisions.

SEC. 8. No seller shall within the District of Columbia deliver a pistol to the purchaser thereof until forty-eight hours shall have elapsed from the time of the application for the purchase thereof, except in the case of sales to marshals, sheriffs, prison or jail wardens or their deputies, policemen, or other duly appointed law-enforcement officers, and, when delivered, said pistol shall be securely wrapped and shall be unloaded.  At the time of applying for the purchase

Register to be kept.

of a pistol the purchaser shall sign in duplicate and deliver to the seller a statement containing his full name, address, occupation, color, place of birth, the date and hour of application, the caliber, make, model, and manufacturer's number of the pistol to be purchased and a statement that he has never been convicted in the District of Columbia or elsewhere of a crime of violence. The seller shall, within six hours after such application, sign and attach his address and deliver one copy to such person or persons as the superintendent of police of the District of Columbia may designate, and shall retain the

Limitation.

other copy for six years.  No machine gun, sawed-off shotgun, or blackjack shall be sold to any person other than the persons designated in section 14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained from the

Wholesale trade.

superintendent of police of the District of Columbia.  This section shall not apply to sales at wholesale to licensed dealers.

### DEALERS TO BE LICENSED

Dealers to be licensed.

SEC. 9. No retail dealer shall within the District of Columbia sell or expose for sale or have in his possession with intent to sell, any pistol, machine gun, sawed-off shotgun, or blackjack without being licensed as hereinafter provided.  No wholesale dealer shall, within the District of Columbia, sell, or have in his possession with intent to sell, to any person other than a licensed dealer, any pistol, machine gun, sawed-off shotgun, or blackjack.

### DEALERS' LICENSES, BY WHOM GRANTED AND CONDITIONS THEREOF

Conditions, etc., for issuing dealers' licenses.
*Ante,* p. 652.

SEC. 10. The Commissioners of the District of Columbia may, in their discretion, grant licenses and may prescribe the form thereof, effective for not more than one year from date of issue, permitting the licensee to sell pistols, machine guns, sawed-off shotguns, and blackjacks at retail within the District of Columbia subject to the following conditions in addition to those specified in section 9 hereof, for breach of any of which the license shall be subject to forfeiture and the licensee subject to punishment as provided in this Act.

1. The business shall be carried on only in the building designated in the license.

2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can be easily read.

JA 172

3. No pistol shall be sold (a) if the seller has reasonable cause to believe that the purchaser is not of sound mind or is a drug addict or has been convicted in the District of Columbia or elsewhere of a crime of violence or is under the age of eighteen years, and (b) unless the purchaser is personally known to the seller or shall present clear evidence of his identity.  No machine gun, sawed-off shotgun, or blackjack shall be sold to any person other than the persons designated in section 14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained from the superintendent of police of the District of Columbia.

4. A true record shall be made in a book kept for the purpose, the form of which may be prescribed by the Commissioners, of all pistols, machine guns, and sawed-off shotguns in the possession of the licensee, which said record shall contain the date of purchase, the caliber, make, model, and manufacturer's number of the weapon, to which shall be added, when sold, the date of sale. *Records.*

5. A true record in duplicate shall be made of every pistol, machine gun, sawed-off shotgun, and blackjack sold, said record to be made in a book kept for the purpose, the form of which may be prescribed by the Commissioners of the District of Columbia and shall be personally signed by the purchaser and by the person effecting the sale, each in the presence of the other and shall contain the date of sale, the name, address, occupation, color, and place of birth of the purchaser, and, so far as applicable, the caliber, make, model, and manufacturer's number of the weapon, and a statement signed by the purchaser that he has never been convicted in the District of Columbia or elsewhere of a crime of violence.  One copy of said record shall, within seven days, be forwarded by mail to the superintendent of police of the District of Columbia and the other copy retained by the seller for six years.

6. No pistol or imitation thereof or placard advertising the sale thereof shall be displayed in any part of said premises where it can readily be seen from the outside.  No license to sell at retail shall be granted to anyone except as provided in this section. *Display, etc., forbidden.*

### FALSE INFORMATION FORBIDDEN

SEC. 11. No person, shall, in purchasing a pistol or in applying for a license to carry the same, or in purchasing a machine gun, sawed-off shotgun, or blackjack within the District of Columbia, give false information or offer false evidence of his identity. *False information or evidence forbidden.*

### ALTERATION OF IDENTIFYING MARKS PROHIBITED

SEC. 12. No person shall within the District of Columbia change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark or identification on any pistol, machine gun, or sawed-off shotgun.  Possession of any pistol, machine gun, or sawed-off shotgun upon which any such mark shall have been changed, altered, removed, or obliterated shall be prima facie evidence that the possessor has changed, altered, removed, or obliterated the same within the District of Columbia: *Provided, however,* That nothing contained in this section shall apply to any officer or agent of any of the departments of the United States or the District of Columbia engaged in experimental work. *Alteration, etc., of identification marks prohibited.*

*Proviso. Experimental work.*

### EXCEPTIONS

SEC. 13. This Act shall not apply to toy or antique pistols unsuitable for use as firearms. *Toys, etc., excepted.*

## POSSESSION OF CERTAIN DANGEROUS WEAPONS

Possession of certain dangerous weapons forbidden.

Proviso.
Exceptions.

SEC. 14. No person shall within the District of Columbia possess any machine gun, sawed-off shotgun, or any instrument or weapon of the kind commonly known as a blackjack, slung shot, sand club, sandbag, or metal knuckles, nor any instrument, attachment, or appliance for causing the firing of any firearm to be silent or intended to lessen or muffle the noise of the firing of any firearms: *Provided, however,* That machine guns, or sawed-off shotguns, and blackjacks may be possessed by the members of the Army, Navy, or Marine Corps of the United States, the National Guard, or Organized Reserves when on duty, the Post Office Department or its employees when on duty, marshals, sheriffs, prison or jail wardens, or their deputies, policemen, or other duly appointed law-enforcement officers, officers or employees of the United States duly authorized to carry such weapons, banking institutions, public carriers who are engaged in the business of transporting mail, money, securities, or other valuables, wholesale dealers and retail dealers licensed under section 10 of this Act.

## PENALTIES

Punishment for violations.

SEC. 15. Any violation of any provision of this Act for which no penalty is specifically provided shall be punished by a fine of not more than $1,000 or imprisonment for not more than one year, or both.

## CONSTITUTIONALITY

Invalidity of any provision not to affect remainder.

SEC. 16. If any part of this Act is for any reason declared void, such invalidity shall not affect the validity of the remaining portions of this Act.

## CERTAIN ACTS REPEALED

Vol. 31, p. 1328, repealed.

SEC. 17. The following sections of the Code of Law for the District of Columbia, 1919, namely, sections 855, 856, and 857, and all other Acts or parts of Acts inconsistent herewith, are hereby repealed.

Approved, July 8, 1932.

---

[CHAPTER 466.]

## JOINT RESOLUTION

July 8, 1932.
[H. J. Res. 462.]
[Pub. Res., No. 35.]

Making an appropriation to provide transportation to their homes for veterans of the World War temporarily quartered in the District of Columbia.

World War veterans. Appropriation for, to provide transportation from District of Columbia to their homes.
*Post,* p. 791.

Proviso.
Credited as a loan.

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That to enable the Administrator of Veterans' Affairs, upon the request of any honorably discharged veteran of the World War, temporarily quartered in the District of Columbia, who is desirous of returning to his home, to provide such veteran with railroad transportation thereto prior to July 15, 1932, together with travel subsistence at the rate of 75 cents per day, there is hereby appropriated, out of any money in the Treasury not otherwise appropriated, the sum of $100,000: *Provided,* That all amounts expended under this appropriation in behalf of any veteran shall constitute a loan without interest which, if not repaid to the United States, shall be deducted from any amounts payable to such veteran on his adjusted-service certificate.

Approved, July 8, 1932.

# 5

Article 52 of the Police Regulations, 1955 Edition-1968 Reprint, Title 35, District of Columbia Rules and Regulations (DCRR the predecessor of the DCMR)

# POLICE
# TRAFFIC AND MOTOR
# VEHICLE REGULATIONS
## OF THE
# DISTRICT OF COLUMBIA



Office of the General Counsel
Metropolitan Police Department

# POLICE REGULATIONS

### OF THE

# DISTRICT OF COLUMBIA



**Amended to**
**August 12, 1968**

For sale by the Department of Licenses and Inspections, District Building.
Per Copy                                              $4.50

PRINTING DIVISION

## TABLE OF CHANGES—Continued

| Article and Section No. (or other divisions) | Commissioners' Order No. | Commissioners' Order Date of | Revised Page No. and Date Printed | |
|---|---|---|---|---|
| Sec. 2 (a) | 63-2076 | Oct. 10, 1963 | 152E4 | (1-10-64) |
| Sec. 2 (a) | 66-1498 | Sept. 27, 1966 | 154E4 | (5-10-67) |
| Sec. 2 (a) | 65-1230 | Aug. 26, 1965 | 154E4 | (5-10-67) |
| Sec. 2 (a) | 66-1596 | Oct. 18, 1966 | 154E4 | (5-10-67) |
| Sec. 2 (a) | 66-1595 | Oct. 18, 1966 | 154E4 | (5-10-67) |
| Sec. 2 (a) | 66-604-A | May 6, 1966 | 154E4 | (5-10-67) |
| Sec. 2 (a) | 66-812-A | June 10, 1966 | 154E4 | (5-10-67) |
| Sec. 2 (a) | 66-866-A | June 23, 1966 | 134 | (5-10-67) |
| Sec. 2 (a) | 66-959 | July 7, 1966 | 138 | (5-10-67) |
| Sec. 2(a) | 67-544 | April 27, 1967 | 152-E4 | (1-30-68) |
| Sec. 3 | 61-1206 | July 11, 1961 | 152E4 | (8-29-61) |
| Sec. 4 | 61-1206 | July 11, 1961 | 152E5 | (8-29-61) |
| Sec. 5 | 61-1206 | July 11, 1961 | 152E6 | (8-29-61) |
| Sec. 6 | 61-1206 | July 11, 1961 | 152E7 | (8-29-61) |
| Sec. 7 | 61-1206 | July 11, 1961 | 152E7 | (8-29-61) |
| Sec. 7 (b) | 67-445 | April 4, 1967 | 152E9 | (5-10-67) |
| Sec. 8 | 61-1206 | July 11, 1961 | 152E9 | (8-29-61) |
| Art. 44 | | | | |
| Sec. 1, 9 | 63-1355 | June 6, 1963 | 152E10 | (7-11-63) |
| Art. 45 | 67-1481 | Sept. 28, 1967 | 152-E12 | (1-30-68) |
| Art. 45 | | | | |
| Sec. 1 | 63-2437 | Dec. 31, 1963 | 152E12 | (2-10-64) |
| Art. 46 | 64-225 | Feb. 18, 1964 | 152E18 152E17 | (3-31-64) |
| Art. 47 | 65-768 | June 10, 1965 | 152E-18 | (9-30-65) |
| Sec. 4 (i) | 68-222 | Mar. 11, 1968 | 152-E25 | (8-12-68) |
| *Sec. 6 | 68-744 | Nov. 18, 1968 | 152-E25 | (4-25-69) |
| Sec. 10 | 68-222 | Mar. 11, 1968 | 152E-28 | (8-12-68) |
| Art. 48 | 68-432 | June 19, 1968 | 152E-28 | (8-12-68) |
| *Art. 50 thru 55 | 68-500 | July 19, 1968 | 152E-33 | (4-25-69) |
| | 69-39a | Jan. 30, 1969 | | |
| Appendix A | | | 152F | (11-29-57) |
| Sec. 1 2 | | | 152G | (11-29-57) |
| Sec. 3, 4 | | | 152H | (11-29-57) |
| Sec. 5 | | | 152I | (11-29-57) |
| Sec. 6 | | | 152J | (11-29-57) |
| Sec. 7 | | | 152K | (11-29-57) |
| Sec. 8 | | | 152L | (11-29-57) |
| Sec. 9, 10 | | | 152M | (11-29-57) |
| Sec. 11 | | | 152N | (11-29-57) |
| Sec. 12, 13, 14 | | | 152O | (11-29-57) |
| Sec. 15, 16, 17, 18, 19 | | | 152P | (11-29-57) |
| Sec. 20, 21 | | | | |
| Appendix B | | | 152Q | (11-29-57) |
| Part I, II | | | | |
| Appendix C | | | 152R | (11-29-57) |
| Part I | | | 152S | (3-4-65) |
| Appendix D | | | 178 | (7-27-56) |
| Index | | | 182 | (10-12-56) |
| Index | | | 188 | (10-12-56) |
| Index | | | | |

## ARTICLE 50.  DEFINITIONS

**Section 1.**  When used in these Regulations (Article 50 through 55 of the Police Regulations of the District of Columbia), unless the context requires otherwise, the terms "pistol," "sawed-off shotgun," "machine gun," "person," and "sell" and "purchase" shall have the meanings ascribed to them in the Act of Congress entitled "An act to control the possession, sale, transfer and use of pistols and other dangerous weapons in the District of Columbia," as amended, approved July 8, 1932 (47 Stat. 650, D. C. Code, sec. 22-3201 et seq.). Other terms used in these Regulations, unless the context otherwise requires, shall have the meanings ascribed to them as follows:

(a) "Commissioner" means the Commissioner of the District of Columbia or his designated agent.

(b) "Chief of Police" and "Chief" mean the Chief of Police of the Metropolitan Police Department of the District of Columbia or his designated agent.

(c) "District" means the District of Columbia.

(d) "Firearm" means any pistol, rifle or shotgun which will or is designed to, or may readily be converted to, expel a projectile by the action of an explosive; or the frame or receiver of any such pistol, rifle, or shotgun; but does not include a firearm that is not designed or redesigned to use rim fire or center fire fixed ammunition or manufactured in or before 1898.

(e) "Rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use energy of the explosive in a fixed metallic cartridge to fire a single projectile through a rifle bore for each single pull of the trigger.

(f) "Short-barreled rifle" means a rifle having one or more barrels less than sixteen inches in length and a weapon made from a rifle, whether by alteration, modification, or otherwise, if such weapon as modified has an overall length of less than twenty-six inches.

(g) "Shotgun" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger.

(h) "Ammunition" means ammunition or cartridge cases, primers, bullets, or propellant powder designed for use in any firearm, machine gun, short-barrel rifle or sawed-off shotgun.

(i) The term "destructive device" means any firearm, weapon or automatic weapon which is not a pistol, rifle, shotgun, sawed-off shotgun or machine gun defined herein and includes any

explosive not commonly used for lawful commercial purposes, explosive bomb, poison gas bomb, tear gas or tear gas bomb, grenade, mine, rocket, missile, or similar device; and includes any type of weapon which will, or is designed to or may readily be converted to expel a projectile by the action of any explosive and having any barrel with a bore of one-half inch or more in diameter; excluding however,

     (1) a pneumatic gun, spring gun, or B-B gun which expels a single globular projectile not exceeding .18 inch in diameter;

     (2) any device used exclusively for the firing of stud cartridges, explosive rivets, or similar industrial ammunition; or

     (3) any device used exclusively for signalling or safety, and required or recommended by the United States Coast Guard or the Interstate Commerce Commission.

(j) "Dealer" means (i) any person engaged in the business of selling firearms or ammunition, (ii) any person engaged in the business of manufacturing or repairing firearms or of making or fitting special barrels, stocks or trigger mechanisms to firearms, or (iii) any person whose business or occupation includes the taking or receiving, by way of pledge or pawn, of any firearm or ammunition as security for the payment or repayment of money. The term "licensed dealer" means any dealer licensed under the provisions of these Regulations.

(k) "Manufacturing" means manufacturing, producing, making or remaking any firearm, destructive device or ammunition for sale or distribution."

(l) "Act" means the Act of Congress, entitled "An Act to control the possession, sale, transfer and use of pistols and other dangerous weapons, in the District of Columbia, as amended, approved July 8, 1932 (41 Stat. 650, D. C. Code, sec. 22-3201 **et seq.**).

(m) The term "these Regulations" means the regulations and provisions contained in Articles **50** through **55** of the Police Regulations of the District of Columbia as adopted by the District of Columbia Council and any orders issued by the Commissioner pursuant to authority transferred to him by the Council in such Articles.

(n) "Carry" means to carry, transport or possess on or about one's person, or in such close proximity to one's person as to be easily and readily accessible.

## ARTICLE 51. REQUIRING THE REGISTRATION OF FIREARMS IN THE DISTRICT OF COLUMBIA

**Section 1.** Except as herein provided, no person shall within the District, possess, or keep under his control, or sell or otherwise dispose of any pistol, or rifle or shotgun unless such person is the

holder of a valid registration certificate for such pistol, rifle or shotgun.

**Sec. 2** (a) Each licensed dealer who sells a pistol, rifle or shotgun to a person in whose possession the pistol, rifle or shotgun must be registered shall require from the purchaser a completed application for the registration of the pistol, rifle or shotgun and shall file the application with the Chief of Police at the time of sale.

(b) Each person who within the District possesses, or keeps under his control any pistol, rifle or shotgun purchased or acquired prior to the effective date of these Regulations, shall make an application to register such pistol, rifle or shotgun within 120 days immediately following the effective date of these Regulations.

(c) Each person who brings into the District any pistol, rifle or shotgun acquired outside of the District, or who causes a rifle or shotgun to be lawfully delivered to him within the District, shall make an application to register such pistol, rifle or shotgun within forty-eight hours after he brings such pistol, rifle or shotgun into the District or within forty-eight hours after such rifle or shotgun is delivered to him in the District.

(d) Each person within the District who otherwise acquires possession or control of any pistol, rifle or shotgun shall make an application to register such pistol, rifle or shotgun within forty-eight hours after he acquires possession or control of the same; except as provided in Art. 55, sec. 6 of these Regulations.

(e) The executor or administrator of an estate containing a registered firearm shall promptly notify the Chief of Police of the death of the registered owner, and at the time of any transfer of the firearm, shall return the registration certificate for the firearm to the Chief. The executor or administrator of an estate containing an unregistered firearm shall make an application to transfer such firearm within thirty days of his appointment or qualification.

**Sec. 3** (a) Each application required by this Article shall contain when filed with the Chief of Police the following information:

(1) "The name, occupation, residence and business address, and date of birth of the applicant. Where the applicant is not a natural person, this information shall refer to principal officer of the applicant, and shall contain in addition the name and address of the applicant."

(2) "The make, model, caliber, or gauge, manufacturer's identification number, serial number and other identifying marks of the pistol, rifle or shotgun; and

(3) "The name and address of the person from whom the firearm was acquired, and the date and place of acquisition."

(b) Each application to register a pistol, rifle, or shotgun shall be made in duplicate on forms provided by the Chief of Police and

be signed by the applicant. The original shall be filed with the Chief of Police, and the duplicate shall be retained by the applicant as temporary evidence of registration. The Chief of Police, after receipt of a duly filed application, shall send to the applicant a numbered registration certificate identifying the applicant as the registered owner of the pistol, rifle or shotgun described in the application.

**Sec. 4.** No information or evidence obtained from an application to register a firearm required to be submitted or retained by a natural person in order to comply with any section of this Article or orders issued by the Chief of Police implementing this Article shall be used as evidence against such natural person in any criminal proceeding with respect to the violation of law occurring prior to or concurrently with the filing of the application containing the information or evidence; **Provided,** that this section shall not apply to any violation of subsections (a) and (b) of Art. 55, Sec. 1 respecting such application.

**Sec. 5.** A fee, in an amount fixed by the Commissioner, shall be paid upon the application for a registration certificate, but such fee shall not exceed $2.00 for each pistol, rifle or shotgun registered, and the fee need not be uniform for all pistols, rifles or shotguns registered to a single person; **Provided,** that no natural person, regardless of the number of guns acquired or owned by him prior to the effective date of these regulations shall be required to pay a registration fee hereunder in excess of $100 for the registration of all firearms acquired by him prior to the effective date of these Regulations.

**Sec. 6.** Any person within the District carrying or having in his immediate possession any pistol, rifle or shotgun for which a registration certificate has been issued as provided in these Regulations shall have such certificate on his person or within his immediate custody. Any person having such possession of a pistol, rifle or shot gun shall upon demand exhibit such certificate to a law enforcement officer. The failure of any person to exhibit such certificate as provided herein shall be cause for the revocation of any and all certificates issued to him under these Regulations.

**Sec. 7.** It shall be the duty of the registered owner of a pistol, rifle or shotgun—

(a) to notify the Chief of Police in writing of the loss, theft or destruction of a registration certificate; or of any change of name or address from that recorded on a registration certificate, within forty-eight hours following discovery of such loss, theft or destruction, or of any change of name or address. Failure to notify the Chief of Police shall be grounds for revocation of the registration certificate.

152E37        POLICE REGULATIONS        Art. 51, Sec. 10

(b) to notify the Chief of Police in writing of the sale, transfer or other disposition of any pistol, rifle or shotgun registered to him within forty-eight hours following such sale, transfer or disposition, except as provided for in Art. 55, Sec. 6 of these Regulations. Such notification shall contain—

(1) the name, residence and business address within the District, the occupation, and date of birth of the person to whom the pistol, rifle or shotgun has been sold or transferred;

(2) the make, model, caliber or gauge, manufacturer's identification number, serial number, and other identifying marks of the pistol, rifle or shotgun sold or transferred; and

(3) the number of the registration certificate issued to the registered owner.

(c) to return to the Chief of Police of registration certificate for any pistol, rifle or shotgun which is lost, stolen or destroyed, or which he sells, transfers or otherwise disposes of at the time he notifies the Chief of Police of such loss, theft, destruction, sale, transfer or other disposition.

**Sec. 8.** No person shall within the District—

(a) lend or give, or allow the use of a registration certificate issued to him by any other person for identification; **Except,** that when a registered owner of a pistol, rifle or shotgun lends or delivers the same to another person in accordance with the provisions of Art. 55, sec. 6 of these Regulations he shall deliver to such other person the registration certificate for each pistol, rifle or shotgun so loaned or delivered.

(b) represent himself as the owner of a registration certificate issued to another person.

**Sec. 9.** (Deleted)

**Sec. 10.** This Article of these Regulations shall not apply to—

(a) any person licensed under Art. 55 of these Regulations as a licensed retail dealer; **Provided,** that this exception shall only apply to pistols, rifles or shotguns acquired by such person in the normal conduct of his business and kept by such person at his place of business; and further **Provided,** that this exception shall not apply to such person for any pistol, rifle or shotgun kept by him for his private use or protection, or for the protection of his business; or

(b) any non-resident of the District participating in any lawful recreational activity in the District involving the use of pistols, rifles or shotguns; or transporting such pistol, rifle or shotgun to or from such lawful recreational activity; **Provided,** that such non-resident shall upon demand of any enforcement officer exhibit proof that his possession of such pistol, rifle or shotgun is registered and

legal in the jurisdiction in which he resides; or proof of residence in a jurisdiction which does not require registration of a pistol, rifle or shotgun;

(c) any officer, agent or employee of the District of Columbia or the Federal Government, or any officer, agent or employee of the government of any state or subdivision thereof, or any member of the Armed Forces of the United States, the National Guard or the Organized Reserves, when such officer, agent, employee or member is authorized to carry a pistol, rifle or shotgun and who is carrying a pistol, rifle or shotgun while on duty in the performance of his official authorized functions; or

## ARTICLE 52. REGULATING THE SALE AND CARRYING OF FIREARMS IN THE DISTRICT OF COLUMBIA

**Section 1.** (a) Any person who is not subject to any of the disabilities enumerated in Sec. 7 of the Act (D.C. Code, sec. 22-3207) shall be entitled to purchase a pistol within the District, and a seller is lawfully entitled to sell a pistol to such a person. No such person shall be denied the purchase of a pistol except as provided in the Act.

(b) Any person who meets the requirement of Sec. 6 of the Act (D. C. Code, sec. 22-3206) shall be entitled to carry a pistol within the District, and no such person shall be denied a license to carry a pistol except as provided in the Act.

(c) Any person who is not subject to any of the disabilities set forth in sec. 5 (c) of this article shall be entitled to purchase and carry a rifle or shotgun in the District, and a seller shall be entitled to sell a rifle or shotgun to such a person.

**Sec. 2.** (a) No person shall carry either openly or concealed on or about his person any pistol unless he possesses a valid license therefor issued to him pursuant to Sec. 4 of the Act (D. C. Code, sec. 22-3204); except as otherwise authorized by said section of the Act.

(b) No person shall purchase, own, possess or carry on or about his person any rifle or shotgun unless he possesses a valid rifle and shotgun license therefor issued to him pursuant to Sec. 5 of this Article.

(c) No person shall within the District sell or transfer any rifle or shotgun to a purchaser who is not a retail dealer licensed under Art. 54 of these Regulations; and no person who is not a licensed retail dealer shall purchase or otherwise acquire any rifle or shotgun from any seller unless—

(1) the purchaser exhibits to the seller a valid rifle and shotgun license issued according to Section 5 of this Article; and

(2) the seller forwards to the Chief of Police at the time of the sale the purchaser's application register the rifle or shotgun being sold pursuant to Art. 51, Sec. 2 (a) of these Regulations; or within forty-eight hours following the sale, a written notification of sale pursuant to Art. 51, Sec 8 (b).

(d) No person within the District shall import or cause to be delivered to him within the District any rifle or shotgun unless he shall within forty-eight hours following delivery to him, submit an application to register the rifle or shotgun pursuant to Art. 51, Sec. 2 (c) of hese Regulations.

**Sec. 3.** Each person who required by Sec. 8 of the Act (D. C. Code, Sec. 22-3208) to submit a statement when applying to purchase a pistol, or who is required by Sec. 4 of the Act (D. C. Code, sec. 22-3204) to have a license to carry a pistol, or who is required by sec. 2 (b) of this Article to have a license to purchase or carry a rifle or shotgun shall submit such statement to the seller or an application for such license directly to the Chief of Police in the form and number prescribed by the Chief.

**Sec. 4.** (a) Each statement on application to purchase a pistol shall be signed by the applicant purchaser and the seller, and each application for a license shall be signed by the applicant for the license.

(b) Each such statement or application shall contain that information prescribed by the Chief of Police which in his judgment is necessary to conduct efficient and thorough investigations, and to effectuate the purposes of the Act and these Regulations. Each statement or application shall contain at least the following information:

(1) the full name, and any other name by which the applicant is or has been known;

(2) the home address, and any other address at which the applicant has resided within five years immediately prior to the submission of the statement or application.

(3) the present business or occupation, any business or occupation in which the applicant has engaged for five years immediately prior to the application, and the addresses of such businesses or places of employment;

(4) the date and place of birth of the applicant;

(5) the sex of the applicant;

(6) a statement by the applicant that he is not ineligible to purchase or possess a pistol under Section 7 of the Act (D. C. Code, sec. 22-3207) or not ineligible for a license to carry a pistol under Sec. 6 of the Act (D. C. Code, sec. 22-3206), or not ineligible under Sec. 5 (c) of this Article to purchase or carry a rifle or shotgun; and indicating whether he has previously been denied any pistol, or rifle or shotgun

license, registration certificate or permit by the Federal Government or any state government or subdivision thereof including the District Government; and whether he has been involved in any mishap involving a pistol, or rifle or shotgun, including the date, place, and circumstances and the names of any persons injured or killed;

(7) a statement by the applicant of his need to purchase or carry a pistol, rifle or shotgun, and his intended use of the same;

(8) the caliber, make, model, manufacturer's identification number, serial number, and any other identifying marks on the pistol, rifle or shotgun to be purchased or carried; and

(9) the name and address of the seller, and his retail license number if he is a licensed dealer under Art. 55 of these Regulations.

(c) The Chief of Police may require each applicant to be fingerprinted if this in his judgment is necessary to conduct efficient and thorough investigations and to effectuate the purposes of the Act and these Regulations; **Provided,** that any person who has been fingerprinted by the Chief within five years prior to submitting his statement or application shall not be fingerprinted again if he offers other satisfactory proof of his identity. In addition, the Chief may require each applicant for a license to carry a pistol, or a rifle or shotgun to submit with his application two full face, black and white photographs of himself, 1-3/4 by 1-7/8 inches in size which shall have been taken within thirty days of the filing of the application.

**Sec. 5.** (a) No person shall be approved by the Chief of Police to purchase a pistol if the Chief after investigation determines that a pistol could not lawfully be sold to such person under Section 7 of the Act (D. C. Code, Sec. 22-2307).

(b) No person shall be issued a license to carry a pistol by the Chief of Police if the Chief after investigation determines that such person is ineligible for such license under Section 6 of the Act (D. C. Code, Sec. 3206).

(c) Except as provided for in subsection (d) of this section, no person shall be issued a license to purchase or carry a rifle or shotgun if the Chief of Police determines after investigation that such person—

(1) is under the age of twenty-one years;

(2) is not of sound mind; **Provided,** that the Chief of Police shall determine that the person is not of sound mind to purchase, possess and carry a rifle or shotgun if he determines that such person has been adjudicated mentally incompetent, or has been acquitted of any criminal charge by reason of insanity by any court or has been adjudicated a

chronic alcoholic by any court **and Provided,** that three years after such conviction adjudication or acquittal, the Chief of Police shall disregard the disabilities of this subsection if, after an investigation, he is satisfied that the applicant is mentally and physically capable of owning, possessing and using a pistol in a safe and responsible manner.

(3) is a drug addict; **Provided,** that the Chief of Police shall determine that the person is a drug addict if he determines that such person (i) is an abusive user of narcotic drugs as defined by section 4731 of the Internal Revenue Code 1954, as amended (Aug. 16, 1954, 68A Stat. 557, ch. 736; Apr. 22, 1960, 74 Stat. 57 Pub. L. 88–429, sec. 4(a), (b); 26 U.S.C., sec. 4731); or (ii) is an abusive user of dangerous drugs as defined by or under the Act entitled the "Dangerous Drug Act for the District of Columbia", approved July 24, 1956 (70 Stat. 612, title II, sec. 202 D. C. Code, sec. 33–701);

(4) has been convicted in any jurisdiction of a crime involving the use of physical force against a person punishable by imprisonment for more than one year, or is under indictment for such a crime; or

(5) he has been convicted in any jurisdiction of any of the following offenses punishable by imprisonment for less than one year: any offense involving a physical assault; any offense committed while carrying a firearm or weapon; using, possessing or selling any narcotic or dangerous drug; or any violation of a law restricting the sale, receipt, possession, use or transportation of a firearm or destructive device; **Provided,** that three years after such conviction, the Chief of Police may disregard the disabilities of this subsection if, after an investigation, he is satisfied that the applicant is mentally and physically capable of owning, possessing and using a rifle or shotgun in a safe and responsible manner; or

(6) suffers from a physical defect which would make it unsafe for him to use a rifle or shotgun; or

(7) has indicated by threatening speech or other behavior that he is likely to make unlawful use of a rifle or shotgun; or

(8) has been adjudicated negligent in a firearms mishap causing death or injury to another human being; or

(9) is otherwise ineligible to purchase or possess a pistol under section 3 of the Act (D. C. Code, sec. 22–3203).

(d) The Chief of Police shall deny a rifle or shotgun license if the Chief determines, after investigation or test, that the applicant—

(1) does answer to one or more of the descriptions

enumerated in subparagraphs (c) (1) through (c) (9) of this section; or

(2) has failed to demonstrate satisfactorily a knowledge of the laws of the District of Columbia pertaining to rifles and shotguns and the safe and responsible use of the same in accordance with tests and standards prescribed by the Chief of Police; or

(3) has vision less than that required to obtain a valid driver's license under the laws of the District; **Provided,** that possession of a valid driver's license shall be prima facie evidence that an applicant's vision is not deficient.

(e) The Chief of Police shall issue to applicant a numbered rifle and shotgun license if the Chief determines, after investigation that the applicant does not answer to any of the descriptions enumerated in subparagraphs (c) (1) through (c) (9) of this section.

(f) The Chief of Police may issue to an applicant between the ages of eighteen and twenty-one years old who is otherwise qualified under subsection (c) a numbered restricted rifle and shotgun license if—

(1) the application is accompanied by a signed statement by the parent or guardian of the applicant (i) that the applicant has the permission of the parent or guardian to use a rifle or shotgun, and (ii) that the parent or guardian assumes civil liability for all damages resulting from the actions of the applicant in the use of the rifle or shotgun; and

(2) if the applicant is not disqualified by subsection (d) in any respect except his age.

**Sec. 6.** Any person in the District carrying of having in his immediate possession any pistol for which a license has been issued to him pursuant to sec. 6 of the Act (D. C. Code, sec. 22–3206), or any rifle or shotgun for which a license has been issued to him pursuant to sec. 5(e) or (f) of this Article, shall have such license within his immediate possession, and upon demand of any law enforcement officer shall exhibit his license.

**Sec. 7.** Any rifle and shotgun license issued under this Article—

(a) may include such reasonable restrictions and prohibitions consistent with applicable laws of the District with respect to the possession, purchase or carrying about of such rifle or shotgun as the Chief of Police may deem essential to the public safety or in the public interest; any license issued under section 3(d) of this Article shall be limited to use of the rifle or shotgun for sport or recreation, only during daylight hours, and only in the presence and under the supervision of a person licensed under section 5(e) of this Article.

(b) may be revoked by the Chief of Police when he has reason to believe that the licensee no longer has the qualification requisite for the issuance of such a license: **Provided,** that the Chief of Police shall first issue and serve upon the licensee, an order to show cause why his license should not be revoked. This licensee may request in writing a hearing before the Chief within 5 days, and the Chief shall grant such hearing within 15 days. If the licensee does not request a hearing or show proper cause why his license should not be revoked the Chief of Police shall issue and serve upon the licensee an order revoking the license and no license issued under these Regulations shall be in effect beyond the date of an order revoking such a license.

(c) shall expire five years after issuance unless sooner revoked.

**Sec. 8.** (a) Section 2 (a) of this Article shall not apply to—

(1) any person directly transporting a registered pistol to the business address of a licensed dealer for purpose of repair or sale, or to any person directly transporting such pistol from the business address of a licensed dealer to his residence, place of business or other land owned by him after the purchase or repair.

(2) Any person directly transporting a registered pistol to the residence, place of business or land owned by the purchaser after the private sale of such pistol approved by the Chief of Police;

(3) any person directly transporting any pistol to any police precinct house to surrender the same to the Chief of Police;

(4) any nonresident of the District actively participating in any lawful recreational activity in the District involving the use of a pistol, or transporting such pistol directly to or directly from such lawful recreational activity; **Provided,** that such nonresident shall upon demand of any law enforcement officer exhibit proof that his carrying about of a pistol is permitted and legal in the jurisdiction in which he resides; or proof of residence in a jurisdiction which does not license the carrying about of a pistol;

(5) any officer, agent or employee of the District of Columbia or the Federal Government, or any officer, agent or employee of the government of any state or subdivision thereof, or any member of the Armed Forces of the United States, the National Guard, or the Organized Reserves, when such officer, agent, employee or member is authorized to carry a pistol, and is carrying a pistol while on duty in the performance of his official authorized functions; or

(6) the regularly enrolled members of any organization duly authorized to purchase or receive such weapons from the United States, provided such members are at or are going to or from their places of assembly or target practice as required by Section 5 of Act (D. C. Code, Sec. 22-3205).

(b) Any pistol carried by any person not having a licensed issued under these Regulations shall be carried in a closed container or securely wrapped, and while being carried shall be kept unloaded. Containers of such pistols or such securely wrapped pistols shall be carried in open view.

**Sec. 9.** (a) Section 2 (b) of this Article shall not apply to—

(1) any person directly transporting any rifle or shotgun to any police precinct house to surrender the same to the Chief of Police;

(2) any nonresident of the District actively participating in any lawful recreational activity in the District involving the use of a rifle or shotgun, transporting a rifle or shotgun directly to or directly from such lawful recreational activity; **Provided,** that such nonresident shall upon demand of any law enforcement officer exhibit proof that his carrying about of a rifle or shotgun is permitted and legal in the jurisdiction in which he resides; or proof of residence in a jurisdiction which does not license the carrying about of a rifle or shotgun;

(3) any officer, agent or employee of the District of Columbia or the Federal Government, or any officer, agent or employee of the government of any state or subdivision thereof, or any member of the armed forces of the United States, the National Guard or the Organized Reserves, when such officer, agent, employee or member is authorized to carry a rifle or shotgun, and who is carrying a rifle or shotgun while on duty in the performance of his official authorized functions;

(4) any person between the ages of 15 and 18 years of age uses a rifle or shotgun as authorized by Art. 55, sec. 8(b) of these Regulations.

(b) Notwithstanding any provision of this Article, it shall be lawful in the District for a seller to sell a rifle or shotgun to a nonresident of the District who is a citizen of the United States and who does not have a license issued under this Article; **Provided,** that such nonresident purchaser possesses and exhibits to the seller a valid license or permit for the purchase, possession or use a rifle or shotgun issued to him by the United States government or by any state or subdivision thereof.

(c) Any rifle or shotgun being carried shall, except when lawful use is imminent, be unloaded and securely wrapped or encased in a closed container.

## ARTICLE 53: REGULATING THE
## SALE OF FIREARM AMMUNITION

**Section 1.** No person shall within the District sell or otherwise transfer ammunition for a firearm to another unless

(a) The sale or transfer is made in a face-to-face transaction;

(b) The purchaser exhibits at the time of the sale or transfer a valid certificate of registration issued under these regulations;

(c) The ammunition sold or transferred is of the same caliber or gauge as the firearm described in the certificate of registration and suitable for use therein;

(d) The purchaser signs a receipt for the ammunition, which receipt shall be maintained by the seller for six months.

**Sec. 2.** No person shall within the District of Columbia purchase or possess ammunition for a firearm unless he is the holder of a valid certificate of registration issued under the regulations; and unless the ammunition is of the same gauge or caliber as the firearm described in the certificate of registration issued to such person.

**Sec. 3.** For purposes of Secs. 1 and 2 above, a valid firearm registration certificate issued by the United States or any state or subdivision thereof shall be sufficient to authorize ammunition sales to and purchases by persons who are not residents of the District.

**Sec. 4.** This Article shall not apply to sales or transfers to government agencies, duly appointed law enforcement officers, or persons duly licensed as dealers of weapons under Section 10 of the Act (D. C. Code, sec. 22-3210).

**Sec. 5.** This Article shall not apply to bona fide collectors of ammunition who are purchasing ammunition for their collections. Any such collector may obtain an ammunition collector's certificate from the Chief of Police, upon proof, submission of a statement, verified by the Chief, that he is, in fact, a bona fide collector. This certificate shall be exhibited to the seller whenever the collector purchases ammunition for his collection. The seller shall keep records of all ammunition sales to collectors for six months.

## ARTICLE 54: REGULATING AND LICENSING
## DEALERS IN DANGEROUS WEAPONS

**Section 1.** (a) No person shall within the District engage in the business of selling, or manufacturing, or repairing any pistol,

rifle, shotgun, or ammunition without first obtaining a license as provided in sec. 2 of this Article.

(b) The Commissioner may grant licenses, effective for not more than one year from date of issue, permitting the licensee to sell, or to manufacture, or to repair pistols, rifles, shotguns or ammunition. Whenever any such licensee breaches any condition upon which his license was issued or violates any provision of these Regulations or of any provision of section 7 of the Act (D. C. Code, sec. 22–3207), which is applicable to any such licensee or any applicable regulation made pursuant to such Act, the license shall be suspended or revoked and the licensee shall be subject to punishment as provided in these Regulations.

(c) The Commissioner is authorized and empowered to fix, and from time to time increase or decrease, fees for any services rendered under this Article. The Commissioner shall increase, decrease, or fix fees in such amount as will in the judgment of the Commissioner approximate the cost to the District of administering this Article.

**Sec. 2.** (a) The Chief of Police shall within 30 days of receipt of an application issue a license to deal in firearms to any person who is not ineligible to purchase a pistol, rifle or shotgun under these Regulations and who has not previously violated any of the conditions set forth in Art. 54, secs. 5 and 6 of these Regulations.

(b) Each application for a license to deal in firearms or ammunition shall be in the form prescribed by the Chief of Police; and shall be signed by the Chief of Police; and shall be signed by the applicant and shall contain—

    (1) the full name of the applicant;

    (2) the home address of the applicant;

    (3) the address of the establishment to be licensed and the principal place of business of the applicant;

    (4) and such other information as may be required by the Chief of Police.

**Sec. 3.** A license to deal in firearms or ammunition may be revoked or suspended by the Chief of Police when he has reason to believe the licensee—

(a) ceases to qualify for a license under Sec. 2 (a) of this Article; or

(b) fails to comply with any of the conditions imposed by Art. 54, secs. 5 and 6; **Provided,** that the Chief of Police shall first issue and serve upon the licensee, an order to show cause why his license should not be revoked. The licensee may request in writing a hearing before the Chief within 5 days, and the Chief shall grant such hearing within 15 days. If the licensee does not request a hearing or show proper cause why his license should

not be revoked the Chief of Police shall issue and serve upon the licensee an order revoking the license and no license issued under this Article shall be in effect beyond the date of an order revoking such a license.

**Sec. 4.** (a) Any dealer within the District who transports or delivers firearms to another dealer in the District shall, before delivery of the firearm, furnish to the Chief of Police an invoice listing his name, his home and business addresses, his license number, the name and address of the dealer to whom such firearms are to be delivered, the place of origin of the shipment, the quantity of firearms transported, and the serial number of each firearm in the shipment.

(b) If such shipment is by common carrier, a copy of the invoice shall be delivered to the common carrier. No common carrier shall knowingly deliver a shipment of firearms to a dealer within the District without having received a copy of such invoice. The Copy of the invoice shall be left with the dealer at the time of delivery.

(c) If such shipment is by other than common carrier, the copy of the invoice shall be furnished to the dealer at the time of delivery.

**Sec. 5.** (a) No person licensed under this Article shall sell a pistol, rifle, shotgun, or ammunition to any person whom he knows or has reasonable cause to believe is ineligible to own a pistol, rifle or shotgun under Section 7 of the Act (D. C. Code, Sec. 22–3207) or Article 52, Sec. 5 (c) of these Regulations.

(b) Each licensed dealer shall keep at his place of business a true record in book form of all pistols, rifles, and shotguns in his possession or under his control which he has acquired to sell or offer for sale, and shall, upon demand exhibit such record book to any policeman or law enforcement officer exercising his official duty. Each licensed dealer must enter upon such record book for each pistol, rifle, and shotgun in his possession the information required for pistols by section 10 of the Act (D. C. Code, sec. 22–3210 (4), and the name and address of the purchaser when such items are sold.

(c) Each licensed dealer shall submit a periodic report to the Chief of Police on all sales of ammunition. The Chief of Police shall fix the times when such reports are due, and he may establish such other procedures under this subsection as he deems necessary. Such periodic reports shall contain—

(1) the name and address of each purchaser of ammunition during that period;

(2) the number on the registration certificate issued under Article 2 of these Regulations which exhibited by the purchaser; and

(3) the quantity and description of the ammunition sold to each purchaser during the period.

(d) Each licensed dealer shall otherwise conform to all provisions of the Act, and nothing contained in these Regulations shall be construed to excuse noncompliance with any provision of the Act.

**Sec. 6.** (a) No licensed dealer shall display any pistol, rifle or shotgun, or ammunition in windows visible from a street or sidewalk. All pistols, rifles and shotguns and ammunition shall be kept in a securely locked place at all times except those firearms or ammunition being shown to a customer, repaired or otherwise worked on.

(b) No licensed dealer shall knowingly permit any person in his establishment to display, sell or repair any pistol, rifle, shotgun or ammunition if such person would not be qualified for a licensed to carry a pistol issued under Section 6 of the Act (D. C. Code, Sec. 22–3206) or if such person has not received from the Chief of Police approval to display, sell or repair any pistol, rifle, shotgun or ammunition in said establishment, **Provided,** that this subsection shall not apply to any relative of the licensed dealer who is eighteen years old or older, if otherwise qualified under Section 6 of the Act (D. C. Code, Sec. 22–3206).

**Sec. 7.** Beginning one year after the effective date of these Regulations, no retail dealer licensed under this Article shall sell or offer for sale in the District any pistol, rifle or shotgun, which does not have imbedded into the metal portion of such pistol, rifle or shotgun a unique manufacturer's identification number or serial number unless the retail dealer shall have imbedded into the metal portion of such pistol, rifle or shotgun a unique dealer's identification number.

**Sec. 8.** (a) No pawnbroker in the District shall sell or offer for sale any firearm or ammunition, or loan money secured by mortgage, deposit or pledge of any firearm or ammunition without obtaining a license under this Article.

(b) No licensed dealer shall take or receive any firearm by way of mortgage, pledge or pawn without also taking and retaining during the term of such pledge or pawn, the registration certificate of the firearm mortgaged, pledged or pawned. If such firearm is not redeemed, the dealer shall return the registration certificate to the Chief of Police and register the firearm in his own name.

## ARTICLE 55.  MISCELLANEOUS PROVISIONS

**Section 1.** (a) It shall be unlawful for any person purchasing any pistol, rifle, shotgun or ammunition, or applying for any certificate of registration or license under these Regulations, or in giving any information pursuant to the requirements of these Regulations, to give false information or offer false evidence of his identity.

(b) It shall be unlawful for anyone to forge or alter any application, registration certificate, temporary evidence of registration, or license submitted, retained or issued under these Regulations.

(c) It shall be unlawful for any person within the District to change, alter, remove, or obliterate the name of the maker, model, manufacturer's identification number, serial number, or other mark of identification on any pistol, rifle or shotgun; **Provided,** that nothing contained in this section shall apply to any officer or agent of any department or agency of the United States or the District Government who is engaged in research or experimental work.

(d) It shall be unlawful for any person within the District to own, possess, sell, offer for sale, purchase or offer to purchase any destructive device, or military type weapon including weapons known as hand grenades, cannons, anti-tank guns and bazookas; **Provided,** that this section shall not apply to any agency or department of the District of Columbia or Federal Government or to any person licensed or authorized by the Federal Government to own, possess, sell or purchase such weapons.

**Sec. 2.** (a) If any person within the District voluntarily delivers and abandons to the Metropolitan Police Department any pistol or rifle or shotgun during an amnesty period which the Chief of Police is hereby authorized to proclaim at regular intervals, the voluntary delivery of such weapon shall preclude the arrest and prosecution of such person on a charge of violating any provisions of these Regulations with respect to the weapon voluntarily delivered. A voluntary delivery of any pistol or rifle or shotgun shall be made to any police precinct and such weapon shall be securely wrapped and unloaded.

(b) Any person within the District may summon a police officer to his residence or place of business for the purpose of voluntarily delivering to a police officer a pistol or rifle or shotgun which shall be securely wrapped and unloaded.

**Sec. 3.** Notwithstanding any provision of Art. 52 or Art. 54 of these Regulations, an application to transfer a pistol or a rifle or shotgun license shall not be required for the transfer of a pistol, rifle or shotgun upon the death of an owner thereof to his heir

or legatee whether the transfer be by testamentary bequest or by the laws of intestacy; **Provided,** that the heir or legatee shall be subject to all other provisions of these Regulations; and **Provided,** that if the heir or legatee does not qualify to possess or carry the pistol, rifle or shotgun under these Regulations, he may possess the same for the purposes of sale for a period not to exceed 60 days.

**Sec. 4.** (a) When an application for a registration certificate under Art. 51 or a license under Art. 52 or Art. 54 of these Regulations is denied, or when the Chief of Police fails to act on any such application within 30 days of its receipt, or when such registration certificate or license is revoked as provided for these Regulations, the aggrieved party may within five days appeal in writing to the Commissioner, and the Commissioner shall schedule a hearing before him within 15 days after the appeal has been made. Any ruling from such hearing and any order of the Commissioner denying an application for a dealer license made pursuant to Art. 55 of these Regulations shall be subject to appropriate judicial review.

(b) The Commissioner is authorized to make orders to carry out the purposes of these Regulations, including without limitation orders prescribing the form, content, and requirements respecting the number of copies of reports, applications, or certificates required under or authorized by these Regulations and for recording and identifying each firearm owned, possessed or under the custody or control of a person; providing for the keeping and disposition of records by persons selling, purchasing, manufacturing, repairing, or delivering firearms and ammunition covered by these Regulations and further regulating the conduct of the business required to be licensed under these Regulations.

(c) The Commissioner may prohibit the sales of ammunition when he determines that the design, construction or material composition of such ammunition makes it unsuitable or unsafe for any lawful use.

**Sec. 5.** Whenever any firearm, ammunition or destructive device is found within the District in an automobile, boat or other vehicle, or in any dwelling unit, business establishment or other structure or building, it shall be prima facie evidence that such firearm, ammunition or destructive device is in the possession of the occupants of the vehicle, structure or building; or, if the vehicle, structure or building is unoccupied, it shall be prima facie evidence of possession by the registered owner in the case of a vehicle, or by the last known occupants or owner in the case of a vehicle, or by the last known occupants or owner in the case of a structure or building.

152E51          POLICE REGULATIONS          Art. 55, Sec. 10

**Sec. 6.** Except for transfers to licensed dealers, no person shall loan or otherwise allow another person to possess, carry or use any firearm unless such firearm is being loaned for a legitimate purpose, and for a period not to exceed 30 days; and unless—

"(a) the person to whom the firearm is loaned possesses a valid license for such firearm issued to him pursuant to section 6 of the Act (D. C. Code, Sec. 22-3206) or to Art. 52 of these Regulations; or

(b) such person to whom the firearm is loaned is at least fifteen years of age, does not possess a valid license because of his age, and is a member or student of an organization or school which teaches firearm safety and use. Where such circumstances exist, it shall be lawful to loan a rifle or shotgun to such person for instruction, military or military type drill, or legitimate recreational activity; **Provided,** that the use of the rifle or shotgun is immediately supervised by a person licensed pursuant to Art. 52 of these Regulations; and **Provided,** the rifle or shotgun is registered to the organization, school, parent or guardian of the user; and **Further Provided,** that the rifle or shotgun is surrendered immediately following its use to the organization, school, or parent or guardian of the user."

**Sec. 7.** (a) Except as provided in the immediately preceding section, no person shall within the District keep any firearm or ammunition for, or intentionally make any firearm or ammunition available to any person who would not qualify under these Regulations for a License for such firearm.

(b) No person shall hold a firearm or loan any money on a firearm as security for the payment or repayment of any debut or pledge, except as otherwise provided for in Art. 55, sec. 8 of these Regulations.

**Sec. 8.** No person shall within the District sell or otherwise transfer a firearm or ammunition to a purchaser who is under the influence of alcohol or a narcotic or dangerous drug. No person shall within the District carry or use any firearm while under the influence of alcohol or a narcotic or dangerous drug.

**Sec. 9.** "The Chief of Police is hereby authorized to issue and promulgate such other orders, rules and regulations as he deems necessary to carry out the purposes of the Act and these Regulations."

**Sec. 10.** (a) "Applications required by these Regulations for registration or licensing of firearms possessed, purchased or acquired by, or delivered to, persons within the District prior to the effective date of these regulations must be submitted within 120 days after that date. No such person shall be deemed in default under the registration provisions of these regulations if his application to register is submitted within that time. Nor shall

any such person be deemed in default under the licensing provisions of these regulations while his application for a license, submitted within that time, is still pending.

(b) The registration and licensing requirements established by these regulations shall be immediately effective, from the effective date of these Regulations, for firearms purchased or acquired by, or delivered to, persons within the District after that date."

**Sec. 11.** Any person who violates any provision of these Regulations shall, upon conviction be fined not more than $300, or be imprisoned for not more than ten days; **Except** that any dealer who violates any provision of Article 55 of these Regulations shall upon conviction be fined not more than $300 or be imprisoned for not more than ninety days; and **Provided,** that the penalties prescribed herein for violating these Regulations shall not supersede but shall supplement all statutes, other regulations, or municipal actions of the District of Columbia or the United States under which similar conduct is prohibited and penalties for engaging therein are prescribed.

**Sec. 12.** Any provision of any Regulation of the District inconsistent with any provision of these Regulations is hereby repealed.

**Sec. 13.** If any provision of these Regulations or the application thereof to any person or circumstance is held invalid, the remainder of these Regulations and the application of such provision to other persons not similarly situated or to other circumstances shall not be affected thereby.

**Sec. 14.** "These Regulations shall become effective on February 15, 1969; provided that the Chief of Police may accept applications for registration of firearms immediately upon adoption of these Regulations." (C.O. 68-500 and C.O. 69-39a)

# 6


24 DCMR 2303 and 2304

(1974)

## 2303   APPLICATION REQUIREMENTS FOR LICENSES FOR CONCEALED WEAPONS

2303.1   The residence requirements for a license to carry a concealed weapon shall be as follows:

    (a)   Applicant shall have a bona fide residence or place of business in the District of Columbia; or

    (b)   If the applicant does not have a bona fide residence or place of business in the District of Columbia, the applicant shall have a bona fide residence or place of business within the United States, and a license to carry a pistol concealed upon his or her person issued by the lawful authorities of that State or sub-division of the United States.

2303.2   No applicant shall be a person prohibited from possessing a pistol under D.C. Code §§22-3201 through §22-3217 (1981).

2303.3   Applicant shall be of sound mind. The Chief of Police or his or her designated agent may presume an applicant is not of sound mind if any of the following conditions are present:

    (a)   Applicant was previously determined by a court or administrative agency to be of unsound mind;

    (b)   Applicant was found not guilty of a crime by reason of insanity;

    (c)   Applicant was ever civilly committed to a mental institution, whether that commitment was voluntary or involuntary;

    (d)   Applicant received treatment for a mental disorder on a regular basis;

    (e)   A reliable witness or witnesses supplies the Chief of Police a written, notarized statement that the applicant is of unsound mind; or

    (f)   Observation by police officials indicate that the applicant is not mentally competent. In this instance, at least two (2) officials of the rank of Sergeant or above shall state in writing their conclusion and facts supporting their conclusion that the applicant is mentally incompetent.

2303.4   The Chief of Police or his or her designated agent may disregard the impediments of §§2303.3 (a), (b), (c) or (d) if five (5) years have elapsed since the last recorded treatment or judicial determination of mental incompetence.

2303.5   To rebut a presumption that the applicant is of unsound mind, an applicant may offer the notarized report of a registered psychologist or psychiatrist that the psychologist or psychiatrist has examined the applicant within six (6) months prior to submitting the statement and found the applicant to be of sound mind.

2303.6   The Chief of Police or his or her designated agent may require the applicant to submit to psychiatric testing by a psychiatrist or psychologist selected by the Chief of Police at the expense of the Metropolitan Police Department.

2303.7   No applicant shall ever have been convicted in the District of Columbia or elsewhere of a felony or shall ever have been convicted of violation of any of the following:

    (a)   D.C. Code §§22-3201 through 22-3217 (1981); or

(b)    A weapons offense in any jurisdiction.

2303.8    No applicant shall be any of the following:

    (a)    Under indictment for a felony or facing criminal misdemeanor charges involving wrongful use of a firearm in any jurisdiction;

    (b)    Charged in any competent court in any jurisdiction of a felony at the time his or her application is pending;

    (c)    A fugitive from justice or have previously been convicted of a firearm violation in any jurisdiction; or

    (d)    An alcoholic, or a user of illegal narcotic or hallucinogens.

2303.9    Applicant shall comply with the following requirements:

    (a)    Be over twenty-one (21) years of age;

    (b)    Be free from physical defects which would impair his or her safe use of the weapon, such as paralysis of hand or arm, poor vision, or lack of coordination due to age;

    (c)    Have reason to fear injury to his or her person or property or any other proper reason;

    (d)    Be properly trained and experienced in the use, functioning, and safe operation of the pistol; and

    (e)    Present a certificate from a certified firing range stating that the applicant has satisfactorily completed a course of supervised training approved by the Chief of Police with the weapon from which the license is requested and is fully familiar with the use and servicing of the weapon.

2303.10    Applicant shall test fire his or her weapon at the standard police course under Metropolitan Police Department supervision to demonstrate his or her ability to shoot accurately and safely. An additional fee of twenty dollars ($20) shall be required for this service. However, this test and fee shall not be required for license renewals.

2303.11    For the purposes of satisfying the specifications of §2303.9(c), applicant shall allege serious threats of death or serious bodily harm to his or her person or theft or destruction of property in writing, under oath. The applicant shall also allege that the threats are of a nature that the legal possession of a pistol would provide adequate protection.

2303.12    The Chief of Police or his or her designated agent shall conduct and investigation into the allegations of the applicant to determine if the alleged threats are serious and factual and are of a nature that can be protected by carrying a pistol. Factors to be considered include the substance of the alleged threat, whether or not the applicant made a timely report to the police of such threats, and whether or not the applicant has made a sworn complaint to the police in the courts of the District of Columbia.

2303.13    The Chief of Police or his or her designated agent shall find that normal police protection, a commission as a Special Police Officer pursuant to D.C. Code §4-114 (1981), or at the discretion of the Chief of Police, special police protection is insufficient to protect the applicant from the alleged threat to his or her person or property.

2303.14   An example of "any other proper reason" used to satisfy the requirements of §2303.9(c) may include an application by a parent, son, daughter, sibling or other adult member of the immediate family of the person for the protection of the other person who is physically or mentally incapacitated to a point where he or she cannot act in defense of himself or herself, or his or her property.

2303.15   "Any other proper reason" shall not include the carrying of a pistol to or from the place of purchase of the weapon, or to or from the place of target practice, sporting or recreational activity.

SOURCE: Final Rulemaking published at 21 DCR 413 (September 3, 1974).

## 2304   LICENSES FOR CONCEALED WEAPONS

2304.1   A license granted for concealed weapons shall be valid for one (1) month from the date of issuance.

2304.2   A license may be renewed at the end of one (1) month upon a written showing of continue d need for the license. Applicants who fail to apply for a renewed license before the expiration date, shall be required to pay the application fee for re-application.

2304.3   Only one (1) weapon shall be carried pursuant to a license. The description and serial number of the weapon shall be part of the license. A new license shall be required for each different weapon carried.

2304.4   At the time of the initial interview with the Chief of Police or his or her designated agent, applicant shall bring the pistol which he or she will carry pursuant to the license and the holster or holsters in which the weapon will be carried.

2304.5   Applicant shall surrender possession of the weapon and holster to the Metropolitan Police Department for a check to determine whether the weapon was reported stolen, to verify that the weapon is safe, in good operating condition, and to obtain test fired ballistics specimens for future comparison if the weapon is fired and to ensure that the holster(s) meets minimum standards for safe carrying of the weapon.

2304.6   If the weapon is reported stolen, the weapon shall not be returned to the applicant until it is properly processed through the Metropolitan Police Department Property Division and a determination of the rightful owner is made.

2304.7   If the pistol is found not to be in good operating condition, the pistol shall be returned to the applicant. No license shall be issued for a pistol which is not in the rightful possession of the applicant or which is not in good operating condition.

2304.8   The pistol for which the license is applied shall be a five (5) or six (6) shot revolver of no greater than a thirty-eight (.38) calibre. Automatic or semi-automatic pistols shall not be approved.

2304.9   Ammunition for the weapon may be no greater in size than a one hundred fifty-eight (158) grain round nose lead bullet and have a velocity of no greater than eight hundred feet (800 ft.) per second. Each weapon shall be carried in a holster approved by the Chief of Police or his or her designated agent.

2304.10   Any intentional false statement made on an application can be grounds for criminal charges for making a false report to the police under this chapter.

2304.11   Any information contained on the application for a license to carry a pistol shall be available to any law enforcement agency for law enforcement purposes. Otherwise, the information contained on the application for a license to carry a pistol shall be considered confidential and shall not be released without the written permission of the applicant.

2304.12   An applicant shall identify all known medical and mental records and sign written release for the Chief of Police or his or her designated agent to obtain the records. These records shall be used only for determining eligibility to be licensed to carry a pistol and for no other purpose.

2304.13   This section shall apply to all applicants for a license to carry a pistol and all renewals of licenses currently possessed.

**JA 204**

2304.14   Each licensee shall submit a report to the Chief of Police each time he or she fires his or her weapon. The report shall state the complete details of the shooting of the weapon.

2304.15   An applicant shall register the pistol for which the license will apply.

2304.16   A license to carry a weapon shall be required whether the weapon is to be carried openly or on or about the person in a concealed manner.

2304.17   Applicants shall first be personally interviewed by the Chief of Police or his or her designated agent at which time applicant shall be fingerprinted and photographed and shall obtain an application form.

2304.18   Applications shall be made in writing only on the forms provided by the Chief of Police or his or her designated agent for that purpose.

2304.19   Applicants shall submit to the Chief of Police or his or her designated agent the following:

    (a)       A completed application; and

    (b)       The required fee of two dollars ($2) which is non-refundable.

2304.20   Upon receipt of a duly filed application, the Chief of Police or his or her designated agent shall, within thirty (30) days, do the following:

    (a)       Determine whether the application shall be approved;

    (b)       Determine whether the application shall be denied;

    (c)       Determine whether the applicant shall submit further information including further personal interviews or medical information, if necessary; and

    (d)       Notify the applicant in writing that his or her application has been approved or disapproved.

2304.21   Upon notification that his or her application has been approved, the Chief of Police, or his or her designated agent shall, within ten (10) days, issue the applicant a license to carry a pistol.

2304.22   An issued license may be revoked for any reason which would act as a bar to an original application for a license. In addition, a license may be revoked for misuse of the weapon. Misuse includes, but is not limited to the following:

    (a)       Firing warning shots; and

    (b)       Playing or "clowning" with the weapon.

2304.23   Revocation shall be in writing and shall be served in the same manner a civil process in the D.C. Superior Court.

2304.24   If the Chief of Police or his or her designated agent has not sent notice to the applicant that the application has been approved within thirty (30) days of the date of application, the application shall be presumed to be denied.

2304.25   Application forms shall include a written release of medical records necessary for a determination that the applicant is a suitable person to be licensed to carry a pistol.

    SOURCE: Final Rulemaking published at 21 DCR 413, 417 (September 3, 1974).

**JA 205**

# # 7

Testimony:

Chief of Police, MPD

U.S. Secret Service

U.S. Capitol Police

**Government of the District of Columbia**



**Metropolitan Police Department**

Testimony of
# Cathy L. Lanier
# Chief of Police

# *License to Carry a Pistol*
# *Amendment Act of 2014*

Committee on the Judiciary & Public Safety
## Tommy Wells, Chair
Council of the District of Columbia
October 16, 2014

John A. Wilson Building
1350 Pennsylvania Avenue, NW
Washington, DC 20004

Good morning, Councilmember Wells, members of the Committee, and guests. As the Chief of Police, I am testifying on behalf of the Executive in support of the *License to Carry a Pistol Amendment Act of 2014*. As you know, the Executive has worked closely with Chairman Mendelson and you to draft this legislation in response to the ruling by the U.S. District Court in the case of *Palmer v. District of Columbia*. The *Palmer* ruling, which may be subject to revision after further consideration by the district court or in an appeal, is the first in the District finding that a person's Second Amendment right to keep and bear arms for self-defense must extend beyond the home. The judge's ruling in the case – that there is a constitutional right to carry a handgun in public for self-defense – goes beyond the 2008 Supreme Court ruling in *Heller v. District of Columbia*, which ruled that there is a constitutional right to have a handgun for self-defense specifically in the home. The proposed bill maintains our commitment to keeping guns out of the wrong hands, while fully respecting the Second Amendment of the U.S. Constitution.

Since the ruling was made public on July 26, 2014, the Executive has worked closely with Chairman Mendelson and Councilmember Wells on emergency and the proposed permanent legislation amending the District's laws to conform to the Court's ruling. The legislation determines the essential guidelines about who can carry a handgun and where, by adapting a 1931 law enacted by Congress that authorized the Chief of Police to issue a license to carry a concealed pistol if it appears that the applicant has demonstrated:

- Good reason to fear injury to his or her person, including evidence of specific threats or previous attacks;
- Any other proper reason for carrying a pistol, such as employment that requires the applicant to transport cash or other valuables upon the applicants person; and
- That the applicant is a suitable person to be so licensed.

The proposed legislation follows models of states such as New York, New Jersey, and Maryland, which have adopted a similar licensing scheme, each of which has had its state licensing scheme upheld against Constitutional challenges by a federal court of appeals.

Other highlights of the draft bill include that anyone applying for a concealed carry license must:

- Meet the existing requirements for a person to register a firearm;
- Successfully complete a training program on gun safety and relevant District laws; and
- Establish that he or she does not currently suffer nor has suffered in the previous five years from any mental illness or condition that creates a substantial risk that he or she is a danger to him or herself or others.

In response to the court ruling, the legislation also establishes that a non-resident may obtain a license to carry a concealed pistol if they meet the same standards as a District resident. So an applicant from outside the District must meet all other eligibility requirements, aside from residing in or owning a business in the District.

1

In addition to including criminal and civil penalties for license-holders who fail to follow the duties and requirements for licensees, the law establishes a 5-person panel to hear appeals for any denials or revocations of licenses. The panel will include a representative from the mental health profession, as well as a prosecutor and a current or former law enforcement officer not employed by MPD.

The proposed law would prohibit concealed carry licensees from carrying handguns in the types of places that firearms have been traditionally prohibited such as government buildings, premises where alcohol is sold and served, schools and universities, and in circumstances where protection of public officials, visiting dignitaries, and demonstrators is paramount. The latter is critical here in the District of Columbia. As the Supreme Court noted in *Heller*, "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" are constitutional.

As I have testified before, the District of Columbia, as the seat of the federal government, with its multitude of critical official and symbolic buildings, monuments, and events, and high-profile public officials traversing its streets every day, is a city filled with sensitive places from a public safety perspective. Our laws should reflect that reality. Government facilities, dignitaries, and public servants are prime targets for terrorists, both foreign and domestic. Protecting government officials and infrastructure is a challenge for every city in the United States. But in the District the likelihood of attack is higher, and the challenges to protecting the city are greater. As recently as 2011, we saw an assassination attempt on the president – where fortunately the only thing the shooter hit was the White House – and another shooter firing at military installations. Both of these incidents were carried out by a lone gunman, angry at one facet or another of the U.S. government.

The high-profile human targets are an obvious and potentially attractive target. The District is vulnerable due to the sheer volume of secure motorcades traveling in Washington on any given day. The daily movements around the city of the President, Vice President, and their families, and the approximately 3,000 foreign dignitaries on official visits or just spending time in our city each year means that all of our roadways are a challenge to secure. And as the September 19th incident earlier this year at the White House demonstrated, even the home and office of the President of the United States has some vulnerability. Law enforcement needs to be able to prohibit guns from entering the perimeter of a secure area in order to be able to lessen the likelihood that an armed gunman will be able to make it close to protected targets.

I would urge the Council to make three changes to the list of places from which handguns will be prohibited.

- First, although the proposed bill prohibits handguns from government buildings, it should be broadened to prohibit them from the grounds and parking lots. We note, for example, the fatal shooting at the Pennsylvania State Police barracks in Blooming Grove, and the 2006 fatal

2

shooting in the District suburb of Fairfax, Virginia[1]. In both instances, officers were gunned down in police parking lots during shift changes. While these two examples are of police, according to a 2013 study published by the U.S. Department of Justice, government employees are more than three times as likely as private-sector employees to be victims of workplace violence.[2] While prohibiting guns from being carried in the lots is not sufficient to stop a determined gunman, it does give police the authority to stop anyone in the parking lot or on the grounds that they have a reasonable suspicion is armed. This can help to save lives. Of course, people seeking to register a gun at the police headquarters can still bring their unloaded gun. Moreover, the provision in Section 907(d)(2) allows a firearm to be stored in compliance with lawful transportation requirements in relevant parking lots. This currently applies to subsections (a)(2) and (3), and can be expanded to cover (a)(1).

- Secondly, subsections 907(a)(8), (12), and (13) all indicate that guns can be prohibited from certain events or locations, but provide however, that no criminal penalty shall apply unless:

    A) The licensee has been advised by a law enforcement officer that such a public gathering, dignitary movement, or demonstration is occurring; and

    B) The licensee has been ordered by the law enforcement officer to leave the area until he or she removes the handgun from his or her possession in compliance with the law.

We have several concerns about these provisions. For one, the licensee should not need to be personally informed of the requirement. There are plenty of opportunities to provide due notice to a licensee, including event materials, signs at all entrances, advertisements, and tickets. It may be a reasonable defense that a licensee did not have due notice, but officers should not have to determine that fact on the spot before being able to take action against someone with a gun at an event open to the public. Moreover, event organizers should not have to rely on hiring police officers to notify attendees that firearms are prohibited. Imagine, for instance, how many officers would be needed at the Barbecue Battle—an annual competition held in the District among restaurants from around the country and dozens of entertainers from around the country—in order to ensure personal notice to licensees? If the fact that the event is a gun-free event is both posted and advertised, that should be sufficient for notice purposes. In addition, once so notified that firearms are prohibited, licensees are already required to know District law directing them to remove the handgun from the event. They should not therefore have another legal defense, to unnecessarily complicate prosecution, that they were not personally directed by law enforcement to remove the gun from the event.

---

[1] http://www.washingtonpost.com/wp-dyn/content/article/2006/05/08/AR2006050800968.html
[2] US Department of Justice, Bureau of Justice Statistics. *Special Report: Workplace Violence Against Government Employees, 1994-2011.*

**JA 210**

- Lastly, the bill would prohibit carrying a concealed handgun on all public transportation except for taxi drivers, who would be authorized to apply for a handgun. We urge the ban to extend to taxi cabs as well. Taxi drivers are no more likely to be subject to specific threats or previous attacks than any other resident. Indeed, one would think it would be more difficult for a person to stalk or ambush a taxi driver because of the randomness of their daily travel. On the other hand, a potential passenger should not have to worry about whether their taxi driver is armed. In New York City, neither taxi drivers nor passengers can carry a firearm. We think this is a better plan for public safety.

We urge the Council to consider these changes to the legislation.

In addition to the legislation, more detailed regulations will be appropriate to establish the process for getting a license to carry a handgun. In consult with District lawyers, the MPD is writing the regulations, based in part on our review of previous regulations in the District and on models from Maryland, New York, and New Jersey, whose licensing programs have already been found to be constitutional by their respective federal Courts of Appeal. To ensure that interested applicants can apply, most of the emergency regulations will be issued no later than October 22nd. Emergency regulations on obtaining certification to provide training will be issued by Monday so that potential trainers can apply for certification. To help ensure that training is available for licensees, any trainer who is already certified to provide firearm training for special police officers -- who are essentially the highest level of private building security -- will only need to provide training curriculum for initial certification.

This concludes my prepared remarks. At this time, I will be happy to address any of your questions.

4



U.S. Department of Homeland Security
## UNITED STATES SECRET SERVICE
*Washington, D.C. 20223*

DEPUTY
DIRECTOR

November 14, 2014

The Honorable Tommy Wells
Chairman
Committee on Judiciary and Public Safety
1350 Pennsylvania Ave. NW, Suite 109
Washington, DC 20004

Dear Chairman Wells:

I am writing to highlight the United States Secret Service's perspective on the proposed "License to Carry a Pistol Amendment Act of 2014," which is currently under your committee's consideration. Given the Secret Service's unique protective mission responsibilities in the District of Columbia, we are highly interested in this proposal and have reviewed the draft permanent legislation. I appreciate the opportunity to provide you with both our overall perspective on the bill and suggestions for your consideration.

While the Secret Service's protective operations occur around the world, given that the President, First Family, Vice President, foreign leaders, and other protectees reside, visit and work here, we maintain a particularly high level of protection-related activities within the District pursuant to our duties under 18 U.S.C. §§ 3056 and 3056A. Beyond our permanent operations at the White House, Vice President's Residence, and around the numerous foreign missions located in the District, the Secret Service often secures venues around the District and transports the President and other protectees throughout it.

As a result of these responsibilities, the Secret Service supports the D.C. Council's efforts to clearly define the circumstances surrounding an individual's ability to carry a concealed weapon within the District. Based on our review of the draft legislation, we suggest your consideration of two important items specific to our protective mission:

- Similar to the specific reference to the prohibition of carrying a concealed weapon in the area around the White House Complex, we suggest a specific reference to a 50 foot area beyond the perimeter fence surrounding the U.S. Naval Observatory and the grounds where the Vice President's Residence is located.

- In its current form, the legislation establishes a 1,000 feet zone around dignitaries and other high ranking officials (where handguns would remain prohibited) when they are moving under the protection of the Metropolitan Police Department

**JA 212**

The Honorable Tommy Wells
Page 2

(MPD). We suggest eliminating the requirement that a protectee in these instances must be "moving" so that the 1,000 feet zone may also include situations when a protectee has arrived at his or her intended destination or has temporarily stopped en route to that destination. Further, because the movements of Secret Service protectees within the District may not involve MPD assistance, we suggest clarifying that this provision also applies to protectees of other agencies with arrest authority in the District, such as the Secret Service Uniformed Division.

Again, I thank you for your willingness to consider our perspective on this piece of legislation. I would like to highlight that the Secret Service's mission success is directly tied to the unwavering support of our partners at the local, state and Federal levels. In particular, we greatly appreciate the MPD and the strong partnership we maintain with it. If you require any additional information from the Secret Service as you consider this bill, I encourage you to contact me.

Respectfully,

A.T. Smith

cc: The Honorable Phil Mendelson, Chairman,
     Council of the District of Columbia



PHONE: 202-224-9806

# UNITED STATES CAPITOL POLICE
OFFICE OF THE CHIEF
119 D STREET, NE
WASHINGTON, DC 20510-7218

October 15, 2014

Phil Mendelson, Chairman
Council of the District of Columbia
John A. Wilson Building
1350 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Pmendelson@dccouncil.us

Councilmember Tommy Wells, Chairperson
Committee on the Judiciary & Public Safety
Council of the District of Columbia
John A. Wilson Building
1350 Pennsylvania Ave., N.W.
Washington, D.C. 20004
twells@dccouncil.us

Subject: D.C. Bill 20-930, *License to Carry Pistol Amendment Act of 2014*

Dear Chairman Mendelson and Chairperson Wells:

Thank you for the opportunity to comment on D.C. Bill 20-930, the "License to Carry Pistol Amendment Act of 2014." It is my understanding that a hearing will take place on Thursday, October 16, 2014, on this bill and that you have invited comment on the bill that will be made part of the official record provided it is submitted no later than Thursday, October 30, 2014. I respectfully request that my comments on behalf of the U.S. Capitol Police be made part of the official record on this important bill.

As a daily partner with the Metropolitan Police Department and as a federal law enforcement entity fulfilling its statutory duties, Bill 20-930 directly impacts our law enforcement duties and responsibilities in maintaining security and safety within the District of Columbia. Therefore, the U.S. Capitol Police submitted comments to the draft legislation through MPD which do not currently appear in the legislation before the Committee and the D.C. Council and which we would like to have included in the permanent bill.

To highlight our comments, which are few in number, the U.S. Capitol Police requests that Capitol Buildings and Grounds be specifically listed as areas where firearms may not be possessed, concealed or not. As you are aware, federal law and D.C. law prohibit firearms within Capitol Buildings and Grounds. See 40 U.S.C. § 5104(e) and D.C. Code 10-503.16(a). Therefore, I respectfully request that new Title IX, Licenses to Carry a Pistol, Section 907(a) be further amended by the language in red to read as follows:

> *(10) The public memorials on the National Mall and along the Tidal Basin, and any other area where firearms are prohibited under federal law or by a federal agency or entity, including U.S. Capitol Buildings and Grounds;*

...

*(12) Within 1,000 feet, or other lesser distance designated by the Chief, his or her designee, or the Chief of the U.S. Capitol Police, when a dignitary or high ranking official of the United States or a state, local, or foreign government is moving under the protection of the MPD or the U.S. Capitol Police, or other law enforcement agency assisting or working in concert with MPD; provided that no criminal penalty shall apply unless:*

...

*(13) Within 1,000 feet, or other lesser distance designated by the Chief or his or her designee, of a demonstration in a public place, other than federal property, provided no criminal penalty shall apply unless:*

...

Given the statutory responsibilities of the U.S. Capitol Police and federal statutes prohibiting firearms on federal property, as well as the specific Capitol Buildings and Grounds prohibitions enumerated in federal and D.C. statutes, these edits are essential to effective law enforcement within the District of Columbia.

I sincerely appreciate your solicitation of comments and acceptance of U.S. Capitol Police comments into the official record. I look forward to working with you and the Metropolitan Police Department in enforcing the governing laws and maintaining our cooperative relationships. Thank you for your long record of leadership for public safety.

Thank you again for your consideration as you move forward with this important legislation.

Very respectfully,

Kim C. Dine
Chief of Police

Cc:   Chief Cathy L. Lanier
      Metropolitan Police Department

      Nicole Goines, Administrative Clerk
      Committee on the Judiciary and Public Safety
      Council of the District of Columbia
      ngoines@dccouncil.us

# 8

X

Sunday, November 16 2014



UTC Aerospace Systems' Aces 5™ Ejection Seat  **PROTECTING AMERICA'S ACES.**

United Technologies   Carrier | Otis | Pratt & Whitney | Sikorsky | UTC Aerospace Systems   LEARN MORE

Ad

**Wonkblog**

# More guns, more crime: New research debunks a central thesis of the gun rights movement

💬 176

**By Christopher Ingraham** November 14

Follow @_cingraham

Making the world safer, or less safe? (Flickr user Robert Nelson / CC)

"More guns, less crime" - surely you've heard this mantra before? There's even an entire book devoted to it. As Emily Badger noted awhile back, it has become a staple of our national gun control debate: "The idea that more guns lead to less crime appears on gun policy 'fact sheets,' as evidence debunking gun control 'myths,' in congressional committee reports."

**The Most** Popular

All Over

The notion stems from a paper published in 1997 by economists John Lott and David Mustard, who looked at county-level crime data from 1977 to 1992 and concluded that "allowing citizens to carry concealed weapons deters violent crimes and it appears to produce no increase in accidental deaths." Of course, the study of gun crime has advanced significantly since then (no thanks to Congress). Some researchers have gone so far as to call Lott and Mustard's original study "completely discredited."

One of the major critiques of the study came from the National Research Council, which in 2004 extended the data through the year 2000 and ultimately concluded that "with the current evidence it is not possible to determine that there is a causal link between the passage of right-to-carry laws and crime rates." Or in other words, "More guns, less crime? ¯\_(ツ)_/¯"

Now, Stanford law professor John Donohue and his colleagues have added another full decade to the analysis, extending it through 2010, and have concluded that the *opposite* of Lott and Mustard's original conclusion is true: more guns equal *more* crime.

"The totality of the evidence based on educated judgments about the best statistical models suggests that right-to-carry laws are associated with substantially higher rates" of aggravated assault, robbery, rape and murder, Donohue said in an interview with the Stanford Report. The

ST. LOUIS POST-DISPATCH
Mizzou wins with offensive explosion   X

THE BALTIMORE SUN
Agents question North Carolina man discovered with missing...

FAST COMPANY
How To Make New Friends As An Adult

**Our Online Games**
Play right from this page

**Spider Solitaire**
**Genre(s):** Card
Spider Solitaire is known as the king of all solitaire games!

**52 card pickup**
**Genre(s):** Card
Pick up cards as fast as you can!

**Tri-Peaks Solitaire**
**Genre(s):** Card
Reveal cards as you clear your way to the top!

**Carniball**
**Genre(s):** Arcade
This amusement park classic will bring back some joyous memories

evidence suggests that right-to-carry laws are associated with an 8 percent increase in the incidence of aggravated assault, according to Donohue. He says this number is likely a floor, and that some statistical methods show an increase of 33 percent in aggravated assaults involving a firearm after the passage of right-to-carry laws.

These findings build on and strengthen the conclusions of Donohue's earlier research, which only used data through 2006. In addition to having nearly two decades' worth of additional data to work with, Donohue's findings also improve upon Lott and Mustard's research by using a variety of different statistical models, as well as controlling for a number of confounding factors, like the crack epidemic of the early 1990s.

These new findings are strong. But there's rarely such a thing as a slam-dunk in social science research. Donohue notes that "different statistical models can yield different estimated effects, and our ability to ascertain the best model is imperfect." Teasing out cause from effect in social science research is often a fraught proposition.

But for this very reason it's important for policymakers on both sides of the gun control debate to exercise caution in interpreting the findings of any one study. Gun rights advocates have undoubtedly placed too much stock in Lott and Mustard's original study, which is now going on 20 years old. The best policy is often

X

informed by good research. And as researchers revisit their data and assumptions, it makes sense for policymakers to do the same.

X

Christopher Ingraham writes about politics, drug policy and all things data. He previously worked at the Brookings Institution and the Pew Research Center.

# 9

Stanford Report, November 14, 2014

# Right-to-carry gun laws linked to increase in violent crime, Stanford research shows

*Stanford research reaffirms that right-to-carry gun laws are connected with an increase in violent crime. This debunks – with the latest empirical evidence – earlier claims that more guns actually lead to less crime.*

By Clifton B. Parker

New Stanford research confirms that right-to-carry gun laws are linked to an increase in violent crime.

Right-to-carry or concealed-carry laws have generated much debate in the past two decades – do they make society safer or more dangerous?

While there is no federal law on concealed-carry permits, all 50 states have passed laws allowing citizens to carry certain concealed firearms in public, either without a permit or after obtaining a permit from local government or law enforcement.



Vartanov Anatoly/Shutterstock

Research co-authored by law Professor John Donohoe finds that right-to-carry gun laws are linked to an increase in violent crime.

Recently published scholarship updates the empirical evidence on this issue. Stanford law Professor John J. Donohue III, Stanford law student Abhay Aneja and doctoral student Alexandria Zhang from Johns Hopkins University were the co-authors of the study.

"Trying to estimate the impact of right-to-carry laws has been a vexing task over the last two decades," said Donohue, the C. Wendell and Edith M. Carlsmith Professor of Law, in an interview.

He explained that prior research based on data through 1992 indicated that the laws decreased violent crime. But in 2004, he noted, the National Research Council issued a report that found that even extending this data through 2000 revealed no credible statistical evidence these particular laws reduced crime.

### 'Totality of the evidence'

Now, Donohue and his colleagues have shown that extending the data yet another decade (1999-2010) provides the most convincing evidence to date that right-to-carry laws are associated with an increase in violent crime.

Case 1:15-cv-02234-RJL    Document 19-1    Filed 01/15/16    Page 108 of 332

"The totality of the evidence based on educated judgments about the best statistical models suggests that right-to-carry laws are associated with substantially higher rates" of aggravated assault, rape, robbery and murder, said Donohue.

The strongest evidence was for aggravated assault, with data suggesting that right-to-carry (RTC) laws increase this crime by an estimated 8 percent – and this may actually be understated, according to the researchers.

"Our analysis of the year-by-year impact of RTC laws also suggests that RTC laws increase aggravated assaults," they wrote.

The evidence is less strong on rape and robbery, Donohue noted. The data from 1979 to 2010 provide evidence that the laws are associated with an increase in rape and robbery.

The murder rate increased in the states with existing right-to-carry laws for the period 1999-2010 when the "confounding influence" of the crack cocaine epidemic is controlled for. The study found that homicides increased in eight states that adopted right-to-carry laws during 1999-2010.

### Research obstacles, next step

"Different statistical models can yield different estimated effects, and our ability to ascertain the best model is imperfect," Donohue said, describing this as the most surprising aspect of the study.

He said that many scholars struggle with the issue of methodology in researching the effects of right-to-carry laws. But overall, his study benefits from the recent data.

Donohue suggested it is worth exploring other methodological approaches as well. "Sensitive results and anomalies – such as the occasional estimates that right-to-carry laws lead to higher rates of property crime – have plagued this inquiry for over a decade," he said.

### Media Contact

John J. Donohue III, Stanford Law School: (650) 721-6339, donohue@law.stanford.edu

Clifton B. Parker, Stanford News Service: (650) 725-0224, cbparker@stanford.edu

---

© Stanford University. All Rights Reserved. Stanford, CA 94305. (650) 723-2300.

**JA 223**

# 10

# SPECIAL ARTICLE

## EFFECTS OF RESTRICTIVE LICENSING OF HANDGUNS ON HOMICIDE AND SUICIDE IN THE DISTRICT OF COLUMBIA

Colin Loftin, Ph.D., David McDowall, Ph.D., Brian Wiersema, and Talbert J. Cottey, M.S.

**Abstract** *Background.* Whether restricting access to handguns will reduce firearm-related homicides and suicides is currently a matter of intense debate. In 1976 the District of Columbia adopted a law that banned the purchase, sale, transfer, or possession of handguns by civilians. We evaluated the effect of implementing this law on the frequency of homicides and suicides.

*Methods.* Homicides and suicides committed from 1968 through 1987 were classified according to place of occurrence (within the District of Columbia or in adjacent metropolitan areas where the law did not apply), cause (homicide or suicide), mechanism of death (firearms or other means), and time of occurrence (before or after the implementation of the law). The number of suicides and homicides was calculated for each month during the study period, and differences between the mean monthly totals before and after the law went into effect were estimated.

*Results.* In Washington, D.C., the adoption of the gun-licensing law coincided with an abrupt decline in homi-

cides by firearms (a reduction of 3.3 per month, or 25 percent) and suicides by firearms (reduction, 0.6 per month, or 23 percent). No similar reductions were observed in the number of homicides or suicides committed by other means, nor were there similar reductions in the adjacent metropolitan areas in Maryland and Virginia. There were also no increases in homicides or suicides by other methods, as would be expected if equally lethal means were substituted for handguns.

*Conclusions.* Restrictive licensing of handguns was associated with a prompt decline in homicides and suicides by firearms in the District of Columbia. No such decline was observed for homicides or suicides in which guns were not used, and no decline was seen in adjacent metropolitan areas where restrictive licensing did not apply. Our data suggest that restrictions on access to guns in the District of Columbia prevented an average of 47 deaths each year after the law was implemented. (N Engl J Med 1991;325:1615-20.)

B Y any measure, firearms — especially handguns — are a leading instrument of violent injury. In 1987, firearms accounted for 32,919 fatalities in the United States: 18,144 suicides, 12,665 homicides, and 2110 unintentional fatalities, legal interventions (killings by law-enforcement officials), or deaths of undetermined type.[1] Sixty percent of all homicides and suicides during this year were committed with guns,[1] and handguns accounted for three fourths of the homicides by firearms.[2]

A central question in research on the prevention of gun-related mortality is whether restricting access to handguns would reduce deaths by firearms.[3] One approach to the issue is to examine patterns of mortality associated with changes in local, state, or national regulations. In 1976 the District of Columbia adopted one of the most restrictive handgun policies in the nation. The law prohibited the purchase, sale, transfer, and possession of handguns by civilians in Washington, D.C., unless a citizen already owned the handgun and had registered it under an existing system.[4] We conducted an interrupted time-series study to determine whether the implementation of the law reduced gun-related homicides and suicides.

### METHODS

#### The Law

The District of Columbia's Firearms Control Regulations Act was signed by the mayor on July 23, 1976, and went into effect on September 24, 1976. A restraining order issued on December 9, 1976, interrupted its enforcement for 49 days, but the Appeals Court

From the Violence Research Group, Institute of Criminal Justice and Criminology, University of Maryland at College Park, 2220 Lefrak Hall, College Park, MD 20742-8235, where reprint requests should be addressed to Dr. Loftin.

of the District of Columbia reinstated the law, and its provisions became fully effective again on February 21, 1977.[5]

The law restricts the possession of firearms to persons who hold registration certificates. Persons who owned firearms at the time the law was implemented and who had registered them under the provisions of the 1968 code were given 60 days to reregister them. After the initial reregistration period, handguns became "unregisterable" and therefore illegal. Newly acquired rifles and shotguns can be registered if they are obtained in person from a licensed dealer in the district and if the owner meets specified requirements relating to age, criminal record, physical fitness, and knowledge of firearms laws and safe use. Finally, the law requires that registrants keep firearms unloaded and disassembled or locked up except while they are being used for lawful recreational purposes or when they are kept at a place of business. The penalty originally specified for violation of the law was 10 days in jail and a $300 fine. It was increased to one year in jail and a $1,000 fine in March 1981.

### Study Design

We undertook a longitudinal study, comparing the mean monthly numbers of gun-related homicides and suicides in the District of Columbia before the law was implemented with the numbers after its implementation. Comparisons with other areas and other types of deaths were used to determine whether the observed differences were specific to the District of Columbia. For comparison we used suicides and homicides committed in the district without firearms, homicides and suicides committed with firearms in adjacent metropolitan areas in Maryland and Virginia, and homicides and suicides committed without firearms in the adjacent metropolitan areas.

### Definition and Classification of Cases

Monthly totals of homicides and suicides in the District of Columbia and suburban Maryland and Virginia during the period 1968 through 1987 (the last year for which data were available) were obtained from tapes produced by the National Center for Health Statistics (NCHS).[1] The cases were classified according to place of occurrence (within the District of Columbia or in an adjacent metropolitan area), cause of death (homicide or suicide), mode

The New England Journal of Medicine
Downloaded from nejm.org at GEORGE MASON UNIVERSITY on February 12, 2012. For personal use only. No other uses without permission.
Copyright © 1991 Massachusetts Medical Society. All rights reserved.

Table 1. Mean Numbers of Homicides and Suicides per Month, According to Jurisdiction and Method, before and after the Implementation of the District of Columbia Law.

| TYPE OF FATALITY AND LOCATION | BEFORE THE LAW | CHANGE AFTER THE LAW* | | | t-STATISTIC |
|---|---|---|---|---|---|
| | no./mo | no./mo | SE | % | |
| **Homicide** | | | | | |
| District of Columbia | | | | | |
| Gun-related | 13.0 | −3.3 | 0.49 | −25 | −6.73 |
| Non-gun-related | 7.3 | −0.3 | 0.36 | −4 | −0.83 |
| Maryland and Virginia | | | | | |
| Gun-related | 5.8 | −0.4 | 0.35 | −7 | −1.14 |
| Non-gun-related | 3.0 | 0.7 | 0.26 | 23 | 2.69 |
| **Suicide** | | | | | |
| District of Columbia | | | | | |
| Gun-related | 2.6 | −0.6 | 0.20 | −23 | −3.00 |
| Non-gun-related | 4.4 | −0.4 | 0.29 | −9 | −1.38 |
| Maryland and Virginia | | | | | |
| Gun-related | 9.2 | 1.1 | 0.45 | 12 | 2.44 |
| Non-gun-related | 9.9 | −0.2 | 0.49 | −2 | −0.41 |

*Difference between the mean number of fatalities per month before the implementation of the gun-licensing law and the mean number after its implementation.

of death (firearms or other means), and month of occurrence. The adjacent metropolitan areas were the parts of the Washington, D.C.–Maryland–Virginia Standard Metropolitan Statistical Area (SMSA) as constituted in 1967,[6] exclusive of the District of Columbia. Specifically, this area included the cities of Alexandria, Fairfax, and Falls Church, Virginia; Arlington, Fairfax, Loudoun, and Prince William counties in Virginia; and Montgomery and Prince George's counties in Maryland.

The cause and mechanism of death in each case were classified according to the codes in the *International Classification of Diseases, 8th Revision* (ICD-8) and *International Classification of Diseases, 9th Revision, Clinical Modification* (ICD-9-CM).[7,8] Four groups were defined: homicide by firearms (codes E965 in ICD-8 and E965.0 through

E965.4 in ICD-9-CM); homicide by other means (E960 through E964 and E966 through E969 in ICD-8, and E960 through E964 and E965.5 through E969 in ICD-9-CM); suicide by firearms (E955 in ICD-8 and E955.0 through E955.4 in ICD-9-CM); and suicide by other means (E950 through E954 and E956 through E959 in ICD-8, and E950 through E954 and E955.5 through E959 in ICD-9-CM). Unintentional deaths (E922) and deaths caused by firearms in which the intent was unknown (E980 through E989) were excluded because the monthly frequencies were too low for meaningful analysis. A further refinement that would have classified deaths as caused by specific types of firearms, such as handguns, was not possible because the ICD-8 codes did not distinguish handguns from other firearms. In all, eight separate 240-month time series (105 months before the implementation of the law and 135 months thereafter) were analyzed. The first month after the law went into effect was October 1976.

As a check against possible effects of changes in the population, we conducted a similar analysis using annual mortality rates. For the District of Columbia, which is treated as a state for reporting purposes, annual population estimates from 1968 through 1987 for five age groups (<5, 5 through 19, 20 through 44, 45 through 64, and ≥65 years) were taken from NCHS vital-statistics records.[9] For the adjacent metropolitan areas, population estimates according to age were not available, but total population estimates for 1968 through 1987 were obtained from the Census Bureau's *Current Population Reports* (the values for 1969, 1978, and 1979 were interpolated, because county-level estimates were not generated by the Census Bureau for those years).[10,11] For the District of Columbia, age-standardized rates were calculated by the direct method, with the population of the district enumerated in the 1970 census as the standard.[12] Crude rates were calculated for the surrounding metropolitan areas. The first year after the law was implemented that is included in the annual analysis is 1977.

## Statistical Analysis

Statistical inferences were based on two approaches. First, the observations were assumed to be independently sampled from the populations in the District of Columbia before and after the im-



Figure 1. Number of Homicides by Firearms per Month in Washington, D.C.
The horizontal lines show the means before and after the implementation of the gun-licensing law, indicated by the vertical line.

The New England Journal of Medicine
Downloaded from nejm.org at GEORGE MASON UNIVERSITY on February 27, 2012. For personal use only. No other uses without permission.
Copyright © 1991 Massachusetts Medical Society. All rights reserved.



Figure 2. Number of Suicides by Firearms per Month in Washington, D.C.
The horizontal lines show the means before and after the implementation of the gun-licensing law, indicated by the vertical line.

plementation of the law. According to this model, the difference between the mean monthly rates of fatalities is an estimate of the magnitude of the intervention (i.e., the effect of the law), and the statistical significance of the differences can be assessed with the usual t-test.[13] Second, because observations in time series are often not independent (that is, they are serially correlated), we also applied Box and Tiao's methods[14] for intervention analysis. Box–Tiao methods are based on the autoregressive, integrated, moving-average time-series models proposed by Box and Jenkins.[15] Following a strategy recommended by Box and Jenkins, we used the data to identify and estimate appropriate models for within-series correlation. Components representing the effect of the intervention (the law) were then added. For each series, we considered models in which change was abrupt and permanent, gradual and permanent, or abrupt and temporary.[16] All these analyses were conducted with use of algorithms in the SCA Statistical System software.[17]

For the analysis of the data on monthly frequency, serial correlation was minimal; therefore, the simple t-test statistics are presented. For some of the annual mortality rates, there was evidence of a relatively strong serial correlation among the observations. For these series, statistical inferences are based on the more complex Box–Tiao models. Details about the Box–Tiao estimates are available elsewhere.* All P values are two-tailed.

## Results

In the District of Columbia, the mean frequency of both suicides and homicides by firearms declined by about one quarter in the period after the law went into effect (Table 1). Gun-related homicides, with a mean

of 13.0 per month before the law was implemented, declined to a mean of 9.7 per month thereafter (Fig. 1). Similarly, suicides in which guns were used declined from a mean of 2.6 per month to 2.0 per month (Fig. 2). When we used both a sampling model that assumed independent observations (Table 1) and one that assumed serial dependence of observations,* these differences between the means before and after the law went into effect were statistically significant ($P<0.001$ for homicides and $P = 0.005$ for suicides). Accordingly, the data are consistent with a model in which there was a decrease in the number of deaths by firearms after the law was implemented.

In contrast, none of the comparison time series showed declines of similar magnitude during the same period. Non-gun-related homicides (Fig. 3) and non-gun-related suicides (Fig. 4) in the District of Columbia declined only slightly (by 0.3 per month, or 4 percent, for homicides, and by 0.4 per month, or 9 percent, for suicides). Neither of these differences was statistically significant.

The adjacent areas in Maryland and Virginia, which were not subject to the change in gun regulations, did not have declines in gun-related homicides and suicides similar to those observed in the District of Columbia. The mean for gun-related homicides in these adjacent areas after the District of Columbia law was implemented was lower by 0.4 homicide per month (a decline of 7 percent), but the rate of suicides in which guns were used was higher by 1.1 per month (an increase of 12 percent). Neither difference represents a statistically significant decline.

*See NAPS document no. 04909 for four pages of supplementary material. Order from NAPS c/o Microfiche Publications, P.O. Box 3513, Grand Central Station, New York, NY 10163-3513. Remit in advance (in U.S. funds only) $7.75 for photocopies or $5 for microfiche. Outside the U.S. and Canada add postage of $4.50 ($1.75 for microfiche postage). There is a $15 invoicing charge on all orders filled before payment.

Downloaded from nejm.org at GEORGE MASON UNIVERSITY on February 27, 2012. For personal use only. No other uses without permission.
Copyright © 1991 Massachusetts Medical Society. All rights reserved.

1618                                    THE NEW ENGLAND JOURNAL OF MEDICINE                                    Dec. 5, 1991



Figure 3. Number of Homicides by Means Other than Firearms per Month in Washington, D.C.
The horizontal lines show the means before and after the implementation of the gun-licensing law, indicated by the vertical line.

The series of cases in Maryland and Virginia provide additional evidence that the decline in fatalities was specific to suicides and homicides by firearms in the District of Columbia. Homicides committed with other weapons in Maryland and Virginia increased by 23 percent, or 0.7 homicide per month, whereas the frequency of suicides by other methods changed very little: there was a decrease of 0.2 suicide per month, or 2 percent.

The analysis of annual mortality rates gave results similar in general pattern to those of the analysis of the monthly data. The Box–Tiao estimates are available elsewhere.* In the District of Columbia the rates of both homicides and suicides by firearms declined in the period after the law went into effect ($P < 0.001$ and $P = 0.085$, respectively); at the same time, the rate of homicides committed by other means increased ($P = 0.082$) and that of suicides by other means did not change ($P = 0.653$). In the surrounding metropolitan area there were no significant changes in the annual mortality rates.

In summary, there was an abrupt decline in both suicides and homicides by firearms that coincided with the implementation of the restrictive licensing law. The reductions were specific to fatalities involving guns in the District of Columbia. No similar reduction was observed in homicides or suicides committed without guns, nor were there reductions in the adjacent areas of Maryland and Virginia, where the provisions of the law were not in effect.

## DISCUSSION

The strongest argument for attributing the reductions in homicides and suicides by firearms in the District of Columbia to the restrictive licensing law is the relative implausibility of alternative explanations. Earlier studies of the District of Columbia law, which were published a few years after the law was implemented,[18,19] were limited by a paucity of data and by the investigators' failure to compare deaths by firearms and deaths by other means. These studies demonstrated declines in violent crime but did not successfully show that the declines were limited to the District of Columbia or to violence involving guns. Accordingly, critics noted that the declines were probably due to confounding demographic trends or to unrelated criminal-justice policies.[20,21]

In the light of our study, alternative explanations appear implausible. The pattern of change in mortality rates that would be predicted from the effects of the gun law is specific and is unlikely to be simulated by coincidental changes in demographic, economic, cultural, or social factors. For example, economic factors might alter the homicide rate or the suicide rate, but it is unlikely that they would affect only deaths involving guns and that the changes would be limited to the

---

*See NAPS document no. 04909 for four pages of supplementary material. Order from NAPS c/o Microfiche Publications, P.O. Box 3513, Grand Central Station, New York, NY 10163-3513. Remit in advance (in U.S. funds only) $7.75 for photocopies or $5 for microfiche. Outside the U.S. and Canada add postage of $4.50 ($1.75 for microfiche postage). There is a $15 invoicing charge on all orders filled before payment.

The New England Journal of Medicine
Downloaded from nejm.org at GEORGE MASON UNIVERSITY on February 27, 2012. For personal use only. No other uses without permission.
Copyright © 1991 Massachusetts Medical Society. All rights reserved.



Figure 4. Number of Suicides by Means Other than Firearms per Month in Washington, D.C.
The horizontal lines show the means before and after the implementation of the gun-licensing law, indicated by the vertical line.

District of Columbia. Similarly, improvements in the medical treatment of gunshot wounds since the Vietnam War or marked changes in the activities of the drug underworld might have reduced gun-related fatalities, but the expected pattern of changes would not be those that we observed. Improved medical treatment would be available in both the city and the suburbs, and changes in the drug underworld would not influence both homicides and suicides. Furthermore, the analysis of mortality rates indicates that the declines in homicides and suicides by firearms were not due to changes in characteristics of the resident population. The population estimates are, of course, subject to error, and complex changes in high-risk groups are also possible. Nevertheless, the population at risk was the same for both gun-related and non-gun-related mortality. Therefore, the differences between the rate of mortality by firearms and that of mortality due to other causes cannot be attributed to a failure to study the appropriate population.

The best explanation for the District of Columbia data is the weapon-choice theory developed by Zimring,[22] Cook,[23] and others.[24,25] According to this view, assaults, whether against others or self-directed, vary with respect to intent to kill. Some are characterized by a sustained, single-minded determination, whereas in others the intention is more episodic and ambivalently motivated. If the resolve is weak or short-lived, the relative frequency with which a particular type of weapon is used will be influenced by its availability.[23] The key element in the theory is that

firearms are more likely to cause death than are other weapons that are likely to be substituted. It follows that even if there is no change in the number of assaults or suicide attempts, a reduction in the availability of guns will result in a reduction in the number of deaths. The theory recognizes that people with more deadly intent may tend to select guns rather than other means, but it assumes that the association is less than perfect. Some people select guns because they are determined to kill, but others do so only because a gun is readily available.

The observations in the District of Columbia fit the predictions of the Zimring–Cook theory well. Especially interesting is the fact that in the District of Columbia there were no compensating increases in homicides or suicides by methods other than guns, as has been suggested in other studies.[26,27] The effects of the law were apparently truly preventive, in the sense that there was an overall reduction in the number of deaths. There may have been an increase in nonlethal injuries from weapons other than guns, but surveillance data on nonfatal injuries are not available.

The most surprising feature of the District of Columbia experience is the magnitude and suddenness of the effect. Observers expected the gun-licensing law to have limited or gradual effects because it "grandfathered" previously registered handguns and did not directly remove existing guns from their owners. In addition, observers argued that social conditions, including high levels of criminal violence and fear of victimization, were not affected and that there would

The New England Journal of Medicine
Downloaded from nejm.org at GEORGE MASON UNIVERSITY on February 27, 2012. For personal use only. No other uses without permission.
Copyright © 1991 Massachusetts Medical Society. All rights reserved.

thus continue to be a high level of demand for illegal guns that could easily be supplied from neighboring jurisdictions.[23,28] In spite of these limitations, the law reduced gun-related suicides and homicides substantially and abruptly. Because people voluntarily disposed of guns or altered their patterns of storage and use, or because it was more difficult to obtain a new gun, the District of Columbia had about 47 fewer gun deaths each year after the restrictive licensing law was implemented.

The facts that the frequency of gun-related homicides remained high in the District of Columbia after the gun law went into effect and that there have been dramatic increases in homicides very recently are not incompatible with the argument that the restrictive licensing law had a preventive effect on homicides. The number of homicides is determined by many factors other than legal restrictions on access to guns. Since the economic and social conditions in the district are similar to those associated with high rates of homicide in other cities, it is not surprising that the frequency of homicide remained high in the District of Columbia or that in the district, as in many other cities in the late 1980s, there were dramatic increases in homicides attributable to the spread of "crack" cocaine.[23,29,30] It is reasonable to assume that the restrictions on access to guns in the district continued to exert a preventive effect even as homicide rates were driven up by conflict over drugs and other factors.

The data from the District of Columbia provide strong evidence that restrictive licensing of handguns reduced gun-related homicides and suicides, but they have limited usefulness in generalizing to other jurisdictions or to other policies designed to limit access to handguns. Comparative studies of other gun-licensing laws would provide information on which to base wider generalizations and increase our understanding of the factors that influence the preventive effect of licensing laws.

## REFERENCES

1. Department of Health and Human Services, National Center for Health Statistics. Mortality detail files, 1968 to 1987. Ann Arbor, Mich.: Interuniversity Consortium for Political and Social Research [distributor], 1990 (computer files).
2. Federal Bureau of Investigation. Crime in the United States, 1987. Washington, D.C.: Federal Bureau of Investigation, 1988.
3. Mercy JA, Houk VN. Firearm injuries: a call for science. N Engl J Med 1988;319:1283-5.
4. District of Columbia Firearms Control Regulations Act (D.C. Law 1-85), D.C. Code Ann. §6-2301, et seq. (1990). Charlottesville, Va.: Michie, 1990.
5. Wentworth E. Strict gun control law revived by Court of Appeals. Washington Post. February 5, 1977:B1.
6. Bureau of the Budget. Standard metropolitan statistical areas. Washington, D.C.: Government Printing Office, 1967.
7. National Center for Health Statistics. International classification of diseases, adapted for use in the United States. 8th rev. Washington, D.C.: Government Printing Office, 1967. (PHS publication no. 1693.)
8. Department of Health and Human Services. ICD-9-CM: international classification of diseases, clinical modification. 3rd ed., 9th rev. Vol. 1. Washington, D.C.: Government Printing Office, 1989. (DHHS publication no. (PHS) 89-1260.)
9. National Center for Health Statistics. Vital statistics of the United States. Vol. 2. Mortality, part A. 1968 to 1987. Washington, D.C.: Government Printing Office, 1972–1990.
10. Bureau of the Census. Current population reports 1968 to 1974. Series P-25. Nos. 432, 517, 537, 629, 688, 694. Washington, D.C.: Government Printing Office, 1969–1977.
11. Idem. Current population reports 1974 to 1987. Series P-26. Nos. 75-46, 76-20, 76-46, 77-20, 77-46, 78-20, 78-46, 85-MD-C, 85-VA-C, 88-B. Washington, D.C.: Government Printing Office, 1976–1990.
12. Idem. Census of the population, 1970, characteristics of the population, District of Columbia. Vol. 1. Part 10. Washington, D.C.: Government Printing Office, 1973.
13. Cochran WG. Planning and analysis of observational studies. New York: John Wiley, 1983.
14. Box GEP, Tiao GC. Intervention analysis with applications to economic and environmental problems. J Am Stat Assoc 1975;70:70-9.
15. Box GEP, Jenkins GM. Time-series analysis: forecasting and control. Rev. ed. San Francisco: Holden-Day, 1976.
16. McDowall D, McCleary R, Meidinger EE, Hay RA. Interrupted time series analysis. Beverly Hills, Calif.: Sage, 1980.
17. Liu LM, Hudak GB, Box GEP, Muller ME, Tiao GC. The SCA statistical system: reference manual for forecasting and time series analysis. Version III for MSDOS. DeKalb, Ill.: Scientific Computing Associates, 1986 (computer software program).
18. Nicholson R, Garner A. The analysis of the Firearms Control Act of 1975: handgun control in the District of Columbia. Washington, D.C.: United States Conference of Mayors, 1980.
19. Jones ED III. The District of Columbia's "Firearms Control Regulations Act of 1975": the toughest handgun control law in the United States — or is it? Ann Am Acad Polit Soc Sci 1981;455:138-49.
20. Wright JD, Rossi PH, Daly K. Under the gun: weapons, crime, and violence in America. New York: Aldine, 1983.
21. Valentine PW. Study cites decline over last 3 years in handgun crime. Washington Post. June 29, 1980:B1.
22. Zimring F. Is gun control likely to reduce violent killings? U Chicago Law Rev 1968;35:721-37.
23. Cook PJ. The technology of personal violence. In: Tonry M, ed. Crime and justice: an annual review of research. Vol. 14. Chicago: University of Chicago Press, 1991:1-71.
24. Baker SP. Without guns, do people kill people? Am J Public Health 1985;75:587-8.
25. Sloan JH, Kellermann AL, Reay DT, et al. Handgun regulations, crime, assaults, and homicide: a tale of two cities. N Engl J Med 1988;319:1256-62.
26. Rich CL, Young JG, Fowler RC, Wagner J, Black NA. Gun suicide: possible effects of some specific legislation. Am J Psychiatry 1990;147:342-6.
27. Sloan JH, Rivara FP, Reay DT, Ferris JAJ, Kellermann AL. Firearm regulations and rates of suicide: a comparison of two metropolitan areas. N Engl J Med 1990;322:369-73.
28. Zimring FE. Firearms in the twenty-first century: alternative policy futures. Ann Am Acad Polit Soc Sci 1981;455:1-10.
29. Office of Criminal Justice Plans and Analysis, Statistical Analysis Center. Homicide in the District of Columbia. Washington, D.C.: Office of Criminal Justice Plans and Analysis, 1988.
30. Morin R. Demographic line between slain, slayer indistinguishable. Washington Post. January 1, 1989:A1.

The New England Journal of Medicine
Downloaded from nejm.org at GEORGE MASON UNIVERSITY on February 27, 2012. For personal use only. No other uses without permission.
Copyright © 1991 Massachusetts Medical Society. All rights reserved.

JA 230

# 12

## Legal Sufficiency



## OFFICE OF THE GENERAL COUNSEL
Council of the District of Columbia
1350 Pennsylvania Avenue NW, Suite 4
Washington, DC 20004
(202) 724-8026

## MEMORANDUM

| | |
|---|---|
| **TO:** | **Councilmember Tommy Wells** |
| **FROM:** | **V. David Zvenyach, General Counsel** |
| **DATE:** | **November 25, 2014** |
| **RE:** | **Legal sufficiency determination for Bill 20-930, the License to Carry a Pistol Amendment Act of 2014** |

Certified by V. David Zvenyach
General Counsel
Council of the District of Columbia

The measure is legally and technically sufficient for Council consideration.

Bill 20-930 amends the Firearm Control Regulations Act of 1975, effective September 24, 1976 (D.C. Law 1-85; D.C. Official Code § 7-2501.01 *et seq.*), to:

(1) Permit a person to register a firearm for self-defense in their home or place of business;[1]

(2) Provide Freedom of Information Act exceptions for records regarding individuals who have applied for, received, or had revoked a pistol registration or license to carry a concealed pistol.

(3) Establish application requirements for a license to carry a concealed pistol, including requirements for completion of a firearms training course and range training;

(4) Provide that a license to carry a concealed pistol shall expire 2 years after the date of issuance and set forth requirements for renewal of the license;

(5) Provide for summary revocation, suspension, and permanent revocation of a license to carry a concealed pistol;

(6) Prohibit the carrying of a concealed pistol while impaired;

---

[1] Under current law, a person may only register a firearm for use of self-defense in that person's home. *See* D.C. Official Code § 7-2502.02(a)(4)(C).

(7) Establish prohibitions on carrying a concealed pistol in specified locations, including District buildings, hospitals, penal institutions, public transportation vehicles and metro stations, and premises licensed as a tavern or nightclub, and in specified circumstances, including circumstances in which a property owner or religious place of worship has not expressly allowed the carrying of a concealed pistol; and

(8) Establish the Concealed Pistol Licensing Review Board to hear appeals from a denial of an application or renewal application to carry a concealed pistol, summary suspension of or restriction on the license to carry a concealed pistol, or permanent revocation of a license to carry a concealed pistol; and to

(9) Set forth penalties.

Bill 20-930 also makes conforming amendments.

I am available if you have any questions.

VDZ

The Council of the District of Columbia
1350 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

Dear Mayor-Elect Bowser, Chairman Mendelson and Council Members,

We represent the city's broad and diverse faith community. We believe and practice our faiths differently. However, we share the same values regarding peace, שָׁלוֹם (shalom), and سلام (salaam).

We come together to express our deep concern with the License to Carry a Pistol Amendment Act of 2014. The proposed legislation presumes that concealed pistols are permissible within houses of worship unless they post "conspicuous signage" prohibiting these pistols. This requirement is inappropriate and impractical in view of the overwhelming number of congregations that object to guns in their sacred spaces.

Moreover houses of worship are considered sanctuaries - places where people are safe from violence or the threat of violence. They are places for prayer, reflection, reconciliation, and solace. People should be able to do so without the fear of violence. They must be free to fulfill their spiritual needs at these holy places knowing they are indeed sanctuaries where peace is both sought and found.

The legislation prohibits pistols in numerous locations such as universities, schools, childcare facilities. We believe the legislation must also prohibit or presumptively prohibit pistols within houses of worship. Twelve other states---some with less restrictive gun laws---have similar prohibitions.

Accordingly we strongly urge you to revise the legislation to prohibit or presumptively prohibit pistols within our houses of worship.

Thank You.

cc:  Mayor Vincent Gray

Respectfully yours,

The Rt. Rev. Marianne Edgar Budde
Bishop
Episcopal Diocese of Washington

Rev. Patrick Walker
President
Baptist Convention of D.C. and Vicinity

Terrance Lynch
Executive Director
Downtown Cluster of Congregations

Monsignor John Enzler
President and CEO
Catholic Charities of the Archdiocese of Washington

Talib M. Shareef, CMSgt, USAF-Retired
Imam / President
The Nation's Mosque, Masjid Muhammad

Rev. Dr. James Coleman
Pastor
All Nations Baptist Church

The Very Rev. Gary R. Hall
Dean
Washington National Cathedral

Ronald Halber
Executive Director
Jewish Community Relations Council of Greater Washington

Rev. Susan Taylor
President
Founding Church of Scientology

Michael Scott
Director
D.C. Catholic Conference

**JA 234**

Dr. Stephanie E. Myers, National Co-Chair
National Co-Chair
Black Women for Positive Change

Rev. Mark Horak
Pastor
Holy Trinity Catholic Church

Patty Johnson
Canon Missioner
Washington National Cathedral

Rev. Dr. Barbara Reynolds
Chaplain
Black Women for Positive Change

Rev. David Bava
Pastor
Holy Redeemer Catholic Church

Rev. Rebecca Justice Schunior
Associate Rector
St. Mark's Episcopal Church, Capitol Hill

AN ACT

## D.C. ACT 20-621
_____

IN THE COUNCIL OF THE DISTRICT OF COLUMBIA

### FEBRUARY 6, 2015
_____

To amend the Firearms Control Regulations Act of 1975 to permit a person to register a firearm
for self-defense in his or her place of business, to provide a Freedom of Information Act
exception for pistol registration information, to specify application requirements for
applying for a license to carry a concealed pistol, to specify the duration of such licenses
and requirements for renewal of licenses, to establish duties of licensees, to provide for
revocation of licenses, to create a criminal offense of carrying while consuming alcohol
or while impaired, to specify prohibitions on licensees, to establish a Concealed Pistol
Licensing Review Board, to provide a Freedom of Information Act exception for license
information, to specify penalties for violations, and to require the Mayor to issue rules;
and to amend An Act To control the possession, sale, transfer, and use of pistols and
other dangerous weapons in the District of Columbia, to provide penalties, to prescribe
rules of evidence, and for other purposes to authorize the Chief of Police to issue licenses
to carry a concealed pistol to District residents and non-residents provided certain
conditions are met.

BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, That this
act may be cited as the "License to Carry a Pistol Amendment Act of 2014".

Sec. 2. The Firearms Control Regulations Act of 1975, effective September 24, 1976
(D.C. Law 1-85; D.C. Official Code § 7-2501.01 *et seq.*), is amended as follows:
(a) Section 201(b)(4) (D.C. Official Code § 7-2502.01(b)(4)) is amended by striking the
phrase "the home" and inserting the phrase "the home or place of business" in its place.
(b) Section 202(a)(4)(C) (D.C. Official Code § 7-2502.02(a)(4)(C)) is amended to read as
follows:
"(C) Any person who seeks to register a pistol:
"(i) For use in self-defense within that person's home or place of
business; or
"(ii) As part of the application process for a license to carry a
concealed pistol pursuant to section 902; or".
(c) Section 203(a)(4) (D.C. Official Code § 7-2502.03(a)(4)) is amended as follows:
(1) Subparagraph (D) is amended by striking the word "or" at the end.
(2) Subparagraph (E) is amended by adding the word "or" at the end.
(3) A new subparagraph (F) is added to read as follows:

"(F) Violation of section 503 of the Omnibus Public Safety and Justice Amendment Act of 2009, effective December 10, 2009 (D.C. Law 18-88; D.C. Official Code § 22-3133);".

(d) A new section 211a is added to read as follows:

"Sec. 211a. Freedom of information exception.

"Any record regarding a person who has applied for, received, or had revoked any registration issued pursuant to this title shall not be made available as a public record under section 202 of the Freedom of Information Act of 1976, effective March 25, 1977 (D.C. Law 1-96; D.C. Official Code § 2-532).".

(e) Section 706(a) (D.C. Official Code § 7-2507.06(a)) is amended by striking the phrase "Except as provided in sections 205, 208, 702, and 807" and inserting the phrase "Except as provided in sections 205, 208, 702, 807, and Title IX" in its place.

(f) A new Title IX is added to read as follows:

"TITLE IX – LICENSES TO CARRY A PISTOL.

"Sec. 901. Definitions.

"For the purposes of this title, the term:

"(1) "Child" means a person under 18 years of age.

"(2) "Concealed pistol" means a loaded or unloaded pistol carried on or about a person entirely hidden from view of the public, or carried on or about a person in a vehicle in such a way as it is entirely hidden from view of the public.

"(3) "Law enforcement officer" means a sworn member of the Metropolitan Police Department or of any other law enforcement agency operating and authorized to make arrests in the District of Columbia, and includes an MPD reserve officer, a special police officer appointed pursuant to section 202 of An Act Making appropriations to provide for the expenses of the government of the District of Columbia for the fiscal year ending June thirtieth, nineteen hundred, and for other purposes, approved March 3, 1899 (30 Stat. 1057; D.C. Official Code § 5-129.02), and a campus and a university special police officer appointed pursuant to the College and University Campus Security Amendment Act of 1995, effective October 18, 1995 (D.C. Law 11-63; 6A DCMR § 1200 *et seq.*).

"(4) "License" means a license to carry a concealed pistol issued pursuant to section 6 of the Pistols and Other Dangerous Weapons Act.

"(5) "Licensee" means a person who has been issued a license pursuant to section 6 of the Pistols and Other Dangerous Weapons Act.

"(6) "MPD" means the Metropolitan Police Department.

"(7) "Section 6 of the Pistols and Other Dangerous Weapons Act" means section 6 of An Act To control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes, approved July 8, 1932 (47 Stat. 650; D.C. Official Code § 22-4506).

"Sec. 902. Application requirements.

"(a) A person who submits an application pursuant to section 6 of the Pistols and Other Dangerous Weapons Act shall certify and demonstrate to the satisfaction of the Chief that he or she:

2

"(1) Is at least 21 years of age;

"(2) Meets all of the requirements for a person registering a firearm pursuant to this act, and has obtained a registration certificate for the pistol that the person is applying to carry concealed;

"(3)(A) Does not currently suffer from a mental illness or condition that creates a substantial risk that he or she is a danger to himself or herself or others; or

(B) If he or she has suffered in the previous 5 years from a mental illness or condition that created a substantial risk that he or she was a danger to himself or herself or others, no longer suffers from a mental illness or condition that creates a substantial risk that he or she is a danger to himself or herself or others;

"(4) Has completed a firearms training course or combination of courses, conducted by an instructor (or instructors) certified by the Chief, which includes at least 16 hours of training, and covers the following:

"(A) Firearm safety;

"(B) Firearm nomenclature;

"(C) Basic principles of marksmanship;

"(D) Care, cleaning, maintenance, loading, unloading, and storage of

pistols;

"(E) Situational awareness, conflict management, and use of deadly force;

"(F) Selection of pistols and ammunition for defensive purposes; and

"(G) All applicable District and federal firearms laws, including the requirements of this act, An Act To control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes, approved July 8, 1932 (47 Stat. 650; D.C. Official Code § 22-4501 *et seq.*), and District law pertaining to self-defense;

"(5) Has completed at least 2 hours of range training, conducted by an instructor certified by the Chief, including shooting a qualification course of 50 rounds of ammunition from a maximum distance of 15 yards (45 feet); and

"(6) Has complied with any procedures the Chief may establish by rule.

"(b) An applicant shall satisfy the requirements of subsection (a)(4) and (a)(5) of this section with a certification from a firearms instructor that the applicant:

"(1) Demonstrated satisfactory completion of the requirements of subsection (a)(4) and (a)(5) of this section; and

"(2) Possesses the proper knowledge, skills, and attitude to carry a concealed pistol.

"(c) An applicant may be exempt from some or all of the requirements of subsection (a)(4) and (a)(5) of this section if the applicant has submitted evidence that he or she has received firearms training in the United States military or has otherwise completed firearms training conducted by a firearms instructor that, as determined by the Chief, is equal to or greater than that required under subsection (a)(4) and (a)(5) of this section.

"(d) An applicant for a license may satisfy any component of the requirements of subsection (a)(4) and (a)(5) of this section by demonstrating to the satisfaction of the Chief that

the applicant has met that particular component as part of a successful application to carry a concealed pistol issued by the lawful authorities of any state or subdivision of the United States.

"(e)(1) An applicant shall sign an oath or affirmation attesting to the truth of all the information required by section 6 of the Pistols and Other Dangerous Weapons Act and this section.

"(2) Any declaration, certificate, verification, or statement made for purposes of an application for a license to carry a concealed pistol pursuant to this act shall be made under penalty of perjury pursuant to section 401 of the District of Columbia Theft and White Collar Crimes Act of 1982, effective December 1, 1982 (D.C. Law 4-164; D.C. Official Code § 22-2402).

"(f) An applicant is required to appear for an in-person interview at the MPD headquarters for purposes including verification of the applicant's identity and verification of the information submitted as part of the application process for a license.

"(g) Any person whose application has been denied may, within 15 days after the date of the notice of denial, appeal to the Concealed Pistol Licensing Review Board established pursuant to section 908.

"Sec. 903. Expiration and renewal of licenses.

"(a) A license shall expire no later than 2 years after the date of issuance unless revoked by the Chief or renewed pursuant to this title.

"(b)(1) A license shall be eligible for renewal if:

"(A) The licensee continues to meet the requirements of section 6 of the Pistols and Other Dangerous Weapons Act and section 902, except that:

"(i) With regard to section 902(a)(4), only 4 hours of such training shall be required for renewal; and

"(ii) With regard to section 902(a)(5), the licensee shall provide proof of 2 hours of range practice within the previous 12 months; and

"(B) The licensee follows any procedures the Chief may establish by rule.

"(2) Timely renewal shall be the responsibility of the licensee, pursuant to any procedures the Chief may establish by rule.

"(c) Any person whose renewal application has been denied may, within 15 days after the date of the notice of denial, appeal to the Concealed Pistol Licensing Review Board established pursuant to section 908.

"Sec. 904. Duties of licensees.

"(a) A licensee shall comply with all limits and conditions of the license.

"(b) A licensee shall notify the Chief in writing:

"(1) Immediately upon discovery of the loss, theft, or destruction of the license and include the circumstances of the loss, theft, or destruction, if known; and

"(2) Within 30 days after a change in the licensee's name or address as it appears on the license.

"(c) A licensee shall have on or about his or her person each time the pistol is carried in the District:

"(1) The license; and

4

**JA 239**

"(2) The registration certificate for the pistol being carried, issued pursuant to this act.

"(d) If a law enforcement officer initiates an investigative stop of a licensee carrying a concealed pistol pursuant to section 6 of the Pistols and Other Dangerous Weapons Act, the licensee, and any other licensee carrying a concealed pistol pursuant to section 6 of the Pistols and Other Dangerous Weapons Act who is with the stopped licensee at the time of the investigative stop, shall:

"(1) Disclose to the officer that he or she is carrying a concealed pistol;

"(2) Present the license and registration certificate;

"(3) Identify the location of the concealed pistol; and

"(4) Comply with all lawful orders and directions from the officer, including allowing a pat down of his or her person and permitting the law enforcement officer to take possession of the pistol for so long as is necessary for the safety of the officer or the public.

"(e) The duties set forth in this section are in addition to any other requirements imposed by this act or applicable law.

"(f) In addition to any other penalty provided by law, a person who violates this section shall be subject to revocation of his or her license.

"Sec. 905. Revocation and suspension of licenses.

"(a)(1) The Chief may limit or revoke a license upon a finding that the licensee no longer meets the requirements of section 6 of the Pistols and Other Dangerous Weapons Act and this title, or as a penalty as specified in this act.

"(2) The United States Attorney for the District of Columbia, the Attorney General for the District of Columbia, or any person may apply to the MPD at any time for limitation or revocation of a license.

"(3) Any person having knowledge that a licensee no longer meets the requirements of this act or the requirements of section 6 of the Pistols and Other Dangerous Weapons Act may so notify the Chief or any other law enforcement officer who may take such action as may be appropriate.

"(4) Before a limitation or revocation taking effect, the Chief shall serve a notice of intent to limit or revoke the license. The limitation or revocation shall take effect unless the licensee requests an appeal to the Concealed Pistol Licensing Review Board established pursuant to section 908 no later than 15 days after the date of the notice of intent.

"(b)(1) The Chief may summarily suspend or limit, without a hearing, a license, when the Chief has determined that the conduct of a licensee presents an imminent danger to the health and safety of a person or the public.

"(2) At the time of the summary suspension or limitation of a license, the Chief shall provide the licensee with written notice stating the action that is being taken, the basis for the action, and the right of the licensee to request a hearing.

"(3) A licensee shall have the right to request a hearing within 72 hours after service of notice of the summary suspension or limitation of the license. The Concealed Pistol Licensing Review Board shall hold a hearing within 72 hours after receipt of a timely request, and shall issue a written decision within 72 hours after the hearing.

"Sec. 906. Carrying a pistol while impaired.

"(a)  A licensee shall not carry a pistol while he or she is consuming alcohol.

"(b)  A licensee shall not carry a pistol while impaired.

"(c)  Upon establishing reasonable suspicion that a licensee has been consuming drugs or alcohol, a licensee's failure to submit to one or more field sobriety, breathalyzer, or urine tests, administered to determine whether the licensee is impaired while carrying a pistol, shall be grounds for summary suspension of the license pursuant to section 905(b).

"(d)  In addition to any other penalty provided by law, any person who violates this section shall be subject to revocation of his or her license.

"(e)  For the purposes of this section, the term "impaired" means a licensee has consumed alcohol or other drug or drugs and that it has affected the licensee's behavior in a way that can be perceived or noticed.

"Sec. 907. Prohibitions on carrying licensed pistols.

"(a)  No person holding a license shall carry a pistol in the following locations or under the following circumstances:

"(1)  A building or office occupied by the District of Columbia, its agencies, or instrumentalities;

"(2)  The building and grounds, including any adjacent parking lot, of an childcare facility, preschool, public or private elementary or secondary school; or a public or private college or university;

"(3)  A hospital, or an office where medical or mental health services are the primary services provided;

"(4)  A penal institution, secure juvenile residential facility, or halfway house;

"(5)  A polling place while voting is occurring;

"(6)  A public transportation vehicle, including the Metrorail transit system and its stations;

"(7)  Any premises, or portion thereof, where alcohol is served, or sold and consumed on the premises, pursuant to a license issued under Title 25 of the District of Columbia Official Code; provided, that this prohibition shall not apply to premises operating under a temporary license issued pursuant to D.C. Official Code § 25-115, a C/R, D/R, C/H, D/H or caterer license issued pursuant to D.C. Official Code § 25-113, or premises with small-sample tasting permits issued pursuant to D.C. Official Code § 25-118, unless otherwise prohibited pursuant to subsection (b)(3) of this section;

"(8)  A stadium or arena;

"(9)  A gathering or special event open to the public; provided, that no licensee shall be criminally prosecuted unless:

"(A)  The organizer or the District has provided notice prohibiting the carrying of pistols in advance of the gathering or special event and by posted signage at the gathering or special event; or

"(B)  The licensee has been ordered by a law enforcement officer to leave the area of the gathering or special event and the licensee has not complied with the order;

6

"(10) The public memorials on the National Mall and along the Tidal Basin, and any area where firearms are prohibited under federal law or by a federal agency or entity, including U.S. Capitol buildings and grounds;

"(11) The area around the White House between Constitution Avenue, N.W., and H Street, N.W., and between 15th Street, N.W., and 17th Street, N.W.;

"(12) The U.S. Naval Observatory and its grounds, and from the perimeter of its fence to the curb of Massachusetts Avenue, N.W., from 34th Street, N.W., south on Massachusetts Avenue, N.W., to Observatory Circle, N.W.;

"(13)(A) When a dignitary or high-ranking official of the United States or a state, local, or foreign government is moving under the protection of the MPD, the U.S. Secret Service, the U.S. Capitol Police, or other law enforcement agency assisting or working in concert with MPD, within an area designated by the Chief, the Chief of the U.S. Secret Service, or the Chief of the U.S. Capitol Police, or a designee of any of the foregoing, that does not include any point at a distance greater than 1,000 feet from the moving dignitary or high-ranking official; provided, that no licensee shall be criminally prosecuted unless:

"(i) The law enforcement agency provides notice of the designated area by the presence of signs, law enforcement vehicles or officers acting as a perimeter, or other means to make the designated area of protection obvious;

"(ii) The District or federal government has provided notice prohibiting the carrying of pistols along a designated route or in a designated area in advance of the event, if possible, and by posted signage along a route or in a designated area; or

"(iii) The licensee has been ordered by a law enforcement officer to leave the designated area and the licensee has not complied with the order.

"(B) For the purposes of this paragraph, the term "moving" shall include any planned or unplanned stops, including temporary stops, in locations open to the public.

"(14) When demonstration in a public place is occurring, within an area designated by the Chief or his or her designee, or other law enforcement agency, that does not include any point at a distance greater than 1,000 feet from the demonstration; provided, that no licensee shall be criminally prosecuted unless:

"(A) The law enforcement agency provides notice of the designated area by the presence of signs, law enforcement vehicles or officers acting as a perimeter, or other means to make the designated area of the demonstration obvious;

"(B) The District or federal government has provided notice prohibiting the carrying of pistols along or within a demonstration route or designated area in advance of the event, if possible, and by posted signage along a demonstration route or designated area; or

"(C) The licensee has been ordered by a law enforcement officer to leave the designated area and the licensee has not complied with the order; or

"(15) Any prohibited location or circumstance that the Chief determines by rule; provided, that for spontaneous circumstances, no criminal penalty shall apply unless the licensee has notice of the prohibition and has failed to comply.

"(b)(1) The carrying of a concealed pistol on private residential property shall be presumed to be prohibited unless otherwise authorized by the property owner or person in

control of the premises and communicated personally to the licensee in advance of entry onto the residential property.

"(2) The carrying of a concealed pistol in a church, synagogue, mosque, or other place where people regularly assemble for religious worship shall be presumed to be prohibited unless the property is posted with conspicuous signage allowing the carrying of a concealed pistol, or the owner or authorized agent communicates such allowance personally to the licensee in advance of entry onto the property; provided, that such places may not authorize the carrying of a concealed pistol where services are conducted in locations listed in subsection (a) of this section.

"(3) The carrying of a concealed pistol on private property that is not a residence shall be presumed to be permitted unless the property is posted with conspicuous signage prohibiting the carrying of a concealed pistol, or the owner or authorized agent communicates such prohibition personally to the licensee.

"(c) Whenever a licensee carries a concealed pistol and approaches any prohibited location, or is subject to any prohibited circumstance, under subsection (a) or (b) of this section, the licensee shall:

"(1) If the licensee is in a vehicle or if a vehicle is readily available, immediately secure the pistol in the manner prescribed in section 4b(b) of An Act To control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes, effective May 20, 2009 (D.C. Law 17-388; D.C. Official Code § 22-4504.02(b)); or

"(2) If the licensee does not have a vehicle available, immediately leave the prohibited location or circumstance.

"(d) A licensee shall not be in violation of this section:

"(1) While he or she is traveling along a public street, road, or highway, including an adjacent public sidewalk that touches the perimeter of any of the premises where the carrying of a concealed pistol is prohibited under subsection (a) or subsection (b) of this section if the concealed pistol is carried on his or her person in accordance with this act, or is being transported by the licensee in accordance with section 4b of An Act To control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes, effective May 20, 2009 ( D.C. Law 17-388; D.C. Official Code § 22-4504.02); or

"(2) While driving a vehicle into and immediately parking at any location listed in subsection (a)(2) of this section for the purpose of picking up or dropping off a student or a child; provided, that the licensee shall secure the concealed pistol in accordance with section 4b(b) of An Act To control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes, effective May 20, 2009 (D.C. Law 17-388; D.C. Official Code § 22-4504.02(b)), before leaving the parked vehicle.

"(e) A licensee shall not carry a pistol openly or otherwise in a manner that is not concealed.

"(f) In addition to any other penalty provided by law, any person who violates this section shall be subject to revocation of his or her license.

"(g) For the purposes of this section, the term:

"(1) "Demonstration" means one or more persons demonstrating, picketing, speechmaking, marching, holding a vigil, or engaging in any other similar conduct that involves the communication or expression of views or grievances and that has the effect, intent, or propensity to attract a crowd or onlookers. The term "demonstration" does not include the casual use of property by visitors or tourists that does not have the effect, intent, or propensity to attract a crowd or onlookers.

"(2) "Public place" means a place to which the general public has access and a right to occupy for business, entertainment, or other lawful purpose. The term "public place" is not limited to a place devoted solely to the uses of the public, and includes:

"(A) The front or immediate area or parking lot of a store, restaurant, tavern, shopping center, or other place of business;

"(B) A public building, including its grounds and curtilage;

"(C) A public parking lot;

"(D) A public street, sidewalk, or right-of-way;

"(E) A public park; and

"(F) Other public grounds.

"(3) "Public transportation vehicle" means any publicly owned or operated commercial vehicle, including any DC Circulator bus, DC Streetcar, MetroAccess vehicle, Metrobus, or Metrorail train.

"(4) "Residence" means a building wholly or partly used or intended to be used for living and sleeping by human occupants, together with any fences, walls, sheds, garages, or other accessory buildings appurtenant to the building, and the area of land surrounding the building and actually or by legal construction forming one enclosure in which such a building is located, but does not include adjacent common areas or commercial property contained in any part of the building.

"Sec. 908.  Concealed Pistol Licensing Review Board.

"(a) There is established a Concealed Pistol Licensing Review Board ("Board") for the purpose of hearing appeals from:

"(1) A denial of an application or renewal application for a license to carry a concealed pistol in the District pursuant to this act;

"(2) A summary suspension or limitation of a license to carry a concealed pistol; or

"(3) A limitation or revocation of a license to carry a concealed pistol.

"(b)(1) The Board shall consist of 7 members as follows:

"(A) The United States Attorney ("USAO") for the District of Columbia or his or her designee; provided, that if the USAO declines to provide a representative, the Mayor shall appoint a person who is a former employee of the USAO;

"(B) The Attorney General for the District of Columbia or his or her designee;

"(C) A mental health professional employed by the Department of Behavioral Health, appointed by the Mayor;

"(D) A former sworn officer of a law enforcement agency other than the MPD, appointed by the Mayor;

"(E) Three public members appointed by the Mayor, as follows:

"(i) One mental health professional; and

"(ii) Two District residents with experience in the operation, care, and handling of firearms.

"(2) The appointment of members designated by subsection (b)(1)(D) and (b)(1)(E) of this section shall be made in accordance with the following provisions:

"(A) Each member shall be appointed for a term of 4 years, and shall continue to serve during that time as long as the member remains eligible for the appointment;

"(B) A member may be reappointed;

"(C) A Board member whose term has expired may continue to serve as a member until a replacement member has been appointed;

"(D) A person appointed to fill a vacancy occurring before the expiration of a term shall serve for the remainder of the term or until a successor has been appointed; and

"(E) A member may be removed by the appointing authority only for incompetence, neglect of duty, or misconduct.

"(3) The Mayor shall select a chairperson.

"(4) Members shall serve without compensation, but shall be compensated for actual and necessary expenses incurred in the performance of their official duties.

"(c) Four members of the Board shall constitute a quorum, except that 2 members shall be a quorum when hearing panels of 3 members are assigned by the Board to conduct a hearing and make a final decision required by this section. Each hearing panel shall contain at least one member designated by subsection (b)(1)(A), (B), or (D) of this section.

"(d)(1) Within 30 days after the effective date of the License to Carry a Pistol Amendment Act of 2014, passed on 2nd reading on December 17, 2014 (Enrolled version of Bill 20-930) , the Mayor, by rule, shall establish hearing procedures for a contested case review of any appeal, including the manner and time of appeals, and procedures for the Board to assign panels of 3 Board members to conduct such hearings and issue final decisions, pursuant to subsection (c) of this section.

"(2) The rules shall include that the burden of production of evidence, and the burden of persuasion, at a hearing before the Board shall be upon the applicant or licensee that is challenging a denial of an application or renewal application or limitation or revocation of a license.

"(e) The meetings and hearings conducted by the Board shall be confidential and not open to the public.

"(f) Any person, including the Chief, aggrieved by a final action of the Board  may file an appeal in accordance with Title I of the District of Columbia Administrative Procedure Act, approved October 21, 1968 (82 Stat. 1204; D.C. Official Code § 2-501 *et seq.*).

"Sec. 909. Freedom of information exception; report.

10

**JA 245**

"(a) Any record regarding a person who has applied for, received, or had revoked a license shall not be made available as a public record under section 202 of the Freedom of Information Act of 1976, effective March 25, 1977 (D.C. Law 1-96; D.C. Official Code § 2-532); provided, that aggregate data, excluding any personal identifying information, may be used for the purposes of the public report in subsection (b) of this section.

"(b) Every 2 years, the MPD shall make public a report that includes the following information:

"(1) The total number of valid licenses; and

"(2) For the most recent 2-year period:

"(A) The number of applications for a license received;

"(B) The number of licenses issued;

"(C) The number of licenses renewed, suspended, revoked, or denied;

"(D) The number of licensees convicted of a crime involving a pistol, classified by type of crime;

"(E) The number of pistols for which a license was issued that were reported lost or stolen; and

"(F) The number of pistols for which a license was issued that were found or recovered as stolen that were unreported by a licensee as lost or stolen.

"Sec. 910. Penalties.

"(a)(1) Except as otherwise provided in this title, a person convicted of a violation of a provision of this title, or rules or regulations issued under the authority of this title, shall be fined not more than the amount set forth in section 101 of the Criminal Fine Proportionality Amendment Act of 2012, effective June 11, 2013 (D.C. Law 19-317; D.C. Official Code § 22-3571.01), or imprisoned for not more than 180 days.

"(2) Civil fines, penalties, and fees may be imposed as alternative sanctions for any infraction of the provisions of this title, or any rules or regulations issued under the authority of this title.

"(b) All prosecutions for violations of this title shall be brought in the name of the District of Columbia and prosecuted by the Office of the Attorney General for the District of Columbia.

"Sec. 911. Rules.

"The Chief of the MPD, pursuant to Title I of the District of Columbia Administrative Procedure Act, approved October 21, 1968 (82 Stat. 1204; D.C. Official Code § 2-501 *et seq.*), shall issue rules to implement the provisions of the License to Carry a Pistol Amendment Act of 2014, passed on 2nd reading on December 17, 2014 (Enrolled version of Bill 20-930), including rules:

"(1) To establish criteria for determining when an applicant has, pursuant to section 6 of the Pistols and Other Dangerous Weapons Act:

"(A) Demonstrated a good reason to fear injury to his or her person, which shall at a minimum require a showing of a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks that demonstrate a special danger to the applicant's life;

"(B) Demonstrated any other proper reason for carrying a concealed pistol, which shall at a minimum include types of employment that require the handling of cash or other valuable objects that may be transported upon the applicant's person; and

"(C) Demonstrated the applicant's suitability to carry a concealed pistol, which shall at a minimum include evidence that the applicant meets the requirements of section 902;

"(2) To establish the type and amount of ammunition that may be carried concealed by a licensee;

"(3) To establish the methods by which a pistol may be carried, including any standards for safe holstering;

"(4) To establish all application forms, investigation procedures, background checks, and fees necessary to process an application for a license to carry a concealed pistol;

"(5) To specify any procedures or requirements specific to non-residents who apply to carry a concealed pistol pursuant to section 6 of the Pistols and Other Dangerous Weapons Act, with regard to the registration requirements in this act;

"(6) To specify requirements for signage on any private premises where the owner or person in control of the premises prohibits the carrying of a concealed pistol pursuant to section 907(b); and

"(7) To establish procedures for the renewal of licenses.".

Sec. 3. An Act To control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes, approved July 8, 1932 (47 Stat. 650; D.C. Official Code § 22-4501 *et seq.*), is amended as follows:

(a) Section 4(a) (D.C. Official Code § 22-4504(a)) is amended as follows:

(1) The lead-in language is amended as follows:

(A) Strike the phrase "a pistol" and insert the phrase "a pistol, without a license issued pursuant to District of Columbia law" in its place.

(B) Strike the phrase "capable of being so concealed".

(2) Paragraph (1) is amended by striking the phrase "a pistol" and inserting the phrase "a pistol, without a license issued pursuant to District of Columbia law" in its place.

(b) Section 6 (D.C. Official Code § 22-4506) is revived as of the effective date of the License to Carry a Pistol Emergency Amendment Act of 2014, effective October 9, 2014 (D.C. Act 20-447; 61 DCR 10765), and is amended to read as follows:

"Sec. 6. Issuance of a license to carry a pistol.

"(a) The Chief of the Metropolitan Police Department ("Chief") may, upon the application of a person having a bona fide residence or place of business within the District of Columbia, or of a person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his or her person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol concealed upon his or her person within the District of Columbia for not more than 2 years from the date of issue, if it appears that the applicant has good reason to fear injury to his

or her person or property or has any other proper reason for carrying a pistol, and that he or she is a suitable person to be so licensed.

"(b) A non-resident who lives in a state that does not require a license to carry a concealed pistol may apply to the Chief for a license to carry a pistol concealed upon his or her person within the District of Columbia for not more than 2 years from the date of issue; provided, that he or she meets the same reasons and requirements set forth in subsection (a) of this section.

"(c) For any person issued a license pursuant to this section, or renewed pursuant to section 903 of the Firearms Control Regulations Act of 1975, passed on 2nd reading on December 17, 2014 (Enrolled version of Bill 20-930), the Chief may limit the geographic area, circumstances, or times of the day, week, month, or year in which the license is effective, and may subsequently limit, suspend, or revoke the license as provided under section 905 of the Firearms Control Regulations Act of 1975, passed on 2nd reading on December 17, 2014 (Enrolled version of Bill 20-930).

"(d) The application for a license to carry shall be on a form prescribed by the Chief and shall bear the name, address, description, photograph, and signature of the licensee.

"(e) Except as provided in section 905(b) of the Firearms Control Regulations Act of 1975, passed on 2nd reading on December 17, 2014 (Enrolled version of Bill 20-930), any person whose application has been denied or whose license has been limited or revoked may, within 15 days after the date of the notice of denial or notice of intent, appeal to the Concealed Pistol Licensing Review Board established pursuant to section 908 of the Firearms Control Regulations Act of 1975, passed on 2nd reading on December 17, 2014 (Enrolled version of Bill 20-930).".

Sec. 4. Section 101 of the Omnibus Public Safety and Justice Amendment Act of 2009, effective December 10, 2009 (D.C. Law 18-88; D.C. Official Code § 22-2511), is repealed.

Sec. 5. Fiscal impact statement.
The Council adopts the fiscal impact statement in the committee report as the fiscal impact statement required by section 602(c)(3) of the District of Columbia Home Rule Act, approved December 24, 1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(3)).

Sec. 6. Effective date.
This act shall take effect following approval by the Mayor (or in the event of veto by the Mayor, action by the Council to override the veto), a 60-day period of congressional review as

provided in section 602(c)(2) of the District of Columbia Home Rule Act, approved December 24, 1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(2)), and publication in the District of Columbia Register.

_____
Chairman
Council of the District of Columbia


_____
Mayor
District of Columbia
APPROVED
February 6, 2015



## COUNCIL OF THE DISTRICT OF COLUMBIA
### WASHINGTON, D.C. 20004

Docket No. **B20-930**

[ ] ITEM ON CONSENT CALENDAR
[ X ] ACTION & DATE     **ADOPTED FIRST READING, 12/2/2014**

[ X ] VOICE VOTE
    RECORDED VOTE ON REQUEST    **APPROVED**

ABSENT

[ ] ROLL CALL VOTE – Result                         (     )

| Councilmember | Aye | Nay | NV | AB | Councilmember | Aye | Nay | NV | AB | Councilmember | Aye | Nay | NV | AB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Chmn. Mendelson | X | | | | Cheh | X | | | | Orange | X | | | |
| Alexander | X | | | | Evans | X | | | | Wells | X | | | |
| Bonds | X | | | | Graham | X | | | | | | | | |
| Bowser | X | | | | Grosso | | X | | | | | | | |
| Catania | X | | | | McDuffie | X | | | | | | | | |

X – Indicate Vote        AB – Absent        NV – Present, Not Voting

CERTIFICATION RECORD

_____
Secretary to the Council

1·14·15
Date

[ ] ITEM ON CONSENT CALENDAR
[ X ] ACTION & DATE     **ADOPTED FINAL READING, 12/17/2014**

[ X ] VOICE VOTE
    RECORDED VOTE ON REQUEST    **APPROVED**

ABSENT

[ ] ROLL CALL VOTE – Result                         (     )

| Councilmember | Aye | Nay | NV | AB | Councilmember | Aye | Nay | NV | AB | Councilmember | Aye | Nay | NV | AB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Chmn. Mendelson | X | | | | Cheh | X | | | | Orange | X | | | |
| Alexander | X | | | | Evans | X | | | | Wells | X | | | |
| Bonds | X | | | | Graham | X | | | | | | | | |
| Bowser | X | | | | Grosso | | X | | | | | | | |
| Catania | X | | | | McDuffie | X | | | | | | | | |

X – Indicate Vote        AB – Absent        NV – Present, Not Voting

CERTIFICATION RECORD

_____
Secretary to the Council

1·14·15
Date

[ ] ITEM ON CONSENT CALENDAR
[ ] ACTION & DATE
[ ] VOICE VOTE
    RECORDED VOTE ON REQUEST
ABSENT

[ ] ROLL CALL VOTE – Result                         (     )

| Councilmember | Aye | Nay | NV | AB | Councilmember | Aye | Nay | NV | AB | Councilmember | Aye | Nay | NV | AB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Chmn. Mendelson | | | | | Cheh | | | | | Orange | | | | |
| Alexander | | | | | Evans | | | | | Wells | | | | |
| Bonds | | | | | Graham | | | | | | | | | |
| Bowser | | | | | Grosso | | | | | | | | | |
| Catania | | | | | McDuffie | | | | | | | | | |

X – Indicate Vote        AB – Absent        NV – Present, Not Voting

CERTIFICATION RECORD

_____
Secretary to the Council

**JA 250**

_____
Date

# The Impact of Right to Carry Laws and the NRC Report:  The Latest Lessons for the Empirical Evaluation of Law and Policy

Abhay Aneja, John J. Donohue III, Alexandria Zhang[1]

Abhay Aneja: School of Law, Stanford University, 559 Nathan Abbott Way, Stanford, CA 94305 (email: aaneja@stanford.edu);  John J. Donohue III: School of Law, Stanford University, 559 Nathan Abbott Way, Stanford, CA 94305 (email: donohue@law.stanford.edu); Alexandria Zhang: Department of Economics, Johns Hopkins University, 440 Mergenthaler Hall, 3400 N. Charles Street, Baltimore, MD 21218 (azhang4@jhu.edu).

December 1, 2014

[1] The authors wish to thank David Autor, Alan Auerbach, Phil Cook, Peter Siegelman, Hugh LaFollette, and an anonymous referee for helpful comments, Todd Elder for assistance in understanding the technique of testing for omitted variable bias, Akshay Rao, Vikram Rao, Andrew Baker, and Kyle Weber for outstanding research assistance, and Stanford Law School and Yale Law School for financial support.

1

**Abstract**

For over a decade, there has been a spirited academic debate over the impact on crime of laws that grant citizens the presumptive right to carry concealed handguns in public – so-called right-to-carry (RTC) laws.  In 2004, the National Research Council (NRC) offered a critical evaluation of the "More Guns, Less Crime" hypothesis using county-level crime data for the period 1977-2000.  15 of the 16 academic members of the NRC panel essentially concluded that the existing research was inadequate to conclude that RTC laws increased or decreased crime.  One member of the panel thought the NRC's panel data regressions showed that RTC laws decreased murder, but the other 15 responded by saying that "the scientific evidence does not support" that position.

We evaluate the NRC evidence, and improve and expand on the report's county data analysis by analyzing an additional six years of county data as well as state panel data for the period 1979-2010.  We also present evidence using both a more plausible version of the Lott and Mustard specification, as well as our own preferred specification (which, unlike the Lott and Mustard model presented in the NRC report, does control for rates of incarceration and police).  While we have considerable sympathy with the NRC's majority view about the difficulty of drawing conclusions from simple panel data models and re-affirm its finding that the conclusion of the dissenting panel member that RTC laws reduce murder has no statistical support, we disagree with the NRC report's judgment on one methodological point: the NRC report states that cluster adjustments to correct for serial correlation are not needed in these panel data regressions, but our randomization tests show that without such adjustments the Type 1 error soars to 22 - 73 percent.

Our paper highlights some important questions to consider when using panel data methods to resolve questions of law and policy effectiveness.  We buttress the NRC's cautious conclusion regarding the effects of RTC laws by showing how sensitive the estimated impact of RTC laws is to different data periods, the use of state versus county data, particular specifications (especially the Lott-Mustard inclusion of 36 highly collinear demographic variables), and the decision to control for state trends.

Across the basic seven Index I crime categories, the strongest evidence of a statistically significant effect would be for aggravated assault, with 11 of 28 estimates suggesting that RTC laws increase this crime at the .10 confidence level. An omitted variable bias test on our preferred Table 8a results suggests that our estimated 8 percent increase in aggravated assaults from RTC laws may understate the true harmful impact of RTC laws on aggravated assault, which may explain why this finding is only significant at the .10 level in many of our models.  Our analysis of the year-by-year impact of RTC laws also suggests that RTC laws increase aggravated assaults.  Our analysis of admittedly imperfect gun aggravated assaults provides suggestive evidence that RTC laws may be associated with large increases in this crime, perhaps increasing such gun assaults by almost 33 percent.

In addition to aggravated assault, the most plausible state models conducted over the entire 1979-2010 period provide evidence that RTC laws increase rape and robbery (but usually only at the .10 level).  In contrast, for the period from 1999-2010 (which seeks to remove the confounding influence of the crack cocaine epidemic), the preferred state model (for those who accept the Wolfers proposition that one should not control for state trends) yields statistically significant evidence for only one crime -- suggesting that RTC laws *increase* the rate of murder at the .05 significance level.  It will be worth exploring whether other methodological approaches and/or additional years of data will confirm the results of this panel-data analysis and clarify some of the highly sensitive results and anomalies (such as the occasional estimates that RTC laws lead to higher rates of property crime) that have plagued this inquiry for over a decade.

Keywords: Crime control, econometric methodology, right-to-carry legislation, model sensitivity

2

**I. Introduction**

The debate on the impact of "shall-issue" or "right-to-carry" (RTC) concealed handgun laws on crime—which has now raged on for over a decade—is a prime example of the many difficulties and pitfalls that await those who try to use observational data to estimate the effects of changes in law or policy.[2]  John Lott and David Mustard initiated the "More Guns, Less Crime" discussion with their widely cited 1997 paper arguing that the adoption of RTC laws has played a major role in reducing violent crime.  However, as Ayres and Donohue (2003a) note, Lott and Mustard's period of analysis ended just before the extraordinary crime drop of the 1990s.  They concluded that extending Lott and Mustard's dataset beyond 1992 undermined the "More Guns, Less Crime" (MGLC) hypothesis.  Other studies have raised further doubts about the claimed benefits of RTC laws (for example, see Black and Nagin, 1997 and Ludwig, 1998).

But even as the empirical support for the Lott and Mustard thesis was weakening, its political impact was growing.  Legislators continued to cite this work in support of their votes on behalf of RTC laws, and the "More Guns, Less Crime" claim has been invoked often in support of ensuring a personal right to have handguns under the Second Amendment.  In the face of this scholarly and political ferment, in 2003, the National Research Council (NRC) convened a committee of top experts in criminology, statistics, and economics to evaluate the existing data in hopes of reconciling the various methodologies and findings concerning the relationship between firearms and violence, of which the impact of RTC laws was a single, but important, issue.  With so much talent on board, it seemed reasonable to expect that the committee would reach a decisive conclusion on this topic and put the debate to rest.

The bulk of the NRC report on firearms, which was finally issued in 2004, was uncontroversial.  The chapter on RTC laws was anything but.  Citing the extreme sensitivity of

---

[2] The term "RTC laws" is used interchangeably with "shall-issue laws" in the guns and crime literature.

3

**JA 253**

point estimates to various panel data model specifications, the NRC report failed to narrow the domain of uncertainty about the effects of RTC laws.  Indeed, it may have increased it.  However, while the NRC report concluded there was no reliable statistical support for the "More Guns, Less Crime" hypothesis, the vote was not unanimous.  One dissenting committee member argued that the committee's own estimates revealed that RTC laws did in fact reduce the rate of murder.  Conversely, a different member went even further than the majority's opinion by doubting that *any* econometric evaluation could illuminate the impact of RTC laws owing to model specification and endogeneity issues.

Given the prestige of the committee and the conflicting assessments of both the substantive issue of RTC laws' impact and the suitability of empirical methods for evaluating such laws, a reassessment of the NRC's report would be useful for researchers seeking to estimate the impact of other legal and policy interventions.  Our systematic review of the NRC's evidence—its approach and findings—also provides important lessons on the perils of using traditional observational methods to elucidate the impact of legislation.  To be clear, our intent is not to provide what the NRC panel could not—that is, the final word on how RTC laws impact crime.  Rather, we show how fragile panel data evidence can be, and how a number of issues must be carefully considered when relying on these methods to study politically and socially explosive topics with direct policy implications.

The outline of this paper is as follows. Section II offers background on the debate over RTC laws, and Section III describes relevant aspects of the NRC report in depth.  Section IV discusses how the NRC majority presented some panel data models based on the Lott and Mustard specification in support of the conclusion that one could not reach a definitive conclusion about the impact of RTC laws.  While this conclusion was correct, the models

4

contained an array of errors that opened the door for the Wilson dissent to argue that RTC laws reduce murder. We discuss these errors in depth and show that Wilson would have been unable to make his dissent if the errors in the presented models (and standard error calculations) had been corrected.

Sections V and VI explore two key econometric issues in evaluating RTC laws—whether to control for state-specific trends (which the NRC panel did not address) and whether to adjust standard errors to account for serial or within-group correlation (we show that the NRC report was in error when it concluded such adjustment was not needed). Section VII extends the analysis through 2006, and Section VIII offers improvements to the NRC model by revising the regression specification in accordance with past research on crime. Section IX discusses the issue of whether the impact of RTC laws can be better estimated using county- or state-level data. Section X delves further into the issue of omitted variable bias in assessing the impact of RTC laws, and in particular, how the difficult-to-measure effect of the crack epidemic may influence our estimates. Section XI offers concluding comments on the current state of the research on RTC laws, the difficulties in ascertaining the causal effects of legal interventions, and the dangers that exist when policy-makers can simply pick their preferred study from among a wide array of conflicting estimates.

## II. Background on the Debate

In a widely-discussed 1997 paper, "Crime, Deterrence, and Right-to-Carry Concealed Handguns," John Lott and David Mustard (1997) argued, based on a panel-data analysis, that right-to-carry laws were a primary driving force behind falling rates of violent crime. Lott and Mustard used county-level crime data (including county and year fixed effects, as well as a set of

5

control variables) to estimate the impact of RTC laws on crime rates over the time period 1977-1992.  In essence, Lott and Mustard's empirical approach was designed to identify the effect of RTC laws on crime in the ten states that adopted them during this time period.  Using a standard difference-in-difference model, the change in crime in RTC regions is compared with the change in crime in non-RTC regions.  The implicit assumption is that the controls included in the regression will explain other movements in crime across states, and the remaining differences in crime levels can be attributed to the presence or absence of the RTC laws.

Lott and Mustard estimated two distinct difference-in-difference-type models to test the impact of RTC laws: a dummy variable model and a trend, or "spline," model.[3]  The "dummy model" tests whether the average crime level in the pre-passage period is statistically different from the post-passage crime level (after controlling for other factors).  The "spline model" measures whether crime *trends* are altered by the adoption of RTC laws.  Lott and Mustard noted that the spline approach would be superior if the intervention caused a reversal in a rising crime rate. Such a reversal could be obscured in a dummy variable model that only estimates the average change in crime between the pre- and post-passage periods. An effective RTC law might show no effect in the dummy model if the rise in the pre-passage crime rate and the fall in the post-passage rate were to leave the average "before" and "after" crime levels the same.

---

[3] In Lott's "dummy model" specification, RTC laws are modeled as a dummy variable which takes on a value of one in the first full year after passage and retains that value thereafter (since no state has repealed its RTC law once adopted).  In Lott's "trend model," RTC laws are modeled as a spline variable indicating the number of years post-passage.  In prior work, including previous drafts of this article, we had followed this specification choice. But this approach adds noise to this key RTC variable because of heterogeneity across states in the effective dates of RTC laws.  Accordingly, we decided to modify our approach to these laws in the most recent version of this paper to more precisely model the impact of the RTC laws based on the actual effective dates of these statutes.  Using the text of relevant statutes and information on the court cases that challenged them, we determined the exact date when each state's RTC law took effect. (A more precise description of what was involved in this process can be found in Footnote 17.)  Our "dummy model" specification uses a variable that takes a value of one for every full year after each law takes effect and is equal to the fraction of the year that the law is in effect the first year it is implemented. Similarly, our "trend model" specification uses a spline variable indicating the number of years post-passage which takes into account the portion of the year the law was initially implemented.

6

**JA 256**

In both regression models, Lott and Mustard included only a single other criminal justice explanatory variable -- county-level arrest rates -- plus controls for county population, population density, income, and thirty-six(!) categories of demographic composition. As we will discuss shortly, we believe that many criminological researchers would be concerned about the absence of important explanatory factors such as the incarceration rate and the level of police force.

Lott and Mustard's results seemed to support the contention that laws allowing the carry of concealed handguns lead to less crime. Their estimates suggested that murder, rape, aggravated assault, and overall violent crime fell by 4 to 7 percent following the passage of RTC laws. In contrast, property crime rates (auto theft, burglary, and larceny) were estimated to have increased by 2 to 9 percent. Lott and Mustard thus concluded that criminals respond to RTC laws by substituting violent crime with property crime to reduce the risk that they would be shot (since, according to them, victims are more often absent during the commission of a property crime). They also found that the MGLC contention was strengthened by the trend analysis, which ostensibly suggested significant *decreases* in murder, rape, and robbery (but no significant increases in property crime).

From this evidence, Lott and Mustard (1997) concluded that permissive gun-carrying laws deter violent crimes more effectively than any other crime reduction policy: "concealed handguns are the most cost-effective method of reducing crime thus far analyzed by economists, providing a higher return than increased law enforcement or incarceration, other private security devices, or social programs like early education." They went even further by claiming that had remaining non-RTC states enacted such legislation, over 1,400 murders and 4,100 rapes would have been avoided nationwide, and that each new handgun permit would reduce victim losses by up to $5,000.

7

### A. The Far-Reaching Impact of "More Guns, Less Crime"

The first "More Guns, Less Crime" paper and Lott's subsequent research (and pro-gun advocacy) have had a major impact in the policy realm. Over the past decade, politicians as well as interest groups such as the National Rifle Association have continually trumpeted the results of this empirical study to oppose gun control efforts and promote less restrictive gun-carrying laws. Lott has repeatedly invoked his own research to advocate for the passage of state-level concealed-carry gun laws, testifying on the purported safety benefits of RTC laws in front of several state legislatures, including Nebraska, Michigan, Minnesota, Ohio, and Wisconsin (Ayres and Donohue 2003a).

The impact of the Lott-Mustard paper can also be seen at the federal level. In 1997, ex-Senator Larry Craig (R-Idaho) introduced the Personal Safety and Community Protection Act with Lott's research as supporting evidence. This bill was designed to allow state nonresidents with valid handgun permits in their home state to possess concealed firearms (former football athlete Plaxico Burress sought to invoke this defense when he accidentally shot himself in a Manhattan nightclub with a gun for which he had obtained a Florida permit). According to Craig, Lott's work confirmed that positive externalities of gun-carrying would result in two ways: by affording protection for law-abiding citizens during criminal acts, and by deterring potential criminals from ever committing offenses for fear of encountering an armed response.[4] Clearly, Lott's work has provided academic cover for policymakers and advocates seeking to justify the view—on public safety grounds—that the 2nd Amendment conferred a private right to possess handguns.

---

[4] 143 CONG. REC. S5109 (daily ed. May 23, 1997) (statement of Sen. Craig). The bill was again introduced in 2000 by Congressman Cliff Stearns (R-Florida), who also cited Lott's work. 146 CONG. REC. H2658 (daily ed. May 9) 2000) (statement of Rep. Stearns).
Indeed, this proposed legislation, now derisively referred to as "Plaxico's Law," is a perennial favorite of the NRA and frequently introduced by supportive members of Congress (Collins 2009).

8

**JA 258**

### B. Questioning "More Guns, Less Crime"

Immediately after the publication of the Lott-Mustard paper, scholars started raising serious questions about the theoretical and empirical validity of the "More Guns, Less Crime" hypothesis.  For example, Zimring and Hawkins (1997) claimed that the comparison of crime between RTC and non-RTC states is inherently misleading because of factors such as deprivation, drugs, and gang activity, which vary significantly across gun-friendly and non-gun-friendly states (and are often difficult to quantify).  To the extent that the relatively better crime performance seen in shall-issue states during the late 1980s and early 1990s was the product of these other factors, researchers may be obtaining biased impact estimates.  Underscoring this point, Ayres and Donohue (2003a) pointed out that crime rose across the board from 1985 to 1992, and most dramatically in non-RTC states.  Since the data set used in Lott and Mustard (1997) ended in 1992, it could not capture the most dramatic reversal in crime in American history.

Figures 1-7 depict the trends of violent and property crimes over the period 1970-2010. For each of the seven crimes, we calculate average annual crime rates for four groupings of states: non-RTC states (those states that had not passed RTC laws by 2006), states that adopted RTC laws over the period 1985-1988 ("early adopters"), those that adopted RTC laws over the period 1989-1991 ("mid-adopters"), and those that adopted RTC laws over the period 1994-1996 ("late adopters").  The crime rate shown for each group is a within-group average, weighted by population.  The figures corroborate Ayres and Donohue's point: crime rates declined sharply across the board beginning in 1992. In fact, there was a steady *upward* trend in crime rates in the years leading up to 1992, most distinctly for rape and aggravated assault. Moreover, the average crime rates in non-RTC states seemed to have dropped even more drastically than those in RTC

9

states, which suggests that crime-reducing factors other than RTC laws were at work.

10

**Figure 1:**



**Figure 2:**



11

**Figure 3:**



**Figure 4:**



**Figure 5:**



**Figure 6:**



**Figure 7:**



Ayres and Donohue (2003a) also recommended the use of a more general model, referred to as the "hybrid model," which essentially combined the dummy variable and spline models, to measure the immediate *and* long-run impact of RTC laws on crime. Since the hybrid model nests both the dummy and spline models, one can estimate the hybrid and generate either of the other models as a special case (depending on what the data show). This exercise seemed to weaken the MGLC claim. Their analysis of the county data set from 1977-1997 using the Lott-Mustard specification (revised to measure state-specific effects) indicated that RTC laws across all states *raised* total crime costs by as much as $524 million.

Just as Lott had identified a potential problem with the dummy model (it might understate a true effect if crime followed either a V-shaped or inverted V-shaped pattern), there is a potential problem with models (such as the spline and the hybrid models) that estimate a post-passage linear trend. Early adopters of RTC laws have a far more pronounced impact on the

14

trend estimates of RTC laws than later adopters, since there may only be a few years of post-passage data available for a state that adopts RTC laws close to the end of the data period.  If those early adopters were unrepresentative of low crime states, then the final years of the spline estimate would suggest a dramatic drop in crime, not because crime had in fact fallen in adopting states, but because the more representative states had dropped out of the estimate (since there would be no post-passage data after, say, three years for a state that had adopted the RTC law only three years earlier, but there would be such data for Maine and Indiana, which were the earliest RTC adopters).  We recognize that each model has limitations, and present the results of all three in our tables below.[5]

### III. Findings of the National Research Council

The sharply conflicting academic assessments of RTC laws specifically and the impact of firearms more generally, not to mention the heightened political salience of gun issues, prompted the National Research Council to impanel a committee of experts to critically review the entire range of research on the relationships between guns and violence.  The blue-chip committee, which included prominent scholars such as sociologist Charles Wellford (the committee chair), political scientist James Q. Wilson, and economists Joel Horowitz, Joel Waldfogel, and Steven Levitt, issued its wide ranging report in 2004.

While the members of the panel agreed on the major issues discussed in eight of the nine chapters of the NRC report, the single chapter devoted to exploring the causal effects of RTC laws on crime proved to be quite contentious. After reviewing the existing (and conflicting)

---

[5]We note that in the latest version of his book, Lott (2010) criticizes the hybrid model, but he fails to appreciate that the problem with the hybrid model –and with the spline model he prefers—is that they both yield estimates that are inappropriately tilted down as the more representative states drop out of the later years, which drive the post-passage trend estimates.  An apples to apples comparison that included the identical states to estimate the post-passage trend would not suggest a negative slope.  This is clear in Figure 1 and Table 1 of Ayres and Donohue (2003a).

15

**JA 265**

literature and undertaking their own evaluation of Lott's county-level crime data, 15 of the 16 academic members of the committee concluded that the data provided no reliable and robust support for the Lott-Mustard contention.  In fact, they believed the data could not support any policy-relevant conclusion.  In addition, they claimed they could not estimate the true impact of these laws on crime because: (1) the empirical results were imprecise and highly sensitive to changes in model specification, and (2) the estimates were not robust when the data period was extended eight years beyond the original analysis (through 2000), a period during which a large number of states adopted the law.

### A. The NRC Presents Two Sets of Estimates of the Impact of RTC Laws

One can get an inkling of the NRC majority's concern about model sensitivity by examining Table 1 below, which reports estimates from the NRC report on the impact of RTC laws on seven crimes.  The Table 1b estimates are based on the Lott and Mustard (1997) dummy and spline models using county data for the period 1977-2000 with the full set of Lott and Mustard controls.  The Table 1a estimates use the same data but provide a more sparse specification that drops the Lott and Mustard controls and provides estimates with no covariates other than year and county fixed effects.  The vastly different results produced by these different models gave the majority considerable pause. For example, if one believed the dummy model in Table 1b, then RTC laws considerably *increased* aggravated assault and robbery, while the spline model in Table 1b suggested RTC laws *decreased* the rate of both of these crimes.  Noting that the RTC impact estimates disagreed across their two models (dummy and spline) for six of the seven crime categories, the NRC report concluded that there was no reliable scientific support for the more guns, less crime thesis.

16

## Table 1

### Table 1a[6]

Estimated Impact of RTC Laws – Published NRC Estimates – No Controls, All Crimes, County Data, 1977-2000

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -1.95 | 17.91*** | 12.34*** | 19.99*** | 23.33*** | 19.06*** | 22.58*** |
| | (1.48) | (1.39) | (0.90) | (1.21) | (0.85) | (0.61) | (0.59) |
| Spline Model: | 0.12 | -2.17*** | -0.65*** | -0.88*** | 0.57*** | -1.99*** | -0.71*** |
| | (0.32) | (0.30) | (0.20) | (0.26) | (0.19) | (0.13) | (0.13) |

### Table 1b[7]

Estimated Impact of RTC Laws – Published NRC Estimates – Lott-Mustard Controls, All Crimes, County Data 1977-2000

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -8.33*** | -0.16 | 3.05*** | 3.59*** | 12.74*** | 6.19*** | 12.40*** |
| | (1.05) | (0.83) | (0.80) | (0.90) | (0.78) | (0.57) | (0.55) |
| Spline Model: | -2.03*** | -2.81*** | -1.92*** | -2.58*** | -0.49** | -2.13*** | -0.73*** |
| | (0.26) | (0.20) | (0.20) | (0.22) | (0.19) | (0.14) | (0.13) |

Interestingly, the conflicting estimates of Table 1 also led to substantial intra-panel dissention, with two members of the Committee writing separately from the NRC's majority evaluation of RTC laws. One sought to refute the majority's skepticism, and one sought to reinforce it. Noted political scientist James Q. Wilson offered the lone dissent to the Committee's report, claiming that Lott and Mustard's "More Guns, Less Crime" finding actually held up under the panel's reanalysis.  Specifically, Wilson rejected the majority's interpretation of the

---

[6]Estimations include year and county fixed effects, and are weighted by county population. Standard errors are in parentheses below estimations.  Robust standard errors are not used in the published NRC estimates. * Significant at 10%; ** Significant at 5%; *** Significant at 1%.  Throughout this paper, the standard errors appear just below the corresponding parameter estimate.

[7] Estimations include year and county fixed effects, and are weighted by county population.  Standard errors are provided beneath point estimates in parentheses.  Robust standard errors are not used in the published NRC estimates. The control variables (adopted from the Lott-Mustard model) include: arrest rate, county population, population density, per capita income measures, and 36 demographic composition measures indicating the percentage of the population belonging to a race-age-gender group.  * Significant at 10%; ** Significant at 5%; *** Significant at 1%.

regression estimates seen in Table 1.  Although the majority saw sharp conflicts in the Table 1b

results between the dummy and spline models, Wilson was impressed that for one of the seven

crimes -- murder --  the dummy and spline models of Table 1b generated estimates that

seemingly suggested there were statistically significant drops in crime associated with RTC laws.

This agreement in the Table 1b murder estimates led him to heartily endorse the "More Guns,

Less Crime" view.  Indeed, after dismissing papers that had cast doubt on the MGLC hypothesis

(such as Black and Nagin, 1998) on the grounds that they were "controversial," Wilson

concluded: "I find the evidence presented by Lott and his supporters suggests that RTC laws do

in fact help drive down the murder rate, though their effect on other crimes is ambiguous" (NRC

Report, p. 271.).

   The Committee penned a response to Wilson's dissent (separate from its overall

evaluation of RTC legislation), which stressed that the only disagreement between the majority

and Wilson (throughout the entire volume on gun issues) concerned the impact of RTC laws on

murder.  They noted that, while there were a number of negative estimates for murder using the

Lott-Mustard approach, there were also several positive estimates that could not be overlooked.

In addition, as the NRC panel noted, even the results for murder failed to support the MGLC

contention when restricting the period of analysis to five years or less after law adoption.[8]  The

important task was to try to reconcile these contradictions—and the panel majority believed that

was not possible using the existing data.

   Committee member (and noted econometrician) Joel Horowitz was the ardent skeptic,

and not without merit.   Horowitz joined the refutation of Wilson but also authored his own

appendix discussing at length the difficulties of measuring the impact of RTC laws on crime

---

[8] The importance of this restriction on the post-passage data was mentioned earlier: as states dropped out of the post-passage data, the estimated impact of RTC laws became badly biased (since one was no longer deriving the estimated effect from a uniform set of states).

18

**JA 268**

using observational rather than experimental data.[9]  He began by addressing a number of flaws in the panel-data approach.  First, if factors other than the adoption of the RTC law change but are not controlled for in the model, then the resulting estimates would not effectively isolate the impact of the law (we demonstrate the likelihood of this possibility in Section X below). Second, if crime increases before the adoption of the law at the same rate it decreases after adoption, then a measured zero-difference would be misleading.  The same problem arises for multiyear averages.  Third, the adoption of RTC laws may be a *response* to crime waves.  If such an endogeneity issue exists, the difference in crime rates may merely reflect these crime waves rather than the effect of the laws.  Lastly, as even Lott (2000) found in his data, RTC states differ noticeably from non-RTC states (e.g., RTC states are mainly Republican and had low but rising rates of crime).  It would not be surprising if these distinctive attributes influence the measured effect of RTC laws. In this event, looking at the impact of RTC laws in current RTC states may not be useful for predicting the likely result if these laws were adopted in very different states.

Ideally, states would be randomly selected to adopt RTC laws, thereby eliminating the systematic differences between RTC states and non-RTC states.  In the absence of such randomization, researchers introduce controls to try to account for these differences, which generates debate over which set of controls is appropriate.  Lott (2000) defended his model by claiming that it included "the most comprehensive set of control variables yet used in a study of crime" (p. 153).  But Horowitz was unimpressed by Lott's claim, noting that it is possible to control for too many variables – or too few.  He pointed out that Donohue (2003) found a significant relationship between crime and *future* adoption of RTC legislation, suggesting the likelihood of omitted variable bias and/or the endogenous adoption of the laws. Horowitz

---

[9] While his chapter is directed at the analysis of RTC laws, Horowitz's comments applied to an array of empirical studies of policy that were discussed throughout the entire NRC volume.

19

**JA 269**

concluded by noting that there is no test that can determine the right set of controls: "it is not possible to carry out an empirical test of whether a proposed set of $X$ variables is the correct one…it is largely a matter of opinion which set [of controls] to use" (NRC Report, p. 307). Noting the likelihood of misspecification in the evaluation of RTC laws, and that estimates obtained from a misspecified model can be highly misleading, he concluded that there was little hope of reaching a scientifically supported conclusion based on the Lott-Mustard/NRC model (or any other).[10]

### B. The Serious Need for Reassessment

The story thus far has been discouraging for those hoping for illumination of the impact of legislation through econometric analysis.  If the NRC majority is right, then years of observational work by numerous researchers, topped off with a multi-year assessment of the data by a panel of top scholars, were not enough to pin down the actual impact of RTC laws.  If Horowitz is right, then the entire effort to estimate the impact of state right-to-carry policies from observational data is doomed.  Indeed, there may be simply too much that researchers do not know about the proper structure of econometric models of crime.  Notably, however, the majority did not join Horowitz in the broad condemnation of all observational microeconometrics for the study of this topic.  Perhaps a model that better accounts for all relevant, exogenous, crime-influencing factors and secular crime trends could properly discern the effects of RTC laws – whether supporting or refuting the Wilson conclusion that RTC laws reduce murder.  On the other hand, an examination of additional models might only serve to strengthen the NRC majority conclusion that the models generated estimates that were too

---

[10] Note that this nihilistic conclusion was very close to that found by a more recent NRC report investigating the deterrent effect of the death penalty.  Daniel S. Nagin and John V. Pepper, editors, Deterrence and the Death Penalty (2012).  This recent NRC report reviewed 30 years of studies on this deterrence question and found the entire literature to be "uninformative."

20

## JA 270

variable to provide clear insight into the effect of RTC laws on crime.

## IV. Panel Data Estimates in the NRC Report

Previous research on guns and crime has shown how data and methodological flaws can produce inaccurate conclusions.  In a follow-up to their initial 2003 *Stanford Law Review* paper, Ayres and Donohue (2003b) demonstrated how coding errors can yield inaccurate and misleading estimates of the effect of RTC laws on crime. Commenting on a study in support of the MGLC premise by Florenz Plassman and John Whitley (2003), Ayres and Donohue (2003b) described numerous coding flaws.  After correcting these errors, the existing evidence supporting the "More Guns, Less Crime" hypothesis evaporated.

### A. The NRC's Panel-Data Models

Since the NRC panel based their reported estimates on data provided by John Lott, we thought it prudent to carefully examine the NRC committee's own estimates.  With the help of the NRC committee members who provided the NRC 1977-2000 county data set, we were ultimately able to generate the NRC panel data estimates.[11]  Once we fully understood the way in which these NRC estimates were generated (shown in Table 1 above), it became clear that the NRC report presented estimates that essentially had three flaws: 1) the specification (used by Lott and Mustard) was problematic in a number of dimensions; 2) the standard errors were incorrect in two ways, both of which made the results appear more significant than they were; and 3) there were some errors in the data, which had been supplied by Lott.

Given the NRC majority conclusion that the Lott and Mustard thesis was not supported by the data, it was a reasonable choice to simply take the Lott and Mustard data and

---

[11] The initial published version of this article -- Aneja, Donohue, and Zhang (2011) -- noted that we had originally failed to replicate the NRC results, with our efforts complicated because the Committee had misplaced the do files that generated the NRC estimates.  After publication, we were informed of the precise specification the NRC had employed, which did generate the published NRC estimates (although these estimates are flawed in the manner described in the text).

21

**JA 271**

specifications and adhere to their method of computing standard errors.  In essence, the NRC

majority was shrewdly saying, "Even if we fully accept everything that Lott and Mustard have

argued for, we still find no support for their conclusion."  The only problem with the NRC

majority approach, though, was that presenting the estimates in Table 1b above opened the door

for James Q. Wilson to argue that some support for RTC laws could be gleaned from the

ostensibly conflicting evidence.

Wilson's claim, once again, was that Table 1b spoke with clarity, albeit on only one

point.  He conceded that the Lott and Mustard dummy and spline estimates conflicted for six of

the seven crime categories, but since they both showed statistically significant reductions in

murder, Wilson claimed that the murder finding was robust and he concluded that RTC laws

save lives.  The NRC majority responded that Table 1a did not similarly suggest that RTC laws

reduced murder but Wilson swatted that response aside by saying that a model with no covariates

would not be as persuasive as the Table 1b models with covariates.  The NRC majority could

have countered Wilson's claim far more effectively if they had simply shown that the Lott and

Mustard model was highly assailable and greatly underestimated its standard errors.  Indeed,

nothing would have been left standing for Wilson to construct a positive story of RTC laws if the

NRC majority had simply calculated the correct standard errors for the Table 1b models, since

doing so would have eliminated any claim that the RTC laws generated a statistically significant

reduction in murder or any other crime.

**B. Problems with the Lott and Mustard Models and Data Published in the NRC Report**

Our goal in this section is to improve on the estimates presented in the NRC report (Table

1 above) by correcting what we consider to be clear errors in the Lott and Mustard specification,

data, and standard errors.  Thus, we began by constructing our own county-level data set, which

22

we will refer to as the "Updated 2013 Data Set."  We create the same variables found in Lott's data—crime rates, demographic composition, arrest rates, income, population, and population density—and extend our new set to 2006 (the NRC data ended in 2000).[12]  This data extension will also provide us an opportunity to explore how the NRC's results are affected when using more current data.  As we will see in Section VII, the additional years of data will also enable us to estimate the effect of six additional state adoptions of RTC laws not present in the NRC analysis: Michigan (2001), Colorado (2003), Minnesota (2003), Missouri (2004), New Mexico (2004), and Ohio (2004).[13]

We obtained our county crime data from the University of Michigan's Interuniversity Consortium for Political and Social Research, which maintains the most comprehensive collection of UCR data.  Unfortunately, county-level crime data for 1993 is currently unavailable.  The National Archive of Criminal Justice Data recently discovered an error in the crime data imputation procedure for 1993 and for this reason, has made 1993 data inaccessible until the error has been corrected.  Thus, for all of the following tables with estimates using our updated county data, we are missing values for 1993.

In Table 2, we will replicate and extend the Table 1 NRC estimates correcting for three errors:  1) some data errors that were transmitted to the NRC when they used the Lott county data set; 2) a clear specification error in the arrest rate controls; and 3) the failure to use both robust and clustered standard errors.  We also modify the RTC variables used in this analysis to take into account additional information that we have gathered on the effective dates of these laws.

---

[12] We also add 0.1 to *all zero* crime values before taking the natural log in our county-level data set, as the NRC did.

[13] Kansas and Nebraska adopted RTC laws which took effect in 2007, which is too late to be captured in our analysis.  A more complete explanation of how these years were determined can be found in Footnote 17 and Appendix G.

23

### 1.   The Lott Data Errors Used in the NRC Estimates

In our original efforts at trying to replicate the NRC estimates derived from their Lott data set, we discovered a number of small errors in that data set.[14]  First, Philadelphia's year of adoption is coded incorrectly—as 1989 instead of 1995.  Second, Idaho's year of adoption is coded incorrectly—as 1991 instead of 1990.  Third, the area variable, which is used to compute county density, has missing data for years 1999 and 2000.  Fourth, we determined that the NRC data set was missing all county identifiers for 1999 and 2000, which meant that that both these years were dropped for the NRC estimates depicted in Table 1.   Our analysis corrects all these errors.

### 2.   Lott and Mustard's Erroneous Arrest Rate Variables

Since the NRC report followed the Lott-Mustard specification, the regressions it presented (which we reproduce in Table 1) used arrest rates as the sole criminal justice control variable in estimating the effect of RTC laws.  Although we have already noted Lott's claim that his is "the most comprehensive set of control variables yet used in a study of crime," in fact, the Lott and Mustard model omits controls for police and incarceration, which many studies -- e.g., Kovandzic, Vieraitis, and Boots, (2009) -- have found to be key influences on crime (we will re-introduce those variables in Section VIII).

Lott and Mustard's use of the arrest rate variables is not a good modeling choice in general, and the particular approach that Lott and Mustard employed is especially problematic.[15]

---

[14] We know all too well how easy it is to make these small but annoying errors in creating these data sets, since regrettably we had a few similar errors in our own data set in the Aneja, Donohue, Zhang (2011) published version, which are all corrected here. None of the main conclusions of the published paper were altered by those errors, some of which are set forth in footnote 18.

[15] Even apart from the considerable data problems with the county arrest rates, the measure is also not well defined. Ideally, one might like a measure showing the likelihood that one who commits a certain crime will be arrested.  The Lott and Mustard arrest rates instead are a ratio of arrests to crimes, which means that when one person kills many, for example, the arrest rate falls, but when many people kill one person, the arrest rate rises since only one can be arrested in the first instance and many can in the second.  The bottom line is that this "arrest rate" is not a probability

To see the concern, note that the NRC's model (Table 1b in this paper) is trying to explain the level of seven individual Index I crime categories while using a control that is computed as a crime-specific arrest rate, which is the number of arrests for a given crime divided by the contemporaneous number of crimes. Thus, murder in 1990 is "explained" by the ratio of arrest to murders in 1990. Econometrically, it is inappropriate to use this contemporaneous measure since it leaves the dependent variable on both sides of the regression equation (at a minimum, a better approach would lag this variable one year, as discussed in Ayres and Donohue (2009)). Better still, one could alternatively use the broad categories of violent and property crimes to compute arrest rates, as have many recent papers (such as, Moody and Marvell, 2008). We adopt this latter approach for all of our regressions in this paper and also lag the arrest rate one year to reduce the endogeneity problem.

### 3.   The Erroneous Standard Errors in the NRC Estimates

Surprisingly, when the NRC presented its estimates (which we reproduce in Table 1), the NRC report did not make the very basic adjustment to their standard errors to correct for heteroskedacticity. Since Hal White's paper discussing this correction has been the single most cited paper in all of economics since 1970,[16] the failure to make this standard adjustment was unexpected. Accordingly, in all of our own estimates, we use robust standard errors.

Even more significant in terms of the results, though, is the issue of whether one must cluster the standard errors. The statistical consequence of the NRC committee's failure to use robust and clustered standard errors is to massively understate the reported standard errors (and consequently to overstate the level of significance). Unlike the issue of robust standard errors,

---

and is frequently greater than one because of the multiple arrests per crime. For an extended discussion on the abundant problems with this pseudo arrest rate, see Donohue and Wolfers (2009).

[16] Kim, E.H.; Morse, A.; Zingales, L. (2006). "What Has Mattered to Economics since 1970?". *Journal of Economic Perspectives* 20 (4): 189–202.

25

the Committee report actually addressed the issue of clustering, concluding that this adjustment was not necessary.  In Section V, we will show that this was an error.  Therefore, we will from this time forward only present results based on the clustering adjustment to our standard errors.

### C. Improving on the Table 1 Estimates by Using Better Data and Slightly Improved Lott and Mustard Models

Having just identified three problems with the estimates presented by the NRC, we now seek to fix them.  To be clear about our approach, we use annual county-level crime data for the United States from 1977 through either 2000 (to conform to the NRC report) or 2006.  We explore the impact of RTC laws on seven Index I crime categories by estimating the reduced-form regression:

$$Y_{it} = \eta RTC_{jt} + \alpha_i + \theta_t + \beta_{jt} + \gamma X_{ijt} + \varepsilon_{it} \tag{1}$$

where the dependent variable $Y_{it}$ denotes the natural log of the individual violent and property crime rates for county $i$ and year $t$.  Our explanatory variable of interest—the presence of an RTC law within state $j$ in year $t$—is represented by $RTC_{jt}$.  The exact form of this variable shifts according to the three variations of the model we employ (these include our modified version of the Lott and Mustard dummy and spline models, as well as the Ayres and Donohue hybrid model.)  Owing to new information that we have gathered about the RTC laws of various states, we use our own modified dummy and spline variables that take into account the exact date when these laws were implemented.[17]

---

[17] As noted in Footnote 3, in the dummy variable approach, the RTC variable is a dichotomous indicator that equals the fraction of the year that the law is in effect the first year the law is implemented and equals one each full year thereafter.  In the spline model, the RTC variable indicates the number of post-passage years (adjusted by the fraction of the year the law is first in effect).  The hybrid specification contains both dummy and trend variables. Using the effective date when laws were implemented rather than simply assuming that laws take effect one year after passage changes the initial year of a number of RTC laws. In addition, some states (e.g., Texas) passed RTC laws that technically "took effect" on one date but which specified another date when permits could begin to be issued.  We treat these states as if their laws took effect on the second date.  We also took court-mandated delays in

26

The variable $\alpha_i$ indicates county-level fixed effects (unobserved county traits) and $\theta_t$ indicates year effects.  As we will discuss below, there is no consensus on the use of state-specific time trends in this analysis, and the NRC report did not address this issue.  Nevertheless, we will explore this possibility, with $\beta_{jt}$ indicating state-specific trends, which are introduced in selected models.  Since neither Lott and Mustard (1997) nor the NRC (2004) focus on state trends, this term is dropped when we estimate their models.  The term $X_{ijt}$ represents a matrix of observable county and state characteristics thought by researchers to influence criminal behavior. The components of this term, however, vary substantially across the literature. For example, while Lott uses only "arrest rates" as a measure of criminal deterrence, we discuss the potential need for other measures of deterrence, such as incarceration levels or police presence, which are measured at the state level.

Table 2 reproduces the regressions depicted in Table 1, while correcting for the three problems mentioned above (the inaccurate Lott data, the poorly constructed Lott arrest ratios, and the incorrect standard errors), changing the manner in which RTC dates were determined, and using our reconstruction of the county dataset from 1977 through 2000 (which omits the flawed 1993 county data).  Tables 2a and 2b represent our improved estimates of what the NRC reported and we depict in Tables 1a and 1b.  Table 2b appends our hybrid model, which estimates the effect of RTC laws with both a dummy and a spline component (thus nesting the individual dummy and spline models).

The bottom line is that the superior Table 2 estimates look nothing like the Table 1 estimates presented in the NRC report.  Table 1 shows estimated effects that are almost

---

implementing RTC laws into account when determining when permits would actually first be issued (and the corresponding value of the RTC dummy).  In short, the process of reviewing the effective dates of different RTC laws led us to change the effective year of a number of these laws, changes which are described in greater detail in Appendix G.

27

**JA 277**

uniformly statistically significant -- at times suggesting crime increases and at times suggesting crime decreases.  Table 2 shows far fewer statistically significant effects, but every one of which suggests RTC laws *increase* crime -- for rape, aggravated assault, robbery, auto theft, burglary, and larceny.  There is not even a hint of any crime declines.

Recall that James Q. Wilson thought that the most important regressions to look at were those presented in Table 1b, because they provided the full set of controls from the Lott and Mustard specification.  While for six of the seven crime categories the story that emerged from Table 1b varied sharply on whether one looked at the dummy or the spline model, Wilson was content to find a beneficial RTC effect on murder because the Table 1 estimates for murder both appeared to be negative and significant.

When we switch to Table 2b, however, we see that there is nothing resembling a statistically significant impact of RTC laws on murder.  In fact, we see that assault, auto theft, and larceny now have estimates that are simultaneously statistically significant and positive for both the dummy and spline model.  Thus, the results that Professor Wilson found to be consistent evidence of RTC laws reducing murder (see Table 1b) disappear with better data and a superior specification.[18]

---

[18] In the process of reviewing our previous published models and data from ADZ (2011), we discovered some errors in the two data sets that we had constructed (the so-called updated 2009 county data and updated 2009 state data), which are corrected in this paper.  For the county data set, we miscoded the state trend variable for Arkansas. Second, Kansas counties had been incorrectly coded as belonging to Kentucky for years 1997-2006.  Third, our spline and hybrid models had included a counter variable to capture the effect of a post-passage trend, but they inadvertently omitted the overall trend variable off of which this post-passage trend was to be estimated. Fourth, Vermont was coded as a "may issue" state instead of a "shall issue" state, although this did not affect our results owing to the inclusion of state fixed effects in our regressions. Fifth, the real per capita income measures from our previous datasets had been calculated incorrectly, and these changes have been made for real per capita income and income maintenance, unemployment insurance, and retirement payments.  (This last change was also made to the state data set.)

In addition to these errors that we discovered, Moody, Lott, Marvell, and Zimmerman (2012) identified three other errors: duplicative observations for Alaska county 2060 were improperly included for 1996, Kansas' year of adoption was coded incorrectly as 1996 instead of 2006, and South Dakota's year of adoption was coded incorrectly as 1986 instead of 1985. All of these errors have been corrected in the tables prepared for this paper.

In fact, this was essentially the message of the NRC report. Small changes made the estimates bounce around so much that it was difficult to reach any conclusion about the true causal impact of RTC laws. Perhaps it might have been helpful to Wilson if the majority had gone one step further and presented something like the alternative results from Table 2. As we will see in the ensuing sections, there are many additional avenues that could have been explored to probe the robustness of the Table 1b findings that Wilson had accepted so unquestioningly.

We will explore these factors in subsequent sections: Section VI will explore whether one should control for individual state trends in crime, section VII will look at additional years of data (adding data beyond 2000 to 2006), section VIII will alter the Lott and Mustard specification (beyond the already mentioned correction for the contemporaneous, crime-specific arrest rates and changing the method used to construct the two RTC variables), section IX will go beyond the county data to look at state data, and Section X will consider the additional problem of potential omitted variable bias. But a key aspect of the Table 2 results is that the standard errors were adjusted using the cluster command, and this is one area where the NRC majority stumbled in concluding that this adjustment was not needed. Section V will now address the clustering question.

---

Moody, Lott et al also claimed that Florida's year of adoption was coded incorrectly as 1989 instead of 1987 but this simply reflects their misreading of our coding. Our county data does not have crime information for Florida counties in the year 1988 (this is evident in the NRC data set as well), so observations for Florida's counties in this year are dropped. Thus, while it may seem that our first year of adoption is erroneously coded as 1989, this simply reflects the fact that we have not included observations for 1988. Note that we maintained consistency with our other trend variables by beginning the post-passage variable counter with a value of "2" in year 1989 to demonstrate 2 years since the passage of RTC legislation.

For the state data set in ADZ (2011), we note the following corrections: both North and South Dakota should show RTC adoption in year 1985. Similarly, Oregon's date of adoption for its RTC law should have been 1989 instead of 1990 in the state data set.

Additional changes made to the RTC indicator variables used in this paper are described in footnotes 3 and 17, as well as Appendix G. The state dataset has also been re-constructed with the most recently available data, the sources of which are provided with this paper at http://works.bepress.com/john_donohue/.

29

**JA 279**

## Table 2

### Table 2a[19]

Estimated Impact of RTC Laws – with ADZ Changes – No Controls, All Crimes, 1977-2000

Dataset: ADZ Updated 2013 County Data (without 1993 data)

Changes: Updated Dataset, Robust and Clustered Standard Errors, Alternative RTC Dates

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -0.07 | 34.43 | 22.85 | 26.21* | 32.76 | 32.24 | 38.42 |
| | (8.48) | (24.72) | (19.88) | (15.02) | (21.20) | (22.51) | (26.15) |
| Spline Model: | 0.65 | 4.41* | 3.83* | 2.96 | 4.41* | 4.65* | 5.59* |
| | (0.88) | (2.61) | (2.07) | (1.86) | (2.44) | (2.42) | (2.93) |

### Table 2b

Estimated Impact of RTC Laws – with ADZ Changes – Lott-Mustard Controls, All Crimes, 1977-2000

Dataset: ADZ Updated 2013 County Data (without 1993 data)

Changes: Updated Dataset, Lagged Violent/Property Arrest Rates, Robust and Clustered Standard Errors, Alternative RTC Dates

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -1.13 | 17.60 | 17.01*** | 11.69* | 19.54*** | 10.70** | 20.89*** |
| | (7.15) | (11.88) | (6.16) | (6.11) | (7.15) | (5.07) | (5.75) |
| Spline Model: | -0.08 | 1.35 | 1.76* | 0.70 | 1.99** | 0.86 | 1.97* |
| | (0.82) | (1.42) | (0.92) | (0.84) | (0.77) | (0.71) | (1.01) |
| Hybrid Post-Passage Dummy: | -1.11 | 16.41 | 13.14** | 12.04* | 15.28* | 9.73* | 17.28*** |
| | (7.96) | (10.34) | (6.04) | (6.93) | (7.74) | (5.63) | (4.71) |
| Trend Effect: | -0.00 | 0.28 | 0.91 | -0.08 | 1.00 | 0.23 | 0.85 |
| | (0.90) | (1.26) | (0.99) | (0.83) | (0.71) | (0.78) | (0.92) |

---

[19] All table estimations include year and county fixed effects, and are weighted by county population. Standard errors are robust and clustered at the state level.  * Significant at 10%; ** Significant at 5%; *** Significant at 1%. In Table 2b, the control variables (adopted from the Lott-Mustard model) include: lagged arrest rates, county population, population density, per capita income measures, and 36 demographic composition measures indicating the percentage of the population belonging to a race-age-gender group.

## V. Debate over the Clustering of Standard Errors

### A. Is Clustering Necessary?

Aside from neglecting to use heteroskedastic-robust standard errors, the NRC committee also did not use a cluster adjustment.  Research has found that the issue of whether to "cluster" the standard errors has a profound impact on assessments of statistical significance.  This issue gained prominence beginning primarily with a 1990 paper by Brent Moulton.  Moulton (1990) pointed to the possible need for the clustering of observations when treatments are assigned at a group-level.  In such cases, there is an additive source of variation that is the same for all observations in the group, and ignoring this unique variation leads to standard errors that are underestimated.  Lott, however, suggests that clustered standard errors are not needed (Lott 2004), claiming that county-level fixed effects implicitly control for state-level effects, and therefore, clustering the standard errors by state is unnecessary.

The NRC committee (2004) sided with Lott on this point, stating that "there is no need for adjustments for state-level clustering." (p. 138).  However, we *strongly* believe the committee was mistaken in this decision.  One must account for the possibility that county-level disturbances may be correlated within a state during a particular year by clustering the standard errors by state.  There is also a second reason for clustering that the NRC report did not address.  Specifically, serial correlation in panel data can lead to major underestimation of standard errors.  Indeed, Bertrand, Duflo, and Mullainathan (2004) point out that even the Moulton correction alone may be insufficient for panel-data estimators that utilize more than two periods of data due to autocorrelation in both the intervention variable and the outcome variable of interest.  Wooldridge (2003, 2006), as well as Angrist and Pischke (2009), suggest that clustering the standard errors by state (along with using heteroskedasiticity-robust standard errors) will help

31

address this problem, and at least provide a lower bound on the standard errors.

### B. Using Placebo Laws to Test the Impact of Clustering

Our Table 2 estimates (which include clustering) reveal that this adjustment makes a major difference in the results generated by the Lott and Mustard models that the NRC report adopted in its analysis -- completely wiping out any sign of statistically significant crime reductions attributable to RTC laws. But who is correct on the clustering issue—Lott, Mustard, and the NRC panel on the one hand, or Angrist, Pischke, and several other high-end applied econometricians on the other? To address this important question we run a series of placebo tests. In essence, we randomly assign RTC laws to states, and re-estimate our model iteratively (1000 times), recording the number of times that the variable(s) of interest are "statistically significant" at the 5% level. For this experiment, we use our most flexible model: the hybrid model (that incorporates both a dummy and a trend variable) with the controls employed by the NRC.

We run five versions of this test. In our first test, we generate a placebo law in a random year for all 50 states and the District of Columbia. Once the law is applied, it persists for the rest of our data period (beginning the year after the law's randomly generated effective date), which is how laws were coded in our original analysis. We run 1000 trials (where each trial consists of a randomly generated set of RTC passage years) and then proceed to take a simple average of the percentage of significant dummy variable and spline variable estimates. In our second test, we apply a placebo law in a random year to the 32 states that had actually implemented right-to-carry laws between 1979 and 2006. The remaining 19 states are assumed to either have no RTC law or to have had one during the entire analysis period.[20] Here again we run 1000 trials in

---

[20] For the purposes of this analysis we do not consider Nebraska or Kansas to have passed an RTC law during this period. These states passed RTC laws in 2006; however, their laws did not take effect until 2007.

**JA 282**

which each iteration consists of randomly generated RTC passage years and proceed to take a simple average of the percentage of significant estimates. Third, we randomly select 32 states to receive a placebo law in a random year (to ensure that any random sample of 32 states does not have the potential to inaccurately bias results, we repeat this entire procedure 5 times – that is, we take 5 samples of 32 random states and for each sample, run the aforementioned process of assigning a random year of RTC adoption 1000 times). Then, we take a simple average of the number of statistically significant dummy variable and spline estimates. Thus, we are, in effect, counting the number of significant dummy and trend estimates generated from 5000 hybrid regressions.  Fourth, we apply a placebo law in a random year to the 19 states which did not pass RTC laws within the period, dropping the other 32 states from our dataset, and take the simple average of the statistically significant dummy variable and spline estimates.  Finally, we randomly select 12 of the 19 states (to correspond to the previous randomly generated 32 states) to receive an RTC in a randomized year of adoption and iterate this process 1,000 times over five separate samples. The results of these five tests are presented in Table 3.

Given the random assignment, one would expect to reject the null hypothesis of no effect of these randomized "laws" roughly 5 percent of the time if the standard errors in our regressions are estimated correctly. Instead, the table reveals that the null hypothesis is rejected 21-69 percent of the time for murder and robbery with the dummy variable and even more frequently with the trend variable (35-73 percent). Clearly, this exercise suggests that the standard errors used in the NRC report are far too small.

Table 3b replicates the exercise of Table 3a, but now uses the cluster correction for standard errors (by state).  Table 3b suggests that clustering standard errors does not excessively reduce significance, as the NRC panel feared.  In fact, the percentages of "significant" estimates

33

produced in all three versions of the test still lie well beyond the 5% threshold.  Similar results

are found when we replicate Tables 3a and 3b using a random selection of either 32 or 12 states

while employing the dummy model instead of the hybrid model (we do not show those results

here).  All of these tests show that if we do *not* cluster the standard errors, the likelihood of

obtaining significant estimates is astonishingly (and unreasonably) high.  The conclusion we

draw from this exercise is that clustering is clearly needed to adjust the standard errors in these

panel-data regressions.  Accordingly, we use this clustering adjustment for all remaining

regressions in this paper.

34

# **Table 3**[21]

## Table 3a

Percentage of Significant Estimates (5% Level) – Lott-Mustard Controls, 1977-2006 – **No Clustered Standard Errors**
Dataset: ADZ Updated 2013 County Data (without 1993 data)
Hybrid Model

| *All figures reported in %* | | Dummy Variable | Trend Variable |
|---|---|---|---|
| 1. All 50 States + DC: | Murder | 45.8 | 67.5 |
| | Robbery | 53.8 | 63.9 |
| 2. Exact 32 States: | Murder | 64.6 | 72.0 |
| | Robbery | 68.9 | 73.0 |
| 3. Random 32 States: | Murder | 56.1 | 68.3 |
| | Robbery | 56.6 | 62.7 |
| 4. All 19 States: | Murder | 21.7 | 34.9 |
| | Robbery | 36.3 | 45.4 |
| 5. Random 12 States: | Murder | 23.6 | 42.1 |
| | Robbery | 39.0 | 46.6 |

## Table 3b

Percentage of Significant Estimates (at the 5% Level) – Lott-Mustard Controls, 1977-2006 – **With Clustered Standard Errors**
Dataset: ADZ Updated 2013 County Data (without 1993 data)
Hybrid Model

| *All figures reported in %* | | Dummy Variable | Trend Variable |
|---|---|---|---|
| 1. All 50 States + DC: | Murder | 8.8 | 13.2 |
| | Robbery | 7.8 | 8.5 |
| 2. Exact 32 States: | Murder | 10.9 | 11.4 |
| | Robbery | 8.1 | 9.8 |
| 3. Random 32 States: | Murder | 11.0 | 13.3 |
| | Robbery | 8.5 | 7.6 |
| 4. All 19 States | Murder | 13.9 | 12.9 |
| | Robbery | 12.7 | 13.8 |
| 5. Random 12 States: | Murder | 15.9 | 18.7 |
| | Robbery | 14.1 | 14.4 |

---

[21] Simulation based on NRC with-controls model, which, similar to above estimations, includes year fixed effects, county fixed effects, and weighting by county population. The control variables (adopted from the Lott-Mustard model) include: lagged arrest rate, county population, population density, per capita income measures, and 36 demographic composition measures indicating the percentage of the population belonging to a race-age-gender group. All ten tests use robust standard errors.

35

**JA 285**

## VI. Debate over the Inclusion of Linear Trends

An important issue that the NRC did not address was whether there was any need to control for state-specific linear trends. Inclusion of state trends could be important if, for example, a clear pattern in crime rates existed before a state adopted an RTC law that continued into the post-passage period. On the other hand, there is also a potential danger in using state-specific trends if their inclusion inappropriately extrapolates a temporary swing in crime long into the future or otherwise mars the estimate of the dynamic effect of the policy shock (Wolfers 2006). Lott and Mustard (1997) never controlled for state-specific trends in analyzing handgun laws in their main analysis (only adding these trends for one robustness check mentioned in a footnote), while Moody and Marvel (2008) always controlled for these trends. Ayres and Donohue (2003a) presented evidence with and without such trends.

Table 4 replicates the NRC's full model (with the appropriate clustering adjustment) from Table 2b with one change: here we add a linear state trend to this county-data model. Strikingly, Table 4 suggests that RTC laws increase aggravated assault by roughly 3-4 percent each year, but no other statistically significant effect is observed. Thus, the addition of state trends eliminates the potentially problematic result of RTC laws increasing property crimes, which actually increases our confidence in these results. Certainly an increase in gun carrying and prevalence induced by a RTC law could well be thought to spur more aggravated assaults. Nonetheless, one must at least consider whether the solitary finding of statistical significance is merely the product of running seven different models, is a spurious effect flowing from a bad model, or reflects some other anomaly (such as changes in the police treatment of domestic violence cases, which could confound the aggravated assault results).[22]

---

[22] We tested this theory by creating a new right-hand side dummy variable that identified if a state passed legislation requiring law enforcement officials to submit official reports of all investigated domestic violence cases. Eight

### Table 4[23]

Estimated Impact of RTC Laws – Lott-Mustard Controls, 1977-2000 – Clustered Errors and State Trends
Dataset: ADZ Updated 2013 County Data (without 1993 data)

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -0.82 | -5.23 | 9.90 | 1.41 | 5.73 | -1.29 | 3.61 |
| | (6.44) | (11.23) | (6.20) | (7.52) | (8.22) | (5.98) | (5.56) |
| Spline Model: | -0.30 | -3.77 | 4.11** | 1.00 | 1.56 | 0.13 | 1.34 |
| | (1.54) | (4.79) | (1.79) | (2.50) | (1.97) | (1.96) | (2.05) |
| Hybrid Post-Passage Dummy: | -0.53 | -1.34 | 5.91 | 0.38 | 4.34 | -1.51 | 2.33 |
| | (6.06) | (7.60) | (6.07) | (7.49) | (7.88) | (5.94) | (5.41) |
| Trend Effect: | -0.27 | -3.70 | 3.79** | 0.98 | 1.32 | 0.21 | 1.22 |
| | (1.46) | (4.54) | (1.79) | (2.54) | (1.90) | (1.98) | (2.07) |

## VII. Extending the Data Through 2006

Thus far we have presented panel-data regression results for the period 1977-2000.  Since more data are now available, we can further test the strength of the MGLC premise over time by estimating the NRC Lott and Mustard covariates specification on data extended through 2006. Table 5a presents our estimates (with clustering), which can be compared with Table 2b (which also clusters the standard errors in the main NRC model, but is estimated on the shorter time period).  This comparison reveals that the additional six years of data do not substantially change the picture that emerged in Table 2b showing that  RTC laws *increase* aggravated assault, auto theft, burglary, and larceny (although the results showing an increase in aggravated assault are

---

states have passed this legislation of which we are aware: Florida (1984), Illinois (1986), Louisiana (1985), New Jersey (1991), North Dakota (1989), Oklahoma (1986), Tennessee (1995), and Washington (1979).  We included this dummy variable when running both the NRC specification (through 2000) and our preferred specification (through 2006) without state-specific trends, and found that this dummy indicator of domestic violence reporting statutes did not undermine our general finding that RTC laws *increase* aggravated assaults.

[23] Estimations include year and county fixed effects and are weighted by county population.  Robust standard errors are provided beneath point estimates in parentheses.   The control variables (adopted from the Lott-Mustard model) include: lagged arrest rate, county population, population density, per capita income measures, and 36 demographic composition measures indicating the percentage of the population belonging to a race-age-gender group.   * Significant at 10%; ** Significant at 5%; *** Significant at 1%.

stronger with the additional years of data for the dummy model).

Table 5b simply adds state trends to the Table 5a model, which can then be compared to Table 4 (clustering, state trends, and 1977-2000 county data).  Collectively, these results suggest that the added six years of data do not appreciably change the results from the shorter period. The inclusion of state trends on the longer data set suggests that RTC laws *increase* aggravated assault by roughly 8-9 percent.

38

# **Table 5**[24]

## Table 5a

Estimated Impact of RTC Laws – Lott-Mustard Controls, 1977-2006 – Clustered Standard Errors

Dataset: ADZ Updated 2013 County Data (without 1993 data)

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -3.03 | 15.45 | 15.30*** | 7.55 | 17.72** | 11.20** | 16.40*** |
| | (6.46) | (14.68) | (5.12) | (5.23) | (7.59) | (4.67) | (5.15) |
| Spline Model: | -0.20 | 0.98 | 1.05 | 0.43 | 1.01 | 0.36 | 1.05* |
| | (0.59) | (1.25) | (0.71) | (0.53) | (0.63) | (0.46) | (0.53) |
| Hybrid Post-Passage Dummy: | -2.61 | 13.65 | 13.06*** | 6.97 | 16.30** | 11.90** | 14.45*** |
| | (6.72) | (12.51) | (4.58) | (6.15) | (7.08) | (5.41) | (5.29) |
| Trend Effect: | -0.09 | 0.39 | 0.49 | 0.13 | 0.31 | -0.15 | 0.42 |
| | (0.60) | (0.96) | (0.71) | (0.61) | (0.51) | (0.52) | (0.55) |

## Table 5b

Estimated Impact of RTC Laws – Lott-Mustard Controls, 1977-2006 – Clustered Standard Errors and State Trends

Dataset: ADZ Updated 2013 County Data (without 1993 data)

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 0.03 | -8.30 | 9.45** | 6.79 | 9.20 | 3.71 | 6.03 |
| | (5.61) | (10.75) | (4.33) | (6.19) | (6.16) | (4.93) | (5.14) |
| Spline Model: | -0.44 | -5.57 | 1.65 | -0.54 | -0.84 | -1.37 | -1.54 |
| | (0.99) | (4.49) | (1.48) | (1.83) | (1.81) | (1.54) | (1.66) |
| Hybrid Post-Passage Dummy: | 0.23 | -5.85 | 8.79** | 7.09 | 9.66* | 4.37 | 6.78 |
| | (5.68) | (9.28) | (4.18) | (6.11) | (5.76) | (4.71) | (4.78) |
| Trend Effect: | -0.45 | -5.46 | 1.48 | -0.68 | -1.03 | -1.45 | -1.67 |
| | (1.01) | (4.40) | (1.47) | (1.83) | (1.76) | (1.53) | (1.65) |

---

[24] Estimations include year and county fixed effects, and are weighted by county population.  Robust standard errors are provided beneath point estimates in parentheses.   The control variables (adopted from the Lott-Mustard model) include: lagged arrest rate, county population, population density, per capita income measures, and 36 demographic composition measures indicating the percentage of the population belonging to a race-age-gender group.   * Significant at 10%; ** Significant at 5%; *** Significant at 1%.

## VIII. Revising the Lott-Mustard Specification

We have already suggested that the Lott and Mustard specification that the NRC employed is not particularly appealing along a number of dimensions.  The most obvious problem – omitted variable bias has already been alluded to: the Lott and Mustard (1997) model had no control for incarceration, which Wilson considered to be one of the most important influences on crime in the last 20 years.  In addition to a number of important omitted variables, the Lott-Mustard model adopted by the NRC includes a number of questionable variables, such as the dubious ratio of arrests to murders, and the 36 (highly collinear) demographic controls.

To explore whether these specification problems are influencing the regression estimates, we revise the NRC models in a number of ways.  First, we completely drop Lott and Mustard's flawed contemporaneous arrest rate variable and add in two preferable measures of state law enforcement/deterrence: the incarceration rate and the rate of police.[25]  Second, we add two additional controls to capture economic conditions: the unemployment rate and the poverty rate, which are also state-level variables. Finally, mindful of Horowitz's admonition that the Lott-Mustard model might have *too many* variables (including demographic controls that are arguably irrelevant to the relationship between the guns and crime, and may have a spurious, misleading effect), we decided not to follow the NRC in using the 36 demographic controls employed by Lott-Mustard.  Instead, we adhered to the more customary practice in the econometrics of crime and controlled only for the demographic groups considered to be most involved with criminality (as offenders and victims), namely the percentage of black and white males between ages 10 and

---

[25] We also estimated the model with the arrest rate (lagged by one year to avoid endogeneity concerns), and the results were qualitatively similar to Table 6a except that dummy variable estimates for Rape (10%), Assault (1%), Robbery (5%), Auto (5%), Burglary (1%), and Larceny (1%) are now all significant. For Table 6b, the dummy variable estimates for murder, burglary, and larceny shift from negative to positive (but still remain insignificant) and assault and auto theft become positive and significant at the 10% level.

40

## JA 290

40 in each county.[26]

The results with this new specification are presented in Tables 6a-6b (which correspond to Tables 5a-5b estimated using the Lott and Mustard specification).  Note that had the NRC panel used our preferred specification while maintaining its view that neither clustering nor controls for state trends are needed, we would have overwhelming evidence that RTC laws *increase* crime.[27]  We don't show these regression results since we are convinced that clustering is needed, although of course when we cluster in Table 6a, the point estimates remain the same (while significance is drastically reduced).  Table 6b shows that this model is sensitive to whether we control for state trends, since adding these trends reverses the sign of most of our estimates (while making all of them statistically insignificant).  Essentially, our preferred specification shows almost no statistically significant crime effects (with the large standard errors reflecting a considerable degree of uncertainty).

---

[26] To test the robustness of this specification to changes in the demographic controls, we also estimated the following variants from our 6 demographic controls: only black males between ages 10 and 40 (three variables); only black males between ages 10 and 30 (two variables); and black and white males between ages 10 and 30 (four variables).  The results were again qualitatively similar across our tests.

[27] Re-estimating Table 6a without clustering (no state trends) shows all dummy variable point estimates (except murder) positive and significant at the 1% level.  The murder dummy variable is positive, but not significant. For the spline model, all spline estimates (except murder) are positive and significant at the 1% level, whereas murder is positive and significant at the 5% level.

## Table 6[28]

### Table 6a

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1977-2006 – Clustered Standard Errors
Dataset: ADZ Updated 2013 County Data (without 1993 data)

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 1.59 | 25.33 | 22.65 | 22.27 | 27.46 | 30.08 | 31.33 |
| | (7.63) | (18.81) | (19.54) | (14.82) | (21.81) | (23.09) | (26.54) |
| Spline Model: | 0.38 | 2.81 | 3.19 | 2.58* | 3.07 | 3.64 | 4.19 |
| | (0.82) | (1.76) | (1.95) | (1.53) | (2.25) | (2.38) | (2.72) |
| Hybrid Post-Passage Dummy: | -0.43 | 14.75 | 8.74 | 12.20 | 15.81 | 15.49 | 13.56 |
| | (7.75) | (15.38) | (17.15) | (12.83) | (17.82) | (19.46) | (21.54) |
| Trend Effect: | 0.40 | 2.11 | 2.77 | 2.01 | 2.32 | 2.91 | 3.55 |
| | (0.86) | (1.45) | (1.81) | (1.42) | (1.97) | (2.17) | (2.41) |

### Table 6b

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1977-2006 – Clustered Standard Errors and State Trends
Dataset: ADZ Updated 2013 County Data (without 1993 data)

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -2.66 | -15.99 | -2.36 | 2.73 | 1.26 | -6.39 | -7.06 |
| | (6.34) | (13.35) | (11.59) | (8.58) | (11.70) | (13.18) | (14.71) |
| Spline Model: | -0.43 | -7.93 | 0.58 | -0.60 | -0.71 | -2.23 | -2.68 |
| | (1.26) | (5.54) | (2.66) | (2.41) | (2.98) | (3.05) | (3.42) |
| Hybrid Post-Passage Dummy: | -2.50 | -12.80 | -2.62 | 3.00 | 1.56 | -5.50 | -6.00 |
| | (6.56) | (12.20) | (12.09) | (8.95) | (12.14) | (13.73) | (15.24) |
| Trend Effect: | -0.38 | -7.69 | 0.63 | -0.66 | -0.74 | -2.13 | -2.57 |
| | (1.31) | (5.50) | (2.75) | (2.48) | (3.08) | (3.17) | (3.55) |

---

[28] Estimations include year and county fixed effects and are weighted by county population.  Robust standard errors are provided beneath point estimates in parentheses.   The control variables for this "preferred" specification include: incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, population density, per capita income measures, and six demographic composition measures.   * Significant at 10%; ** Significant at 5%; *** Significant at 1%.

42

**JA 292**

## IX. State versus County Crime Data

In their initial study, Lott and Mustard (1997) tested the "More Guns, Less Crime"
hypothesis by relying primarily on county-level data from the FBI's *Uniform Crime Reports*
(UCR).[29]  These FBI reports present yearly estimates of crime based on monthly crime data from
local and state law enforcement agencies across the country.  The NRC report followed Lott and
Mustard in this choice and presented regression estimates using only county data.  Unfortunately,
according to criminal justice researcher Michael Maltz, the FBI's county-level data is highly
problematic.

The major problem with county data stems from the fact that law enforcement agencies
voluntarily submit crime data to the FBI.  As a result, the FBI has little control over the accuracy,
consistency, timeliness, and completeness of the data it uses to compile the UCR reports.  In a
study published in the *Journal of Quantitative Criminology,* Maltz and Targonski (2002)
carefully analyzed the shortcomings in the UCR data set and concluded that UCR county-level
data is unacceptable for evaluating the impact of RTC laws.   For example, in Connecticut,
Indiana, and Mississippi, over 50% of the county-level data points are missing crime data for
more than 30% of their populations (Maltz and Targonski 2002).  In another thirteen states, more
than 20% of the data points have gaps of similar magnitude.  Based on their analysis, Maltz and
Targonski (2002) concluded that:

> "County-level crime data cannot be used with any degree of confidence…The crime rates
> of a great many counties have been underestimated, due to the exclusion of large
> fractions of their populations from contributing to the crime counts. Moreover, counties
> in those states with the most coverage gaps have laws permitting the carrying of
> concealed weapons. How these shortcomings can be compensated for is still an open
> question…it is clear, however, that in their current condition, county-level UCR crime
> statistics cannot be used for evaluating the effects of changes in policy" (pp. 316-317).

---

[29] Lott and Mustard present results based on state-level data, but they strongly endorse their county-level over their
state-level analysis: "the very different results between state- and county-level data should make us very cautious in
aggregating crime data and would imply that the data should remain as disaggregated as possible" (Lott and
Mustard, 1997, p. 39).

Because of the concerns raised about county-level crime data, it is prudent to test our models on state-level data. According to Maltz and Targonski (2003), state-level crime data are less problematic than county-level data because the FBI's state-level crime files take into account missing data by imputing all missing agency data. County-level files provided by NACJD, however, impute missing data only if an agency provides at least six months of data; otherwise, the agency is dropped completely (Maltz 2006). As with our estimations using county-level data, we compiled our state-level data from scratch, and will refer to it as "Updated 2013 State-level Data."[30]

### A. State Data Results Using the Lott-Mustard Specification

Unsurprisingly, the regression results reproduced using state-level data are again different from the NRC committee's estimates using county-level data. This is shown in Table 7a, which presents the results from the NRC's specification (the Lott-Mustard model) on state data through 2010, with the cluster adjustment.[31] Table 7b simply adds state trends. When we compare these state-level estimates to the county-level estimates (using the Updated 2013 County-Level Data Set), we see that there are marked differences. Considering the preceding discussion on the reliability—or lack thereof—of county data, this result may be unsurprising.[32] Looking across

---

[30] State poverty data for years 1977 and 1978 are unavailable from the census. Thus all regressions run on our state dataset are effectively using data from 1979 onwards. State poverty figures from 1980 onwards come from the Census Bureau's Historical Poverty Table 21 found at (http://www.census.gov/hhes/www/poverty/data/historical/people.html). The data for 1979 comes from the Census Statistical Abstract for 1982.

[31] Our placebo test on county data showed that standard errors needed to be adjusted by clustering. In Appendix A, we again find that clustering is needed for state data. Thus, all our state-level estimates include clustering.

[32] We also estimated the model on data through 2000 (the last year in the NRC report). Though those results are not shown here, our point estimates for this model are qualitatively similar to those shown in Tables 7a. Interestingly, the patterns of statistical significance are extremely different. For example, when Table 7a is estimated through the year 2000, there is a statistically significant decline in aggravated assault in the hybrid model with no other impact on violent crime. When estimated to the year 2010, however, Table 7a shows no statistically significant decline in aggravated assault and evidence of declines in rape and robbery. Moreover, while Table 7b shows some hints of crime declines for rape and aggravated assault when estimated through 2000, when the data is extended for another

the models with and without state linear trends, there is evidence of increases in aggravated assault and murder and decreases in robbery, burglary, auto theft, and rape after the passage of RTC laws.

As Ayres and Donohue (2003; 1231) noted, the most important driver of the ostensible decline in crime from RTC laws comes from the Lott and Mustard use of 36 highly collinear demographic variables. The Ayres and Donohue finding that "The results are incredibly sensitive to the inclusion of various seemingly unimportant demographic controls" still applies even after augmenting the data set with 10 more years of data. To demonstrate the strong influence of these variables, we rerun the regression shown in Table 7a after substituting a more defensible set of 6 controls for black and white men in the higher crime ages (the ADZ demographic variables) for the full set of 36 controls used in the Lott-Mustard specification. Examining the results of this process (shown in Table 7c) reveals that 27 out of the 28 resulting estimates of the effect of RTC laws on crime are positive, with at least some evidence of statistical significant crime increases for 5 of the 7 crime categories. The story is somewhat muddier when state trends are added (Table 7d), but the strongest effect in this modified version of the Lott and Mustard specification on more complete data suggests substantial and statistically significant increases in aggravated assaults.

---

decade, the table shows only statistically significant evidence of *increases* in aggravated assault. We also estimate the NRC's no-controls model through 2010 on the state-level data. See Appendix B for these results.

## Table 7[33]

### Table 7a

Estimated Impact of RTC Laws – Lott-Mustard Controls, 1977-2010 – Clustered Standard Errors

Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -2.96 | -5.07** | -0.69 | -7.53** | 1.78 | -3.35* | 2.24 |
| | (3.60) | (2.23) | (4.56) | (2.92) | (4.03) | (1.92) | (1.76) |
| Spline Model: | 0.49 | -0.23 | 0.64 | 0.03 | -0.54 | -0.26 | 0.39 |
| | (0.36) | (0.38) | (0.62) | (0.45) | (0.32) | (0.35) | (0.25) |
| Hybrid Post-Passage Dummy: | -4.91 | -4.70* | -2.94 | -8.28*** | 3.75 | -2.75 | 1.10 |
| | (3.59) | (2.68) | (3.76) | (3.01) | (4.48) | (1.90) | (1.59) |
| Trend Effect: | 0.62* | -0.12 | 0.71 | 0.24 | -0.63* | -0.19 | 0.37 |
| | (0.34) | (0.42) | (0.60) | (0.43) | (0.35) | (0.35) | (0.25) |

### Table 7b

Estimated Impact of RTC Laws – Lott-Mustard Controls, 1977-2010 – Clustered Standard Errors and State Trends

Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -0.87 | -3.54 | -2.93 | -3.91 | 2.20 | -2.28 | 0.45 |
| | (3.48) | (2.43) | (3.07) | (2.76) | (3.10) | (1.51) | (1.36) |
| Spline Model: | 0.70 | 0.03 | 1.70*** | 0.23 | -1.62** | 0.20 | 0.18 |
| | (0.75) | (0.60) | (0.56) | (0.86) | (0.74) | (0.55) | (0.44) |
| Hybrid Post-Passage Dummy: | -1.50 | -3.68 | -4.49 | -4.23 | 3.68 | -2.53 | 0.31 |
| | (3.39) | (2.59) | (3.02) | (2.74) | (3.20) | (1.68) | (1.46) |
| Trend Effect: | 0.76 | 0.17 | 1.87*** | 0.39 | -1.75** | 0.29 | 0.16 |
| | (0.73) | (0.63) | (0.56) | (0.85) | (0.79) | (0.57) | (0.45) |

---

[33] Estimations include year and state fixed effects, and are weighted by state population.  Robust standard errors are provided beneath point estimates in parentheses.   The control variables (adopted from the Lott-Mustard model) include: lagged arrest rate, state population, population density, per capita income measures, and 36 demographic composition measures indicating the percentage of the population belonging to a race-age-gender group.   * Significant at 10%; ** Significant at 5%; *** Significant at 1%.

46

**JA 296**

## Table 7 (Continued)[34]

### Table 7c

Estimated Impact of RTC Laws – Lott-Mustard Controls (with ADZ Demographic Variables), 1977-2010 – Clustered Standard Errors

Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 2.20 | 9.67* | 7.86 | 12.04 | 17.15 | 11.21* | 10.40** |
| | (6.84) | (5.37) | (5.42) | (8.97) | (10.70) | (6.22) | (4.55) |
| Spline Model: | 0.62 | 0.86 | 1.18* | 1.59* | 1.39 | 0.95 | 1.05** |
| | (0.64) | (0.59) | (0.67) | (0.80) | (0.93) | (0.61) | (0.43) |
| Hybrid Post-Passage Dummy: | -1.21 | 6.54 | 2.22 | 4.82 | 12.55 | 7.96 | 6.31* |
| | (5.78) | (4.76) | (4.62) | (6.86) | (8.30) | (4.81) | (3.75) |
| Trend Effect: | 0.66 | 0.61 | 1.09 | 1.40** | 0.90 | 0.64 | 0.80** |
| | (0.59) | (0.56) | (0.68) | (0.69) | (0.70) | (0.51) | (0.39) |

### Table 7d

Estimated Impact of RTC Laws – Lott-Mustard Controls (with ADZ Demographic Variables), 1977-2010 – Clustered Standard Errors and State Trends

Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 0.77 | -4.65* | -3.33 | -2.01 | 3.10 | -0.63 | 0.24 |
| | (3.91) | (2.41) | (3.55) | (3.16) | (4.72) | (1.90) | (1.87) |
| Spline Model: | 0.46 | 0.15 | 1.82** | -0.26 | -1.49* | 0.02 | -0.39 |
| | (0.72) | (0.59) | (0.68) | (0.95) | (0.78) | (0.59) | (0.55) |
| Hybrid Post-Passage Dummy: | 0.43 | -4.88* | -4.83 | -1.86 | 4.31 | -0.66 | 0.54 |
| | (3.95) | (2.50) | (3.38) | (3.29) | (4.63) | (2.15) | (2.05) |
| Trend Effect: | 0.45 | 0.31 | 1.97*** | -0.20 | -1.63** | 0.04 | -0.41 |
| | (0.72) | (0.60) | (0.67) | (0.98) | (0.79) | (0.63) | (0.58) |

---

[34] Estimations include year and state fixed effects, and are weighted by state population.  Robust standard errors are provided beneath point estimates in parentheses.   The control variables (adopted from the Lott-Mustard model) include: lagged arrest rate, state population, population density, per capita income measures, and the six demographic composition measures used in the ADZ model.   * Significant at 10%; ** Significant at 5%; *** Significant at 1%.

47

## JA 297

### B. State Data Results Using the ADZ Preferred Specification

Table 8 mimics Table 7 in that we again employ state data through 2010 but now we use our preferred set of controls.  Here the ostensible evidence that RTC laws increase crime is very strong:  all three models in Table 8a have positive coefficients for every crime category, and 12 of the 28 coefficients are statistically significant.  Table 8b once again shows highly significant evidence (in the spline model and in the trend effect of the hybrid model) that RTC laws increase aggravated assault.  Some significant but conflicting predictions for auto theft emerge with both dummy effects positive and significant, while both trend effects are negative and significant.  None of the remaining coefficients are statistically significant.[35]

While there are a number of differences in the modified Lott-Mustard specification versus the ADZ specification, the most important difference in generating the different estimates of the impact of RTC laws is the Lott-Mustard use of 36 demographic variables.  We illustrate this in Table 8c, by substituting Lott's chosen thirty-six demographic variables in place of our own.  Under this specification, RTC laws are no longer associated with any statistically significant increases in crime and rape, robbery, and auto theft appear to decline.  Adding state trends in Table 8d brings back a result similar to that in Table 7d:  aggravated assault rises sharply and auto theft seems to fall with the adoption of RTC laws.

---

[35] As a robustness check for the Tables 8a and 8b results, we explored the effect of dropping the states with the highest residual variances from the aggravated assault regressions in these two tables.  Appendix C shows the results of this exercise.  Essentially, the basic patterns of Tables 8a and 8b persist, but evidence of RTC laws increasing aggravated assault is strengthened when the high variance states are dropped from Table 8a and somewhat weakened when dropped from Table 8b.xxx

48

## Table 8[36]

### Table 8a

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1979-2010 – Clustered Standard Errors

Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 3.31 | 11.53** | 8.03* | 13.85* | 17.83* | 12.54* | 10.80** |
| | (6.51) | (5.73) | (4.46) | (8.03) | (8.95) | (6.28) | (4.70) |
| Spline Model: | 0.58 | 0.82 | 1.05* | 1.27 | 1.20 | 0.81 | 0.85* |
| | (0.64) | (0.63) | (0.60) | (0.82) | (0.80) | (0.63) | (0.49) |
| Hybrid Post-Passage Dummy: | 0.82 | 9.23* | 3.91 | 9.58 | 14.59* | 10.46* | 8.18** |
| | (5.35) | (4.79) | (4.01) | (6.86) | (7.47) | (5.21) | (4.00) |
| Trend Effect: | 0.56 | 0.51 | 0.92 | 0.95 | 0.72 | 0.46 | 0.58 |
| | (0.58) | (0.58) | (0.62) | (0.77) | (0.66) | (0.55) | (0.46) |

### Table 8b

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1979-2010 – Clustered Standard Errors and State Trends

Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -0.74 | -3.16 | -1.80 | 1.66 | 8.72* | 0.87 | 1.03 |
| | (3.94) | (2.30) | (3.61) | (3.16) | (4.50) | (2.19) | (1.83) |
| Spline Model: | 0.77 | -0.25 | 1.88** | -0.23 | -1.32* | -0.08 | -0.59 |
| | (0.74) | (0.65) | (0.80) | (0.79) | (0.76) | (0.64) | (0.52) |
| Hybrid Post-Passage Dummy: | -1.33 | -3.05 | -3.23 | 1.87 | 9.90** | 0.95 | 1.49 |
| | (3.86) | (2.34) | (3.51) | (3.33) | (4.42) | (2.31) | (1.98) |
| Trend Effect: | 0.81 | -0.16 | 1.99** | -0.29 | -1.64** | -0.11 | -0.64 |
| | (0.72) | (0.65) | (0.79) | (0.83) | (0.73) | (0.66) | (0.55) |

---

[36] These regressions include year and state fixed effects, and are weighted by state population. Robust standard errors are provided beneath point estimates in parentheses. The control variables for this "preferred" specification include: incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, population density, per capita income measures, and six demographic composition measures.
* Significant at 10%; ** Significant at 5%; *** Significant at 1%.

**JA 299**

## Table 8 (Continued)

Table 8c[37]

Estimated Impact of RTC Laws – ADZ Preferred Controls (with Lott-Mustard demographic variables), 1979-2010 – Clustered Standard Errors

Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -4.55 | -5.46** | 0.48 | -6.62** | 3.87 | -3.29 | 0.98 |
| | (3.46) | (2.50) | (4.23) | (3.23) | (3.14) | (2.16) | (1.95) |
| Spline Model: | 0.21 | -0.30 | 0.64 | -0.26 | -0.75* | -0.38 | 0.13 |
| | (0.35) | (0.35) | (0.58) | (0.46) | (0.38) | (0.33) | (0.27) |
| Hybrid Post-Passage Dummy: | -5.51 | -4.91* | -1.47 | -6.27* | 6.43* | -2.34 | 0.66 |
| | (3.46) | (2.73) | (3.59) | (3.49) | (3.45) | (2.22) | (2.01) |
| Trend Effect: | 0.33 | -0.19 | 0.68 | -0.12 | -0.89** | -0.33 | 0.11 |
| | (0.35) | (0.37) | (0.56) | (0.46) | (0.37) | (0.33) | (0.28) |

Table 8d

Estimated Impact of RTC Laws – ADZ Preferred Controls (with Lott-Mustard demographic variables), 1979-2010 – Clustered Standard Errors and State Trends

Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -0.32 | -2.36 | -2.50 | -0.21 | 5.29** | -0.74 | 1.12 |
| | (3.27) | (2.54) | (3.08) | (2.60) | (2.30) | (1.61) | (1.19) |
| Spline Model: | 0.96 | 0.05 | 1.92*** | 0.49 | -1.36* | 0.38 | 0.09 |
| | (0.73) | (0.60) | (0.69) | (0.88) | (0.75) | (0.56) | (0.46) |
| Hybrid Post-Passage Dummy: | -1.17 | -2.49 | -4.26 | -0.64 | 6.65*** | -1.10 | 1.08 |
| | (3.10) | (2.65) | (3.00) | (2.59) | (2.32) | (1.68) | (1.30) |
| Trend Effect: | 1.01 | 0.14 | 2.09*** | 0.51 | -1.62** | 0.43 | 0.05 |
| | (0.69) | (0.62) | (0.69) | (0.89) | (0.76) | (0.58) | (0.48) |

---

[37] These regressions include year and state fixed effects, and are weighted by state population. Robust standard errors are provided beneath point estimates in parentheses. The control variables for this "preferred" specification include: incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, population density, per capita income measures, and thirty-six demographic composition measures.
* Significant at 10%; ** Significant at 5%; *** Significant at 1%.

**JA 300**

Given the strong influence that demographic variables have on the estimated effect of RTC laws on crime, it is important to reflect on why we prefer our demographic variables to the specification used in the Lott-Mustard model.  The first thing to note about the Lott-Mustard specification is that it is entirely idiosyncratic:  no other major study in the entire empirical literature on crime has used the sheer number of demographic controls found in the Lott-Mustard model.  In fact, many published papers use fewer demographic controls than the six that we include in our own preferred model.  Table 9 modifies our specification by reducing our six demographic controls to only three that represent the size of the younger black male population (in the three age groups of 10-19, 20-29 and 30-39).  The effect of this change can be seen by comparing Table 9a to 8a (no state trends) and Table 9b to 8b (with state trends).  Beginning with the first comparison, we see that using even fewer demographic controls only strengthens our finding that RTC laws are generally associated with higher, not lower, crime rates.  Table 9a suggests that RTC laws caused every crime category apart from murder to rise by 9.5 percent or more.  The comparison of Tables 9b and 8b (with state trends) shows that changing the demographic variables has a small influence on the results when controls are included for state trends.  Nevertheless, reducing the number of demographic variables in Table 9b does not change our finding that there is no evidence that RTC laws decrease violent crime.[38]

---

[38] A fairly standard set of demographics that can be seen in the crime literature includes controls for a few age categories across all races combined with a single identifier of the percentage of blacks in the state.  Table D1 and D2 in Appendix D provide this tweak to the ADZ model by putting in four such demographic variables – the percent of the population falling into the three age categories of 10-19, 20-29, and 30-39 plus the percent black -- in place of the ADZ six demographic variables.  The results for violent crime are not dramatically different from the main ADZ models of Tables 8a and 8b.  Table D1's and Table 8a's estimated violent crime increases for rape, aggravated assault, and robbery are substantial in both sets of dummy variable estimates and significant at the .10 level or better, but only Table 8a has one of these rise to the level of significance at the .05 level (for rape).

51

# Table 9[39]

## Table 9a

Estimated Impact of RTC Laws – ADZ Preferred Controls (with 3 demographic variables), 1979-2010 – Clustered Standard Errors

Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 3.01 | 10.77** | 9.69** | 14.66** | 19.65** | 13.26** | 11.24** |
| | (5.71) | (5.36) | (3.84) | (7.29) | (7.76) | (5.51) | (4.25) |
| Spline Model: | 0.50 | 0.87 | 1.04* | 1.26 | 1.08 | 0.89 | 0.88* |
| | (0.60) | (0.59) | (0.54) | (0.75) | (0.72) | (0.56) | (0.45) |
| Hybrid Post-Passage Dummy: | 0.84 | 8.00* | 5.79 | 10.49 | 17.37** | 10.87** | 8.51** |
| | (4.71) | (4.43) | (3.78) | (6.71) | (6.82) | (4.85) | (3.82) |
| Trend Effect: | 0.47 | 0.60 | 0.84 | 0.90 | 0.49 | 0.52 | 0.59 |
| | (0.56) | (0.55) | (0.57) | (0.74) | (0.65) | (0.52) | (0.44) |

## Table 9b

Estimated Impact of RTC Laws – ADZ Preferred Controls (with 3 demographic variables), 1979-2010 – Clustered Standard Errors and State Trends

Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 0.23 | -3.46 | 1.01 | 4.24 | 11.14** | 1.93 | 1.67 |
| | (3.81) | (2.76) | (3.33) | (3.19) | (4.41) | (2.21) | (1.79) |
| Spline Model: | 0.48 | -0.16 | 1.52* | -0.31 | -0.77 | -0.20 | -0.95* |
| | (0.67) | (0.58) | (0.79) | (0.74) | (0.74) | (0.64) | (0.48) |
| Hybrid Post-Passage Dummy: | -0.06 | -3.41 | 0.08 | 4.50 | 11.78** | 2.08 | 2.28 |
| | (3.74) | (2.80) | (3.18) | (3.34) | (4.44) | (2.30) | (1.97) |
| Trend Effect: | 0.48 | -0.08 | 1.52* | -0.41 | -1.04 | -0.25 | -1.00* |
| | (0.65) | (0.59) | (0.79) | (0.76) | (0.73) | (0.65) | (0.50) |

---

[39] These regressions include year and state fixed effects, and are weighted by state population. Robust standard errors are provided beneath point estimates in parentheses. The control variables for this "preferred" specification include: incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, population density, per capita income measures, and three demographic composition measures.
\* Significant at 10%; \*\* Significant at 5%; \*\*\* Significant at 1%.

52

**JA 302**

### C. The 36 Demographic Controls Should Not be Used in Crime Regressions

In his book *More Guns, Less Crime*, Lott concedes that he "overcontrolled" for demographic composition out of an abundance of caution, in order to avoid potentially problematic omitted variable bias.  However, it is well known that introducing a large number of highly collinear variables into a regression model can lead to highly unstable results.[40]  To test for the degree of collinearity among the independent variables when the Lott-Mustard demographic variables are used in Table 8c, we run auxiliary regressions of one independent variable on the remaining explanatory variables and analyze the resulting variance inflation factor (VIF).[41]  Table 10 shows that the RTC variable has an uncomfortably high VIF greater than 5 in both the dummy and spline models when the 36 demographic controls are used.  Using the 6 ADZ variables (or the more limited set of 3 demographics) reduces the multicollinearity for the RTC dummy to a tolerable level (with VIFs always below 5).  Nonetheless, the degree of multicollinearity for the individual demographics (showing three different black-male categories) can be seen to be astonishingly high with 36 demographic controls and still high with even more limited demographic controls. This analysis makes us highly skeptical of any estimates of the impact of RTC laws that employ the Lott-Mustard set of 36 demographic controls.

---

[40] For a longer discussion of the consequences that multicollinearity can have on a regression model, see Studenmund (1997).

[41] The VIF is an estimate of the extent to which multicollinearity has increased the variance of the estimated coefficient. A VIF of five or more, calculated as the inverse of the difference between 1 and the coefficient of determination ($R^2$) from the auxiliary regression, is evidence of severe multicollinearity.

53

**JA 303**

| Table 10[42] | | RTC | Black Male: 10-19 | Black Male: 20-20 | Black Male: 30-39 |
|---|---|---|---|---|---|
| *VIF Calculations* | | | | | |
| 36 Demographic Controls: | Dummy Variable Model: | 5.9 | 13888.9 | 1733.1 | 1788.9 |
| | Spline Mode: | 7.0 | 13888.9 | 1733.1 | 1785.7 |
| 6 Demographic Controls: | Dummy Variable Model: | 4.1 | 158.8 | 91.4 | 74.1 |
| | Spline Model: | 4.8 | 158.4 | 90.8 | 75.6 |
| 3 Demographic Controls: | Dummy Variable Model: | 3.8 | 136.5 | 82.1 | 67.7 |
| | Spline Model: | 4.4 | 136.8 | 82.6 | 68.8 |

### D. Addressing the Problem of Endogenous Adoption of RTC Laws

The problem of endogenous adoption of RTC laws during a period of rising crime that is unique to a state is obviously a concern, since this would likely bias the estimated effect of the law in a way that would make the law appear more favorable in reducing crime (as crime ultimately returned to prior mean levels).  One way to address this concern is to restrict the analysis to a period such as 1999-2010, which is a far more stable period of crime in the US. The 1999-2010 period does not include the immense increases and then declines associated with the rise and fall of the crack epidemic, which threatened a key assumption of the panel data model of crime (since these dramatic crime shifts were not uniform across states and thus could not be expected to be adequately captured by year fixed effects). Table 11a restricts the analysis of the basic ADZ model to this date range, with the hope that this estimation on a more limited sample involving only 8 states that adopted RTC laws during that time frame will eliminate enough endogeneity bias to offset the cost of having a smaller sample size.  This approach generates evidence that RTC laws increased the rate of murder but had no other statistically

---

[42] These regressions include year and state fixed effects, and are weighted by state population.  The control variables for this "preferred" specification include: incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, population density, and per capita income measures. The number of demographic variables (excluding the explanatory variable for which the VIF is calculated) varies by row in the table. The VIF is calculated as $1/(1-R^2)$.

54

**JA 304**

significant impact on crime for the 8 changing states.  Table 11b shows that if state trends need to be controlled for, the results become more varied, with some crime declines (in rape and larceny and possibly auto theft) and a possible crime increase in aggravated assault.

## <u>Table 11</u>[43]

### Table 11a

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1999-2010 – Clustered Standard Errors
Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 7.40 | 3.00 | 4.76 | -3.55 | -0.21 | 1.79 | -3.18 |
| | (5.84) | (3.50) | (3.73) | (5.23) | (4.07) | (3.40) | (2.64) |
| Spline Model: | 1.47** | 0.34 | 1.10 | 0.12 | -0.61 | 0.59 | 0.15 |
| | (0.55) | (0.42) | (0.67) | (0.43) | (0.73) | (0.38) | (0.33) |
| Hybrid Post-Passage Dummy: | 6.73 | 2.85 | 4.26 | -3.62 | 0.08 | 1.52 | -3.27 |
| | (6.06) | (3.51) | (3.82) | (5.31) | (4.05) | (3.52) | (2.66) |
| Trend Effect: | 1.42*** | 0.32 | 1.07 | 0.14 | -0.61 | 0.58 | 0.18 |
| | (0.53) | (0.42) | (0.67) | (0.44) | (0.73) | (0.39) | (0.33) |

### Table 11b

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1999-2010 – Clustered Standard Errors and State Trends
Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 5.70 | 4.66 | 6.00* | 1.04 | 1.66 | 1.91 | -0.38 |
| | (5.30) | (3.57) | (3.24) | (6.66) | (5.48) | (4.11) | (2.43) |
| Spline Model: | 1.03 | -2.94** | -1.70 | -1.41 | -5.36* | -0.92 | -1.72** |
| | (3.24) | (1.22) | (1.40) | (1.93) | (2.79) | (1.41) | (0.85) |
| Hybrid Post-Passage Dummy: | 5.79 | 4.44 | 5.87* | 0.93 | 1.24 | 1.84 | -0.52 |
| | (5.32) | (3.53) | (3.21) | (6.75) | (5.26) | (4.07) | (2.34) |
| Trend Effect: | 1.10 | -2.89** | -1.64 | -1.40 | -5.35* | -0.90 | -1.72** |
| | (3.23) | (1.22) | (1.35) | (1.91) | (2.76) | (1.37) | (0.85) |

## X. Additional Concerns in the Evaluation of Legislation Using Observational Data

We now turn to three critical issues that must be considered when using panel data to evaluate the impact of legislation and public policy (and gun laws in particular).  First, we discuss the possibility of difficult-to-measure omitted variables and how such variables can shape estimates of policy impact.  We are particularly concerned with how the crack epidemic of the 1980s and 1990s may bias results in the direction of finding a beneficial effect.  Second, we explore pre-adoption crime trends in an attempt to examine the potentially endogenous adoption of right-to-carry legislation.  Finally, given that the intent of right-to-carry legislation is to increase gun-carrying in law-adopting states, we explore whether these laws may have had a particular effect on gun-related assaults (which is the one crime category that has generated somewhat consistent results thus far).

### A. Further Thoughts on Omitted Variable Bias

As discussed above, we believe it is likely that the NRC's estimates of the effects of RTC legislation are marred by omitted variable bias. In our attempt to improve (at least to a degree) on the original Lott-Mustard model, we included additional explanatory factors, such as the incarceration and police rates, and removed extraneous variables (such as unnecessary and collinear demographic measures).  We recognize, however, that there are additional criminogenic influences for which we cannot fully control.  In particular, we suspect that a major shortcoming of all of the models presented is the inability to account for the possible influence of the crack-

---

[43] These regressions include year and state fixed effects, and are weighted by state population.  Robust standard errors are provided beneath point estimates in parentheses.  The control variables for this "preferred" specification include: incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, population density, per capita income measures, and six demographic composition measures. The states that adopted shall issue laws during the time period are Colorado (2003), Kansas (2007), Michigan (2001), Minnesota (2003), Missouri (2004), Nebraska (2007), New Mexico (2004), and Ohio (2004).
* Significant at 10%; ** Significant at 5%; *** Significant at 1%.

cocaine epidemic on crime.[44]

Many scholars now suggest that rapid growth in the market for crack cocaine in the late 1980s and the early 1990s was likely one of the major influences on increasing crime rates (and violent crimes in particular) during this period (Levitt 2004).  Moreover, the harmful criminogenic effect of crack was likely more acute in urban areas of states slow to adopt RTC laws.  Meanwhile, many rural states adopted such laws during this era.  If this was indeed the case, this divergence between states could account for much of the purported "crime-reducing" effects attributed by Lott and Mustard to gun laws (which were then supported by scholars such as James Q. Wilson).  The regression analysis would then identify a relationship between rising crime and the failure to adopt RTC legislation, when the actual reason for this trend was the influence of crack (rather than the passage of the RTC law).

We now explore how results from our main models vary when we restrict the analysis to the time periods before and after the peak of the American crack epidemic. According to Fryer et al. (2005), the crack problem throughout most of the country peaked at some point in the early 1990s.  Coincidentally, the original Lott-Mustard period of analysis (1977-1992) contains years that likely represent the height of crack-induced crime problem.  With this in mind, we run our main regressions after breaking up our dataset into two periods: the original Lott-Mustard period

---

[44] Although Lott and Mustard (1997) do attempt to control for the potential influence of crack cocaine through the use of cocaine price data based on the U.S. Drug Enforcement Agency's STRIDE program, we find their approach wanting for both theoretical and empirical reasons.  First, a control for crack should capture the criminogenic influence of the crack trade on crime.  We know that prior to 1985, there was no such influence in any state and that after some point in the early to mid-1990s this criminogenic influence declined strongly.  Since there is little reason to believe that cocaine prices would be informative on the criminogenic influence of crack in particular geographic areas, it is hard to see how the cocaine price data could be a useful control.  Second, the data that Lott and Mustard use is itself questionable.  Horowitz (2001) argues forcefully that STRIDE data is not a reliable source of data for policy analyses of cocaine.  The data are mainly records of acquisitions made to support criminal investigations in particular cities, and are not a random sample of an identifiable population.  Moreover, since the STRIDE data is at the city-level, we are not sure how this would be used in a county-level analysis.  The data was collected for 21 cities, while there are over 3,000 counties in the U.S.  In addition, the data is missing for 1988 and 1989, which are crucial years in the rise of the crack epidemic in poor urban areas.  Lott and Mustard drop those years of analysis when including cocaine prices as a control.

of analysis (1979-1992) as well as the post-Lott-Mustard period (1993-2010). We first present the results for the era that includes the crack epidemic (1979-1992) [45] on our preferred model. We run these regressions (with clustered standard errors) on state-level data, with and without state trends. These results are presented in Tables 12a and 12b. We then estimate the same models on the post-crack period (see Tables 13a and 13b).

Note that, with a simple naive reading, the regression results in Table 12 from the initial 14-year time period (1979-1992) do suggest that violent crime rates are dampened by RTC laws if state trends are not needed and that murder, rape, and robbery may have declined if state trends are needed. If we look at the following 18 year period from 1993 – 2010 in Table 13, however, there is no longer any evidence of a statistically significant decline in violent crimes. Instead, RTC laws are associated with higher rates of murder, aggravated assault, robbery, and burglary. This evidence supports the theory that the initial Lott and Mustard finding was likely the result of the crime-raising impact of crack in non-RTC states.

---

[45] As mentioned in footnote 29, poverty data is not available before 1979. Thus, although the Lott-Mustard period originally was 1977-1992, for our preferred specification the analysis covers 1979-1992.

**Table 12**[46]

## Table 12a

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1979-1992 – Clustered Standard Errors

Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -4.88 | -7.28** | -9.71** | -5.46 | 7.95* | -3.12 | -0.20 |
| | (4.28) | (3.40) | (4.48) | (4.02) | (4.38) | (2.70) | (1.51) |
| Spline Model: | -1.48 | -0.93 | -0.30 | -2.49*** | 0.27 | -0.42 | 0.04 |
| | (1.18) | (0.63) | (1.53) | (0.60) | (0.83) | (0.75) | (0.30) |
| Hybrid Post-Passage Dummy: | -1.02 | -7.20* | -13.75** | 2.58 | 11.14** | -2.97 | -0.49 |
| | (5.02) | (3.67) | (5.64) | (5.06) | (5.13) | (3.56) | (1.69) |
| Trend Effect: | -1.35 | -0.03 | 1.42 | -2.81*** | -1.12 | -0.05 | 0.10 |
| | (1.40) | (0.77) | (1.19) | (0.86) | (0.81) | (0.84) | (0.31) |

## Table 12b

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1979-1992 – Clustered Standard Errors and State Trends

Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -4.83 | -6.19** | -2.93 | -2.80 | 1.37 | -1.86 | 2.75 |
| | (4.27) | (2.81) | (2.75) | (5.25) | (4.54) | (3.07) | (2.32) |
| Spline Model: | -5.56** | -0.39 | -0.72 | -4.03* | -1.17 | -1.96 | 0.86 |
| | (2.34) | (1.22) | (1.07) | (2.21) | (1.79) | (1.19) | (1.07) |
| Hybrid Post-Passage Dummy: | 5.65 | -7.95*** | -2.56 | 5.11 | 4.58 | 1.76 | 1.98 |
| | (6.22) | (2.83) | (3.61) | (6.88) | (4.20) | (3.99) | (2.54) |
| Trend Effect: | -6.62** | 1.11 | -0.23 | -5.00* | -2.03 | -2.29 | 0.49 |
| | (2.95) | (1.15) | (1.34) | (2.76) | (1.87) | (1.44) | (1.23) |

---

[46] Estimations include year and state fixed effects and are weighted by state population.  Robust standard errors are provided beneath point estimates in parentheses.   The control variables for this "preferred" specification include: incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, population density, per capita income measures, and six demographic composition measures.  * Significant at 10%; ** Significant at 5%; *** Significant at 1%.

## Table 13[47]

### Table 13a

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1993-2010 – Clustered Standard Errors
Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 4.77 | -1.53 | 2.03 | 2.91 | 5.18 | 6.29** | 2.26 |
| | (4.68) | (3.45) | (4.49) | (4.57) | (4.32) | (3.09) | (2.77) |
| Spline Model: | 1.25** | 0.28 | 1.37** | 1.28** | 0.61 | 0.68 | 0.16 |
| | (0.51) | (0.55) | (0.60) | (0.62) | (0.87) | (0.57) | (0.43) |
| Hybrid Post-Passage Dummy: | 4.15 | -1.68 | 1.34 | 2.27 | 4.89 | 5.96* | 2.19 |
| | (4.94) | (3.55) | (4.58) | (4.74) | (4.11) | (3.23) | (2.77) |
| Trend Effect: | 1.22** | 0.29 | 1.36** | 1.26** | 0.58 | 0.65 | 0.15 |
| | (0.52) | (0.54) | (0.61) | (0.63) | (0.86) | (0.57) | (0.43) |

### Table 13b

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1993-2010 – Clustered Standard Errors and State Trends
Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 6.30* | 0.94 | 1.85 | 4.38 | 4.22 | 1.12 | -0.94 |
| | (3.38) | (3.29) | (3.27) | (3.26) | (4.25) | (2.54) | (2.30) |
| Spline Model: | -0.26 | 0.43 | 1.66 | -0.21 | -3.87** | -1.14 | -1.61** |
| | (1.40) | (0.87) | (1.24) | (0.93) | (1.50) | (0.73) | (0.65) |
| Hybrid Post-Passage Dummy: | 6.62* | 0.74 | 1.03 | 4.61 | 6.38 | 1.76 | -0.12 |
| | (3.46) | (3.23) | (3.01) | (3.54) | (4.07) | (2.47) | (2.13) |
| Trend Effect: | -0.62 | 0.39 | 1.61 | -0.46 | -4.22** | -1.23 | -1.60** |
| | (1.32) | (0.86) | (1.24) | (1.03) | (1.61) | (0.77) | (0.70) |

---

[47] Estimations include year and state fixed effects and are weighted by state population.  Robust standard errors are provided beneath point estimates in parentheses.   The control variables for this "preferred" specification include: incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, population density, per capita income measures, and six demographic composition measures.   * Significant at 10%; ** Significant at 5%; *** Significant at 1%.

60

**JA 310**

Figure 8 depicts a measure of crack prevalence for the period 1980-2000 in the five states with the greatest crack problem, as well as the five states with the least crack, according to Fryer et al. (2005).  Figure 9 shows the murder rates over time for these two sets of states.  We see that crime rose in the high crack states when the crack index rises in the mid-to-late 1980s, but that the crack index does not turn down in those states at the time crime started to fall.  Apparently, the rise of the crack market triggered a great deal of violence, but once the market stabilized, the same level of crack consumption could be maintained while the violence ebbed.

Of course, omitting an appropriate control for the criminogenic influence of crack is problematic if the high-crack states tend not to adopt RTC laws and the low-crack states tend to adopt.  This is in fact the case:  all of the five "high-crack" states are non-RTC states during the time period of Figure 9, whereas four of the five "low-crack" states are RTC states (all four adopted an RTC law by 1994).[48]   The only exception is Nebraska, a state that did not adopt an RTC law until 2007.[49]

---

[48] New Mexico, one of the five highest crack states, became an RTC state in 2004.  Wyoming and Montana adopted RTC laws in 1994 and 1991, respectively.  North Dakota and South Dakota both adopted their laws by 1985.
[49] Out of the ten states with the lowest crack cocaine index, seven adopted an RTC law by 1994.  The exceptions are Nebraska (2007), Minnesota (2003), and Iowa (2011).

**Figure 8: Prevalence of Crack in the 5 Most and 5 Least Crack-affected States**



Source:  Authors' calculations based on the crack index of Fryer et al (2005).

**Figure 9: Murder Rates in the 5 Most and 5 Least Crack-affected States**

Source:  FBI UCR Data.

Moreover, as Table 14 reveals, the 13 states that adopted RTC laws during the initial

62

**JA 312**

Lott-Mustard period (1977-1992) had crack levels substantially below the level of the five high-crack states shown in Figures 8 and 9.  Of the RTC adopters shown in Table 14, the largest has an average crack index of 1.46 (Georgia), while the high-crack states had an average population weighted crack level of 1.76.

### Table 14: Population-weighted Statistics of RTC-Adopting States between 1977 and 1992[50]

| State | Year of RTC Law Adoption | Murder Rate | Crack Index |
|-------|--------------------------|-------------|-------------|
| Indiana | 1980 | 6.56 | 0.30 |
| Maine | 1985 | 2.34 | 0.09 |
| North Dakota | 1985 | 1.32 | 0.04 |
| South Dakota | 1985 | 1.96 | -0.04 |
| Virginia | 1986 | 7.97 | 1.13 |
| Florida | 1987 | 11.53 | 1.24 |
| Georgia | 1989 | 12.89 | 1.46 |
| Pennsylvania | 1989 | 5.75 | 1.13 |
| West Virginia | 1989 | 5.53 | 0.42 |
| Idaho | 1990 | 3.04 | 0.34 |
| Mississippi | 1990 | 11.50 | 0.44 |
| Oregon | 1990 | 4.85 | 1.14 |
| Montana | 1991 | 3.69 | 0.07 |
| *Top Five Crack States*[51] | | 10.64 | 1.76 |
| RTC Adopters | | 8.04 | 0.96 |

In other words, over the initial Lott-Mustard period of analysis (ending in 1992), the criminogenic influence of crack made RTC laws look beneficial since crack was raising crime in non-RTC states.  In the later period, crime fell sharply in the high-crack states, making RTC states look bad in comparison.  Therefore, the effects estimated over this entire period will necessarily water down the initial Lott-Mustard results.  The hope is that estimating the effect

---

[50] The crack index data comes from Fryer et al (2005), which constructs the index (beginning in 1980) based on several indirect proxies for crack use, including cocaine arrests, cocaine-related emergency room visits, cocaine-induced drug deaths, crack mentions in newspapers, and DEA drug busts.  The paper does suggest that these values can be negative. The state with the lowest mean value of the crack index over the data period from 1980 to 1990 is South Dakota (-0.03), and the state with the highest mean value is New York (1.58).

[51] The top five states with the highest population weighted average crack index in the period 1980-1992 were California, Maryland, Massachusetts, New York, and Rhode Island. None of these states adopted RTC laws during this period.

**JA 313**

over the entire period will wash out the impact of the omitted variable bias generated by the lack of an adequate control for the effect of crack.

As an additional test for potential omitted variable bias in both the NRC and our own preferred model specification, we perform an analysis inspired by Altonji et al. (2005).  In their influential paper, the authors provide a practical method to test the extent to which potential omitted variable bias drives the results of a multivariate analysis.  This test assumes that the selected, observable variables are chosen from a broader set of possible controls, and then explores how strong selection on unobserved variables would have to be relative to selection on observed variables to produce an OLS estimate if the true effect (in our case the effect of RTC laws on crime trends) were zero. We provide further details on this test procedure in Appendix F.

Using the Altonji et al (2005) test procedure, we analyzed the relative strength of the Table 1b estimate from the NRC Report that RTC laws were associated with an 8.33% reduction in murder rates (using the Lott-Mustard county data estimate for 1977-2000).  The Altonji test procedure suggests that this Lott-Mustard estimate has a potential bias of -1.03, which implies that the ostensible finding of a crime-reducing estimate would be entirely driven by selection bias if selection on unobservables were only 8 percent as strong as selection on observables. This is strong evidence that the NRC/Lott model suffers fatally from omitted variable bias.  In comparison, an analogous test of our preferred specification using state data from 1979 to 2010 (Table 8a) – which showed an estimated *increase* in murder of 3.31% (albeit not statistically significant) – shows that the potential bias in the murder effect was -0.35.  In other words, in our case, the implied bias is negative, which means that the positive and statistically insignificant effect of RTC laws on murder that we found is a likely a *lower* bound for the true effect.

64

### B. Endogeneity and Misspecification Concerns

To this point, our analysis has remained within the estimation framework common to the NRC/Lott-Mustard analyses, which implicitly assumes that passage of right-to-carry legislation in a given state is an exogenous factor influencing crime levels.  Under this assumption, one can interpret the estimated coefficient as an unbiased measure of RTC laws' collective impact.

We probe the validity of this strong claim by estimating a more flexible year-by-year specification, adding pre- and post-passage dummy variables to the analysis.[52]  Pre-passage dummies can allow us to assess whether crime trends shift in unexpected ways prior to the passage of a state's RTC law.  Figures 10 through 13 present the results from this exercise in graphical form.  Using our preferred model as the base specification, we introduce dummies for the eight years preceding and the first eight years following adoption.  We first estimate this regression for each violent crime category over the full sample of 50 states plus the District of Columbia.  However, because of the presence of five states that adopted their RTC law within eight years of 1979, and seven states that adopted laws within the eight years before our dataset ends, we have twelve states that cannot enter into the full set of pre- and post-adoption dummy variables.[53]  Because Ayres and Donohue (2003) showed that the year-by-year estimates can jump wildly when states drop in or out of the individual year estimates, we also estimate the year-by-year model after dropping out the earliest (pre-1987) and latest (post-2002) law-adopting states. In this separate series of regressions, our estimates of the full set of lead and lag variables for the 22 states that adopted RTC laws between 1987 and 2002 are based on a trimmed data set

---

[52] In Appendix C, we further analyze the issue of misspecification and model fit by analyzing residuals from the regression analysis.

[53] We also include a control for more than 8 years before the passage of RTC laws, although these are not shown in the following charts.

**JA 315**

that omits the 12 early and late adopters.[54]

Autor, Donohue, and Schwab (2006) point out that when analyzing the impact of state-level policies using panel data, one would ideally see lead dummies that are near zero. For the crime of aggravated assault (Figure 12), this desirable pattern is roughly approximated. Therefore, we would expect these estimates to perhaps be the most reliable among the four violent crime categories. The graphs for murder, rape, and robbery, though, suggest the possible presence of systematic differences between RTC law adopters that can complicate or thwart the endeavor of obtaining clean estimates of the impact of right-to-carry laws. Rather than being close to zero in the pre-passage period, the levels of murder, rape, and robbery seemed to be lower in the pre-passage period and rising rapidly. Such a pattern raises concerns about the presence of endogenous adoption that complicate our thinking about the influence of right-to-carry laws on violent crime.

---

[54] The states that drop out (with dates of RTC law passage in parentheses) include: Indiana (1980), Maine (1985), North Dakota (1985), South Dakota (1985), Virginia (1986), Colorado (2003), Minnesota (2003), Missouri (2004), New Mexico (2004), Ohio (2004), Kansas (2007), and Nebraska (2007).

**JA 316**

Figure 10[55]



Figure 10: Normalized Year-by-Year Estimates of the Impact of RTC Laws on Murder (State Data, 1979-2010)

If one looks at the four lines in Figure 10, one sees four different sets of year-by-year

estimates of the impact of RTC laws on murder.  The lines have been normalized to show a zero

value in the year of adoption of a RTC law.  Let's begin with the bottom line (looking at the right

hand side of the figure) and the line just above it.  The lower line represents the naive year-by-

year estimates from the preferred model estimated on the 1979-2010 period, while the line just

above it drops out the early and late adopters, so that the estimated year-by-year estimates are

based on the "clean" sample of all non-adopting states (over the sample period) plus the 22 RTC

adopters for which complete data is available from 8 years prior to adoption through 8 years after

---

[55] Estimations include year and state fixed effects and are weighted by county population.  The control variables include: incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, population density, per capita income measures, and six demographic composition measures.

adoption. One sees that the trimmed estimates are different and less favorable to the "More Guns, Less Crime" hypothesis, as evidenced by the higher values in the post-passage period.

How should we interpret these trimmed sample estimates? One possibility is to conclude that on average the pre-passage estimates are reasonably close to zero and then take the post-passage figures as reasonable estimates of the true effect. If we do this, none of the estimates would be statistically significant, so one could not reject the null hypothesis of no effect.

Perhaps, though, what is most important is the trend just prior to passage. This might suggest that rising crime in fact increases the likelihood that a state would adopt a RTC law. In particular, since murder is typically the crime most salient in the media, we suspect it has the greatest effect on the implementation of purported crime control measures such as RTC legislation. Of course, this would suggest an endogeneity problem that would also likely lead to a bias in favor of finding a deterrent effect. The mechanism driving this bias would presumably be that rising crime strengthens the NRA push for the law, and the mean reversion in crime would then falsely be attributed to the law by the naive panel data analysis (incorrectly premised on exogenous RTC law adoption). But in the trimmed model, there is no sign of mean reversion. Murder rates keep increasing after RTC adoption. There is certainly no evidence of a beneficial impact from RTC laws, but conclusions about causation are difficult given the strong pre-passage crime trends.

Another striking feature we note is the strong influence of Florida and Georgia on our estimates of the impact of RTC laws on murder (Figure 10). When we remove these two states, the post-adoption trend lines for murder clearly shift upwards. Moreover, when dropping them from the set of RTC states that already excludes the early and late adopters—still leaving us with 20 RTC states to analyze—we see that murder increases in each post-adoption year. As previous

68

## JA 318

papers have noted, Florida experienced enormous drops in murder during the 1990s that may have been completely unrelated to the passage of its right-to-carry policy.  Donohue (2003) points out that the 1980 Mariel boat lift temporarily added many individuals prone to committing crimes to Florida's population, causing a massive increase in crime in Florida during the 1980s. Thus, it is plausible that the massive 1990s crime reductions in Florida were not driven by the adoption of the state's RTC law but rather a return to traditional population dynamics that were less prone to violent crime (again, a reversion to the mean).  This is important to consider given the strong downward pull of Florida on aggregate murder rates.

     The line based on dropping Florida and Georgia from the trimmed sample would suggest that for the 20 other states, the impact of RTC laws on murder was highly pernicious.  Again a number of interpretations are possible: 1) Florida and Georgia are unusual and the best estimate of the impact of RTC laws comes from the trimmed sample that excludes them (and the early and late adopters); 2) there is heterogeneity in the impact of RTC laws, so we should conclude that the laws help in Florida and Georgia, and tend to be harmful in the other 21 states; and 3) omitted variables mar the state-by-state estimates but the aggregate estimates that include Florida and Georgia may be reasonable if the state-by-state biases on average cancel out.

     Note that Figure 11, which presents the comparable year-by-year estimates of the impact of RTC laws on rape, shows a similar yet even more extreme pattern of apparent spikes in crime leading to the adoption of RTC laws.  The rape estimates are less sensitive than the murder estimates to the dropping of the early and late adopters (or Georgia and Florida).  Clearly, the rate of rape is higher in the post-passage period but Figure 11 shows why the controls for state trends can be influential for this crime. If one believes that the pre-passage trend of increasing rapes would have continued without the adoption of RTC laws then you might conclude that the

69

RTC laws moderated that upward trend.  Alternatively, a dummy variable model that just compared pre- and post-passage would show greater evidence of RTC laws increasing the rate of rape.

Figure 11[56]



<hr />

[56] Estimations include year and state fixed effects, state trends, and are weighted by state population.  The control variables include: incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, state population, population density, per capita income, and six demographic composition measures.

**Figure 12**[57]



Figure 12: Normalized Year-by-Year Estimates of the Impact of RTC Laws on Assault (State Data, 1979-2010)

---

[57] Estimations include year and state fixed effects, state trends, and are weighted by state population. The control variables include: incarceration and police rates, unemployment rate, poverty rate, state population, population density, per capita income, and six demographic composition measures.

**Figure 13[58]**



As noted, the pattern of near-zero pre-passage estimates for the crime of assaults gives us greater confidence that we are able to estimate the impact of RTC laws on this crime.  The general story here seems to be that assault increases markedly over the time period after law passage, which squares with our results discussed in previous sections.  One observes positive coefficient changes that are initially modest, but that increase dramatically and uniformly over the second half of the post-passage period.  Moreover, in contrast to the year-by-year murder estimate, assault trends are not demonstrably different when we alter the sample to exclude early

---

[58] Estimations include year and state fixed effects, state trends, and are weighted by state population.  The control variables include: incarceration and police rates, unemployment rate, poverty rate, state population, population density, per capita income, and six demographic composition measures.

and late adopters, as well as Florida and Georgia.  The pattern is generally unaffected by sample, giving us some confidence that RTC laws may be having an adverse impact on the rate of assault.  Robbery rates similarly increase over time after the passage of RTC laws.

If the near uniform increases in assault coefficients means that aggravated assault did actually increase over time with the passage of right-to-carry legislation, this would strongly undercut the "More Guns, Less Crime" thesis.  Interestingly, the robbery data (Figure 13) either suggests a pernicious effect similar to that on aggravated assault (particularly for the trimmed estimates dropping only early and late adopters) or a strong upward trend in crime, starting well before passage, that might be taken as a sign of the absence of any impact of RTC laws on robbery.

### C. Effects of RTC Laws on Gun-related Assaults

A general concern in evaluating the impact of generic law X is that there is not some other law or policy Y that is generating the observed effect.  In this case, the apparent finding that RTC laws increase aggravated assaults raises the question of whether changes in reporting or documenting aggravated assaults might be a possible confounding factor.  Specifically, over the last two decades a number of states and municipalities have launched programs designed to combat domestic violence by increasing the arrests of likely perpetrators.  These programs could influence the count of aggravated assaults appearing in the FBI crime data we employ.  If such programs are more likely to be adopted in either RTC or non-RTC states than the potential for bias must be considered.

One way to address this problem would be to collect data on the various state or municipal initiatives that lead to higher rates of arrest of those committing acts of domestic violence.  However, collecting uniform panel data along these lines that also fully captures the

73

nature and intensity of the police initiatives is extremely difficult.  An alternative approach is to look at assaults that we think are less likely to be influenced by these domestic violence initiatives (or by other shifts in the likelihood of arrest for potentially assaultive conduct), but which are most likely to be influenced by RTC laws (if there is in fact such an influence). Counts of gun assaults would seem to meet these two criteria, because assaults with a gun tend to be serious enough that the level of discretion as to whether to arrest is reduced, and because gun assaults are precisely the types of crimes that we might expect would be influenced if more guns are on the street because of the passage of RTC laws.  For this reason, we may get more reliable estimates of the impact of RTC laws by looking at gun-related aggravated assaults than at overall aggravated assaults.

To test this possibility, we estimate our preferred regression using gun-related aggravated assaults as the dependent variable (both with and without state-specific trends) in Table 15 below.  Unfortunately, our confidence in these results is undermined by data quality issues similar to those described in section IX.  Since agencies report gun assault data to the FBI on a voluntary basis, there are significant gaps in which areas are reporting their gun assault totals in a given year.  In addition, if reporting bias were correlated with either the gun assault rate or a state's adoption of an RTC statute, our coefficient estimates of the effect of RTC laws on the gun assault rate would be biased (although the direction of this bias would depend on the nature of this correlation).  Nevertheless, we report our results for these regressions to examine whether they are consistent with our other evidence that right-to-carry laws increase aggravated assault rates.

Comparing these new results with the assault estimates in Tables 8a and 8b and Figure 12 above, our bottom-line story of how RTC laws increase rates of aggravated assault is further

74

strengthened when limiting our analysis to assaults involving a gun.  Without state trends, we uniformly see very large, positive estimates, some of which are significant at the 5% and 10% level.  With state trends, we again see some evidence that gun-related aggravated assault rates are increased by RTC legislation, although none of the resulting coefficients are statistically significant.  These results again suggest that RTC laws may be generating higher levels of assaultive conduct, although more refined tools (or cleaner data) will be needed before confident predictions can be made.

---

### Table 15[59]

Estimated Impact of RTC Laws on Gun-Related Aggravated Assaults –
ADZ Preferred Controls, 1979-2010 – Clustered Standard Errors
Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Gun-Related Aggravated Assault (No State Trends) | Gun-Related Aggravated Assault (With State Trends) |
|---|---|---|
| Dummy Variable Model: | 32.96** | 4.36 |
| | (13.24) | (8.19) |
| Spline Model: | 2.86* | 3.07 |
| | (1.47) | (2.13) |
| Hybrid Post-Passage Dummy: | 23.49** | 2.08 |
| | (9.77) | (8.01) |
| Trend Effect: | 2.08 | 3.00 |
| | (1.30) | (2.11) |

---

[59] Estimations include year and state fixed effects, and are weighted by state population.  Robust standard errors are provided beneath point estimates in parentheses.   The control variables for this "preferred" specification include: incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, population density, per capita income measures, and six demographic composition measures.   * Significant at 10%; ** Significant at 5%; *** Significant at 1%. The gun assault data comes from the FBI master file, available upon request from the agency. The data is provided at the local level; thus for state values we sum the reported gun assaults over all of the reporting agencies by year. However, not all agencies report their estimates during each reporting period, leaving our gun assault figures likely to be undervalued.

## XI. Conclusion

In this paper, we have explored the question of the impact of RTC laws on crime and the NRC panel's 2004 report concluding that the then-current literature was too fractured to reach a conclusion on what that impact is. We agree with the conclusion that the NRC panel reached at that time, as well as with the pointed rebuke the panel gave to James Q. Wilson who argued -- without scientific merit according to the NRC majority -- that RTC laws reduce murder. We do take issue, though, with the NRC majority report in a few respects.

First, as we show in this paper, there is a clear need to employ the cluster correction to the standard errors when estimating panel data models of crime, and the NRC majority erred when it concluded otherwise. As our placebo tests show, the standard errors that the NRC presented in their panel data models were far too low and greatly exaggerated the statistical significance of their results. Indeed, the clustering gaffe was on top of the NRC failure to use the robust correction for heteroskedasticity, which created additional downward bias in the standard errors (although less dramatically than the failure to cluster). Both corrections are needed, and this error alone set the stage for Wilson's dissent. With correct standard errors, none of the estimates that Wilson thought established a benign effect of RTC laws on murder would have been statistically significant. Thus, getting the standard errors right might have kept Wilson from writing his misguided dissent -- to the benefit of Wilson, the NRC majority, and the public.

Second, beyond getting the standard errors correct and therefore undermining the ostensible statistical significance of their presented murder regression, the NRC majority could have said much more than they did to refute Wilson's reliance on extremely limited statistical evidence to endorse the view that RTC laws reduce murder. Wilson's conclusion essentially rested on the NRC report's presentation of two Lott and Mustard models (the dummy and the

76

**JA 326**

spline) based on county data from 1977-2000.   The NRC majority did point out that the estimates for six out of 7 crimes were contradictory (some suggesting crime increases and some suggesting crime decreases), so the fact that  for the seventh crime -- murder -- both models suggested RTC laws reduced crime might well be a spurious result.  But the NRC majority could have given many more reasons to be cautious about relying on the two Lott and Mustard regressions.

Specifically, the NRC response to Wilson could easily have noted that Wilson had previously written that incarceration was perhaps the most important factor explaining the drop in crime in the United States in the 1990s, and he had also written on the importance of police (Wilson, 2008).  Yet the Lott and Mustard model that the NRC presented (and that Wilson relied on) did not control for either of these factors.[60]  Thus, on these grounds alone, one would have thought Wilson would have been particularly wary not to rely on a regression which was potentially subject to a charge of omitted variable bias. Neither the NRC majority nor Wilson ever noted this omission.

Moreover, we note in this paper some of the data problems with the Lott data set that the NRC panel used and then address an array of issues about data and model specification that Wilson ideally should have explored before he uncritically accepted the ostensible finding of a RTC impact on murder.  These issues included the danger of omitted variable bias concerning the crack epidemic, the choice of county over state-level data, the inclusion of state-specific linear trends, and the over-use of highly collinear demographic variables, all of which have enough impact on the panel data estimates to influence one's perception of the "More Guns, Less Crime" theory and thus warrant closer examination than they received from Wilson.

---

[60] The Lott and Mustard model omitted a control for the incarceration and police rates (which is indicated implicitly —though not explicitly highlighted — in the notes to each table of the NRC report, which listed the controls included in each specification).

Perhaps Wilson was so wedded to his position that nothing could have persuaded him not to write his ill-conceived dissent, but the NRC majority could have done more to buttress their entirely correct assessment that "the scientific evidence does not support [Wilson's] position" (pg. 275). As a result, Lott now claims that Wilson, one of the most eminent criminologists of our time, supports his position (Lott, 2008).  If one of the goals of the NRC report was to shield the public and policymakers from claims based on inadequate empirical evidence, the Wilson dissent represents a considerable failure.

A number of important lessons emerge from this story for both producers and consumers of econometric evaluations of law and policy.  The first and most obvious is that a single statistical study cannot resolve an important question.  Instead, one must wait until a literature has developed.  But even then, the conclusion that emerges may be one of uncertainty as the NRC report showed.

 A second lesson is how easy it is for mistakes to creep into these empirical studies.  The pure data errors that entered into the NRC data set when Lott transmitted an imperfect data set or the error in the 1993 Uniform Crime Reports data (or the errors that entered into our own work in Aneja et al (2011), which are described in greater detail in Footnote 18) were not major enough to have an impact, but at times the errors will be decisive (and the process of peer review is not well-equipped to detect such errors).  This episode underscores the value of making publicly available data and replication files that can reproduce published econometric results.  This exercise can both help to uncover errors prior to publication and then assist researchers in the process of replication, thereby aiding the process of ensuring accurate econometric estimates that later inform policy debates.

A third lesson is that the "best practices" in econometrics are evolving. Researchers and

policymakers should keep an open mind about controversial policy topics in light of new and better empirical evidence or methodologies.  Prior to the important work of Bertrand, Duflo, and Mullainathan (2004) on difference-in-differences estimation, few researchers understood that clustering standard errors on the state-level in order to account for serial correlation in panel data was necessary.  The results in many pre-2004 published papers would be wiped out with this single adjustment.  Despite its impressive array of talent, the NRC report in 2004 got this important issue wrong, even though most applied econometricians today would make this cluster adjustment to avoid greatly increasing the level of Type I error.

While the NRC majority decision of uncertainty was clearly influenced by the sensitivity of the estimates to various modeling choices, the separate statement by Horowitz was even more categorical in its nihilism, essentially rejecting all applied econometric work on RTC legislation, as indicated by his independent statement in an appendix to the NRC's (2004) report:

> "It is unlikely that there can be an empirically based resolution of the question of whether Lott has reached the correct conclusions about the effects of right-to-carry laws on crime."  (p. 304, NRC Report.)

Of course, if there can be no empirically based resolution of this question, it means that short of doing an experiment in which laws are randomly assigned to states, there will be no way to assess the impact of these laws.  But there is nothing particularly special about the RTC issue, as the recent National Research Council report on the deterrence of the death penalty shows (essentially adopting the Horowitz position on the question of whether the death penalty deters murders). The econometrics community needs to think deeply about what these NRC reports and the Horowitz appendix imply more broadly for the study of legislation using panel data econometrics and observational data.

Finally, despite our belief that the NRC's analysis was imperfect in certain ways, we agree with the committee's cautious final judgment on the effects of RTC laws: "with the current

79

**JA 329**

evidence it is not possible to determine that there is a causal link between the passage of right-to-carry laws and crime rates." Our results here further underscore the sensitivity of guns-crime estimates to modeling decisions.[61] But not being able to "determine" with the level of certainty one strives for in academic work does not mean that one cannot offer conclusions at some lower level of certainty such as "more probable than not." Since policymakers need to act, it is more useful to offer guidance as to which evidence is likely to be most reliable than to simply reject all evidence until the highest level of certainty has been attained.

Clearly, we now have more believable panel data models of the type used in the NRC report estimated on more complete state and county data, coupled with the additional evidence presented in this article examining gun assaults (Table 15) and estimating year by year effects on crime (Figures 10-13). Can a consistent story be distilled from this evidence?

We would consider our preferred regression models run on either the most complete data (state data from 1979-2010) or the data likely to be free of the confounding effect of the crack cocaine epidemic (state data from 1999-2010) as likely to yield more reliable estimates of the effect of RTC laws on crime than the Lott-Mustard specification. If we estimate both the dummy and spline models using our preferred specification without state trends for each of these two time periods (overall or after 1999), then we have 4 estimates of the impact of RTC laws for each of seven crime categories (Tables 8a and 11a). In each of the seven crime categories, at least one of these four estimates suggests that RTC laws increase crime at the .10 level of significance, with murder, rape, and larceny estimates reaching significance at the .05 level. These crime increases are substantial, with the dummy variable model for the complete period (Table 8a) suggesting that RTC laws increased every crime category by at least 8 percent, except

---

[61] For a quick and clear sense of how sensitive estimates of the impact of right-to-carry laws are, see Appendix E, where we visually demonstrate the range of point estimates we obtain throughout our analysis.

murder (in that model, murder rose 3 percent but it is not statistically significant).   For the post-1999 regressions, spline estimate (Table 11a) suggests that RTC laws increased the rate of murder by 1.5 percentage points each year (significant at the .05 level).   In none of those 28 regressions was there any statistically significant estimate suggesting that RTC laws decreased crime.

Thus, the evidence that RTC laws increase crime is strongest if one accepts the dummy variable model with our preferred specification on state data (the Table 8a and 11a results) and accepts the Wolfers (2006) critique that one should avoid controlling for state trends.[62]  But even here questions remain.  First, one might argue that the fact that estimates suggest that RTC laws increase property crime is an indication that these models are not giving credible causal estimates since this link is not based on a strong theoretical foundation.[63]  Second, for all but aggravated assault, the state year by year estimates of Figures 10-13 raise endogeneity concerns that may undermine the state panel data results.

But the fact that Figure 12 shows a more ideal pattern of no pre-RTC adoption effects followed by sharp rises in aggravated assault and that the data on gun aggravated assaults also

---

[62] If one were to reject the Wolfers proposition and conclude that one *must* control for state trends in estimating the impact of RTC laws, the story becomes even more complicated.  Exhibit E shows (using the .10 level or better for significance) that there are two estimates with state trends suggestive of crime *decreases* in rape, six suggestive of crime *increases* in aggravated assault and one suggesting a decrease in this crime, four suggestive of *decreases* in auto theft and one suggesting an increase in this crime, and one suggestive of *decreases* in larceny.

[63] It is not clear why the property crimes of burglary, auto theft, and larceny would rise as a result of RTC passage.  Three possible explanations for this finding come to mind.  First, the results are correctly capturing the impact of RTC laws and perhaps the indirect effect of increasing the weapons available to criminals (through loss or theft) facilitates all criminal activity (perhaps by emboldening newly armed criminals) or the increase in violent crime diverts police resources so that property crime is stimulated.  Second, it is possible that states adopting RTC laws were less successful in fighting crime than non-adopting states, so the RTC law was not itself increasing crime but was simply a proxy for states that on the whole adopted less successful crime-fighting strategies over the last quarter century.  Third, it is possible that states chose to adopt RTC laws at a time when crime was on the rise, so their post-passage crime experience reflects an adverse crime shock that is incorrectly causally attributed to RTC laws.  If this endogenous timing argument is correct, then it might suggest that post-1999 estimates of Table 11a are preferable, since that has been a period of greater crime stability (as opposed to the dramatic crime swings of the late 1980s and 1990s).  The Table 11a estimates show that RTC laws only affected one crime category – with the laws causing a substantial *increase* in murder.

81

provides evidence that RTC laws increase these crimes may provide the strongest conclusion of a causal impact of RTC laws on crime.  The evidence that RTC laws increase aggravated assault is not overwhelming but it does find support in different models and different time periods using both state and county data sets in different panel data regressions both for all assaults and gun assaults (Table 15), and in models estimating year-by-year effects.  As Tables E5 and E6 reveal, eleven of the 28 estimates of the impact of RTC laws on aggravated assault meet at least the minimal standard of significance at the .10 level and show evidence of crime increases (against only one model showing a significant decline, but only if the data stops in 2000 instead of 2010).[64]  Moreover, the omitted variable bias test suggests that if anything our 8 percent estimate of the increase in aggravated assault from RTC laws (at the .10 level, see Table 8a) is likely to understate the true increases in aggravated assault caused by RTC law.[65]

Further research will hopefully further refine our conclusions as more data and better methodologies are employed to estimate the impact of RTC laws on crime.

---

[64] The one regression suggesting declines in aggravated assault was the Lott/Mustard state data dummy model with linear state trends estimated only through 2000.  Even this effect disappears when the full data set through 2010 is used).

[65] Note that the assaults can be committed either by RTC permit holders or those who have acquired their guns -- either via theft or appropriation of lost guns.

**JA 332**

### References

**Altonji, Joseph G., Todd E. Elder, and Christopher R. Taber.**  2005. "Selection on Observed and Unobserved Variables: Assessing the Effectiveness of Catholic Schools." *Journal of Political Economy* 113(1): 151-184.

**Angrist, Joshua and Jorn-Steffen Pischke.** 2009. *Mostly Harmless Econometrics*. Princeton: Princeton University Press.

**Autor, David, John J. Donohue, and Stewart Schwab**.  2006.  "The Costs of Wrongful-Discharge Laws." *Review of Economics and Statistics* 88(2): 211-231.

**Ayres, Ian and John J. Donohue**. 2003a. "Shooting Down the More Guns, Less Crime Hypothesis." *Stanford Law Review*, 55(4): 1193-1312.

**Ayres, Ian and John J. Donohue**. 2003b. "The Latest Misfires in Support of the More Guns, Less Crime Hypothesis." *Stanford Law Review*, 55(4): 1371-1398.

**Ayres, Ian and John J. Donohue**. 2009. "More Guns Less Crime Fails Again: The Latest Evidence from 1977-2006." *Econ Journal Watch*, 6(2): 218-238. http://www.aier.org/aier/publications/ejw_com_may09_ayresdonohue.pdf

**Bertrand, Marianne, Esther Duflo, and Sendhil Mullainathan**. 2004. "How Much Should We Trust Differences-in-Differences Estimates?" *Quarterly Journal of Economics*, 119(1): 249-275.

**Black, Dan A., and Daniel S. Nagin**. 1998. ''Do Right-to-Carry Laws Deter Violent Crime?'' *Journal of Legal Studies*, 27: 209-219.

**Cramer, Clayton E., and David B. Kopel.** 1995. "'Shall Issue': The New Wave of Concealed Handgun Permit Laws." *Tennessee Law Review,* 62 (3)*:* 679-757.

**Collins, Gail**. 2009. "Have Gun, Will Travel." *The New York Times*. 31 July 2009.

**Donohue, John J.** 2003.  "The Impact of Concealed-carry Laws." *Evaluating Gun Policy*. J. Ludwig & P. J. Cook (Eds.). Washington, DC: Brookings Institution Press.  287–324.

**Donohue, John J**. 2004. "Guns, Crime, and the Impact of State Right-to-Carry Laws." *Fordham Law Review*, 73: 623-652.

**Donohue, John J. and Justin Wolfers**. 2009. "Estimating the Impact of the Death Penalty on Murder." *American Law and Economics Review, 11 (2): 249-309*

**Elder, Todd and Christopher Jepsen**. 2013. "Are Catholic Primary Schools More Effective Than Public Primary Schools?" *Journal of Urban Economics*, forthcoming.

**Fryer, Roland, Paul Heaton, Steven Levitt, and Kevin Murphy.** 2005. "Measuring the Impact of Crack Cocaine." NBER Working Paper Series No. W11318. National Bureau of Economic Research, Cambridge, MA.

**Horowitz, Joel L.** "Should the DEA's STRIDE Data Be Used for Economic Analyses of Markets for Illegal Drugs?" *Journal of the American Statistical Association*, 96(465): 1254-1271.

**Kovandzic, T. V., Vieraitis, L. M. and Boots, D. P.** (2009), Does the death penalty save lives? *Criminology & Public Policy*, 8: 803–843.

**Levitt, Steven D.** 2004. "Understanding Why Crime Fell in the 1990's: Four Factors that Explain the Decline and Six that Do Not," *Journal of Economic Perspectives*, 17: 163-190.

**Lott, John R.** 2000. *More Guns, Less Crime*. Chicago: University of Chicago Press.

**Lott, John R**. 2004. "Right-to-Carry Laws and Violent Crime Revisited: Clustering, Measurement Error, and State-by-State Breakdowns."  http://ssrn.com/abstract=523002 or doi:10.2139/ssrn.523002.

**Lott, John R.**  2008.  "Do Guns Reduce Crime?" *Intelligence Squared Debate Series*.

    http://intelligencesquaredus.org/wp-content/uploads/Guns-Reduce-Crime-102808.pdf

**Lott, John R. and David Mustard**. 1997. "Crime, Deterrence and Right-to-Carry Concealed

    Handguns." *Journal of Legal Studies*, 26(1): 1-68.

**Ludwig, J.** 1998. "Concealed Gun-carrying Laws and Violent Crime: Evidence from State Panel

    Data." *International Review of Law and Economics*, 18: 239-254.

**Maltz, Michael D**. 2006. *Analysis of Missingness in UCR Crime Data*. NCJ 215343

    Washington: U.S. Department of Justice.

**Maltz, Michael D., and J. Targonski**. 2002. "A note on the use of county-level crime data."

    *Journal of Quantitative Criminology*, 18(3): 297-318.

**Maltz, Michael D., & J. Targonski**. 2003. "Measurement and other errors in county-level UCR

    data: A reply to Lott and Whitley." *Journal of Quantitative Criminology*, 19: 199-206.

**Moody, Carlisle E. and Thomas B. Marvell.** 2008. "The Debate on Shall-Issue Laws." *Econ*

    *Journal Watch*, 5(3): 269-293. http://www.aier.org/ejw/archive/doc_view/3610-ejw-

    200809?tmpl=component&format=raw.

**Moody, Carlisle E. John R Lott, Jr., Thomas B. Marvell, and Paul R. Zimmerman.** 2012.

    "Trust but Verify: Lessons for the Empirical Evaluation of Law and Policy."

**Moulton, Brent.** 1990. "An Illustration of a Pitfall in Estimating the Effects of Aggregate

    Variables on Micro Units." *Review of Economics and Statistics*, 72: 334-338.

**Nagin, Daniel S. and John V. Pepper**, editors, 2012. *Deterrence and the Death Penalty*.

    Washington: The National Academies Press.

**National Research Council**. 2004. *Firearms and Violence: A Critical Review*. Washington: The

    National Academies Press.

85

**JA 335**

**Plassman, Florenz and John Whitley.** 2003. "Confirming More Guns, Less Crime." *Stanford Law Review*, 2003: 1313-1369.

**Studenmund, AH.** 1997. *Using Econometrics: A Practical Guide*. Reading, MA: Addison-Wesley.

**Wilson, James Q.** 2000. "Guns and Bush." *Slate Politics*. http://slate.msn.com/?id=91132. (accessed on November 29 2009).

**Wilson, James Q.** 2008. "What Do We Get From Prison?" *The Volokh Conspiracy*. http://volokh.com/posts/chain_1213046814.shtml. (accessed on 20 November 2009).

**Wooldridge, Jeffrey M.** 2003. "Cluster-sample Methods in Applied Econometrics" *American Economic Review*, 93: 133-138.

**Wooldridge, Jeffrey M.** 2006. "Cluster-Sample Methods in Applied Econometrics: An Extended Analysis." Unpublished manuscript. Michigan State University.

**Wolfers, Justin.** 2006. "Did Unilateral Divorce Laws Raise Divorce Rates? A Reconciliation and New Results." American Economic Review, 96(5): 1802-1820.

**Zimring, Franklin and Gordon Hawkins.** 1997. "Concealed handguns: The counterfeit deterrent." *The Responsive Community*, 7:46-60.

86

**Appendix A:  Using Placebo Laws to Test the Impact of Clustering in the State Data**

Table 3 reports the results of our placebo tests using county data.  In this appendix, we use state-level data to again conduct our experiment with placebo laws to examine the effects of clustering the standard errors.  As seen in Tables 1-4 of Appendix A, we find results similar to those generated with our county data:  without clustering, the Type 1 error rates are often an order of magnitude too high or worse for our murder and robbery regressions (see Tables A1 and A3).  In fact, even *with* clustered standard errors (Tables A2 and A4), the rejection of the null hypothesis (that RTC laws have no significant impact on crime) occurs at a relatively high rate.  This finding suggests that, at the very least, we should include clustered standard errors to avoid unreasonably high numbers of significant estimates.

87

# Appendix A[66]

## Table A1

Percentage of Significant Estimates (5% Level) – Lott-Mustard Controls, 1979-2010 – Hybrid Model
Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | | Dummy Variable | Trend Variable |
|---|---|---|---|
| 1. All 50 States + DC: | Murder | 47.6 | 63.9 |
| | Robbery | 46.5 | 63.7 |
| 2. Exact 34 States: | Murder | 46.9 | 61.6 |
| | Robbery | 51.5 | 64.4 |
| 3. Random 34 States: | Murder | 52.4 | 68.0 |
| | Robbery | 53.0 | 67.1 |
| 4. All 17 States: | Murder | 36.4 | 58.5 |
| | Robbery | 45.4 | 72.5 |
| 5. Random 11 States: | Murder | 35.4 | 64.4 |
| | Robbery | 43.4 | 73.0 |

## Table A2

Percentage of Significant Estimates (5% Level) – Lott-Mustard Controls, 1979-2010 – Hybrid Model and **Clustered Standard Errors**
Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | | Dummy Variable | Trend Variable |
|---|---|---|---|
| 1. All 50 States + DC: | Murder | 16.1 | 28.5 |
| | Robbery | 13.4 | 18.3 |
| 2. Exact 34 States: | Murder | 15.8 | 23.0 |
| | Robbery | 14.6 | 15.3 |
| 3. Random 34 States | Murder | 21.5 | 35.1 |
| | Robbery | 17.1 | 25.8 |
| 4. All 17 States | Murder | 23.9 | 45.5 |
| | Robbery | 24.2 | 53.0 |
| 5. Random 11 States: | Murder | 23.7 | 48.7 |
| | Robbery | 23.0 | 53.7 |

---

[66] Simulation based on NRC with-controls model, includes year fixed effects, state fixed effects, and weighting by state population.  The control variables (adopted from the Lott-Mustard model) include: lagged arrest rate, state population, population density, per capita income measures, and 36 demographic composition measures indicating the percentage of the population belonging to a race-age-gender group.

# Appendix A (Cont.)

## Table A3

Percentage of Significant Estimates (5% Level) – Lott-Mustard Controls, 1979-2010 – Dummy Model

Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | | Dummy Variable |
|---|---|---|
| 1. All 50 States + DC: | Murder | 47.1 |
| | Robbery | 46.9 |
| 2. Exact 34 States: | Murder | 46.3 |
| | Robbery | 50.6 |
| 3. Random 34 States: | Murder | 61.6 |
| | Robbery | 56.8 |
| 4. All 17 States: | Murder | 35.9 |
| | Robbery | 45.4 |
| 5. Random 11 States: | Murder | 37.5 |
| | Robbery | 49.8 |

## Table A4

Percentage of Significant Estimates (5% Level) – Lott-Mustard Controls, 1979-2010 – Dummy Model and **Clustered Standard Errors**

Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | | Dummy Variable |
|---|---|---|
| 1. All 50 States + DC: | Murder | 16.3 |
| | Robbery | 13.2 |
| 2. Exact 34 States: | Murder | 13.7 |
| | Robbery | 13.1 |
| 3. Random 34 States | Murder | 29.6 |
| | Robbery | 21.4 |
| 4. All 17 States | Murder | 22.2 |
| | Robbery | 24.4 |
| 5. Random 11 States: | Murder | 25.2 |
| | Robbery | 28.0 |

89

### Appendix B – Panel Data Models over the Full Period with No Covariates

The NRC panel sought to underscore the importance of finding the correct set of covariates by presenting county panel data estimates (on data through 2000) of the impact of RTC without covariates but including county and year fixed effects.  For completeness, this Appendix presents these same no controls estimates for models (with and without state trends) estimated on both county and state data for the periods from 1977-2006 and 1977-2010 (respectively).

If one compares the results from these four tables with no controls with the analogous tables using the preferred model for the same time period, one sees some interesting patterns. For example, if we compare the county results without state trends from both our preferred specification (Table 6a) and the no-controls specification (Table B1), we see that both sets of results are always positive (suggesting crime increases) but rarely statistically significant when covariates are added (although quite frequently for the no-controls model).  The basic story in these two different county data regressions seems to be that there is no evidence of an effect of RTC laws on murder, while if there is *any* RTC effect on other crimes generally, it is a crime-*increasing* effect.  When we compare those from the county models that include state trends (Tables 6b and B2), some negative point estimates emerge, although there is no sign of any statistically significant results at even the .10 level in either Table.

When we shift to a comparison of the state-level results, we again see similarities between the preferred and no-controls specifications.  When looking at the results without state trends (Tables 8a and B3), we see that the estimates are fairly similar in terms of direction, although the no-controls estimates are often larger in magnitude and more statistically significant (with Table B3 showing statistically significant increases at the .05 level in all crime categories other than murder and rape).  When doing a similar comparison of the specifications that now

90

## JA 340

add in state trends (Tables 8b and B4), we also see similar results.  In both tables, the only statistically significant effect on violent crime at the .05 level is that RTC laws increase aggravated assaults.

# Appendix B[67]

## Table B1

Estimated Impact of RTC Laws – No Controls, 1977-2006 – Clustered Standard Errors
Dataset: ADZ Updated 2013 County Data (without 1993 data)

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 0.53 | 35.43 | 28.59 | 28.64* | 36.66 | 39.79* | 41.22 |
| | (8.91) | (23.88) | (19.84) | (15.18) | (22.40) | (22.93) | (26.50) |
| Spline Model: | 0.35 | 3.25* | 2.96* | 2.75** | 3.30* | 3.68* | 4.08* |
| | (0.73) | (1.92) | (1.61) | (1.32) | (1.96) | (1.95) | (2.23) |
| Hybrid Post-Passage Dummy: | -2.02 | 24.26 | 16.86 | 18.64 | 25.58 | 27.02 | 25.84 |
| | (9.13) | (20.04) | (18.53) | (13.86) | (19.05) | (20.58) | (23.32) |
| Trend Effect: | 0.45 | 1.99 | 2.08 | 1.78 | 1.97 | 2.27 | 2.73 |
| | (0.71) | (1.24) | (1.29) | (1.07) | (1.47) | (1.54) | (1.70) |

## Table B2

Estimated Impact of RTC Laws – No Controls, 1977-2006 – Clustered Standard Errors and State Trends
Dataset: ADZ Updated 2013 County Data (without 1993 data)

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -1.93 | -13.42 | 3.00 | 4.37 | 5.28 | -0.25 | -0.04 |
| | (6.33) | (12.08) | (11.00) | (8.89) | (10.58) | (12.16) | (13.23) |
| Spline Model: | 0.04 | -5.77 | 2.50 | 0.29 | 0.51 | -0.43 | -0.39 |
| | (1.26) | (4.40) | (2.36) | (2.41) | (2.59) | (2.44) | (2.59) |
| Hybrid Post-Passage Dummy: | -1.98 | -9.90 | 1.43 | 4.24 | 5.03 | 0.03 | 0.21 |
| | (6.45) | (11.32) | (11.62) | (9.40) | (11.19) | (12.99) | (14.14) |
| Trend Effect: | 0.09 | -5.55 | 2.47 | 0.19 | 0.40 | -0.43 | -0.40 |
| | (1.28) | (4.40) | (2.46) | (2.49) | (2.69) | (2.59) | (2.76) |

---

[67] Estimations include year and county fixed effects, and are weighted by county population.  Robust standard errors are provided beneath point estimates in parentheses. * Significant at 10%; ** Significant at 5%; *** Significant at 1%.

92

**JA 342**

## Appendix B (Cont.)

Table B3

Estimated Impact of RTC Laws – No Controls, 1977-2010 – Clustered Standard Errors
Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 1.07 | 13.83 | 13.38** | 21.63** | 26.88** | 23.32*** | 17.63*** |
|  | (8.23) | (8.98) | (5.51) | (8.99) | (12.81) | (8.00) | (5.73) |
| Spline Model: | 0.37 | 1.10 | 1.33** | 1.86** | 1.79 | 1.70** | 1.32** |
|  | (0.72) | (0.84) | (0.61) | (0.85) | (1.16) | (0.73) | (0.52) |
| Hybrid Post-Passage Dummy: | -1.62 | 9.48 | 6.96 | 13.62* | 21.32** | 17.27** | 12.75** |
|  | (6.86) | (6.26) | (4.36) | (7.59) | (9.10) | (6.52) | (4.98) |
| Trend Effect: | 0.44 | 0.70 | 1.04* | 1.29 | 0.90 | 0.98 | 0.79 |
|  | (0.66) | (0.70) | (0.61) | (0.80) | (0.93) | (0.63) | (0.47) |

Table B4

Estimated Impact of RTC Laws – No Controls, 1977-2010 – Clustered Standard Errors and State Trends
Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -0.83 | -4.56* | 0.57 | 4.45 | 9.59 | 3.10 | 1.98 |
|  | (4.57) | (2.67) | (3.64) | (4.59) | (5.92) | (3.60) | (2.50) |
| Spline Model: | 1.09 | -0.53 | 2.03** | 0.13 | -0.27 | -0.41 | -1.03** |
|  | (0.73) | (0.88) | (0.86) | (1.03) | (1.12) | (0.62) | (0.48) |
| Hybrid Post-Passage Dummy: | -1.36 | -4.34 | -0.40 | 4.42 | 9.78 | 3.32 | 2.48 |
|  | (4.43) | (2.70) | (3.39) | (4.76) | (5.94) | (3.76) | (2.54) |
| Trend Effect: | 1.10 | -0.47 | 2.04** | 0.07 | -0.41 | -0.46 | -1.07** |
|  | (0.73) | (0.88) | (0.86) | (1.05) | (1.13) | (0.65) | (0.51) |

Note:  In earlier tables, our data period begins in 1979 for models that include the poverty rate as a control since that is when that information becomes available.

93

JA 343

## Appendix C – Trimming the Sample to Address Questions of Model Fit

Given our concerns about how well the guns-crime econometric models fit all 50 US states (plus D.C.), we decided to examine the residuals from various regressions models.  For example, one potentially important issue is whether one should include linear state trends in our models.  To further explore this issue, we examined the variance of the residuals for the aggravated assault regression estimates using our preferred models on state data for the period through 2010—both with and without state trends.[68]  In particular, we found that the residual variance was high for smaller states, even when we do not weight our regressions by population.[69]

We explored how these "high residual-variance" states (defined from the aggravated assault regressions on our preferred model through 2010) might be influencing the results.  We estimated our preferred model (both with and without state trends) after removing the 10 percent of states with the highest residual variance.  This step is also repeated after removing the highest 20 percent of states in terms of residual variance.  Our results for our preferred specification (which includes clustered standard errors and is run over the 1979-2010 time period) are shown in Table 8a and 8b (without and with state trends, respectively).  The results from our two trimmed set of states are presented below. Tables C1 and C2 should be compared to Table 8a (no state trends), and Tables C3 and C4 should be compared to Table 8b (adding in state trends).

Removing high residual-variance states (based on the aggravated assault regressions)

---

[68] Since evidence that RTC laws increased aggravated assault appeared in a number of different models and with different data sets, we focused specifically on the residuals obtained using assault rate as the dependent variable.

[69] We removed the population weight for this exercise because it is likely that when regressions are weighted by population, the regression model will naturally make high-population states fit the data better.  As a result, we expect that residuals for smaller states will be higher.  We find, however, that the results are qualitatively similar even when we obtain the residuals from regressions that include the population-weighting scheme (although the patterns of statistical significance sometimes change significantly when dropping the highest variance 20% of states from the sample).

94

**JA 344**

does not alter the story told in Table 8a (no state trends) that there is no hint that RTC laws reduce crime and this message comes through again in Tables C1 and C2.  Indeed, removing the high variance states has increased the statistical significance of the finding that RTC laws *increase* aggravated assault from the .10 level in Table 8a to the .05 level in both Tables C1 and C2.  Removing the high residual-variance states from the models with state trends again reveals the same Table 8b estimates of a statistically significant increase in aggravated assault at the .05 level (Table C3), but reduces this level of significance to the .10 level in Table C4.

Of the states dropped from Tables C1 because of their high residual variance, all adopted RTC laws during the 1977-2010 period (with date of adoption in parentheses): Montana (1991), Maine (1985), West Virginia (1989), North Dakota (1985), and Tennessee (1996).  Of the *additional* states dropped from Table C2, the following two states adopted RTC laws during the 1977-2010 period (with date of adoption in parentheses): Nebraska (2007) and Oregon (1990). Results from Table C3 come from dropping Montana, North Dakota, New Hampshire, Nebraska, and Vermont.[70]  Finally, in addition to the five RTC states that were dropped in Table C3, Table C4 dropped the following five RTC states: West Virginia (1989), Nevada (1995), Kentucky (1996), Indiana (1980), and South Dakota (1985).

---

[70]The dropped states are slightly different between Tables C1 and C3, as well as between Tables C2 and C4, because the state ranks based on residual variances differed when the models were run with and without state trends.

**JA 345**

# Appendix C[71]

## Table C1

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1979-2010 – Clustered Standard Errors

Dataset: ADZ Updated 2013 State Data

Dropping States with Highest Residual Variance (Top 10%: ND, MT, WV, TN, ME)

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 3.54 | 11.70** | 8.48** | 14.12* | 19.32** | 12.40* | 10.43** |
| | (6.66) | (5.74) | (3.93) | (8.13) | (9.15) | (6.26) | (4.76) |
| Spline Model: | 0.61 | 0.65 | 1.03* | 1.21 | 1.31 | 0.79 | 0.87* |
| | (0.65) | (0.64) | (0.59) | (0.84) | (0.80) | (0.61) | (0.50) |
| Hybrid Post-Passage Dummy: | 0.95 | 10.35** | 4.51 | 10.22 | 15.82** | 10.44* | 7.66* |
| | (5.60) | (4.96) | (3.39) | (7.13) | (7.83) | (5.40) | (4.06) |
| Trend Effect: | 0.57 | 0.30 | 0.88 | 0.87 | 0.78 | 0.44 | 0.61 |
| | (0.60) | (0.60) | (0.60) | (0.80) | (0.67) | (0.55) | (0.48) |

## Table C2

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1979-2010 – Clustered Standard Errors

Dataset: ADZ Updated 2013 State Data

Dropping States with Highest Residual Variance (Top 20%:  ND, MT, WV, TN, ME, NE, NH, HI, OR, VT)

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 3.93 | 12.52** | 10.21** | 15.19* | 20.26** | 13.11* | 10.85** |
| | (7.01) | (5.91) | (3.92) | (8.48) | (9.54) | (6.56) | (4.97) |
| Spline Model: | 0.80 | 0.78 | 1.30** | 1.49* | 1.43* | 0.91 | 0.91* |
| | (0.65) | (0.65) | (0.58) | (0.83) | (0.83) | (0.62) | (0.53) |
| Hybrid Post-Passage Dummy: | 0.47 | 10.62** | 5.23 | 10.06 | 16.33* | 10.64* | 8.01* |
| | (5.83) | (5.20) | (3.58) | (7.35) | (8.17) | (5.64) | (4.26) |
| Trend Effect: | 0.78 | 0.43 | 1.13* | 1.16 | 0.89 | 0.56 | 0.64 |
| | (0.59) | (0.60) | (0.59) | (0.78) | (0.70) | (0.55) | (0.50) |

---

[71] Estimations include year and state fixed effects, and are weighted by state population.  Robust standard errors are provided beneath point estimates in parentheses.   The control variables for this "preferred" specification include: incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, population density, per capita income measures, and six demographic composition measures.   * Significant at 10%; ** Significant at 5%; *** Significant at 1%.

**JA 346**

**Appendix C (Cont.)**

## Table C3

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1979-2010 – Clustered Standard Errors and State Trends

Dataset: ADZ Updated 2013 State Data

Dropping States with Highest Residual Variance (Top 10%: MT, ND, NH, NE, VT)

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -0.13 | -3.20 | -0.33 | 1.86 | 9.64** | 1.12 | 1.11 |
| | (4.02) | (2.34) | (3.62) | (3.21) | (4.52) | (2.24) | (1.88) |
| Spline Model: | 0.86 | -0.23 | 1.71** | -0.26 | -1.41* | -0.10 | -0.57 |
| | (0.76) | (0.65) | (0.79) | (0.83) | (0.76) | (0.65) | (0.53) |
| Hybrid Post-Passage Dummy: | -0.78 | -3.10 | -1.63 | 2.10 | 10.95** | 1.23 | 1.57 |
| | (3.93) | (2.38) | (3.51) | (3.40) | (4.43) | (2.37) | (2.06) |
| Trend Effect: | 0.89 | -0.13 | 1.76** | -0.33 | -1.76** | -0.14 | -0.62 |
| | (0.74) | (0.65) | (0.79) | (0.86) | (0.73) | (0.67) | (0.56) |

## Table C4

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1979-2010 – Clustered Standard Errors and State Trends

Dataset: ADZ Updated 2013 State Data

Dropping States with Highest Residual Variance (Top 20%:   MT, ND, NH, NE, VT, WV, NV, KY, IN, SD)

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -0.30 | -3.11 | 1.36 | 2.56 | 10.91** | 0.89 | 1.24 |
| | (4.26) | (2.47) | (3.44) | (3.25) | (4.38) | (2.36) | (1.97) |
| Spline Model: | 0.94 | -0.15 | 1.38* | -0.11 | -1.39 | -0.13 | -0.55 |
| | (0.83) | (0.71) | (0.78) | (0.89) | (0.84) | (0.73) | (0.57) |
| Hybrid Post-Passage Dummy: | -0.98 | -3.07 | 0.40 | 2.70 | 12.16*** | 1.01 | 1.67 |
| | (4.16) | (2.51) | (3.38) | (3.49) | (4.30) | (2.50) | (2.18) |
| Trend Effect: | 0.97 | -0.06 | 1.37* | -0.20 | -1.78** | -0.17 | -0.60 |
| | (0.81) | (0.71) | (0.79) | (0.94) | (0.80) | (0.76) | (0.61) |

**JA 347**

## Appendix D – Alternative Demographic Variable Specification

A fairly standard set of demographics that can be seen in the crime literature includes controls for a few age categories across all races combined with a single identifier of the percentage of blacks in the state.  Table D1 and D2 in Appendix D provide yet another robustness check to the ADZ model by putting in four such demographic variables – the percent of the population falling into the three age categories of 10-19, 20-29, and 30-39 plus the percent black -- in place of the ADZ six demographic variables.  The results are not dramatically different from the main ADZ models of Tables 8a and 8b, and they essentially show only evidence of RTC laws increasing crime.  Table D1's and Table 8a's estimated violent crime increases for rape, aggravated assault, and robbery are substantial in both sets of dummy variable estimates and significant at the .10 level or better, only Table 8a has one of these estimates rise to the level of significance at the .05 level (for rape).

98

# **Appendix D**

## Table D1[72]

Estimated Impact of RTC Laws – ADZ Preferred Controls (with four demographic variables), 1979-2010 – Clustered Standard Errors

Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 2.25 | 9.45* | 8.15* | 12.06* | 15.06* | 11.33** | 11.06** |
| | (5.75) | (5.43) | (4.27) | (6.51) | (8.15) | (4.88) | (4.29) |
| Spline Model: | 0.47 | 0.97 | 1.07 | 1.27 | 1.12 | 0.83 | 0.93* |
| | (0.63) | (0.64) | (0.64) | (0.76) | (0.76) | (0.58) | (0.49) |
| Hybrid Post-Passage Dummy: | 0.08 | 5.90 | 3.81 | 7.31 | 11.73 | 8.90** | 8.02** |
| | (4.69) | (4.21) | (3.77) | (5.52) | (7.12) | (4.00) | (3.49) |
| Trend Effect: | 0.47 | 0.77 | 0.94 | 1.03 | 0.72 | 0.52 | 0.66 |
| | (0.60) | (0.60) | (0.66) | (0.75) | (0.70) | (0.55) | (0.47) |

## Table D2

Estimated Impact of RTC Laws – ADZ Preferred Controls (with four demographic variables), 1979-2010 – Clustered Standard Errors and State Trends

Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 0.60 | -2.86 | -0.73 | 3.25 | 9.47** | 1.74 | 1.52 |
| | (3.99) | (2.57) | (3.97) | (3.17) | (4.34) | (2.13) | (1.72) |
| Spline Model: | 0.59 | -0.28 | 1.53* | -0.70 | -1.06 | -0.42 | -0.71 |
| | (0.70) | (0.63) | (0.78) | (0.94) | (0.79) | (0.61) | (0.48) |
| Hybrid Post-Passage Dummy: | 0.15 | -2.71 | -1.95 | 3.88 | 10.54** | 2.11 | 2.12 |
| | (3.89) | (2.63) | (3.90) | (3.41) | (4.23) | (2.29) | (1.86) |
| Trend Effect: | 0.59 | -0.19 | 1.59** | -0.82 | -1.39* | -0.49 | -0.78 |
| | (0.68) | (0.64) | (0.78) | (0.97) | (0.75) | (0.63) | (0.52) |

---

[72] These regressions include year and state fixed effects, and are weighted by state population. Robust standard errors are provided beneath point estimates in parentheses. The control variables for this "preferred" specification include: incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, population density, per capita income measures, and four demographic variables (percent of the population that is between 10 and 19, 20 and 29, and 30 and 39 as well as percent black in the state).
* Significant at 10%; ** Significant at 5%; *** Significant at 1%.

**JA 349**

**Appendix E – Summarizing Estimated Effects of RTC Laws Using Different Models, State v. County Data, and Different Time Periods**

This appendix provides graphical depictions of 14 different estimates of the impact of RTC laws for both the dummy and spline models for specific crimes using different data sets (state and county), time periods (through 2000, 2006, or 2010), and models (Lott and Mustard versus our preferred model and with and without state trends).  For example, Figure E1 shows estimates of the impact on murder using the dummy model, designed to capture the average effect of RTC laws during the post-passage period.  The first bar in each of the first six groupings corresponds to county-level estimates; the second bar corresponds to state-level estimates, for a total of 14 estimates per figure.  Since our county model estimates are generally run through 2006 and our state model estimates are run through 2010, we generally paired state and county model results that were otherwise identical and which were run through 2010 and 2006 (respectively).  Additionally, the last two estimates only contain one bar corresponding to state models run between 1999 and 2010. The value of the figures is that they permit quick visual observation of the size and statistical significance of an array of estimates.  Note, for example, that only one of the estimates of RTC laws on murder in either Figure E1 or Figure E2 is significant at even the .10 threshold.   This is the estimate for the 1999-2010 period on state data, which shows a statistically significant *increase* in murder (at the .05 level) in the spline model.  This sharp contrast to the conclusion drawn by James Q. Wilson on the NRC panel is in part driven by the fact that all of the estimates in this appendix come from regressions in which we adjusted the standard errors by clustering.

In contrast to the solitary statistically significant estimate for murder (suggesting an increase), the estimates of the impact of RTC laws on aggravated assault in Figures E5 and E6

are significant at at least the .10 level suggesting crime increases in 11 of the 28 estimates depicted, as indicated by the shading of the columns.[73]   Note that the overall impression from these two figures is suggestive that RTC laws *increase* aggravated assault, although the evidence is not uniformly strong in the more preferred models.   No other crime category has as strong evidence of an impact of RTC laws as the findings on aggravated assault.

Figure E1. Various Murder Estimates (Dummy Model)





Figure E2. Various Murder Estimates (Spline Model)



---

[73] No shading indicates insignificance, and the shading darkens as significance increases (from a light grey indicating significance at the .10 level, slightly darker indicating significance at the .05 level, and black indicating significance at the .01 level).

**JA 351**

Figure E3. Various Rape Estimates (Dummy Model)



Figure E4. Various Rape Estimates (Spline Model)



Figure E5. Various Aggravated Assault Estimates (Dummy Model)



Figure E6. Various Aggravated Assault Estimates (Spline Model)



102

**JA 352**

Figure E7. Various Robbery Estimates (Dummy Model)



Figure E8. Various Robbery Estimates (Spline Model)



Figure E9. Various Auto Theft Estimates (Dummy Model)



Figure E10. Various Auto Theft Estimates (Spline Model)



**JA 353**

Figure E11. Various Burglary Estimates (Dummy Model)



Figure E12. Various Burglary Estimates (Spline Model)



Figure E13. Various Larceny Estimates (Dummy Model)



Figure E14. Various Larceny Estimates (Spline Model)



104

**JA 354**

### Appendix F – Methodological Description of Using Selection on the Observables to Assess Selection Bias

Altonji et al. (2005) provides a test for whether there is omitted variable bias in a regression that attempts to quantify whether selection bias drives the OLS estimate. An underlying assumption of this approach is that the observable controls are selected independently from the larger set of possible controls. Elder and Jepsen (2013) provides a useful description of the methodological features of the test, and footnote 6 of that paper states that potential bias can be calculated with the given equation $\frac{cov(CS,\varepsilon_i)}{var(\widetilde{CS_i})} = \frac{cov(\widetilde{CS_i},\varepsilon_i)}{var(\widetilde{CS_i})}$, where CS corresponds to our right-to-carry dummy variable.[74]

Drawing on this equation and equation (3) of the Elder and Jepsen paper, one can generate an expression for the potential bias: $\frac{cov(CS_i,X_i'\gamma)\cdot var(\varepsilon_i)}{var(\widetilde{CS_i})\cdot var(X_i'\gamma)}$. Here $\widetilde{CS}_i$ is given by the formula $CS_i = X_i\beta + \widetilde{CS}_i$ (that is, $\widetilde{CS}_i$ is simply the residual from the regression of $CS_i$ on $X_i\beta$). Putting this formula in terms of our RTC dummy variable gives the expression $\frac{cov(Shall_i,X_i'\gamma)\cdot var(\varepsilon_i)}{var(\widetilde{Shall}_i)\cdot var(X_i'\gamma)}$. Because the beta coefficient of the bivariate regression of the RTC dummy on the fitted values of the regression of $Y_i$ (murder rate) on our full set of controls (less the RTC dummy variable) amounts to $\frac{cov(Shall_i,X_i'\gamma)}{var(X_i'\gamma)}$, the only remaining variables needed are $var(\varepsilon_i)$ and $var(\widetilde{Shall}_i)$. With this information one can calculate the "potential bias," which then can be compared to the beta coefficients we estimate in this paper.

The ratio of this implied bias to the estimate of the beta coefficient represents how strong selection on unobserved variables would have to be relative to selection on observed variables to

---

[74] In Elder and Jepsen's (2013) paper, CS refers to the effect of Catholic schools on educational achievement.

**JA 355**

attribute the entire estimated effect to selection bias.  For the ADZ preferred specification (Table 8a), we find a beta coefficient of 0.0331, with a potential bias of -0.3549.  This implied ratio is negative, implying that selection on observables and unobservables would have to be of <u>opposite signs</u> to be consistent with a true effect of zero.  This finding implies that our slightly positive coefficient is a lower bound of the true effect of RTC laws on murder.

In contrast, the Altonji test applied to the NRC regression (Table 1b) finding of a statistically significant beta coefficient on murder of -0.0833 indicates strong evidence of omitted variable bias.  The test reveals an estimate of potential bias of -1.0304, which implies that the -0.0833 OLS estimate would be solely driven by selection bias if selection on unobservables were <u>only 8 percent</u> as strong as selection on observables.

Finally, owing to the frequency with which RTC laws are associated with statistically significant increases in aggravated assault rates, we analyze the results of the Altonji test when using the ADZ preferred specification (Table 8a) and aggravated assaults as the relevant dependent variables.   The coefficient associated with this model is .080334, with a potential bias of -.07211.  Thus, our results again suggest that selection on observables and unobservables would have to be biased in opposite directions to eliminate our estimated effect of RTC laws on aggravated assault.  This strongly suggests that our finding that RTC laws increase aggravated assaults is, if anything, biased toward zero.

106

### Appendix G – Summarizing Changes to Our RTC Dates

In this appendix, we detail all of the changes that we have made to the years when RTC laws took effect.  As noted in Footnote 3 and Footnote 17, the most recent version of our analysis includes a change in how the RTC dummy was defined.  Whereas in earlier work, we modeled RTC laws on the assumption that their impact would take effect only during the first full year after they were passed, we now assume that they take effect immediately after they are actually implemented.

**Missouri:**  While the state's right-to-carry law was originally intended to take effect in 2003 (the date that we used in earlier versions of this paper), a legal challenge based on the state's constitution prevented the law from taking effect until February 26, 2004.  For this reason, we use the date that the law's legal challenges were dismissed rather than the statutory date that the law was originally intended to take effect as its effective date.

**New Mexico & Oklahoma:**  This law passed in 2003 but took effect January 1st, 2004.  For this reason, while the initial year of the law switches from 2003 to 2004 in our most recent version of the paper, New Mexico's RTC dummy does not change after this revision.  Similarly, Oklahoma's RTC law passed in 1995 (our passage year) but took effect January 1st, 1996 (our new effective date).

**South Dakota:** Earlier versions of this paper inaccurately identified the state's 1986 legislation modifying its concealed carry laws as making the state "shall issue," but a careful re-examination of the details of this statute reveals that the state's 1985 legislation is a more appropriate candidate.

107

**JA 357**

**Tennessee:**  While we earlier identified the state's 1994 law as making the state's concealed carry permitting system "shall issue," this law continued to allow sheriffs to deny permits "for good cause and in the exercise of reasonable discretion" without precisely defining what "good cause" entails.  For this reason, we now use the state's 1996 law (which took effect the same year) as the basis for determining the effective date of the state's RTC status.

**Texas:**  Texas's RTC law passed in 1995 and took effect that same year, but the state's statute specifies that permits (even those issued in 1995) are not supposed to have legal backing before January 1st, 1996.  For this reason, while our original passage year for RTC legislation was 1995, our new effective date for this legislation is actually in 1996.

**Virginia:**  Virginia's RTC law has undergone so many changes that it is difficult to say which one eliminated discretion in the issuance of permits.  While our earlier analysis used the state's 1988 revisions as the proper year for this transition, our decision to use this date was based on the date used in Lott (2000), which was based on research by Cramer and Kopel (1995).  Surprisingly, the language that he identified as coming from the state's 1988 law was actually introduced in earlier legislation passed in 1986, so we accordingly changed our chosen effective date from 1988 to the effective date of this 1986 law.

108



ELSEVIER

# Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State Panel Data

JENS LUDWIG

*Georgetown University and Northwestern University/University of Chicago Poverty Center, Chicago, Illinois, USA*
*E-mail: ludwigj@gunet.georgetown.edu*

A recent study concludes that permissive concealed-handgun-carrying (or "shall-issue") laws have sharply reduced crime rates, including the rate of homicide. The method of the study has been critiqued by several authors. In this paper, I report a quite different approach that exploits the minimum age requirements for concealed-carry permits to more effectively control for unobserved variables that may vary over time. Because even permissive concealed-carry states require permit holders to meet minimum age requirements, any deterrent benefits from these laws should be concentrated among adults and, therefore, should be reflected in the gap between adult and juvenile victimization rates. My results suggest that shall-issue laws have resulted, if anything, in an *increase* in adult homicide rates.   © 1998 by Elsevier Science Inc.

## I. Introduction

Crime is one of the American public's top priorities,[1] a source of concern and frustration that has translated into individual as well as collective action. Motivated in large part by fear of crime, between 35% and 40% of all American households keep a total of 127 million long guns and 65 million handguns [Cook and Ludwig (1997)], despite uncertainty about whether such widespread gun ownership increases or decreases public safety [Zimring and Hawkins (1997a)]. For the owner, firearms may be used for protection against intruders, yet keeping a gun also seems to be a risk factor for unintentional injury, suicide, and homicide [Vernick et al. (1997)]. Keeping a gun also may impose costs and benefits on others. High rates of gun ownership may produce

---

Thanks to Dan Black, John Cawley, Jeffrey Conte, Philip Cook, Geof Gee, John Graham, Paul Harrison, David Hemenway, John Lott, James Mercy, Jean Mitchell, Daniel Nagin, Steve Pischke, Elizabeth Scott, Jon Vernick, Daniel Webster, Doug Weil, Franklin Zimring and two anonymous referees for assistance and comments. Any remaining errors of fact or interpretation are mine alone.

[1]For example, a USA Today/CNN/Gallup poll from January 5 to 7, 1996 ($N = 1000$), found that 66% of voters listed violent crime as an issue that would be a "high priority" in deciding whom to vote for, second only to the quality of public education (67%). (*USA Today*, "Ideal citizens go face to face," by Richard Wolf, January 22, 1996, p. 6D).

International Review of Law and Economics 18:239–254, 1998
© 1998 by Elsevier Science Inc.
655 Avenue of the Americas, New York, NY 10010

0144-8188/98/$19.00
PII S0144-8188(98)00012-X

general deterrence effects, for example by reducing the frequency with which burglars rob occupied homes. On the other hand, over 500,000 firearms are stolen each year, and keeping guns out of dangerous hands is made more difficult by over 2 million private transfers of second-hand guns annually [Cook et al. (1995); Cook and Ludwig (1997)]. In a recent survey, 85% of those without guns and 40% of gun owners report that they would feel less safe if more people in their community obtained a gun [Hemenway et al. (1995)].

Given the uncertainty surrounding the benefits and costs of widespread gun ownership, it is noteworthy that many states have responded to the crime problem by expanding the opportunities of private citizens to arm themselves in public. To date, 31 states have enacted "shall-issue" laws, which require local law enforcement authorities to issue concealed-handgun-carrying permits to any applicant who meets a set of specified criteria related to age, criminal history, and mental illness [Jost (1997)]. The number of states with shall-issue laws is likely to increase in the near future, as suggested by the consideration of shall-issue legislation in California and eight other states during 1997 [Hill (1997)].

The net effects of shall-issue laws are as difficult to predict as those of widespread gun ownership, though shall-issue laws have an even greater potential for positive and negative externalities. If gun carrying increases once these laws are passed, homicide rates may increase as guns are substituted for less lethal weapons in hostile confrontations [Zimring (1968); Cook (1991)]. Shall-issue laws also could cause homicides to increase if higher rates of gun carrying among potential victims causes criminals to arm themselves with greater frequency [Cook (1991)]. On the other hand, if shall-issue laws cause more citizens to carry handguns, then the expected costs associated with committing crimes may increase. An increase in the costs of crime may deter some criminal activity [Lott and Mustard (1997)], particularly as the number of permits issued within a state increases over time. It is also possible that the publicity surrounding the passage of the law may be sufficient to cause criminals to revise their perceptions of the costs of crime,[2] in which case any deterrent benefits may surround changes in the legal regime.

Unfortunately, there is currently little empirical evidence on the relationship between shall-issue laws and crime. A recent study by John Lott and David Mustard (1997) analyzes county-level panel data for 1977 through 1992 and finds evidence that shall-issue laws are negatively correlated with crime rates, including homicide. The authors conclude that "concealed handguns are the most cost-effective method of reducing crime thus far analyzed by economists" (p. 65). However, their method has been critiqued by several authors. Their study seems to suffer from model specification problems that will bias their estimates, a point that receives empirical support from Black and Nagin's (1998) reanalysis of the Lott and Mustard data.

In this paper, I present the results of a quite different approach to examining the effects of shall-issue laws on crime that exploits the fact that each shall-issue state enforces a minimum-age requirement for obtaining a concealed-carry permit to help control for the effects of unobserved variables. Because juveniles will not be eligible for concealed-carry permits even after shall-issue laws are passed, any deterrent benefits from these laws should be concentrated among adults. Any deterrent benefits of these laws should, therefore, reveal themselves in the difference in homicide victimization rates between adults and juveniles. My sample includes observations through 1994, an

---

[2]Zimring and Hawkins (1997b) call this an "announcement effect."

important extension of Lott and Mustard, because some of the shall-issue states studied in their sample enacted these laws as late as 1991. My results suggest that shall-issue laws have resulted, if anything, in an *increase* in adult homicide rates.

The paper is organized as follows. The next section offers a critical review of the available evidence on shall-issue laws. The third section reviews the data and empirical strategy used in this paper, as well as the results of my analysis. The fourth section offers a discussion of my findings.

## II. Previous Research

The effects of shall-issue laws on crime will depend, in part, on how concealed-handgun carrying changes when such laws are passed. Although almost nothing is known on this point, most gun carrying in the United States seems to occur without benefit of a concealed-carry permit. Cook and Ludwig (1997) find that 7.5% of American adults carried a firearm on their person or in a motor vehicle at some point during 1994. By way of comparison, a total of 1.4% of adults had obtained a concealed-carry permit in Florida 7 years after that state passed a shall-issue law,[3] and a recent review of other estimates suggests that in 12 of 16 shall-issue states fewer than 2% of adults had obtained permits [Hill (1997)]. Presumably, some fraction of those who apply for permits carried illegally before the shall-issue law was passed, so the number of permits issued may overstate the degree to which gun carrying changes. The effects of shall-issue laws on the prevalence of gun carrying are likely to be small.

Lott and Mustard (1997) examine the effects of shall-issue laws on crime by applying regression models to a panel dataset of all counties in the United States from 1977 through 1992.[4] Their dependent variables include the natural logarithm of several violent and property crime rates. Explanatory variables include age, race, *per capita* income, population, people per square mile, and *per capita* spending on social programs to proxy for poverty, though whether these proxy variables should be positively or negatively correlated with an area's level of material deprivation is not clear.[5] The variables also include year-specific dummy variables to capture changes in the U.S. crime rate over time, county-specific dummy variables to capture unobserved county "fixed effects," and the county's arrest ratio to control for other policy changes that may affect crime.[6] Lott and Mustard find that shall-issue laws are, in general, negatively correlated with violent crimes and are positively correlated with property crimes.

Yet, Lott and Mustard's (1997) analysis may suffer from bias from omitted variables for at least two reasons. First, the Lott and Mustard fixed-effects approach cannot control for unobserved factors that influence county crime trends but are not fixed over time. Crack is one example of a factor that is not explicitly controlled for in the Lott and

---

[3]Calculated from permit figures reported in McDowall, et al. (1995, p. 194) together with population estimates from the U.S. Statistical Abstracts (1995, Table 34).

[4]McDowall et al. (1995) estimate the effects of shall-issue laws on crime rates using data from three states. Because their approach is susceptible to the same biases as that of Lott and Mustard, I restrict my attention to the problems with the Lott and Mustard estimates based on national data.

[5]A given level of *per capita* social spending may reflect a large number of pre-government-transfer poor who each receive a relatively meager transfer payment, or a small number of pretransfer poor who each receive a relatively generous transfer payment; the implications for the level of material deprivation are obviously different.

[6]The problems with using arrest ratios in this way have been well known since Blumstein et al. (1978). Yet in practice the Lott and Mustard results do not seem sensitive to the inclusion or exclusion of the arrest ratio [Black and Nagin (1998)].

Mustard study, is likely to be different between shall-issue states such as Idaho and other states such as California and New York, and is unlikely to have fixed effects over time [Zimring and Hawkins (1997b)].[7] Other examples include gang activity [Klein (1995)] and, as noted above, poverty. Second, passage of a shall-issue law presumably reflects a jurisdiction's preferences for anticrime measures, which may manifest themselves in other government anticrime responses beyond passage of shall-issue legislation. Lott and Mustard include policy variables that are likely to capture only a subset of the many possible public-sector responses to crime.[8]

Empirical evidence that Lott and Mustard's (1997) analysis produces biased estimates comes from Black and Nagin (1998). By applying a formal model mis-specification test that exploits the panel structure of the dataset [Heckman and Hotz (1989)], Black and Nagin find evidence to suggest that the Lott and Mustard regression model is unable to control for all of the factors that cause crime rates to differ between shall-issue states and other states *before* these laws are adopted. As a result, Lott and Mustard's estimates for the effects of shall-issue laws will reflect in whole or part the effects of omitted factors that are not captured by their regression model.[9]

Lott and Mustard (1997) present an additional set of regressions that uses two-stage least squares (2SLS) methods in an attempt to control for the omitted variables highlighted by Black and Nagin's analysis. To produce unbiased estimates for the effects of shall-issue laws, their 2SLS approach requires that lagged crime rates (or changes in crime over time), the proportion of a state that belongs to the National Rifle Association or voted Republican in the most recent Presidential election, and *per capita* (and per crime) police resources will only affect a county's crime rate by influencing the state's shall-issue law status. Nagin (1978) offers a relevant discussion of why many of the variables used by Lott and Mustard are unlikely to be valid for this purpose. Unfortunately, Lott and Mustard do not present the results of statistical tests such as those discussed in Hausman (1983) or Newey (1985), which could shed light on the validity of their estimation procedure.

Yet, some evidence that the Lott and Mustard 2SLS estimates are biased comes from their implausibly large magnitudes [Lott and Mustard (1997), Table 11]: The estimates imply that passage of a shall-issue law will reduce homicides by 67%, rapes by 65%, and assaults by 73%.[10] In sum, Lott and Mustard's analysis seems to suffer from bias and, as

---

[7]How to conceptualize and measure drug market activity is not obvious. Lott and Mustard (1997) experiment with drug prices as an additional covariate, though they ultimately reject this model specification because of missing data problems. Drug prices may be positively correlated with criminal activity if, as Lott and Mustard (1997, note 50) suggest, higher drug prices make addicts more prone to commit crimes to finance their habits. On the other hand, prices could be negatively correlated with criminal activity if low prices reflect the frequency of and (potentially violent) competition among drug suppliers. Unfortunately, as Kleiman and Smith (1990, p. 102) note, "[N]o city has anything resembling a quantitatively accurate description of its own drug problem."

[8]In addition to controlling for arrest ratios and (in some cases) burglary and robbery rates, Lott and Mustard (1997) experiment with including variables for sentencing enhancements for crimes committed with weapons, handgun purchase waiting periods, conviction rates, and sentence lengths (apparently available only for Oregon).

[9]Lott and Mustard (1997) also experiment with a model specification that includes a county's burglary or robbery rate as an additional explanatory variable to control for omitted variables. In unpublished calculations, Black and Nagin find that this model specification is also rejected using the Heckman and Hotz test (Dan Black, personal communication).

[10]Lott and Mustard (1997) report that the "percent of a standard deviation change in the endogenous variable [logged crime rate] that can be explained by a 1 standard deviation change in the exogenous variable [predicted probability of enacting a shall-issue law]" (p. 47). The implied effects on crime rates from passing a shall-issue law can

a result, is unlikely to provide reliable information about the effects of shall-issue laws on crime.

### III. Empirical Methods and Results

This section presents the results of a new test for the causal effects of shall-issue laws using state homicide data disaggregated by age. After reviewing the data, I discuss why my estimation approach may help control for the omitted variables problems that seem to plague Lott and Mustard (1997). Then, I show that there is little evidence to suggest that shall-issue laws have reduced homicide victimization rates for adults.

#### Data

The dataset used in this paper contains information for each state in the United States from 1977 through 1994. Of the various crime rates that may be used in assessing the effects of shall-issue laws, homicide is widely considered to be measured most accurately [Cook and Laub (1997)] and, as such, is the focus of the analysis presented here. Annual state-by-state homicide counts are taken from vital statistics reports compiled by the U.S. Department of Health and Human Services. State population data are taken from the Statistical Abstracts for the United States, while data on the age distribution within each state are from the Census Bureau's Population Estimates and Population Distribution Branches.[11] Descriptive statistics for these data can be found in Table 1.

Lott and Mustard (1997) classify the following states as having enacted shall-issue laws between 1987 and 1991: Florida (1987); Georgia (1989); Idaho (1990); Maine (1985); Mississippi (1990); Montana (1991); Oregon (1990); Pennsylvania (1989); Virginia (1988); and West Virginia (1989). As Lott and Mustard note, whether Virginia and Maine should be included in this list is unclear, because Maine passed a series of modifications to its concealed-carry laws starting in 1981, and Virginia enacted additional shall-issue legislation on July 1, 1995, that eliminated the previous law's "need-to-carry" requirement and greatly increased the rate at which permits were issued [Hill (1997); Webster et al. (1997)]. The appropriate treatment of Pennsylvania in my sample is also complicated, because the shall-issue law exempts Philadelphia [Lott and Mustard (1997)].

Several additional states had shall-issue laws in place at the start of my sample period (Alabama, Connecticut, Indiana, New Hampshire, North Dakota, South Dakota, Vermont, and Washington). Although I present descriptive statistics for these states in what follows, identification of the effects of shall-issue laws using estimation approaches that control for state fixed effects (as does my empirical strategy) will rest on the states that change their laws during the sample period.

The minimum age requirement for obtaining a concealed-carry permit in those states that changed their laws from 1987 to 1991 is 18 in Maine, Montana, and West Virginia and is 21 in the others. For my empirical analysis, I define juvenile homicide victimization rates as those involving victims between the ages of 12 and 17. I exclude homicides to younger children because they tend to have characteristics that are quite different from those involving older children or adults, though replicating the analysis presented

---

be calculated as $e^{\beta} - 1$ for the coefficient $\beta$ on the shall-issue variable, because the dependent variable is the logarithm of the crime rate [for example, see Kennedy (1993), p. 106]. Thanks to Daniel Nagin for this point.

[11]Annual state population estimates taken from the U.S. Department of Commerce web page, http://www.census.gov/population/www/estimates/statepop.html.

Table 1. Descriptive statistics for state data

|  | Homicide rate (per 100,000 population) | Adult (21+) homicide rate (per 100,000 adults) | Youth (12–17) homicide rate (per 100,000 youth) |
|---|---|---|---|
| U.S., 1977–1994 | 9.35 | 11.17 | 5.93 |
| Non-shall-issue states, 1977–1994 | 9.75 | 11.73 | 6.07 |
| Rates for states with concealed-carry laws before 1977,* for 1977–1994 | 6.68 | 8.18 | 3.68 |
| Rates for states that implemented concealed-carry laws between 1987–1991,† for the period before these laws went into effect | 10.96 | 13.89 | 4.08 |
| Rates for states that implemented concealed-carry laws between 1987–1991,† for the period after these laws went into effect | 9.95 | 11.48 | 7.62 |

Notes: All means were calculated using state population figures as weights. Homicide counts taken from U.S. Vital Statistics, population counts taken from U.S. Census Bureau.

*States with shall-issue laws before 1977: Alabama, Connecticut, Indiana, New Hampshire, North Dakota, South Dakota, Vermont, and Washington.

†States that implemented shall-issue laws between 1987 and 1991: Florida, Georgia, Idaho, Mississippi, Montana, Oregon, and West Virginia. Pennsylvania, Maine, and Virginia are excluded from the sample for reasons discussed in the text.

below using victimization rates for all those under 18 years of age produces qualitatively similar results.[12]

## Estimation Strategy

Of primary concern with previous research such as Lott and Mustard (1997) are the difficulties involved in controlling for unobserved or difficult-to-measure factors that influence local crime rates but change over time. One way to address the problem of unobserved, time-varying factors is suggested by the requirement in each shall-issue state that permit holders be at least 18, or more typically 21, years of age. As a result, the probability of encountering an armed juvenile (the costs of committing crime against juveniles) should be largely unaffected by shall-issue laws. Any deterrent benefits from these laws thus should be concentrated among adults and should be reflected by a decrease in the difference between adult and juvenile victimization rates (that is, adult rates should decrease relative to juvenile rates).

Both the standard fixed-effects approach and the empirical strategy used here can be illustrated using Table 2, adapted from Joyce and Kaestner (1996). The standard fixed-effects approach consists of comparing the rate of change in adult homicide victimization rates in shall-issue states (*a-b*) with the change in non-shall-issue states (*e-f*) to control for unobserved state fixed effects that cause crime rates to differ between

---

[12]Thanks to an anonymous referee for this suggestion.

TABLE 2. Differences-in-differences-in-differences model

| | Pre-shall-issue | Post-shall-issue | Difference |
|---|---|---|---|
| Shall-issue states | | | |
|   Adults ("treatment") | b | a | (a-b) |
|   Juveniles ("control") | d | c | (c-d) |
|   Difference in differences | | | (a-b) − (c-d) |
| Non-shall-issue states | | | |
|   Adults ("treatment") | f | e | (e-f) |
|   Juveniles ("control") | h | g | (g-h) |
|   Difference in differences | | | (e-f) − (g-h) |
|   DDD | | | [(a-b) − (c-d)] − [(e-f) − (g-h)] |

Source: Joyce and Kaestner (1996). Cell entries represent homicide rates per 100,000 for the group defined at left.

shall-issue states and other states by the same amount each period. Yet, the fixed-effects approach will not address the effects of unobserved variables that differ between shall-issue states and other states and that vary over time. For example, suppose that crack use and gang activities have increased more substantially during the sample period in states without shall-issue laws relative to states that have such laws. Fixed-effects comparisons will reveal that adult homicide rates have grown more slowly in shall-issue states $[(a\text{-}b) < (e\text{-}f)]$, even if shall-issue laws have no effect on crime.

The "difference-in-difference-in-difference" (DDD) estimation strategy exploits the fact that juveniles are not eligible to obtain gun-carrying permits after shall-issue laws are passed but will still be affected by other fixed and time-varying state-specific factors that influence crime victimization rates. Juveniles thus provide a natural "control group" for examining the effects of shall-issue laws (the "treatment") on adults who are 21 years of age and older (the "treatment group"). The difference between the change in adult homicide victimization rates and the change in juvenile rates $[(a\text{-}b) - (c\text{-}d)]$ differences out the effects of both fixed and time-varying factors that cause both adult and juvenile rates to change over time, and it will reflect only those factors that act on the difference between adult and juvenile homicides. To control for the possibility that there are nationwide changes in the differences between adult and juvenile homicide victimization rates that are independent of the shall-issue laws, the difference in the adult-juvenile trends in shall-issue states are compared with the difference in the adult-juvenile trends in other states $[(a\text{-}b) - (c\text{-}d) - (e\text{-}f) - (g\text{-}h)]$. The DDD estimator thus isolates those factors that are unique to shall-issue states (such as shall-issue laws) that will cause adult homicide rates to decrease relative to the rates for juveniles.[13]

More formally, the proposition that shall-issue laws reduce adult homicide victimization rates suggests that $[(a\text{-}b) - (c\text{-}d) - (e\text{-}f) - (g\text{-}h)]$ will be negative, which can be tested by estimating the following regression model:

$$y_{it} = \theta_0 + \theta_1(Exper_i) + \theta_2(Adult_i) + \theta_3(Post_t) + \theta_4(Exper_i{}^*Adult_i) + \theta_5(Adult_i{}^*Post_t)$$
$$+ \theta_6(Exper_i{}^*Post_t) + \theta_7(Exper_i{}^*Post_t{}^*Adult_i) + v_{it} \tag{1}$$

The sample used to estimate equation (1) will include two observations for each state ($i$) for each period ($t$); one corresponds to the state's juvenile homicide victimization

---

[13]The DDD estimator is discussed further in Card (1992), Gruber (1994), and Joyce and Kaestner (1996).

TABLE 3. Differences-in-differences-in-differences regression model*

|  | Pre-shall-issue | Post-shall-issue | Difference |
|---|---|---|---|
| **Shall-issue states** |  |  |  |
| Adults ("treatment") | $(\theta_0 + \theta_1 + \theta_2 + \theta_4)$ | $(\theta_0 + \theta_1 + \theta_2 + \theta_3 + \theta_4 + \theta_5 + \theta_6 + \theta_7)$ | $(\theta_3 + \theta_5 + \theta_6 + \theta_7)$ |
| Juveniles ("control") | $(\theta_0 + \theta_1)$ | $(\theta_0 + \theta_1 + \theta_2 + \theta_3 + \theta_4 + \theta_5 + \theta_6 + \theta_7)$ | $(\theta_3 + \theta_6)$ |
| Difference in differences |  |  | $(\theta_5 + \theta_7)$ |
| **Non-shall-issue states** |  |  |  |
| Adults ("treatment") | $(\theta_0 + \theta_2)$ | $(\theta_0 + \theta_2 + \theta_3 + \theta_5)$ | $(\theta_3 + \theta_5)$ |
| Juveniles ("control") | $(\theta_0)$ | $(\theta_0 + \theta_3)$ | $(\theta_3)$ |
| Difference in differences |  |  | $(\theta_5)$ |
| DDD |  |  | $(\theta_5 + \theta_7) - (\theta_5) = (\theta_7)$ |

Source: Modification of Joyce and Kaestner (1996). Cell entries represent homicide rates per 100,000 for group defined at left.

*Regression model:*

$$y_{it} = \theta_0 + \theta_1(Exper_i) + \theta_2(Adult_i) + \theta_3(Post_t) + \theta_4(Exper_i{*}Adult_i) + \theta_5(Adult_i{*}Post_t) + \theta_6(Exper_i{*}Post_t)$$
$$+ \theta_7(Exper_i{*}Post_t{*}Adult_i) + v_{it}$$

$y_{it}$ = homicide victimization rate for observation (either adult or juvenile) in state ($i$), period ($t$)
$Exper_i$ = 1 if state (i) enacts shall-issue law during sample period, 0 otherwise
$Adult_i$ = 1 if observation corresponds to adult victimization rate, 0 if juvenile rate
$Post_t$ = 1 if observation occurs in post-shall-issue law period, 0 if pre-shall-issue law period

rate in period ($t$), whereas the other corresponds to the adult rate in period ($t$). That is, with a data sample consisting of $N$ states in the panel, with observations on the states for $T$ periods that span changes in shall-issue law status in a subset of states, then equation (1) is estimated using $2NT$ observations. The variable $y_{it}$ represents a homicide rate measure for state ($i$) in period ($t$), whereas $Adult_i$ equals 1 if the observation is for adult homicide rates (zero otherwise), $Exper_i$ is equal to 1 if state ($i$) adopts a shall-issue law during the sample period (zero otherwise), and $Post_t$ equals 1 if the period is after the shall-issue laws have been enacted (zero otherwise). Equation (1) is estimated using state populations as weights to control for heteroskedasticity in the regression residuals [Greene (1993)].

The parameters in this regression model will capture fixed factors that reflect differences between shall-issue states and other states during the sample period ($\theta_1$), differences between adult and juvenile homicide rates ($\theta_2$), trends over time in homicide rates ($\theta_3$), differences in the effects of fixed-state factors on adults versus juveniles ($\theta_4$), differences in the trends of adult versus juvenile homicide rates over time ($\theta_5$), and differences in homicide trends over time between shall-issue states and other states ($\theta_6$). The key parameter of interest is $\theta_7$, which represents $[(a\text{-}b) - (c\text{-}d) - (e\text{-}f) - (g\text{-}h)]$, the effects of the shall-issue law on the difference between adult and juvenile homicide rates in states that do adopt a shall-issue law during this period versus those that do not.

That the estimate for $\theta_7$ from equation (1) represents an estimate for the quantity $[(a\text{-}b) - (c\text{-}d) - (e\text{-}f) - (g\text{-}h)]$ can be seen with the help of Table 3, which is identical to Table 2 except that the homicide rates are now expressed in terms of the parameters underlying equation (1). For example, the expected value of adult homicide victimization rates in shall-issue states after these laws are passed is given by $[a = (\theta_0 + \theta_1 + \theta_2 +$

$\theta_3 + \theta_4 + \theta_5 + \theta_6 + \theta_7)$], because each of the dummy variables underlying equation (1) will be equal to one in this case. The expected value of juvenile homicide victimization rates in states that never pass these laws, during the period before the adoption of shall-issue laws by the shall-issue states, is equal to $[h = (\theta_0)]$, because none of the dummy variables are "switched on" in this case. Taking the difference between adult and juvenile homicide trends over time in shall-issue states, and subtracting from this the difference between adult and juvenile homicide trends in non-shall-issue states, leaves us with $\theta_7$.

Note also that the DDD approach differs in important ways from that used in Section IV-C of Lott and Mustard (1997), in which they apply their standard regression model to data for 1977 through 1992 to examine whether shall-issue laws change the age composition of homicide victimizations. They find a negative, but not statistically significant, relationship between shall-issue laws and the proportion of murder victims above some age level, though the specific age cutoff and regression coefficients are not reported. Yet, the strategy of using the ratio of adult to total homicides will not help control for unobserved state factors that vary over time.[14]

*Empirical Results*

Figure 1 provides a graphical representation of my results. The graph shows trends in the difference between adult (age 21 and over) and juvenile (ages 12 to 17) homicide victimization rates over time for those states that passed a shall-issue law during the period 1977 to 1994 (Florida, Georgia, Idaho, Mississippi, Montana, Oregon, and West Virginia), those that did not have a shall-issue law in effect during this period, and those that had enacted a shall-issue law before the sample period (Alabama, Connecticut, Indiana, New Hampshire, North Dakota, South Dakota, Vermont, and Washington). The sample excludes Pennsylvania, Virginia, and Maine because of the uncertainty surrounding how these states should be classified.

As noted above, any deterrent benefits of shall-issue laws should manifest themselves as a decrease in the difference between adult and juvenile homicide rates. Moreover, any change in the adult-juvenile difference should be greater in shall-issue states than in other states if the shall-issue laws themselves exert any influence on adult homicide rates beyond those factors that affect adult homicide nationwide. However, as seen in Figure 1, adult and juvenile homicide rates converged throughout the United States during the 1980s, and the rate of this convergence in shall-issue states after these laws were passed (1987–1991) does not seem to be noticeably different than the rates observed in other states. Figure 1 thus presents informal evidence that shall-issue laws did not serve to reduce adult homicide rates.

The results of testing this proposition more formally by estimating regression equation (1) are shown in Table 4. The one complication is the proper definition of the pretreatment and posttreatment periods. Because the states that passed shall-issue laws between 1987 and 1991 passed these laws in different years, "the" treatment period actually consists of a several-year window. In my preferred regressions, I define the 10

---

[14]This can be seen by imagining two separate regression equations with adult and juvenile homicide rates as the dependent variables of interest and the various explanatory variables on the right-hand side. The regression equation with the ratio of adult to total homicides can be written as the ratio of the adult equation divided by the adult plus juvenile equations, with a residual term that still includes unobserved, time-varying state effects that influence adult and juvenile rates equally. These terms will be purged with my differencing strategy.



F<span style="font-variant:small-caps">IG</span>. 1.  Difference Between Adult (21+) and Juvenile (12–17) Homicide Victimization Rates, 1977–1994. States that enacted shall-issue laws during the sample period are as follows: Florida (1987), Georgia (1989), Idaho (1990), Mississippi (1990), Montana (1991), Oregon (1990), and West Virginia (1989). States with shall-issue laws in effect during entire sample period are: Alabama, Connecticut, Indiana, New Hampshire, North Dakota, South Dakota, Vermont, and Washington. Excluded from the sample are Maine, Virginia, and Pennsylvania (see text).

years before Florida's implementation of its shall-issue law as the "pretreatment" period (1977 through 1986) and the 3 years after Montana's shall-issue law as the "posttreatment" period (1992 through 1994).

Because this analysis compares homicide rates that are averaged over several pretreatment and posttreatment years, the method is not well suited for determining whether shall-issue laws have immediate versus gradual effects on crime. If the effects of shall-issue laws change over time, for example because the number of concealed-carry permits issued within a state increases, then the posttreatment effect will reflect the average treatment effect for states with these laws in place for different lengths of time. Any bias that may arise from time-varying treatment effects will be exacerbated by including those states that enacted shall-issue laws before 1977 in the comparison (no change in shall-issue regime) group, because the change in the comparison-group homicide rates in this case may in part reflect changes in the shall-issue "dose" in some comparison-group states. As a result, these states are excluded from the my analytic sample, though below I examine the sensitivity of my estimates to the treatment of these states.

The regression results shown in Table 4 reveal that parameter $\theta_7$, which captures the effects of shall-issue laws on adult homicide rates, is slightly positive, implying an increase of around one-sixth of a homicide per 100,000 adults. With an average adult homicide victimization rate of 11.17 per 100,000 in the United States for 1977 through 1994, this implies an increase of 1.4%. Because the sample of states that change their laws from 1977 to 1994 is relatively small, the standard errors around this point estimate

TABLE 4. Differences-in-differences-in-differences regression results

| Explanatory Variable† | Coeff. | Controls for | Estimate (standard error) |
|---|---|---|---|
| Exper = 1 if state ever passes shall-issue law (=0 else) | $\theta_1$ | Fixed factors which differ between shall-issue and other states | −1.53 (0.53)* |
| Adult = 1 if observation is for adult homicide rates (=0 if observation is for juvenile homicide rate) | $\theta_2$ | Differences in levels between adult and juvenile homicide rates | 7.19 (0.26)* |
| Post = 1 if period is after implementation of shall-issue laws | $\theta_3$ | Trends over time in homicide rates | 4.80 (0.44)* |
| Adult × Exper | $\theta_4$ | Differences in shall-issue state fixed-effects on adult versus juvenile homicide rates | 2.62 (0.73)* |
| Adult × Post | $\theta_5$ | Differences in trends of adult versus juvenile homicide rates over time | −6.10 (0.52)* |
| Exper × Post | $\theta_6$ | Differences in homicide trends in shall-issue v. other states over time | −1.43 (1.01) |
| Exper × Post × Adult | $\theta_7$ | Effects of shall-issue laws on adult homicide rates relative to juvenile homicide rates | 0.16 (1.42) |
| N | | | 1,039 |
| Adjusted $R^2$ | | | 0.64 |

Notes: Preprogram years included in the model are 1977 through 1986. Postprogram years included in the model are 1992 through 1994. The regression model also includes a constant term, the percentage of state population living in poverty, the percentage of state that is African-American, the state *per capita* personal income (measured in 1987 constant dollars), and the percentage of the state population living in urban areas, and it is estimated using state population counts as weights. Shall-issue states are Florida, Georgia, Idaho, Maine, Mississippi, Montana, Oregon, Virginia, and West Virginia. The sample excludes states with shall-issue laws enacted before the sample period (Alabama, Connecticut, Indiana, New Hampshire, North Dakota, South Dakota, Vermont, and Washington), as well as Maine, Pennsylvania, and Virginia (see text). "Pretreatment" period is defined as 1977 to 1986, "posttreatment" period is defined as 1992 to 1994.

* = significant at 1%.

†Dependent variables: Adult (21 and older) and juvenile (12–17) homicide victimization rates per 100,000 population.

are somewhat large. The standard errors imply that the point estimate is not statistically significant, with a 95% confidence interval of −2.68 to 3.00 homicides per 100,000. Yet even fairly small standard errors (such as those produced by Lott and Mustard's county-level ordinary least squares analysis) would imply that these estimates are consistent with positive, negative, or nonexistent effects of shall-issue laws on adult homicides.

As shown in Table 5, the results are not qualitatively different when states with shall-issue laws enacted before 1977 are included in the comparison group for the analysis, when the natural logarithm of the adult and juvenile victimization rates are

TABLE 5. Sensitivity analysis of DDD regression results

| *Difference in regression model from that used in Table 4* | *Estimated effect (standard error) of shall-issue laws on adult homicide rates (per 100,000)* |
|---|---|
| Alternative weighting variable | |
|   Use adult (21+) rather than total population    as weighting variable | 0.15 (1.62) |
| Alternative functional form | |
|   Use natural logarithm of homicide victimization rates | −0.04 (0.19) |
| Alternative definitions of "pre" and "post treatment" periods | |
|     "Pre-law" period defined as 1982–1986 | 0.35 (1.65) |
|     "Pre-law" period defined as 1980–1986 | 0.24 (1.55) |
|     "Post-law" period defined as 1992 | 0.67 (1.98) |
|     "Post-law" period defined as 1992–1993 | 0.26 (1.62) |
|     "Post-law" period defined as 1993–1994 | −0.09 (1.63) |
| Alternative "comparison state" groupings | |
|   Include states with shall-issue laws on books before 1977 in comparison group | −0.05 (1.33) |
| Alternative "shall-issue" state groupings | |
|   Include Pennsylvania as shall-issue state | 1.20 (1.23) |
|   Include Virginia as shall-issue state | 0.53 (1.30) |
|   Include Maine as shall-issue state | 0.43 (1.39) |
|   Drop Florida | 0.76 (1.86) |
|   Drop Georgia | 1.18 (1.60) |
|   Drop Idaho | 0.05 (1.46) |
|   Drop Mississippi | 0.11 (1.48) |
|   Drop Montana | −0.01 (1.45) |
|   Drop Oregon | −0.29 (1.50) |
|   Drop West Virginia | −0.29 (1.47) |

Notes: Standard errors in parentheses. Results presented above taken from estimating regression equations similar to those underlying Table 4; coefficients presented above correspond to the variable in the last row of Table 4.

used rather than the raw values,[15] or when the adult (rather than total) populations are used as regression weights. The results are also generally not sensitive to the choice of pretreatment and posttreatment periods, though the exclusion of data from 1993 and 1994 causes the estimated positive effect of shall-issue laws on homicide to become even larger. When Pennsylvania, Virginia, or Maine are included, in turn, as shall-issue states, the estimated effect of shall-issue laws on adult homicides becomes even more positive, though the idiosyncrasies in how these laws were enacted makes interpretation of these results difficult.

Previous research has found that the shall-issue "treatment effects" implied by the Lott and Mustard model vary quite substantially across states [Black and Nagin (1998)].

---

[15]Using the natural logarithm for the homicide victimization rates is complicated somewhat by the fact that several states reported no homicides to victims ages 12 to 17 for some of the years between 1977 and 1994. Because the logarithm of 0 is undefined, I substitute the logarithm of (0.1) in these cases. Substitution of the logarithm of yet smaller values will increase the implied difference between adult and juvenile homicides when there are no juvenile homicide cases and will serve to make the shall-issue coefficient more negative.



FIG. 2. Difference in Adult (21+) minus Juvenile (12–17) Homicide Victimization Rates in Florida and Georgia, 1977–1994. Florida enacted shall-issue law in 1987, while Georgia enacted shall-issue law in 1989.

This finding may reflect heterogeneity across states that is not captured by the Lott and Mustard regression model, including differences in the way that shall-issue laws are written or enacted and the rate at which citizens within a state obtain concealed-carry permits. For example, state shall-issue laws vary with respect to fingerprint and safety training requirements, as well as to permit application fees, and even to the degree to which carrying privileges are restricted within some counties in a state [National Rifle Association (1998)]. Estimates for the proportion of adults who have been issued permits range from 0.2 percentage points in Mississippi to as high as 6.0% in South Dakota [Hill (1997)]. Although most of the permit holders in shall-issue states seem to be middle-aged white men, there does seem to be some variation across states in the age distribution of those holding permits [Hill (1997)].

Figures 2 and 3 provide informal evidence that the effects of shall-issue laws may vary across states. Figure 2 presents trends in the difference between adult and juvenile homicide victimization rates in Florida and Georgia, those states with the most notice-able changes in the difference between adult and juvenile homicide rates. However, as seen in Figure 3, even after enacting shall-issue laws the remaining states reflect the kind of cyclicality in homicide rates that is typical in the United States [Blumstein (1995)].

The sensitivity of my estimates to the exclusion of each shall-issue state in turn is shown in Table 5. As suggested by Figures 2 and 3, evidence for any crime-reducing benefits are concentrated in Florida and Georgia: The exclusion of these states causes the estimated effect of shall-issue laws on adult homicides to become even more positive. This finding is consistent with Black and Nagin (1998), who note that many of the negative shall-issue effects estimated by Lott and Mustard (1997) disappear once Florida is excluded from the sample. The results are generally not sensitive to excluding any of the other shall-issue states from the sample, or even to excluding such atypical



FIG. 3. Difference between Adult (21+) and Juvenile (12–17) Homicide Victimization Rates for Idaho, Mississippi, Montana, Oregon, and West Virginia, 1977–1994. Idaho, Mississippi, and Oregon enacted shall-issue laws in 1990, whereas Montana enacted a shall-issue law in 1991 and West Virginia in 1989.

non-shall-issue states as California or New York, with estimated effects that are consistently no larger than one-third of a homicide in absolute value. Taken together, this analysis produces little evidence that shall-issue laws reduce crime and suggests that these laws are as likely to cause crime to increase as to decrease.

## IV. Discussion

Whether "shall-issue" laws that liberalize concealed-handgun-carrying requirements cause crime rates to increase or to decrease has become an increasingly important public policy question, as a growing number of states adopt or consider such legislation. The widely publicized study of Lott and Mustard (1997) suggests that shall-issue laws reduce crime and save lives and money. However, as I have argued above, the Lott and Mustard study does not seem to have controlled adequately for omitted variables and other problems and, as a result, is unlikely to provide reliable information about the effects of shall-issue laws on crime.

In this paper, I present the results of an alternative test for the effects of shall-issue laws on homicide rates that exploits the fact that juveniles are not eligible for concealed-carry permits to control for time-varying unobserved state factors. The results of my analysis suggest that shall-issue laws have resulted, if anything, in an increase in adult homicide rates.

What explains the difference between the findings in Lott and Mustard (1997) and those presented here? My use of state-level rather than county-level data is unlikely to explain the difference, inasmuch as Lott and Mustard's analysis of state-level data using their fixed-effects regression approach produces results that are similar to their county-level analysis. The additional 2 years of data that I use (1993 and 1994) also do not seem to explain the difference across studies, because excluding data from 1993 and 1994 in

my analysis causes the estimated positive effect of shall-issue laws on adult homicides to become even larger.

I believe that the most compelling explanation for the differences between the results in Lott and Mustard (1997) and those presented here is that my estimation strategy is able to more adequately control for unobserved state variables that vary over time. Lott and Mustard's (1997) analysis is susceptible to bias from any unobserved state or county factor that varies over time, which in fact seems to be the case on the basis of Black and Nagin's (1998) analysis and the implausibility of Lott and Mustard's 2SLS results. In contrast, only social or public policy changes that are unique to shall-issue states, concurrent with the implementation of these laws, and that affect the difference between adult and juvenile homicide rates may impart bias to the estimates presented here. It is also possible that some criminals change their behavior after shall-issue laws are passed and now either victimize juveniles instead of adults or leave crime altogether, in which case my estimates may be subject to a slight negative or positive bias, respectively. The possibility of some unmodeled heterogeneity in my estimates is suggested by the sensitivity of the estimates to the exclusion of Florida and Georgia from the sample; these sample restrictions cause the estimated positive effect of shall-issue laws on homicide to become even larger. My results are generally robust to dropping other shall-issue and non-shall-issue states from the analytic sample.

The omitted variables problems highlighted in this paper are of general concern in evaluating the effects of anticrime efforts and seem even more severe than the problems involved in evaluating other areas of public policy such as education. In both crime and education, many of the important factors that influence policy outcomes vary at the local level. In the area of education policy, the government has invested substantial resources to collect rich data at levels as disaggregated as the school or student. In contrast, many of the important factors that influence crime are not measured, are not systematically compiled by government agencies, or are unusually difficult to measure. Even sophisticated measurement techniques such as fixed-effects or 2SLS models may produce biased estimates in the face of these problems, given that many of the unmeasured factors that cause crime are likely to vary over time and that valid instrumental variables are difficult to find. Public policymakers should be made aware of the unique identification problems in evaluating anticrime policies such as concealed-carry laws and should recognize that even elaborate studies such as Lott and Mustard (1997) may not provide reliable information. There may be many reasons for state and federal legislators to support shall-issue laws, but the belief that these laws reduce crime should not be one of them.

### References

BLACK, D., AND D. NAGIN. (1998). "Do 'Right to Carry' Laws Reduce Violent Crime?" *Journal of Legal Studies* **27**(1):209–219.

BLUMSTEIN, A., J. COHEN, AND D. NAGIN. (1978). *Deterrence and Incapacitation: Estimating the Effects of Criminal Sanctions on Crime Rates.* Washington, D.C.: National Academy of Sciences.

CARD, D. (1992). "Do Minimum Wages Reduce Employment? A Case Study of California, 1987–89." *Industrial and Labor Relations Review* **46**(1):38–54.

COOK, P.J. (1991). The Technology of Personal Violence. In *Crime and Justice: A Review of Research*, ed. M. Tonry, Vol 13, 1–70. Chicago: University of Chicago Press.

COOK, P.J., AND J.H. LAUB. (1997). "The Unprecedented Epidemic in Youth Violence." Duke University, unpublished paper.

Cook, P.J., and J. Ludwig. (1997). *Guns in America: Results of a Comprehensive National Survey on Firearms Ownership and Uses.* Washington, D.C.: Police Foundation.

Cook, P.J., S. Molliconi, and T. B. Cole. (1995). "Regulating Gun Markets." *Journal of Criminal Law and Criminology* **86**(1):59–92.

Greene, W.H. (1993). *Econometric Analysis.* 2nd ed. New York: Macmillan.

Gruber, J. (1994). "The Incidence of Mandated Maternity Benefits." *American Economic Review.* **84**(3): 622–641.

Hausman, J.A. (1983). "Specification and Estimation of Simultaneous Equation Models." In *Handbook of Econometrics,* Vol 1, eds. Z. Griliches and M. Intriligator, 391–448. Amsterdam: North Holland.

Heckman, J.J., and V.J. Hotz. (1989). "Choosing Among Alternative Nonexperimental Methods for Estimating the Impact of Social Programs: The Case of Manpower Training." *Journal of the American Statistical Association* **84**(408):862–880.

Hemenway, D., S.J. Solnick, and D.R. Azrael. (1995). "Firearms and Community Feelings of Safety." *Journal of Criminal Law and Criminology* **86**(1):121–132.

Hill, J.M. (1997). "The Impact of Liberalized Concealed Weapons Statutes on Rates of Violent Crime." Duke University undergraduate thesis.

Jost, K. (1997). "Gun Control Standoff." *Congressional Quarterly Researcher* **7**(47):1107–1114.

Joyce, T., and R. Kaestner. (1996). "The Effect of Expansions in Medicaid Income Eligibility on Abortion." *Demography* **33**(2):181–192.

Kennedy, P. (1993). *A Guide to Econometrics,* 3rd ed. Cambridge, MA: MIT Press.

Kleiman, M.A.R., and K.D. Smith. (1990). "State and Local Drug Enforcement: In Search of a Strategy." In *Crime and Justice: A Review of Research,* Vol 12, 69–107. Chicago: University of Chicago Press.

Klein, M.W. (1995). *The American Street Gang: Its Nature, Prevalence, and Control.* New York: Oxford University Press.

Lott, J.R., and D.B. Mustard. (1997). "Crime, Deterrence, and Right-to-Carry Concealed Handguns." *Journal of Legal Studies* **26**:1–68.

McDowall, D., C. Loftin, and B. Wiersema. (1995). "Easing Concealed Firearms Laws: Effects on Homicide in Three States." *Journal of Criminal Law and Criminology* **86**(1):193–206.

Nagin, D. (1978). "General Deterrence: A Review of the Empirical Literature." In *Deterrence and Incapacitation: Estimating the Effects of Criminal Sanctions on Crime Rates,* eds. A. Blumstein, J. Cohen, and D. Nagin, 95–139. Washington, D.C.: National Academy of Sciences.

National Rifle Association. (1998). *State Firearm Laws: ILA Research & Information Division Fact Sheet.* Washington, D.C.: National Rifle Association.

Newey, W. (1985). "Generalized Method of Moments Specification Testing." *Journal of Econometrics* **29**:229–256.

U.S. Bureau of the Census. (1995). *Statistical Abstract of the United States: 1995,* 11th ed. Washington, D.C.: Government Printing Office.

Vernick, J.S., S.P. Teret, and D.W. Webster. (1997). "Regulating Firearm Advertisements That Promise Home Protection: A Public Health Intervention." *Journal of the American Medical Association* **277**(27): 1391–1397.

Webster, D.W., J.S. Vernick, J. Ludwig, and K.J. Lester. (1997). "Flawed Gun Policy Research Could Endanger Public Safety." *American Journal of Public Health* **87**(6):918–921.

Zimring, F.E. (1968). "Is Gun Control Likely to Reduce Violent Killings?" *University of Chicago Law Review* **35**:721–737.

Zimring, F.E., and G. Hawkins. (1997a). *Crime Is Not the Problem: Lethal Violence in America.* New York: Oxford University Press.

Zimring, F.E., and G. Hawkins. (1997b). "Concealed Handguns: The Counterfeit Deterrent." *The Responsive Community* **7**(2):46–60.

# Lives Saved or Lives Lost?
# The Effects of Concealed-Handgun Laws on Crime

*By* Hashem Dezhbakhsh and Paul H. Rubin*

The role of handguns in crime has been the subject of extensive policy and academic debate in recent years. The interest in the issue has grown with the enactment of the restrictive (federal) Brady Bill and the adoption by many states of the right-to-carry concealed-handgun laws. These "shall issue" laws make it much easier for noncriminals to obtain licenses to carry concealed handguns. (Ten states passed such laws from 1977 to 1992, and 13 states have passed such laws since 1992.) This observed dichotomy in policy reflects the lack of consensus among policymakers regarding the role of handguns in violence. A similar disagreement exists in academic circles. For example, results reported in Philip Cook et al. (1995), Arthur Kellermann et al. (1995), Cook and Jen Ludwig (1996), and David Hemenway (1996) imply that an increase in gun ownership increases rates of crime. Daniel Polsby (1995) and John Lott and David Mustard (1997) are doubtful of such implications.

There are two theoretical possibilities regarding the effects of these laws. Increased gun ownership might lead to increased crime because of the increased availability of guns—the facilitating effect. Alternatively, because increased gun ownership might help potential victims to arm and protect themselves, thus increasing the criminals' uncertainty regarding an armed response, such laws might lead to reduced crime against persons—the deterrent effect. Which effect dominates might depend on population characteristics in a given jurisdiction. Concealed-handgun laws might

lead to increases in crime in some jurisdictions, while leading to decreases in other jurisdictions.

In a controversial paper, Lott and Mustard (1997) have examined this issue. They find that passage of concealed-handgun (shall-issue) laws by a state causes a significant reduction in violent as well as property crimes (Lott and Mustard, 1997 table 11). They attribute the results to a deterrent effect: as criminals become aware that victims might be armed, they reduce the rate of commission of crimes.[1]

We believe Lott and Mustard's findings are suspect, mainly because of the way they parameterize and measure the effect of permissive handgun laws on crime. They model the effect as a shift in the intercept of the linear crime equation they estimate at the county level. This approach is predicated on two assumptions: (i) all behavioral (response) parameters of this equation (slope coefficients) are fixed (unaffected by the law), and (ii) the effect of the law on crime is identical across counties. Obviously, if the law affects the behavior of the criminals or of citizens, then these response parameters should change, and not only the intercept term. Moreover, it seems highly unlikely that the magnitude of the ef-

* Department of Economics, Emory University, Atlanta, GA 30322-2240. We thank John Lott and David Mustard for providing us with the data and Bill Sribney, from Stata Corporation, for helpful programming suggestions. We also acknowledge financial support from the Emory University Research Committee. The usual disclaimer applies.

[1] The Lott-Mustard results that have received the most attention from media and from critics, and that the authors themselves emphasize in the abstract, are based on their table 3, which uses least squares and does not correct for the endogeneity of the arrest rate. This is the specification that shows a trade-off between violent and property crimes as states adopt "shall issue" laws. In the two-stage least-squares regression reported in Lott and Mustard (1997 table 11) the trade-off does not exist; they find a significant, and very substantial, decrease in all categories of crime in this specification. Our results are also based on two-stage least-squares methods. We should also note that the Lott-Mustard results in their table 11 are based on predicted arrest rates, from the first-stage estimation, which does not include the county fixed-effect estimates. This may also render suspect the results in their table 11.

fects such laws may have on crime rates in a county would be independent of economic and demographic characteristics of the county. In fact, the effect may vary with the age and gender composition of the population and the economic conditions of the counties, among other things. Others who have commented on Lott and Mustard (1997) (e.g., Ludwig, 1996; Dan Black and Daniel Nagin, 1998) have overlooked this problem, and consequently their alternative estimates may be subject to the same criticism; see also the reply by Lott (1998) to Black and Nagin's criticisms.

We reexamine the effect of permissive concealed-handgun laws on crime using a procedure to overcome these shortcomings, allowing all behavioral parameters of the model to change. Our method also allows the effect of the law on crime rates to be heterogeneous across counties so that we can infer how various factors influence the magnitude of the change in crime resulting from such laws. More specifically, we project the 1992 crime rate for counties without such laws if they had adopted the law by 1992. We then compare these projections, which are a function of county characteristics, with actual crime data for 1992 to infer how the absence of the law has affected crime in these counties. We also examine the relationship between these projected changes and county characteristics.

## I. Model and Estimation Approach

Lott and Mustard (1997) use county-level panel data to estimate several linear crime equations. The dependent variable is one of several crime rates: murder, rape, aggravated assault, robbery, burglary, larceny, and auto theft. The regressors include the corresponding arrest rate, a host of economic and sociodemographic factors, and a (0 or 1) binary variable measuring the status of the concealed-handgun law. The other regressors serve as control variables. The model they estimate is therefore

$$(1) \quad C_{it} = \alpha + \gamma I_{it} + \beta A_{it} + \delta X_{it} + \varepsilon_{it}$$

where $I$ is the binary variable, $A$ is the arrest rate, $X$ includes the economic and demo-

graphic variables and a set of time and county dummies (one for each sampling year or county), $\varepsilon$ is the regression error, and $i$ and $t$ denote counties and time periods, respectively.

Lott and Mustard's inference about the effect of concealed-handgun laws on various categories of crime is based on the sign and statistical significance of the estimated coefficient of the binary variable: the estimate of $\gamma$. A positive and significant estimate suggests that concealed-handgun provisions would increase the crime rate, while a negative and significant estimate points to the contrary conclusion. This representation assumes that the law only affects the intercept of the crime equation, so the crime equations for the counties with and those without the law have different intercepts but identical slopes. The coefficient of the binary variable captures the difference between the two intercept terms.

The implicit assumptions behind this characterization is that all other response parameters are identical for the two groups of counties and that all counties that adopt the law will observe identical changes in their crime rates. Both assumptions are unwarranted. Each of these parameters measures the change in the crime rate resulting from a change in the corresponding control variable (arrest rate, economic variables, or demographic characteristics). If adopting the law does indeed affect the action of criminals or their potential victims, it would do so by altering these response parameters.[2] The statistical consequences of ignoring such changes are biased estimation and potentially invalid results. Moreover, assuming the effect of the law on crime rates (parameter $\gamma$) to be fixed across counties is unjustified given the diversity of the county characteristics. Finally, using an intercept change to measure the effect of a change in the law causes the estimated effect to be fragile with respect to small specification changes. William Bartley et al. (1998) use

---

[2] Lott and Mustard (1997) in one of their least-squares regressions (their table 7) which, as explained earlier, is inappropriate in the present context, allow the slope coefficient of county population (one of the 53 regressors in their model) to change. However, they do not examine the combined effect.

extreme-bounds analysis to examine the range of the estimates of the intercept change and find it to be apparently quite wide in many cases.

We reexamine the effect of the concealed-handgun laws on crime using a regression-based procedure that overcomes these limitations. We allow all behavioral parameters of the model to respond to a change in the status of the law. The data will then show which of these parameters the law indeed affects. We implement this parameter flexibility by estimating two separate crime equations, one for counties in states with a concealed-handgun law and the other for the remaining counties:

$$(2a) \quad C_{L,it} = \alpha_L + \beta_L A_{L,it} + \delta_L X_{L,it} + \varepsilon_{L,it}$$

$$(2b) \quad C_{NL,it} = \alpha_{NL} + \beta_{NL} A_{NL,it} + \delta_{NL} X_{NL,it} + \varepsilon_{NL,it}$$

where the subscripts L and NL indicate the presence or the absence of the concealed-handgun law, respectively.

First, we examine whether the law affects the response parameters by using an asymptotic Wald test of the null hypothesis $H_0$: $\Theta_L = \Theta_{NL}$ against the alternative $H_0$: $\Theta_L \neq \Theta_{NL}$, where $\Theta$ denotes $(\beta, \delta)$.[3] A rejection of the null hypothesis implies that the law affects the response parameters of the model and therefore the crime rate. Following Isaac Ehrlich (1973), in all our estimations we treat the arrest rate, $A$, as an endogenous variable that is affected by such variables as the lagged crime rate, economic and demographic variables in the crime equation, police employment and payroll, and variables to control for political influences. These include percentage of Republican presidential votes and the percentage of a states' population who are members of the National Rifle Asso-

ciation (NRA); see Lott and Mustard (1997 p. 42). We estimate equations (2a) and (2b) along with the corresponding arrest equations via two-stage least-squares (2SLS) analysis, allowing the concealed-handgun law to shift the coefficients of the arrest equation in the first stage of estimation; such shifts are incorporated in cases where the Wald test applied to an arrest equation suggests that such a change is warranted. This ensures the consistency of the second-stage estimates. In all our estimations, we correct the residuals from the second-stage least square to account for using predicted rather than the actual arrest rate in estimation of the crime equation (see e.g., Russell Davidson and James G. MacKinnon, 1993 Ch. 7).

We estimate for each county the direction and extent of the change in crime rate that may result from introducing the concealed-handgun law. We determine how different the crime rate would have been during 1992 in the counties that did not have the concealed-handgun law in place, had they adopted the law by 1992. We obtain these estimates, which are useful for policy purposes, simply by switching the estimates of the behavioral parameters in equations (2a) and (2b) and computing the resulting predicted values for the dependent variable (the crime rate) over the relevant year. The estimates are obtained from $\hat{C} = \hat{\alpha}_L + \hat{\Theta}_L Z_{NL}$, where $Z_{NL}$ denotes the regressors in equation (2b). These are predicted crime rates conditional on adopting the concealed-handgun law. The difference between these predicted crime rates and the actual crime rates is our measure of the effect of concealed-handgun laws on crime. We emphasize that our interest is in estimating the expected 1992 crime rates conditional on the law being in place in a county that did not have it in 1992. This estimate is then compared with the county's actual 1992 crime rate to estimate the expected change. It is important to note that, in the above comparison, one should not use the county's predicted 1992 crime rate in the absence of the law, $\hat{\alpha}_L + \hat{\Theta}_{NL} Z_{NL}$, in place of the observed crime rate. This is because the former has no useful information for our inference that is not contained in the county's observed 1992 crime rate. Therefore, if we used $\hat{\Theta}_{NL} Z_{NL}$ instead of

[3] The Wald statistic is the quadratic form constructed on the estimate of the difference $(\Theta_L - \Theta_{NL})$. The statistic is asymptotically distributed as a $\chi^2$ variate with degrees of freedom equal to the number of parameters tested (Leslie Godfrey, 1988 Ch. 4; Andrew Lo and Whitney Newey, 1985).

the actual crime rate, we would add extra noise (residual), thus reducing the accuracy of the inference. Also, note that all the information relevant to adopting the law is incorporated in $\Theta_L$, which is estimated using counties with the law.

We summarize the predictions we obtain to make inferences about the scope of the potential influence of the law in each state that did not have a concealed-handgun law in place in 1992. The projections are then further analyzed to determine factors that influence their direction or magnitude. The effect of concealed-handgun laws, therefore, may vary with population density, racial and gender characteristics, income, and so forth.

## II. Data and Results

We use the data provided by Lott and Mustard (1997). The complete data set covers 3,054 counties for the period 1982–1992. The data set includes the FBI's crime data for murder, rape, aggravated assault, and robbery which comprise "violent crime" and auto theft, burglary, and larceny which comprise "property crime." The series also include the corresponding arrest rate for these nine crime categories,[4] population and population density, population characteristics for 36 age and race segments (black, white, and other; male and female; and age divisions), retirement payments per person over 65 years of age, and the ratio of real per capita income to personal income, unemployment insurance payments, and income maintenance payments. The data set also includes state-level data on police employment and payroll, the percentage of Republican presidential votes, and the percentage of each state's population who are members of the NRA. This is the most exhaustive panel data set available for research in this area.

Using a Wald test for all nine categories of crimes, we find that the Lott-Mustard hypoth-

esis of no change in slope coefficients is rejected strongly (with $p$ values close to zero) for all categories of crime.[5] That is, in all cases, there are significant changes in the slope coefficients, so that assuming all changes to be embedded in the intercept is incorrect. This suggests that the Lott-Mustard results are biased due to a misspecification. Similar results for the arrest equation, used in the first stage of the 2SLS estimation, indicate that the coefficients of these equations also change with the law. In fact, we incorporate these changes when obtaining the predicted arrest rates. A comparison of our predicted arrest rates to those of Lott and Mustard (1997) reveals the inaccuracy introduced by limiting the change to the intercept term. For example, depending on the crime category, the mean-square errors of Lott and Mustard's predicted arrest rates are 1.5–5.2 times larger than those of ours. Their predicted arrest rates also include a large number of negative values (i.e., out of about 33,000 observations for each crime category, over 19,000 are negative for auto theft, 9,900 for aggravated assault, and 13,500 for property crimes).[6]

We use the two-stage procedure described earlier to estimate the hypothetical effect on crime in each county in states that did not have a concealed-handgun law in place if such a law had been in effect in 1992. We examine these effects in two ways, both on a county-by-county basis. First, we examine for each crime and county the predicted effect of changing the law. Second, we examine the effect of county characteristics on predicted change in crime rates for each aggregated crime category.

Table 1 contains summary statistics derived from these county-level conditional predictions; more extensive results including estimated percentages are available from the

---

[4] The arrest series we use are slightly different than those used by Lott and Mustard (1997). As indicated in the last paragraph of their data appendix, Lott and Mustard use arrest series that erroneously contain zero's instead of some missing values. We use the corrected series.

[5] Results reported here are slightly different than those in an earlier draft, where we did not use population weights in estimation. Here the weights are included to make our specification as close to that of Lott and Mustard (1997) as possible, given the difference in the way we model the effect of the law.

[6] These large negative values may be partly due to Lott and Mustard's omission of the county fixed effects from the predicted arrest rates.

TABLE 1—THE PREDICTED EFFECT OF ADOPTING
CONCEALED-HANDGUN LAWS ON VIOLENT CRIMES
IN STATES WITHOUT SUCH LAWS IN 1992

| State | Murder | Rape | Robbery | Aggrevated assault |
|---|---|---|---|---|
| Arizona | no | + | + | + |
| Arkansas | no | − | no | − |
| Colorado | no | no | no | + |
| Illinois | − | no | mix | mix |
| Iowa | no | mix | + | mix |
| Kansas | − | − | + | + |
| Kentucky | − | mix | + | − |
| Louisiana | no | no | + | − |
| Maryland | no | no | + | mix |
| Michigan | no | no | + | no |
| Minnesota | − | no | + | mix |
| Missouri | no | mix | mix | mix |
| Nebraska | no | no | no | mix |
| Nevada | no | no | + | no |
| New Jersey | no | no | no | + |
| New Mexico | no | no | + | + |
| New York | no | no | no | mix |
| North Carolina | no | + | no | + |
| Ohio | − | mix | + | mix |
| Oklahoma | no | no | no | mix |
| South Carolina | no | + | no | no |
| Tennessee | no | mix | + | mix |
| Texas | − | − | mix | mix |
| Utah | no | no | no | + |
| Wisconsin | no | + | + | − |

*Notes:* Entries indicate the effect of such laws on crimes in 1992 for each state, had the state adopted the law by then. A + (−) indicates an unambiguous increase (decrease), "no" indicates that no county would have been affected, and "mix" indicates increases for some counties in the state and decreases for others. The states with "no" in all four categories are dropped for brevity; these include Alaska, California, Delaware, the District of Columbia, Hawaii, Massachusetts, Rhode Island, Wyoming, and Pennsylvania (Philadelphia County).

authors upon request. Our results suggest that for counties in six states a concealed-handgun law would have reduced murder rates, and for all counties in the other 27 states it would have been ineffective. Overall, the results indicate a relatively small, and crime-reducing, effect of concealed-handgun laws on murder rates. There would have been little effect on rape, with 22 states unaffected, four states with unambiguous increases, and two states with unambiguous decreases. The effect on robbery would have been an increase in crime for many states. For counties in 13 states, there would have

been unambiguous increases in robbery; there would have been a mixed effect (increases in some counties and decreases in some) in only three states. The overall increase in robbery is not surprising given that concealed handguns add little deterrence in this case. Many potential robbery targets already have armed protection; therefore, concealed firearms would not increase the deterrence factor. It would, however, have a crime-facilitating effect, helping the robbers.

For aggravated assault, 12 states would have been unaffected, seven states would have been adversely affected, and four states would have observed a drop in crime. The result for the remaining states is mixed. For the three categories of property crime, the effect would have been more mixed. The largest percentage of counties predicted to be affected in one direction by changing the law would have been the 15 percent of counties predicted to experience an increase in larceny; all other predicted percentage changes in any direction are less than 10 percent.

We next determine which characteristics of counties are associated with increases or decreases in each aggregate type of crime (violent and property crime) for counties. We do this by regressing the predicted change in crime rates as a function of a list of demographic and economic variables for the county. The economic variables, all measured per capita, are personal income, unemployment insurance, and retirement payments per person over 65. We also include (predicted) arrest rates and population density. We include demographic variables. Since most crime is committed by young males, we include the number of males 10–29 years old, and similarly for females. We include persons 65 and over, who are perhaps more likely to be victims than perpetrators of crimes.[7] Finally, we include per capita measures of number of NRA members in the state and police pay-

---

[7] Experiments with other specifications indicate that this specification provides most of the useful information in the data and is sufficiently aggregated so that the results are easily interpreted.

roll. In all cases, we measure the effect of the relevant variable on predicted changes in crime by category of the passage of a concealed-handgun law by county.

Regression results show that for counties that spend relatively more on police the laws lead to crime reductions. This is plausible: higher spending on police will not affect the deterrent benefit of handguns but will reduce the facilitating effect of handguns that benefits criminal activity. On the other hand, for counties with higher arrest rates, passage of shall-issue laws leads to increased crime, perhaps because there are more criminals in these counties. The other consistent results are for likely victims: more elderly people and more young (10–29-year-old) nonblack females are associated with reduced crime as a result of passage of gun laws. This may represent evidence of the deterrent effect in some cases. Evidence that potential criminals (generally, young males) use these laws to obtain guns and commit crimes is weak; only one of the four possible coefficients is significant and positive, and one is negative ($t$ values for both black and nonblack young males are less than 0.2 in the property-crime estimate).

### III. Concluding Remarks

We have reexamined the effect of concealed-handgun laws on crime rates using a statistical procedure that overcomes the limitations of previous studies. Our procedure allows us to assess the full implications of the right-to-carry gun provisions. We find that the results of concealed-weapons laws are much smaller than suggested by Lott and Mustard (1997) and by no means negative across all crime categories. For murder, for example, there is only at best a small reducing effect. For robbery, many states experience increases in crime. For other crimes, results are ambiguous, with some counties showing predicted increases, and some predicted decreases.

We also examine demographic and other influences on the likely effect of passage of laws on crime rates. We find that there are predictable patterns on the effect of shall-issue laws on crime. For example, counties spending more on police could expect a decrease in

crime from the passage of a law or a smaller increase where the law leads to an increase in crime. The sort of analysis developed here could be used to enable policymakers to tailor laws more carefully to particular conditions in a jurisdiction. More research in this important area is warranted.

### REFERENCES

**Bartley, William; Cohen, Mark and Froeb, Luke.** "The Effect of Concealed Weapon Laws: An Extreme Bounds Analysis." *Economic Inquiry*, 1998 (forthcoming).

**Black, Dan and Nagin, Daniel.** "Do 'Right-to-Carry' Laws Deter Violent Crime?" *Journal of Legal Studies*, January 1998, *27*(1), pp. 209–19.

**Cook, Philip J. and Ludwig, Jen.** "Guns in America: Results of a Comprehensive National Survey on Firearms Ownership and Uses." Report prepared for the National Institute of Justice, Washington, DC, 1996.

**Cook, Philip; Molliconi, Stephanie and Cole, Thomas.** "Regulating Gun Markets." *Journal of Criminal Law and Criminology*, Fall 1995, *86*(1), pp. 59–92.

**Davidson, Russell and MacKinnon, James G.** *Estimation and inference in econometrics*. New York: Oxford University Press, 1993.

**Ehrlich, Isaac.** "Participation in Illegitimate Activities: A Theoretical and Empirical Investigation." *Journal of Political Economy*, May–June 1973, *81*(3), pp. 521–65.

**Godfrey, Leslie.** *Misspecification tests in econometrics: The Lagrange multiplier principle and other approaches*. Cambridge: Cambridge University Press, 1988.

**Hemenway, David.** "Survey Research and Self-Defense Gun Use: An Explanation of Extreme Overestimates." Working paper, Harvard University, 1996.

**Kellermann, Arthur; Westohal, Lori; Fischer, Lauri and Harvard, Beverly.** "Weapon Involvement in Home Invasion Crime." *Journal of the American Medical Association*, 14 June 1995, *273*(22), pp. 1759–62.

**Lo, Andrew and Newey, Whitney.** ''A Large-Sample Chow Test for the Linear Simultaneous Equation.'' *Economics Letters*, 1985, *18*(4), pp. 351–53.

**Lott, John.** ''The Concealed Handgun Debate.'' *Journal of Legal Studies*, January 1998, *27*(1), pp. 221–43.

**Lott, John and Mustard, David.** ''Crime, Deterrence, and Right-to-Carry Concealed Hand-guns.'' *Journal of Legal Studies*, January 1997, *26*(1), pp. 1–68.

**Ludwig, Jens.** ''Do Permissive Concealed-Carry Laws Reduce Violent Crime?'' Mimeo, Georgetown University, 1996.

**Polsby, Daniel.** ''Firearm Costs, Firearm Benefits, and the Limits of Knowledge.'' *Journal of Criminal Law and Criminology*, Fall 1995, *86*(1), pp. 207–20.





Journal of Public Economics 90 (2006) 379   391

www.elsevier.com/locate/econbase

# The social costs of gun ownership

Philip J. Cook[a,*], Jens Ludwig[b]

[a]*Duke University and NBER, United States*
[b]*Georgetown University and NBER, United States*

Received 17 August 2004; received in revised form 18 February 2005; accepted 18 February 2005
Available online 31 May 2005

**Abstract**

This paper provides new estimates of the effect of household gun prevalence on homicide rates, and infers the marginal external cost of handgun ownership. The estimates utilize a superior proxy for gun prevalence, the percentage of suicides committed with a gun, which we validate. Using county  and state level panels for 20 years, we estimate the elasticity of homicide with respect to gun prevalence as between $+0.1$ and $+0.3$. All of the effect of gun prevalence is on gun homicide rates. Under certain reasonable assumptions, the average annual marginal social cost of household gun ownership is in the range $100 to $1800.
© 2005 Elsevier B.V. All rights reserved.

*Jel classifications:* H21; I18; K42
*Keywords:* Regulation; Social costs; Evaluation methods; Externalities; Gun violence

## 1. Introduction

Like many other private decisions about health and safety, such as getting vaccinated, purchasing LoJack (Ayres and Levitt, 1998), or driving a sport utility vehicle (Gayer, 2004), private gun ownership may impose externalities. Widespread gun ownership in a community could provide a general deterrent to criminal predation, lowering the risk to owners and non-owners alike. But widespread gun ownership could also lead to increased

---

* Corresponding author.
*E-mail address:*  pcook@duke.edu (P.J. Cook).

0047-2727/$ - see front matter © 2005 Elsevier B.V. All rights reserved.
doi:10.1016/j.jpubeco.2005.02.003

**JA 382**

380          *P.J. Cook, J. Ludwig / Journal of Public Economics 90 (2006) 379 391*

risks of various sorts, including the possibility that guns will be misused by the owners or transferred to dangerous people through theft or unregulated sale. Whether the social costs of gun ownership are positive or negative is arguably the most fundamental question for the regulation of firearms in the United States.

Previous research has produced conflicting conclusions. One prominent estimate for the effects of gun prevalence on homicide is by John Lott (2000), who relates state-level estimates of gun ownership rates from voter exit polls in 1988 and 1996 to state crime rates, conditioning on several socioeconomic variables in a cross-section analysis. His estimate of the elasticity of homicide with respect to state gun ownership rates is extraordinarily large, equal to $-3.3$.[1]

Mark Duggan (2001) identifies the relationship between guns and crime using over-time variation in panels of states and also counties. Duggan's elasticity estimate, $+0.2$, is of the opposite sign from Lott's and an order of magnitude smaller. There is some question about the validity of his proxy for gun prevalence, the subscription rate to *Guns and Ammo* magazine.

In this paper we follow Duggan's lead in using panel regression methods to estimate the effect of gun prevalence on homicide rates, but with a different and well-validated proxy variable. Our results suggest that the social cost of an additional household acquiring a handgun depends on the rate of violence and the existing prevalence of guns, but under a wide range of assumptions is greater than $100 per year.

## 2. FSS as a proxy for gun prevalence

Since most states lack any sort of registration or licensing system that would generate administrative data on firearms ownership, household surveys provide the only direct source of information on this matter. But survey data are not always available or reliable for sub-national units, so analysts have employed a variety of proxy variables. Two independent inquiries have recently identified one such proxy as superior to all others for the purpose of estimating the cross-section structure of gun prevalence across large geographic entities (Azrael et al., 2004; Kleck, 2004). That proxy is the fraction of suicides committed with a firearm (FSS).

Our use of FSS is primarily to estimate variation over time rather than in the cross-section. To validate this use requires consistent estimates of gun prevalence over time, preferably at a sub-national level. The "gold standard" for national surveys of gun ownership is the General Social Survey (GSS). We ran panel regressions of GSS-based estimates of gun prevalence against two proxies, FSS and the subscription rate to *Guns and Ammo*, the proxy used by Duggan (2001). The estimated coefficients of our GSS

---

[1] Lott conditions on region but not state dummies in his regressions, so his estimates will be identified primarily by cross-sectional variation in gun ownership rates (Azrael et al., 2004). A more fundamental problem is that there are serious problems with his voter exit poll data, which suggest that from 1988 to 1996 gun ownership rates increased for the U.S. as a whole from 27.4 to 37.0% (p. 36). Yet the best source of national data on gun ownership trends   the General Social Survey   indicates that individual gun ownership trends were essentially flat during this period (Kleck, 1997, pp. 98 99).

*P.J. Cook, J. Ludwig / Journal of Public Economics 90 (2006) 379  391*                381

measures on FSS are in every case significantly positive, and are especially strong when year fixed effects are omitted, while the subscription rate to *Guns and Ammo* performs less well and in some cases yields a negative coefficient estimate.[2]

## 3. Data

The estimates presented below are based on panel data for 200 counties that had the largest population in 1990,[3] or a subset of those counties, for the period 1980 to 1999. We also present estimates based on state-level panel data. The 200 largest counties accounted for 74% of all homicides in the United States in 1990.[4]

Suicide and homicide counts are taken from Vital Statistics Program mortality data, based on reports of coroners and medical examiners and compiled by the National Center for Health Statistics. Data on robbery, burglary, and other types of crime besides homicide are from the FBI's Uniform Crime Reports.

Finally, we control for other changes over time in county socio-demographic characteristics that could affect both crime and gun prevalence. Such data are available at the county level only from the decennial Census, from which we interpolate data for the inter-Censal years. Covariates include the prevalence of blacks, households headed by a female, urban residents, and residents living in the same house 5 years ago.

## 4. Empirical strategy

The basic empirical approach here is to estimate the relationship between gun prevalence and homicide by exploiting the substantial across-area differences in trends in gun ownership over a 20-year period. Our baseline estimates are generated from model (1), which relates the natural log of jurisdiction (i)'s homicide rate (or, alternatively, the gun- or non-gun homicide rate) in year $t$ against FSS, the proxy for the jurisdiction's gun ownership rate, in year $(t - 1)$. FSS is lagged by one period out of concern for reverse causation – gun ownership may be consequence as well as cause of a county's crime rate – although the lag can also be justified for substantive reasons: the thefts and secondary-

---

[2] The GSS is conducted by the National Opinion Research Center most years from 1972 to 1993 and biennially since 1994 (Davis and Smith, 1998), and is capable of providing representative samples at the national or census region or even division level. Our panel dataset for this validation exercise is defined over the nine Census divisions and the 14 years in which GSS fielded gun questions between 1980 and 1998. In these regressions, we condition on fixed effects for Census division in all model specifications. We define "prevalence" in the GSS data for either handguns or all guns, and for either households or individuals. For additional details, see Cook and Ludwig (2004b).

[3] Kelly (2000) used this sample of counties in studying the determinants of crime rates. The 5 counties of New York City are combined in our analysis due to data limitations. Oklahoma City was dropped in 1995 due to the large homicide count associated with the bombing of the federal building there.

[4] Also of some interest is what fraction of all guns in the U.S. is found in the top 200 counties. While we cannot perform this calculation with our FSS proxy, which is not available for all counties, we find that 43% of all *Guns and Ammo* subscriptions in the U.S. are in the 200 largest counties.

382          *P.J. Cook, J. Ludwig / Journal of Public Economics 90 (2006) 379 391*

market transfers that move guns from households to use by criminals will ordinarily take some time. To further control for the possibility of reverse causation, we condition on the natural log of the area's burglary and robbery rates, which are the kinds of crimes that seem likely to motivate the acquisition of a firearm for self-defense. These crime variables also are a good reflection of criminogenic factors in the community that influence homicide rates (Blumstein, 2000). To account for other county or state characteristics that affect homicide, the regression model includes year and county/state fixed effects, as well as the logs of the socio-demographic variables. The regression estimates are weighted by each county or state's population to account for heteroskedasticity in the error term.

$$\log Y_{it} = \beta_0 + \beta_1 \log FSS_{it\ 1} + \beta_2 X_{it} + d_i + d_t + \varepsilon_{it}. \tag{1}$$

Another concern is serial correlation in the error structure, given that FSS changes only slowly over time within counties and that other unmeasured determinants of county crime rates may also have jurisdiction-specific trends.[5] We address this problem by calculating Huber–White standard errors that are robust to an arbitrary autocorrelation pattern in the errors over time within counties. Bertrand et al. (2004) show that this approach works better than more parametric strategies in panels with a short time dimension.

A final concern in estimating Eq. (1) is that the proxy for gun prevalence, FSS, is subject to measurement error of two types. First, because it is only a proxy, the correlation between FSS and the "true" prevalence is presumably less than one. Judging the quality of the proxy in that sense is difficult, given that there are no error-free measures of the criterion variable. In particular, survey-based estimates are subject to sampling error and reporting error. Based on an analysis of national GSS estimates over time, the hypothesis that FSS *is* a "perfect" proxy cannot be rejected, but that is not the same thing as demonstrating that it is perfect in fact.[6]

Second, and probably more important, is that the reliability of FSS will depend on the number of suicides used to compute it. For the 21 years of data on 200 large counties, the 10th and 90th percentiles have 27 and 142 suicides respectively, with a median of 52 and a mean of 196. If the choice of weapon in suicide follows a binomial process, then a jurisdiction with 50 suicides a year would generate an observed FSS that is subject to a standard error of 7 percentage points. The effect of this measurement error will be to bias the coefficient estimate of FSS toward zero. We address this problem in a variety of ways below, including re-calculating our estimates with state-level data. While the state data have the advantage of reducing measurement error in FSS, one drawback is that county-

---

[5] Testing for the presence of serial correlation in fixed-effects models is complicated in applications where the time dimension is fairly short compared to the number of observational units. Following Solon (1984), we test for serial correlation by first-differencing the data, and then keep the residuals from a regression of the log change in homicides against the log change in FSS and year effects. A regression of these residuals against their 1-year lag yields a coefficient of  0.4, close to the value of  0.5 characteristic of an error structure that is serially uncorrelated. Additional tests indicate that serial correlation is a somewhat greater problem with the state-level data.

[6] The correlation between national household handgun prevalence and FSS over 18 waves of the GSS is 0.635, very close to the mean of a large number of correlations generated from a simulation based on the assumption that FSS is exact and the GSS estimates are unbiased but subject to normal sampling error. That mean is 0.664.

*P.J. Cook, J. Ludwig / Journal of Public Economics 90 (2006) 379 391*                          383

Table 1
Descriptive statistics for county data

|  | Full sample (largest 200) | Bottom quartile 1980 FSS | Top quartile 1980 FSS |
|---|---|---|---|
| *Full period (1980 1999)* |  |  |  |
| FSS | 49.9 | 34.6 | 66.9 |
| Homicide rate | 11.0 | 10.9 | 14.4 |
| Gun homicide rate | 7.3 | 6.9 | 10.1 |
| %Urban | 92.6 | 94.7 | 91.8 |
| %Percent black | 14.0 | 13.5 | 19.5 |
| %Female household head | 18.0 | 20.1 | 18.5 |
| # Suicides | 195.8 | 192.5 | 120.0 |
| | | | |
| *FSS in selected years* | | | |
| 1980 | 48.0 | 29.2 | 73.3 |
| 1990 | 52.8 | 37.2 | 69.1 |
| 1999 | 48.0 | 34.9 | 59.8 |

Source: Mortality   National Center for Health Statistics, Vital Statistics, Mortality; Crime   Federal Bureau of Investigation, Uniform Crime Reports; Demographics   US Census Bureau, 1980, 1990 and 2000 Censuses.

level gun prevalence may be more relevant for local gun availability in the used or "secondary" gun market (Cook et al., 1995).[7]

## 5. Results

Table 1 presents descriptive statistics for the full panel assembled from annual data for the 200 largest counties for the years 1980–1999 (all calculations are weighted by county population). Over the entire sample period, the average homicide rate is 11 per 100,000 residents, with half of all suicides having been committed with a firearm.

Table 1 also provides some sense for the variation in gun ownership that identifies the panel data estimates shown below. The second and third columns of Table 1 present data for the top and bottom quartiles for our 200 counties ranked according to their gun ownership rates at the start of our panel, in 1980. The (disproportionately Southern) counties where guns are most common in 1980 experience a persistent and pronounced reduction in household gun ownership rates during the 20 years of our panel, as reflected by the nearly 20% decline in FSS over this period. At the same time, counties where guns were least common in 1980 (disproportionately in the Northeast and Midwest regions) experienced an increase in FSS of 20% from 1980 to 1999.

The source of this convergence remains something of a mystery (Azrael et al., 2004). If whatever drove this convergence between high- and low-gun ownership areas was orthogonal to the determinants of homicide trends, then a difference-in-differences

---

[7] On the other hand, a potential advantage of the state-level data comes from the possibility that people cross county lines to obtain firearms. This may not be a very severe problem, at least for youth, who account for a disproportionate share of all gun crime. When Cook and Ludwig (2004a) regress an indicator for youth gun carrying against FSS the relationship is much stronger when FSS is measured at the county than at the state level.

estimate of the effect of FSS on homicide ($Y$) would be unbiased. In particular, expression (2) is an estimate of the elasticity of $Y$ with respect to FSS, where $\Delta$ indicates the difference between 1999 and 1980, and the subscripts $Q1$ and $Q4$ refer to "top quartile" and "bottom quartile" respectively.

$$\left(\Delta\ln Y_{Q1} - \Delta\ln Y_{Q4}\right)/\left(\Delta\ln\text{FSS}_{Q1} - \Delta\ln\text{FSS}_{Q4}\right). \tag{2}$$

The elasticity of homicide with respect to FSS estimated in this fashion is $+0.18$. A similar calculation for gun homicides yields an elasticity with respect to gun ownership rates of $+0.35$. These simple estimates turn out to be quite compatible with those derived from the panel regression analysis that uses all of the variation across counties over time.

### 5.1. Panel regression findings

The first column of Table 2 presents the results for our most parsimonious model, which includes county and year fixed effects but no other covariates. The estimated elasticity of homicide with respect to the lagged value of log FSS equals $+0.100$ ($p < 0.05$). The final three columns of Table 2 show that this point estimate is not sensitive to controlling for several sets of influential covariates.

Table 3 reports results for a number of alternative specifications, in each case for three dependent variables: the logs of the homicide rate, the gun homicide rate, and the non-gun homicide rate. If the predominant causal mechanism linking gun prevalence to homicide is that increased prevalence induces substitution of guns for other weapons in assaults, with a consequent increase in lethality, then only the gun homicide rate will increase in response to an increase in FSS. Table 3 generally supports this prediction.

The results are robust to a variety of modifications to our basic estimation approach. In the second row, additional county-level characteristics are added –percentages of resident

Table 2
Baseline results, county-level data, 1980 1999

|  | Ln(Hom) | Ln(Hom) | Ln(Hom) | Ln(Hom) |
|---|---|---|---|---|
| Ln FSS ($t$    1) | 0.100** (0.044) | 0.107*** (0.037) | 0.085* (0.044) | 0.086** (0.038) |
| Ln Rob ($t$) | | 0.139*** (0.043) | | 0.149*** (0.042) |
| Ln Burg ($t$) | | 0.258*** (0.068) | | 0.226*** (0.072) |
| Ln percent black ($t$) | | | 0.233 (0.166) | 0.278* (0.164) |
| Ln %Urb ($t$) | | | 0.389** (0.161) | 0.537*** (0.157) |
| Ln %same house 5 years ago | | | 10.209*** (0.430) | 0.690 (0.419) |
| Ln %female headed house | | | 0.790* (0.460) | 0.303 (0.413) |
| Year fixed effects? | Yes | Yes | Yes | Yes |
| County fixed effects? | Yes | Yes | Yes | Yes |
| $R^2$ | 0.915 | 0.921 | 0.918 | 0.923 |
| $N$ | 3822 | 3822 | 3822 | 3822 |

Parentheses contain standard errors adjusted for serial correlation (see text). Estimates utilize county population as weight. Analytic sample consists of annual observations for 200 largest counties in U.S. over the period 1980 1999.
   * Significantly different from zero at the 10% level.
   ** Significantly different from zero at the 5% level.
   *** Significantly different from zero at the 1% level.

*P.J. Cook, J. Ludwig / Journal of Public Economics 90 (2006) 379 391*          385

Table 3
Sensitivity analysis

|  | Ln(Homicide) | Ln(Gun Homicide) | Ln(Non-gun Homicide) |
|---|---|---|---|
| *Alternative specifications* | | | |
| Baseline model, final column, Table 2 | 0.086** (0.038) | 0.173*** (0.049) | 0.033 (0.040) |
| 2 Additional covariates (age, poverty, immigrants) | 0.086** (0.036) | 0.173*** (0.043) | 0.020 (0.040) |
| 3 Baseline model, unweighted | 0.051 (0.043) | 0.167*** (0.043) | 0.061 (0.042) |
| 4 Add census division/year fixed effects | 0.068* (0.035) | 0.162*** (0.044) | 0.047 (0.038) |
| 5 Condition on lag dependent variable | 0.061* (0.033) | 0.108** (0.046) | 0.032 (0.040) |
| | | | |
| *Alternative samples* | | | |
| 6 Average FSS over 2 years | 0.148** (0.059) | 0.317*** (0.089) | 0.054 (0.061) |
| 7 Limit sample to largest 100 counties | 0.131*** (0.047) | 0.207*** (0.066) | 0.026 (0.051) |
| 8 Limit sample to largest 50 counties | 0.223*** (0.076) | 0.252** (0.101) | 0.114 (0.078) |
| 9 State-level data, baseline model | 0.407*** (0.142) | 0.562*** (0.180) | 0.106 (0.130) |
| 10 State data, add division/year fixed effects | 0.335*** (0.114) | 0.534*** (0.167) | 0.066 (0.099) |
| 11 State data, condition on lag dependent variable | 0.208** (0.081) | 0.272** (0.110) | 0.103 (0.116) |

Unless otherwise noted, analytic sample consists of 200 largest counties in US using data from 1980 to 1999. Each cell in table presents the coefficient estimate and standard error for the log of FSS ($t$   1) (except for row 6), with the robbery rate, burglary rate, indicators for missing values for robbery and burglary, and percent black as covariates. Parentheses contain standard errors adjusted for serial correlation (see text). Estimates utilize county population (rows 1  8) or state population (rows 9  11) as weights.

   \* Statistically significant at 10%.
   \*\* Statistically significant at 5%.
   \*\*\* Statistically significant at 1%.

population living in poverty, born outside of the U.S., and in different age groupings – which have almost no effect on the point estimates for FSS. Re-calculating the estimates without weighting by county population produces an elasticity estimate for homicide with respect to guns that is about two-thirds as large as the weighted estimate (row 3). We prefer the weighted estimates because they provide a heteroskedasticity correction. Finally, the results reported in rows 4 and 5 demonstrate that the results hold up quite well to the inclusion of separate year fixed effects for each of the nine Census divisions, or to inclusion of the lagged dependent variable.[8]

The second panel of Table 3 reports the results of several efforts to deal with the fact that our measure of gun prevalence, FSS, is subject to error, primarily due to the relatively small number of suicides in some counties. To increase the "sample" of suicides, we average FSS over 2 years (row 6), limit the analysis to the largest 100 or largest 50 counties (rows 7 and 8), and utilize state-level data (rows 9, 10, and 11). The results suggest that the reduction in measurement error, as expected, tends to increase the point

---

   [8] When we condition on county-specific linear trends (or state trends with the state data), the point estimates for FSS are generally about half as large as in Table 3. These estimates are statistically significant in the state data but not quite significant in the county data, with $p$-values on the order of $p \approx 0.2$.

Table 4
Specification checks for county and state results, 1980 1999

| Outcome | 200 Largest county data | State data |
|---|---|---|
| Ln(UCR murder) | 0.073* (0.043) | 0.645*** (0.200) |
| Ln(UCR rape) | 0.012 (0.048) | 0.201 (0.382) |
| Ln(UCR aggravated asslt) | 0.040 (0.038) | 0.275 (0.168) |
| Ln(UCR larceny) | 0.004 (0.015) | 0.096 (0.074) |
| Ln(UCR MV theft) | 0.041 (0.038) | 0.046 (0.189) |
| Ln(Fatality rate from falls) | N/A | 0.058 (0.158) |
| Ln(MV crash fatality rate) | N/A | 0.081 (0.068) |

Each cell presents the coefficient and standard error (adjusted for serial correlation) for a separate regression of the outcome measure described in the first column against the log of lagged FSS, controlling for the log of the robbery and burglary rates as well as the other covariates described in the final column of Table 4. The county-level regressions condition on county and year fixed effects and weight by county population, using a sample of the 200 largest counties in the U.S.; the state-level regressions condition on year and state fixed effects, as well as weight by state population.
    * Statistically significant at 10%.
  *** Statistically significant at 1%.

estimates by a factor of from 1.5 to 3 or 4 times our baseline specification. County-level estimates that adjust for measurement error using the approach suggested by Griliches and Hausman (1986), based on a comparison of the within- and first-difference estimators, are also generally about 3 or 4 times those from the baseline model.[9]

A final way to test for the possibility of bias from unmeasured variables is to determine whether FSS predicts outcomes that logically have little relationship to gun prevalence, in the spirit of Altonji et al. (2000, 2002). Table 4 reports the results of estimating the baseline model (final column, Table 2) on rates of other types of crime from the UCR, and on the fatality rate from falls and from motor-vehicle accidents. The estimated coefficients on FSS are not significantly different from zero in any of these regressions.[10,11]

Finally, Table 5 provides suggestive evidence that gun prevalence leads to elevated rates of homicide through the transfer of guns from "legal" to "illegal" owners, rather than through increased gun misuse by otherwise legal owners. In this exercise, we

---

[9] When we recalculate our estimates with the state-level data using a weighted average of the three gun proxies that are available to us (FSS, gun prevalence from the GSS, and Guns and Ammo subscription rates, where the weights are calculated using factor analysis as in Fryer et al., 2005), the point estimates are about 1.3 times those from our baseline model.

[10] Another implication from Table 4 is that the results are not sensitive to measuring homicides using data from the UCR rather than our preferred source, the Vital Statistics. Note that Duggan (2001) also finds evidence that gun prevalence as proxied by Guns and Ammo subscription rates are not systematically related to other types of crime besides homicide.

[11] We also calculated our estimates using just the long-term variation in gun ownership rates and homicide from the early 80s to the late 90s. This long-difference approach circumvents the problem of modeling the sharp increase and fall of the homicide rate during our sample period. We estimate a long-difference model that shows the changes in log homicides (or log gun or non-gun homicides) from 1980 to 1999, regressed against the change in log FSS over the same period, conditioning on the log changes in the other explanatory variables included in our baseline model. This long-difference estimator yields an elasticity of homicide with respect to gun prevalence of +.3, which is even larger when we pool data from multiple years to correct for measurement error.

*P.J. Cook, J. Ludwig / Journal of Public Economics 90 (2006) 379 391*        387

Table 5
Effects of gun ownership on Youth Homicides, State Data, 1980 1999

|  | Ln(Hom 15 19) | Ln(Gun hom 15 19) | Ln(Nongun 15 19) |
|---|---|---|---|
| *State data* |  |  |  |
| Ln(State FSS) | 0.593** (0.194) | 0.458* (0.205) | 0.053 (0.373) |

Each cell presents a coefficient and standard error (adjusted for serial correlation) from a separate regression. Each regression controls for the log of the state's burglary and robbery rate and percent black, log state alcohol consumption per capita, and year and state fixed effects. Estimates are calculated using state populations as weights.

 \* Statistically significant at 10%.
\*\* Statistically significant at 5%.

focus on homicide rates to victims 15 to 19, a relatively high percentage of whom are killed in gang- and felony-related attacks by youthful criminals—with guns that are typically obtained from the secondary market (Cook and Ludwig, 2004a). That this market is closely tied to the prevalence of gun ownership is suggested by the large coefficient on FSS.[12]

## 6. Social costs

In sum, gun prevalence is positively associated with overall homicide rates but not systematically related to assault or other types of crime. Together, these results suggest that an increase in gun prevalence causes an *intensification* of criminal violence—a shift toward greater lethality, and hence greater harm to the community. Of course, gun ownership also confers benefits to the owners and possibly other members of the household. The benefits are associated with the various private uses of guns—gun sports, collecting, protection of self and household against people and varmints. But if our estimates are correct, the net external effects appear to be negative.

The magnitude of these net external costs is suggested by the elasticity estimates of homicide with respect to FSS. The baseline model applied to county-level data yields an elasticity of $+0.09$ or $+0.10$, although our various attempts to correct for measurement error typically suggest estimates on the order of $+0.3$ or more. All of these have the feature that the effect on overall homicide is due to changes in gun use, with the possibility of some substitution away from other types of weapon.

These elasticity estimates with respect to FSS also serve as estimated elasticities with respect to the household prevalence of gun ownership, if FSS is proportional to prevalence. Based on cross-section data, FSS does not appear to be strictly proportional—the best-fit line between FSS and survey-based gun ownership rates is linear with a significantly negative intercept (Azrael et al., 2004). But proportionality is

---

[12] Note that all of the estimates presented here assume that the elasticity of homicide with respect to guns is constant across counties. When we test this assumption by including interactions between FSS and indicators for whether the county's value of FSS in 1980 is in the top or bottom quartile, these interactions are not statistically significant.

a defensible assumption for time-series data: a regression of national handgun prevalence rates (from GSS data) on FSS yields an intercept with a *t*-statistic of only −1. In what follows, we treat the elasticity with respect to FSS as equal to the elasticity with respect to the prevalence of gun ownership.

The positive elasticity estimates imply that an increase in the prevalence of gun ownership has positive marginal social cost. It is relevant to translate the elasticity into a ratio: the annual change in the homicide count associated with a change in the number of households with guns. That ratio is related to the elasticity by this formula:

$$\text{Ratio of changes in homicides to gun−owning households} = [e \times h \times n]/g \quad (3)$$

where $e$=elasticity of homicide rate to prevalence of guns; $h$=homicide rate per capita; $g$=household prevalence of gun ownership; $n$=number of people per household.

This ratio is proportional to the marginal social cost of an additional gun homicide. The formula implies that the marginal social cost of acquiring a gun increases with the homicide rate. For a given homicide rate, the marginal social cost is lower for high-prevalence jurisdictions than low-prevalence—an implication of the log–log specification.

It is important to distinguish between gun types. While handguns make up only about one-third of the private inventory of guns, they account for 80% of all gun homicides and a still-higher percentage of gun robberies. Handguns are also used in most gun suicides. Hence the social costs of handgun ownership are much higher than ownership of rifles and shotguns. Unfortunately, it is difficult to distinguish between the prevalence of long-gun ownership and handgun ownership in aggregate data, since they are very highly correlated across jurisdictions. There is some divergence over time, as overall gun ownership has had a strong downward trend that is not so evident for handgun ownership. FSS is a better proxy over time for handgun ownership.

If the marginal social cost of gun prevalence is entirely attributable to handguns, then the relevant national average is about 20%. Using that value, together with a homicide rate of 10/100,000 (which is close to the average for the 200 counties), an elasticity of +0.10, and 2 people per household, then the formula indicates one additional homicide per year for every 10,000 additional handgun-owning households. In a county with 10% prevalence and a baseline homicide rate of 20, there are 4.0 additional homicides per year for every additional 10,000 handguns; if the baseline homicide rate is 5, and handgun prevalence 30%, just 0.3 homicides are engendered. If the true elasticity is closer to +0.3 instead of +0.1, then the predicted changes in homicides should be tripled.

Two additional questions relevant to calculating marginal social cost cannot be resolved satisfactorily from our results: which margin, and what geographic unit?

### 6.1. Which margin?

Most households that own one gun own several.[13] FSS is a valid proxy for the prevalence of gun ownership, but much of the "action" is at the intensive margin. With

---

[13] About three-quarters of all guns are owned by the one-third of gun-owning households that own at least four (Cook and Ludwig, 1996).

respect to providing the right attribution of marginal social cost, it is important to determine whether the acquisition of the nth gun by a gun-owning household has the same cost on average as the acquisition of the first gun. Of course it is only the latter acquisition that will change prevalence.

## 6.2. What geographic unit?

While our focus has been on county-level ownership, we note that guns often travel across county lines. For that reason, household gun ownership in nearby counties may affect gun availability to local criminals. If true, then "gun prevalence in nearby counties" is a variable that belongs in the homicide regressions, since it is substantively relevant and quite possibly correlated with within-county prevalence. We experimented with specifications that included rest-of-state FSS in addition to the usual within-county FSS, but the results were not very sensible. At this point, it is necessary to be guided by other sorts of evidence regarding the importance of diffuse sources of guns outside of the immediate county. If there are few frictions in the flow of guns to criminals within a state, then our state-level estimates are a better basis for imputing the social costs than the county-level estimates.

Translated into the policy domain, the answers to these questions should influence the nature of regulation adopted in response to the cost argument, and also the geographic scope of the regulatory system. If the number of households with guns, as opposed to the number of guns, is the main concern, then a licensing system may be the preferred form of regulation.[14]

What would be the optimal license fee per household? Answering this question requires monetizing the social costs of the additional homicides that appear to be generated by widespread gun prevalence. One possibility would be to assign each homicide the value per statistical life that has been estimated in previous research, a range of $3 to $9 million (Viscusi, 1998), which come primarily from studies of workplace wage-risk tradeoffs. But even the lower end of this range may overstate the dollar value required to compensate the average homicide victim for a relatively higher risk of death, given that (as noted above) such a large proportion of homicide victims are engaged in criminal activity that entails a high risk of death. For example, a study of the wage premium paid to gang members engaged in selling drugs suggests a value per statistical life on the order of $8000 to $127,000 (Levitt and Venkatesh, 2000).

Suppose that given local conditions with respect to violence and gun ownership, we estimate a ratio of 10,000 handgun-owning households per annual homicide (approximately what holds at the national average for gun prevalence and homicide with an elasticity of homicide to gun prevalence of $+0.1$) Given a conservative value of life, $1 million, then the appropriate license fee for a household would be $100 per year. That license fee would increase with the homicide rate, and in some jurisdictions, such as Washington, DC, would become so high that as to be the practical equivalent of a ban on ownership (a ban on handgun acquisition is currently in place in Washington, Chicago, and some other cities). Of course, this calculation ignores the problem of compliance.

---

[14] If it is the number of guns that matters, as opposed to the number of households, then an annual tax per gun could be assessed. But our estimates are not directly relevant to estimating the appropriate fee in that case.

*P.J. Cook, J. Ludwig / Journal of Public Economics 90 (2006) 379 391*

This calculation will understate the optimal license fee per gun-owning household if our assumption about the average value per statistical life for homicide victims is too low, or if, as seems likely, gun violence imposes costs on society that are not well captured by any study of the value per statistical life.

Contingent valuation estimates intended to capture the complete social costs of gun violence indicate a value of around $1 million per assault-related gunshot injury (Cook and Ludwig, 2000; Ludwig and Cook, 2001). On average one in six assault-related gunshot injuries results in death (Cook, 1985; Cook and Ludwig, 2000). Under the assumption that this case-fatality rate is stable across time and space, then at the national averages for gun prevalence and homicide our baseline estimate of a guns/homicide elasticity of $+0.10$ implies that each additional 10,000 gun-owning households leads to around 6 additional crime-related gunshot injuries. If these contingent valuation estimates are approximately correct, the optimal license fee per gun-owning household would be on the order of $600. If the true elasticity of homicide with respect to gun prevalence is on the order of $+0.30$ rather than $+0.10$, as suggested by some of our estimates that are based on modifications intended to reduce measurement error, the optimal license fee may be as high as $1800 per household.[15]

## Acknowledgements

The research reported here was supported by a grant from the Joyce Foundation, and was conducted in part while the authors were residents at the Rockefeller Foundation's Bellagio Study and Conference Center. Thanks to Mark Duggan for sharing his data on gun magazine subscriptions, to Bob Malme, Dmitri Mirovitski, Joe Peters and Eric Younger for excellent research assistance, and to seminar participants at the NBER Health Spring 2004 meetings, and to David Hemenway, for helpful comments. All opinions and any errors are our own.

## References

Altonji, J.G., Elder, T.E., Taber, C.R., 2000. Selection on observed and unobserved variables: assessing the effectiveness of catholic schools. NBER Working Paper, vol. 7831. National Bureau of Economic Research, Cambridge, MA.

Altonji, J.G., Elder, T.E., Taber, C.R., 2002. An evaluation of instrumental variable strategies for estimating the effects of Catholic schools. NBER Working Paper, vol. 9358. National Bureau of Economic Research, Cambridge, MA.

Ayres, I., Levitt, S., 1998. Measuring positive externalities from unobservable victim precaution: an empirical analysis of LoJack. Quarterly Journal of Economics 113 (1), 43 77.

Azrael, D., Cook, P.J., Miller, M., 2004. State and local prevalence of firearms ownership: measurement, structure and trends. Journal of Quantitative Criminology 20 (1), 43 62.

---

[15] Note that all of these calculations ignore any additional costs that may arise from increased gun prevalence in the form of additional gun accidents or suicides (for estimates of the relationship between gun prevalence and suicide, see Duggan, 2003).

Bertrand, M., Duflo, E., Mullainathan, S., 2004. How much should we trust differences-in-differences? Quarterly Journal of Economics 119 (1), 249  275.

Blumstein, A., 2000. Disaggregating the violence trends. In: Blumstein, A., Wallman, J. (Eds.), The Crime Drop in America. Cambridge University Press, New York, pp. 13  44.

Cook, P.J., 1985. The case of the missing victims: gunshot woundings in the National Crime Victimization Survey. Journal of Quantitative Criminology 1 (1), 91  102.

Cook, P.J., Ludwig, J., 1996. Guns in America: Results of A Comprehensive Survey of Gun Ownership and Use. Police Foundation, Washington, DC.

Cook, P.J., Ludwig, J., 2000. Gun Violence: The Real Costs. Oxford University Press, New York.

Cook, P.J., Ludwig, J., 2004a. Does gun prevalence affect teen gun carrying after all? Criminology 42 (1), 27  54.

Cook, P.J., Ludwig, J., 2004b. The social costs of gun ownership. NBER Working Paper, vol. 10736. National Bureau of Economic Research, Cambridge, MA.

Cook, P.J., Molliconi, S., Cole, T.B., 1995. Regulating gun markets. Journal of Criminal Law and Criminology 86 (1), 59  92.

Davis, J.A., Smith, T.W., 1998. General social surveys, 1972 1998 (machine-readable data file)/Principal Investigator J.A. Davis; Director and Co-Principal Investigator, T.W. Smith; Sponsored by National Science Foundation  NORC ed.  National Opinion Research Center, Chicago (producer); The Roper Center for Public Opinion Research, University of Connecticut, Storrs, CT (distributor).

Duggan, M., 2001. More guns, more crime. Journal of Political Economy 109 (5), 1086  1114.

Duggan, M., 2003. Guns and suicide. In: Ludwig, J., Cook, P.J. (Eds.), Evaluating Gun Policy. Brookings Institution Press, Washington, DC, pp. 41  73.

Fryer, R., Heaton, P.S., Levitt, S.D., Murphy, K.M., 2005. Measuring the impact of crack cocaine. Working paper, Department of Economics, University of Chicago.

Gayer, T., 2004. The fatality risks of sport-utility vehicles, vans and pickup trucks relative to cars. Journal of Risk and Uncertainty 28 (2), 103  133.

Griliches, Z., Hausman, J., 1986. Errors in variables in panel data. Journal of Econometrics 31, 93  118.

Kelly, M., 2000. Inequality and crime. Review of Economics and Statistics 82 (4), 530  539.

Kleck, G., 1997. Targeting Guns: Firearms and Their Control. Aldine de Gruyter, New York.

Kleck, G., 2004. Measures of gun ownership levels for macro-level crime and violence research. Journal of Research in Crime and Delinquency 41 (1), 3  36.

Levitt, S., Venkatesh, S., 2000. An economic analysis of a drug-selling gang's finances. Quarterly Journal of Economics 115, 755  789.

Lott, J.R., 2000. More Guns, Less Crime, 2nd ed. University of Chicago Press, Chicago.

Ludwig, J., Cook, P.J., 2001. The benefits of reducing gun violence: evidence from contingent-valuation survey data. Journal of Risk and Uncertainty 22 (3), 207  226.

Solon, G., 1984. Estimating autocorrelations in fixed-effects models. National Bureau of Economic Research Working Paper, No. 32. National Bureau of Economic Research, Cambridge, MA.

Viscusi, W.K., 1998. Rational Risk Policy. Oxford University Press, New York.

**JA 394**

RESEARCH AND PRACTICE

# Investigating the Link Between Gun Possession and Gun Assault

Charles C. Branas, PhD, Therese S. Richmond, PhD, CRNP, Dennis P. Culhane, PhD, Thomas R. Ten Have, PhD, MPH, and Douglas J. Wiebe, PhD

Among a long list of issues facing the American public, guns are third only to gay marriage and abortion in terms of people who report that they are "not willing to listen to the other side." In concert with this cultural rift, scholarly discussion over guns has been similarly contentious.[1] Although scholars and the public agree that the roughly 100 000 shootings each year in the United States are a clear threat to health, uncertainty remains as to whether civilians armed with guns are, on average, protecting or endangering themselves from such shootings.[2–4]

Several case control studies have explored the relationship between homicide and having a gun in the home,[5,6] purchasing a gun,[7,8] or owning a gun.[9] These prior studies were not designed to determine the risk or protection that possession of a gun might create for an individual at the time of a shooting and have only considered fatal outcomes. This led a recent National Research Council committee to conclude that, although the observed associations in these case control studies may be of interest, they do little to reveal the impact of guns on homicide or the utility of guns for self defense.[3,10]

However, the recent National Research Council committee also concluded that additional individual level studies of the association between gun ownership and violence were the most important priority for the future.[3] With this in mind, we conducted a population based case control study in Philadelphia, Pennsylvania, to investigate the relationship between being injured with a gun in an assault and an individual's possession of a gun at the time. We included both fatal and nonfatal outcomes and accounted for a variety of individual and situational confounders also measured at the time of assault.

## METHODS

We applied a case control study design to determine the association between being injured with a gun in an assault and an individual's possession of a gun at the time. To determine this in the most generalizable way, we chose our target population to be residents

*Objectives.* We investigated the possible relationship between being shot in an assault and possession of a gun at the time.

*Methods.* We enrolled 677 case participants that had been shot in an assault and 684 population-based control participants within Philadelphia, PA, from 2003 to 2006. We adjusted odds ratios for confounding variables.

*Results.* After adjustment, individuals in possession of a gun were 4.46 ($P<.05$) times more likely to be shot in an assault than those not in possession. Among gun assaults where the victim had at least some chance to resist, this adjusted odds ratio increased to 5.45 ($P<.05$).

*Conclusions.* On average, guns did not protect those who possessed them from being shot in an assault. Although successful defensive gun uses occur each year, the probability of success may be low for civilian gun users in urban areas. Such users should reconsider their possession of guns or, at least, understand that regular possession necessitates careful safety countermeasures. (*Am J Public Health.* 2009;99:2034–2040. doi:10.2105/AJPH.2008.143099)

of Philadelphia prompting the use of population based control participants. We considered trial, cohort, and matched cohort designs but for various reasons (ethical considerations, prohibitively long implementation time, limited generalizability, and so on.) these were not pursued.

We assumed that the resident population of Philadelphia risked being shot in an assault at any location and at any time of day or night. This is an acceptable assumption because guns are mobile, potentially concealable items and the bullets they fire can pass through obstacles and travel long distances.[11–14] Any member of the general population has the potential to be exposed to guns and the bullets they discharge regardless of where they are or what they are doing. As such, we reasonably chose not to exclude participants as immune from hypothetically becoming cases because they were, for instance, asleep at home during the night or at work in an office building during the day. Instead we measured and controlled for time based situational characteristics that might have changed, but did not eliminate, the possibility of being shot in an assault.

## Participant Identification and Matching

Gunshot assault cases caused by powder charge firearms were identified as they occurred, from October 15, 2003, to April 16,

2006. The final 6 months of this period were limited to only fatal cases. We excluded self inflicted, unintentional, and police related shootings (an officer shooting someone or being shot), and gun injuries of undetermined intent. We excluded individuals younger than 21 years because it was not legal for them to possess a firearm in Philadelphia and, as such, the relationship we sought to investigate was functionally different enough to prompt separate study of this age group. We excluded individuals who were not residents of Philadelphia as they were outside our target population and individuals not described as Black or White as they were involved in a very small percentage of shootings (<2%). Even after these exclusions, the study only needed a subset of the remaining shootings to test its hypotheses. A random number was thus assigned to these remaining shootings, as they presented, to enroll a representative one third of them.

Data coordinators at the Philadelphia Police Department identified and enrolled new shooting case participants as they occurred by reviewing an electronic incident tracking system and interviewing police officers, detectives, and medical examiners. Basic data for eligible case participants were wirelessly sent to the University of Pennsylvania where study leaders forwarded them to a survey research firm for recruitment of a matched control participant.

**JA 395**

| RESEARCH AND PRACTICE |

More detailed information for each enrolled case was later filled in with additional data from state and local police, medical examiner, emergency medical services, and hospital data sources.[15]

We pair matched case participants to control participants on the date and time (within 30 minute intervals; i.e., 10:30 PM, 11:00 PM) of each shooting. This was done because the factors we planned to analyze, including gun possession, were often short lived making the time of the shooting most etiologically relevant.[16] This also helped to control for a great many unmeasurable confounders related to time. We also matched our control participants to case participants on the basis of age group (aged 21–24 years, 25–39 years, 40–64 years, and 65 years and older), gender, and race (Black or White). We pair matched on these variables to avoid extremely sparse data in certain subgroups given a priori knowledge that exceedingly different age, race, and gender distributions existed among assaultive shootings relative to the general population of Philadelphia.[17] We did not pair match case participants and control participants on location. On the basis of early power calculations, we matched 1 control participant to each shooting case.

Control participants were in Philadelphia at the time their matched case was shot. The median number of days between the time a shooting occurred and the time a control participant interview was completed was 2 days. More than three quarters of all control participant interviews were completed within 4 days of their matched shooting. Control participants were interviewed as rapidly as possible to minimize recall bias.

Control participants were sampled from all of Philadelphia via random digit dialing.[10,18] In the interest of time, multiple interviewers may have simultaneously begun and then completed control participant interviews. This resulted in 7 case participants that had more than 1 control participant. These few additional control participants were retained in final analyses. We also tested for the possibility of unequal sampling by using an inverse probability of selection weight defined as the number of eligible control participants divided by the number of phone lines in a household. These weighted models generated only very small differences (<5%) in our results.

We took several steps to maximize participation and avoid selection biases caused by nonresponse.[15,10,19–21] According to standard formulae, the cooperation rate for our control participant survey was calculated to be 74.4% and the response rate 56.0%.[22] These rates exceeded those of other surveys conducted at about the same time[23] and were high enough to produce a reasonably representative sample of our target population.[24,25] Our control participants were statistically similar to the general population of Philadelphia in terms of marital status, retirement, education, general health status, and smoking status within the age, gender, and race categories specified earlier.[26] Our control participants were, however, significantly more unemployed than the general population.

## Conceptual Framework and Variables

We conceptually separated confounding variables in the association between victim gun possession and gun assault into individual and situational characteristics, both of which feed the eventual victim–offender interaction that results in gun assault (Figure 1).[27–29]

Case subsets included fatal gun assaults and gun assaults in which the victim had at least some chance to resist the threat posed by an offender, based on circumstance data and written accounts from police, paramedics, and medical examiners. Case participants with at least some chance to resist were typically either 2 sided, mutual combat situations precipitated by a prior argument or 1 sided attacks where a victim was face to face with an offender who had targeted him or her for money, drugs, or property. Case participants with at least some chance to resist were in contrast to those that happened very suddenly, involved substantial distances, had no face to face contact, and

had physical barriers between victim and shooter (e.g., an otherwise uninvolved victim shot in his living room from a gun fired during a fight down the street).[30–33] Each case's chance to resist status was assigned after being independently rated by 2 individuals (initial $\kappa=0.64$ indicating substantial agreement[34]) who then reconciled differential ratings.

For case participants, gun possession at the time of the shooting was determined by police observations at crime scenes and police interviews with victims and witnesses, as well as confiscation and recovery of guns by police investigators. We coded case participants as in possession if 1 or more guns were determined to have been with them and readily available at the time of the shooting. We coded control participants as in possession if they reported any guns in a holster they were wearing, in a pocket or waistband, in a nearby vehicle, or in another place, quickly available and ready to fire at the time of their matched case's shooting. We determined gun possession status for 96.8% of case participants and 99.6% of control participants. We imputed missing data by using multiple imputation by chained equations.[35,36]

We collected participants' locations as street intersection or blockface points. We collected environmental factors as centroid and population weighted centroid points of blocks, block groups, and tracts.[37] We assigned study participants cumulative, inverse distance weighted measures of each environmental factor on the basis of the points where they were located and the point locations and magnitudes of the factors surrounding them. The higher the measure, the greater the clustering and magnitude of factors around a participant's location.[15,38]



**FIGURE 1—Conceptual framework showing the relationships between victim gun possession, gun assault, and other important characteristics.**

JA 396

## Statistical Analyses

We modeled gun possession as the focal independent variable with the outcome of gun assault and other confounding variables by using conditional logistic regression.[39] We excluded excessively collinear confounders to keep variance inflation factors less than 10.[40]

We adjusted all regression models for yearly age (to control for residual variability within age groups that remained after matching[17]) and numerous other potential individual and situational confounders based on previous work and theory (Table 1).[5–8,27,32,33,41–48] We defined workers at high probability of being assaulted based on their profession (e.g., their job involved handling of cash) as being at high risk.[46] We

calculated reduced regression models with confounders that, when added to the model of gun possession and yearly age, changed the matched odds ratio by more than 15%.[49,50] We also calculated full regression models with all confounders that were not excessively collinear regardless of how much they changed the matched odds ratio. Robust sandwich estimators of variance were specified.[51] Regression model residuals were not statistically significant for spatial autocorrelation.[52,53]

We performed sensitivity analyses to assess the potential impact of misclassification bias on our analyses of gun possession and gun assault. To do this we purposely miscoded the gun possession status of case participants and

control participants by specifying that a randomly selected 1%, 3%, 5%, and 10% of them had their guns go undetected and then reran our regression models to determine the effect on our original odds ratio. We repeated this procedure 100 times for each percentage combination of miscoded case participants and control participants and averaged the results to produce a mean biased odds ratio and standard error. The 2 misclassification biases upon which we most concentrated were case participants without guns recoded to having guns (e.g., to test the bias of a shooting victim or others on scene disposing of their guns before police arrived) and control participants without guns recoded to having guns (e.g., to

TABLE 1—Comparison of Case and Control Participants, by Situational and Individual Characteristics: Philadelphia, PA, 2003–2006

| | All Gun Assaults | | Fatal Gun Assaults | | Gun Assaults Where Victim Had at Least Some Chance to Resist | |
|---|---|---|---|---|---|---|
| | Case Participants (n 677) | Control Participants (n 684) | Case Participants (n 163) | Control Participants (n 166) | Case Participants (n 446) | Control Participants (n 451) |
| **Situational characteristics** | | | | | | |
| Gun possession, % | 5.92 | 7.16 | 8.80 | 7.85 | 8.28 | 7.37 |
| Alcohol involvement, % | 26.34 | 13.82** | 24.55 | 14.20** | 28.94 | 13.58** |
| Illicit drug involvement, % | 11.27 | 7.51** | 23.38 | 4.75** | 9.00 | 8.85 |
| Being outdoors, % | 83.13 | 9.05** | 70.77 | 9.24** | 82.21 | 9.65** |
| Other persons present, mean no. | 3.12 | 2.91 | 3.29 | 2.90 | 3.36 | 2.95 |
| Surrounding area | | | | | | |
| Blacks, mean 1000 persons per mile | 26.04 | 20.19** | 24.44 | 20.62** | 25.81 | 19.56** |
| Hispanics, mean 1000 persons per mile | 4.50 | 2.68** | 4.21 | 2.89* | 4.65 | 2.68** |
| Unemployment, mean 1000 persons per mile | 2.44 | 1.98** | 2.29 | 2.02** | 2.43 | 1.96** |
| Income, mean million dollars per mile | 594.90 | 652.79** | 577.11 | 632.32 | 586.65 | 660.26** |
| Alcohol outlets, mean no. per mile | 79.87 | 82.12 | 73.05 | 82.42 | 78.48 | 84.28 |
| Illicit drug trafficking, mean arrests per mile | 953.21 | 563.60** | 809.94 | 634.19* | 958.58 | 551.69** |
| **Individual characteristics** | | | | | | |
| Age, mean, y | 30.56 | 32.65** | 31.99 | 34.12** | 30.88 | 32.84** |
| Black, % | 87.89 | 87.87 | 87.69 | 87.31 | 85.56 | 85.31 |
| Male, % | 91.88 | 91.67 | 91.38 | 91.54 | 94.40 | 94.25 |
| Hispanic, % | 7.15 | 3.51** | 7.63 | 4.23 | 8.12 | 3.82** |
| Occupation | | | | | | |
| Professional, % | 33.00 | 29.93 | 28.68 | 30.82 | 34.70 | 30.43 |
| Working class, % | 31.34 | 46.70 | 30.77 | 41.39 | 30.49 | 46.40 |
| Not working, % | 35.66 | 23.38 | 40.55 | 27.79 | 34.81 | 23.17 |
| High risk occupation (those handling cash), % | 24.34 | 11.40** | 13.78 | 10.45 | 27.21 | 10.99** |
| Education, mean y | 11.59 | 12.73** | 11.66 | 12.68** | 11.59 | 12.76** |
| Prior arrests, % | 53.12 | 37.06** | 54.58 | 35.95** | 52.80 | 37.17** |

*P≤.05; **P≤.01.

test the bias of having been in possession of a gun but not admitting it to an interviewer). The levels of misclassification we tested were based on prior work[54–56] and our own data that indicated less than 1% of our control participants were not "very sure" of their gun possession status. Statistical tests were 2 tailed and significance was indicated by $P$ values less than .05 throughout our analyses.

## RESULTS

Over the study period, our research team was notified of 3485 shootings of all types occurring in Philadelphia. This translated into an average of 4.77 (standard deviation [SD]=2.82) shootings per day, with a maximum of 21 shootings in a single day and an average of 9 days a year that were free from shootings. From among all these shootings, 3202 (91.88%) were assaults, 167 were self inflicted (4.79%), 60 were unintentional (1.72%), 54 were legal interventions (1.55%), and 2 were of undetermined intent (0.06%). When we considered only assaults, an average of 4.39 (SD=2.70) individuals were shot per day in Philadelphia with a maximum of 20 in a single day and an average of 13 days a year in which no individuals were shot.

From among all 3202 individuals who had been shot in an assault, we excluded those aged younger than 21 years or of unknown age (29.83%), non Philadelphia residents (4.34%), individuals not described as being Black or White (1.62%), and police officers that had been shot (0.09%). From the remaining group of 2073 participants, we randomly selected and enrolled 677 individuals (32.66%). We also concurrently identified and enrolled an age , race , and gender matched group of 684 control participants.

Case participants and control participants showed no statistically significant differences in age group, race, and gender distributions, or in the times of day, days of the week, and months of the year when their data were collected. Case participants and control participants were thus successfully matched on age category, race, gender, and time.

However, compared with control participants, shooting case participants were significantly more often Hispanic, more frequently working in high risk occupations[1,2], less educated, and had a greater frequency of prior arrest. At the time of shooting, case participants were also significantly more often involved with alcohol and drugs, outdoors, and closer to areas where more Blacks, Hispanics, and unemployed individuals resided. Case participants were also more likely to be located in areas with less income and more illicit drug trafficking (Table 1).

## Association Between Gun Possession and Gun Assault

After we adjusted for confounding factors, individuals who were in possession of a gun were 4.46 (95% confidence interval [CI]=1.16, 17.04) times more likely to be shot in an assault than those not in possession. Individuals who were in possession of a gun were also 4.23 (95% CI=1.19, 15.13) times more likely to be fatally shot in an assault. In assaults where the victim had at least some chance to resist, individuals who were in possession of a gun were 5.45 (95% CI=1.01, 29.92) times more likely to be shot.

When we only considered independent variables that most strongly affected our models, smaller but correspondingly significant adjusted odds ratios were noted. In these reduced models, individuals who were in possession of a gun were 2.55 (95% CI=1.00, 6.58) times more likely to be shot in an assault than those not in possession. Individuals who were in possession of a gun were also 3.54 (95% CI=1.18, 10.58) times more likely to be fatally shot in an assault. In assaults where the victim had at least some chance to resist, individuals who were in possession of a gun were 2.92 (95% CI=1.01, 8.42) times more likely to be shot (Table 2 ).

Sensitivity analyses produced no odds ratio estimates less than 1.00. If we assumed that both case participants and control participants had 5% of their guns go undetected, the observed odds ratio of 4.46 (significant) would have been reduced to 2.23 (nonsignificant). Similarly, among gun assaults where the victim had a reasonable chance to resist, 5% under detection of guns among both case participants and control participants would have reduced the observed odds ratio of 5.45 (significant) to 3.12 (nonsignificant; Table 3).

## DISCUSSION

After we adjusted for numerous confounding factors, gun possession by urban adults was associated with a significantly increased risk of being shot in an assault. On average, guns did not seem to protect those who possessed them from being shot in an assault. Although successful defensive gun uses can and do occur,[33,57] the findings of this study do not support the perception that such successes are likely.

A few plausible mechanisms can be posited by which possession of a gun increases an individual's risk of gun assault. A gun may falsely empower its possessor to overreact, instigating and losing otherwise tractable conflicts with similarly armed persons. Along the same lines, individuals who are in possession of a gun may increase their risk of gun assault by entering dangerous environments that they would have normally avoided.[58–60] Alternatively, an individual may bring a gun to an otherwise gun free conflict only to have that gun wrested away and turned on them.

**TABLE 2—Regression Results Showing the Association Between Gun Possession and Gun Assault: Philadelphia, PA, 2003–2006**

| | Total Participants (Cases and Controls), No. | Full Models, AOR (95% CI) | Reduced Models, AOR (95% CI) |
|---|---|---|---|
| All gun assaults | 1361 | 4.46 (1.16, 17.04)* | 2.55 (1.00, 6.58)* |
| Fatal gun assaults | 329 | 4.23 (1.19, 15.13)* | 3.54 (1.18, 10.58)* |
| Gun assaults where victim had at least some chance to resist | 897 | 5.45 (1.01, 29.92)* | 2.92 (1.01, 8.42)* |

*Notes.* AOR = adjusted odds ratio; CI = confidence interval. The full models adjusted for all characteristics listed in Table 1; reduced models adjusted for age, illicit drug involvement, being outdoors, and unemployment.
*$P \le .05$.

| RESEARCH AND PRACTICE |

TABLE 3—Sensitivity Analyses Showing the Effects of Simulated Misclassification Because of Undetected Gun Possession: Philadelphia, PA, 2003–2006

| % of Control Participants Without Guns Randomly Recoded to Having Guns[a] | % of Case Participants Without Guns Randomly Recoded to Having Guns[b] | | | | |
|---|---|---|---|---|---|
| | 0% | 1% | 3% | 5% | 10% |
| **All gun assaults** | | | | | |
| 0% | 4.46* | 4.80* | 5.45* | 6.22* | 8.25** |
| 1% | 3.66 | 3.83 | 4.51* | 5.07* | 6.91** |
| 3% | 2.49 | 2.69 | 3.11 | 3.51 | 4.81* |
| 5% | 1.86 | 2.01 | 2.37 | 2.23 | 3.07* |
| 10% | 1.03 | 1.14 | 1.32 | 1.26 | 1.78 |
| **Fatal gun assaults** | | | | | |
| 0% | 4.23* | 4.76* | 5.48* | 6.30* | 8.36** |
| 1% | 3.62 | 3.87* | 4.44* | 5.28* | 7.21* |
| 3% | 2.52 | 2.85 | 3.35 | 3.84 | 4.45* |
| 5% | 1.89 | 2.29 | 2.54 | 2.87 | 4.01 |
| 10% | 1.03 | 1.31 | 1.53 | 1.74 | 2.31 |
| **Gun assaults where victim had at least some chance to resist** | | | | | |
| 0% | 5.45* | 4.78* | 5.66* | 6.27* | 8.34** |
| 1% | 3.59 | 4.75 | 5.48 | 6.24* | 8.73* |
| 3% | 2.46 | 3.25 | 3.82 | 4.34 | 6.00* |
| 5% | 1.86 | 2.53 | 2.80 | 3.12 | 4.36 |
| 10% | 1.03 | 1.42 | 1.66 | 1.83 | 2.48 |

[a]For instance, to compensate for control participants who failed to disclose their gun possession.
[b]For instance, to compensate for case participants who discarded their guns after they were shot.
*$P \le .05$; **$P \le .01$; base adjusted odds ratio is adjusted odds ratios from full models with 0% of case and 0% of control participants recoded.

Situations in which the victim had at least some chance to resist may have generated gun assault risks when one considers that many of these events were 2 sided situations in which both parties were ready and mutually willing to fight on the basis of a prior argument.[29,30] Because both victim and offender had some sense of each other's capabilities prior to the event they may have had more time to prepare for their ensuing conflict.[61] More preparation may have increased the likelihood that both individuals were armed with guns and that at least 1 or both were shot.

Although less prevalent, 1 sided situations in which a victim had at least some chance to resist an unprovoked attack may have also generated gun assault risks for victims who possessed guns.[29] In these situations, victim and offender were often interacting for the first time and the element of surprise afforded the offender likely limited the victim's ability to quickly produce a gun and defuse or dominate

their advantaged opponent. If the victim did produce a gun, doing so may have simply exacerbated an already volatile situation and gotten them shot in the process.

In contrast, when victims had little to no chance to resist, they were almost always confronted with events that happened very suddenly, involved substantial distances, had no face to face contact, and had physical barriers between them and the shooter (e.g., bystander or drive by shootings). These victims likely had no meaningful opportunity to use a gun even if they had one in their possession.

### Prior Case–Control Studies

We endeavored to improve upon prior case control studies that have explored the relationship between homicide and exposure to guns.[5–9] Although gun homicides are important to prevent, the ability to produce a more general conclusion about the risk of gun assault, not simply the risk of being murdered with a gun,

was of greater importance to public health and safety. This prompted us to enroll all shootings, regardless of their survival, as one improvement to our case control study.

A second improvement was our use of an incidence density sampling framework to select control participants. This allowed us to make a judgment about the risk associated with gun possession proximal to the shooting event itself. Prior case control work has involved less proximal gun exposure measures — owning,[9] purchasing,[7,8] or having a gun in the home.[5,6] These measures leave open to question the actual risk that a gun may pose for an individual concurrent with the time they were shot. That is, someone may have a gun in their home, may have purchased a gun, or may own a gun, but without knowledge of whether that gun was in their possession at the time they were shot, the possibility that they have been misclassified as being exposed to a gun when in fact they were not is a potential bias.[43,62,63] This bias erodes the ability to speculate on plausible causal mechanisms other than to say that general access to a gun, over some amount of space or time, is a risk factor.

Finally, as this was a case control study, we had the advantage of being able to statistically adjust for numerous confounders of the relationship between gun possession and gun assault. These confounders included important individual level factors that did not change with time such as having a high risk occupation, limited education, or an arrest record. Other confounders that we included were situational factors that could have influenced the relationship under study: substance abuse, being outside, having others present, and being in neighborhood surroundings that were impoverished or busy with illicit drug trafficking. Although these situational confounders were potentially short lived (e.g., a participant may have metabolized the drugs or alcohol they consumed, moved to another location, or left the company of others) this was less important given the incidence density sampling and the fact that case and control participants were essentially matched on time.

### Study Limitations

A number of study limitations deserve discussion. Our control population was more unemployed than the target population of

## RESEARCH AND PRACTICE

Philadelphians that it was to intended to represent. Although we did account for employment status in our regression models and our control population was found to be representative of Philadelphians for 5 other indicators, having a preponderance of unemployment among our control participants may mildly erode our study's generalizability. It is also worth noting that our findings are possibly not generalizable to nonurban areas whose gun injury risks can be significantly different than those of urban centers like Philadelphia.[64]

Certain other variables that may have confounded the association between gun possession and assault were also beyond the scope of our data collection system and, therefore, were not included in our analyses. For instance, any prior or regular training with guns was a potentially important confounding variable that we did not measure and whose inclusion could have affected our findings (although the inclusion of other confounding variables possibly related to training may account for some of this unmeasured confounding).

We also did not account for the potential of reverse causation between gun possession and gun assault. Although our long list of confounders may have served to reduce some of the problems posed by reverse causation,[65] future case-control studies of guns and assault should consider instrumental variables techniques to explore the effects of reverse causation. It is worth noting, however, that the probability of success with these techniques is low.[66]

Finally, our results could have been affected by misclassification of gun possession status. Because of prior discussion[63] and likely levels of misclassification,[54–56] we concentrated on undetected gun possession. The ensuing sensitivity analyses demonstrated odds ratio estimates that increased and decreased in statistical significance but that did not drop below 1.00, even when challenged with high levels of misclassification. Thus, even after simulating high levels of misclassification bias, a net protective effect of gun possession was not evident.

## Conclusions

On average, guns did not protect those who possessed them from being shot in an assault. Although successful defensive gun uses are possible and do occur each year,[33,57] the probability of success may be low for civilian gun users in urban areas. Such users should rethink their possession of guns or, at least, understand that regular possession necessitates careful safety countermeasures. Suggestions to the contrary, especially for urban residents who may see gun possession as a surefire defense against a dangerous environment,[61,67] should be discussed and thoughtfully reconsidered. ■

## About the Authors

*Charles C. Branas and Douglas J. Wiebe are with the Department of Biostatistics and Epidemiology, Firearm and Injury Center at Penn, University of Pennsylvania School of Medicine. Therese S. Richmond is with the Division of Biobehavioral and Health Sciences, Firearm and Injury Center at Penn, and University of Pennsylvania School of Nursing, Philadelphia. Dennis P. Culhane is with the Cartographic Modeling Laboratory, University of Pennsylvania School of Social Policy and Practice, Philadelphia. Thomas R. Ten Have is with the Department of Biostatistics and Epidemiology, University of Pennsylvania School of Medicine, Philadelphia.*

*Correspondence should be sent to Charles C. Branas, PhD, Department of Biostatistics and Epidemiology, University of Pennsylvania School of Medicine, Room 936 Blockley Hall, 423 Guardian Dr, Philadelphia, PA 19104 6021 (e mail: cbranas@upenn.edu). Reprints can be ordered at http://www.ajph.org by clicking the "Reprints/Eprints" link.*

*This article was accepted February 7, 2009.*

## Contributors
C.C. Branas originated the study idea, oversaw the implementation of the study, and analyzed the data. T.S. Richmond and D.P. Culhane advised the study's implementation and analyses. T.R. Ten Have and D.J. Wiebe advised the study's implementation and analyzed the data. All authors wrote this article.

## Acknowledgments
This study was funded by the National Institutes of Health, National Institute on Alcohol Abuse and Alcoholism (grant R01AA013119).

The authors are also indebted to numerous dedicated individuals at the Philadelphia Police, Public Health, Fire, and Revenue Departments as well as DataStat Inc, who collaborated in this work.

## Human Participant Protection
The study was approved by both the University of Pennsylvania and the Philadelphia Department of Public Health institutional review boards. A federal certificate of confidentiality was also provided by the National Institutes of Health.

## References
1. Branas CC. A review of: suing the gun industry: a battle at the crossroads of gun control and mass torts. *J Leg Med.* 2006;27(1):103 108.

2. Centers for Disease Control and Prevention. Web based Injury Statistics Query and Reporting System: 2000 2001. Available at: http://www.cdc.gov/ncipc/wisqars. Accessed March 1, 2009.

3. Wellford CF, Pepper JV, Petrie CV. *Firearms and Violence: A Critical Review.* Washington, DC: National Academies Press; 2005:6.

4. Vizzard W. *Shots in the Dark. The Policy, Politics, and Symbolism of Gun Control.* New York, NY: Rowman and Littlefield; 2000.

5. Wiebe DJ. Homicide and suicide risks associated with firearms in the home: a national case control study. *Ann Emerg Med.* 2003;41:771 782.

6. Kellermann AL, Rivara FP, Rushforth NB, et al. Gun ownership as a risk factor for homicide in the home. *N Engl J Med.* 1993;329:1084 1091.

7. Grassel KM, Wintemute GJ, Wright MA, Romero MP. Association between handgun purchase and mortality from firearm injury. *Inj Prev.* 2003;9:48 52.

8. Cummings P, Koepsell T, Grossman D, Savarino J, Thompson R. The association between the purchase of a handgun and homicide or suicide. *Am J Public Health.* 1997;87:974 978.

9. Kleck G, Hogan M. National case control study of homicide offending and gun ownership. *Soc Probl.* 1999;46(2):275 293.

10. Weiner J, Wiebe DJ, Richmond TS, et al. Reducing firearm violence: a research agenda. *Inj Prev.* 2007;13:80 84.

11. Poole C. Critical appraisal of the exposure potential restriction rule. *Am J Epidemiol.* 1987;125:179 183.

12. Poole C. Exposure opportunity in case control studies. *Am J Epidemiol.* 1986;123:352 358.

13. Poole C. Controls who experienced hypothetical causal intermediates should not be excluded from case control studies. *Am J Epidemiol.* 1999;150:547 551.

14. Richmond TS, Branas CC, Cheney RA, Schwab CW. The case for enhanced data collection of gun type. *J Trauma.* 2004;57:1356 1360.

15. Branas C, Richmond T, Culhane D, Wiebe D. Novel linkage of individual and geographic data to study firearm violence. *Homicide Stud.* 2008;12(3):298 320.

16. Roberts I. Methodologic issues in injury case control studies. *Inj Prev.* 1995;1:45 48.

17. Rothman KJ, Greenland S. Case control studies. In: Rothman KJ, Greenland S, eds. *Modern Epidemiology.* 2nd ed. Philadelphia, PA: Lippincott Williams & Wilkins; 1998:93 114.

18. Waksberg J. Sampling methods for random digit dialing. *J Am Stat Assoc.* 1978;73:40 46.

19. Koepsell TD, McGuire V, Longstreth WT Jr, Nelson LM, van Belle G. Randomized trial of leaving messages on telephone answering machines for control recruitment in an epidemiologic study. *Am J Epidemiol.* 1996;144:704 706.

20. Harlow BL, Crea EC, East MA, Oleson B, Fraer CJ, Cramer DW. Telephone answering machines: the influence of leaving messages on telephone interviewing response rates. *Epidemiology.* 1993;4:380 383.

21. Herzog A, Rodgers W. The use of survey methods in research on older Americans. In: Woolson R, ed. *The Epidemiologic Study of the Elderly.* New York, NY: Oxford University Press; 1992.

22. Daves R. *Standard Definitions: Final Dispositions of Case Codes and Outcome Rates for Surveys.* 4th ed. Lenexa, KS: The American Association for Public Opinion Research; 2006.

23. Galea S, Tracy M. Participation rates in epidemio logic studies. *Ann Epidemiol.* 2007;17:643 653.

24. Keeter S, Kennedy C, Dimock M, Best J, Craighill P. Gauging the impact of growing nonresponse on estimates from a national RDD telephone survey. *Public Opin Q.* 2006;70:759 779.

25. Groves R. Nonresponse rates and nonresponse bias in household surveys. *Public Opin Q.* 2006;70:646 675.

26. Southeastern Pennsylvania Household Health Survey. Adult Respondent File, 2002, 2004, 2006. Philadelphia, PA: Public Health Management Corpora tion; 2006.

27. Ziegenhagen E, Brosnan D. Victim responses to robbery and crime control policy. *Criminology.* 1985; 23:675 695.

28. Felson R, Steadman H. Situational factors in dis putes leading to criminal violence. *Criminology.* 1983; 21:59 74.

29. Wells W. The nature and circumstances of de fensive gun use: a content analysis of interpersonal conflict situations involving criminal offenders. *Justice Q.* 2002;19:127 157.

30. Denton JF, Fabricius WV. Reality check: using newspapers, police reports, and court records to assess defensive gun use. *Inj Prev.* 2004;10:96 98.

31. Wolfgang M. A tribute to a view I have opposed. *J Crim Law Criminol.* 1995;86(1):188 192.

32. Kleck G, DeLone M. Victim resistance and offender weapon effects in robbery. *J Quant Criminol.* 1993;9(1): 55 81.

33. Kleck G, Gertz M. Armed resistance to crime: the prevalence and nature of self defense with a gun. *J Crim Law Criminol.* 1995;86(1):150 187.

34. Koepsell TD, Weiss NS. *Epidemiologic Methods: Studying the Occurrence of Illness.* New York, NY: Oxford University Press; 2003:200.

35. van Buuren S, Boshuizen HC, Knook DL. Multiple imputation of missing blood pressure covariates in survival analysis. *Stat Med.* 1999;18:681 694.

36. Rubin D. *Multiple Imputation for Nonresponse in Surveys.* New York, NY: Wiley; 1987.

37. Xie D, Raghunathan TE, Lepkowski JM. Estimation of the proportion of overweight individuals in small areas  a robust extension of the Fay Herriot model. *Stat Med.* 2007;26:2699 2715.

38. Branas CC, Elliott MR, Richmond TS, Culhane DP, Wiebe DJ. Alcohol consumption, alcohol outlets, and the risk of being assaulted with a gun. *Alcohol Clin Exp Res.* 2009;33:906 915.

39. Breslow NE. Statistics in epidemiology: the case control study. *J Am Stat Assoc.* 1996;91(433):14 28.

40. Fox J. *Regression Diagnostics: An Introduction. Sage University Paper Series on Quantitative Applications in the Social Sciences.* Newbury Park, CA: Sage; 1991:7 79.

41. Nelson DE, Grant Worley JA, Powell K, Mercy J, Holtzman D. Population estimates of household firearm storage practices and firearm carrying in Oregon. *JAMA.* 1996;275:1744 1749.

42. Kleck G, Gertz M. Carrying guns for protection: results from the National Self Defense Survey. *J Res Crime Delinq.* 1998;35(2):193 224.

43. Kleck G. What are the risks and benefits of keeping a gun in the home? *JAMA.* 1998;280:473 475.

44. Decker S, Caldwell A. *Illegal Firearms: Access and Use by Arrestees.* Washington, DC: US Department of Justice, Office of Justice Programs, National Institute of Justice; 1997. Report ID NCJ 163496.

45. Dahlberg LL, Ikeda RM, Kresnow MJ. Guns in the home and risk of a violent death in the home: findings from a national study. *Am J Epidemiol.* 2004;160: 929 936.

46. Islam SS, Edla SR, Mujuru P, Doyle EJ, Ducatman AM. Risk factors for physical assault. State managed workers' compensation experience. *Am J Prev Med.* 2003;25:31 37.

47. Warner BD, Wilson Coomer B. Neighborhood drug arrest rates: are they a meaningful indicator of drug activity? A research note. *J Res Crime Delinq.* 2003;40(2): 123 138.

48. Kleck G, McElrath K. The effects of weaponry on human violence. *Soc Forces.* 1991;69(3):669 692.

49. Mickey RM, Greenland S. The impact of confounder selection criteria on effect estimation. *Am J Epidemiol.* 1989;129:125 137.

50. Kleinbaum DG. Epidemiologic methods: the "art" in the state of the art. *J Clin Epidemiol.* 2002;55: 1196 1200.

51. White H. A heteroscedasticity consistent covariance matrix estimator and a direct test for heteroscedasticity. *Econometrica.* 1980;48:817 838.

52. Getis A. Spatial statistics. In: Longley P, Goodchild M, Maguire D, Rhind D, eds. *Geographical Information Systems Volume 1 Principles and Technical Issues.* 2nd ed. Chi chester, England: John Wiley and Sons; 2000:239 251.

53. Gruenewald PJ, Remer L. Changes in outlet densi ties affect violence rates. *Alcohol Clin Exp Res.* 2006; 30:1184 1193.

54. Smith T. A seeded sample of concealed carry permit holders. *J Quant Criminol.* 2003;19:441 445.

55. Rafferty AP, Thrush JC, Smith PK, McGee HB. Validity of a household gun question in a telephone survey. *Public Health Rep.* 1995;110:282 288.

56. Kellermann AL, Rivara FP, Banton J, et al. Validat ing survey responses to questions about gun ownership among owners of registered handguns. *Am J Epidemiol.* 1990;131:1080 1084.

57. Hemenway D. The myth of millions of annual self defense gun use: a case study of survey overestimates of rare events. *Chance.* 1997;10(3):6 10.

58. Thompson DC, Thompson RS, Rivara FP, Adams J, Hillman M. Risk compensation theory should be subject to systematic reviews of the scientific evidence. *Inj Prev.* 2001;7(2):86 88.

59. Peltzman S. The effects of automobile safety regulation. *J Polit Econ.* 1975;83:677 725.

60. Wilkinson DL, Fagan J. Role of firearms in violence scripts: the dynamics of gun events among adolescent males. *Law Contemp Probl.* 1996;59(1) 55 89.

61. Wilkinson DL. *Guns, Violence, and Identity Among African American and Latino Youth.* New York, NY: LFB Scholarly Publishing LLC; 2003.

62. Ikeda RM, Dahlberg LL, Kresnow MJ, Sacks JJ, Mercy JA. Studying "exposure" to firearms: household ownership v access. *Inj Prev.* 2003;9(1):53 57.

63. Cummings P, Koepsell TD. Does owning a firearm increase or decrease the risk of death? *JAMA.* 1998; 280:471 473.

64. Branas CC, Nance ML, Elliott MR, Richmond TS, Schwab CW. Urban rural shifts in intentional firearm death: different causes, same results. *Am J Public Health.* 2004;94:1750 1755.

65. Brookhart MA, Wang PS, Solomon DH, Schneeweiss S. Evaluating short term drug effects using physician specific prescribing preference as an instrumental variable. *Epidemiology.* 2006;17:268 275.

66. Staiger D, Stock J. Instrumental variables regression with weak instruments. *Econometrica.* 1997;65: 557 586.

67. Anderson E. *Code of the Street: Decency, Violence, and the Moral Life of the Inner City.* New York, NY: W. W. Norton; 1999.

■ BRIEF REPORT

# Criminal Records of Homicide Offenders

Philip J. Cook, PhD

Jens Ludwig, PhD

Anthony A. Braga, PhD

H OMICIDE IS A SERIOUS PUBLIC health problem in the United States, with 17 638 victims in 2002.[1] Programs to prevent homicide can be distinguished by whether they are addressed to the general public or are targeted toward individuals who are considered high risk because of their previous criminal involvement. For example, federal gun laws incorporate both approaches; there are general provisions, such as the near prohibition on the private possession of fully automatic weapons, and targeted provisions, such as the ban on possession of any firearm by convicted felons and domestic violence offenders. Similarly, the criminal law poses a general threat of punishment to any adult contemplating criminal violence but targets individuals with convictions for more severe sentences. Other criminal justice interventions are highly targeted, affecting only individuals who are actually arrested or convicted: mandated drug programs and other rehabilitation-oriented programs, incarceration, parole and probation supervision, and so forth.

Although the criminology literature includes a number of studies of the criminal histories of select groups of homicide offenders,[2-7] previous studies have typically dealt with special subsets of homicide offenders, provided few specifics on criminal record, and lacked comparable information for the gen-

**For editorial comment see p 623.**

**Context** Homicide prevention strategies can be either targeted toward high-risk groups or addressed to the population at large. One high-risk group of particular interest is adults with a criminal record. But the prevalence of a criminal record among homicide offenders has not been reliably quantified, nor has the prevalence of criminal record in the general population.

**Objective** To determine what portion of the homicide problem would be addressed by interventions linked to arrest or conviction.

**Design, Setting, and Participants** A case-control analysis was performed using a comprehensive data set of all arrests and felony convictions in Illinois for 1990-2001. Cases were defined as Illinois residents aged 18 to 64 years who were arrested for homicide in 2001. Controls were all other Illinois residents aged 18 to 64 years in 2001. Illinois criminal and juvenile record information for cases and controls was compiled for 1990-2000. Five definitions of previous record were considered (arrest, arrest for a violent crime, 5 or more arrests with at least 1 for a violent crime, felony conviction, and violent-felony conviction), each measured for 1990-2000 and for 1996-2000.

**Main Outcome Measure** The population-attributable risk: the portion of homicide offenses that would be eliminated by a hypothetical intervention that reduced the offending risk of individuals with a record to the offending risk of those who lack a record.

**Results** For 1990-2000, 42.6% of 884 cases had at least 1 felony conviction compared with 3.9% of nearly 7.9 million controls, for a population-attributable risk of 40.3% (95% CI, 37.0%-43.8%); among cases, 71.6% had experienced any arrest from 1990-2000 compared with 18.2% of controls, for a population-attributable risk of 65.3% (95% CI, 61.6%-68.8%). For 1996-2000, the population-attributable risk among individuals with a felony conviction or any arrest was 31.0% (95% CI, 27.9%-34.2%) and 58.5% (95% CI, 54.9%-62.1%), respectively.

**Conclusions** Interventions after arrest or conviction, such as supervised release, imprisonment, correctional programs, or bans on firearm possession, are targeted toward a group that has relatively high incidence of lethal violence, but they leave a large portion of the problem untouched.

*JAMA. 2005;294:598-601*                                               www.jama.com

eral population. As a result, this literature offers little guidance on the relative scope of targeted vs general prevention strategies in addressing the homicide problem. Specifically, how much would the homicide rate be reduced by a hypothetical intervention that eliminated the excess risk of homicide offending among people with a criminal record, defined, for example, by felony conviction within the previous decade? To answer this question, we conducted a case-control study comparing the prevalence of criminal histories among homicide offenders to the prevalence of criminal histories among the general population.

Author Affiliations: Department of Public Policy Studies, Duke University, Durham, NC (Dr Cook); Georgetown University, Washington, DC (Dr Ludwig); and the John F. Kennedy School of Government, Harvard University, Cambridge, Mass (Dr Braga).
Corresponding Author: Philip J. Cook, PhD, Sanford Institute of Public Policy, Duke University, Durham, NC 27708-0245 (pcook@duke.edu).

©2005 American Medical Association. All rights reserved.

**JA 402**

Downloaded From: http://jama.jamanetwork.com/ on 07/08/2015

## METHODS

The data include all arrests of juveniles and adults in Illinois from 1990-2001. They were extracted from the Illinois State Police mainframe computer by a special program written by the Illinois Criminal Justice Information Authority and are stored at the Chapin Hall Center for Children, University of Chicago. The specific data files used in our analysis are described in more detail elsewhere.[8]

Every "arrest event" included in these data files was assigned a unique identification number. Every arrestee was also assigned a unique identification number by the Illinois State Police that was the basis for compiling an individual's complete arrest and conviction record over time. (The identity of arrestees is routinely confirmed by the police by use of fingerprint data.) Details on the arrest event included information on the date of arrest and the criminal charges initially filed against the arrestee. A separate data file compiled from reports from the state's prosecuting attorney's offices lists additions or deletions to the criminal charges filed against arrestees for each arrest event. Another data file reported separately by the court clerks provided information on court hearings and dispositions and was the basis for determining convictions.

All individuals arrested for murder or manslaughter in Illinois in 2001 were identified in the arrest data files for that year and linked to their arrests and convictions in Illinois for 1990-2000. We defined the cases as just those homicide arrestees who were Illinois residents aged 18 to 64 years. Of the 1032 individuals arrested for homicide in 2001, we excluded 32 who were out-of-state residents, 110 who were younger than 18 years, and 6 who were older than 64 years. Arrestees younger than 18 years were excluded because they are too young to have a criminal history that can be meaningfully compared with those who are older.

The data on court dispositions are somewhat less complete than the data on arrests. To deal with this problem of missing data, we generated 2 sets of

**Table.** Attributable Risks of Homicide

| | No. of Cases (n = 884) | Proportion of Population | Proportion of Cases | Population-Attributable Risk (95% CI) |
|---|---|---|---|---|
| Criminal record during 1990-2000 | | | | |
| Arrest | 633 | 0.182 | 0.716 | 0.653 (0.616-0.688) |
| Violent arrest | 327 | 0.078 | 0.370 | 0.317 (0.283-0.352) |
| ≥5 Arrests, ≥1 violent | 258 | 0.028 | 0.292 | 0.272 (0.242-0.304) |
| Felony conviction | 377 | 0.039 | 0.426 | 0.403 (0.370-0.438) |
| Violent-felony conviction | 82 | 0.009 | 0.093 | 0.085 (0.067-0.106) |
| Criminal record during 1996-2000 | | | | |
| Arrest | 559 | 0.113 | 0.632 | 0.585 (0.549-0.621) |
| Violent arrest | 228 | 0.042 | 0.258 | 0.225 (0.197-0.257) |
| ≥5 Arrests, ≥1 violent | 157 | 0.011 | 0.178 | 0.169 (0.144-0.195) |
| Felony conviction | 287 | 0.021 | 0.325 | 0.310 (0.279-0.342) |
| Violent-felony conviction | 55 | 0.004 | 0.062 | 0.058 (0.045-0.077) |

Abbreviation: CI, confidence interval.

estimates of the prevalence of felony convictions (and convictions for violent felonies) that bracket the true prevalence; the low estimate assumed no conviction in cases in which the data were unclear, and the high estimate assumed a conviction in these cases. Disposition was unclear in this sense in 56 046 instances, 22.6% of the known felony convictions. For the sake of brevity, and because in practice it made little difference in the pattern of results, we report only the high estimates.

We computed the prevalence of an arrest record for the controls (the Illinois resident population aged 18 to 64 years in 2001 who were not arrested for homicide in that year) by counting all individuals who were arrested at least once in Illinois from 1990-2000 and who were between 18 and 64 years on April 15, 2001, and dividing by the state population in this age range. We also computed the prevalence of arrest from 1996-2000. Similarly, we computed the prevalence of other types of criminal record for 1990-2000 and 1996-2000: arrest for a violent crime (including homicide, rape, robbery, and assault); 5 or more arrests, including a violent crime arrest; felony conviction; and felony conviction for a violent crime.

The Illinois population for 2001 for residents aged 18 to 64 years was estimated from 2 sources. The noninstitutionalized population was estimated from the US Census Bureau's American Community Survey for 2001.[9] The institutionalized population is not included in the American Community Survey. We estimated it from the Census Bureau's public use microfile data for 2000[10] on the assumption that the institutionalized population did not change in size or composition between 2000 and 2001.

The prevalence of a record among cases (homicide arrestees) and controls (the population at large) were compared, and attributable risks were computed.[11] (The population-attributable risk is the proportion of homicides that would be eliminated if the homicide risk of those with a record dropped to the rate of those without a record.) We used SAS software, version 9.1 (SAS Institute Inc, Cary, NC).

## RESULTS

There were 884 cases and 7 879 478 controls. From 1990-2000, 42.6% of cases and 3.9% of controls had at least 1 felony conviction, implying a population-attributable risk of 40.3% (95% CI, 37.0%-43.8%) (**Table**). For every definition of record, the population-attributable risk is less when record is defined on the 5-year interval 1996-2000 than on the 11-year interval 1990-2000. It differs widely across the 5 definitions of record, depending mostly on the prevalence of that record among cases. For example, for records defined on the interval 1996-2000, the

©2005 American Medical Association. All rights reserved.

**JA 403**

Downloaded From: http://jama.jamanetwork.com/ on 07/08/2015

population-attributable risk is 58.5% for arrest (95% CI, 54.9%-62.1%), 31.0% for felony conviction (95% CI, 27.9%-34.2%), and 5.8% for violent-felony conviction (95% CI, 4.5%-7.7%).

## COMMENT

These estimates of population-attributable risk are useful in assessing conflicting perspectives in the literature about the importance of general as opposed to targeted prevention strategies for homicide.

Some observers have characterized most homicide offenders as ordinary citizens who kill in a moment of rage or sudden impulse when provoked by acquaintances or relatives.[12-15] This perspective seems to be supported by Federal Bureau of Investigation data indicating that about half of all homicides are committed by an acquaintance or relative of the victim, more than a quarter of all female victims are killed by boyfriends or husbands, and arguments precipitate about a third of all homicides.[16] This type of evidence has been offered in support of increased controls on firearms commerce, possession, and use in the general population to forestall lethal attacks by generally nonviolent citizens.[12-15]

In contrast, there is a large body of research evidence documenting the previous criminal justice system involvement of a majority of homicide offenders.[3,6,7,17-20] Most domestic homicides are preceded by a history of assaults,[20,21] and "acquaintance" homicides often turn out to be killings among rival gang members, drug dealers, or organized crime figures.[22,23] This evidence supports an intervention strategy targeted toward serious offenders.

Our findings provide some support to both perspectives. Homicide offending in Illinois is certainly concentrated among individuals with a criminal record. The prevalence of a serious criminal record among homicide offenders is far higher than for the general population. Nonetheless, a large part of the homicide problem lies beyond the reach of any preventive treatment that is limited to individuals who

have been arrested or convicted. For example, just 32.5% of homicide arrestees have been convicted of a felony in the previous 5 years. An intervention that reduced the homicide risk of felons to that of the general population would reduce the homicide rate by just 31.0%. Such findings indicate the potential importance of general prevention strategies. Of course, whether any prevention program is worthwhile depends on its effectiveness in influencing behavior of the target population and on its cost.

There are several limitations to our study, stemming from the nature of the data. First, the identification of homicide offending with homicide arrest leads to 2 types of misclassification. An unknown fraction of homicide arrestees in Illinois in 2001 was not factually guilty, and hence some individuals are incorrectly classified as "cases." And some proportion of killers in 2001 were not arrested for homicide in that year so that a relatively small number of "controls" are in fact killers. Some indication of the magnitude of the latter problem is given by the fact that 60.2% of Midwest-region homicides were cleared by arrest in 2001.[24] For our purposes, the main concern is that individuals who were arrested in 2001 were not strictly representative of the population of killers with respect to record.

Second, we have no information on arrests or convictions occurring in other states. That omission is not necessarily relevant to assessing the opportunities available to Illinois state agencies to prevent lethal violence through interventions in the lives of individuals arrested or convicted. But an out-of-state record may be relevant to sentencing options and to federal law governing firearms possession. (In federal law, any conviction for domestic violence and any conviction for a felony bar an individual from obtaining or possessing a firearm.[25])

Third, our method for estimating the prevalence of an Illinois criminal record among Illinois residents in 2001 has a positive bias of unknown magnitude. We tabulated the number of in-

dividuals who were arrested or convicted in Illinois during a specified period and divided by the resident population in 2001. Yet not all individuals arrested in Illinois during the given period were living there in 2001; there was attrition because of death and relocation out of state. This problem does not apply to the cases, because all of them are identified as individuals. Thus, homicide arrest in Illinois is somewhat more concentrated among individuals with an Illinois criminal record than indicated by our statistics. As a logical matter, this bias should be smaller for record defined for the 5-year period (1996-2000) than for the 11-year period (1990-2000).

Finally, we have limited our analysis to the record of arrests and convictions. There are other opportunities for official intervention in the lives of dangerous people, including civil restraining orders and court-ordered hospitalization for certain kinds of mental illness.[26,27]

## CONCLUSION

Interventions after arrest or conviction, such as mandatory drug treatment, supervised release, imprisonment, correctional programs, or bans on firearm possession, are targeted toward a group that has relatively high incidence of lethal violence, but they leave a large portion of the problem untouched. Broader prevention strategies, including general deterrence and the regulation of markets for "criminogenic" commodities (firearms, alcohol, and drugs), may also be warranted as part of a comprehensive strategy.

**Author Contributions:** Drs Cook and Ludwig had full access to all of the data in the study and take responsibility for the integrity of the data and the accuracy of the data analysis.
*Study concept and design:* Cook, Ludwig, Braga.
*Acquisition of data:* Ludwig.
*Analysis and interpretation of data:* Cook, Ludwig, Braga.
*Drafting of the manuscript:* Cook, Ludwig, Braga.
*Critical revision of the manuscript for important intellectual content:* Cook, Ludwig, Braga.
*Statistical analysis:* Cook, Ludwig.
*Administrative, technical, or material support:* Ludwig, Braga.
*Study supervision:* Ludwig.

**Financial Disclosures:** None reported.

©2005 American Medical Association. All rights reserved.

## JA 404

Downloaded From: http://jama.jamanetwork.com/ on 07/08/2015

## REFERENCES

1. *WISQARS Injury Mortality Reports, 1999-2002.* Centers for Disease Control and Prevention. Atlanta, Ga: Centers for Disease Control and Prevention; 2005.
2. Wolfgang ME. *Patterns of Criminal Homicide.* Philadelphia: University of Pennsylvania Press; 1958.
3. Kleck G, Bordua D. The factual foundation of certain key assumptions of gun control. *Law Policy Q.* 1983;5:271-298.
4. Straus M. Domestic violence and homicide antecedents. *Bull N Y Acad Med.* 1986;62:446-465.
5. Braga AA. Serious youth gun offenders and the epidemic of youth violence in Boston. *J Quant Criminol.* 2003;19:33-54.
6. McGarrell EF, Chermak S. Problem solving to reduce gang and drug-related violence in Indianapolis. In: Decker SH, ed. *Policing Gangs and Youth Violence.* Belmont, Calif: Wadsworth; 2003:77-101.
7. Tita G, Riley J, Greenwood P. From Boston to Boyle Heights: the process and prospects of a "pulling levers" strategy in a Los Angeles barrio. In: Decker SH, ed. *Policing Gangs and Youth Violence.* Belmont, Calif: Wadsworth; 2003: 102-130.
8. Chapin Hall Center for Children. *Illinois State Police Arrests Database, Codebook Version 1.* Chicago, Ill: Chapin Hall Center for Children at the University of Chicago; 2003.
9. US Bureau of the Census. *American Community Survey: 2001.* Washington, DC: US Bureau of the Census; 2001.
10. US Bureau of the Census. *Public-Use Microdata Samples: Census 2000.* Washington, DC: US Bureau of the Census; 2000.
11. Leung H, Kupper L. Comparison of confidence intervals for attributable risk. *Biometrics.* 1981;37:293-302.
12. Zimring FE, Hawkins G. *Crime Is Not the Problem: Lethal Violence in America.* New York, NY: Oxford University Press; 1997.
13. Christoffel KK. Toward reducing pediatric injuries from firearms: charting a legislative and regulatory course. *Pediatrics.* 1991;88:294-305.
14. Webster DW, Chaulk CP, Teret SP, Wintemute GJ. Reducing firearms injuries. *Issues Sci Technol.* 1991; 7:73-79.
15. Conklin B, Seiden R. Gun deaths: biting the bullet on effective control. *Public Aff Rep.* 1981;22:1-7.
16. Spitzer RJ. *The Politics of Gun Control.* 2nd ed. New York, NY: Chatham House; 1998.
17. Dowd MD, Knapp J, Fitzmaurice L. Pediatric firearm injuries, Kansas City 1992: a population-based study. *Pediatrics.* 1994;94:867-873.
18. Kennedy DM, Piehl AM, Braga AA. Gun buybacks: where do we stand and where do we go? In: Plotkin M, ed. *Under Fire: Gun Buyback, Exchanges, and Amnesty Programs.* Washington, DC: Police Executive Research Forum; 1996:141-174.
19. Lane R. *Murder in America: A History.* Columbus: Ohio State University Press; 1997.
20. Mercy JA, Saltzman L. Fatal violence among spouses in the United States. *Am J Public Health.* 1989; 79:595-599.
21. Campbell JC, Webster DW, Koziol-McLain J, Blcok C, Campbell D, Curry MA. Risk factors for femicide in abusive relationships: results from a multisite case control study. *Am J Public Health.* 2003;93:1089-1097.
22. Braga AA, Piehl AM, Kennedy DM. Youth homicide in Boston: an assessment of supplementary homicide reports. *Homicide Studies J.* 1999;3:277-299.
23. Kates DB, Schaffer H, Lattimer JK, et al. Guns and public health: epidemic of violence or pandemic of propaganda. *Tenn Law Rev.* 1995;62:513-596.
24. Bureau of Justice Statistics. *Sourcebook for Criminal Justice Statistics.* Washington, DC: Bureau of Justice Statistics, US Dept of Justice; 2002.
25. Vernick JS, Hepburn LM. State and federal gun laws: trends for 1970-99. In: Ludwig J, Cook PJ, eds. *Evaluating Gun Policy.* Washington, DC: Brookings Institution Press; 2003:345-402.
26. Myers WC, Scott K. Psychotic and conduct disorder symptoms in juvenile murderers. *Homicide Stud.* 1998;2:160-175.
27. Langford L, Isaac N, Kabat S. Homicides related to intimate partner violence in Massachusetts. *Homicide Studies J.* 1998;2:353-377.

©2005 American Medical Association. All rights reserved.

Downloaded From: http://jama.jamanetwork.com/ on 07/08/2015

## JA 405

This document is made available electronically by the Minnesota Legislative Reference Library as part of an ongoing digital archiving project. http://www.leg.state.mn.us/lrl/lrl.asp



# DRUG & VIOLENT CRIME TASK FORCES
## 2011 Annual Report

**March 2011**
**Prepared by the Office of Justice Programs – Minnesota Department of Public Safety**

## BACKGROUND

**Narcotics Task Forces –** Since 1988, the Minnesota Department of Public Safety Office of Justice Programs has funded multijurisdictional narcotics task forces with a portion of its annual Edward Byrne Memorial Grant from the U.S. Department of Justice. One of the purposes of the funding is to support programs that integrate federal, state and local drug law enforcement agencies and prosecutors to conduct effective multijurisdictional investigations and prosecutions.  For many years, Minnesota's drug task forces received $2.6 million in federal funding each year.

The 2005 Minnesota Legislature passed legislation to improve coordination of gang and drug enforcement efforts throughout the state. To ensure an effective outcome, the legislature established a **GANG AND DRUG OVERSIGHT COUNCIL** ("Council") to provide guidance related to the investigation and prosecution of gang and drug crime. One of the Council's primary responsibilities was to establish multijurisdictional task forces to combat gang and drug crime throughout the state. At the same time, the Minnesota legislature appropriated state funding for task force efforts to fund statewide gang enforcement efforts and to replace the rapidly and dramatically declining federal resources used for drug enforcement.

Subsequently, the 2010 Minnesota Legislature established the **VIOLENT CRIMES COORDINATING COUNCIL (VCCC")** to provide guidance related to the investigation and prosecution of gang crime, drug crime and related violent crime. The Council is comprised of 19 voting members that represent federal, state and local law enforcement and prosecution agencies and includes four citizen members. The council provides direction and oversight to the multijurisdictional task forces and enforcement teams located throughout the state.  This new council replaced the Gang and Drug Oversight Council that had been in existence since 2005.

The council's primary duty is to "develop an overall strategy to ameliorate the harm caused to the public by gang and drug crime within the State of Minnesota".   In addition, the council works closely with the Commissioner of Public Safety and is charged with additional responsibilities:

- The development of an operating procedures and policies manual to guide gang and drug investigation;
- The identification and recommendation of an individual to serve as the statewide gang and drug coordinator;
- The development of grant eligibility criteria and application review process;
- The recommendation for multijurisdictional task force funding termination for those not operating in a manner consistent with the best interest of the state or the public;
- The development of processes to collect and share investigative data;
- The development of policies to prohibit the improper use of personal characteristics to target individuals for law enforcement, prosecution or forfeiture actions; and ,
- The adoption of objective criteria and identifying characteristics for use in determining whether individuals are or may be members of gangs involved in criminal activity.

## JA 407

There are currently twenty-four funded task forces that span sixty-five counties.  The task forces are staffed by over 200 investigators from over 120 individual agencies.  Funding available for SFY 11 was $4,975,147 with 85% of the funding coming from state general funds.   Annual grant amounts range from $35,000 to $518,500.  The work of the task force teams is supported by an appointed Statewide Gang and Drug Coordinator; an experienced sworn officer who provides training, monitoring and technical assistance services to all funded task forces.  Task force officers also sought to develop their own professional skills, completing 11,775 hours of POST certified training in 2010.

## STATEWIDE THREAT ASSESSMENT

As a part of their application for funding that was completed in the Fall of 2009, each task force was asked to comment on the current threats and emerging trends they were facing within their service area.  They also report on emerging trends when they prepare extensive quarterly narrative reports submitted to the office of Justice Programs.  A summary follows.

### DRUG ASSESSMENT

The wide spread production of methamphetamine has continued to taper off, with all regions reporting significant drops in lab seizures since 2004.  The reduction over time is largely attributed to legislation restricting access to precursor ingredients needed in the production of methamphetamine. Use by minors has also decreased dramatically due to the success of anti-methamphetamine advertising campaigns.  However, many regions are now reporting smaller scale production of methamphetamine in remote areas or in mobile labs producing quantities for personal use. The year 2010 indicated a slight upward trend.



Despite the reduction in the manufacture of methamphetamine, it continues to be the greatest concern for many of the task force regions in the state.  Increasingly, large quantities of high grade methamphetamine being trafficked into the area from the southwest U.S. and Mexico.  Evidence of intravenous use of methamphetamine has increased in some task force areas.  This all comes along with high rates of property crimes, child abuse and neglect, and the drain on social services agencies that are seeing families affected by addiction to methamphetamine.

## JA 408



The abuse and illegal sale of pharmaceutical drugs, such as OxyContin, has also significantly increased. Seizures and arrests involve both pills and fentanyl patches.  This has been a particular problem on Indian reservations in the northern part of the state.  In fact, both the White Earth and Red Lake nations have recently declared public health emergencies related to prescription drug abuse.  In 2005, prescription drugs were involved in 4.5% of drug arrests and that number increased to 14.3% in 2010.  Task forces have reported some significant sale cases where large quantities of OxyContin have been sold.  At an average cost of $1.00/milligram, there is a high profit margin on the sale of the drug.  Illicit sellers are getting their product from forged prescriptions, "doctor shopping", paid procurers of the drug and pharmacy burglaries.  There have been an alarming number of minors and young adults abusing prescription medications. Individuals often take it from household medicine cabinets or receive it or buy it from friends.



*NOTE:  Chart does not include 83,746 pills seized in 2009 from an internet pharmacy.*

Historically, increases in the abuse of prescription pain killers including OxyContin; morphine; codeine; and fentanyl patches, reduces the demand for heroin.  Despite this, investigators have seen an increase in the trafficking and use of heroin.  Heroin arrests increased 116% from 2008 to 2010.  Minnesota has been identified as the state that has the lowest price and highest purity of heroin available.  Heroin overdose deaths and hospital emergency room visits related to heroin were at a very high level in 2009.  Past use of heroin by 12th graders in Minnesota is above the national average.  Marijuana is undoubtedly the most commonly abused and readily available drug throughout the state.  It is cultivated locally and imported from Canada and source states along

**JA 409**

the border with Mexico.   As such, the importation and local cultivation of marijuana continues to be a significant target for task forces primarily with high volume trafficking and the dismantling of grow operations.  The sale of marijuana is very profitable and is often associated with violence. According to the local Drug Enforcement Administration office, an ounce of fairly low quality Mexican marijuana retails for $150 - $175.  The lack of serious criminal consequences for cultivators and sellers of marijuana makes it difficult to disrupt the supply of this very available drug.

In terms of local production, indoor marijuana grow operations are becoming more prevalent, and operations are often more sophisticated than seen in the past. Nationwide, the environmental and health hazards of such operations are becoming apparent. The potency of marijuana has risen with higher concentrations of THC found in seized samples. Task forces have also reported an increase in the street price of marijuana.



While crack cocaine continues to be a fairly common drug of abuse it is declining in popularity for distribution and use throughout the state. The amounts encountered by task forces are not at previous levels and the cost has increased significantly. However, cocaine and crack cocaine are more prevalent in the Mankato, Rochester and Duluth areas. In these areas, the importation and distribution of the drug is often gang related.   In Greater Minnesota, the principal wholesale distribution centers for cocaine and crack cocaine are Minneapolis, Chicago and Detroit.

Other substances have also presented challenges for law enforcement in 2010.

- Over 1,000 pounds of khat was seized by task forces in 2010, but absent significant penalties for the importation of the drug, few arrests follow.

- Synthetic marijuana products (K2, Spice, Blade, Red X Dawn, etc.) have been found in many parts of the state and have become increasingly popular, particularly among teens and young adults. These products consist of plant material that has been coated with chemicals that claim to mimic THC, the active ingredient in marijuana, and are sold at a variety of retail outlets, in head shops, and over the Internet. These products that can cause serious side effects for users.  There have been an increasing number of reports from poison control centers, hospitals and law enforcement regarding these products.

- Mephedrone is also being sold in both the metro and greater Minnesota areas.  This is a synthetic stimulant. It is reportedly manufactured in China and is chemically similar to the compounds found in khat. It comes in the form of tablets or a powder, which users can swallow, snort or inject, producing similar effects to MDMA, amphetamines and cocaine. In the USA it can be sold legally if labeled as 'plant food' or 'bath salts'.

## GANG AND VIOLENT CRIME ASSESSMENT

Gang activity and violence related to the sale and distribution of narcotics is growing, especially in rural areas, according to many task force reports.  Aside from narcotics violations, weapons violations appear to be the criminal activity of choice.  Prostitution and other forms of human trafficking and victimization of women are also an operating procedure for some street gangs.

The primary distributors of the three most common drugs (cocaine, meth and marijuana) are Mexican drug trafficking organizations.  As a result, illegal drugs are present in increasing amounts. These organizations are well documented as using extreme violence to advance their interests in Mexico as well as increasing violence in the southwest US.  Some of these organizations have connections to the La Familia gang and there are multiple cells operating within the northern portion of Dakota County.  It is only logical that their presence will continue to grow in the twin cities area.

Many regions are reporting intensified recruiting efforts by gangs, and many gang members from major metropolitan areas such as Chicago, Minneapolis and Detroit are moving into rural regions for criminal purposes.  The Surenos 13 is the fastest growing gang in Minnesota.  This is a gang that has a history of violence and connections to drug cartels in South America.  Another growing gang threat in Minnesota, particularly within the Twin Cities and Rochester areas, is from the evolution of Somali gangs.  Somali gangs are believed to be responsible for crimes ranging from drive by shootings to drug activity. It has been difficult for law enforcement to penetrate these gangs due to the very much closed network that they establish.

Outlaw motorcycle gangs operate throughout the state and prison based gang members reside in many parts of the state.  For example, the Supreme White Power "SWP" prison gang members are now living in the Iron Range area after recently being paroled.  This group poses a serious safety threat to the area as they have a high propensity for violence and has suspected ties to the use and sale of methamphetamine.  One of the SWP members was arrested in the City of Virginia and is in custody awaiting trial on murder charges for a stabbing death.

Native gangs pose significant threats on tribal lands and in parts of the Twin Cities.  There has been a significant increase in gang violence in the state and local areas involving the Native Mob and associates. During the past 12-18 months Native Mob members and associates have been the victim of drive-by shootings, assaults and other violence.  It has been reported that as older members of the Native Mob are being released from prison the gang is becoming more structured and organized throughout the state.  This is substantiated by Department of Corrections

investigations and informant information.  There has also been an increase in 'council' meetings for the Native Mob across the state.

Both metro and rural task forces are experiencing an increase in the size and violence of hybrid gangs as they attempt to gain power.  Individuals may join one or more of these loosely affiliated "gangs" that have no hierarchy or code of conduct. In the case of hybrid gangs, rival gang members are more apt to work together in criminal endeavors.  The metro area reports that currently, gangs tend to be smaller and more factionalized with violence becoming less about drug territory and more about on-going feuds.

Violence in the community has increased and in many cases is violence for the sake of violence. Task forces report increases in armed robberies and burglaries. The frequency of weapons seized during investigations continues to increase.  High capacity guns are not unique.  It is not unusual for some gang members, particularly members of outlaw motorcycle gangs, to have a permit to carry a firearm.  The firearm issue has resulted in task forces using a variety of tactics to promote officer and community safety.  Whenever possible, suspects that have potential to be violent or have access to weapons are arrested in tightly controlled situations.  Removal of gun permits through felony criminal charges is a strategy used to disrupt assignments and structures within gangs.

## BENEFITS OF THE TASK FORCE MODEL

In their regular reporting, task forces provide testimony and examples of the benefits of the task force approach and examples of how collaboration has fostered success.  In the words of one task force commander, "We also have had some luck in identifying out-of-the-area sources and pass that information on to other task forces and agencies or collaborate with them on continuing the investigation.  Collaborating with other law enforcement fosters information and resource sharing and creates relationships that are mutually beneficial."  The situation in the past where there was competition for good cases has been replaced by cooperation.  Data from 2010 indicate the highest degree of cooperation ever experienced with over 1,500 cases worked collaboratively with another law enforcement entity.

In previous examinations of the task force model as employed in Minnesota, the following were identified as benefits:  (1) The level of expertise and knowledge increases when you combine a variety of experience and training in one location;  (2) Task force officers have access to training not readily available to officers on other assignments; (3) When officers return to their home agencies, they take that experience, training and their resources back to their departments; (4) Co-location provides for constant communication between task force members and helps to build rapport, trust and solid relationships.  It also provides an atmosphere where a wide variety of techniques and experiences can be consulted while discussing and planning investigative activities; (5) Task forces frequently provide assistance and resources to other law enforcement agencies during other non-drug investigations.  That assistance is usually welcomed by other agencies, and helps task forces produce positive results and create a favorable image within the law enforcement community.

## RESULTS OF 2010 TASK FORCE OPERATIONS

The following is a summary of task force results throughout the state.

**Drug Enforcement** - In calendar year 2010, task forces made 3,382 arrests for narcotics violations with 93% of the arrests at a felony-level. Individuals prosecuted at the federal level numbered 195. Of the arrests, 40% involved methamphetamine, 36.6% involved marijuana, 14.3% involved prescription drugs and 17.6% involved cocaine/crack cocaine.  In the course of their investigations, task forces seized 28 methamphetamine labs, 28 pounds of cocaine/crack cocaine, 86 pounds of methamphetamine, one half pound of heroin, 1,102 dosage units of ecstasy, over 16,000 dosage units of prescription drugs, 1,284 pounds of marijuana and 7,618 cultivated marijuana plants. Firearm seizures totaled 662.  In addition to drug arrests, task force officers made 307 arrests for other criminal activity.



*TOTAL of $14 million including all task forces, VOTF's and the St. Cloud MGSF*

Results since 2007 indicate that task forces are improving and addressing what the program intends: major cases that have the potential to significantly affect drug trafficking and related crimes within their regions.  The year 2007 saw the highest results ever in terms of: percentage of felony arrests and the percentage of cases prosecuted federally. In 2009, the highest percentage of drug arrests for "sales" was attained.  Working these complex cases requires collaboration with other task forces, as well as other local, state and federal agencies.  Data from 2010 indicates that approximately 45% of all the cases worked by task forces were done in cooperation with another local, state or federal law enforcement entity.

 **St. Cloud Metro Gang Strike Force** - This multijurisdictional effort between the City of St. Cloud and Sherburne County began in 2007.  In its fourth year of operation, this unit reports 85 felony-level drug arrests.  Forty-six of the individuals arrested were confirmed gang members.  Seventeen additional arrests were made for felony-level violent offenses and fourteen of those arrested were confirmed gang members.  Thirty-five additional arrests were made for non-felony drug arrests, non-violent Part I offenses and other Part II offenses.  Probation violation or outstanding warrants

accounted for twenty-three arrests.  In the course of their work they executed 24 search warrants, seized 32 firearms, and took quantities of crack, marijuana and meth off the streets.  They responded to 51 requests for assistance from other agencies and expended over 450 person hours in doing so. In addition to their enforcement duties they gave many presentations to a variety of audiences.

The SCMGSF notes a continuing trend of older gang members returning to the community. Most of these gang members have been released from prison in the recent past. Some of these older gang members are resuming the distribution of narcotics. In one quarter of 2010, some of these recently released gang members were involved in five shootings.  In addition to responding to violations of the law, the strike force is working with local probation officers to keep track of the location and activity of these gang members and to get their probation revoked if they violate probation conditions.

**Gang Specialists Assigned to Task Forces** - In 2010, there were 10 task forces outside the metro area that had a total of 18 assigned gang officers.  In addition, 3 suburban task forces added gang and violent crime specialists to ensure that specialized gang knowledge was not lost with the demise of the Metro Gang Strike Force.  Other metro agencies also incorporated gang specialists to their task forces. These officers worked hand in hand with the drug agents and their specialized knowledge of gangs, gang crimes and gang members enhanced the work of the task forces. Specifically, of the arrests noted above under "drug enforcement," 116 of the arrests were of suspected or confirmed gang members.  Of the non-drug arrests noted, there were 37 violent Part I crimes, 4 non-violent Part I crimes and 3 Part II crimes committed by suspected or confirmed gang members.  In addition, 9 individuals were arrested for outstanding warrants or probation violation.  Eleven of those arrested were charged federally. Forty-four handguns were seized from the individuals noted above.

**Violent Offender Task Forces** -   Newly funded in 2008 were two task forces in Hennepin County that target violent offenders.  The Violent Offender Task Forces (VOTFs) were started as a new strategy in combating violent crimes that was increasing in some neighborhoods in Minneapolis and the surrounding suburbs.

Analyses of the problem showed clearly that the vast majority of the violence was due to guns and drugs but, more importantly, that the same individuals were at the core of the problem time and time again. An overloaded system was ineffectively dealing with the same repeat violent offenders continually engaged in narcotics trafficking, gang activity and related violence.

To deal with these challenges, task forces were formed that consist of local and federal investigators and prosecutors. The rationale behind the VOTFs is: rather than target a specific crime (i.e. narcotics, robbery, etc.), target the individuals who are repeatedly causing the violent crimes. The methods of investigation in these cases are lengthy, complex and resource intensive. In 2010, the Minneapolis VOTF was reconfigured as a FBI "Safe Streets" task force and the Bureau of Criminal Apprehension and the St. Paul Police Department joined the effort.

In 2010, the two Violent Offender Task Forces demonstrated meaningful results. In many instances they work cases jointly.  The VOTFs executed 216 search warrants and seized 152 firearms, including 45 handguns and 49 semi-automatic weapons. Substantial amounts of narcotics were also seized including: 16.9 pounds of cocaine and crack cocaine, 66 pounds of marijuana, 38.44 pounds of methamphetamine, 1.9 pounds of heroin and over 15,000 doses of ecstasy. They arrested 251 individuals for narcotics violations, of which 89 were confirmed gang members. Thirty-five individuals were arrested for violent crimes and 20 were confirmed gang members. Ninety-eight of the individuals arrested were accepted for federal prosecution. Of those that are federally indicted, almost all dependents plead guilty to crimes that will result in sentences averaging ten years. In addition to their own arrests, the two VOTFs participated in the arrests of other individuals while responding to requests for assistance from other law enforcement entities.

There are several excellent examples of the impact that the VOTFs are having on the quality of life and crime within neighborhoods in the metro area. The Safe Streets initiative developed information in two separate instances where murders were planned and overt acts to carry out the murders were made.  In both instances, officers conducted surveillance on the suspects in order to ascertain the veracity of the information.  Using advanced, investigative techniques, officers worked with other local units and agencies and disrupted the murder plots.  Guns were recovered and arrests were made.

"Operation Family Ties" is a case that was worked jointly by the two VOTFs.  The violent, criminal gang it addressed had been making resurgence in Minneapolis since it was hit hard by law enforcement in the late 1990's.  The reason this violent gang was targeted by Safe Streets was due to the gang's stated desire to reorganize after many of its leaders were getting out of prison. Hennepin County VOTF was of particular benefit in the investigation as the gang was not only talking about re-establishing their former gang territory through the use of violence, but expanding their territory to other parts of Minneapolis and the northern suburbs.

**Prevention and Education** -It is important to note that beyond their objective of combating drug trafficking through law enforcement, task force officers spent a significant amount of time educating other criminal justice personnel, health professionals, teachers, parents and members of the public about drugs and gangs.  In the words of one task force, "officers gave five presentations to community groups, schools, and law enforcement and news agencies.   These presentations are an opportunity to inform the public of our presence and give rudimentary training on drug and gang activity in the task force area.  We also work with local law enforcement to keep them abreast of gang activity, drug trends, and legal updates pertaining to narcotics and search and seizure". In 2010, task force officers made 443 presentations with a total attendance of 16,509 people.

Task force personnel also participate in many local initiatives aimed at reducing the demand for drugs and sharing enforcement strategies to address emerging issues.  For example the task force in Polk County was compelled to respond when the County Attorney's Office noted that approximately 50% of felony drug possession crimes being prosecuted in 2010 were prescription

related.  The Pine to Prairie Task Force has developed a strategy in response to the increasing prescription drug problem in the area:  Working with local heath care providers to create "prescription drug-seeker" policy; conducting interviews with cooperating defendants to ascertain the "bigger picture" of the prescription drug problem; collaborating with the county attorney's office to obtain successful prosecution of defendants selling prescription pills; and sharing information learned from interviews and investigations with local law enforcement officers and public officials.

Another example is that in response to an emerging trend, the Southwest Metro Task Force produced a PowerPoint slide show educating people about synthetic marijuana and the problems and dangers associated with its use. It has been presented to the emergency room staff at one of the local hospitals and was shared with local school liaison officers. It was subsequently presented to the counselors at a local high school who then showed it to the all of the 9th grade health classes.  At their request, it was presented to one of the local city councils who are acting on banning the substances.

Last, but not least, task force officers also engage in prevention in a very personal way.  The following are just a few examples:

- Six Minneapolis officers assigned to Safe Streets are active in youth sports and activities to promote prevention activities and serve as positive role models.  The activities included: hockey, baseball, football, camping, fishing and academic activities.
- One of the Paul Bunyan Task Force officers is the coach for the local football team.  Many of the kids on this team are from dysfunctional families, have learning disabilities and may have a history of problems at school.  The officer has been a positive influence on these boys and is more than just a coach to them.  He also participated in the local area national night out: a community activity that promotes interaction with law enforcement.
- The BLLRR Task Force commander continues to do his radio talk show "Twenty Minutes with the Task Force." Most recently he discussed the widespread abuse of prescription drugs.

## ATTACHMENTS

● Gang and Drug Case Summaries
● Map of 2011 Drug and Violent Crime Enforcement Teams
● List of 2010 - 2011 Task Force Grants
● List of Violent Crime Coordinating Council Members

## GANG and DRUG CASE SUMMARIES

**The following are selected summaries of completed or active investigations.  These are examples as to the types of investigations and types of illegal activities being committed by different criminal elements throughout the state.**

The **Dakota County Task Force**, along with Eagan and Apple Valley Police Departments, conducted a joint investigation involving stolen property and narcotics.  Two search warrants were executed. Stolen property valued over $250,000, 6 grams methamphetamine, marijuana, and $1,300 currency were seized.  The **Dakota County Task Force also** assisted the Apple Valley Police Department in the recovery of 4,039 doses of Vicodin, 809 doses Hydrocortisone, and numerous other controlled prescription medication that were stolen during a burglary of a drug store in Cannon Falls.  Two suspects were arrested.

In December 2010, the **Southeast Minnesota Task Force** arrested 14 suspects after a 7 month investigation.   The task force had 17 First Degree Drug Sales complaints approved for the sale of cocaine.  Twelve of the suspects have been identified as Black P-Stone or Black Disciples gang members.   Gang members were purchasing large amounts of cocaine in Chicago and Minneapolis.  This operation took some significant criminals off of the streets of Rochester and the entire task force area.

During the fall of 2010, the **Buffalo Ridge Task Force** and ATF joined forces to recover stolen firearms in the Worthington area.  The burglary, which included the theft of 42 firearms, took place at a Vail, IA gun store on May 31, 2010.  Early in the investigation, the primary suspects, who were identified as Norteno gang members, were arrested and federally indicted on bank robbery charges.  They had robbed a Rushmore, MN Bank in an effort to raise enough funds to repay drug debts. Four suspects were identified and arrested at a Worthington residence. Cash from the bank robbery and two firearms were located and seized.  Within a few days, a shooting was investigated at a Worthington residence. The uninjured occupants of the house were linked to those suspected in the bank robbery.  Further investigation by the task force led to two long guns being located that were buried in the yard;  five handguns in a plastic bag hidden under a tree ; two SKS assault rifles and magazines located in a body of water in southern Nobles County; and additional weapons and narcotics located at the scene during subsequent search warrants.

**Paul Bunyan Task Force** officers were involved in the successful rescue of a child hostage and subsequent arrest of the suspect at a house in Bemidji.  Officers had just finished a drug deal in Bemidji when the call was received and they were all in a position to act as perimeter cover officers and eventually make entry into the residence.

Agents of the **North Central Task Force** executed a search warrant at an apartment in Onamia. During the execution of the search warrant, a half pound of marijuana was found along with drug paraphernalia.  Children were also present in the apartment along with marijuana smoke and Mille Lacs Family Services was called in to deal with the endangered children. The suspect and his girlfriend were both charged in Mille Lacs District Court with the drugs and child endangerment.

**Pine to Prairie Task Force** officers were requested to investigate a suspected methamphetamine lab 6 miles north of East Grand Forks.  The case was worked in collaboration with other agencies in conducting the investigation and task force officers processed the methamphetamine lab.  The investigation resulted in one arrest for First Degree-Manufacture of Methamphetamine.  The investigation indicated the suspect had "cooked" meth approximately 50 to 100 times throughout 2009 within three different northwest Minnesota counties.

**Paul Bunyan Task Force** officers spent many hours investigating gang-related shootings on the Leech Lake and White Earth Reservations.  They worked with investigators from several agencies during the course of building a case against the shooters at Leech Lake and two people have currently been charged with attempted murder. We hope to enhance the charges with "crime to benefit a gang".  The task force gang officer and a DOC investigator have obtained information that this shooting took place at the direction of Native Mob leaders and was retaliation for prior conflict between the Mob and victim. The shootings have demonstrated an increased propensity of the Native Mob to settle its' problems by violence.

An **Anoka-Hennepin Task Force** investigation into a suspected drug dealer in Coon Rapids led to a search warrant. The results of the search were three arrests, two children placed, and the seizure of 51 grams of marijuana, 24 ecstasy pills, 46 diazepam pills, $1,354 in cash and two handguns.

The **Boundary Waters Task Force** reports that there have been two deaths in the communities of Hibbing and Gilbert directly related to pill overdoses and the Gilbert police, a member of the BWDTF, arrested 7 juveniles that were selling prescription pills inside the junior high school.  The task force remains focused on fighting this problem and have charges currently pending against 16 more individuals for illegal pill sales.

**Central Minnesota Task Force** investigators concluded an investigation into the distribution of crack cocaine by local gang members.  Three known gang members and a number of previously unidentified female associates were responsible for a crack cocaine delivery operation.  One of the defendants, a violent felon, was arrested in the possession of a loaded revolver during a crack deal.  This person was already out on bail for possession of a handgun by a felon at the time of his arrest.  This case has been presented to the United States Attorney's Office for possible charges.

A **Red River Valley Task Force** officer had a ten day jury trial in federal court which resulted in guilty verdicts for three upper tier traffickers of methamphetamine.  These defendants were indicted under Operation "Abrasion" and were responsible for approximately 40 pounds s of methamphetamine trafficked into the region.  One defendant was the president of the "Dakota Riders Motorcycle Club" based in Bismarck, North Dakota.

In December, the **Lake Superior Task Force** concluded a methamphetamine/pill sales case on a high profile local dealer with two search warrants.  The first warrant resulted in seizure of methamphetamine, heroin, Opana pills, $754 cash and 2 firearms.  A second warrant yielded seizure of third firearm and large amount of ammunition.  Charges were presented and the case adopted in the federal system.

In the City of Willmar**, a CEE-VI Task Force** drug agent bought 200 prescription pills at one time from two female individuals while there were small children in the vehicle.  In addition to drug charges there were also child endangerment charges.

Members of the **South Central Task** Force teamed with members of the MN BCA, MN State Patrol K-9 and Truck Enforcement), DEA, and our local agencies for an interdiction project.  This was a coordinated effort along I-35 and I-90, with the State Patrol opening an old scale site for enforcement efforts on large trucks.  Well over 200 traffic stops were conducted by officers, deputies and troopers as well as a large number of trucks at the scale site.  Numerous citations for license violations, speed, seatbelt, insurance, illegal drugs and paraphernalia were issued.  There was also a 40 pound marijuana seizure from the trunk of a car that was on a semi car hauler.  A controlled delivery of the marijuana was later conducted near the University of Minnesota and three additional suspects were apprehended.

The **Minnesota River Valley Task Force** wrapped up a marijuana investigation involving a known Gangster Disciple gang member in the St. Peter area after he sold marijuana at a local recreation center while pushing his 9 month old baby in a stroller. Also, what agents believed to be a simple marijuana search warrant in St. James turned into something a lot more complex after several items of child pornography were discovered.  The local police executed a separate search warrant and removed a high volume of evidence in that case.

The **Lakes Area Drug Investigation Division** (LADID) was able to arrest a large supplier of methamphetamine in the Crow Wing County area as a result of citizen concerns and good police work.  A concerned citizen had been supplying license plate numbers of people frequenting a house of a known drug dealer.  Agents installed a GPS tracker and conducted garbage pulls on the suspect.  Through the use of uniformed officers and drug interdiction techniques, LADID obtained a search warrant for the residence which resulted in the seizure of 2 ounces of methamphetamine. The suspect provided useful information about drug trafficking in Crow Wing County.

The **Northwest Metro Task Force** had a large cocaine seizure during the third quarter of 2010.  A suspect was identified that was believed to be a cocaine dealer. A GPS tracker was placed on the suspect's car and eventually the suspect was seen going to Dallas, Texas then turning around after staying there for only about an hour and coming home. The task force found the suspect entering Minnesota and with the assistance of the Minnesota State Patrol made a traffic stop on the suspect. During the stop just over one pound of cocaine was recovered. Follow up search warrants turned up more cocaine and a large amount of cash.

**Ramsey County Violent Crime Enforcement Team** officers completed an investigation on a mid-level methamphetamine dealer who is a member of a local outlaw motorcycle gang.  Through the use of an undercover officer, several ounces of methamphetamine were purchased from the target.  Search warrants were executed and additional meth, 10 pounds of marijuana and 2 handguns were recovered.  The target has an extensive criminal history and is a registered sex offender.



## 2011 Drug and Violent Crime Enforcement Teams
### Department of Public Safety
### OFFICE OF JUSTICE PROGRAMS

**GRANTS FOR DRUG AND VIOLENT OFFENDER TASK FORCES:  January 1, 2010 – June 30, 2011**

| Task Force | Fiscal Agent | 2010 Grant | Grant for 1/1/11 - 6/30/11 | New Total Award |
|---|---|---|---|---|
| Anoka-Hennepin TF | Anoka County Sheriff's Office | $290,000 | $141,375 | $431,375 |
| B-L-L-R-R Task Force | New Ulm Police Department | $175,000 | $86,625 | $261,625 |
| Boundary Waters TF | St. Louis County Sheriff's Office | $100,000 | $49,500 | $149,500 |
| Buffalo Ridge TF | Worthington Police Department | $200,000 | $97,500 | $297,500 |
| CEE-VI  TF | Kandiyohi County Sheriff's Office | $210,000 | $102,375 | $312,375 |
| Central MN  MCIU | Central Minnesota Major Crimes Investigation Unit | $295,000 | $143,813 | $438,813 |
| Dakota County TF | City of Eagan | $310,000 | $138,938 | $448,938 |
| East Metro VCET | Ramsey County Sheriff's Office | $530,000 | $253,500 | $783,500 |
| Hennepin County VOTF | Hennepin County Sheriff's Office | $470,000 | $229,125 | $699,125 |
| Lake Superior TF | Duluth Police Department | $335,000 | $163,313 | $498,313 |
| Lakes Area TF | Crow Wing Co Sheriff's Office | $35,000 | $17,500 | $52,500 |
| MN River Valley TF | No. Mankato Police Department | $150,000 | $74,250 | $224,250 |
| North Central TF | Mille Lacs County Sheriff's Office | $62,500 | $30,938 | $93,438 |
| Northwest Metro VCET | St. Louis Park Police Dept. | $90,000 | $44,550 | $134,550 |
| Paul Bunyan  TF | Beltrami County Sheriff's Office | $297,768 | $145,162 | $442,930 |
| Pine To Prairie  TF | Crookston Police Department | $125,000 | $61,875 | $186,875 |
| Red River Valley  TF | Moorhead Police Department | $125,000 | $61,875 | $186,875 |
| St. Cloud Metro GSF | St. Cloud Police Department | $100,000 | $49,500 | $149,500 |
| South Central  TF | Owatonna Police Department | $160,000 | $79,200 | $239,200 |
| Southeast MN  TF | Olmsted County Sheriff's Office | $200,000 | $97,500 | $297,500 |
| Southwest Metro  TF | Shakopee Police Department | $85,000 | $42,075 | $127,075 |
| Washington County  TF | Washington Co Sheriff's Office | $135,000 | $66,825 | $201,825 |
| West Central  TF | Douglas County Sheriff's Office | $160,000 | $79,200 | $239,200 |
| Safe Streets Task Force | Minneapolis Police | $250,000 | $75,000 | $325,000 |
| Safe Streets Task Force | St. Paul Police | $147,000 | $75,000 | $222,000 |
| Statewide Prosecution | Attorney General's Office | $50,000 | $25,000 | $75,000 |
| **TOTAL** | | **$5,087,268** | **$2,431,513** | **$7,518,781** |

**JA 421**

## MINNESOTA VIOLENT CRIME COORDINATING COUNCIL (January 2011)

| TITLE | NAME | AGENCY |
|---|---|---|
| Acting Superintendent | David Bjerga | Bureau of Criminal Apprehension |
| U.S. Attorney | B. Todd Jones | District of Minnesota |
| Deputy Attorney General | David Voigt | Office of the Attorney General |
| Asst. Chief **(VICE CHAIR)** | Ken Reed | St. Paul Police Department |
| Chief | Tim Dolan | Minneapolis Police Department |
| Chief | Mike Goldstein | Plymouth Police Department |
| Chief **(CHAIR)** | Dana Waldron | Virginia Police Department |
| Sheriff | Rich Stanek | Hennepin County Sheriff's Office |
| Sheriff | Matt Bostrom | Ramsey County Sheriff's Office |
| Sheriff | Bill Hutton | Washington County Sheriff's Office |
| Sheriff | Rodney Bartsh | Wabasha County Sheriff's Office |
| Director | Cari Gerlicher | MN Department of Corrections - Office of Special Investigations |
| Assistant County Attorney | Hilary Caligiuri | Hennepin County Attorney's  Office |
| Assistant County Attorney | Benjamin Bejar | Rice County Attorney's Office |
| Chief | Garr Pemberton | Leech Lake Tribal Police |
| Mr. | Hector Garcia | Chicano Latino Affairs Council |
| Ms. | Nicole Matthews | Minnesota Indian Women's Sexual Assault Coalition |

**LEGAL COUNSEL**

| | | |
|---|---|---|
| Asst.  Attorney General | John Gross | Office of the Attorney General |

# EXHIBIT 1

No. 15–2234

# Evaluating Gun Policy

*Effects on Crime and Violence*

Jens Ludwig
Philip J. Cook
*editors*

BROOKINGS INSTITUTION PRESS
*Washington, D.C.*

*Copyright © 2003*
THE BROOKINGS INSTITUTION
1775 Massachusetts Avenue, N.W.
Washington, D.C.  20036
*www.brookings.edu*

All rights reserved

*Library of Congress Cataloging-in-Publication data*

Evaluating gun policy: effects on crime and violence / Jens Ludwig and
Philip J. Cook, editors.
    p.    cm.
Includes bibliographical references and index.
  ISBN 0-8157-5312-8 (cloth : alk. paper)—
  ISBN 0-8157-5311-X (pbk. : alk. paper)
  1. Gun control—United States.  2. Violent crimes—United States.
I. Ludwig, Jens.  II. Cook, Philip J., 1946–

HV7436 .E9 2003
364.15'0973—dc21                        2002014696

9 8 7 6 5 4 3 2 1

The paper used in this publication meets minimum requirements of the
American National Standard for Information Sciences—Permanence of Paper
for Printed Library Materials: ANSI Z39.48-1992.

Typeset in Adobe Garamond

Composition by Circle Graphics
Columbia, Md.

Printed by R. R. Donnelley
Harrisonburg, Virginia

sible finding (that shall-issue laws increase violent crime) and an implausible one (that the same laws also increase property crime), my confidence in the regression is weakened.

The overall evidence suggests to me that broad (and conflicting) crime swings that occurred in the late 1980s and 1990s happened to correlate with the passage of shall-issue laws, and the panel data model seems unable to separate out the contribution of the relatively minor influence of the shall-issue law from the major impacts of these broad swings. With data problems making it unclear whether the county or state data are more reliable, with the lack of good instruments available to directly address the problems of endogeneity and the lack of good controls available to capture the criminogenic influence of crack, it is hard to make strong claims about the likely impact of passing a shall-issue law. The tidal swings in crime rates during the late 1980s and the 1990s have both helped stimulate passage of shall-issue laws as a fearful population searches for relief from anxiety and obscured what the true effect of these laws on crime has been.

# COMMENT BY
# David B. Mustard

More than seven years ago John Lott and I decided to examine the impact of shall-issue laws on crime and accidental deaths. As someone who passionately disliked firearms and who fully accepted the conventional wisdom that increasing the gun ownership rate would necessarily raise violent crime and accidental deaths, I thought it obvious that passing these laws would cause a host of problems. It is now almost six years since I became convinced otherwise, and John Lott and David Mustard concluded that shall-issue laws reduce violent crime and have no impact on accidental deaths.[52] Since then we have distributed the data to about seventy groups of scholars and policymakers, thus facilitating an extensive research agenda concerning the efficacy of right-to-carry laws. John Donohue's chapter first evaluates the basic Lott-Mustard arguments and the subsequent research, and second, provides some new empirical work.

## Lott-Mustard and Subsequent Research

An overview of the right-to-carry scholarly research in the past six years is a good start. One fundamentally important point is how much the terms of the debate

---

52. Lott and Mustard (1997).

have been significantly altered. Before this explosion of research, many presumed that shall-issue laws would increase crime. However, since Lott-Mustard no empirical research has made a case for shall-issue laws increasing crime. Instead, the literature has disputed the magnitude of the decrease and whether the estimated decreases are statistically significant. This work is notable in the broader gun literature because right-to-carry laws are the first gun law to produce an empirically verifiable reduction in criminal activity. The empirical work in refereed scholarly journals presents a much stronger case for the efficacy of shall-issue laws to reduce crime than any other gun control law. From a public policy perspective, if one believes there is insufficient evidence to endorse concealed-carry laws, then to be logically consistent one must also oppose the implementation of waiting periods, safe-storage laws, and other gun laws even more adamantly.

Given the sizable empirical research devoted to this issue and the hundreds of thousands of regressions that have been run, the small number of positive and statistically significant estimates is absolutely striking. Even if one uncritically accepts the most negative reviews of Lott-Mustard at face value, there is still more evidence that shall-issue laws reduce, rather than raise, crime. For example, Mark Duggan, widely recognized as producing one of the most critical papers, reports thirty regressions of the impact of right-to-carry laws on violent crime. Only one of the thirty coefficient estimates is positive and statistically significant (robbery in one specification). In contrast, fourteen of the thirty have negative and statistically significant coefficient estimates, and most of the rest are negative and statistically insignificant.[53] Similarly Daniel A. Black and Daniel S. Nagin obtain a positive and significant coefficient in one specification for assaults but only while using the problematic quadratic estimation procedure. However, this same table reports thirteen negative and statistically significant coefficient estimates, and the remaining estimates are disproportionately negative and statistically insignificant.[54]

Donohue's chapter starts by discussing the basic model and methodology of Lott-Mustard. Unfortunately, many of the criticisms have already been addressed extensively in the literature.[55] Some criticisms were even discussed in the original Lott-Mustard article. Because space constraints limit the number and depth of the issues that I can address, I encourage you to investigate these additional sources more thoroughly in evaluating Donohue's chapter.

---

53. Duggan (2001). Although only twelve are designated as statistically significant in the table, rape and assault in specification 2 are also statistically significant given the reported estimates of the coefficients and standard errors.

54. Black and Nagin (1998).

55. Bronars and Lott (1998); Lott (2000); Lott and Whitley (2001); articles in "Guns, Crime, and Safety" issue of *Journal of Law and Economics* 44 (2, pt. 2) (October 2001).

Like many critics, Donohue contends that different results for the impact of shall-issue laws on property crime undermine the Lott-Mustard work. He dramatically states, "Lott might respond that . . . murderers and rapists shifted over to committing property crime" and that the initial argument asserted, "that Shall-Issue laws induced massive shifts by thwarted murderers and rapists toward property crime." Regrettably, these misrepresentations of the original work continue to be made even though Lott and I have repeatedly asserted, "No one believes that hard-core rapists who are committing their crimes only for sexual gratification will turn into auto thieves."[56] Results of differing signs in no way indict our work. In the original paper we maintained that the deterrent effect should be larger on violent crime than on property crime, so the total effect on violent crime should be more negative than on property crime. Because financial gain is an important motive in some violent crimes there may be some substitution to property crime. However, to the extent that offenders reduce their involvement in all illegal activity as a result of the laws, property offenses may also decrease. Therefore, the theoretical prediction is ambiguous. In some specifications in the original paper property crimes increase, in others there is no effect, and in some there is a decrease. In writing the cost-benefit portion of the paper, we emphasized the results showing the effect of the law on property crime was positive (which also showed the smallest drops in violent crime), because we sought a lower bound on the total benefit and biased the findings *against* our conclusion that the laws provide net social benefits. Consequently, if shall-issue laws have no impact or actually reduce crime, the benefits of the law are even larger than we estimated.

Similarly, Donohue highlights another frequently repeated, yet incorrect, statement about how the relatively small decline in robbery as a result of shall-issue laws, "constitutes a major theoretical problem for Lott's interpretation." These comments about robbery neither acknowledge our initial arguments about how robbery should be affected, nor respond to Lott's subsequent arguments.[57] To briefly reiterate, the theoretical effect of shall-issue on robbery is ambiguous, because the offense category is composed of seven types of robberies. Only one of these categories involves the robbery of one person of another in a public place, which is the most likely type of robbery to be deterred by concealed carry. Clearly, the theory predicts that this type of crime should decrease. However, the theoretical prediction about the entire classification of robbery is not so clear. The other types of robbery could increase if as a result of right-to-carry laws offenders substitute from street robbery to other forms of robbery. Consequently, the effect of the law on the total category is ambiguous.

56. Lott (2000, p. 134).
57. Lott and Mustard (1997, note 26).

One last example is that utilizing the arrest rate as a control variable in the crime rate regressions is problematic. However, Donohue does not mention that Lott and Mustard include extensive explanations of these problems, that the original article tested the robustness of the results to the inclusion of the arrest rate in a number of ways, or that Lott further tests the sensitivity of the results to different arrest rate specifications.[58] These papers show that the qualitative results were robust to omitting arrest rates from the regression, using moving averages of arrest rates, using predicted values of arrest rates, and examining large counties that had well-defined arrest rates. Furthermore, Donohue's discussion of the arrest rate misses an important point. Omitting arrest rates may generate a truncation problem because many counties with zero crime rates will be included in the regression. By construction it is impossible for a shall-issue law to reduce crime in a county that has no crime, no matter how effective the law is.[59]

## Post-1992 Analysis

Donohue's second principal objective is to examine the results when the data are extended to 1997. Of all the empirical papers that examine the impact of right-to-carry laws, Donohue's chapter is unique, because it is the first to argue that the laws may increase crime. Tables 8-1 through 8-6 in his chapter present this evidence by portraying the coefficient estimates and standard errors of a series of leads and lags before and after the law passes. He contends that adding subsequent years of data demonstrates that there are differential effects between the early and late adopters of laws. I outline three central concerns about this analysis.

First, Donohue neither discusses nor controls for very important changes in right-to-carry laws. There are at least four trends that have made it more costly for law-abiding citizens to protect themselves. One, fees have increased substantially. For example, the average fee for states that implemented laws since 1994 was about 2.5 times greater than the states that adopted right-to-carry laws from 1985 to 1992. Two, the training requirements for obtaining permits have increased significantly. Of the eight states that adopted their laws before 1960, only one state had any training requirement. Of the laws adopted between 1985 and 1992, only half the states required training, which on average was relatively short. In sharp contrast, most of the states that passed laws since 1994 require training periods, and the average length of those periods is relatively long. Three, there are fewer places in which licensed individuals are legally permitted to carry. Other than the areas prohibited by federal laws, early states had few, if any, excluded

---

58. Lott and Mustard (1997); Lott (2000).
59. Plassman and Tideman (2001).

areas. While many states that adopted their laws between 1985 and 1992 have few restrictions, the states since 1994 typically have extensive lists of excluded areas. Pennsylvania, which passed its law in 1989, excludes only courthouses and some government buildings, while Texas, which passed its law six years later, lists forty-eight places where carrying a concealed weapon is forbidden. Fourth, states that passed their laws later generally have more punitive penalties for carrying in unauthorized places. By raising the cost that law-abiding citizens bear in carrying a concealed weapon for self-protection, these four trends decrease the number of law-abiding citizens who can carry and the opportunities each license holder has to use a weapon for self-defense. Consequently, there are strong theoretical reasons for expecting the later laws to have different effects than earlier laws. Future empirical research should control for these changes and test the degree to which such provisions affect the carrying and crime rates. To the extent that these more restrictive laws reduce the carrying rate and the opportunities for self-defense, laws implemented later may be less efficacious.

A second concern about the new empirical work is that although it is important to know whether the coefficient estimates in the postlaw years are positive or negative, it is also important to understand how they compare to the prelaw estimates. For example, if the prelaw coefficient estimate is 8.5, and the postlaw estimate 5.5, the law may have lowered the crime rate in shall-issue states relative to the other states. To show these intertemporal effects more clearly, figure 8-5 plots the coefficient estimates from Donohue's table 8-5 county-level regression covering the 1977 to 1997 period. This figure clearly shows that all four violent crime rates plunge precipitously after the law is adopted. During the prelaw period, the murder rates are the same in shall-issue and non-shall-issue counties. After the law goes into effect, the murder rate for shall-issue counties drops dramatically. Crime rates for the other three offenses (rape, robbery, and assault) increase in the right-to-carry states before the law and plummet after the law. These drops are not simply reversions to the mean as some have suggested, because the postlaw rates for all three offenses are markedly lower than any of the prelaw rates.

Lott addressed this prelaw increase in crime in various ways in his many papers. Some methods include dropping the years immediately before and after the passage of the law, estimating regressions with instrumental variables and two-stage least squares, including nonlinear time trends, and showing that the postlaw crime rates drop far below the prelaw trend. Stephen Bronars and Lott used another strategy when they showed that when a given state passed a right-to-carry law, the crime rates in surrounding states increase.[60] There is no theoretical reason why the adoption of a law in one state should be a function of neighboring

60. Bronars and Lott (1998).

Figure 8-5. *"Entire Period" Coefficient Estimates*



Source: John Donohue, chapter 8, in this volume.

crime rates. Last, if gun laws are adopted in response to random periods of high crime, other gun laws should exhibit similar drops in postlaw crime. However, shall-issue laws are unique among gun laws in that they are the only ones that show these large decreases in postlaw crime.

My last concern about Donohue's allegation that allowing law-abiding citizens to protect themselves increases crime rates is his lack of articulating and documenting a clear mechanism through which such an increase would occur. The most frequently articulated claim is that permit holders will use their guns to commit crimes instead of using their guns for self-defense. However, many years of evidence across different states and time periods overwhelmingly rejects such claims. In Multnomah County, Oregon, only 1 of 11,140 permit holders was arrested for a crime during a four-year period—an annual rate of only 0.2 incidents for every 10,000 holders.[61] The annual rate in Florida over a seven-year period was even lower at 0.1. In Virginia as of the beginning of 1997, not a

61. Lott and Mustard (1997).

single concealed-carry permit holder had committed a violent crime. In North Carolina through 1997, permit-holding gun owners had not had a single permit revoked as a result of use of a gun in a crime. In South Carolina through 1997, only one permit holder had been indicted for a felony, a charge that was later dropped. Mustard showed that even those who vehemently opposed shall-issue laws have been forced to acknowledge that license holders are extremely law abiding and pose little threat.[62] Glenn White, president of the Dallas Police Association, twice lobbied against the proposed right-to-carry law, but after it finally passed he acknowledged, "I'm a convert." The president and the executive director of the Florida Chiefs of Police and the head of the Florida Sheriff's Association admitted that despite their best efforts to document problems arising from the law, they were unable to do so. Speaking on behalf of the Kentucky Chiefs of Police Association, Lt. Col. Bill Dorsey stated, "We haven't seen any cases where a [concealed-carry] permit holder has committed an offense with a firearm."[63] Many who believed that concealed-carry permit holders would threaten society actively tried to document that danger. However, they were compelled to change their minds as they observed law-abiding citizens who have no mental health histories, pay fees, and give authorities personal information do not use their weapons for inappropriate purposes. Much of the debate about concealed carry has involved detailed comments about empirical specifications and statistical estimation procedures, which has often left the average person confused. However, sometimes the most straightforward evidence, namely, the lack of criminality among law- abiding citizens who carry concealed weapons, is the most convincing and easy to understand.

## COMMENT BY
# Willard Manning

John J. Donohue's chapter examines the sensitivity of the results in earlier work by John Lott and his colleagues on the impact of laws granting a right to carry

---

62. Mustard (2001).

63. Scott Parks, "Charges against Texans with Gun Permits Rise. Law's Supporters, Foes Disagree on Figures' Meaning," *Dallas Morning News*, December 23, 1997, p. A1; Steve Patterson, "Concealed-Weapons Law Opponents Still Searching for Ammunition," *Florida Times-Union*, May 9, 1998, pp. A1, A3; Terry Flynn, "Gun-Toting Kentuckians Hold Their Fire," *Cincinnati Enquirer*, June 16, 1997, p. A1. Kentucky state police trooper Jan Wuchner is also quoted as saying that he has "heard nothing around the state related to crime with a gun committed by permit holders. There has been nothing like that I've been informed of."

# Defendants' Exhibit A



| Avalon Home | Document Collections | Ancient 4000bce - 399 | Medieval 400 - 1399 | 15th Century 1400 - 1499 | 16th Century 1500 - 1599 | 17th Century 1600 - 1699 | 18th Century 1700 - 1799 | 19th Century 1800 - 1899 | 20th Century 1900 - 1999 | 21st Century 2000 - |

Yale Law School
LILLIAN GOLDMAN LAW LIBRARY
in memory of Sol Goldman

THE AVALON PROJECT  *Documents in Law, History and Diplomacy*

Search Avalon

# The Letters of Thomas Jefferson

_To Peter Carr_
_Paris, August 19, 1785_

DEAR PETER, -- I received, by Mr. Mazzei, your letter of April the 20th. I am much mortified to hear that you have lost so much time; and that when you arrived in Williamsburg, you were not at all advanced from what you were when you left Monticello. Time now begins to be precious to you. Every day you lose, will retard a day your entrance on that public stage whereon you may begin to be useful to yourself. However, the way to repair the loss is to improve the future time. I trust, that with your dispositions, even the acquisition of science is a pleasing employment. I can assure you, that the possession of it is, what (next to an honest heart) will above all things render you dear to your friends, and give you fame and promotion in your own country. When your mind shall be well improved with science, nothing will be necessary to place you in the highest points of view, but to pursue the interests of your country, the interests of your friends, and your own interests also, with the purest integrity, the most chaste honor. The defect of these virtues can never be made up by all the other acquirements of body and mind. Make these then your first object. Give up money, give up fame, give up science, give the earth itself and all it contains, rather than do an immoral act. And never suppose, that in any possible situation, or under any circumstances, it is best for you to do a dishonorable thing, however slightly so it may appear to you. Whenever you are to do a thing, though it can never be known but to yourself, ask yourself how you would act were all the world looking at you, and act accordingly. Encourage all your virtuous dispositions, and exercise them whenever an opportunity arises; being assured that they will gain strength by exercise, as a limb of the body does, and that exercise will make them habitual. From the practice of the purest virtue, you may be assured you will derive the most sublime comforts in every moment of life, and in the moment of death. If ever you find yourself environed with difficulties and perplexing circumstances, out of which you are at a loss how to extricate yourself, do what is right, and be assured that that will extricate you the best out of the worst situations. Though you cannot see, when you take one step, what will be the next, yet follow truth, justice, and plain dealing, and never fear their leading you out of the labyrinth, in the easiest manner possible. The knot which you thought a Gordian one, will untie itself before you. Nothing is so mistaken as the supposition, that a person is to extricate himself from a difficulty, by intrigue, by chicanery, by dissimulation, by trimming, by an untruth, by an injustice. This increases the difficulties ten fold; and those who pursue these methods, get themselves so involved at length, that they can turn no way but their infamy becomes more exposed. It is of great importance to set a resolution, not to be shaken, never to tell an untruth. There is no vice so mean, so pitiful, so contemptible; and he who permits himself to tell a lie once, finds it much easier to do it a second and third time, till at length it becomes habitual; he tells lies without attending to it, and truths without the world's believing him. This falsehood of the tongue leads to that of the heart, and in time depraves all its good dispositions.

An honest heart being the first blessing, a knowing head is the second. It is time for you now to begin to be choice in your reading; to begin to pursue a regular course in it; and not to suffer yourself to be turned to the right or left by reading any thing out of that course. I have long ago digested a plan for you, suited to the circumstances in which you will be placed. This I will detail to you, from time to time, as you advance. For the present, I advise you to begin a course of antient history, reading every thing in the original and not in translations. First read Goldsmith's history of Greece. This will give you a digested view of that field. Then take up antient history in the detail, reading the following books, in the following order: Herodotus, Thucydides, Xenophontis Hellenica, Xenophontis Anabasis, Arrian, Quintus Curtius, Diodorus Siculus, Justin. This shall form the first stage of your historical reading, and is all I need mention to you now. The next, will be of Roman history (*). From that, we will come down to modern history. In Greek and Latin poetry, you have read or will read at school, Virgil, Terence, Horace, Anacreon, Theocritus, Homer, Euripides, Sophocles. Read also Milton's Paradise Lost, Shakspeare, Ossian, Pope's and Swift's works, in order to form your style in your own language. In morality, read Epictetus, Xenophontis Memorabilia, Plato's Socratic dialogues, Cicero's philosophies, Antoninus, and Seneca. In order to assure a certain progress in this reading, consider what hours you have free from the school and the exercises of the school. Give about two of them, every day, to exercise; for health must not be sacrificed to learning. A strong body makes the mind strong. As to the species of exercise, I advise the gun. While this gives a moderate exercise to the body, it gives boldness, enterprise, and independence to the mind. Games played with the ball, and others of that nature, are too violent for the body, and stamp no character on the mind. Let your gun therefore be the constant companion of your walks. Never think of taking a book with you. The object of walking is to relax the mind. You should therefore not permit yourself even to think while you walk; but divert your attention by the objects surrounding you. Wa king is the best possible exercise. Habituate yourself to walk very far. The Europeans value themselves on having subdued the horse to the uses of man; but I doubt whether we have not lost more than we have gained, by the use of this animal. No one has occasioned so much, the degeneracy of the human body. An Indian goes on foot nearly as far in a day, for a long journey, as an enfeebled white does on his horse; and he will tire the best horses. There is no habit you will value so much as that of wa king far without fatigue. I would advise you to take your exercise in the afternoon: not because it is the best time for exercise, for certainly it is not; but because it is the best time to spare from your studies; and habit will soon reconcile it to health, and render it nearly as useful as if you gave to that the more precious hours of the day. A little walk of half an hour, in the morning, when you first rise, is advisable also. It shakes off sleep, and produces other good effects in the animal economy. Rise at a fixed and an early hour, and go to bed at a fixed and early hour also. Sitting up late at night is injurious to the health, and not useful to the mind. Having ascribed proper hours to exercise, divide what remain, (I mean of your vacant hours) into three portions. Give the principal to History, the other two, which should be shorter, to Philosophy and Poetry. Write to me once every month or two, and let me know the progress you make. Tell me in what manner you employ every hour in the day. The plan I have proposed for you is adapted to your present situation only. When that is changed, I shall propose a corresponding change of plan. I have ordered the following books to be sent to you from London, to the care of Mr. Madison. Herodotus, Thucydides, Xenophon's Hellenics, Anabasis and Memorabilia, Cicero's works, Baretti's Spanish and English Dictionary, Martin's Philosophical Grammar, and Martin's Philosophia Britannica. I will send you the following from hence. Bezout's Mathematics, De la Lande's Astronomy, Muschenbrock's Physics, Quintus Curtius, Justin, a Spanish Grammar, and some Spanish books. You will observe that Martin, Bezout, De la Lande, and Muschenbrock are not in the preceding plan. They are not to be opened till you go to the University. You are now, I expect, learning French. You must push this; because the books which will be put into your hands when you advance into Mathematics, Natural philosophy, Natural history, &c. will be mostly French, these sciences being better treated by the French than the English writers. Our future connection with Spain renders that the most necessary of the modern languages, after the French. When you become a public man, you may have occasion for it, and the circumstance of your possessing that language, may give you a preference over other candidates. I have nothing further to add for the present, but husband well your time, cherish your instructors, strive to make every body your friend; and be assured that nothing will be so pleasing, as your success, to, Dear Peter,

## JA 434

Your's affectionately,

(*) Livy, Sullust, Caesar, Cicero's epistles, Suetonius, Tacitus, Gibbon.

**Alphabetic List of Recipients**

| Avalon Home | Document Collections | Ancient 4000bce - 399 | Medieval 400 - 1399 | 15th Century 1400 - 1499 | 16th Century 1500 - 1599 | 17th Century 1600 - 1699 | 18th Century 1700 - 1799 | 19th Century 1800 - 1899 | 20th Century 1900 - 1999 | 21st Century 2000 - |
|---|---|---|---|---|---|---|---|---|---|---|

© 2008 Lillian Goldman Law Library
127 Wall Street, New Haven, CT 06511.

Avalon Statement of Purpose    Contact Us    Yale Law Library    University Library    Yale Law School    Search Morris    Search Orbis

an intent to murder him, as by discharging a pistol, or pushing at him with a drawn sword, &c., may not justify killing such an assailant, as much as if he had attempted to rob him. For is not he who attempts to murder me more injurious than he who barely attempts to rob me? And can it be more justifiable to fight for my goods than for my life? And it is not only highly agreeable to reason that a man in such circumstances may lawfully kill another, but it seems also to be confirmed by the general tenor of our law books, which, speaking of homicide se defendo, suppose it done in some quarrel or affray." "And so, perhaps, the killing of dangerous rioters may be justified by any private persons, who cannot otherwise suppress them or defend themselves from them, inasmuch as every private person seems to be authorized by the law to arm himself for the purposes aforesaid."—Hawkins, p. 71, § 14. Here every private person is authorized to arm himself; and on the strength of this authority, I do not deny the inhabitants had a right to arm themselves at that time, for their defence, not for offence. That distinction is material, and must be attended to.

Hawkins, p. 75, § 14: "And not only he who on an assault retreats to the wall, or some such strait, beyond which he can go no further before he kills the other, is judged by the law to act upon unavoidable necessity; but also he who being assaulted in such a manner and in such a place, that he cannot go back without manifestly endangering his life, kills the other without retreating at all." § 16: "And an officer who kills one that insults him in the execution of his office, and where a private person, that kills one who feloniously assaults him in the highway, may justify the fact without ever giving back at all."

There is no occasion for the magistrate to read the riot act. In the case before you, I suppose you will be satisfied when you come to examine the witnesses and compare it with the rules of the common law, abstracted from all mutiny-acts and articles of war, that these soldiers were in such a situation that they could not help themselves. People were coming from Royal Exchange Lane, and other parts of the town, with clubs and cord-wood sticks; the soldiers were planted by the wall of the Custom House; they could not retreat; they were surrounded on all sides, for there were people behind them as well as before them; there were a number of people in Royal Exchange Lane; the soldiers were so near to the Custom House that they could not retreat, unless they had gone into the brick wall of it. I shall show you presently that all the party concerned in this unlawful design were guilty of what any one of them did; if any body threw a snowball, it was the act of the whole party; if any struck with a club or threw a club, and the club had killed any body, the whole party would have been guilty of murder in law.

Ld. C. J. Holt, in Mawgrige's case, Keyling

128, says: "Now it has been held, that if A of his malice prepensed assaults B to kill him, and B draws his sword and attacks A, and pursues him, then A, for his safety, gives back and retreats to a wall, and B still pursuing him with his drawn sword, A in his defence kills B; this is murder in A. For A having malice against B, and in pursuance thereof endeavoring to kill him, is answerable for all the consequences, of which he was the original cause. It is not reasonable for any man that is dangerously assaulted, and when he perceives his life in danger from his adversary, but to have liberty for the security of his own life, to pursue him that maliciously assaulted him; for he that has manifested that he has malice against another, is not fit to be trusted with a dangerous weapon in his hand. And so resolved by all the judges when they met at Seargeant's Inn, in preparation for my Lord Morley's trial."

In the case here we will take Montgomery, if you please, when he was attacked by the stout man with a stick, who aimed it at his head, with a number of people round him, crying out, Kill them! kill them! Had he not a right to kill the man? If all the party were guilty of the assault made by the stout man, and all of them had discovered malice in their hearts, had not Montgomery a right, according to Lord Chief Justice Holt, to put it out of their power to wreak their malice upon him? I will not at present look for any more authorities in the point of self-defence; you will be able to judge from these how far the law goes in justifying or excusing any person in defence of himself, or taking away the life of another who threatens him in life or limb. The next point is this: that in case of an unlawful assembly, all and every one of the assembly is guilty of all and every unlawful act committed by any one of that assembly in prosecution of the unlawful design they set out upon.

Rules of law should be universally known, whatever effect they may have on politics; they are rules of common law, the law of the land; and it is certainly true, that wherever there is an unlawful assembly, let it consist of many persons or a few, every man in it is guilty of every unlawful act committed by any one of the whole party, be they more or be they less, in pursuance of their unlawful design. This is the policy of the law: to discourage and prevent riots, insurrections, turbulence, and tumults.

In the continual vicissitudes of human things, amidst the shocks of fortune and the whirls of passion that take place at certain critical seasons, even in the mildest government, the people are liable to run into riots and tumults. There are Church-quakes and State-quakes in the moral and political world, as well as earthquakes, storms, and tempests in the physical. Thus much, however, must be said in favor of the people and of human nature, that it is a general, if not universal truth, that the aptitude of the people to mutinies, seditions, tumults, and insur-

Digitized by Google



# ANECDOTES AND REMINISCENCES.

SOON after the close of the Revolutionary War, General Washington went to Alexandria on horseback, accompanied by his negro servant.  The road then used lay through the farm of a desperado who had committed murder, a stranger to the General, the main road having become impassable.  As was then the custom, the General had holsters, with pistols in them, to his saddle.  On returning to Mount Vernon, as General Washington was about to enter on this private road, a stranger on horseback barred the way, and said to him, "You shall not pass this way."  "You don't know me," said the General.  "Yes, I do," said the ruffian; "you are General Washington, who commanded the army in the Revolution, and if you attempt to pass me I shall shoot you."   General Washington called his servant, Billy, to him, and taking out a pistol, examined the priming, and then handed it to Billy, saying, "If this person shoots me, do you shoot him;" and coolly passed on without molestation.

> A desperado.

AT Mount Vernon, a guest who slept in an adjacent chamber is reported to have heard a curtain lecture from Mrs. Washington

> Curtain lecture.

Digitized by Google

to her lord.   The General received it in silence, and at last said, "Good-night, Mrs. Washington," and was heard to turn over in bed.

Mr. Buchanan, when I related the above, remarked that it bore with it internal evidence of its truth.

----

<p style="text-align:left"><small>Jumping-match.</small></p>

WHEN a youth, Washington was travelling along the Upper Potomac, and stopping at an inn, inquired the news.   The landlord told him there was a great jumping-match for a wife, rich Mr. ——'s daughter, in the vicinity.   "Is it open to all comers?" asked Washington.   On being told it was, he repaired to the jumping-ground.   A young man having jumped far beyond all others, the young lady's face brightened.   At last, Washington asked if he might try his chance.   Permission being given, he was the victor.   The young lady's countenance fell.   Washington went up to her and remarked, "You would have preferred I had not been the one who excelled the other." The lady candidly admitted it.   "Then," said Washington, "I surrender my chance to *him*," and retired as unknown as he came.   Towards the close of the Revolution, Washington was entertained by a colonel of militia, whose wife inquired of him, "Did you ever see General Washington before?"   "Never," was the reply.   "But I have," said his wife.   Her husband would not believe it, but at her request reluctantly referred the point in dispute to the General himself.   "Yes," said the General; "I saw your wife at the jumping-match, before she was married, and I believe I won her."

----

DURING the canvass for the Presidential election in which Jefferson beat Adams, Burr, who was an early riser, met a boy

Digitized by Google

# Defendants' Exhibit B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MATTHEW GRACE, *et al.,*<br><br>Plaintiffs,<br><br>v.<br><br>DISTRICT OF COLUMBIA, *et al.,*<br><br>Defendants. | Civ. Action No. 15-2234 (RJL) |

## DECLARATION OF TWANA V. SMALLS

Pursuant to 28 U.S.C. § 1746, I, TWANA V. SMALLS, do declare and state as follows:

1. I am over the age of eighteen (18) years, competent to testify to the matters contained herein, and testify based on my personal knowledge and information, including information provided to me by other District employees in the course of my official duties.

2. I am a Paralegal Specialist, in the District of Columbia Office of Attorney General (OAG), Public Interest Division, a position I have held since November of 2009. My initial position here with the Office of the Attorney General's Office was the Child Support Legal division as a paralegal. My position changed to the Equity Public Interest Division that I have held since November of 2011. My duties include management of caseloads, performing case investigation, analyses and legal research for special projects, drafting legal documents, correspondence and memoranda and conducting off-site research of file materials and documents. My

education background includes a Bachelor's of Science degree in Criminal Justice with a minor in Psychology from the University of Maryland Eastern Shore and a Masters' Degree in Psychology Counseling from Walden University.

3.   At the direction of counsel, I went with other OAG staff to the Metropolitan Police Department (MPD) and conducted a search of applications for concealed-carry firearms licenses. As of the end of January, MPD had received 324 applications, of which 61 were approved and 214 denied.

4.   There are two general "categories" of concealed-carry firearms licenses, those persons who want to carry a firearm due to a "good reason to fear injury to his or her person by showing a special need for self-protection distinguishable from the general community[,]" 24 DCMR § 2333.1, and those persons who have "any other proper reason" to carry a firearm, including "[e]mployment of a type that requires the handling of large amounts of cash or other highly valuable objects that must be transported upon the applicant's person[.]" *Id.*, § 2334.1(a).

5.   OAG staff and I copied the application files for all of the "approved" applicants and most of the "denied" applicants, many hundreds of pages. I then reviewed the files to determine the types of information sufficient to qualify an applicant for a "good reason" license or a "proper reason" license. I provide here some specific examples of the types of information necessary to qualify for a concealed-carry license. For privacy and security reasons, I describe these cases in general terms, without reference to an applicant's name or business.

**Approved Business Owners**

6.  A license was granted to an applicant who is the owner of a jewelry store and often transports large amounts of cash and valuables.  He wished to carry a firearm in order to protect himself from the potential risk of robbery.

7.  A license was also granted to the owner of another business, who must transport large sums of cash to the bank on a daily basis.  He also wished to carry a firearm in order to protect himself from the potential risk of robbery.

8.  Another license was given to an applicant who is the owner/operator of a welding business.  His job requires him to transport large sums of cash as well as high value equipment through public and exposed places.  He wishes to carry a firearm in order to protect himself from the potential risk of robbery.

9.  Another applicant who was successful in obtaining a license is the owner of a security company.  The applicant is required to transport firearms as well as large sums of cash and checks to be deposited.  He wishes to carry a firearm in order to protect himself from the potential risk of robbery.

10. A license was obtained by the co-owner of a funeral home because he is required to transfer large sums of cash and checks to the bank.  He wishes to carry a firearm in order to protect himself from the potential risk of robbery.

**"Good Reason" Licensees**

11. A successful applicant has worked in a correctional facility and was threatened by gang members, one of which said he would, "have someone follow him to his house and murder him."  He wished to carry a firearm in order to protect himself from the potential risk of injury or attack.  The applicant did not provide

**JA 442**

reports of this incident; however several incident reports from the institution are included in the case jacket.

12. Another individual was granted a license because he demonstrated that he was attacked by a man who believed the applicant was becoming "too familiar" with his mother.   The attacker was arrested for simple assault and subsequently incarcerated.   He has recently been released and the applicant fears he will be attacked again.   He wishes to carry a firearm in order to protect himself from the potential risk of injury or attack.   A police report for simple assault and threats to do bodily harm reflecting this incident is attached in the case jacket.

13. An applicant was granted a license because he received an email which threatened his family and his own life. The applicant works at a political think tank, and he writes commentaries.   One of his commentaries offended a man who sent him a threatening email. The applicant wishes to carry a firearm in order to protect himself from the potential risk of injury or attack.   The applicant filed a police report with the Metropolitan Police Department.

14. Another individual who is a supervisor for a District government agency was granted a license because he received a threat from a subordinate after the applicant gave him an order. The subordinate said, "I am going to get my gun and shoot you." He said this several times and was arrested for misdemeanor threats. The applicant wishes to carry a firearm in order to protect himself from the potential risk of injury or attack. A copy of the police forms are attached in the case

jacket. The subordinate was placed on "enforced leave" by the agency pending the outcome of the criminal and internal investigation.

15. Another applicant was given a license after an individual trespassed on his property multiple times. The applicant confronted the man who was trespassing and after an argument the man said, "Fuck you, I'll kill you." The applicant had recently seen the individual on his property again. He wishes to carry a firearm in order to protect himself from the potential risk of injury or attack. After their verbal confrontation the trespasser was placed under arrest for making "felony threats." After this incident the applicant requested and was granted a civil protection order.

16. An applicant was granted a license after a man entered the store which he owned and began to harass customers and steal small items. After the applicant told the man to leave, the man walked up the stairs of the store to the applicant's living space. He proceeded to tell the applicant's wife, "You better pray you keep living." He wishes to carry a firearm in order to protect himself from the potential risk of injury or attack. A police report was filed by the Metropolitan Police for "Threats to do bodily harm."

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on _February 22, 16_      _Twana V. Smalls_
                                    TWANA V. SMALLS

# Defendants' Exhibit C



# Concealed Carry Pistol License Application

## Metropolitan Police Department

Firearms Registration Section · 300 Indiana Avenue, NW · Washington, DC 20001 · 202-727-4275

## Applicant Information

| Grace | Matthew | James | |
|---|---|---|---|
| Last Name | First Name | Middle Name | |

| 1449 Lawrence St NE | Washington | DC | 20017 |
|---|---|---|---|
| Home Street Address | City | State | ZIP Code |

Financial Advisor and Self Employed

Occupation /Name of Business

| | | | | |
|---|---|---|---|---|
| If Applying as a Business Owner: Business/Occupation Street Address | | City | State | ZIP Code |

| ███████████ | ████████████ | ████████████ |
|---|---|---|
| Home Phone Number | Work Phone Number | Email Address (Optional) |

| ███████████ | Rockville, MD | |
|---|---|---|
| Date of Birth (mm/dd/yyyy) | Place of Birth | |

███████████

Driver's License State & ID Number or Other Government-Issued Photo Identification Description & ID Number

| M | White | 5'11" | 210 | Green | Brown |
|---|---|---|---|---|---|
| Sex | Race | Height | Weight | Eye Color | Hair Color |

## Statement of Eligibility

**Please answer each of the following questions by marking the appropriate box.**

1. ☐Yes ☑No    Have you ever been convicted of a crime of violence, weapons offense, any other violation of the Firearms Control Regulation Act of 1975, or a felony in any jurisdiction (including any crime punishable by imprisonment for a term exceeding one year)?

2. ☐Yes ☑No    Are you under indictment for a crime of violence or a weapons offense?

3. ☐Yes ☑No    Have you been convicted within the past five years for a narcotics or dangerous drug offense, a threat to do bodily harm, or for assault?

4. ☐Yes ☑No    Have you been acquitted of any criminal charge by reason of insanity or adjudicated a chronic alcoholic by any court within the past five years?

5. ☐Yes ☑No    Have you been voluntarily or involuntarily committed to any mental hospital or institution within the past five years?

6. ☐Yes ☑No    Do you suffer from any physical defect that would make it unsafe for you to possess and use a firearm safely and responsibly?

Rec. 7/21/15

Ver. 10.14.1

JA 446

Page 1 of 3

7. ☐Yes ☑No    Have you been found negligent in any firearm related mishap causing death or injury to another person?

8. ☐Yes ☑No    Have you provided accurate and true facts on this application?

9. ☐Yes ☑No    Have you ever been dishonorably discharged from the U.S. Armed Forces?

10. ☐Yes ☑No   Were you a citizen of the United States who has renounced his or her citizenship?

11. ☐Yes ☑No   Are you legally blind? (Legally blind means your vision is not impaired more than 20/200 visual acuity in the better eye, or your vision cannot be improved to be better than 20/200, or you do not have a loss of vision due wholly or in part to impairment of field vision or to other factors which affect the usefulness of vision to a like degree. If the Firearms Registration Section determines there are reasonable grounds to believe that the certification provided is not accurate, you may be required to obtain a certification from a licensed optometrist that you meet the vision requirements as stated above.)

12. ☐Yes ☑No   Have you been convicted of two or more violations for driving under the influence within the past five years?

13. ☐Yes ☑No   Have you been the subject of a civil protection order within the past five years?

14. ☐Yes ☑No   Have you been convicted of a misdemeanor intrafamily offense?

15. ☐Yes ☑No   Are you an alcoholic, addict, or habitual user of a controlled dangerous substance?

***If you answer yes to any of the next five questions, you must attach the additional documentation as described on the Instructions form.***

16. ☒Yes ☑No   Are you seeking to register a pistol concurrently with this application?

17. ☐Yes ☑No   Do you currently suffer – or have you suffered in the past five years – from any mental illness or condition that creates a substantial risk that you are a danger to yourself or others?

18. ☑Yes ☐No   Do you have a bona fide residence in the District of Columbia?

19. ☐Yes ☑No   Do you have a bona fide place of business in the District of Columbia?

20. ☐Yes ☑No   Do you have a bona fide residence or place of business in the United States and are licensed to carry a concealed pistol by another State?

## Firearms Training Background

1. Have you completed at least 16 hours of training from an MPD-certified firearms training instructor?                    ☑Yes    ☐No

2. Have you completed at least two hours of range training from an MPD-certified firearms training instructor?            ☑Yes    ☐No

3. Have you completed training in District of Columbia laws on firearms and self-defense? (There is no exemption from this requirement.)                    ☑Yes    ☐No

**If you answered "Yes" to <u>all</u> three questions above, you can skip the next three questions.**

4. Are you requesting an exemption from the firearms training course requirements in either Question 1 or 2 above?                    ☐Yes    ☑No

5. Which requirement(s) are you requesting an exemption:
   ☐ 16 hours of firearms training        ☐ 2 hours of range training

6. If you answered "No" to Question 4, do you intend to complete the firearms training requirements within 45 days if your application is preliminarily approved by MPD?                    ☐Yes    ☐No

## Basis for Request for a Concealed Carry Pistol

Under District law, an applicant must demonstrate that either they have good reason to fear injury to himself or herself or property or they have another proper reason for carrying a concealed pistol.

*Please check the box below that is the basis of your application and attach the additional documentation as described on the Instructions form.*

☐ **Good reason to fear injury to person or property**: You fear injury to yourself and can show a special need for self-protection, such as evidence of specific threats or previous attacks which demonstrate a special danger to your life.

☐ **Other proper reason to carry a concealed pistol**: Your employment requires that you handle large amounts of cash or valuables that you must transport on your person. Or you are the adult member of a family that needs to provide protection for a family member who is physically or mentally incapacitated to a point where he or she cannot act in defense of himself or herself or his or her property.

## Authorization to Disclose Mental Health Records

If you checked "Yes" on Question 17 on page 2 of this application, you must authorize the D.C. Department of Behavioral Health, or any other similar agency or department of another state, to disclose to the Metropolitan Police Department information on whether you: (1) Suffer from a mental disorder and have a history of violence; or (2) Have been voluntarily or involuntarily committed to a mental health facility or an institution that provides treatment or services for individuals with mental disorders.

By signing here, you hereby make the authorization stated in the preceding paragraph.

_____          _____
Applicant's signature                                                Date

## Applicant Affirmation

In signing this Concealed Carry Pistol License Application, I am affirming under oath each of the following declarations:

- I have provided true and accurate information in this document and any supporting documents attached to this application.
- I understand that any knowing material omission or false statement made by or provided by me as part of this application may be considered grounds for denial of a concealed carry license or revocation for a license falsely obtained.
- I understand that making a false statement is punishable by criminal penalties under D.C. Official Code § 22-2405.
- I am not prohibited under federal or District of Columbia law (or the law of the state of my residence) from possessing a firearm.
- I shall be responsible for compliance with all federal and District of Columbia laws, rules, regulations, and procedures that are applicable to a Concealed Carry Pistol License.

_____          7/9/15
Applicant's signature                                                Date

Ver. 10.14.1                                                                          Page 3 of 3

**JA 448**



# Concealed Carry Pistol License Application
**Basis for Request for a Concealed Carry Pistol**

**Metropolitan Police Department · Firearms Registration Section · 300 Indiana Avenue, NW**
**Washington, DC 20001 · 202-727-4275**

## Applicant Information

| Grace | Matthew | James | |
|---|---|---|---|
| *Last Name* | *First Name* | *Middle Name* | |
| 1449 Lawrence St NE | Washington | DC | 20017 |
| *Home Street Address* | *City* | *State* | *ZIP Code* |

District of Columbia law requires you to demonstrate either that: (1) you have good reason to fear injury to yourself or your property; or (2) you have another proper reason for carrying a concealed pistol.

## Demonstration of Good Reason to Fear Injury to Person or Property

To demonstrate a good reason to fear injury to yourself, you must:

- Show a special need for self-protection distinguishable from the general community, as supported by evidence of specific threats or previous attacks which demonstrate a special danger to your life.
- Allege serious threats of death or serious bodily harm, any attacks on yourself, or any theft of property from your person.
- Allege that the threats are of a nature that the legal possession of a pistol is necessary as a reasonable precaution against the apprehended danger.
- Provide all evidence of contemporaneous reports to the police of such threats or attacks, and disclose whether or not you made a sworn complaint to the police or the courts of the District of Columbia concerning any threat or attack.

***Pursuant to District of Columbia law, the fact that you live or work in a high crime area shall not by itself establish a good reason to fear injury to yourself or your property for the issuance of a concealed carry license.***

You can also include any supporting statements from third parties, **but the statements must be made under oath and before a notary.**

## Demonstration of Other Proper Reason for a Concealed Carry License

This may include: (1) employment of a type that requires the handling of large amounts of cash or other highly valuable objects that must be transported on your person; or (2) the need for you to provide protection of a family member who is physically or mentally incapacitated to a point where that family member cannot act in defense of himself or herself, or his or her property. You can include any documents (such as police reports or court documents) and/or personal statements to demonstrate that you have a proper reason to be issued a Concealed Carry License.

**You may provide a separate document with your personal statement or you may use the reverse side of this document. If you use the reverse side of this document to have a third party provide their statement, their statement must be made under oath, before a notary, and signed by the notary, including the notary's seal.**

Page 1 of 2
Ver. 10.14.1

## Statement

Name of person applying for a Concealed Carry Pistol License: <u>Matthew James Grace</u>

Name of Person providing this statement: <u>Matthew James Grace</u>

The US Constitution affords me the right and privilege to conceal carry my firearm in DC by way of the the 2nd Amendment.

Signature of person providing this statement: _____

Date: _____7/9/15_____



# Concealed Carry Pistol License Application
## Notice of Denial

Metropolitan Police Department · Firearms Registration · 300 Indiana Ave, NW · Washington, DC 20001 · (202) 727-4275

## Applicant Information

| Grace | Matthew | J. | |
|---|---|---|---|
| *Last Name* | *First Name* | *Middle Initial* | |
| 1449 Lawrence Street, NE | Washington | DC | 20017 |
| *Home Street Address* | *City* | *State* | *ZIP Code* |

October 19, 2015

Dear applicant:

The Firearms Regulations Control Act of 1975, (D.C. Official Code § 7-2501 et seq.), and Chapter 23 (Guns and Other Weapons) of Title 24 (Public Space and Safety) of the District of Columbia Municipal Regulations (DCMR), establish the qualifications and procedures for the issuance of a license to carry a concealed pistol. Based on these criteria, your application has been **denied**. The applicant did not:

    Meet the basic eligibility requirements for registering a firearm or obtaining a license to carry a concealed pistol.

    Meet the standards of suitability required to obtain a concealed carry license.

XX    Demonstrate a good reason to fear injury to person or property, or other proper reason for a concealed carry license.

Specifically, the applicant did not meet the minimum requirement of showing: "a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks that demonstrate a special danger to the applicant's life," (D.C. Official Code § 7-2509.11(1)(A)) and did not demonstrate "Employment of a type that requires the handling of large amounts of cash or other highly valuable objects that must be transported upon the applicant's person." (D.C. Official Code § 7-2509.11(1)(B)) , therefore the applicant did not receive further consideration.

You may appeal this decision by submitting a written request to the Concealed Pistol Licensing Review Board to review the decision within fifteen (15) days after receipt of this notice. The request should be mailed to: *Office of the City Administrator, Concealed Pistol Licensing Review Board // 1350 Pennsylvania Avenue, NW, Suite 513 // Washington, DC 20004*. Details of this process are included in the enclosed materials.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
MATTHEW GRACE, ET AL.,            )
                                  )
          Plaintiffs,             )   CV No. 15-2234(RJL)
                                  )
                                  )   Washington, D.C.
          vs.                     )   February 2, 2016
                                  )   1:30 p.m.
DISTRICT OF COLUMBIA, ET AL.,     )
                                  )
          Defendants.             )
_____  )
```

TRANSCRIPT OF PRELIMINARY INJUNCTION
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs
Matthew Grace,
Pink Pistols:               Charles J. Cooper
                            David H. Thompson
                            Peter Patterson
                            COOPER & KIRK, PLLC
                            1523 New Hampshire Avenue, NW
                            Washington, D.C. 20036
                            (202) 220-9660
                            ccooper@cooperkirk.com

                            Erin E. Murphy
                            BANCROFT PLLC
                            500 New Jersey Avenue, NW
                            Seventh Floor
                            Washington, D.C. 20001
                            (202) 234-0090
                            emurphy@bancroftpllc.com

APPEARANCES CONTINUED:

For the Defendant(s):      Andrew J. Saindon
                          Chad Naso
                          Holly Johnson
                          Loren AliKhan
                          D.C. OFFICE
                          OF ATTORNEY GENERAL
                          441 4th Street, NW
                          Sixth Floor South
                          Washington, D.C. 20001-2714
                          (202) 724-6643

Court Reporter:         William P. Zaremba, RMR, CRR
                          Registered Merit Reporter
                          Certified Realtime Reporter
                          Official Court Reporter
                          U.S. District Court
                          for the District of Columbia
                          333 Constitution Avenue, NW
                          Room 6511
                          Washington, D.C. 20001
                          (202) 354-3249
                          WilliamPZaremba@gmail.com

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription

P R O C E E D I N G S

DEPUTY CLERK:  All rise.  This Honorable Court is now in session.  The Honorable Judge Richard J. Leon presiding.  God save the United States and this Honorable Court.  Please be seated and come to order.

Your Honor, we have Civil Action 15-2234, Matthew Grace, et al., versus the District of Columbia, et al.

Would counsel please approach the lectern and identify yourselves for the record, starting with the plaintiff's table.  Thank you.

MR COOPER:  Good afternoon, Judge Leon.

THE COURT:  Good afternoon.

MR COOPER:  Charles Cooper with the firm of Cooper & Kirk.  I represent the plaintiffs, Matthew Grace and the Pink Pistols.

And I'd like also to introduce to the Court my colleague, David Thompson --

MR. THOMPSON:  Good afternoon, Your Honor.

THE COURT:  Welcome.

MR COOPER:  -- and Peter Patterson.

Mr. Thompson, with the Court's permission, will make our presentation to the Court today.

I'd also like to introduce as well Ms. Erin Murphy of the Bancroft firm, who's here representing our amicus

1  curiae, the National Rifle Association, and she too will

2  make a presentation pursuant to the Court's invitation.

3         THE COURT:  Very good.

4         MR. THOMPSON:  Thank you, Your Honor.

5         THE COURT:  Welcome.

6         MR. SAINDON:  Good morning, Your Honor.

7  Andrew Saindon on behalf of the defendants.

8         With me at counsel table is Chad Naso from my

9  office, Holly Johnson from my office, who will be presenting

10  our arguments today.  Next to her is Loren AliKhan from our

11  office.  Next to her, Deepak Gupta from Everytown for Gun

12  Safety, to which we've allocated ten minutes of our time,

13  and Jonathan Taylor, also from Everytown.

14         THE COURT:  Very good.

15         Welcome, everyone.

16         All right.  You know the batting order.

17  Mr. Thompson, you get to go first.

18         MR. THOMPSON:  Good afternoon, Your Honor, and may

19  it please the Court, David Thompson for the plaintiffs.

20         And we'd like to first thank the Court for holding

21  this hearing today.  We very much appreciate it.

22         I'm going to try to confine my remarks to

23  25 minutes, if I may, and then Ms. Murphy will address the

24  Court.  And if it pleases the Court, I'd like five minutes

25  for rebuttal.

1          THE COURT:  Let's start with an issue that is a

2     procedural issue, a practical issue.

3          MR. THOMPSON:  Yes.

4          THE COURT:  In your briefs, you, essentially,

5     advocate that the Court should consolidate this into summary

6     judgment.

7          MR. THOMPSON:  Yes, Your Honor.

8          THE COURT:  And instead of having two separate

9     opinions, two separate decisions, just have one decision and

10    get it to the Court of Appeals, where, undoubtedly, it's

11    headed no matter what I do, and then who knows where it will

12    go after that, but probably, it will go somewhere else.

13          In any event, is that still your position?

14          MR. THOMPSON:  Yes, Your Honor.

15          THE COURT:  Do you see any procedural impediments

16    to doing that?

17          MR. THOMPSON:  I don't, Your Honor.

18          The defendant said, well, we haven't had enough

19    time, but the issues that are presented before this Court

20    are the same issues that were before the Court in *Wrenn*, and

21    that was 11 months ago.  They said they didn't get enough

22    pages.  The page limits are the same.

23          And this is very much what Judge Posner did in the

24    *Moore* case, where that was on a motion to dismiss; and we

25    had filed for a preliminary injunction in the District

1     Court, the motion to dismiss was granted, the PI was denied.

2          We went up on appeal, and Judge Posner said he'd

3     been treated to hundreds of pages of history briefs.

4     He didn't need more briefing on the history.  He saw

5     everything he needed to, and he entered final judgment at

6     that time.  And so we would respectfully submit that would

7     be appropriate here as well, Your Honor.

8          THE COURT:  Okay.  If the opposing counsel wanted

9     some extra time to submit supplemental briefs for summary

10    judgment purposes, would you have any objection to that?

11          MR. THOMPSON:  No, Your Honor.

12          THE COURT:  Okay.  You'd get a chance to do it

13    too, if you wished.

14          I don't really need a lot more reading to do here.

15    I've got lots of reading.  But I'm hard-pressed to

16    understand, and I'll give, obviously, the government a

17    chance to give its position on this, hard set to understand

18    how it's in the interest of anyone to have to go through two

19    rounds.

20          And I'm about to start a three-month trial in two

21    weeks, so I'd just as soon get going on this and do it once,

22    because I have four other trials lined up after that

23    three-month trial.

24          So we'll see what the other side has to say.

25    Go ahead.

1    MR. THOMPSON:  Very well.  Thank you, Your Honor.

2    THE COURT:  Take it from the top then.

3    MR. THOMPSON:  Okay.  Great.

4    Well, in *Heller*, the Supreme Court made clear that

5    the enumeration of a right in the Constitution takes out of

6    the hands of government the power to decide, on a

7    case-by-case basis, whether the right is really worth

8    insisting upon.  Yet the District did not get the message in

9    *Heller*, for that is precisely the power that it asserts

10   here:  The power to decide on a case-by-case basis whether a

11   law-abiding citizen has a good or proper reason for

12   exercising the right to carry a firearm.

13   And to make matters worse, the District does not

14   deem the desire to carry a firearm for self-defense a good

15   or proper reason.

16   The District's law is absolutely and categorically

17   inconsistent with the very meaning of a fundamental right.

18   Over the last 40 years --

19   THE COURT:  You're really challenging just one

20   aspect to this process, right, the good and proper reason

21   clauses?

22   MR. THOMPSON:  Yes, Your Honor, that's absolutely

23   correct.  We don't have any dispute with all the

24   qualifications, the training, the fingerprinting, the photo

25   IDs, the restrictions on where the gun can be carried.

1   It is just this one point which acts as a de facto ban for

2   people like Matthew Grace, who are here in the courtroom

3   today.

4           THE COURT:  If they wanted to cordon off certain

5   areas of the city -- I'm making this up to make a point --

6   five blocks from the White House, five blocks from the

7   Capitol, anything within a five-block perimeter of the

8   Capitol, the White House or, for that matter, any Embassy or

9   whatever, you have no problem with that.

10          MR. THOMPSON:  Yes, Your Honor, you're correct.

11  And we have no problem.  The Supreme Court in *the Heller*

12  decision specifically said that sensitive places like

13  courthouses and the White House and Embassies could be safe

14  zones where there are gun-free zones.  So we don't have a

15  problem with that, Your Honor.

16          But what we do have a problem with is the

17  District's fixation over the last 40 years on how guns can

18  be misused by criminals.  In *Heller*, the Supreme Court said,

19  that's the wrong focus.  The focus is on the needs of

20  law-abiding citizens for self-defense.

21          And under *Heller*, once it's determined that a law

22  restricts the law-abiding citizen's right to keep and bear

23  arms for the core lawful purpose of self-defense, that law

24  is unconstitutional.

25          In light of these principles, the only way the

1   District can prevail today is if the right to keep and bear

2   arms is confined to the home.  Now, that issue was litigated

3   in *Palmer*, and the District lost, and we would respectfully

4   submit *Palmer* was correct.  And I'd like briefly to talk

5   about the text and the purposes and the history.

6           As to the text, the Second Amendment, by its very

7   terms, protects the right to both keep and to bear firearms,

8   because a right to keep arms would have been sufficient to

9   protect the right citizens to possess firearms in the home;

10  the right to bear arms can be confined to the home, only at

11  the cost of making bear wholly superfluous.  It cannot be

12  emphasized enough that the District simply gives no

13  plausible content to the term "bear arms" under their

14  interpretation.

15          Under their reading of history, there was a total

16  or near-total prohibition on the right to bear arms in

17  public in force in most of the country for most of its early

18  history.  They never specify what content the right to bear

19  arms could possibly have if their history is correct.

20          But Judge Posner, in *Moore*, noted *Heller* rejected

21  a similar attempt to try to utilize history to erase the

22  terms of the text of the Constitution, and the District

23  should not be permitted to erase the word "bear" any more

24  than they were not permitted to erase the word "keep" in

25  *Heller*.

1        Nor do we have to speculate as to what "bear"

2   means.  *Heller* defined it as "wear, bear, or carry upon the

3   person or in the clothing or in a pocket for the purpose of

4   being armed and ready for offensive or defensive action in

5   case of conflict with another person."

6        THE COURT:  Well, indeed, didn't, in *Heller*,

7   Justice Scalia, who wrote the majority opinion, wasn't he

8   focusing on safety in the home and self-protection in the

9   home?

10        MR. THOMPSON:  Well, he -- that was the narrow

11  issue before the Court, but the Court was very clear in

12  articulating three purposes behind the Second Amendment.

13  First and foremost, it said the critical component was

14  self-defense.

15        And obviously, as Judge Posner in the *Moore* case

16  pointed out, the need for self-defense is at least as

17  necessary outside the home as it is inside the home.

18        The second purpose that the Supreme Court

19  identified for the Second Amendment was hunting, which,

20  obviously, takes place outside of the home.

21        And the third purpose was military training,

22  which, again, obviously takes place outside of the home.

23        So the purposes identified by Justice Scalia in

24  that majority opinion are further evidence that their

25  reading, trying to read the word "bear" out of the

1  Constitution, cannot be squared with the most basic premises

2  and purposes of the Second Amendment.

3         Now, as to the history, Ms. Murphy, for amicus,

4  the NRA, will speak in more detail to that, Your Honor, but

5  I would like to make just a couple of quick points.

6         First, history cannot be used to delete the text

7  of the Constitution.  D.C. tried this in *Heller* and it

8  failed.  And the same result should obtain here.

9         Second, Your Honor, the history doesn't support

10  the defendant.

11         It is true that tradition showed that states had

12  the flexibility to regulate the manner of carriage.

13  So there were efforts to ban concealed carry, and that was

14  upheld by many courts, provided open carry was allowed.

15  But no court ever allowed the destruction, the complete

16  destruction of the right.

17         Now, they have, in this court, invoked the Statute

18  of Northampton from 1328.

19         It's interesting --

20         THE COURT:  We don't see that around here very

21  often.

22         MR. THOMPSON:  Well, Your Honor, you wouldn't have

23  seen it if you would have had the *Palmer* briefs and the

24  *Wrenn* briefs, you wouldn't have seen any mention at all of

25  the statute of Northampton.

1          This is a new invention, and Your Honor candidly

2   can't be squared with just the statutes that were on the

3   books.  They say on the one hand, look at these states that

4   adopted the Statute of Northampton, but then some of those

5   very states subsequently went on to ban concealed carry.

6   If the Statute of Northampton meant what they said, that it

7   was a de facto ban on carriage, then there would have been

8   no need for states like Virginia and Tennessee to

9   subsequently come in and ban conceal carry.

10         Fourth, Your Honor, the founders themselves, if we

11  look at their practices and their understanding, it's

12  inconsistent with their view of history.

13         George Washington, his custom was to carry his

14  pistol.  John Adams defended the soldiers at the

15  Boston Massacre.  And during one of his arguments he said,

16  "Every private person is authorized to arm himself.  And on

17  the strength of this authority, I do not deny the

18  inhabitants had a right to arm themselves at that time for

19  their defense."

20         Thomas Jefferson wrote his nephew:  "Let your gun

21  be your constant companion."

22         Your Honor, unless the first three Presidents of

23  the United States were Scofflaws, then their version of

24  history must be rejected.

25         Finally, Your Honor, even if their version of

1   history were right -- because they put this forward as

2   evidence that this is a longstanding prohibition.  Even if

3   it were a longstanding prohibition, then that would merely

4   create a presumption of lawfulness.

5          But in the *Heller II* case, Judge Ginsburg made

6   clear that that just creates a rebuttable presumption, one

7   that can be rebutted by a showing that the burden on the

8   right is more than de minimis.  And here, the burden on the

9   right for Mr. Grace is far more than de minimis, it's a flat

10   ban.

11          Now, they say, oh, that part of *Heller II* was

12   Dicta.  But it wasn't because Judge Ginsburg applied that

13   very framework to the registration requirement.  He said, A,

14   it's longstanding, so it's presumably lawful; and, B, it's

15   de minimis, so I'm not going to revoke the presumption.

16   So it wasn't Dicta, Your Honor, and it is binding.

17          Now, Your Honor, I'd like to turn --

18          THE COURT:  So you don't quarrel with the notion

19   that this Court is bound by *Heller II*?

20          MR. THOMPSON:  Oh, of course not, Your Honor, no.

21          And we would also -- and I'll get to *Heller III* in

22   a moment as well, which I think is very significant.

23          Because the right to bear arms extends beyond the

24   home, the District's law barring ordinary law-abiding

25   citizens from exercising that right is categorically

1    unconstitutional.

2         In *Heller*, the Court affirmatively rejected, at

3    least with respect to broad prohibitions, like the one in

4    this case, any interest-balancing analysis.

5         That approach was urged by Justice Breyer in his

6    dissent.  The majority, by contrast, concluded that the

7    right to keep and bear arms, "elevated above all other

8    interests," the moment that the people chose to enshrine it

9    in the Constitution's text.  To quote from the Court,

10   "a constitutional guarantee subject to future judges'

11   assessments of its usefulness is no constitutional guarantee

12   at all."

13        And the Court clearly indicated that this

14   categorical approach must apply not only to bans on keeping

15   arms, like the one it faced there, but also, "severe

16   restrictions on bearing arms."

17        The *Heller* Court noted that in a case called

18   *Nunn v. State*, the Georgia Court was confronted with a

19   severe restriction on carriage and had struck it down, and

20   that was noted approvingly.

21        In McDonald, the Court reaffirmed that *Heller* had

22   deliberately and expressly rejected the argument that the

23   scope of the Second Amendment should be determined by,

24   "judicial interest balancing."

25        And this Court took a similar approach in *Palmer*,

1 striking down the predecessor to the law challenged here as

2 unconstitutional under any standard of constitutional

3 review.

4 And the District's present law should be subjected

5 to this same categorical invalidation.

6 THE COURT:  But didn't, under *Heller II*, they

7 design a framework that requires this Court to apply one of

8 those two standards, either intermediate or strict scrutiny?

9 As a practical matter, don't I have to apply one or the

10 other?

11 MR. THOMPSON:  Well, the very -- the language of

12 *Heller II* is significantly less re -- that if the law is

13 significantly less restrictive than an outright ban, if it's

14 significantly less restrictive than an outright ban, then

15 you apply intermediate or strict scrutiny.

16 This law here is not significantly less

17 restrictive than an outright ban.  And the implication of

18 what *Heller II* is saying is if you have a law that's an

19 outright ban --

20 THE COURT:  Let's look at that for a second.

21 MR. THOMPSON:  Yes.

22 THE COURT:  The way the law is currently

23 structured, if you have a specific basis to believe you're

24 at risk; you can meet the good reason, "Proper Reason"

25 standard, can you not?

1        MR. THOMPSON:  Well, I mean, let's look at it in

2   the context of Mr. Grace.  He had a shooting outside his

3   home with bullet cases in front.

4        THE COURT:  Not a shooting at him.

5        MR. THOMPSON:  Not a shooting at him to be sure.

6        THE COURT:  All right.

7        MR. THOMPSON:  And there was an armed robbery of

8   his neighbor, and the police never caught the person who did

9   the armed robbery.

10        THE COURT:  All right.

11        MR. THOMPSON:  His wife has been robbed, you know,

12   in daylight in the District of Columbia, and the District

13   said, that's not enough.

14        And the District's been very clear, living in a

15   high-crime neighborhood, that's not enough.  You need to be

16   able to point in a specific way that you anticipate a

17   specific threat, and that is just not consistent with the

18   experience of normal, ordinary law-abiding citizens.

19        THE COURT:  So what bank of information have you

20   had available to you to assess the types -- if any, to

21   assess the types of factual basis that has been viewed as

22   adequate to meet the "Proper" or "Good Reason" standard in

23   terms of threats?

24        Is there a place you can go to at the police

25   department headquarters where you can see the applications

1    of those that have been granted?  I don't think so.

2              MR. THOMPSON:  Not that I'm aware of, Your Honor.

3              THE COURT:  So is it by just word of mouth or

4    folklore or how do you know when a reasoned application

5    based on threats in the community, or threats, perhaps, even

6    to a neighbor's house or whatever has been viewed by MPD as

7    that's an adequate, that's a good reason, that's a proper

8    reason?

9              MR. THOMPSON:  Well, when there are -- they have

10   issued regulations, Your Honor.

11             And here's what one of the regulations say; that

12   you need to -- a special need for self-protection

13   distinguishable from the general community.

14             Now, the Second Amendment says, the people have a

15   right to keep and bear arms.  And they're saying right here

16   in this reg, the people don't.  Only a very small sliver and

17   subset of the people do, people who can point to a specific,

18   identifiable, anticipated threat.  If you just want to have

19   a firearm so that you can go out of your home and be able to

20   deal with unanticipated threats, too bad.  And, Your Honor,

21   that's, you know, fundamentally inconsistent with, you know,

22   the history that I was reading of Jefferson, Washington,

23   Adams.  So it's a really -- it's a very narrow subset.

24             THE COURT:  They also permit -- they also claim

25   that they would permit it for people who have a business of

```
 1   some kind that has a particular and frequent use of cash or
 2   other types of valuables that they're transporting within
 3   the city.
 4              MR. THOMPSON:  Yes.
 5              THE COURT:  That might be a necessary situation
 6   that would give rise to a good-and-proper reason to need to
 7   be armed, right?
 8              MR. THOMPSON:  Yes, Your Honor.
 9              And, you know, it's interesting that *Heller* itself
10   had exceptions too.
11              *Heller* had an exception for retired police
12   officers, and the Supreme Court said, it doesn't matter that
13   there are these minor exceptions for subsets of the
14   population.  The right of the people to keep and bear arms
15   cannot be channeled into a sliver, a subset, where ordinary,
16   law-abiding citizens --
17              And it's interesting that the Chief of Police
18   Lanier, after the *Palmer* decision came down, she said, we're
19   not worried about ordinary law-abiding citizens carrying
20   firearms.
21              And the data, by the way, provides that out.
22   If you look at the revocation rates in states like Florida
23   and Texas which have hundreds of thousands of these permits,
24   they're well less than one percent.  I think they're less
25   than one tenth of one percent.
```

1          THE COURT:  Remind me, do you have a percentage,

2     do you have statistics of what percentage of applicants for

3     concealed carry permit have actually been granted?

4          MR. THOMPSON:  I don't know that, Your Honor, as I

5     stand here.

6          THE COURT:  The MPD does not share that with the

7     public?  You don't know.

8          MR. THOMPSON:  If they do, I'm not aware of it,

9     Your Honor.

10          THE COURT:  Maybe Ms. Johnson will know the answer

11     to that.  I mean, she, after all, has access to that

12     information.

13          MR. THOMPSON:  Yeah.

14          And, Your Honor, what's really striking with this,

15     if we were in any other fundamental right, you know, there

16     would not be a, you know, an issue where we would have to

17     show need.

18          You know, if you're talking about a Miranda

19     warning or the exclusionary rule or getting married or

20     writing a book, you know, this is totally far into the

21     United States' constitutional structure to say a fundamental

22     component of the Bill of Rights that's been incorporated

23     against the States can be dolled out on a, you know,

24     person-by-person basis.

25          And that goes back to the point I was making at

1  the very beginning, where *Heller* says, you know, we're

2  taking out of the hands of government the power to decide on

3  a case-by-case basis whether the right is really worth

4  insisting on -- they're trying to take that right on a

5  case-by-case basis.

6          THE COURT:  Well, let's assume for the sake of

7  discussion that you're persuasive on the issue of whether or

8  not the Court should apply some type of scrutiny test here.

9  Which test do you believe should be applied by this Court?

10          MR. THOMPSON:  Well, okay, so first of all, we

11  will say it should be a categorical approach like in *Palmer*

12  and *Moore*, and that it should just be invalidated.

13          But if we were, then it should be strict scrutiny,

14  Your Honor, because --

15          THE COURT:  Why do you say that?

16          MR. THOMPSON:  Well, because with fundamental

17  rights, that is the normal way in which fundamental rights

18  are looked at.

19          Now, they say, oh, but in the First Amendment,

20  intermediate scrutiny is sometimes applied.

21          THE COURT:  Slow down.

22          MR. THOMPSON:  Okay.

23          THE COURT:  My reporter is good, but he can only

24  take so many words down a minute now.  You have to pace

25  yourself.

1          MR. THOMPSON:  Sorry about that, Your Honor.

2          So they say, well, look, in the First Amendment

3   context, intermediate scrutiny is applied, but they're

4   pointing to things like nude dancing, you know, that are on

5   the periphery.  They're not at the core.  They're not core

6   political speech.

7          THE COURT:  Hope not.

8          MR. THOMPSON:  Yeah.

9          Core political speech, you know that's strict

10  scrutiny.

11          And when you're talking about something that's

12  built into the text of the Constitution, the right to keep

13  and bear arms, then anything like --

14          THE COURT:  Well, certainly, the right to protect

15  yourself, self-protection, it would seem that that would be

16  a pretty core value in the Constitution.

17          MR. THOMPSON:  Yes.  Absolutely.  Yes, Your Honor.

18          THE COURT:  Self-protection.

19          MR. THOMPSON:  And one of the things that's very

20  troubling about the District's defense of its law, it's a

21  defense that they ran in *Heller III*; and respectfully,

22  Your Honor, we would say that *Heller III* decision is very

23  important and really dictates the outcome if the Court were

24  to apply intermediate or strict scrutiny to the outcome

25  here, because in *Heller III*, one of the provisions that was

1   at issue was a limitation of buying one handgun per month,

2   one pistol per month.  And the District defended that on the

3   ground that, well, look, there will be fewer handgun

4   purchases, there will be fewer handguns being kept in the

5   home, and this is going to have all sorts of positive

6   benefits, see our social science.

7           And the D.C. Circuit said, no, you cannot target

8   the exercise of a right, even if you think there are going

9   to be other benefits flowing from it.

10          And just as we see this in the First Amendment

11  context, where Justice Kennedy in Alameda Books says, you

12  know that jurisdictions can't target speech, even if they

13  think it will have some ancillary benefit.

14          And likewise here, Your Honor, if we're in a world

15  where we're looking at tears of scrutiny, their policy

16  justification is impermissible.

17          Imagine if they were to come -- they say they're

18  entitled to deference and they have all the social science.

19          Imagine if they came to this Court and they said,

20  well, we've decided we're not going to give Miranda warnings

21  anymore or honor the exclusionary rule anymore because we

22  have all the social science research showing we can put

23  more, you know, criminals in prison, and that's going to

24  save lives, the Court won't give that a moment's notice.

25  That policy has been taken off the table by the

1  Constitution.

2          And so too here the policy that they're trying to

3  promote of limiting firearm carriage, targeting the right

4  itself and then hypothesizing benefits, that's an

5  impermissible purpose, and it just vaporizes any attempt

6  they have to try to defend this under a tier of scrutiny.

7          THE COURT:  So why isn't this narrowly tailored?

8          MR. THOMPSON:  Well, Your Honor, it's not narrowly

9  tailored.  Under the tailoring piece of this, they need to

10  have substantial evidence and meaningful evidence.

11          Now, for the evidence to be meaningful,

12  presumably, that connotes that their plan might work.

13          And all of their evidence is just correlation

14  based; in other words, if you look at the meta-analyses from

15  the government, the CDC, you'll see that they say, look, we

16  can't tell.  We see some correlations, you know, but we

17  can't tell whether there's any causal relationship between

18  gun carriage laws and public safety.  It's just impossible

19  to know.

20          And given that they have the burden -- under

21  intermediate scrutiny, they have the burden.

22          The VMI case, *United States versus Virginia*, said

23  they have to be exceedingly persuasive under intermediate

24  scrutiny.  And here, they come forward with a bunch of

25  studies showing correlation.

1    As Judge Scullin in the *Wrenn* decision in footnote

2  11 said, look, if we're just going to look at correlation,

3  let's look at the FBI statistics.  They show that states

4  that have permissive carriage laws have a lot less crime.

5    So I mean, the correlation is, it's a -- it just

6  negates any concept that there's a meaningful amount of

7  data, that there's any empirical evidence here, even if

8  their central policy justification were permissible.

9    Your Honor, the other thing about their policy

10  justifications is, again, looking at the words of Police

11  Chief Lanier, she said on *60 Minutes* that swift civilian

12  action may be the key to saving lives.  "If you're in a

13  position to try and take the gunman down, to take the gunmen

14  out, it's the best option for saving lives before the police

15  can get there."

16    Take the gunmen out.  How are law-abiding citizens

17  supposed to do that without a firearm?

18    Obviously, there's another side of this equation

19  that the District wants to blind the Court to, and that's

20  the hundreds of thousands and millions of times a year that

21  law-abiding citizens throughout this country use a gun to

22  save a life.

23    If we look at the recent tragedy in San

24  Bernardino, if only one of those individuals had been

25  carrying a firearm, that tragedy might have been mitigated.

1    The District in its brief laments the recent surge

2 in violence in the District, but that just shows the abject

3 failure of their anti-gun policies, which are among the most

4 draconian in the nation and they're depriving --

5    THE COURT:  Do they have any statistics comparing,

6 on an annualized basis, the number of burglaries in the

7 District of Columbia, where the burglar was armed, versus

8 the number of confrontations in the given year in the

9 District of Columbia, where the person who was being

10 confronted by a potential criminal was armed?

11    MR. THOMPSON:  Your Honor, I'm not aware of those

12 statistics.

13    The one statistic I do remember --

14    THE COURT:  Any reason to think that the number of

15 burglaries is a greater number than the number of

16 confrontations on the street involving weapons?

17    MR. THOMPSON:  No, Your Honor.  I think typically,

18 there's more violent crime outside the home than within the

19 home in terms of -- and is this the point Judge Posner made.

20 He said the normal Chicagoan has a lot more need to have a

21 firearm on the streets of Chicago than on the 34th, 35th

22 floor of his condo.

23    THE COURT:  Why wouldn't that also be equally

24 applicable in the District of Columbia?

25    MR. THOMPSON:  It is, Your Honor.  And that goes

```
1   back to the purpose of the Second Amendment.  It is, among
2   others, for self-defense.  And the need for self-defense is
3   just as critical outside the home as it is within the home,
4   Your Honor.
5              I would just say in closing, Your Honor, that in
6   this instance, the text it clear.  It says, "keep and bear
7   arms."
8              The purposes are clear:  The need for
9   self-defense, which is obviously applicable inside the home
10  and outside the home.  The history; the Founders understood
11  what this meant.
12             And this Court, respectfully, should not allow the
13  District of Columbia to try to gut the Second Amendment
14  again.  Thank you, Your Honor.
15             THE COURT:  Thank you, Mr. Thompson.
16             Ms. Murphy.
17             MS. MURPHY:  Thank you, Your Honor.  May it please
18  the Court.
19             As Mr. Thompson indicated, if I may, I'd like to
20  spend my time talking in a little bit more detail about the
21  historical evidence here and this notion that this is a
22  longstanding, you know -- of a piece with longstanding
23  prohibitions.
24             THE COURT:  The history in D.C. now.
25             MS. MURPHY:  The history both of the D.C.
```

1  regulations and how to put that in context with the other

2  laws that the District in its amici have relied upon to try

3  to --

4          THE COURT:  How long has it been since we've had

5  open carry in the District of Columbia?

6          MS. MURPHY:  Since the District has had open

7  carry?

8          THE COURT:  Even in the last century?  The last

9  century?

10          MS. MURPHY:  I think that open carry was actually

11  permissible during the beginning of the 1900s with -- as

12  long as it wasn't with intent to injure.

13          So the District has had concealed prohibitions or

14  concealed restrictions since the mid-1800s, but that is,

15  you know, entirely consistent with what we saw in a lot of

16  states around the time, which is, okay, you can carry

17  openly, but you can't carry concealed.

18          And in our view, that actually just underscores

19  that there's not a historical record of broad prohibitions

20  on carrying outside the home.  If there were, you wouldn't

21  have had a great deal of controversy about laws that were

22  prohibiting concealed carry.

23          And when those laws were challenged in the

24  decisions that were relied heavily upon in *Heller* itself,

25  the courts didn't say, concealed carry bans are permissible

1  because you're not allowed to carry at all, they said

2  they're permissible as long as you also are allowing open

3  carry.

4       And that makes sense because when you look at this

5  history of these laws, that they generally refer to all as

6  kind of Northampton-style laws.

7       And, first off, that's built on a premise that

8  doesn't actually help their case, because, as Mr. Thompson

9  suggested, Northampton-style laws were not general

10  prohibitions on carrying firearms in public places, or even,

11  you know, in kind of more populated areas.

12       What they actually were prohibitions on carrying

13  firearms with intent to terrorize the people or to,

14  you know, cause a breach of the peace.

15       And we know this not just from the historical

16  record, but -- because *Heller* itself actually specifically

17  references Northampton style statutes.  That's page 623 of

18  the decision.  There's a discussion of the kind of laws that

19  existed in England before the United States, and what

20  they're talking about specifically is the Statute of

21  Northampton when Justice Scalia described that as the crime

22  of carrying dangerous or unusual weapons to terrorize the

23  people.

24       And when those laws were considered on this side

25  of the Atlantic in the North Carolina State Court in the

1   1800s, the Court held it is an element of this crime that

2   you must be carrying with intent to terrorize the people.

3           So even just starting from this premise of

4   Northampton-style laws, that doesn't amount to a type of

5   prohibition that's anything like this, because that was an

6   intent-based crime, much like current laws that would

7   prohibit carrying a firearm with intent to commit a crime.

8   So that's kind of the first category of laws they rely upon.

9           Then we get to some in the meld of the 1800s that

10   they try to characterize as good-cause laws that are

11   comparable to this. And the problem with those laws is that

12   they're actually not criminal prohibitions. What they are

13   is, basically, provisions.

14           They're generally found in a part of the code

15   that's talking about laws to help prevent crime, and they

16   allow a private individual to bring a complaint that they

17   believe somebody is carrying with intent to injure or to

18   breach the peace.

19           And then that can result in, basically, a bond.

20   They're all called surety laws. And what you would have is

21   a bond that you don't breach the peace for six months.

22   There was no fine, no jail time. There wasn't even

23   confiscation of firearms.

24           So from what we know of these laws, you were

25   perfectly free to continue carrying your firearms during

1    that six months, you just couldn't use them to breach the

2    peace or cause injury.

3            So those laws really also -- and these are the

4    ones with primarily in the 1830s and 1840s, they really

5    don't support any kind of historical practice of prohibiting

6    carry.

7            And one reason we know that is because the

8    District itself had one of those surety-style laws that they

9    had in place in 1857, and the very next year, they passed a

10   concealed-carry ban, which they wouldn't have needed if this

11   1857 law that was on the books was already generally

12   prohibiting carrying.

13           And then, really, the third category of laws that

14   they rely upon are post-Civil War laws, which, first off,

15   you know, is a little problematic if you're thinking about

16   the inquiry as the meaning of the Second Amendment

17   historically, which is why I think they're trying to

18   categorize it as evidence of a longstanding prohibition

19   instead of anything that's relevant to the scope of the

20   Second Amendment.

21           But those laws, actually, aren't comparable at all

22   to what the District has now either, because, first off,

23   very few of them actually are state laws, a number of them

24   are from territories and municipalities.

25           But when you take the handful of them that are

1    from states, three of the five of those had express

2    exceptions either written into the statute itself or read

3    into it by the State Supreme Court for the types of arms

4    that were considered protected by the Second Amendment.

5          So even as you have -- or by the state analogues

6    at that point, because lot of these laws -- it's around the

7    time of crookshank, which is all the more reason to be a

8    little weary of looking at these laws, because it's not

9    clear that there are Second Amendment prohibitions on the

10   states at the time.

11         But when the State Supreme Courts are looking at

12   these laws, they're saying, well, there has to be an

13   exception for carrying the types of arms that we believe are

14   protected either by the Second Amendment or a state

15   analogue.

16         THE COURT:  Since Mr. Thompson has acknowledged,

17   and the briefs, essentially, bear this out, that the focus

18   here is the particular clause in the existing regulatory,

19   statutory framework that's troubling to the plaintiffs

20   through the Good-and-Proper-Reason provision.

21         MS. MURPHY:  Right.

22         THE COURT:  Let me ask you, from a historical

23   perspective, are there any examples of similar type, either

24   exactly the same or similar-type regulatory structures in

25   other cities or other states that, A, exist, and, B, have

1 also been upheld by courts in those states?

2 MS. MURPHY: Not really.

3 I mean, you know, you can get to a period around

4 1900 when there's some municipal laws that are actually just

5 kind of total bans, but those are upheld on the theory that

6 there is no individual Second Amendment right.

7 So if you can go by the analysis that

8 Judge O'Scannlain used in the *Peruta*, the panel opinion, as

9 he talked about, you can't put -- you have to put it in

10 context. And if those laws are only considered permissible

11 because no one thought there was an individual right, then

12 they're not very persuasive as to anything.

13 You know, I think that they would suggest that the

14 ones that are the most relevant are those surety laws from

15 the 1830s and '40s, because those laws did have a

16 "Reasonable Cause" standard in them. Basically, if someone

17 brought this complaint against you, then you could have a

18 defense of, you don't even put the surety on me because I've

19 had a reasonable cause to fear injury. But those aren't

20 comparables here because those aren't bans.

21 THE COURT: So you would be advocating, in

22 essence, if not specifically, that there's really no

23 historical precedent for this type of regulatory scheme.

24 MS. MURPHY: That's exactly right.

25 THE COURT: Either in this city or anywhere else,

1  for that matter.

2          MS. MURPHY:  That's exactly right.

3          And also, where we saw, you know, licensing and

4  those types of schemes, where they started to develop was as

5  to concealed carry.  So perhaps you could find at some point

6  a concealed-carry licensing regime that operated like this

7  one, but those were -- at the same time, there was a right

8  to carry openly, and the only constraint on that, as

9  I believe the language in the District's law when it had an

10 open-carry prohibition.  In several of these laws, it was if

11 you had intent to injure someone, then you couldn't carry

12 openly, but, otherwise, you could.

13         So while the conceal-carry laws, the District's,

14 it's a little unclear -- and certainly in the 1900s and

15 certainly the second half of the 20th century, it appears

16 the District was basically never granting licenses under its

17 regime, but, you know, all of that has to be kind of taken

18 with a little bit of the grain of salt of the state of the

19 constitutional protections at that time were very unclear.

20         THE COURT:  I gather from some of the questions

21 and answers that -- questions that I've asked and answers

22 I've gotten from Mr. Thompson, it is a bit of a black box to

23 know what's actually happened with regard to these various

24 regulatory schemes, because there isn't a place for the

25 public to go to to actually gather information and data with

1  regard to applications made, applications accepted,

2  applications rejected, what the reasoning was that was

3  advanced, what was the reasoning that was rejected,

4  et cetera.  It's a bit of a black box.  Is that a fair

5  statement?

6          MS. MURPHY:  It certainly seems that way to me.

7          I think what you can say about the District's

8  regime is that what it has in common with regimes that,

9  you know, we view as problematic, like, for instance, what's

10 been at issue in California or, you know, what some of the

11 other Courts have dealt with it is it's basically written

12 right into the law that the ordinary law-abiding person

13 isn't good enough; you know, just wanting to carry a firearm

14 for self-defense isn't good enough.

15         So whatever may or may not be going on with regard

16 to how they grant, they have put in place a legal standard

17 that says the people, the average ordinary American person

18 cannot qualify to carry a firearm in the District, and I

19 don't see how that can be reconciled with a right to keep

20 and bear arms.

21         THE COURT:  Thank you very much.

22         MS. MURPHY:  Thank you.

23         THE COURT:  Ms. Johnson.

24         MS. JOHNSON:  Good afternoon.  May it please the

25 Court.

1          The relief the plaintiffs seek in this preliminary

2     injunction hearing is truly extraordinary.

3          THE COURT:  Let me stop you there.

4          What's your position on the issue that I raised

5     with Mr. Thompson at the beginning?  Why wouldn't it just

6     make sense to -- you can do supplemental briefing if you

7     need to, but why wouldn't it just make sense -- the facts

8     and the law isn't going to really change in the next few

9     weeks or a month even, and, you know, why have two stops at

10    the District Court and two stops at the Court of Appeals

11    when it can all be consolidated, basically, into one?

12         MS. JOHNSON:  Because there is more to come.

13    There is more to come in the world of history, and there is

14    definitely more to come in the evidence under the levels of

15    scrutiny.

16         Can I point this Court to --

17         THE COURT:  What do you mean when you say "there's

18    more to come in the world of history"?  The history has been

19    written, right?

20         MS. JOHNSON:  It's been written, but it's not all

21    before this Court, and it's critical to this Court's

22    determination.

23         THE COURT:  Well, you can do that in the next few

24    weeks?

25         MS. JOHNSON:  No.  No, Your Honor.

```
 1              THE COURT:  Why not?
 2              MS. JOHNSON:  These things take time and they take
 3    briefing space.
 4              And, indeed, the historians are still researching
 5    these questions.
 6              But even aside from the history, because I think
 7    that there's a simpler answer in the other --
 8              THE COURT:  Who are these historians you're
 9    referring to?
10              MS. JOHNSON:  Historians that are working with
11    Everytown; the historians who are researching these
12    questions.
13              THE COURT:  Is there any legal or procedural
14    reason why the Court can't make such consolidation in this
15    case?
16              MS. JOHNSON:  There's no legal bar to this Court
17    considering summary judgment at the outset, except for the
18    District intends to introduce considerably more evidence.
19              This is a very important public safety law, and
20    this complaint was filed on Christmas Eve.  This case just
21    started and the District needs an opportunity to develop a
22    full record.
23              The D.C. Circuit is going to want a full record;
24    and if this goes to the Supreme Court, they're going to want
25    a full record too.
```

1          If the Court looks to *Heller II* and *Turner*, the

2   *Turner* cases, but these cases are repeatedly remanded back

3   to the District Court for more evidence.

4          Indeed, *Heller II* --

5          THE COURT:  What form would that evidence take?

6          MS. JOHNSON:  Well -- and this is why I say

7   there's the history side of things.

8          THE COURT:  I don't want to talk about the history

9   side; I want to put that aside.

10          What evidence would be out there, aside from

11  history, that you think you would be expecting to develop

12  and put on the record in this case?

13          MS. JOHNSON:  Indeed, that's the more important

14  evidence; expert testimony supporting the council's

15  decision.

16          If this Court looks at the *Turner II* decision and

17  the *Heller II* and *Heller III* decisions, all of them relied

18  on experts.  Indeed, there's a whole section of *Heller III*

19  that talks about why the experts were, in fact, qualified

20  and relevant to the question of intermediate scrutiny.

21          *Turner II* and *Heller II* both actually involve

22  remands after summary judgment, after a full record, and

23  then even more evidence was needed.

24          THE COURT:  Let me explain something to you.

25          When I start, you have to stop.

1          MS. JOHNSON:  I will.  I apologize, Your Honor.

2          THE COURT:  Because my reporter is very good, but

3    he can't take us both down at once.  So when I start to ask

4    a question, you have to pause --

5          MS. JOHNSON:  I will.

6          THE COURT:  -- until I finish.  Okay.

7          Now, with regard to expert testimony, do

8    I understand you to say that you want to have experts who

9    will opine on the decision-making process by the MPD?

10         The people at the MPD who made the decisions are

11   not "experts."

12         MS. JOHNSON:  This is not about -- this case is

13   not about the MPD.  This case is about the council and the

14   council's decisions.

15         This is not as-applied challenge.  This is a

16   challenge to the "Good Reason" standard.

17         THE COURT:  That's what this is, both a facial and

18   it has applied challenge.

19         MS. JOHNSON:  I don't believe so.

20         Mr. Grace did not give a good reason, gave nothing

21   in his application.  He said his good reason in his

22   application was that the Second Amendment gives him a right

23   to carry.

24         This is a challenge purely to the question of the

25   council's decision to apply the "Good Reason" standard, and

1  the council is entitled, the District is entitled to put on

2  evidence beyond what was before the council.  That is the

3  holding of *Turner II*, that is the holding of *Heller II*;

4  that, indeed, you rely both on the evidence -- relied on by

5  the council and then outside evidence.

6        And in *Heller II* and in *Turner I* and *Turner II*,

7  expert testimony was presented.

8        If this Court looks to the *Woollard* decision, the

9  *Woollard* decision is very helpful in describing the types of

10  evidence the District plans on putting on.

11        Testimony about how right-to-carry laws, which is

12  what, essentially, the plaintiffs say the District has to

13  be, increase, substantially increase crime rates, and the

14  different ways in which they make it difficult for the

15  police to do their jobs, even assuming no misuse by the

16  person carrying.

17        And so --

18        THE COURT:  How long do you think it's going to

19  take to get all this evidence gathered up?  60 days?

20        MS. JOHNSON:  Oh, I would imagine it would be

21  whatever the standard track is for litigation.

22        We would we need to conduct discovery.  I mean,

23  this is an important case and it shouldn't be rushed.  If it

24  is, it's likely to get remanded.

25        THE COURT:  Right now, we have a PI, obviously,

1    application in front of the Court, but -- and that has its

2    own standards that it has to meet.

3          But this is the first I've heard that you have

4    this -- you envision this fulsome need to do discovery in

5    this case.  This is the first.

6          MS. JOHNSON:  Oh, indeed.  And I thought that was

7    implied in our briefs when we referred to a full record.

8    We intended to conduct some discovery and present evidence

9    and present experts, and that is the path that these levels

10   of scrutiny have taken.

11         Even strict scrutiny -- if this Court looks at

12   Humanitarian Law Project, even strict scrutiny looked at

13   expert testimony and considered all the evidence before it.

14         THE COURT:  I recall *McConnell versus FEC*, which

15   was a considerably larger case than this, that involved the

16   constitutionality of 21 sections of a statute, 21 sections.

17   180,000 page record was developed in six months.  There

18   won't be a need for 180,000 page record here.

19         MS. JOHNSON:  I certainly hope not, Your Honor.

20         THE COURT:  And I can't imagine the discovery

21   could take more than 90 days in this case.  I can't imagine

22   I'd give you more than 90 days in this case.

23         So what I will do is I'll give both sides a

24   chance.  I'll give you a couple weeks to submit a brief with

25   regard to your position on consolidation; A, whether or not

1  it's doable in this case; B, whether it should be done in

2  this case; and, C, what, if any, discovery each side thinks

3  is necessary, if at all, what discovery, but I'd say I'd be

4  naturally inclined in that direction if the facts and

5  circumstances bear it out.

6       So we'll see what you have to say.  I'm not going

7  to, obviously, rule on that without giving each side a

8  chance to put it in writing.

9       MS. JOHNSON:  Thank you.

10      THE COURT:  Move on to your argument.

11      MS. JOHNSON:  Okay.

12      And I would like, first of all, to address the

13 fact that we are talking about a preliminary injunction

14 here, and so we do have to consider not just the merits,

15 which I definitely want to address, but the equities.

16      And, indeed, the plaintiffs' injury is completely

17 speculative here.  They give you no reason to believe that

18 if they are denied a right to carry during this litigation,

19 that they will suffer any injury at all.  This flat out does

20 not satisfy the standard.  And even if their injury was not

21 speculative, the balance of the equities favors the

22 District.

23      This is an important public safety law, and the

24 council has found that preventing its enforcement could

25 substantially increase rates of aggravated assault, rape,

1   robbery and murder.  If anything, the equities on enforcing
2   any law fall in favor of the public; and for an important
3   public safety law like this, it must fall in favor of the
4   District.
5         That said, even on the merits, the plaintiffs
6   cannot satisfy their high burden.
7         It's important to note that three Circuits, three
8   separate Circuits have already looked at this exact law and
9   upheld it.  No court holds otherwise.  And the Supreme Court
10  has denied cert three times.  If this was such an
11  extraordinary outlier, then the Supreme Court would have
12  spoken; it would have done something about it.
13        This is not like *Heller I*, right?  23 percent of
14  the public in the four states with a "Good Reason" stance,
15  23 percent of the public is under the statute.  This is not
16  a draconian measure.  This is not an outlier.  This
17  represents a big chunk of the country.
18        So I want to talk, first, about the categorical
19  argument; that the right is absolutely destroyed.
20  It's important when you're looking at whether a right is
21  destroyed to define the right.  And what plaintiffs do is
22  they start by defining the right as the right to carry in
23  public in cities without good reason, and then they say that
24  right is totally destroyed.
25        But the question is to first look at what conduct

the Second Amendment protects.  And what *Heller* tells us is

that constitutional rights are enshrined with the scope they

were understood to have when the people adopted them.

Now, the need for self-defense definitely played a

role at the framing, definitely played a role in what was

enshrined in the Second Amendment, but it was not the only

factor.  The framers were practical people.

The framers were using the entire body of law that

was enacted at the time to determine what the Second

Amendment would cover, and they balanced self-defense; those

laws balanced self-defense with public safety.

THE COURT:  The right for self-protection hasn't

gone away.

MS. JOHNSON:  Of course not.

THE COURT:  It's not any less real today than it

was back then.

MS. JOHNSON:  Indeed, it is not.

But just like your Fourth Amendment rights, you

have a Fourth Amendment right all the time.  The

Fourth Amendment walks with you everywhere.

But when you're in an airport, it's different than

it is when you're at home.  And it's different on the

sidewalk than when you're at home.

Second Amendment rights are determined by context.

So the Second Amendment applies to every single person in

1    the District of Columbia.  But whether that protects a right

2    to carry depends on the contract -- context.

3              So in the home, for example, the need is at its

4    zenith.  That's what *Heller I* tells us.

5              And also the risk of public --

6              THE COURT:  I don't remember Justice Scalia

7    telling us that.

8              MS. JOHNSON:  Is that not in *Heller*?

9              I apologize.

10             THE COURT:  I don't remember him using that

11   expression.

12             MS. JOHNSON:  Or, perhaps the words he used were

13   as "most acute."

14             THE COURT:  He prides himself on his expressions

15   in the original language.

16             MS. JOHNSON:  He does.

17             THE COURT:  And I don't remember Justice Scalia

18   using the words "at its zenith."

19             MS. JOHNSON:  I believe what he said is, "The need

20   is most acute."

21             And I am paraphrasing because I do not have the

22   quote in front of me, and I would not want to misquote

23   Justice Scalia.

24             But in cities and in heavily populated areas, the

25   need for self-defense does not outweigh public safety, and

1    that is what history tells us.

2              And this history, as --

3              THE COURT:  Well, what's your basis for that

4    thought?

5              There are sections of every major city in America,

6    including the District of Columbia, where if you're a person

7    out at night alone, you're at grave risk, grave risk.

8              And don't say it's not true in the

9    District of Columbia.  There are sections of this city that

10   are particularly dangerous, especially for a person unarmed.

11   You can't argue with that.  That's just a fact.

12             MS. JOHNSON:  And I'm not arguing with it,

13   Your Honor.

14             THE COURT:  I hope you're not.

15             MS. JOHNSON:  No, of course I'm not.

16             THE COURT:  And that's true in New York and

17   Philadelphia and Chicago and all major cities.

18             MS. JOHNSON:  Indeed.

19             But the Second Amendment enshrined the rights as

20   they exist at the time.

21             And the cities, which were dangerous at the time,

22   the streets of London were likely dangerous at the time,

23   still, many cities banned public carrying.

24             And mind you, the District is not banning public

25   carrying.  I'm just saying that the right is different in

1  cities.

2         And the District believes that, indeed, it is so

3  much more regulated at the time of framing, that the statute

4  that we are defending is -- should be considered

5  longstanding beyond the scope.  But even if it is not,

6  right, even if it is not that, the history of regulation in

7  cities informs the scope of this Court's inquiry.

8         And what this Court -- what the Second Amendment

9  said in -- what the Second Circuit said in *Kachalsky* is that

10 intermediate scrutiny should apply, because firearms rights

11 have always been more limited outside the home.

12        Now, mind you, *Kachalsky* was talking about rural

13 areas and wilderness as well, and the District is asking an

14 even narrower question, which is in cities, where the rights

15 have been even more restricted than what *Kachalsky* was

16 referring to.

17        *Kachalsky* pointed to founding era regulations;

18 it pointed to the Statute of Northampton.

19        The Statute of Northampton has been in effect --

20 it was enforced in England from the 14th century through the

21 19th century.  It came over into the American colonies law,

22 it was applied in the American States after the Constitution

23 was ratified, and it banned carrying in the public

24 concourse.

25        I want to address, because I think it's important,

1    the idea that the Statute of Northampton was limited to acts
2    of menacing or acts of terrifying, because this probably is
3    going to be a critical juncture in the question of what the
4    Second Amendment protects in public.
5            In 1594, the Queen of England issued a
6    proclamation asking her sheriffs to again -- and it was not
7    the first proclamation, as you see from the law review
8    articles that cite all of the history, this went on
9    repeatedly.  But in her interpretation of the statute of
10   Northampton, she pointed out that public carrying had been a
11   problem and was to the terror of the country, to the
12   terror -- well, of to her people, to her subjects.
13           And she asked the sheriffs to enforce the ban from
14   the statute of Northampton, including open carrying and
15   secretly small weapons.
16           And if this Court -- all of the cites for this are
17   in Patrick Charles' 2012 law review article, and at page 22,
18   you get this queen's quote.
19           And it's interesting because she's talking about
20   open carry and concealed carry, and that is the first
21   reference of this terrifying the people.
22           And, indeed, public carrying was banned because it
23   caused terror to the people, not only when it did cause
24   terror to the people.
25           Indeed, if this were not so, the statute itself

1 would be completely inconsistent.  It has all of these

2 exceptions, like the king's servants in his presence and the

3 king's ministers, and what they refer to as the human cry,

4 which is when citizens are called by government officials to

5 come out and suppress criminal activity.

6         And it seems very unlikely that the human cry

7 public was actually, once they had that license, entitled to

8 go out and terrify the public, or even that the king's

9 servants and the king's ministers could terrify the public.

10         THE COURT:  When was open carry banned in the

11 District of Columbia?

12         MS. JOHNSON:  That is a -- it's a bit of a tricky

13 question, because there's an 1857 statute.

14         THE COURT:  That's why I asked you.

15         MS. JOHNSON:  What?

16         THE COURT:  That's why I asked you.

17         MS. JOHNSON:  Yes.

18         I can tell you --

19         THE COURT:  You're supposed to be an expert on

20 this stuff, right?

21         MS. JOHNSON:  I try.

22         I can tell you that by the -- I think it's 1913,

23 Congress had definitely stepped in and allowed open carry,

24 and concealed carry was strictly regulated by license.

25         THE COURT:  Was that as a result of an

1 assassination attempt on a president?

2        MS. JOHNSON: It may well have been. I do not

3 claim to be a historian.

4        THE COURT: All right.

5        MS. JOHNSON: I do my best, but this is not my

6 area of expertise. But I can also say that between 1858 and

7 that time, it's not clear.

8        There is a statute in 1858 that bans carrying or

9 having concealed about your person, and we believe that

10 that's meant to be in the disjunctive. But, again, this is

11 area that historians are still looking at. They're trying

12 to find -- cases aren't published from back then, so you're

13 looking at newspaper articles. It's a tricky thing to work

14 out.

15        But I do want to note that while the District's

16 law is relevant, it is not the answer to the question.

17 All right? The question here for longstanding is not

18 longstanding in this jurisdiction, it's longstanding so that

19 you get a sense of what the people believed the right

20 protected.

21        THE COURT: Who said that? Has the D.C. Circuit

22 actually said that?

23        MS. JOHNSON: Oh, someone has said that.

24 I don't know who it is.

25        THE COURT: So that's just not your theory?

1      MS. JOHNSON:  No, it's not just my theory.

2   That I know.  I know for sure someone said that.

3      Yes, definitely.  And it makes sense, because the

4   point is that the Constitution applies everywhere and to

5   everyone.

6      And the ultimate question, when we start talking

7   about what is longstanding and what is not, the question

8   we're trying to answer is whether a right was -- is a

9   venerable, widely understood liberty.  That's what the

10  Constitution enshrined.  If it was not a venerable, widely

11  understood liberty, it is not within the scope of the Second

12  Amendment.

13      And while I'm speaking about the scope of the

14  Second Amendment, I do want to address this question about

15  *Heller II*, because I think it's very important, about

16  whether you can rebut this scope question by saying

17  something is greater than de minimis.

18      I will be the first to concede that that sentence

19  in *Heller* is a little difficult to unpack, but I'm going to

20  read the clause and then tell you how I believe it should be

21  interpreted.

22      *Heller II* says that a plaintiff can rebut the

23  presumption that something is longstanding and therefore,

24  beyond the scope of the Second Amendment by showing the

25  regulation does have more than a de minimis effect on his

1  right.

2         And those words, "his right", are critically

3  important, because it begs the question, what is his right.

4  It can't be that it has a more than de minimis effect on

5  something that is beyond the scope of the Second Amendment,

6  because if it's beyond the scope of the Second Amendment, it

7  simply isn't protected.

8         Indeed, if you look at *Heller's* presumptively

9  lawful measures, and some of which have upheld repeatedly,

10  like a ban on felons, no one would suggest that for a felon,

11  a ban on possession is a de minimis burden.  That's way more

12  than de minimis, and yet, it is longstanding and therefore,

13  beyond the scope.

14        So the way that I think that this is supposed to

15  be read is that even if a law is generally longstanding, a

16  plaintiff can prove its affect will have a greater than de

17  minimis effect on a right that is within the scope of the

18  Second Amendment.

19        And as an example, I would say, let's say that a

20  training requirement is longstanding.  And yet if a city

21  like Chicago were to ban all training centers and firing

22  ranges within the city, then suddenly the effect of that

23  longstanding law is making it -- severely burdening a right

24  that we know is protected under the Second Amendment.

25        Otherwise, we run into a problem of saying that a

1   law might have been completely permissible at the time of
2   the codification, and the right was not a venerable, widely
3   understood liberty.  And yet, if it's a great burden, it's
4   beyond the scope.
5            THE COURT:  So assume for the sake of discussion
6   that does create a substantial burden on a core right.
7   What standard should apply, and why is it that you should
8   win under either standard?
9            MS. JOHNSON:  Well, I would start with the premise
10  of core right.
11           We believe that the right to carry in cities
12  without good reason is not at the core of the Second
13  Amendment, and we certainly believe that intermediate
14  scrutiny --
15           THE COURT:  Let's assume, for the sake of
16  discussion, you lose that fight.  Now I'm talking about the
17  second requirement of *Heller II*.
18           MS. JOHNSON:  Yes.
19           THE COURT:  Once you go over the first hurdle, the
20  Court still has to deal with the second hurdle erected in
21  *Heller II*.
22           MS. JOHNSON:  Yes.  And we believe --
23           THE COURT:  Applying one of the standards of
24  scrutiny.
25           So let's go through each of the standards of

1    scrutiny.  Explain to me why you don't think you not only

2    don't lose, but you win applying strict scrutiny or

3    intermediate scrutiny.

4              Start with strict scrutiny.

5              MS. JOHNSON:  Start with strict scrutiny.

6              We believe intermediate scrutiny would be the

7    appropriate test and not strict scrutiny.  And the reasons

8    for that -- and then I'll address the merits of strict

9    scrutiny.

10             The reasons for that -- I, again, just urge this

11   Court to look at *Kachalsky*, *Woollard*, and *Drake*, because

12   they all address that.  The reason for that is the history

13   of regulation.

14             And, in fact, this Court can look to other --

15             THE COURT:  Well, there's no history of this type

16   of regulatory scheme in this District.

17             MS. JOHNSON:  Oh, but the history is not this

18   regulatory scheme.  The history is an even --

19             THE COURT:  Well, all they're seeking an

20   injunction as to is this particular narrow aspect of this

21   regulatory scheme, the "Good" and "Proper" reason

22   requirement.

23             MS. JOHNSON:  I apologize.  Yes, I can --

24             THE COURT:  That's all they're asking for an

25   injunction to.

1       And there is no history of that being used as a

2  part of a regulatory scheme in the District of Columbia.

3  So history has very little to no value in that respect.

4       MS. JOHNSON:  Respectfully, I disagree, because --

5       THE COURT:  You're entitled to, but you need to

6  start talking about -- you've only got about 7 minutes left

7  and you haven't talked about strict or intermediate scrutiny

8  yet and you've got 7 minutes.

9       MS. JOHNSON:  All right.  Quickly, I'm going to

10  answer your question.  Then I'm going to talk about

11  strict --

12       THE COURT:  I hope Mr. Gupta is going to go into

13  that, but my guess is he's not, so you've got about 7

14  minutes.

15       MS. JOHNSON:  Here's what's important.

16       First of all, *Heller II* says that the question has

17  to do with jurisdictions beyond D.C.  And so if this Court

18  looks to *Heller II* at 1254, it talks about that.

19       And with regard to the "Good Reason" standard, it

20  is a less burdensome restriction than a flat-out ban.

21  The history --

22       THE COURT:  How do you figure that?

23       MS. JOHNSON:  Because a flat-out ban says that

24  nobody can carry.

25       It's less restrictive to say that some people can

1    carry than that nobody can carry.  And if the history is

2    that nobody could carry, then historically, this law is

3    longstanding.

4          But I will --

5          THE COURT:  Do you have any statistics or

6    information as to the number of applicants that have been

7    granted and how many have been rejected?

8          MS. JOHNSON:  Yes.  324 applications; 61 approved,

9    214 denied.

10         THE COURT:  324 applications.  Say it again now.

11         MS. JOHNSON:  61 approved.

12         THE COURT:  All right.

13         MS. JOHNSON:  The remainder denied.

14         THE COURT:  And as to the ones approved and

15    denied, is there any place for the public to go to see what

16    the reasons given were for the "Good" and "Proper" reason,

17    so that they can see what was rejected and what was

18    approved?

19         MS. JOHNSON:  I assume that they are subject to

20    FOIA, but I do not know.  I do not know.

21         But I can tell you -- because I know, you know,

22    talking about this black box, and I want to assure you that

23    there's not this giant secret around it.  And, indeed, it's

24    not just the District's law.  New York has had this law for

25    100 years.

1          THE COURT:  I would assume that you, defending

2     this position, would have gone and looked at that.

3          MS. JOHNSON:  At whether it's FOIA-able?

4          THE COURT:  No.  Well, not only whether it's

5     FOIA-able.  You would have gone to look and see the

6     applications that were granted and the ones that were

7     rejected and what the reasons were that they were granted or

8     rejected, that you would have firsthand knowledge.  It's not

9     that many.  It's 324.

10         MS. JOHNSON:  It's not that many.

11         THE COURT:  It's a very small amount.  You could

12    put two -- let me finish.

13         You could put two paralegals on that and have a

14    synopsis of it within a matter of a couple days.

15         MS. JOHNSON:  I could.

16         And we can provide that information if Your Honor

17    wants it.

18         This is an as-applied challenge, and there is

19    judicial review for people who are denied for lack of good

20    reason.  There's a whole administrative review.

21         I do want to talk quickly about intermediate

22    scrutiny.  All the evidence that we have already amassed is

23    in my brief, and I don't need to get into that.

24         But I think the really important element of both

25    intermediate scrutiny and strict scrutiny is that when there

1    are empirical questions that are up in the air, this Court
2    must defer to the legislature.  That's what *Turner II* says.
3    It says even with respect to conflicting prediction.
4              THE COURT:  You mean the D.C. City Council?
5              MS. JOHNSON:  Yes.
6              THE COURT:  Okay.
7              MS. JOHNSON:  Absolutely.
8              THE COURT:  Okay.  What do we have in the way of
9    legislative history there?
10             MS. JOHNSON:  We have a committee report, which is
11   in the record.  And it cites the John Donohue study.  And I
12   encourage this Court to read.  The John Donohue study is the
13   most recent and comprehensive and involves modern
14   statistical modeling that deals with more than just raw
15   numbers.  So yes, you look at the council.  You also look at
16   the evidence we will put on with the Court.
17             And I included additional evidence in our briefing
18   that we intend to put on in this case, because it's not just
19   what the council relied on.  Both *Turner II* and *Heller II*
20   talked about that.
21             And for strict scrutiny, Humanitarian Law Project
22   also says that you defer to the executive and the
23   legislature when it comes to these questions.
24             We don't just say, oh, well, it's hard to
25   directly -- all we have is correlation.  We don't actually

1 have direct evidence that this points to this, and,

2 therefore, we can't legislate. That's not the way

3 legislation is done. The Courts defer to the predictive

4 judgments, and the District has produced more than

5 substantial evidence, more than substantial evidence that

6 the creating --

7         THE COURT: Well, if that's the case, why do we

8 need to do more discovery at all?

9         MS. JOHNSON: Because we don't want this to be

10 remanded like it was in *Turner II* and *in Heller II*.

11         *Heller II* was after summary judgment, and still

12 the Court remanded for more evidence.

13         THE COURT: Well, the D.C. Circuit tends to do

14 that a lot anyway.

15         MS. JOHNSON: Well, we would like to give it a

16 full record, and we think we're entitled to it.

17         THE COURT: Well, you just said you've got a

18 plentiful record. You've got more than enough evidence, you

19 just said, to defend your position. You just said that.

20         MS. JOHNSON: Yeah.

21         THE COURT: You're not backing off of that, are

22 you?

23         MS. JOHNSON: Not at all. I believe it's more

24 than enough evidence.

25         THE COURT: Very good. Then you have a complete

1   record.

2          MS. JOHNSON:  Yet -- and I don't think that

3   plaintiffs would agree that it would be better to rule now

4   on this evidence.

5          THE COURT:  I'm not sure I know what he's going to

6   say on that subject.

7          MS. JOHNSON:  Well, that's a good point.

8          THE COURT:  I'm looking forward to hearing it in

9   about 6 minutes.

10          MS. JOHNSON:  I won't speak for him.

11          I do want to address this *Heller* 3-1 gun for 30

12   days, because this is a very different issue here.  That

13   was, first of all, based on an undoubted, core, central

14   constitutional right to keep arms in the home.

15          But beyond that, there is no quota here.  If 90

16   percent of the people had their various different, special

17   reasons, then 90 percent of the people could carry a

18   handgun.

19          What the District has done is determined that

20   there is great public risk to public carrying.  And the

21   public shouldn't bear that burden unless somebody has a

22   special self-defense need.  That's where the tailoring comes

23   in.

24          THE COURT:  Wasn't it Chief Lanier herself who

25   said that the concern that the police have is not those that

1    are licensed, but those that are carrying without a license?

2          MS. JOHNSON:  That's not what she said.  And I --

3    she needs to -- we would speak at some point about, again,

4    on a full record, about everything she said.

5          But also, Chief Lanier is not the council, right?

6    I mean, Chief Lanier backs our law, and I'm not suggesting

7    she doesn't.

8          THE COURT:  She's the one who has to pass on the

9    applications, her office.

10          MS. JOHNSON:  Under a specific standard

11    established.  The council establishes the law, Chief Lanier

12    executes it.  And the law has -- there's a whole wealth of

13    standards there.

14          The council is the one that has made this

15    determination.  It has tailored the law so that people with

16    a specific self-defense need can carry.

17          And it is important that this law be allowed to

18    stay in force while this litigation is going on.  It's an

19    important public safety regulation, and we need it to stay

20    in effect while we're litigating this case.

21          THE COURT:  Very good.

22          Mr. Gupta.

23          MR. GUPTA:  Good afternoon, Your Honor.

24    Deepak Gupta for Everytown for Gun Safety.

25          I'm going to talk about the historical analysis.

1    And before I do, let me make a pitch to try to persuade you

2    why you should care about the historical analysis at all.

3           You asked --

4           THE COURT:  Whoa, whoa, whoa.  What would ever

5    lead you to believe that I don't?  What is the basis of that

6    assumption, Mr. Gupta?

7           MR. GUPTA:  Well, you asked a good question to my

8    colleague, which was --

9           THE COURT:  Are you saying based on a question

10   I've asked, I've indicated that --

11          Wait till I'm finished, Mr. Gupta.  You heard what

12   I told your co-counsel.

13          MR. GUPTA:  Correct.

14          THE COURT:  Based on a question I asked, you're

15   suggesting that I don't care about the historical context of

16   this case?

17          MR. GUPTA:  I don't mean to suggest that you don't

18   care, I just want to try to answer the question that you

19   asked my colleague.

20          THE COURT:  Don't make accusations like that in my

21   courtroom.  That's not an appropriate way to advocate in

22   this courtroom.

23          MR. GUPTA:  I'm sorry, we've gotten off on the

24   wrong foot.

25          THE COURT:  You certainly have, Mr. Gupta.

1        MR. GUPTA:  I just want to try to persuade you

2   that the history --

3        THE COURT:  Especially when I move this argument

4   to accommodate your trip today.

5        MR. GUPTA:  And I greatly appreciate that.

6        THE COURT:  I'm glad to hear you do.

7        Now, start over.

8        MR. GUPTA:  So you asked my colleague from the

9   District why the relevant history is not just the District's

10  history but history from elsewhere, and I want to try to

11  answer that question.  And then that's, respectfully, all I

12  meant to say, Your Honor.

13       I think it's hard to come away from *Heller* without

14  the impression that this is a deeply historical inquiry;

15  that the question is, what is the scope of the right and

16  what was the scope of the right in 1791, as well as when the

17  Second Amendment was incorporated to the states after

18  the Civil War.

19       And if you look at *Heller II*, there, the

20  D.C. Circuit was considering the registration requirement in

21  the District of Columbia, and it went through an analysis of

22  whether that requirement was longstanding within the meaning

23  of *Heller*.

24       And what it did there was --

25       THE COURT:  Want the public to carry.

```
1              MR. GUPTA:  No, it wasn't.

2              THE COURT:  Very different situation.

3              MR. GUPTA:  Exactly.

4              But just to go to your -- I'm trying to answer

5     your question about whether it's the District's history

6     that's relevant or other history.

7              The D.C. Circuit looked at other jurisdictions to

8     conclude that the registration requirement was longstanding,

9     because what matters is the category of regulation in

10    question, not the particular history of the law -- the

11    specific law in question; otherwise --

12             THE COURT:  Why isn't what matters most is the

13    history in this and other jurisdictions with statutory

14    regimes similar to this one?

15             MR. GUPTA:  I think that is the right question,

16    Your Honor.

17             THE COURT:  Okay.  Give me an example,

18    historically, in another district, if not this district,

19    where they used a regulatory scheme similar to this one,

20    requiring a "Good" or "Proper" reason as a basis to permit a

21    person to carry in public?

22             MR. GUPTA:  So the "Good" or "Proper" reason

23    requirement, I think the most analogous example is what we

24    call in our brief the Massachusetts model statutes.

25    So those began in the 1830s in Massachusetts, and they were
```

1    carried forward across the country through the Civil War.

2    But that's just the good-cause requirement.

3           If you're asking the question, you know, what is

4    the scope of the right, I think it's relevant not just where

5    do you find the good-cause requirement, but where do you

6    find the restriction on public carry in highly populated

7    areas.

8           And I think for that question, I think it's

9    relevant to go back to England, to the 13th century and the

10   14th century.  Perhaps, the most analogous is to look at the

11   statute that covered Westminster, which was the seat of

12   government in London.  And so that's analogous to the

13   District, right, a highly populated area, where you have

14   sensitive places, you have the seat of government.

15          THE COURT:  They're not challenging that.

16          Mr. Thompson made it very clear in his argument,

17   and I think his brief is pretty clear on this too, they

18   didn't have any objection to cordoning off certain sections

19   of the city for obvious reasons:  The Capitol, the

20   White House, Embassies perhaps, the Department of Justice,

21   whatever.  They have no problem with those kind of

22   restrictions.  They're focusing on this specific requirement

23   of the "Good" and "Proper" reason.

24          And as it relates to non-cordoned-off areas,

25   non-segregated areas.

1    MR. GUPTA:  Well, but the historical tradition,

2    I think, shows that in England and then in the colonies and

3    in the United States, whole cities were, indeed, cordoned

4    off in this way, and the City of London was one of those

5    places.

6        So at page 7 of our brief, you'll find a statute

7    that was in effect in the City of London starting in 1381

8    and on through the 18th century; and that that statute said

9    that public carrying of arms in the City of London, with

10   certain exceptions, was forbidden.  And those exceptions

11   included people who were responsible for keeping the peace,

12   for example, you know, police officers, as well as valets of

13   the lords.

14       And so what I think --

15       THE COURT:  So how does that have anything to do

16   with the Founding Fathers enshrining in our Constitution a

17   right to bear arms?  How are those two connected?

18       Mr. Thompson gave specific examples, obviously, of

19   statements made publicly by three of the first presidents

20   with regard to the importance of being able to carry arms

21   for self-protection.

22       What counter-examples are there, among the

23   Founding Fathers, or anyone else of stature back then,

24   suggesting that they were more concerned about the City of

25   Northampton or what's going on in London as their thinking

1  or as their basis for thinking with regard to the Second

2  Amendment?

3          MR. GUPTA:  Well, we don't deny that the Founders

4  were very concerned about self-defense and protection and

5  that that was part of their thinking about the --

6          THE COURT:  This, after all, was a country that

7  was in the developing stage.

8          MR. GUPTA:  Right.

9          What Mr. Thompson did not give you is statements

10  by the Founders indicating that they thought it was

11  permissible to walk down the streets of Philadelphia or

12  Boston or other major cities armed, and that is the relevant

13  question here.

14          And I think that's why the Northampton statutes

15  and the analogous statutes adopted in the colonies are the

16  most relevant examples to look to, not statements by the

17  Founders about the importance of carrying arms, which they

18  were free to do under Northampton in the countryside and

19  outside of populated areas.  So I think that's the relevant

20  question.

21          And let me just say a little bit about how to

22  frame the question.

23          I think the question is not, I hope I've

24  established, whether *Heller* applies outside the home.

25  The question is whether a law that restricts but does not

1 foreclose carrying and does so in an exclusively urban area

2 at the seat of government is consistent with the Second

3 Amendment's historical scope.

4          And I think the answer is yes.  You can start back

5 in Westminster in 1313.  You can look at Northampton in

6 1328.  But you can also trace those prohibitions forward all

7 the way through to laws that were enacted just around the

8 time -- just before the Civil War and after the Civil War.

9          And the upshot of my friend's --

10          THE COURT:  Certainly, there's a long tradition in

11 England for law enforcement officers, Bobbies, in

12 particular, in London, to not be armed either openly or

13 concealed when they're doing their police duties.  That is

14 the exact opposite tradition --

15          MR. GUPTA:  Right.

16          THE COURT:  -- of the United States.

17          Every major city in the United States has its law

18 enforcement officers openly carrying weapons, openly, and

19 that has been the tradition in the United States in every

20 major city in the United States for well over 100 years.

21 I don't think you'd disagree with that.

22          MR. GUPTA:  Well, I don't, but I'd like --

23          THE COURT:  Of course you wouldn't.

24 The traditions in London, while they may have some

25 historical interest or value, don't seem to shed a lot of

1  relevant light on the last 100-something years in the

2  United States, 150 years in the United States, do they?

3        MR. GUPTA:  Well, I mean, I think they're

4  relevant, but I think if you want to look at the U.S.

5  history, I'd like to focus you on that, because I think,

6  actually, our case is stronger on the American history.

7        THE COURT:  Go ahead.

8        MR. GUPTA:  If you look at pages 12 through 16 of

9  the Everytown brief, you will find dozens of state and local

10 laws passed just before and after the Civil War, ranging

11 from New Haven to Nashville to Syracuse to Los Angeles, even

12 Tombstone and Dodge City, which we think of as the Wild

13 West, you had to check your guns at the city limits.

14 You could not carry around guns on the streets of those Wild

15 West towns.

16        And so I think that should give you some pause

17 about the other side's history, because it suggests that the

18 very folks who ratified the 14th Amendment and, in turn,

19 incorporated the Second Amendment to the states, had just

20 before that enacted laws that, on their view, are

21 inconsistent with the Second Amendment.

22        THE COURT:  Now, those laws that you're citing to

23 in that section of your brief, were those laws regarding

24 open carry, concealed carry, or both?

25        MR. GUPTA:  Both, Your Honor.

1          THE COURT:  Okay.

2          MR. GUPTA:  So it's clear that in those cities --

3   and these are not aberrations.  This was nationwide.  And we

4   can supply you with more laws if we have more briefing

5   space.  But it was a national trend that, you know, even

6   where we think of as the Wild West, that you could not carry

7   openly within the city limits.

8          And so I think those laws are a big problem for

9   their position, because it means that all of those laws were

10  unconstitutional under the Second Amendment.  And I haven't

11  heard them deny that.  I didn't hear Ms. Murphy deny that.

12  And this is to say nothing of the earlier American laws, the

13  Northampton variance.  So let's forget about England.

14         But if we look at the colonies just before the

15  ratification of the Constitution, those colonies, including

16  Virginia, and Virginia's laws became the District's law,

17  adopted Northampton statutes.  Some of them did so just by

18  adopting the common law.  Some of them did so by enacting

19  their own versions.  And so those laws too would be

20  unconstitutional under my friend's view.

21         Now, their response is to try to limit or

22  reinterpret Northampton to suggest that it didn't do quite

23  what we say it does.  And so I'd like, if I may, to respond

24  to those concerns.

25         The first thing they say is they focus on this

1  language in the Statute in Terrorem Populi Regis.

2          And I'm no expert on Latin.  I've tried very hard

3  to try to figure out what that meant, looking at the

4  treatises and the cases, and I've come away with a pretty

5  clear impression that what it did not mean was that you had

6  to engage in specific threatening behavior or have some kind

7  of specific threatening intent.

8          First of all, if you just think about this as a

9  statutory structure matter, this is a statute that has all

10  of these exceptions for the king's officers, for, you know,

11  carrying arms in the countryside, for quelling riots, for

12  carrying out your militia service.  It would make no sense,

13  if the statute was aimed at threatening specific bad

14  conduct, to have those kinds of exceptions.  So it was

15  obviously a much more general regulatory scheme.

16          And then if you look at some of the cases, even

17  the cases that my friends on the other side cite; for

18  example, there's a case from 1615, *Chune versus Piott*, which

19  discusses this statute.  And it says that the sheriff has

20  the power to arrest, "anyone who carry weapons in the

21  highway, even if he doth not break the peace."  In terrorem

22  Populi Regis, "even if he doth not break the peace."

23          And so I think what that shows is, this was –– it

24  was carrying that was prohibited, at least within urban

25  areas, and not terrorizing behavior.

1          So I think that argument does not wipe away the

2     Northampton prohibitions either in England or in the

3     United States.

4          THE COURT:  One minute.

5          MS. JOHNSON:  And then let me just, lastly, say,

6     my friend, Ms. Murphy, said that you should disregard the

7     good-cause variance statutes in the United States because

8     they're essentially civil actions, and they were not.

9     They were --

10          And we've provided all of these statutes in an

11     appendix, Your Honor, so that you and your law clerks can

12     take a look, because I think there's a lot of history on

13     both sides, but you can actually look at these statutes

14     yourself.  They're very clearly criminal statutes.  They

15     say, you know, this is how the offense is punished.

16          And so if you accept their view, all of those

17     statutes would have violated the Second Amendment; that it

18     should at least give you pause before you accept a much

19     greater expansion of the Second Amendment right in this very

20     sensitive, urban location.

21          THE COURT:  Until *Heller*, the original *Heller*

22     opinion, the Supreme Court hadn't really specifically

23     addressed that Second Amendment right at all.

24          MR. GUPTA:  That's right.

25          THE COURT:  So I mean, it's still, in the world of

1    jurisprudence, this is -- we're still in a very early stage

2    of the development of this area of the law.

3              MR. GUPTA:  I think that's right.

4              But I think if you look at the Third, Fourth, and

5    Second Circuits, they have all upheld good-cause

6    requirements that applied statewide.  They're

7    indistinguishable in every way except that they're broader

8    than this one because they apply statewide, and no circuit

9    has struck down a requirement like that.

10             So what they're asking you to do is far more

11   extreme.  It's asking you to say that even in this highly

12   urbanized area full of, you know, diplomats and Congressmen

13   and people walking freely, that the government doesn't have

14   the power to restrict public carry.  That is foreign to our

15   historical tradition.  Thank you.

16             THE COURT:  Thank you.

17             MR. GUPTA:  And I do really appreciate your

18   accommodation.  Thank you.

19             THE COURT:  All right.

20             Mr. Thompson, you can have an extra minute,

21   because I gave him an extra minute.

22             MR. THOMPSON:  Thank you, Your Honor.  I'll try to

23   go quickly.

24             On the discovery question, there was no discovery

25   in *Palmer*, there was no discovery in the *Moore* case, and

1   we would respectfully submit there doesn't need to be any

2   discovery in this case.

3        With respect to what Chief of Police Lanier said,

4   I will quote, because I know there was a colloquy about that

5   quote, "law-abiding citizens that register firearms that

6   follow the rules are not our worry."  That's what she said

7   after the *Palmer* case.

8        *Woollard* and *Kachalsky* and *Drake* have been invoked

9   by my friends on the other side, and I would respectfully

10  say that binding D.C. Circuit precedent precludes following

11  the path of those three cases.

12       *Heller III* said that it is not legitimate for a

13  governmental entity, the District, to target and try to

14  suppress the exercise of a right.  And that was the basis in

15  *Woollard* and *Kachalsky* and *Drake*.  The Court said, well,

16  you're trying to limit carriage.  That's going to have some

17  public safety benefits.  Maybe we'll defer to that.  And as

18  a consequence, it's okay.  *Heller III* says it's not okay in

19  this Circuit.

20       With respect to the model laws, Mr. Gupta was

21  asked, is there any law that is similar to what's at stake

22  here?  And he invoked the Massachusetts model.

23       It's really important, Your Honor, to make clear,

24  that law was radically different.  Those laws, they were not

25  bans.  They were what were called surety laws.  So that if

1    somebody came and said that a person was a threat to them,

2    then that person, unless they could show that they

3    themselves were threatened, would have to post a surety, but

4    they were allowed to continue to carry.

5         Here, there's no -- first of all, that was,

6    obviously, a very small subset of the people who were

7    impacted, and even those people who were specifically

8    identified as threats were able to carry.

9         They said that there was no example of the Founder

10   saying you could carry in a heavily urban environment.

11   The Boston Massacre took place in the most urban of

12   environments, Your Honor.

13        I would say -- they said on pages 12 to 16 of the

14   Everytown brief that there are dozens of examples of cities

15   banning carriage.  Of the top 100 population centers, they

16   identified four.  Four percent is what they have identified

17   to date.

18        With respect to the colonies, they say, well, some

19   of these colonies had Northampton analogues.

20        Well, let's look at North Carolina.  In 1843, the

21   North Carolina Supreme Court interpreted that statute and

22   said, it is not a ban on carriage, it is what we said it

23   was, which is -- and what Judge Posner said, which was, it

24   was a ban on carrying and terrifying people.

25        Likewise in Virginia, there was a Northampton

1  analogue.  They say that's a ban on carriage.

2          But Virginia subsequently passed a ban on

3  concealed carry.  If that Northampton analogue were as

4  sweeping as they say, then why would Virginia have gone back

5  and passed concealed carry?  It would have been totally

6  redundant.

7          So, Your Honor, for all those reasons, we would

8  respectfully request that the Court enter the relief we

9  seek.  Thank you, Your Honor.

10          THE COURT:  Very good.

11          All right, Counsel, in the normal course of events

12  when we have a PI, especially one that's novel and complex,

13  I usually give both sides an opportunity to submit a

14  supplemental pleading based only on issues that arose in

15  this courtroom today.  So once you get the transcript, which

16  will take a few days, you're welcome to review it, and,

17  you know, decide what you want, if anything, to say, and

18  supplement your argument that way.

19          We've all had the experience of, you know, being

20  out in the pub after an argument and saying, gee, I wish I'd

21  said this, I wish I'd said that, I wish I'd said that.

22  Well, this will give you a chance to do that; this will give

23  you chance to do that.  And you can have two weeks to do

24  that, okay.

25          Now, separate and apart from that, separate and

```
 1   apart from that, I think on this issue of consolidation on
 2   summary judgment, I think probably the neatest and cleanest
 3   thing to do is to have, if the plaintiffs want that,
 4   plaintiffs should file a motion for that, the defense can
 5   oppose it if they wish, and you can do a reply.
 6           In your motion for it, if you're going to seek it,
 7   and I'm not telling you what to do, that's your decision,
 8   you talk to your client, you figure it out.  If you're going
 9   to do it, then you need to address, obviously, the discovery
10   issue in it, because, obviously, they're going to address
11   the discovery issue in opposing it.  If you seek it, they've
12   already said they'll oppose it.
13           So I think you should be anticipating that, and
14   you should address it.  If you're going to move for it,
15   they're going to oppose it, in part, at least in part
16   because of the discovery concerns that they have.
17           And I'll give each side a chance to flush that
18   out, because it obviously hadn't arisen in the original
19   briefs that the Court has received in this case, even though
20   they are quite voluminous, I might add.
21           So think of it as two tracks.  You can have two
22   weeks to do the supplemental briefing based on the arguments
23   today and only based -- two weeks from the date of you
24   getting the transcript.  So if you get the transcript a week
25   from now, then it's two weeks after that, okay.
```

1          As far as the motion for consolidation, you can

2    have two weeks from today.  So you might end up doing that

3    brief first, and -- because, you know, as good as he is, and

4    he's really good, it takes him a while, because he's a

5    perfectionist, he wants to get it down right, and you guys

6    both spoke -- all of you spoke rather quickly.

7          So he's got the tape recorder, though, to compare

8    his notes to, so I'm sure you'll get a very good transcript

9    of the process.

10          On the whole, the briefs and the arguments were

11   way above the standard we see in this Court.  Compliment the

12   advocates for their hard work.  We'll stand in recess.

13          DEPUTY CLERK:  All rise.

14          This Honorable Court is now in recess until the

15   return of court.

16          (Proceedings concluded at 3:04 p.m.)

17

18

19

20

21

22

23

24

25

## C E R T I F I C A T E

        I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.


Date:_February 5, 2016_____    /S/__William P. Zaremba_____

                             William P. Zaremba, RMR, CRR

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MATTHEW GRACE and PINK PISTOLS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Case No. 15-2234 (RJL) |
| | ) | |
| DISTRICT OF COLUMBIA and CATHY | ) | **FILED** |
| LANIER, in her official capacity as | ) | |
| Chief of Police for the Metropolitan Police | ) | MAY 1 7 2016 |
| Department, | ) | |
| | ) | Clerk, U.S. District & Bankruptcy |
| Defendants. | ) | Courts for the District of Columbia |

**MEMORANDUM OPINION**
(May __17__, 2016) [Dkt. #6]

In 2008, the Supreme Court recognized for the first time that "the Second Amendment conferred an individual right to keep and bear arms." *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). As such, it struck down as unconstitutional the District of Columbia's ("the District's") total ban on handguns in the home. *Id.* at 635. Since then, various courts have considered a multitude of challenges to gun laws, charting the contours of a constitutional right that has been the people's since the infancy of our Nation. In this case, plaintiffs Matthew Grace ("Grace") and the Pink Pistols challenge the constitutionality of yet another law, and set of regulations, enacted by the District. In particular, they contend that the District's requirement that applicants for a license to carry a concealed firearm demonstrate a "good reason to fear injury to his or her person or property" or "any other proper reason for carrying a pistol," as further

defined by District law and regulations (collectively "the 'good reason' requirement"), is inconsistent with the individual right to bear arms under the Second Amendment and therefore unconstitutional.   *See* Compl. ¶¶ 11–15 [Dkt. #1] (quoting D.C. Code § 22-4506(a)).  Presently before the Court is plaintiffs' Motion for a Preliminary and/or Permanent Injunction to enjoin the District and Chief of Police Cathy Lanier ("defendants" or "the District") from enforcing the "good reason" requirement.  Pls.' Mot. for Prelim. and/or Permanent Inj. [Dkt. #6].  Upon consideration of the record, the relevant law, and the pleadings, briefs, and oral arguments submitted and presented by the parties and the amici curiae, I find that plaintiffs have demonstrated a substantial likelihood of success on the merits of their claim that the District's "good reason" requirement is unconstitutional, that they will suffer irreparable harm absent preliminary injunctive relief, and that the equities and the public interest weigh in plaintiffs' favor.  I will therefore GRANT plaintiffs' request for a preliminary injunction prohibiting the District from requiring individuals to comply with the "good reason" requirement when applying for a concealed carry permit.

## Statutory and Regulatory Background

In *Heller*, the Supreme Court held that the District's ban on the possession of handguns in the home violated the Second Amendment.  554 U.S. at 635.  Shortly thereafter, the District adopted the Firearms Registration Amendment Act of 2008 ("FRA"), 56 D.C. Reg. 1365–80 (Feb. 13, 2009), to conform to the Supreme Court's ruling and to provide a "new scheme for regulating firearms."  *Heller v. District of*

2

**JA 531**

Columbia ("*Heller II*"), 670 F.3d 1244, 1249 (D.C. Cir. 2011).   The FRA required registration of handguns but provided that individuals who were not retired police officers could only obtain "registration of pistols for use in self-defense within the registrant's home" and, therefore, could not carry firearms outside the home.   56 D.C. Reg. 1365.   Six years later, in *Palmer v. District of Columbia*, visiting Judge Frederick J. Scullin, Jr.,[1] sitting by designation, ruled that "the carrying of an operable handgun outside the home for the lawful purpose of self-defense, though subject to traditional restrictions, constitutes 'bear[ing] Arms' within the meaning of the Second Amendment." 59 F. Supp. 3d 173, 181–82 (D.D.C. 2014) (quoting *Peruta v. Cnty. of San Diego*, 742 F.3d 1144, 1166 (9th Cir. 2014)) (alteration in original).[2]   He went on to hold that the District's "complete ban on the carrying of handguns in public [was] unconstitutional." *Id.* at 183.

Undaunted, the District went back to the drawing board and, mimicking legislation in New York, Maryland, and New Jersey, *see* Council of the District of Columbia, Comm. on the Judiciary and Pub. Safety, Report on Bill 20-930, at 9 (2014), enacted a concealed carry licensing scheme that became effective June 16, 2015.   License to Carry a Pistol Amendment Act of 2014, 62 D.C. Reg. 1944–57 (Feb. 6, 2015).   Under the

---

[1] Judge Scullin is a Senior Judge of the Northern District of New York who was at that time serving as a visiting judge in the District of Columbia by designation of the Chief Justice of the United States. *See Wrenn v. District of Columbia*, 808 F.3d 81, 83 (D.C. Cir. 2015).

[2] The Ninth Circuit Court of Appeals has since ordered that *Peruta* be reheard *en banc*. *Peruta v. Cty. of San Diego*, 781 F.3d 1106, 1107 (9th Cir. 2015). Therefore, the three-judge panel's opinion no longer has precedential value, *see id.*, but it nevertheless retains its persuasive authority, *cf. Coal. to End Permanent Cong. v. Runyon*, 979 F.2d 219, 221 (D.C. Cir. 1992) ("[E]ven a vacated opinion, while no longer the law of the case, still may carry persuasive authority.") (internal quotation marks omitted).

current law, "[n]o person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, without a license issued pursuant to District of Columbia law . . . ."  D.C. Code § 22-4504(a).  The law provides for a multi-hurdle process for obtaining a concealed carry license, but the open carrying of firearms is, of course, still prohibited.  *See id.* § 7-2509.07(e); Transcript of Prelim. Inj. Proceedings at 48 [Dkt. #33].  Applicants for a concealed carry license must meet a variety of age, criminal history, personal history, mental health, and physical requirements.  D.C. Code §§ 7-2502.03; 7-2509.02.  Thereafter, they must satisfactorily complete a mandatory gun training and safety program and an in-person interview with a member of the Metropolitan Police Department to verify the information included in their application form.  D.C. Code §§ 7-2509.02(a)(4), (f).  Of relevance here, however, is a different hurdle embedded in a provision which states that the Chief of the Metropolitan Police Department "may" issue otherwise suitable applicants a license to carry a concealed firearm *only* if "it appears that the applicant has good reason to fear injury to his or her person or property or has any other proper reason for carrying a pistol . . . ."  *Id.* § 22-4506(a).

Chief Lanier was directed to issue rules establishing criteria for determining whether an applicant has shown "good reason to fear injury to his or her person" or another "proper reason for carrying a concealed pistol."  D.C. Code § 7-2509.11(1).  The criteria to determine "good reason to fear injury to his or her person" were "at a minimum [to] require a showing of a special need for self-protection distinguishable from the

4

general community as supported by evidence of specific threats or previous attacks that demonstrate a special danger to the applicant's life." *Id.* § 7-2509.11(1)(A). As to other "proper reason[s]" the criteria were "at a minimum [to] include types of employment that require the handling of cash or other valuable objects that may be transported upon the applicant's person." *Id.* § 7-2509.11(1)(B).

Chief Lanier issued regulations stating, "A person shall demonstrate a good reason to fear injury to his or her person by showing a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks which demonstrate a special danger to the applicant's life." D.C. Mun. Regs. tit. 24, § 2333.1. To satisfy this requirement, an applicant must "allege, in writing, serious threats of death or serious bodily harm, any attacks on his or her person, or any theft of property from his or her person" and must also "allege that the threats are of a nature that the legal possession of a pistol is necessary as a reasonable precaution against the apprehended danger." *Id.* § 2333.2. "The fact that a person resides in or is employed in a high crime area shall not by itself establish a good reason to fear injury to person or property for the issuance of a concealed carry license." *Id.* § 2333.4. Furthermore, an applicant "may allege any other proper reason that the Chief may accept for obtaining a concealed carry license," including that his or her employment "requires the handling of large amounts of cash or other highly valuable objects that must be transported upon the applicant's person" or that the applicant has an immediate family member "who is physically or mentally incapacitated to a point where he or she cannot

5

act in defense of himself or herself" and who "can demonstrate a good reason to fear injury to his or her person by showing a special need for self-protection distinguishable from the general community . . . ." *Id.* § 2334.1.

## FACTUAL AND PROCEDURAL BACKGROUND

The laws and regulations at issue here were first challenged in *Wrenn v. District of Columbia*, 107 F. Supp. 3d 1 (D.D.C. 2015). This Court's calendar committee assigned that case to visiting Senior Judge Scullin, and in granting the plaintiffs' Motion for a Preliminary Injunction he held that the "good reason" requirement likely "r[an] afoul of the Second Amendment." *Id.* at 12. On appeal, however, our Circuit Court ruled that Judge Scullin's designation to this Court "was limited to specific and enumerated cases" and that *Wrenn* was "not one of those cases." *Wrenn*, 808 F.3d at 83. Accordingly, the Circuit Court vacated Judge Scullin's order.[3] *Id.* at 84. Shortly thereafter, on December 22, 2015, the plaintiffs in this case filed a challenge to these same laws in a new complaint against defendants the District of Columbia and Chief Lanier, in her official capacity. *See* Compl. On December 28, 2015, plaintiffs moved for a preliminary and/or permanent injunction. *See* Pls.' Mot. for a Prelim. and/or Permanent Inj.

Plaintiff Grace is a law-abiding, responsible United States citizen and resident of the District. Compl. ¶ 2, 16. He owns four handguns and has lawfully registered them with the District. Compl. ¶ 17. He would like to carry them outside his home for self-

---

[3] The Circuit Court affirmed, however, the validity of Judge Scullin's designation to preside over *Palmer*. *See Wrenn*, 808 F.3d at 83.

defense and has completed the firearm training required under District law to obtain a concealed carry license. Compl. ¶ 17. Grace concedes he does not face any specific threat that differentiates him from a typical resident of the District; however, several events have contributed to his desire to carry a concealed handgun including his wife being robbed on a public street, the discovery of shell casings in front of his home on the sidewalk, and robberies at gunpoint that occurred in his neighborhood and for which there has been no arrest. Compl. ¶ 18. In August 2015, Grace applied for a District of Columbia concealed carry license. Compl. ¶ 20. The application asked him to state his "special need for self-protection distinguishable from the general community" or any other "proper reason" to carry a firearm under District law. Compl. ¶ 20. Having none, Grace cited the Second Amendment instead. Compl. ¶ 20. On October 19, 2015, his application was denied on the grounds that he did not demonstrate a "good reason to fear injury to person or property, or other proper reason for a concealed carry license." Compl. ¶ 21. This was the sole basis for the rejection of his application. Compl. ¶¶ 21–22.

The Pink Pistols is a shooting group, of which Grace is a member. Compl. ¶¶ 3, 16. The group advocates for "the use of lawfully owned, lawfully concealed . . . firearms for the self-defense of the sexual minority community." Compl. ¶ 3. The Pink Pistols has dozens of chapters across the country and is open to all regardless of sexual orientation. Compl. ¶ 3. The group believes, as Justice Alito recognized in *McDonald v. City of Chicago*, that "the right to keep and bear arms . . . is especially important for

7

women and members of other groups that may be especially vulnerable to violent crime." Compl. ¶ 3 (quoting 561 U.S. 742, 790 (2010) (controlling opinion)).  The Pink Pistols maintain that the District's "restrictive carry laws are a direct affront to [its] central mission." Compl. ¶ 3.

Arguing the District's "good reason" requirement violates the Second Amendment, plaintiffs request a preliminary and/or permanent injunction (1) forbidding defendants from denying concealed carry licenses to applicants who meet all of the District's eligibility requirements other than the "good reason" requirement; (2) forbidding defendants from enforcing the District's laws and regulations establishing and further defining the "good reason" requirement, and (3) directing defendants to issue concealed carry licenses to Grace and other members of the Pink Pistols, who, apart from the "good  reason" requirement are eligible for a concealed carry license. Pls.' Proposed Order 1–2 [Dkt. #6-2].  Plaintiffs do not challenge any other aspect of the District's licensing scheme. Mem. of P. & A. in Supp. Pls.' Appl. for a Prelim. and/or Permanent Inj. 7 [Dkt. #6-1] [hereinafter "Pls.' Mem."].

On February 2, 2016, I heard arguments on plaintiffs' motion from the parties and from amici curiae the National Rifle Association, on behalf of plaintiffs, and Everytown for Gun Safety ("Everytown"), on behalf of defendants.  Those amici also submitted briefs [Dkts. ##21, 22], as did amicus curiae the Brady Center to Prevent Gun Violence [Dkt. #31].  Ultimately, our Court of Appeals issued its mandate in *Wrenn* on February 5, 2016, and, on February 9, 2016, that case was reassigned to my colleague Judge

8

Kollar-Kotelly. *Wrenn v. District of Columbia*, 2016 WL 912174, at *5 (D.D.C. Mar. 7, 2016). Following the reassignment, Judge Kollar-Kotelly chose not to hear oral argument and instead, on March 7, 2016, issued an opinion denying the *Wrenn* plaintiffs' motion for a preliminary injunction. *Id.* at *15. Not surprisingly, the *Wrenn* plaintiffs filed a notice of appeal as to that decision the same day. Notice of Appeal, Wrenn v. District of Columbia, No. 15-162 (D.D.C. Mar. 7, 2016).

## ANALYSIS

When ruling on a motion for preliminary injunction, the Court must consider "whether (1) the plaintiff has a substantial likelihood of success on the merits; (2) the plaintiff would suffer irreparable injury were an injunction not granted; (3) an injunction would substantially injure other interested parties; and (4) the grant of an injunction would further the public interest." *Sottera, Inc. v. Food & Drug Admin.*, 627 F.3d 891, 893 (D.C. Cir. 2010) (internal quotation marks omitted).[4] I will address each of these factors in turn.[5]

---

[4] "The first component of the likelihood of success on the merits prong usually examines whether the plaintiffs have standing in a given case." *Kingman Park Civic Ass'n v. Gray*, 956 F. Supp. 2d 230, 241 (D.D.C. 2013). I find that Grace has demonstrated standing, as he "invoked his rights under the Second Amendment to challenge the statutory classifications used to bar his [carrying] of a handgun under D.C. law, and the formal process of application and denial, however routine, makes the injury to [Grace's] alleged constitutional interest concrete and particular." *Parker v. District of Columbia*, 478 F.3d 370, 376 (D.C. Cir. 2007), *aff'd sub nom., Heller*, 554 U.S. 570. It is therefore unnecessary to address defendants' argument that the Pink Pistols lacks standing. *See Common Cause v. Biden*, 909 F. Supp. 2d 9, 17–18 (D.D.C. 2012) ("If the Court finds that one of the Plaintiffs has standing, it need not consider the standing of the other Plaintiffs.").

[5] Our Circuit has traditionally applied a "sliding scale" approach to these four factors, *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009), under which "a strong showing on one factor could make up for a weaker showing on another." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). Following the Supreme Court's decision in *Winter v. NRDC, Inc.*, 555 U.S. 7 (2008), however,

9

## I.   Plaintiffs Have Demonstrated a Substantial Likelihood of Success on the Merits.

Our Circuit employs a two-step approach to determining the constitutionality of gun laws, *Heller II*, 670 F.3d at 1252–53.  The Court firsts asks "whether a particular provision impinges upon a right protected by the Second Amendment." *Id.* at 1252.  If it does not, there is no reason for further inquiry.  If it does, however, the Court then "determine[s] whether the provision passes muster under the appropriate level of constitutional scrutiny." *Id.*

### A.   Step One: The "Good Reason" Requirement Likely Impinges Upon A Right Protected by the Second Amendment.

In *Heller*, the Supreme Court held the Second Amendment secures at least "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 635.  The Court did not, however, "undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment[.]" *Id.* at 626.  It therefore left open the questions of whether, and to what extent, the Second Amendment protects a right to carry arms for self-defense *outside* the home.  *Heller* made clear, however, that the Second Amendment right to keep and bear arms, like other constitutional rights, is "not unlimited" and "include[s] exceptions." 554 U.S. at 595, 635.  At the same time, it is not a malleable provision that bends to "future judges' assessments of its usefulness"

---

our Circuit Court "has suggested, without deciding, that *Winter* should be read to abandon the sliding-scale analysis in favor of a 'more demanding burden' requiring Plaintiffs to independently demonstrate both a likelihood of success on the merits and irreparable harm." *Smith v. Henderson*, 944 F. Supp. 2d 89, 95–96 (D.D.C. 2013) (citing *Sherley*, 644 F.3d at 392).  Regardless of how *Winter* is read, the Court's analysis here is unaffected because I conclude that plaintiffs have made a sufficient showing of both a likelihood of success on the merits and irreparable harm.

10

and is instead "enshrined with the scope [it was] understood to have when the people adopted [it.]" *Id.* at 634–35. Thus, a "historical understanding of the scope of the right" is critical to the analysis. *Id.* at 625.

The Supreme Court identified several "longstanding prohibitions on the possession of firearms," and emphasized "nothing in [the] opinion should be taken to cast doubt on" them. *Id.* at 626–27 (citing "prohibitions on the possession of firearms by felons and the mentally ill, [] laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, [and] laws imposing conditions and qualifications on the commercial sale of arms"). The Court stated these laws are a non-exhaustive set of "presumptively lawful regulatory measures," *id.* at 627 n.26, but it "did not explain *why*" that is so. *United States v. Chester*, 628 F.3d 673, 676 (4th Cir. 2010). In *Heller II*, our Circuit Court clarified that longstanding regulations are presumptively lawful because they have "long been accepted by the public," and are therefore presumed not to cover "activities . . . protected from regulation by the Second Amendment." [6] 670 F.3d at 1253. Although our Circuit Court has yet to address the issue of the burden of proof, it seems only fair that the Government should bear the burden of demonstrating

---

[6] Of course, there is a familiar concept in First Amendment jurisprudence, where the classic examples of longstanding regulations are "[l]aws punishing libel and obscenity." *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122 (2011). Such laws do not implicate the freedom of speech, because they "existed in 1791 and have been in place ever since." *Id.* As the Supreme Court has explained, a "universal and long-established tradition of prohibiting certain conduct creates a strong presumption that the prohibition is constitutional: Principles of liberty fundamental enough to have been embodied within constitutional guarantees are not readily erased from the Nation's consciousness." *Id.* (quoting *Republican Party of Minn. v. White*, 536 U.S. 765, 785 (2002)); *cf. McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 375 (1995) (Scalia, J., dissenting) ("A governmental practice that has become general throughout the United States, and particularly one that has the validation of long, accepted usage, bears a strong presumption of constitutionality.").

that a challenged regulation is "longstanding" and therefore enjoys a presumption of constitutionality. *See, e.g.*, *Kolbe v. Hogan*, 813 F.3d 160, 176 (4th Cir. 2016) ("[I]t it is the government's burden to establish that a particular weapon or activity falls outside the scope of the Second Amendment right."), *reh'g en banc granted*, No. 14-1945, 2016 WL 851670 (4th Cir. Mar. 4, 2016); *Ezell v. City of Chicago*, 651 F.3d 684, 702–03 (7th Cir. 2011) (stating the government does not establish a challenged regulation "fall[s] outside the scope of the Second Amendment right . . . where the historical evidence is inconclusive or suggests that the regulated activity is *not* categorically unprotected"). If the Government meets this burden, a plaintiff in this Circuit may still rebut the presumption by showing that "the regulation does have more than a de minimis effect upon [his or her Second Amendment] right." *Heller II*, 670 F.3d at 1253.

Here, the parties present two potentially dispositive questions. First, is the Second Amendment's applicability limited only to the home? Second, does the "good reason" requirement enjoy a presumption of constitutionality that cannot be rebutted? If the answer to either question is "yes," the plaintiffs lose at step one because the Second Amendment has not been implicated.[7] If the answer to both is "no," the Second

---

[7] In their opening brief, plaintiffs took pains to answer the first question, but defendants responded that plaintiffs' arguments regarding the reach of the Second Amendment "defeat[] a straw man." Defs.' Opp'n to Pls.' Appl. for a Prelim. and/or Permanent Inj. 16 [Dkt #20] [hereinafter "Defs.' Opp'n"]. Although defendants are not willing to concede the right to bear arms extends outside the home, Defs.' Opp'n 17 n.9, they say the real issue here is whether the Second Amendment specifically protects a right to bear arms in a "densely populated city, filled with unique, high-risk security targets, without any specific self-defense reason." Defs.' Opp'n 16. Because they address different questions, the parties often talk past each other. I find it necessary to address each question separately, not only for the sake of clarity and thoroughness, but because plaintiffs' argument regarding the Second Amendment's applicability outside the home sets the stage for defendants' opposition.

Amendment applies, and the Court must proceed to step two.

### 1. The Second Amendment's Applicability Is Not Limited to the Home.

Plaintiffs rely on the text and history of the Second Amendment to argue that the individual rights therein extend beyond the threshold of the home. Pls.' Mem. 9–19. As is the case with all constitutional provisions, the meaning of the Second Amendment "is to be interpreted according to standard tools of statutory interpretation, beginning with its text." *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1312 (D.C. Cir. 2004); *see also Noel Canning v. NLRB*, 705 F.3d 490, 495 (D.C. Cir. 2013) ("When interpreting a constitutional provision, [a court] must look to the natural meaning of the text as it would have been understood at the time of the ratification of the Constitution."). The Second Amendment states, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." The Supreme Court has explained that "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'" *Heller*, 554 U.S. at 584. One does not typically think of "carrying" as an activity exclusively done within the home. *See Peruta*, 742 F.3d at 1152 ("Speakers of the English language will all agree: 'bearing a weapon inside the home' does not exhaust this definition of 'carry.'"). Thus, reading the Second Amendment right to "bear" arms as applying only in the home is forced or awkward at best, and more likely is counter-textual. *See Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1125 (10th Cir. 2015); *Moore v. Madigan*, 702 F.3d 933, 936 (7th Cir. 2012). Moreover, the Supreme Court recognized that when "bear" is used with "'arms' . . . the term has a meaning that refers to carrying

13

for a particular purpose—confrontation." *Heller*, 554 U.S. at 584; *see also id.* (stating that as used in the Second Amendment, the phrase to "bear arms" means to "wear, bear, or carry [arms] upon the person or in the clothing or in a pocket, for the purpose of being armed and ready for offensive or defensive action in a case of conflict with another person" (alterations omitted) (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting))). Surely confrontations do not occur only in the home, and therefore "[t]o confine the right to be armed to the home is to divorce the Second Amendment from the right of self-defense described in *Heller* and *McDonald*." *Moore*, 702 F.3d at 937. Indeed, confrontations that might necessitate self-defense are less likely to occur in the home than on the streets of a city with many dangerous neighborhoods. *See, e.g.*, Pls.' Supplemental Br. in Supp. of Their App. for a Prelim. and/or Permanent Inj. 2 [Dkt. #40] (citing the Bureau of Justice Statistics and stating "18.4% of violent crimes occur at or in the victim's home, while 26.5% occur on the street or in a parking lot or garage"). Thus, the textual analysis, when viewed with a touch of common sense and logic, weighs heavily in favor of finding that the right to bear arms reaches beyond one's doorstep.[8] Finally, I would emphasize that a legitimate need to protect oneself can

---

[8] Indeed the Supreme Court, in undoubtedly carefully selected language, has hinted the Second Amendment has application in settings other than the home. *See McDonald*, 561 U.S. at 780 (plurality opinion) ("[T]he Second Amendment protects a personal right to keep and bear arms for lawful purposes, *most notably* for self-defense within the home." (emphasis added)); *Heller*, 554 U.S. at 628 (stating the "the need for defense of self, family, and property" that is "central to the Second Amendment right" is "*most acute*" in the home (emphasis added)). Furthermore, the Supreme Court recently vacated and remanded an opinion by the Massachusetts Supreme Judicial Court that held there is no Second Amendment right to keep and carry stun guns. *Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016) (per curiam). Without reading too much into what was left unsaid, I note that, as the petitioner there was prosecuted for carrying a stun gun *in a supermarket parking lot*, the case certainly presented the

14

arise at the drop of a hat.  Thus, the right to "carry weapons *in case of* confrontation," *Heller*, 554 U.S. at 592 (emphasis added), necessarily includes a right to carry firearms to protect oneself against unanticipated and suddenly arising threats.  *Cf. Heller*, 554 U.S. at 679 (Stevens, J., dissenting) (acknowledging "the reality that the need to defend oneself may suddenly arise in a host of locations outside the home").

Not surprisingly, such a reading is also supported by the historical record.  The Second Amendment "codified a pre-existing right," *Heller*, 554 U.S. at 592, and therefore the first step in the historical inquiry is examining the right we inherited from English and natural law.  England's Bill of Rights of 1689 provided that "the subjects which are Protestants, may have arms for their defense suitable to their conditions, and as allowed by law."  1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441.  As William Blackstone explained, "the subjects of England [were] entitled . . . to the right of having and using arms for self-preservation and defence," which stems from "the natural right of resistance and self-preservation."  1 William Blackstone, Commentaries *139–40.  Early commentators on this side of the pond described the right in substantially similar terms.  *See, e.g.*, 1 St. George Tucker, Blackstone's Commentaries, App. 300 (1803) [hereinafter "Tucker's Blackstone"] (stating the that right to keep and bear arms "may be considered the true palladium of liberty" and that "[t]he right of self defence is the first law of nature"); *Heller* 554 U.S. at 585 ("Justice James Wilson interpreted the Pennsylvania

---

opportunity for any of the Justices to assert the view that the Second Amendment right does not extend to public spaces.  None did.

15

Constitution's arms-bearing right . . . as a recognition of the natural right of defense 'of one's person *or* house'—what he called the law of 'self-preservation.'" (emphasis added) (quoting 2 Collected Works of James Wilson 1142, and n. x (K. Hall & M. Hall eds. 2007))). Notably, these sources in no way suggest that the right to have and use arms in self-defense was considered a domiciliary right.

Moreover, it is unquestionable that the public carrying of firearms was widespread during the Colonial and Founding Eras. And although this fact alone does not directly prove that the people had a *right* to do so, *see McIntyre*, 514 U.S. at 360 (Thomas, J. concurring) ("[T]he simple fact that the Framers engaged in certain conduct does not necessarily prove that they forbade its prohibition by the government."), it does provide an essential context for what the people who ratified the Second Amendment understood bearing arms to entail. Indeed, in the Colonial Period, carrying arms publicly was not only permitted—it was often *required*! "[A]bout half the colonies had laws requiring arms-carrying in certain circumstances." Nicholas J. Johnson et al., Firearms Law and the Second Amendment 106 (2012). For example, in Virginia colonists were forbidden from traveling unless they were well armed, and they were required to "bring their pieces to church." *Id.* (citing William Walter Hening, 1 The Statutes at Large; Being a Collection of all the Laws of Virginia from the First Session of the Legislature in the Year 1619, at 198 (1823)). In 1639, a Newport, Rhode Island law provided that "noe man shall go two miles from the Towne unarmed, eyther with Gunn or Sword; and that none shall come to any public Meeting without his weapon." *Id.* at 107 (citing 1 Records

16

of the Colony of Rhode Island and Providence Plantations, in New England 94 (John Ressull Bartlett ed., 1856)).

St. George Tucker, an eminent legal scholar and jurist, observed in 1803 that "[i]n many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in hand, than an European fine gentleman without his sword by his side." 5 Tucker's Blackstone at App. 19. Plaintiffs' brief and an amicus brief filed by historians and legal scholars in the *Wrenn* litigation cite multiple instances of our Founding Fathers carrying or advocating for carrying of firearms—including in populated areas. *See* Pls.' Mem. 15–16; Br. of Amici Curiae Historians, Legal Scholars, and CRPA Found. in Supp. of Appellees and in Supp. of Affirmance 20–23, Wrenn v. District of Columbia, No. 15 7057 (D.C. Cir. Oct. 7, 2015) [hereinafter "Historians & Scholars Br."]. For example, when George Washington traveled between Alexandria and Mount Vernon he holstered pistols to his saddle, "[a]s was then the custom." Pls.' Mem. 15 (quoting Benjamin Ogle Tayloe, In Memoriam 95 (1872)). Patrick Henry lived "just north of Hanover town, but close enough for him to walk to court, his musket slung over his shoulder to pick off small game . . . ." Historians & Scholars Br. 21 (quoting Harlow Giles Unger, Lion of Liberty 30 (2010)). Thomas Jefferson, who in an oft-cited letter advised his nephew to have his gun as a "constant companion on [his] walks," Pls.' Mem. 15 (citing 1 The Writings of Thomas Jefferson 398 (H.A. Washington ed., 1853)), once left his pistol at an inn between Monticello and Washington, D.C. and asked two friends—both members of Congress—to retrieve it and bring it to him at the White

17

House, Historians & Scholars Br. 22–23.  Regarding the Boston Massacre, John Adams

stated, "every private person is authorized to arm himself; and on the strength of this

authority I do not deny the inhabitants had a right to arm themselves at that time for their

defense."  Pls.' Mem. 15–16 (quoting John Adams, First Day's Speech in Defense of the

British Soldiers Accused of Murdering Attucks, Gray, and Others, in the Boston Riot of

1770, in 6 Masterpieces of Eloquence 2569, 2578 (Hazeltine et al. eds. 1905)).

Finally, and importantly, Antebellum Era jurisprudence confirms that the right to

bear arms includes a right to carry weapons in public for self-defense.  *See Noel Canning*,

705 F.3d at 501 ("The interpretation of [a constitutional provision] in the years

immediately following [its] ratification is the most instructive historical analysis in

discerning the original meaning.").  Nine state constitutional provisions were adopted

from the late eighteenth century to the early nineteenth century, "which enshrined a right

of citizens to 'bear arms in defense of themselves and the state' or 'bear arms in defense

of himself and the state.'"  *Heller* 554 U.S. at 584–85 (citing provisions).[9]  In the early

nineteenth century, several jurisdictions enacted laws that regulated the *manner* in which

firearms could be carried in public by prohibiting the carrying of concealed weapons.

*See* Leider, 89 Ind. L.J. at 1601–06.  When these concealed carry bans were challenged as

---

[9] These provisions predate the Second Amendment's application to the states through the Due Process Clause of the Fourteenth Amendment.  *See McDonald*, 561 U.S. at 791.  Nevertheless, their earliest interpretations are evidence of the Second Amendment's meaning, including its application outside the home, because "nineteenth-century courts viewed the Second Amendment and state analogues as codifying the same preexisting right to bear arms."  Robert Leider, Our Non-Originalist Right to Bear Arms, 89 Ind. L.J. 1587, 1591 n.18 (2014).  Moreover, nineteenth century courts at times invoked the Second Amendment in their discussion of the right.  *See, e.g*, *Nunn v. State*, 1 Ga. 243, 250–51 (1846); *State v. Chandler*, 5 La. Ann. 489, 490 (1850).

antithetical to the right to bear arms, courts almost uniformly upheld them, provided that open carry was not also prohibited.[10]  *See, e.g.*, *State v. Reid*, 1 Ala. 612, 619 (1840) ("[T]he Legislature cannot inhibit the citizen from bearing arms openly because [the state constitution] authorizes him to bear them for the purposes of defending himself and the State, and it is only when carried openly, that they can be efficiently used for defence."); *Nunn*, 1 Ga. at 250 (stating a prohibition of concealed carry was constitutionally permissible "inasmuch as it d[id] not deprive the citizen of his *natural* right of self-defense, or of his constitutional right to keep and bear arms" but making clear that a simultaneous "prohibition against bearing arms *openly*" would be "in conflict with the Constitution, and *void*"); *Chandler*, 5 La. Ann. at 490 (stating the right to carry arms openly for self-defense "is the right guaranteed by the Constitution of the United States").[11]  As the open carrying of weapons at issue was not occurring inside homes, *see, e.g.*, *Reid*, 1 Ala. at 612–13, these cases are powerful evidence of a "*public understanding*," *Heller*, 554 U.S. at 605, that the right to bear arms includes a right to carry arms outside the home for the purpose of self-defense.

---

[10] For outliers, see *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90, 91–92 (1822) (holding a prohibition of concealed—but not open—carry of firearms impermissibly "restrain[ed] the full and complete exercise of" the right to bear arms); *State v. Buzzard*, 4 Ark. 18, 27 (1842) (opinion of Ringo, C.J.) (endorsing the state's authority to prohibit the carrying of arms, whether concealed or open, except that done "to defend the[] free state and the established institutions of the country").

[11] Defendants argue "judicial decisions in the 1800s by courts in the Southern States" should be excluded from the analysis because they "come from 'a time, place, and culture where slavery, honor, violence, and the public carrying of weapons were intertwined.'"  Defs.' Opp'n 13 (quoting Eric M. Ruben & Saul Cornell, Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context, 125 Yale L.J. Forum 121, 129 (2015)).  The Southern cases' relevance is indeed the subject of an academic debate, but the practical reality is that *Heller* relied on these very cases as probative of the Second Amendment's original meaning.  *See* 554 U.S. at 612 (citing, *inter alia*, *Nunn* and *Chandler*).  I am in no position to entertain arguments to the contrary.

19

Given the textual and historical evidence, I have little trouble concluding that under its original meaning the Second Amendment protects a right to carry arms for self-defense in public.  Of course, Judge Scullin already reached this same conclusion in *Palmer*.  59 F. Supp. 3d at 182.  And, not surprisingly, the Court of Appeals panels that have directly addressed the issue have also reached the same conclusion.  *See Moore*, 702 F.3d at 936 ("A right to bear arms thus implies a right to carry a loaded gun outside the home."); *Peruta*, 742 F.3d at 1166 ("[T]he carrying of an operable handgun outside the home for the lawful purpose of self-defense, though subject to traditional restrictions, constitutes 'bear[ing] Arms' within the meaning of the Second Amendment.") (alteration in original).  And other circuits have at least been willing to so assume. *See Bonidy*, 790 F.3d at 1125; *Woollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir. 2014); *Drake v. Filko*, 724 F.3d 426, 431 (3d Cir. 2013); *Kachalsky v. County of Westchester*, 701 F.3d 81, 89 (2d Cir. 2012).  Indeed, no Court of Appeals to date has found to the contrary.

## 2. Defendants Are Unlikely to Demonstrate an Unrebutted Presumption of Constitutionality for the District's "Good Reason" Requirement.

Concluding that there is a right to carry arms in self-defense in public places, of course, does not resolve the *extent* of that right.  Just as it is inside the home, the Second Amendment right outside the home is *not* unlimited, *see Heller*, 554 U.S. at 626, and is "subject to traditional restrictions." *Palmer*, 59 F. Supp. at 181 (D.D.C. 2014).  In this vein, the District persists that the conduct governed by the "good reason" requirement falls outside the scope of the Second Amendment because pursuant to an alleged

20

longstanding tradition, the right to bear arms does not encompass any right to carry arms in populated, public places—including the entire District of Columbia. [12] Defs.' Opp'n 9–11. Indeed defendants maintain that the longstanding tradition of banning public carrying in urban areas is so broad that the District's comparatively less restrictive "good reason" requirement does not even infringe upon a Second Amendment right.[13] Defs.' Opp'n 9. Please. Put simply, this argument strains credulity and flies in the face of prior litigation. Not only is it severely undercut by the historical record of public carrying of firearms discussed above, but it was already rejected by Judge Scullin who ruled in *Palmer* that the District's complete ban on carrying firearms outside the home runs afoul of the Second Amendment. 59 F. Supp. 3d at 182–83. Notwithstanding the fact that the District voluntarily *withdrew* its appeal of Judge Scullin's order, Unopposed Mot. to Dismiss Case Voluntarily, Palmer v. District of Columbia, No. 14-7180 (D.C. Cir. Apr. 2, 2015), it is now essentially renewing this argument that was already fully litigated and rejected by him. Moreover, defendants do not cite a *single* Colonial Era, Founding Era,

---

[12] I note that defendants certainly do not *have to* put forth a "longstanding tradition" to demonstrate certain conduct falls outside the Second Amendment's scope. While "the widespread and longstanding traditions of our people" are among "the most weighty" evidence of a constitutional guarantee's meaning, they are not the only such evidence. *McIntyre*, 514 U.S. 375 (Scalia, J., dissenting). Here, however, defendants have rested on the longstanding tradition theory, and I therefore evaluate their arguments under it.

[13] Unfortunately for defendants, the Supreme Court in *Heller* expressly rejected the notion that the Districts' ban on keeping handguns in the home was constitutionally permissible because it was "limited to an urban area." 554 U.S. at 634. Here, defendants emphasize the District's unique nature in that "compared to other large cities, the District has greater public safety and national security concerns." Defs.' Opp'n 4. Even so, this point does not help defendants on questions of the Second Amendment's scope. *Heller* made abundantly clear that one does not surrender his or her Second Amendment rights upon crossing the Key Bridge. Although the District may impose firearms regulations "that suit local needs and values," its authority to do so is circumscribed by the guarantees of the Second Amendment. *McDonald*, 561 U.S. at 784–85.

21

or nineteenth-century commentator, let alone jurist, espousing an urban/rural divide on the right to carry arms.[14] Instead, defendants' rely on the Statute of Northampton, 2 Edw. 3 (Eng. 1328), which forbade, *inter alia*, "go[ing or] rid[ing] armed by night or by day, in Fairs, Markets." Defendants contend the Statute of Northampton and its American analogues imposed a near-total ban on the carrying of firearms in populated, public places from medieval times until the mid-nineteenth century. Defs.' Opp'n 9–12. Unfortunately for the District, the weight of the historical evidence demonstrates that the statute forbade only carrying weapons in a terrifying manner that threatened a breach of the peace and not the ordinary carrying of weapons for self-defense.[15]

Defendants next argue that our Nation has a longstanding tradition of "strictly regulat[ing]" the carrying of firearms by requiring an individual to set forth a specific and

---

[14] To be sure, defendants were able to find eleven examples of ordinances from the late 1800's prohibiting public carrying of weapons within city limits, almost exclusively from the frontier and Wild West. Defs.' Opp'n 13. In addition, Everytown points to a few state and territory-wide provisions either largely prohibiting public carrying in populated areas or giving cities the option to do so. Everytown Br. 15; *see also* Unlawfully Carrying Arms, Art. 317, in The Penal Code of the State of Texas 42–43 (1879). These laws, however, are needles in a legal haystack and come nowhere close to establishing a "universal and long-established tradition," *Carrigan*, 564 U.S. at 122, of prohibiting the carrying of firearms in populated areas. They were in place in only an infinitesimal fraction of American jurisdictions, governed a minute portion of the Nation's population, and were found almost entirely in a particular, homogenous region. *Contrast with Heller II*, 670 F.3d at 1254 (finding regulations in force in "diverse states and cities" and "now applicable to more than one fourth of the Nation by population" to be "longstanding in American law"). Moreover, defendants fail to establish the "*standing*" of "long*standing*." Nowhere do they argue that it is the norm in the United States *today* for the carrying of weapons in populated or public places to be prohibited *Cf. Carrigan*, 564 U.S. at 122 (noting libel and obscenity laws "have been in place ever since" the Founding Era).

[15] For American jurisprudence and commentary supporting this conclusion, see, for example, *State v. Huntley*, 25 N.C. 418, 422–23 (1843); *Simpson v. State*, 13 Tenn. 356, 358–60 (1833); Conductor Generalis, Or, the Office, Duty, and Authority of the Justice of the Peace 11–12 (James Parker, ed. 1764). For English sources see, for example, 1162; *Sir John Knight's Case*, (1686) 87 Eng. Rep. 75 (K.B.) 76, 90 Eng. Rep. 330 (K.B.) 330, Comberbach,; *Chune v. Piott*, (1615) 80 Eng. Rep. 1161 (K.B.) 39; 1 Sir William Oldnall Russell, A Treatise on Crimes and Indictable Misdemeanors 271–72 (2d ed. 1826); 1 William Hawkins, A Treatise of the Pleas of the Crown 489 (1824 ed.); 4 William Blackstone, Commentaries *148–49.

personal reason to fear for his or her safety before being authorized to carry a firearm in

public.  Defs. Br. 11–12.  In support thereof they point to defendants cite an obsolete

District law that provided:

> If any person shall go armed with a dirk, dagger, sword, pistol, or other
> offensive and dangerous weapon, without reasonable cause to fear an
> assault or other injury or violence to his person, or to his family or property,
> he may, on complaint of any person having reasonable cause to fear an
> injury or breach of the peace be required to find sureties for keeping the
> peace for a term not exceeding six months . . . .

Of Proceedings to Prevent the Commission of Crimes, § 16, in The Revised Code of the

District of Columbia 567, 570 (1857) [hereinafter "D.C. Surety Law"].  From 1836 to

1891, similar surety laws were adopted in Massachusetts, Wisconsin, Maine, Michigan,

Virginia, Minnesota, Oregon, Pennsylvania, and West Virginia.[16]  Defendants maintain

these statutes were "precursor[s]" to the "good reason" requirement and that the

jurisdictions that adopted them permitted public carrying of firearms only when an

individual had "reasonable cause to fear an assault or other injury or violence to his

person."[17]  Defs.' Opp'n 11.  I disagree.

---

[16] Of Proceedings to Prevent the Commission of Crimes, § 16, in Revised Statutes of the Commonwealth
of Massachusetts 748, 750 (1836); An Act to Prevent the Commission of Crimes, § 16, in Statutes of the
Territory of Wisconsin 379, 381 (1839); Of Proceedings for Prevention of Crimes, § 16 (1840), in The
Revised Statutes of the State of Maine 707, 709 (1841); Of Proceedings to Prevent the Commission of
Crimes, § 16, in The Revised Statutes of the State of Michigan 690, 692 (1846); For Preventing the
Commission of Crimes, § 8, in Code of Virginia 755, 756 (1849); Of Proceedings to Prevent the
Commission of Crimes, § 18, in The Revised Statutes of the Territory of Minnesota 526, 528 (1851);
Proceedings to Prevent Commission of Crimes, § 17, in The Statutes of Oregon 218, 220 (1854);
Proceedings to Detect the Commission of Crimes, § 6 , in A Digest of the Laws of Pennsylvania 248, 250
(John Purdon comp., 1862); For Preventing the Commission of Crimes, § 8, in The Code of West
Virginia 702, 703 (1870).
[17] Defendants also use these statutes to support their argument that public carrying of firearms was almost
entirely prohibited in the Northern United States and those prohibitions went unchallenged in that region.

The District's law was located in the section of the Code regarding the recognizance system under which magistrates could order certain individuals to pay a surety guaranteeing they would "keep the peace towards all the people of this District." D.C. Surety Law § 4. The provision's language and context, however, strongly suggest that it did not criminalize public carrying of weapons absent "reasonable cause," but instead provided a mechanism for *preventing crimes* under which individuals with reason to believe another person was likely to breach the peace or injure someone with a weapon could seek law enforcement intervention. *See id.* § 1 (providing that judges and justices of the peace "shall have the power to cause all laws made for the preservation of the public peace to be kept, and, in the execution of that power, may require persons to give security to keep the peace, or for their good behavior, or both . . .").[18] It also seems a fair inference that a respondent could defend himself by demonstrating the complainant had no grounds to fear he would cause an injury or breach the peace. The statutes from other jurisdictions referenced by defendants were almost all virtually identical to the District's

---

Defs.' Opp'n 13. Defendants contend that plaintiffs cannot demonstrate a "widely understood national consensus that individuals had a pre-existing right to carry in populated areas" by pointing to the "fact that some [Southern] states wanted broader public-carrying rights" than those afforded in the North. Defs.'s Opp'n 13. Defendants conflate the burden. *Plaintiffs* have a right to bear arms, and *defendants* seek to prove that carrying weapons in public places without a specific "good" or "proper" self-defense need is somehow outside the purview of that right. If they are to prevail, it is *defendants* who must bear the burden of demonstrating such conduct has long been understood *throughout the Nation* to be unprotected by the right to bear arms.

[18] Everytown makes much of section headings in these statutes; for example, the Minnesota provision was located next to the heading "Persons carrying offensive weapons, how punished." Of Proceedings to Prevent the Commission of Crimes, § 18, in The Revised Statutes of the Territory of Minnesota 526, 528 (1851). But "the heading of a section cannot limit the plain meaning of the text." *Trainmen v. Baltimore & Ohio R. Co.*, 331 U.S. 519, 528–29 (1947).

24

in language and context.[19] I am therefore skeptical, at best, of defendants' interpretation of the surety laws as providing for public carrying only upon a showing of a specific reason to fear for one's safety. Regardless, the consequence imposed by the surety laws was merely the payment of a bond guaranteeing one would not breach the peace. *See, e.g.*, D.C. Surety Law § 16. In contrast, those who carry a firearm in the District today without a license, which would be issued only upon satisfaction of the "good reason" requirement, face not only hefty fines but also up to *five years in prison*! D.C. Code § 22-4504(a)(1). This dramatic disparity in penalties leads me to believe the "good reason" requirement is not "truly the heir[] to" the surety laws. Jonathan Meltzer, Open Carry for All: *Heller* and Our Nineteenth-Century Second Amendment, 123 Yale L.J. 1486, 1510 n.101 (2014).

Even assuming *arguendo*, however, that defendants are correct and that the "good reason" requirement qualifies as a longstanding regulation,[20] under our Circuit Court's framework it would only be afforded a presumption of constitutionality. *Heller II*, 670

---

[19] *But see* For Preventing the Commission of Crimes, § 8, in Code of Virginia 755, 756 (1849) (omitting the language requiring the complainant to have "reasonable cause to fear an injury or breach of the peace"); For Preventing the Commission of Crimes, § 8, in The Code of West Virginia 702, 703 (1870) (same).

[20] Setting the surety laws aside, defendants hint at, but do not develop, the argument that the "good reason" requirement *itself* could squeak in to qualify as a "longstanding" regulation under *Heller II*. The first such requirement was enacted in New York in 1913, and New Jersey's statute has existed "in some form for nearly 90 years." *Drake*, 724 F.3d at 432; *compare Heller II*, 670 F.3d at 1253–54 (finding registration requirements enacted between 1881 and 1927 to be longstanding). Defendants further state that currently twenty-three percent of the Nation's population is governed by a "good reason" statute. Defs.' Opp'n 15–16 (referencing New York, New Jersey, Maryland, and California); *compare Heller II*, 670 F.3d at 1253–54 (finding basic registration requirements to be "longstanding" in part because they are applicable to approximately twenty-five percent of the Nation's population but also noting such requirements were traditionally accepted in "diverse" jurisdictions throughout the country).

25

F.3d at 1253.  Plaintiffs could then rebut that presumption "by showing the regulation does have more than a de miminis effect upon" their Second Amendment right to bear arms for self-defense.  *Id.*  This they could do, because the "good reason" requirement covers the precise conduct, carrying arms, for the precise reason, self-defense, that the text and historical record make clear the Second Amendment was intended to protect. Further, it is simply beyond dispute that requiring individuals to possess certain self-defense needs that the District deems worthy *before* they are permitted to carry a firearm "meaningfully affect[s] individual self-defense, which is the central component of the Second Amendment right." *Id.* at 1260 (internal quotation and alteration marks omitted). The "good reason" requirement therefore imposes more than a de minimis burden on that right.  *See id.* at 1255 (stating a burden that "make[s] it considerably more difficult" for individuals to exercise their Second Amendment rights is not de minimis).

Thus, I easily conclude that the plaintiffs are substantially likely to succeed on the merits in step one.  While defendants have not yet put forth all their evidence, nothing they have presented to date leads me to believe plaintiffs are at all unlikely to prevail on the question of whether the Second Amendment is implicated.  Instead, the record strongly indicates that even if the "good reason" requirement has a robust heritage in the United States, it nevertheless governs—and always has governed—conduct protected by the Second Amendment.  Whether or not the District's "good reason" requirement does so in a constitutionally permissible manner is, of course, the subject of step two.

26

**B. Step Two: The District's Concealed Carry Scheme Is Likely Unconstitutional.**

Having found that the District's "good reason" requirement implicates conduct protected by the Second Amendment, I turn now to determining whether the provision places an unconstitutional burden on that right.  To make this determination, I must decide first the appropriate level of constitutional scrutiny to apply to the District's law, and then whether the law passes muster under that framework.  *See Heller II*, 670 F.3d at 1252.

### 1. Strict Scrutiny Is Likely the Appropriate Level of Constitutional Scrutiny.

Although there has been some debate regarding the constitutional framework that applies to laws burdening conduct protected by the Second Amendment, our Circuit Court has indicated that the means-end analysis often employed in the First Amendment context is also appropriate in analyzing Second Amendment challenges.  *See Heller II*, 670 F.3d at 1257.  Within this framework, there are three levels of scrutiny that may be applied: strict scrutiny, intermediate scrutiny, and rational basis review.  However, the Supreme Court in *Heller* specifically *rejected* rational basis review for laws that burden protected Second Amendment conduct, and with it the presumption that these laws are constitutional.  *Id.* at 1256 (citing *Heller*, 554 U.S. at 628 n.27).  This necessarily means, of course, that the District is required to justify its law under some level of heighted scrutiny.  As to whether strict or intermediate scrutiny should apply, our Circuit Court approaches the question, as it does in First Amendment cases, by examining "the nature

of the conduct being regulated and the degree to which the challenged law burdens the right." *Id.* at 1257. "[A] regulation that imposes a substantial burden upon the core right of self-defense protected by the Second Amendment must have a strong justification, whereas a regulation that imposes a less substantial burden should be proportionately easier to justify." *Id.* In other words, the former receives strict scrutiny, while the latter receives intermediate scrutiny. *See id.* at 1266 (stating intermediate scrutiny applies to "laws [that] do not affect the core right protected by the Second Amendment"). For the following reasons, I have concluded that the "good reason" requirement substantially burdens the "core right of self-defense protected by the Second Amendment," *id.* at 1257, and I will therefore subject it to strict scrutiny.

### a) The District's "Good Reason" Requirement Burdens Core Second Amendment Conduct.

Plaintiffs argue that *Heller* and *McDonald* make clear "that the core of the Second Amendment guarantee is the right to keep and bear arms for the purpose[] of self-defense," and "that the core of this right to self-defense applies both inside and outside the home." Pls.' Mem. 7. I agree, and conclude that the text and purpose of the Second Amendment demonstrate that the right of law-abiding, responsible citizens to carry arms in public for the purpose of self-defense does indeed lie at the core of the Second Amendment.[21] As discussed previously, *see supra* 13–14, the text of the Second

---

[21] I recognize that several Courts of Appeals considering similar statutory schemes have found otherwise. *See Drake*, 724 F.3d at 436 (stating "[i]f the Second Amendment protects the right to carry a handgun outside the home for self-defense at all, that right is not part of the core of the Amendment"); *see also Woollard*, 712 F.3d at 876; *Kachalsky*, 701 F.3d at 96. As my analysis makes clear, I do not find these

28

Amendment indicates its protections include "the individual right *to possess and carry weapons in case of confrontation.*" *Heller*, 554 U.S. at 592 (emphasis added).   The District's "good reason" requirement infringes on Second Amendment activity because it does not allow individuals to obtain a license to carry a concealed firearm in public for legitimate self-defense purposes, including for protecting themselves from non-particularized threats faced by the general community and from unanticipated, suddenly arising threats.

The question, then, is whether the right to carry arms in public for self-defense lies at the "core" of the Second Amendment.  In *Heller*, the Supreme Court held that the right to "keep" a firearm in the home for self-defense lies at the core of the Second Amendment's protections.  Because the Second Amendment's text places the right to "keep" and to "bear" arms on equal footing, it follows that the right to "bear" arms for self-defense also lies at the core of the Second Amendment's protections.  Indeed, the purpose of the Second Amendment, as articulated by the Supreme Court, supports this conclusion.  How so?  In *McDonald*, the Court specifically noted that *Heller* "held that the Second Amendment protects the right to keep and bear arms *for the purpose of self-defense.*" *McDonald*, 561 U.S. at 748 (emphasis added); *see also Heller*, 554 U.S. at 616

---

opinions persuasive.  In my view, they fail to recognize that the text and purpose of the Second Amendment indicate that carrying weapons in public for the lawful purpose of self-defense is a central component of the right to bear arms. *See Peruta*, 742 F.3d at 1175 ("By evading an in-depth analysis of history and tradition, the Second, Third, and Fourth Circuits missed a crucial piece of the Second Amendment analysis. They failed to comprehend that carrying weapons in public for the lawful purpose of self defense is a central component of the right to bear arms."); *see also Moore*, 702 F.3d at 942 ("The Supreme Court has decided that the amendment confers a right to bear arms for self-defense, which is as important outside the home as inside.").

29

(describing the Second Amendment as protecting the "individual right to use arms for self-defense"); *Heller II*, 670 F.3d at 1260 (describing *Heller* as stating that self-defense is the "core lawful purpose" that the Second Amendment protects).  The need for self-defense is, of course, greater *outside* the home than it is within it.  Indeed, the Seventh Circuit noted as much in *Moore* when it observed, "a Chicagoan is a good deal more likely to be attacked on a sidewalk in a rough neighborhood than in his apartment on the 35th floor of the Park Tower."  *Moore*, 702 F.3d at 937.  So too in our Nation's capital, where so many live in or near the various neighborhoods where street crime is a daily occurrence.  Given that the Second Amendment's central purpose is self-defense and that this need arises more frequently in public, it logically follows that the right to carry arms for self-defense in public lies at the very heart of the Second Amendment.  *Cf. id.* ("To confine the right to be armed to the home [would be] to divorce the Second Amendment from the right of self-defense described in *Heller* and *McDonald*.").  And I do not read *Heller* to suggest otherwise.  The law challenged in *Heller* restricted the right to keep a handgun *in one's home* for self-defense.  It is therefore of little consequence to the questions presented in this case that *Heller*'s holding was limited to the context of the home.[22]

Furthermore, I note that plaintiffs here are the very type of "law-abiding,

---

[22] *Cf. Snyder v. Phelps*, 562 U.S. 443, 460 (2011) ("Our holding today is narrow. We are required in First Amendment cases to carefully review the record, and the reach of our opinion here is limited by the particular facts before us.  As we have noted, 'the sensitivity and significance of the interests presented in clashes between First Amendment and [state law] rights counsel relying on limited principles that sweep no more broadly than the appropriate context of the instant case.'" (quoting *Florida Star v. B.J. F.*, 491 U.S. 524, 533 (1989))).

responsible citizens" whose Second Amendment rights are entitled to full protection under *Heller*.   As *Heller* made clear, "the Second Amendment right is exercised individually and belongs to all Americans." 554 U.S. at 581.   To the extent that historical prohibitions excluded certain classes of people from the Second Amendment's protections, those classes do not include "law-abiding, responsible citizens." *Id.* at 635; *see also id.* at 626 (noting that "longstanding prohibitions on the possession of firearms by felons and the mentally ill" are presumptively constitutional).   Moreover, there is nothing about those excluded from the right to carry in public by the District's "good reason" requirement that would suggest that they somehow lie outside the core protections of the Second Amendment. *Cf. Schrader v. Holder*, 704 F.3d 980, 989 (D.C. Cir. 2013) (finding common-law misdemeanants fall outside the Second Amendment's core protections because they "cannot be considered law-abiding and responsible").

Without citation to the text or to historical support, defendants respond by arguing that a prohibition on bearing arms that is "completely contained in a dense urban setting filled with critical official and symbolic buildings, monuments, and events, and high-profile public officials" does not burden core Second Amendment conduct. Defs.' Opp'n 17 (internal quotation marks omitted).   Although a jurisdiction's unique characteristics could be relevant in the means-end analysis, on the record before me they provide no guidance for the inquiry into what protections are at the core of the Second Amendment.   The District also makes reference to longstanding "laws that prohibit the carrying of firearms in sensitive places such as schools and government buildings" and

31

seem to argue that the entire District of Columbia could be considered such a sensitive place.   Defs.' Opp'n 17.   But the District has already provided that citizens with concealed carry licenses may *not* carry firearms in many sensitive places that require extra regulation, belying the notion that the whole of the District falls into the same category.[23]   Again, defendants point to no textual or historical evidence as support for their through-the-looking-glass view that a citizen's right to carry a firearm for self-defense falls outside the "core" of the Second Amendment because the citizen lives in a densely populated and dangerous city where the need for self-protection is elevated.   Nor do they wrestle with how downgrading a citizen's rights merely because he or she lives in the same 68 square mile city as many of our Nation's leaders is consistent with our Constitution.   I therefore reject these arguments wholesale.

### b) The District's "Good Reason" Requirement Imposes a *Substantial* Burden on Core Second Amendment Conduct.

If, as I find, the District's "good reason" requirement burdens core Second Amendment conduct, then the question remains whether it "substantial[ly]" burdens such conduct and therefore must withstand strict scrutiny.   *See Heller II*, 670 F.3d at 1256–57 (noting strict scrutiny is not always required when a fundamental right is at stake).   For the following reasons, I have concluded: it surely does.

---

[23] Concealed carry licensees are precluded from carrying their firearms in many sensitive areas including government buildings, school and university buildings and campuses, hospitals, polling places while voting is occurring, public transportation vehicles including the Metrorail transit system and its stations, stadiums and arenas, the public memorials on the National Mall and along the Tidal Basin, the area around the White House, the U.S. Capitol buildings and grounds, and the U.S. Naval Observatory and its perimeter.  D.C. Code §7-2509.07(a).  Plaintiffs do not challenge these limitations, Pls.' Mem. 26, and an injunction in this case would *not* affect them.

Plaintiffs argue that the District's public carry law, although disguised as "a licensing requirement," actually "amounts to a total ban on the exercise of the Second Amendment right to bear arms by typical, law-abiding citizens." Pls.' Mem. 21. Defendants, not surprisingly, could not disagree more. Far from a "wholesale ban," defendants liken the District's "good reason" requirement to "time, place, manner restrictions" of protected speech. Defs.' Opp'n 17; *see Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984) ("We have often noted that [reasonable time, place, and manner restrictions] are valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information."). Indeed, in the District's view, the requirement "speaks not to who may carry a handgun, but when a handgun may be carried: after the applicant develops a non-speculative need for armed self-defense." Defs.' Opp'n 18. As such, defendants argue the law does not "destroy" any particular person's right to carry a gun for self-defense because any person could, at some point, face a threat that rises to the level necessary to be issued a license under the District's "good reason" requirement. *Id.* Unfortunately for the District, such arguments border on the frivolous! How so?

Turning first to defendants' "insignificance argument," I cannot possibly agree that the burden imposed by the statute at issue is as insignificant as that of a "time, place, and manner restrictions" on speech that leave open "ample alternative channels of communication." *See, e.g., Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)

33

**JA 562**

(upholding sound amplification guideline designed to control noise levels at open-air bandshell events); *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640 (1981) (upholding state fair rule, prohibiting sale or distribution on fair grounds of any merchandise including printed or written material, except from a fixed location).  To the contrary, the law at issue is a far cry from the regulations that have been upheld by other courts under intermediate scrutiny as similar to time, place, and manner restrictions, including registration requirements and regulations banning the carrying of certain types of guns.

In *Heller II*, our Circuit Court considered several "novel" registration requirements for firearm ownership, including requirements that applicants submit the firearm for a ballistics-identification procedure, initially appear in person for registration and re-register each firearm after three years, and a limitation that only one firearm be registered per person in a 30-day period.  Although our Circuit Court found that these laws burdened core Second Amendment conduct, it subjected them to intermediate scrutiny because the burden was not "substantial."  670 F.3d at 1257–58.  To support this view, our Circuit Court noted that "none of the District's registration requirements prevents an individual from possessing a firearm in his home or elsewhere, whether for self-defense or hunting, or any other lawful purpose."  *Id.* at 1258.  The same cannot be said, however, of the District's "good reason" requirement, which precludes carrying a handgun "without any specific self-defense reason."  Defs.' Opp'n 16.  Indeed, the requirement's intended effect is to prohibit the typical citizen from carrying a firearm

34

outside his or her home for several legitimate and constitutionally protected purposes—including when in dangerous neighborhoods, where the need for protection is as undeniable as it is unfortunate, or for self-defense from unanticipated, suddenly arising threats—notwithstanding the fact that he or she can successfully clear a multitude of qualifying hurdles.

Nor can the reasoning employed to uphold bans on the possession of particular types of firearms support the law at issue here. When a jurisdiction bans particular types of guns, such as automatic rifles or guns with obliterated serial numbers, a law-abiding, responsible person can preserve an undiminished right of self-defense by simply choosing a type of gun that is permitted. *Heller II*, 670 F.3d at 1260–64 (applying intermediate scrutiny to a ban on assault weapons and large-capacity magazines because the law did not "effectively disarm individuals or substantially affect their ability to defend themselves"); *Marzzarella*, 614 F.3d at 97 (finding a prohibition on possession of unmarked firearms to be "more accurately characterized as a regulation on the manner in which persons may lawfully exercise their Second Amendment rights" because it left a person "free to possess any otherwise lawful firearm"). Not so with the District's "good reason" requirement. Unless a law-abiding, responsible person can predict and prove some self-defense need beyond that of the typical person, he is wholly banned from exercising his right to carry a gun for the purpose of self-defense outside his home. *See Peruta*, 742 F.3d at 1171 (finding prohibition on carrying in public not to be a time, place, and manner restriction because "it precludes a responsible, law-abiding citizen

35

from carrying a weapon in public for the purpose of lawful self-defense in *any* manner").

As these examples reveal, the District's "good reason" requirement places a far more significant burden on core Second Amendment conduct than laws previously upheld as akin to time, place, and manner restrictions. In fact, the burden is so substantial that it is tempting, indeed, to agree with plaintiffs that the "good reason" requirement is *per se* unconstitutional. The District continues to rely on the mantra "more guns equals more crime" to prove the safety benefits of disarming typical law-abiding citizens like Grace, who do not face a particularized threat. But there can be no doubt that at least some of those citizens seek a carrying license for the legitimate purpose of protecting against an unexpected confrontation. The District's policy thus bans some citizens from exercising their *constitutional right* to carry firearms outside the home for self-defense, and no amount of proof of the negative effects of exercising a constitutional right can justify a ban. *Heller*, 554 U.S. at 629 ("A statute which, under the pretence of regulating, amounts to a destruction of the right . . . [is] unconstitutional." (quoting *Reid*, 1 Ala. at 6161–17)). In the interest of judicial restraint, however, I will leave for another day the question of whether the "good reason" requirement is *per se* unconstitutional. For today, I will simply assume that the requirement only incidentally sweeps in this sort of protected activity and review the "good reason" requirement under the strict scrutiny standard, which its substantial burden would most assuredly have to survive.

### 2. The District's Concealed Carry Scheme Likely Fails Strict Scrutiny.

In order for the District's law to pass muster under strict scrutiny, it must be

narrowly tailored to promote a compelling government interest. *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000); *accord Heller II*, 670 F.3d at 1256. If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative. *Id.; see also Sable Comn'cs of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989) ("The Government may . . . regulate the content of constitutionally protected speech in order to promote a compelling interest if it chooses the least restrictive means to further the articulated interest"). Notably, a court applying strict scrutiny must presume the law is invalid, and "the Government bears the burden to rebut that presumption." *Playboy Entm't*, 529 U.S. at 817.

This Court recognizes, as it must, that the District's interests in preventing crime and promoting public safety certainly qualify as "compelling government interests." *See, e.g., Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 376 (1997) (referring to "the significant governmental interest in public safety"); *Heller II*, 670 F.3d at 1258 ("[T]he Government's general interest in preventing crime is compelling." (quoting *United States v. Salerno,* 481 U.S. 739, 750 (1987))). And this Court agrees with defendants that the District's interest in public safety is implicated by people carrying guns in public, and certainly more so than when they keep guns within the confines of their homes. But, unfortunately for defendants, it does not automatically follow that the District has a compelling interest in reducing to the greatest extent possible the number of law-abiding, responsible citizens eligible to carry guns in public. Rather, when the District's pursuit of public safety substantially burdens conduct protected by the Second

37

**JA 566**

Amendment, as issuing licenses only in certain self-defense situations does, it must at the very least prove that the policy achieves significant public safety gains and that those gains would not be achieved by a more inclusive licensing policy.

Defendants have failed to meet these criteria, and I am skeptical that they can. They waste much ink on the irrelevant contention that plaintiffs cannot prove that "more guns equals less crime." In strict scrutiny review, however, *defendants* bear the burden of justifying their policy. More important still, defendants do not even attempt to explain why the District's licensing scheme could not be broader and allow for more responsible, law-abiding citizens to obtain concealed carry permits for their legitimate self-defense needs, while simultaneously protecting public safety. All they offer by way of reasoning is that all guns, even guns carried in self-defense, increase the incentive for criminals to carry guns, or increase the chances for accidents. But as plaintiffs rightly emphasize, "it is 'not a permissible strategy' to reduce the alleged negative effects of a constitutionally protected right by simply reducing the number of people exercising the right." Pls.' Mem. 28 (quoting *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 445 (2002) (Kennedy, J., concurring in judgment) (controlling opinion)); *see also Alameda Books*, 535 U.S. at 445 ("Though the inference may be inexorable that a city could reduce secondary effects by reducing speech, . . . [t]he purpose and effect of a zoning ordinance must be to reduce secondary effects and not to reduce speech."); *Heller*, 554 U.S. at 636 ("[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table.").

38

Rather, the District's licensing restrictions would only be narrowly tailored to achieve public safety if they were targeted at keeping guns away from the people who are likely to misuse them or situations where they are likely to be misused.  On the record before me, I must agree with plaintiffs that defendants are unlikely to be able to show the "good reason" requirement is narrowly tailored to this end.[24]  For a law to be "narrowly tailored," it must actually advance the compelling interest it is designed to serve, *see Eu v. S.F. County Democratic Cent. Comm.*, 489 U.S. 214, 226 (1989), and it must be the least-restrictive method of serving that interest—indeed, the burdening of a significant amount of protected conduct not implicating the interest is evidence the regulation is insufficiently tailored. *See Ashcroft v. ACLU*, 542 U.S. 656, 665–66 (2004).

Although the District's "good reason" requirement likely does keep guns out of the hands of *some* people likely to misuse them, it does so only by keeping guns out of the hands of *most* people.  The requirement that a person demonstrate a need for self-defense beyond that of the typical citizen before being granted a concealed carry license

---

[24] Defendants, for their part, do not attempt to show that the law is narrowly tailored to this end.  In fact, they concede that the "good reason" requirement was not designed to keep firearms out of the hands of those who might be expected to misuse them, *see* Defs.' Opp'n at 33–34 ("Plaintiffs argue that the 'good reason' standard is 'unrelated to the problem it intends to solve' because '[t]he fact that one has a greater need for self-defense tells us nothing about whether he is less likely to misuse or accidentally use handguns.' This criticism, however, misunderstands the purpose of the standard.").  Rather, proceeding on the theory that the compelling interest is in public safety generally and that more guns equal more crime, defendants argue that the "good reason" requirement "offers a reasonable, balanced approach to protecting the public safety and meeting an individual's need for self-defense," *id.* at 36, and is "the result of a 'careful balancing of the interests involved' and not a general animus towards guns." *Id.* at 38 (quoting *Kachalsky*, 701 F.3d at 97 n.22).  Of course, such interest balancing squarely contradicts the Supreme Court's admonition that the "core protection" of enumerated constitutional rights should not be "subjected to a freestanding 'interest-balancing' approach" because "[t]he very enumeration of the right takes out of the hand of the government . . . the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 634.  Moreover, even if this type of interest-balancing were permissible, it does nothing to demonstrate that the law is narrowly tailored.

invariably means most people will not qualify. But the fact that a person can demonstrate a heightened need for self-defense says nothing about whether he or she is more or less likely to misuse a gun. Pls.' Mem. 28; *see also Drake*, 724 F.3d at 454 (Hardiman, J., dissenting) ("Put simply, the solution is unrelated to the problem it intends to solve."). Therefore, by employing this standard, the District's law is likely vastly over-inclusive, burdening substantially more of the Second Amendment right than is necessary to advance public safety. *See Peruta*, 742 F.3d at 1177 (explaining that a public carry regulation is not narrowly tailored to achieve public safety if it would "not perform any better than a random rationing system, wherein gun permits were limited to every tenth applicant"). Because the District's law is likely wholly disproportionate to the public interest it could legitimately serve, there is a strong likelihood plaintiffs will ultimately succeed in showing the law *is not* narrowly tailored and is, therefore, unconstitutional.

## II.    Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief.

Having concluded that plaintiffs are substantially likely to succeed on their claim that the District's "good reason" requirement acts to deprive them of the rights guaranteed to them by the Second Amendment, there is little need to belabor the irreparable injury prong. Their Second Amendment rights are indeed being violated, and, as our Circuit Court has itself made clear, "the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)); *see also* 11A Wright, et al., Federal Practice and

40

Procedure § 2948.1 (3d ed. 2013) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.").

Defendants, not surprisingly, argue that this proposition should *not* apply to Second Amendment harms because the right to keep and bear arms is "inherently different" from other constitutional rights in that it "has no intrinsic value." Defs.' Opp'n 39–40. In defendants' view, "[i]f no occasion arises where a handgun is needed for self-defense," the denial of the Second Amendment right to bear arms "cannot cause harm." Defs.' Opp'n 40. What poppycock! Just because present plaintiffs "have not identified a single instance when their inability to carry a handgun caused them injury," does not mean they have failed to demonstrate a likelihood of irreparable harm. Defs.' Supplemental Br. 1 [Dkt. #39]. Once again, defendants, sadly, miss the point. The Second Amendment protects plaintiffs' right to bear firearms *for* self-defense—a right that can be infringed upon whether or not plaintiffs are ever actually called upon to use their weapons to defend themselves. *See Ezell*, 651 F.3d at 699 (explaining that, like other constitutional rights, "[t]he Second Amendment protects . . . intangible and unquantifiable interests," which "cannot be compensated by damages"). The right to bear arms enables one to possess not only the means to defend oneself but also the self-confidence—and psychic comfort—that comes with knowing one could protect oneself if necessary. Moreover, while this Court is not permitted to recognize "a hierarchy among . . . constitutional rights," *Caplin & Drysdale, Chtd v. United States*, 491 U.S. 617, 628 (1989), the Supreme Court has nevertheless made clear that the Second

41

Amendment is not a "second-class right," *McDonald*, 561 U.S. at 780–81 (plurality). Thus, because plaintiffs are likely to succeed in showing their Second Amendment rights are being infringed each and every day the District continues to enforce the "good reason" requirement, they have more than adequately demonstrated irreparable injury.

## III.  The Balance of the Equities and the Public Interest Also Weigh in Plaintiffs' Favor.

The final factors I must consider are the balance of the equities and public interest. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting these two factors "merge when the Government is the opposing party"). As a preliminary matter, I emphasize, as plaintiffs have, that "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013); *see also Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.") (internal quotation marks omitted)), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014). This is the case even though it is otherwise presumed that, "any time a State is enjoined by a court from effectuating statutes enacted by the representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers). Because plaintiffs are likely to prevail in showing that their Second Amendment rights are being violated, the public interest weighs heavily in favor of granting their requested injunction.

Undaunted, the District argues that granting the requested injunction "would

42

clearly have a negative impact on thousands of District residents and visitors, because of the uncertain public impact of allowing untold numbers of concealed handguns to be carried on the streets of the city." Defs.' Opp'n 41. Defendants appear to reach this conclusion based on the assumption that "automatic issuance of concealed-carry licenses" would result from the requested injunction. Defendants' hyperbole, however, is not only unwarranted but irresponsible. As plaintiffs point out, they are "not seek[ing] an unfettered right to bear arms free from any regulation or oversight by the District." Pls.' Mem. 38. Indeed, enjoining the District's "good reason" requirement would have *no* effect whatsoever on a veritable gauntlet of other licensing requirements which would remain intact, including: (1) compliance with a wide range of requirements to even qualify to register a firearm in the District, *e.g.*, age, criminal history, mental health, personal history, and certain physical requirements; (2) successful completion thereafter of a firearms training program; and (3) an in-person interview with the Metropolitan Police Department. D.C. Code § 7-2509.02. One can only wonder what evidence, if any, the District could muster to demonstrate that the type of people who would be willing and able to successfully complete this regulatory gauntlet would nevertheless be likely to pose a safety risk to the greater community. More importantly, perhaps, the requested injunction would have *no* impact on the District's complete prohibition of (1) carrying without a license, D.C. Code § 22-4504(a); (2) carrying in specified places including government buildings, schools, the National Mall, the area surrounding the White House, public transportation vehicles, and stadiums, *id.* § 7-2509.07(a); and (3) carrying by

43

violent felons, drug addicts, and other prohibited persons, *id.* §§ 7-2502.03(a); 7-2509.02(a); 22-4503.  Under these circumstances, the Court finds that the public interest and the balance of the equities weigh heavily in favor of granting plaintiffs' request for a preliminary injunction.

## IV.  Issuing a Permanent Injunction Would Be Imprudent.

Finally, in addition to a preliminary injunction, plaintiffs request a permanent injunction.  "[W]hen the eventual outcome on the merits is plain at the preliminary injunction stage, the judge should, after due notice to the parties, merge the stages and enter a final judgment." *Morris v. District of Columbia*, 38 F. Supp. 3d 57, 62 n.1 (D.D.C. 2014) (quoting *Curtis 1000, Inc. v. Suess*, 24 F.3d 941, 945 (7th Cir. 1994)). Plaintiffs argue a permanent injunction is appropriate *now* because the "final outcome of this case does not depend on any facts that may be presented at trial, and because there is no genuine uncertainty about what the outcome of this case will be on the merits." Pls.' Mem. 40.  Plaintiffs point to *Moore*, in which the Seventh Circuit remanded for issuance of a permanent injunction after finding a Second Amendment challenge did not present any evidentiary issues and that "another round of historical analysis" was unnecessary. Pls.' Mem. 40–41 (quoting *Moore*, 702 F.3d at 942).  Defendants counter that the important issues at stake here are deserving of a full record and additional briefing.  They state that "[i]t makes no sense to undertake this significant inquiry on consideration of a preliminary injunction, where the parties and *amici* are constrained by an expedited schedule and strict briefing limitations." Defs.' Opp'n 44.  Defendants request the

44

## JA 573

opportunity to develop the facts supporting their argument that the "good reason" requirement survives means-end scrutiny. Defs.' Opp'n 44. They point out that our Circuit Court remanded claims for additional factual development in *Heller II*, 670 F.3d at 1259–60. Defs.' Opp'n 44. I agree with defendants. Unlike the situation in *Morris*, the parties here did not come to an agreement that the resolution of the preliminary injunction "also resolves the merits of the case." *Morris*, 38 F. Supp. 3d at 62. And unlike the Court of Appeals for the Seventh Circuit, I have an obligation as a district court judge to oversee the development of a full record, not only to inform my decision-making process but to aid our Court of Appeals when they ultimately review the case. Finally, while I believe plaintiffs are highly likely to succeed on the merits, this case presents novel issues for our Circuit Court, issues on which other Courts of Appeal have reached the contrary conclusion. As such, caution dictates that I pause before declaring "there is *no genuine uncertainty* about what the outcome of this case will be on the merits." Pls.' Mem. 40 (emphasis added). Accordingly, I will DENY plaintiffs' motion for a permanent injunction.

## CONCLUSION

In *Heller*, the Supreme Court unequivocally asserted that "the enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Heller,* 554 U.S. at 636. The District's understandable, but overly zealous, desire to restrict the right to carry in public a firearm for self-defense to the smallest possible number of law-abiding, responsible citizens is exactly the type of policy choice the Justices had in mind.

45

**JA 574**

Because the right to bear arms includes the right to carry firearms for self-defense both in and outside the home, I find that the District's "good reason" requirement likely places an unconstitutional burden on this right.  Accordingly, I hereby GRANT plaintiffs' request for a preliminary injunction and enter an order that enjoins the District of Columbia from denying concealed carry licenses to applicants who meet all eligibility requirements other than the "good reason" requirement.  An order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MATTHEW GRACE and PINK PISTOLS,** <br> **Plaintiffs,** <br> **v.** <br> **DISTRICT OF COLUMBIA and CATHY LANIER, in her official capacity as Chief of Police for the Metropolitan Police Department,** <br> **Defendants.** | ) | **Civil Case No. 15-2234 (RJL)** |

FILED
MAY 17 2016
Clerk, U.S. District & Bankruptcy Courts for the District of Columbia

**ORDER**

(May 17, 2016) [Dkts. ##6, 37]

For the reasons set forth in the Memorandum Opinion entered this date, it is hereby

**ORDERED** that plaintiffs' Motion for Preliminary Injunction [Dkt. #6] is **GRANTED**, and it is further

**ORDERED** that defendants and their officers, agents, and employees are preliminarily enjoined from denying concealed carry licenses to applicants who meet all eligibility requirements other than the requirement that the applicant demonstrate a "good reason to fear injury to his or her person or property" or "any other proper reason for carrying a pistol," as established and further defined in D.C. Code §§ 22-4506(a) and 7-2509.11 and D.C. Mun. Regs. tit. 24, §§ 2332.1, 2333.1, 2333.2, 2333.3, 2333.4, and 2334.1, and it is further

**ORDERED** that defendants shall modify and reissue, forthwith, all District of Columbia concealed carry license application materials to be consistent with this Order and the accompanying Memorandum Opinion, and it is further

**ORDERED** that plaintiffs' Motion for a Permanent Injunction [Dkt. #6] is **DENIED WITHOUT PREJUDICE**, and it is further

**ORDERED** that plaintiff's Motion to Consolidate the Preliminary Injunction Proceedings with the Determination on the Merits [Dkt. #37] is **DENIED**.

**SO ORDERED.**

RICHARD L. LEON
United States District Judge

2

**JA 577**

**CERTIFICATE OF SERVICE**

I certify that on July 6, 2016, an electronic copy of this Joint Appendix was

served through the Court's ECF system, to:

Charles J. Cooper
Cooper & Kirk PLLC
1523 New Hampshire Ave, NW
Washington, D.C. 20036

/s/ Holly M. Johnson
HOLLY M. JOHNSON