SCHEDULED FOR ORAL ARGUMENT ON SEPTEMBER 20, 2016

No. 16-7067

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

MATTHEW GRACE, *et al.*,
APPELLEES,

v.

DISTRICT OF COLUMBIA, *et al.*,
APPELLANTS.

ON APPEAL FROM AN ORDER OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

**BRIEF OF THE DISTRICT OF COLUMBIA AND
METROPOLITAN POLICE DEPARTMENT CHIEF CATHY LANIER**

KARL A. RACINE
Attorney General for the District of Columbia

TODD S. KIM
Solicitor General

LOREN L. ALIKHAN
Deputy Solicitor General

HOLLY M. JOHNSON
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 600S
Washington, D.C. 20001
(202) 442-9890
holly.johnson@dc.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A. *Parties and amici*.—The District of Columbia and Metropolitan Police Department Chief Cathy Lanier are appellants here and defendants below. Matthew Grace and Pink Pistols are appellees here and plaintiffs below. *Amici curiae* for appellants include Brady Center to Prevent Gun Violence, DC Appleseed Center for Law & Justice, and Everytown for Gun Safety. Charles Nichols will participate as *amicus curiae* but does not support either party.

B. *Rulings under review*.—The District and Chief Lanier appeal an order issued on May 17, 2016, by District Court Judge Richard J. Leon, granting plaintiffs' motion for a preliminary injunction barring the District from enforcing D.C. Code § 22-4506(a) by requiring that any applicant for a license to publicly carry a handgun demonstrate "good reason" to fear injury to his or her person or property or any other proper reason for carrying a pistol. District Court ECF Record Docket ("RD") 45, 46.

C. *Related cases*.—In February 2015, another group of plaintiffs brought an identical Second Amendment challenge to the District's "good reason" standard. *Wrenn v. District of Columbia*, 107 F. Supp. 3d 1 (D.D.C. 2015). They designated the case as "related" to an earlier lawsuit, which had been assigned to visiting Senior District Court Judge Frederick J. Scullin, so *Wrenn* was also assigned to him. *See Wrenn v. District of Columbia*, 808 F.3d 81, 83 (D.C. Cir. 2015). He

preliminarily enjoined the District from enforcing the "good reason" standard against those plaintiffs. *Id.* In December 2015, this Court held that Judge Scullin had not been properly designated to preside over the case, vacated the injunction, and returned the case to the district court for reassignment. *Id.* at 84.

In February 2016, *Wrenn* was assigned to District Court Judge Colleen Kollar-Kotelly. *Wrenn* RD37; 2/9/15 Docket Entry. The District and the *Wrenn* plaintiffs notified the judges that *Grace* and *Wrenn* were related. RD34; *Wrenn* RD42, 43. The *Grace* plaintiffs objected. RD35 at 2. Judge Leon did not transfer the case to Judge Kollar-Kotelly, and the two cases—with their pending motions for preliminary injunction—proceeded on separate tracks.

On March 7, 2016, Judge Kollar-Kotelly denied the *Wrenn* plaintiffs' motion for a preliminary injunction. *Wrenn* RD54. The *Wrenn* plaintiffs appealed, and this Court expedited the case and ordered argument to be held in September 2016. No. 16-7025, 5/4/16 Order. This Court has ordered that this appeal and the *Wrenn* appeal be heard on the same date and before the same panel. 6/8/16 Order.

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ..........................................................1

STATEMENT OF THE ISSUES...........................................................1

STATEMENT OF THE CASE................................................................2

    1.    The District Of Columbia Enacts A System For Licensing The Public Carrying Of Handguns. ...........................................2

    2.    Two District Court Judges Issue Conflicting Rulings On Motions To Preliminarily Enjoin Enforcement Of The "Good Reason" Standard. ................................................5

STANDARD OF REVIEW ....................................................................7

SUMMARY OF ARGUMENT ...............................................................7

ARGUMENT ....................................................................................11

    I.    Plaintiffs Are Not Likely To Prevail On The Merits Of Their Claim That The Constitution Requires A "Shall-Issue" Nation. .......11

        A.    Historical analysis demonstrates that the "good reason" standard does not implicate the right codified in the Second Amendment. ................................................12

            1.    When the Second Amendment was ratified, carrying in the public concourse was generally prohibited. ...................................................15

            2.    Moreover, the "good reason" standard itself is longstanding and thus presumed constitutional.............26

        B.    Alternatively, the "good reason" standard is likely to survive constitutional scrutiny. ................................................29

            1.    The "good reason" standard is not categorically unconstitutional..........................................................29

2.     The "good reason" standard should be measured under nothing more rigorous than intermediate scrutiny. ...........................................................32

3.     The "good reason" standard survives intermediate scrutiny. ...........................................................40

a.     The Council's evidence. ......................................42

b.     The evidence the District will introduce in the district court. .................................................46

c.     The Council's tailoring of the "good reason" standard to accomplish its objectives. ..................49

II.    The District Court Wrongly Balanced The Equities In Plaintiffs' Favor. ....................................................................53

A.     Plaintiffs have not shown that they will suffer irreparable harm if the "good reason" standard is enforced while litigation is pending. ...................................................53

B.     The preliminary injunction will irreparably harm the District and the public. ...............................................55

C.     Judge Leon's balancing of the equities is not entitled to deference. ...................................................................58

CONCLUSION ............................................................................60

iv

# TABLE OF AUTHORITIES*

## *Cases*

*\*Bonidy v. USPS*, 790 F.3d 1121 (10th Cir. 2015).....................................35, 37, 51

*In re Brickey*, 8 Idaho 597 (1902)..........................................................................18

*Califano v. Yamasaki*, 442 U.S. 682 (1979) .............................................................58

*CFGC v. England*, 454 F.3d 290 (D.C. Cir. 2006)....................................53, 54, 55

*CFGC v. Navy*, 534 F.3d 756 (D.C. Cir. 2008)..........................................................54

*Cincinnati v. Discovery Network*, 507 U.S. 410 (1993) ...........................................37

*Craig v. Boren*, 429 U.S. 190 (1976)........................................................................35

*Dearth v. Lynch*, 791 F.3d 32 (D.C. Cir. 2015) ........................................................33

*\*District of Columbia v. Heller*,
554 U.S. 570 (2008)..............2, 12, 17, 23, 24, 25, 26, 28, 29, 31, 32, 33, 35, 36, 39

*\*Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013) ...................................3, 26, 32, 53, 57

*FET v. Heckler*, 756 F.2d 143 (D.C. Cir. 1985) ........................................................58

*Frank v. Walker*, 769 F.3d 494 (7th Cir. 2014) ........................................................57

*Gonzales v. Carhart*, 550 U.S. 124 (2007) ..............................................................30

*\*Heller v. District of Columbia*,
670 F.3d 1244 (D.C. Cir. 2011) ...............................6, 13, 26, 28, 33, 41, 46, 49, 57

*Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015)..............................48

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ................................30, 42

---

[*]       Authorities upon which we chiefly rely are marked with asterisks.

*Horsley v. Trame*, 808 F.3d 1126 (7th Cir. 2015) ....................................31

*Hutchins v. District of Columbia*, 188 F.3d 531 (D.C. Cir. 1999) .................. 14, 30

*INS v. Chadha*, 462 U.S. 919 (1983) .......................................13

*Kachalsky v. Cty. of Westchester*,
701 F.3d 81 (2d Cir. 2012)........................................ 3, 16, 32, 37, 53, 57

*Keystone Bituminous Coal v. DeBenedictis*, 480 U.S. 470 (1987).........................38

*Koon v. United States*, 518 U.S. 81 (1996)..............................................7

*Lorillard Tobacco v. Reilly*, 533 U.S. 525 (2001) ....................................42

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ..............................54

*Maryland v. King*, 133 S. Ct. 1 (2012) .......................................58

*Mazurek v. Armstrong*, 520 U.S. 968 (1997)...........................................12

*McDonald v. City of Chi.*, 561 U.S. 742 (2010) ............................... 11, 55

*McLaughlin v. Florida*, 379 U.S. 184 (1964) .........................................35

*Michael H. v. Gerald D.*, 491 U.S. 110 (1988).......................................30

*Mills v. District of Columbia*, 571 F.3d 1304 (D.C. Cir. 2009)............................54

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ..................................16

*Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)................................14

*Nken v. Holder*, 556 U.S. 418 (2009) .......................................55

*Noel Canning v. NLRB*, 705 F.3d 490 (D.C. Cir. 2013).........................................36

*O Centro Espirita Beneficente Uniao do Vegetal v. Ashcroft*,
389 F.3d 973 (10th Cir. 2004) .................................................53

*Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978) .................................... 37, 38

*Palmer v. District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014) ........................2

*\*Peruta v. Cty. of San Diego*, No. 10-56971,
2016 WL 3194315 (9th Cir. Jun. 9, 2016)............. 13, 15, 19, 20, 21, 22, 23, 49, 52

*Reichle v. Howards*, 132 S. Ct. 2088 (2012) ..........................................................31

*Robertson v. Baldwin*, 165 U.S. 275 (1897) ..........................................................12

*\*Schrader v. Holder*, 704 F.3d 980 (D.C. Cir. 2013) ........................... 32, 33, 41, 50

*Sherbert v. Verner*, 374 U.S. 398 (1963) ...............................................................38

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011).............................................7, 12

*Stanley v. USC*, 13 F.3d 1313 (9th Cir. 1994) .......................................................53

*Turner Broadcasting System v. FCC*, 512 U.S. 622 (1994) .............................. 40, 46

*Turner Broadcasting System v. FCC*, 520 U.S. 180 (1997) ...................................40

*United States v. Carter*, 750 F.3d 462 (4th Cir. 2014) ...........................................32

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010).....................................28

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011).......................... 34, 39

*United States v. Miller*, 307 U.S. 174 (1939) ........................................................35

*United States v. O'Brien*, 391 U.S. 367 (1968) ......................................................38

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) ...........................................32

*United States v. Williams*, 616 F.3d 685 (7th Cir. 2010).......................................32

*Williams v. IRS*, 919 F.2d 745 (D.C. Cir. 1990) ....................................................14

*Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656 (2015)..............................................40

*Winter v. NRDC*, 555 U.S. 7 (2008) .........................................................7

*Wisc. Gas v. FERC*, 758 F.2d 669 (D.C. Cir. 1985)...............................54

*\*Woollard v. Gallagher*,
712 F.3d 865 (4th Cir. 2013) ............................ 3, 33, 39, 47, 48, 49, 51, 53, 56, 57

*Wrenn v. District of Columbia*, 107 F. Supp. 3d 1 (D.D.C. 2015) ...........5

*Wrenn v. District of Columbia*, 808 F.3d 81 (D.C. Cir. 2015) ..................5

## Statutes and Regulations

1 W. & M., c. 2, § 7 (1689)......................................................................22

2 Edw. 3, 258, ch. 3 (1328).....................................................................15

18 U.S.C. § 930.......................................................................................31

28 U.S.C. § 1292(a)(1).............................................................................1

28 U.S.C. § 1331 ......................................................................................1

D.C. Code § 7-2502.01 (2001).................................................................2

D.C. Code § 7-2502.02(a)(4) (2001) .......................................................2

D.C. Code § 7-2502.02(a)(4) ...................................................................2

D.C. Code § 7-2509.06 .............................................................................2

D.C. Code § 7-2509.11 .............................................................................3

D.C. Code § 22-4504 (2009).....................................................................2

D.C. Code § 22-4506(a).............................................................................3

*Constitutional Provisions*

U.S. Const. Amend. II.. 1, 2, 6, 9, 11-15, 18, 20-22, 24, 26, 28-37, 39-40, 52, 54-55

Md. Const. of 1776, art. III, § 1 ...............................................................16

*Other*

A Bill for the Office of Coroner and Constable (Mar. 1, 1882) ..............16

Ayres & Donohue, *Nondiscretionary Concealed Weapons Laws*,
1 Am. L. & Econ. Rev. 436 (1999).........................................................43

Ayres & Donohue, *Shooting Down the "More Guns, Less Crime"
Hypothesis*, 55 Stan. L. Rev. 1193 (2003) .......................................43, 47

Ayres & Donohue, *Yet Another Refutation of the More Guns, Less Crime
Hypothesis*, 6 Econ. J. Watch 35 (2009)................................................43

Ayres & Donohue, *More Guns, Less Crime Fails Again*,
6 Econ. J. Watch 218 (2009).....................................................................43

Black & Nagin, *Do 'Right to Carry' Laws Reduce Violent Crime?*,
27(1) J. Legal Stud. Studies 209 (1998) ................................................46

Blackstone, *Commentaries* (1769).................................................25, 36

Blackerby, *The Second Part of the Justice of the Peace* (1734)............21

Blocher, *Firearm Localism*, 123 Yale L.J. 82 (2013) ................17, 18, 25

Bogus, *A Symposium on Firearms, the Militia, and Safe Cities*,
1 Alb. Gov't L. Rev. 440 (2008)........................................................18, 51

Branas, *et al.*, *Investigating the Link Between Gun Possession and Gun
Assault*, 99 Amer. J. Pub. Health 2034 (2009) ......................................47

Brockmole & Witt, *Action Alters Object Identification*,
38 J. Experimental Psychology 1159 (2012) .........................................51

Cay, *An Abridgment of Publick Statutes In Force and Use* (1739)........21

Charles, *The Faces of the Second Amendment Outside the Home*,
60 Clev. St. L. Rev. 1 (2012) ..........................................15, 19, 22, 23, 36

Charles, *The Statute of Northampton by the Late Eighteenth Century*,
41 Fordham Urb. L.J. City Square 10 (2013) .............................16, 20, 25

Charles, *The Faces of the Second Amendment Outside the Home, Take Two*,
4 Clev. St. L. Rev. 373 (2016) ...............................................................20

Coke, *Institutes of the Laws of England* (1694)................................23, 36

Cook, *et al.*, *Criminal Records of Homicide Offenders*,
294 JAMA 598 (2005) .............................................................................51

Cook, *et al.*, *Gun Control After* Heller, 56 UCLA L. Rev. 1041 (2009)................48

Cook & Ludwig, *The Social Costs of Gun Ownership*,
90 J. Pub. Econ. 379 (2006).....................................................................48

Cress, *Whither Columbia? Congressional Residence and the Politics of the
New Nation*, 32 Wm. & Mary Q. 581 (1975) ..........................................34

Dalton, *The Countrey Justice* (1618).....................................................20

Davis, *The Office and Authority of a Justice of the Peace* (1774) ...................17, 34

Dezhbakhsh & Rubin, *Lives Saved or Lives Lost? The Effects of Concealed-
Handgun Laws on Crime*, 88 Am. Econ. Rev. 468 (1998)......................47

Donohue, *Guns, Crime, and the Impact of State Right-to-Carry Laws*,
73 Fordham L. Rev. 623 (2004)...............................................................43

Donohue, *The Impact of Right to Carry Laws and the NRC Report* (2014) ..........43

Dunlap, *The New York Justice* (1815) ...................................................16

Hawkins, 1 *Treatise of the Pleas of the Crown* (1716).....................21, 36

Henigan, *The* Woollard *Decision and The Lessons of the Trayvon Martin
Tragedy*, 71 Md. L. Rev. 1188 (2012) ..............................................15, 46

Herz, *Gun Crazy: Constitutional False Consciousness and Dereliction of Dialogic Responsibility*, 75 B.U. L. Rev. 57 (1995).................................................39

Lambarde, *Eirenarcha* (1582) .............................................19

Lott & Mustard, *Crime, Deterrence, and Right-to-Carry Concealed Handguns*, 26 J. Legal Stud. 1 (1997) ......................................43

Ludwig, *Concealed-Gun-Carrying Laws and Violent Crime*, 18 Int'l L. Rev. L. & Econ. 239, 240 (1998) ............................................46

Nat'l Research Council, *Firearms and Violence: A Critical Review* (2004) .........43

Niles, *The Connecticut Civil Officer* (1833)............................................16

Ruben & Cornell, *Firearm Regionalism and Public Carry*, 125 Yale L.J. F. 121 (2015) ................................................24, 27

U.S. Government Accountability Office, Report to Congressional Requesters, GAO-12-717, *Gun Control: States' Laws and Requirements for Concealed Carry Permits Vary Across the Nation* (2012) ....................................29

Winkler, *Gunfight: The Battle over the Right to Bear Arms in America* (2011) .........................................................................18

Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683 (2007)................................................37

# GLOSSARY

| | |
|---|---|
| JA | Joint Appendix |
| RD | Record Document |
| SA | Statutory Addendum |

## JURISDICTIONAL STATEMENT

The district court has jurisdiction over this Second Amendment case under 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1). The May 26, 2016 notice of appeal of the May 17 preliminary injunction was timely.

## STATEMENT OF THE ISSUES

The District of Columbia appeals a preliminary injunction compelling it to issue licenses to publicly carry handguns to applicants who cannot make the showing of "good reason" that the Council of the District of Columbia has required. The issues are:

1. Whether the district court erred by finding plaintiffs likely to prevail on the merits under the Second Amendment, where history demonstrates that the Amendment did not codify a right to carry handguns in cities without "good reason"; and, alternatively, the law survives constitutional scrutiny because the Council's finding that the "good reason" is necessary to prevent crime and promote public safety is supported by substantial evidence and entitled to deference.

2. Whether the district court erred in balancing the equities in plaintiffs' favor, where plaintiffs do not claim they will suffer tangible harm if they cannot publicly carry while litigation is pending, and where the District will be irreparably harmed and the public interest obstructed if it cannot enforce this public-safety provision while it is compiling a full record in the district court.

# STATEMENT OF THE CASE

## 1.     The District Of Columbia Enacts A System For Licensing The Public Carrying Of Handguns.

Ever since its founding, the District has regulated public carrying. *See* Statutory Addendum ("SA") 9-33. For much of that time, some carrying was allowed under a licensing scheme. *E.g.*, SA26 (1892 statute), 33 (1943 statute). Starting in 1976, however, the District generally banned the possession of handguns. D.C. Code §§ 7-2502.01(a), 7-2502.02(a)(4) (2001).

In *District of Columbia v. Heller*, 554 U.S. 570 (2008) ("*Heller I*"), the Supreme Court held that this ban violated the Second Amendment's command that "the right of the people to keep and bear Arms, shall not be infringed." The Court held that the Amendment codified a pre-existing right and that, "whatever else it leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 592, 635.

In response, the Council amended the law to allow possession for self-defense in the home—the "core" of the Second Amendment. D.C. Code § 7-2502.02(a)(4); *Heller I*, 554 U.S. at 628-30. There remained a complete ban on public carrying, D.C. Code § 22-4504 (2009), until it was struck in *Palmer v. District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014). The Council responded with legislation to permit the issuance of public-carry licenses if, among other

qualifications, the applicant has "good reason to fear injury" or "any other proper reason for carrying a pistol." D.C. Code § 22-4506(a). To show "good reason," an applicant must demonstrate "a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks that demonstrate a special danger to the applicant's life." D.C. Code § 7-2509.11(1)(A). "[O]ther proper reason" "shall at a minimum include types of employment that require the handling of cash or other valuable objects that may be transported upon the applicant's person." D.C. Code § 7-2509.11(1)(B).

The Council based this "good reason" standard on similar provisions in New York, Maryland, and New Jersey, all of which "have withstood constitutional challenges." Joint Appendix ("JA") 120, 127 & n.39 (Committee Report, citing *Kachalsky v. Cty. of Westchester*, 701 F.3d 81 (2d Cir. 2012) , *cert. denied*, 133 S. Ct. 1806 (2013); *Woollard v. Gallagher*, 712 F.3d 865 (4th Cir.), *cert. denied*, 134 S. Ct. 422 (2012); *Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013), *cert. denied*, 134 S. Ct. 2134 (2014)). The Council credited empirical studies demonstrating that "right-to-carry laws" enacted in "shall issue" states "are associated with substantially higher rates of aggravated assault, rape, robbery and murder." JA135. "[I]ntroducing a gun into any conflict can escalate a limited danger into a lethal situation," and this "danger extends to bystanders and the public at large." JA136. Given the "substantial governmental interest in public safety and crime

prevention," the Council concluded that the "good reason" standard "offers a reasonable, balanced approach to protecting the public safety and meeting an individual's specific need for self-defense." JA136-37.

The Council explained that the "good reason" standard makes particular sense in the District, because it "is completely contained in a dense urban setting." JA125. And the District has greater "public safety and national security concerns" than other large cities as "the home of the President" and "all high-ranking federal officials and members of Congress," many "under constant protection" by the Secret Service or Capitol Police. JA122, 125. "[T]hreats are a constan[t]" for the "3,000 foreign dignitaries [who] spend[] time in our city each year," and the Metropolitan Police Department "provides security support for more than 4,000 special events annually." JA123, 124.

Moreover, the District is "heavily patrolled and protected by … more than two dozen law enforcement entities," few of which fall under its authority. JA125. Without the licensing regime, these entities would have to account for the increased risk associated with increased carrying—a result that, the Council found, could "turn the District into a semi-police state." JA135. "[I]ncreasing the posting of armed officers, or clearing streets of all automobiles and restricting pedestrian movement except through checkpoints, tips society away from the freedom and openness we value … ." JA125.

**2. Two District Court Judges Issue Conflicting Rulings On Motions To Preliminarily Enjoin Enforcement Of The "Good Reason" Standard.**

In February 2015, in *Wrenn v. District of Columbia*, 107 F. Supp. 3d 1 (D.D.C. 2015), a group of plaintiffs sued to challenge the District's "good reason" standard. *Id.* at 3. They designated the case "related" to *Palmer*, which had been assigned to a visiting judge, and *Wrenn* was also assigned to him. *See Wrenn v. District of Columbia*, 808 F.3d 81, 83 (D.C. Cir. 2015). He preliminarily enjoined the District from enforcing the "good reason" standard against those plaintiffs. *Id.* In December 2015, this Court vacated the injunction, returning the case to the district court for reassignment. *Id.* at 84.

Plaintiffs Matthew Grace and Pink Pistols brought this lawsuit one week later, raising the same claim and also seeking preliminary relief. JA11-21; ECF Record Document ("RD") 6. This case was assigned to Judge Richard Leon.

In February 2016, the *Wrenn* mandate issued and the case was assigned to Judge Colleen Kollar-Kotelly. *Wrenn* RD37; 2/9/15 Docket Entry. The District and the *Wrenn* plaintiffs notified the judges that the cases were related. RD34; *Wrenn* RD42, 43. The *Grace* plaintiffs objected. RD35 at 2. Judge Leon did not transfer this case per LCvR 40.5(c)(2), and the two cases proceeded separately.

On March 7, 2016, Judge Kollar-Kotelly denied the *Wrenn* plaintiffs' motion for a preliminary injunction. *Wrenn* RD54. She found them unlikely to prevail on the merits, holding that, even assuming the "good reason" standard

implicates a Second Amendment right, it should be measured under intermediate scrutiny. *Id.* at 12-16. This conclusion was "[g]uided by [this Court's] analysis in [*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ('*Heller II*'),]" and "the thorough analysis of" the Second, Third, and Fourth Circuits—"the *only* Courts of Appeals to have, thus far, addressed and definitively resolved the constitutionality of 'good reason' handgun licensing laws." *Id.* at 12, 14-15. She also held the equities favored the District and the public, noting their "strong interest" in public safety and finding that "the public carrying of operable handguns … poses a potential risk to others—carriers and non-carriers alike—far greater than the risk of possessing a handgun within the home." *Id.* at 28-29.

On May 17, 2016, Judge Leon reached the opposite conclusion and enjoined the District from enforcing the "good reason" standard against any applicant (including the *Wrenn* plaintiffs, contrary to Judge Kollar-Kotelly's decision). JA576. He would apply strict scrutiny, holding that the law "substantially burdens" the "core right of self-defense protected by the Second Amendment," and that the "good reason" standard was "not a permissible strategy" regardless of its efficacy. JA557, 567. He held the equities favor plaintiffs, explaining that "the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury'" even without tangible harm, and that "enforcement of an unconstitutional law is always contrary to the public interest." JA569, 571.

## STANDARD OF REVIEW

The Court reviews preliminary injunctions for abuse of discretion. *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing [this] extraordinary remedy." *Winter v. NRDC*, 555 U.S. 7, 24 (2008). A court necessarily "abuses its discretion when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 100 (1996).

## SUMMARY OF ARGUMENT

The Supreme Court has recognized that the Second Amendment preserves, even if it limits, local jurisdictions' ability to craft firearm regulations to suit local needs and values. The Council has done just that in a carefully considered public-carrying law that addresses the District's unique public-safety challenges while preserving an individual's ability to carry a handgun when there is a special self-defense need. Yet Judge Leon preliminarily enjoined the District from enforcing a law the Council and other state legislatures have found necessary to prevent gun violence. To justify this radical change in the status quo, plaintiffs must be extremely likely to prevail on the merits, and the threat of irreparable injury they face must outweigh the interest of the District and the public in enforcing this important public-safety law while this case continues. Judge Leon committed legal error and otherwise abused his discretion in finding plaintiffs met this high burden.

7

1.  Judge Leon wrongly found plaintiffs likely to prevail on their novel constitutional challenge.  They take an absolutist view that the Constitution requires every jurisdiction in the nation—regardless of local needs and values—to allow anyone who meets threshold requirements to carry a handgun in populated public places.  But they have failed to make either of two necessary showings.

*First*, plaintiffs have not even demonstrated that the District's law implicates the Second Amendment.  It codified a pre-existing right, and the people understood in 1791 that carrying could be barred in densely populated areas.  Early American laws were largely based on the laws of England, and there the Statute of Northampton banned open and concealed public carrying in fairs, markets, and other populated places.  More than half of the original States and the District were bound by Northampton-style laws before or soon after the Second Amendment was ratified, and several more adopted such laws in the mid-1800s.  Because Northampton laws explicitly prohibited carrying in populated areas, the ability to carry in cities could not have been understood as part of the pre-existing right.  And because the District's law is less burdensome than widespread Framing-era regulation of public carrying, it does not implicate the Second Amendment.

Moreover, *Heller I* and *II* recognize that longstanding firearm regulations are presumptively lawful.  Many states adopted a precursor to the "good reason" standard during the 1800s, allowing public carrying only by people with

"reasonable cause" to fear assault. Thus, for almost two centuries, the public has recognized the need for—and accepted as constitutional—laws restricting carrying in the public concourse without a particularized self-defense reason.

*Second*, assuming the "good reason" standard even implicates the Second Amendment, it is likely to pass intermediate scrutiny. No stricter scrutiny would be proper because public carrying in populated areas has been heavily regulated for more than seven centuries, from when firearms first appeared in England through the Second Amendment's ratification. Thus, even assuming the Second Amendment codified some right to publicly carry in cities without "good reason," it was not at the core.

The Council's judgment was supported by more than the substantial evidence needed to survive intermediate scrutiny (and more can be expected on a full record). It relied on empirical studies, expert testimony, anecdotal experience, and common sense, concluding that any increase in handgun carrying in the District's densely populated public areas would increase the risk of criminal violence and public harm.

This same evidence provides substantial support for the Council's conclusion that the "good reason" standard is no broader than reasonably necessary to accomplish its objectives. The Council properly recognized that it is difficult to predict whether a seemingly responsible person will misuse a handgun, much less

whether his public carrying will lead to gun-related problems through some other mechanism. So it tailored the law in a different way, crafting a standard ensuring that the public bears additional risk from public carrying only for individuals with a special need to carry a handgun in public for self-defense. Intermediate scrutiny requires a reasonable fit between a law and its objectives, not a perfect one, and the "good reason" standard satisfies this standard.

2. Judge Leon also erred in his equitable analysis. A preliminary injunction should issue only to prevent irreparable harm, and plaintiffs concede that they have no particular reason to fear injury if they cannot publicly carry a handgun while their lawsuit is pending. Moreover, even crediting Judge Leon's finding of "psychic" harm to plaintiffs, precedent instructs that, where an *intangible* deprivation of an alleged right is at issue, the other preliminary-injunction factors should determine whether this extraordinary relief is warranted. And the District has amply demonstrated that it will be irreparably harmed, and the public interest obstructed, if it cannot enforce the "good reason" standard while the law is challenged. The government suffers irreparable injury whenever it is enjoined from effectuating statutes enacted by the people's representatives. For a public-safety measure such as this, the injury can be palpable. Unlike gun possession in the home, public carrying subjects vast numbers of people to safety risks against their will, especially in a crowded city like the District.

The "good reason" standard is critically important. Without this standard, the District becomes a "shall-issue" regime, despite the Council's substantiated prediction that this will increase rates of aggravated assault, rape, robbery and murder. Judge Leon was not free to disregard these harms. The preliminary injunction should be vacated and the case should proceed to final judgment.

## ARGUMENT

### I. Plaintiffs Are Not Likely To Prevail On The Merits Of Their Claim That The Constitution Requires A "Shall-Issue" Nation.

The District of Columbia is unique. Unlike any state, it is entirely urban and densely populated. Unlike any city, it is filled with thousands of high-ranking federal officials and international diplomats, and it hosts hundreds of heavily attended events each year, including political marches and protests. The Second Amendment preserves the ability of local jurisdictions "to devise solutions to social problems that suit local needs and values," *McDonald v. City of Chi.*, 561 U.S. 742, 784-85 (2010), and that is precisely what the Council has done through the "good reason" standard.

Against the weight of established precedent and the Council's considered judgment, plaintiffs press the unwavering argument that the Second Amendment requires the District—and, indeed, every jurisdiction in the nation, irrespective of local conditions—to allow the carrying of handguns in public spaces without considering any particular license applicant's self-defense needs. Anything else,

they say, "destroys" their right. RD6-1 at 35. They argue that the circuits that unanimously conclude otherwise are wrong, and that the quarter of the American population in "may-issue" jurisdictions must change to "shall-issue," no matter what they and their elected representatives wish and what the public-safety consequences will be. RD6-1 at 27-30, 35.

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam); *see Sherley*, 644 F.3d at 392. Plaintiffs cannot satisfy this high burden because they must show both that the law at issue implicates the Second Amendment and that it would not survive constitutional scrutiny, but are unlikely to show either.

### A. Historical analysis demonstrates that the "good reason" standard does not implicate the right codified in the Second Amendment.

"Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller I*, 554 U.S. at 634-35. The Bill of Rights was crafted "to embody certain guaranties and immunities which we had inherited from our English ancestors, and which had … been subject to certain well-recognized exceptions." *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897). "[T]here was no intention of disregarding the exceptions, which continued to be recognized as if … formally expressed." *Id.* Because the District's law—providing licenses only to individuals with particularized self-defense needs—is

*less* burdensome than widespread Framing-era regulation of public carrying, it does not implicate any Second Amendment right. *See Peruta v. Cty. of San Diego*, No. 10-56971, 2016 WL 3194315, *15 (9th Cir. Jun. 9, 2016) (en banc) ("Because the Second Amendment does not protect … the right to carry concealed firearms in public, … a requirement of 'good cause' … is necessarily allowed … .").

Judge Leon held that the "good reason" standard impinges on a "core" right enshrined in the Second Amendment. JA539-55. But his analysis was legally flawed from the outset. *Heller II* instructs courts to determine "whether a particular provision impinges upon a right protected by the Second Amendment." 670 F.3d at 1252. To tailor this inquiry to the "particular provision" challenged here, Judge Leon had to determine whether the Amendment codified a right to carry handguns on the streets of a jurisdiction like the District, regardless of any particularized need. Instead, he broadly asked whether the Second Amendment protects *any* right to carry outside the home. JA541. Then, after concluding that it does, JA549, he shifted the burden to the District to prove a nationwide negative:

> *Plaintiffs* have a right to bear arms, and *defendants* seek to prove that carrying weapons in public places without ["good reason"] is somehow outside the purview of that right. If they are to prevail, it is *defendants* who must bear the burden of demonstrating such conduct has long been understood *throughout the Nation* to be unprotected by the right to bear arms.

JA553 n.17. This is exactly backwards. Laws are presumed constitutional until their challengers prove otherwise. *INS v. Chadha*, 462 U.S. 919, 944 (1983). To

justify constitutional scrutiny, plaintiffs must demonstrate that the Constitution actually protects the conduct the challenged law prohibits. *Cf. Williams v. IRS*, 919 F.2d 745, 746 (D.C. Cir. 1990) (holding that, in First Amendment retaliation cases, "plaintiff has the burden of showing his conduct is constitutionally protected"); *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) (similar). It therefore does not matter whether the Second Amendment protects a right to carry *somewhere* outside the home—even if it does, this cannot justify shifting the burden to the District to prove that the Second Amendment does not protect carrying in cities without good reason, much less prove this negative in every corner of the nation. *Cf. Hutchins v. District of Columbia*, 188 F.3d 531, 538 (D.C. Cir. 1999) (reviewing juvenile curfew by asking "not whether Americans enjoy a general right of free movement," but whether "juveniles … have a fundamental right to be on the streets at night without adult supervision").

In any event, regardless of who bears the burden, history confirms that most Framing-era citizens were prohibited, in populated areas, from publicly carrying firearms for self-defense. In many areas this general ban evolved into the less-restrictive "good reason" standard challenged here. Plaintiffs are therefore unlikely to prevail on their claim that the District's law infringes on a pre-existing right to publicly carry in crowded urban areas without good reason.

1. When the Second Amendment was ratified, carrying in the public concourse was generally prohibited.

For as long as citizens have owned firearms, English and American law has restricted any right to carry in populated public places. In 1328, England enacted the Statute of Northampton, which stated that "no Man" shall "go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere." SA36 (2 Edw. 3, 258, ch. 3). The Statute reflected a general rule that, in the public concourse, "the authority to ensure the public peace rested with the local government authorities," not individually armed citizens. Charles, *The Faces of the Second Amendment Outside the Home*, 60 Clev. St. L. Rev. 1, 20 (2012) ("Charles 2012"). Indeed, the Statute explicitly excluded from its prohibition "the King's servants in his presence," "his ministers," and citizens summoned to "keep the Peace." SA36.

The Statute "would become the foundation for firearms regulation in England for the next several centuries" and was "widely enforced." *Peruta*, 2016 WL 3194315, *7-8 (citing Charles 2012, *supra*, at 36, and historical orders, proclamations, and cases); *see* SA37-51. This "tradition of restricting both the concealed and the open carry of firearms in public places" was "reflected in various state laws immediately following the ratification of the Constitution." Henigan, *The* Woollard *Decision and The Lessons of the Trayvon Martin Tragedy*, 71 Md. L. Rev. 1188, 1202 (2012). Massachusetts, Virginia, North Carolina,

Tennessee, Maine, Delaware, New Mexico, and South Carolina all adopted the Statute's public-carrying ban, SA52-80, 138-40, and it was in effect through common law in New York, Connecticut, New Jersey, and Maryland.[1]  *See* RD23 at 13 (plaintiffs' concession that "the States imported Northampton from across the Atlantic," with "the contemporary English understanding" of its scope).  And "[m]ost states enacted laws banning the carrying of concealed weapons." *Kachalsky*, 701 F.3d at 95 (citing statutes).  Thus, "[i]n contrast to inside the home, where one could largely do what he wished, there was a long history of regulating arms in public."  *Moore v. Madigan*, 702 F.3d 933, 944 (7th Cir. 2012) (Williams, J., dissenting).

When Congress established the District's judicial systems in 1801, it adopted existing Maryland law.  SA9-11.  Maryland had adopted the common law of England, Md. Const. of 1776, art. III, § 1, where "the Statute of Northampton and regulations touching upon public carriage were alive and well."  Charles, *The Statute of Northampton by the Late Eighteenth Century*, 41 Fordham Urb. L.J. City Square 10, 20 (2013) ("Charles 2013").  The first codification of the District's common law, completed by Judge William Cranch in 1818, repeated the Statute's

---

[1]    *See* A Bill for the Office of Coroner and Constable (Mar. 1, 1882) (N.J. Constable Oath); Dunlap, *The New York Justice* (1815); Niles, *The Connecticut Civil Officer* (1833); Md. Const. of 1776, art. III, § 1 (adopting English common law).

ban on public carrying. SA18-19. By 1857, this ban was tempered by the precursor to the "good reason" standard—allowing public carrying by people with "reasonable cause to fear an assault." SA22 (unratified codification of common law). From then on, the District's laws strictly regulated open and/or concealed carrying, at some points banning public carrying altogether. *See, e.g.*, SA24 (1857 statute banning all carrying); SA25 (1858 statute banning concealed carrying without repealing ban on open carrying); SA26 (1892 statute banning concealed carrying without a license, which required good reason); SA33 (1943 statute banning all carrying without a license, which required good reason).

The District's actions in this compact, urban jurisdiction were consistent with how the Statute of Northampton's public carrying ban was "tailored to public places like 'Fairs' and 'Markets.'" Blocher, *Firearm Localism*, 123 Yale L.J. 82, 113 (2013). London began enacting gun-control laws "[a]s early as the 1300s." *Id.* at 112; *see also Heller I*, 554 U.S. at 587 n.10 (quoting a 1704 treatise reciting a prohibition on "bear[ing] any Arms within London, and the Suburbs"). And in America, "[u]rban gun control was … a nationwide phenomenon, reaching from the harbors of Boston to the dusty streets of Tombstone." Blocher, *supra*, at 120. As a North Carolina jurist explained, peacekeepers could "apprehend any Person who shall go or ride armed with unusual and offensive Weapons, in an Affray, or among any great Concourse of the People." Davis, *The Office and Authority of a*

*Justice of the Peace* 13 (1774). This "urban/rural divide appears to have been even more pronounced out West," where "even the towns most associated with gun violence ... required people to leave their weapons at the city limits when arriving in town." Blocher, *supra*, at 117 (citing Winkler, *Gunfight: The Battle over the Right to Bear Arms in America* 13 (2011)); *see, e.g.*, SA166 (1876 Dodge City, Kansas law). "Almost everyone carried firearms in the untamed wilderness," but "[i]n the frontier towns, … where people lived and businesses operated, the law often forbade people from toting their guns around." Blocher, *supra*, at 117; *see also* Bogus, *A Symposium on Firearms, the Militia, and Safe Cities*, 1 Alb. Gov't L. Rev. 440, 464 (2008) (explaining that, even in the "Wild West," "'[t]hose entering the towns had to come disarmed, since it was against the law for anyone but law enforcement officials to carry a gun'"). By the late 1800s, many cities completely banned public carrying. *See, e.g.*, SA149-53, 155-57, 159-63, 166. Many other cities had no reason to do so because longstanding Northampton-style laws at the state level already restricted carrying in populated areas. And the territories of New Mexico, Wyoming, Arizona, and Idaho[2] banned carrying in *all* cities, towns, and settlements. SA135-36, 142, 144-45.

---

[2] In 1902, the Idaho Supreme Court found this ban inconsistent with the state constitution and the Second Amendment. *In re Brickey*, 8 Idaho 597 (1902).

Judge Leon rejected this rich history, holding that the Statute of Northampton "forbade only carrying weapons in a terrifying manner that threatened a breach of the peace." JA551. But his strained reading creates textual inconsistencies in the Statute, which explicitly excludes from its prohibition "the King's servants," "his ministers," and citizens summoned to "keep the Peace." SA36. These peacekeeping exclusions would be superfluous if the Statute banned only carrying in a peace-*breaching* manner. Certainly nothing in the Statute itself suggests it was so limited. SA36.

Indeed, two centuries passed before William Lambarde first mentioned public terror in his restatement of the Statute, and he described this as the *result* of public carrying, not an element of the crime. Lambarde, *Eirenarcha* 134-35 (1582). He wrote that an "affray" may take place "without word or blow given, as if a man shall sh[o]w himself furnished with armour or weapon, which is not usually worne and borne, it will strike a feare to others that be not armed as he is," and "therefore … the Statute of Northampton" prohibits "the wearing of Armour and weapon." *Id.* Two decades later, in 1594, Elizabeth I proclaimed that public carrying—including *concealed* carrying—was "to the terrour" of her subjects and banned by the Statute. Charles 2012, *supra*, at 22; *Peruta*, 2016 WL 3194315, *9. And when Michael Dalton repeated the Statute's prohibition in 1618, he explained that it applied to "such as shall carry any Daggs or Pistols that be charged" even if

19

"those persons were so armed or weaponed for their defence; for they might have had the peace against the other persons: *and besides*, it striketh a feare and terror into the Kings subjects." Dalton, *The Countrey Justice* 129-30 (1618) (emphasis added).

"What Dalton and Lambarde's treatises make abundantly clear is that the act of carrying dangerous weapons was sufficient to amount an affray, … not some … particularized conduct." Charles 2013, *supra*, at 16. And, over the next two centuries, Lambarde's restatements on the Statute "were cited, reprinted, or paraphrased by a number of prominent commentators," none of whom supports Judge Leon's narrow interpretation. *Id.* at 14; *see id.* at 11-22 (analyzing the works of John Layer (1641), Edward Coke (1644), William Sheppard (1657), Richard Crompton (1660), Edmund Wingate (1661), Joseph Keble (1689), George Meriton (1669), Robert Gardiner (1692), Michael Dalton (1705), John Bond (1707), William Forbes (1707), William Hawkins (1716), and William Blackstone (1769)); *see also* Charles, *The Faces of the Second Amendment Outside the Home, Take Two*, 64 Clev. St. L. Rev. 373, 385-97 (2016) (analyzing additional historic material); *cf. Peruta*, 2016 WL 3194315, *9 (holding that the Statute prohibited concealed carrying).

Plaintiffs suggest that the Statute's scope "narrow[ed]" over the centuries. RD 23 at 11. But early-American recitations also tellingly made exceptions for

government-sanctioned peacekeeping. *See, e.g.*, SA18 (1818 District law), 55 (1786 Virginia law), 58 (1792 North Carolina law), 78 (1859 New Mexico law). And in England, prominent commentators continued reciting these exceptions. Hawkins, 1 *Treatise of the Pleas of the Crown*, ch.63, § 10 (1716); Blackerby, *The Second Part of the Justice of the Peace* 41 (1734); Cay, *An Abridgment of Publick Statutes In Force and Use*, "Arms" (1739). These exceptions make sense only if the Statute is read to prohibit carrying in the public concourse *because* it would terrify people. Public carrying was expected from the King's servants, noblemen charged with peacekeeping, and citizens responding to a "hue and cry." Such carrying did not cause public terror in the manner of civilians carrying dangerous weapons in a public concourse when not charged with keeping the peace.

Judge Leon's reading also conflicts with the detailed historical record recounted in *Peruta*, which establishes that, when the Second Amendment was ratified, "English law had for centuries consistently prohibited carrying *concealed*"—a prohibition that "may be traced back generally to the Statute of Northampton." 2016 WL 3194315, *9 (emphasis added). In 1594, Elizabeth I proclaimed that "the Statute of Northampton prohibited not just the 'open carrying' of weapons, but also the carrying of … 'secretly small Dagges.'" *Id.* *8. "Six years later, she ordered 'all Justices of the Peace' to enforce the Statute 'according to [its] true intent and meaning,'" "which meant a prohibition on the 'car[r]ying

and use of … [small firearms] that could be easily concealed." *Id.* In 1613, James I issued a proclamation "forbidding concealed weapons and reciting that the 'bearing of Weapons covertly … hath ever beene … straitly forbidden.'" *Id.* This is consistent with Elizabeth I's proclamation that even covert public carrying was "to the terrour of all people professing to travel and live peaceably." Charles 2012, *supra*, at 22. After all, a resulting upswing in violent crime could certainly contribute to public terror, as could the knowledge that any public dispute could trigger gunfire.

In 1689, England's Parliament enacted a Declaration of Rights—described in *Heller I* as "the predecessor to our Second Amendment," 554 U.S. at 593— guaranteeing that Protestants "may have arms for their defense suitable to their conditions, and as allowed by law." 1 W. & M., c. 2, § 7. Plaintiffs claim that, "[b]y th[at] time," the Statute was "well understood" to apply only when "arms were carried … with a design to terrify." RD 23 at 11. But, as discussed, their reading conflicts with the post-Declaration analyses of numerous scholars, including Dalton, Hawkins, and Blackstone, as well as some Framing-era Northampton laws. Indeed, Lord Coke's 1694 treatise explicitly foreclosed any self-defense exception, recounting the case of Sir Thomas Figett, who was imprisoned for violating the Statute when he "went armed under his garments" before a King's justice, even though he did so "to safeguard his life" after another

man "menaced him." Coke, *Institutes of the Laws of England* 161-62 (1694). And plaintiffs' reading cannot be squared with Granville Sharp's 1782 interpretation of the Declaration—relied on in *Heller I*, 554 U.S. at 594—that its phrase "as allowed by law" "referred to pre-existing restrictions, including the statute passed under Henry VIII prohibiting concealed arms." *Peruta*, 2016 WL 3194315, *9.

Citing a handful of quotes from America's founding fathers, Judge Leon found it "unquestionable that the public carrying of firearms was widespread during the Colonial and Founding Eras." JA545. But context matters. Thomas Jefferson recommended hunting to his nephew as a "species of exercise," to break up his "regular course" of reading, because "it gives boldness, enterprise, and independence to the mind," adding: "Let your gun therefore be the constant companion of your walks. Never think of taking a book with you." JA434. Northampton laws permitted hunting and did not apply in the countryside. Charles 2012, *supra*, at 19. John Adams defended Bostonians who used their weapons to suppress "dangerous rioters." JA436. Under Northampton laws, civilians were expected to publicly carry their firearms upon a "Cry made for Arms to keep the Peace." SA36. They also were expected to bring their weapons to public gatherings for militia inspection and training. *See, e.g.*, SA168-70 (early colonial laws). And the evidence that it was George Washington's "custom" to carry his pistol, JA546, comes from a book of anecdotes, tall tales, and jokes—the next page

describes Washington joining in a jumping contest for a wife. JA437-38. In any event, as the country's highest ranking military officer, Washington would have been immune from public carrying laws, and the road between Alexandria and Mount Vernon was rural, not urban.

To be sure, some courts in the Antebellum South that upheld concealed-carrying bans noted that open carrying was protected under state analogues to the Second Amendment. *See* JA547-48. But these cases "did not emerge in a vacuum and do not reflect the full range of American legal history." Ruben & Cornell, *Firearm Regionalism and Public Carry*, 125 Yale L.J. F. 121, 125 (2015). "Rather, they come from a time, place, and culture where slavery, honor, violence, and the public carrying of weapons were intertwined." *Id.* "The judges … were thus immersed in a social and legal atmosphere unique to the South," where their "view … was not universally held." *Id.* at 128 (citing Davis, *supra*, at 13 (1774 North Carolina treatise)). "No similar judicial record exists in the North," where "public carry restrictions appear to have gone unchallenged." *Id.* at 127. Judge Leon found this point "academic" because *Heller I* "relied on these very cases as probative of the Second Amendment's original meaning." JA548 n.11. But *Heller I* cited these cases as evidence of "an individual right unconnected to militia service," not the *scope* of the individual right to "bear arms." 554 U.S. at 610.

Moreover, none of these cases addresses the specific regulation challenged here, which applies only in this densely populated urban jurisdiction and makes exception for individuals with a special self-defense need. Even if some states did not ban public carrying, *cities* historically had broad discretion to limit public carrying in populated places. Blocher, *supra*, at 112-20. Judge Leon rejected this "urban/rural divide," describing the city ordinances as "needles in a legal haystack."[3] JA551 & n.14. But Northampton laws *themselves* make this distinction. Blackstone likened the Statute to the laws of ancient Greece, where "every Athenian was finable who walked about the city in armour." 4 Blackstone, *Commentaries* 148-49 (1769). And Dalton explained that people in the public concourse "could always seek the assistance of the constable to have 'the Peace against the other persons' enforced." Charles 2013, *supra*, at 21. In contrast, "[w]hen traveling on unprotected highways or through the unsettled frontier, it would certainly have been common for late eighteenth century Americans to arm themselves." *Id.* at 26; *see, e.g.*, SA78-80 (1859 New Mexico law allowing carrying "from one town to another" but not "after … arriv[al] at the town").

---

[3] Judge Leon also held that *Heller I* "expressly rejected" this "urban area" argument. JA550 n.13. But what the Court rejected was a "freestanding 'interest-balancing'" review of laws banning home possession, not the urban/rural distinction underlying centuries of regulation of public carrying. *Heller I*, 554 U.S. at 634.

The Second Amendment "is the very *product* of an interest balancing by the people." *Heller I*, 554 U.S. at 635. Those people recognized the need for strict regulation of public carrying in cities and recognized that laws could be drafted accordingly. A huge segment of the Framing-era population was governed by Northampton laws banning carrying in the public concourse because that is where carrying poses the greatest public risk. The "*pre-existing* right" to bear arms codified in the Second Amendment, *id.* at 592, is a right that, history shows, is not implicated by the District's "good reason" law.

       2.    Moreover, the "good reason" standard itself is longstanding and thus presumed constitutional.

In the mid-1800s, many states and territories began to allow public carrying by people with "reasonable cause" to fear assault. *See, e.g.*, SA22. This precursor to the "good reason" standard was adopted in Massachusetts, Wisconsin, Maine, Michigan, Virginia, Minnesota, Oregon, Pennsylvania, Texas, and West Virginia, and was the common law in the District. SA22, 85, 87, 88, 91, 94, 97, 101, 104, 122, 124. These laws create a rebuttable presumption that the "good reason" standard is beyond the scope of the Second Amendment. *See Heller I*, 554 U.S. at 626-27 & n.6; *Heller II*, 670 F.3d at 1253 (acknowledging "longstanding" status of laws enacted in the early 20th Century); *Drake*, 724 F.3d at 434 ("We discern no hint in the Second Amendment jurisprudence … that the analysis of a particular

regulation in a particular jurisdiction should turn entirely on the historical experience of that jurisdiction alone.").

Judge Leon refused to accord this presumption, explaining that the "reasonable cause" laws only required violators to "pay a surety" and therefore "did not criminalize" public carrying. JA553. Civil restrictions on carrying are, however, relevant in determining the scope of the right. Moreover, these laws appear in the criminal section of the code, alongside other indisputably criminal acts, such as "threaten[ing] to kill or beat another." SA85, 87, 88, 91, 94, 97, 101, 104, 122, 127. And, similar to probation, surety sanctions were criminal—failing to find a surety could lead to incarceration. *See, e.g.*, SA84 (1836 Massachusetts law); *see also* SA90, 93, 96, 100, 123 (similar provisions). That the lawbreaker was, essentially, sentenced to probation did not render his conduct lawful, much less constitutionally protected. Plaintiffs argue that these laws could not have applied to peaceful carrying because enforcement was triggered by citizen complaint. RD 23 at 9. But "before the age of police forces or an administrative state, this citizen-complaint process was an efficient way to deal with the danger posed by public carrying." Ruben & Cornell, *supra*, at 131. The prohibited conduct was unlawful even if it was not reported, and some states did not even have this enforcement mechanism. *See, e.g.*, SA94 (Virginia), 122 (West Virginia).

Invoking *Heller II*, plaintiffs argue in the alternative that they have rebutted the presumption of constitutionality "by showing the regulation does have more than a de minimis effect upon [their] right." RD 23 at 17 (quoting 670 F.3d at 1253). But what *is* their "right?" It cannot be *any* right—a claimed right beyond the scope of the Second Amendment cannot justify Second-Amendment scrutiny, no matter how severely it is burdened. *See United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010). Indeed, *Heller II* adopts a "two-step approach" in which the first step is to ask "whether a particular provision impinges upon a right *protected by the Second Amendment*." 670 F.3d at 1252 (emphasis added). And there is no broad, categorical "right" to carry any time a gun is desired for self-defense— *Heller I* identified bans on possession for felons and the mentally ill as "presumptively lawful," despite any self-defense need. 554 U.S. at 626-27. If the District's law does not implicate a protected right, it must be upheld. That is the whole point of *Heller II*'s two-step analysis.

Plaintiffs argue that the right to "bear arms" must apply somewhere outside of the home. JA460-62. The District does not challenge this assumption here. Instead, the District focuses on the narrow question posed: whether the right to "bear arms" includes a right to publicly carry a handgun in a crowded city without a particularized self-defense reason for doing so. And history demonstrates that

this particular conduct was not a "venerable, widely understood liberty" when the Second Amendment was ratified. *Heller I*, 554 U.S. at 605; *see id.* at 634-35.

**B. Alternatively, the "good reason" standard is likely to survive constitutional scrutiny.**

    1.    The "good reason" standard is not categorically unconstitutional.

*Heller I* found the District's handgun ban categorically unlawful because it "totally ban[ned] handgun possession in the home," "where the need for defense of self, family, and property is most acute." 554 U.S. at 628. Plaintiffs argue that the "good reason" standard is likewise categorically unlawful as a "wholesale ban" on "core Second Amendment conduct." RD 6-1 at 20. But the "good reason" standard is nothing like the handgun ban. "Few laws in the history of our Nation have come close to th[at] severe restriction." *Heller I*, 554 U.S. at 629. The "good reason" standard, in contrast, applies in New York, New Jersey, Maryland, and California—23 percent of the population of the United States.[4] Delaware, Connecticut, and Massachusetts also have "may-issue" laws that give discretion to licensing officials. U.S. Government Accountability Office, Report to Congressional Requesters, GAO-12-717, *Gun Control: States' Laws and Requirements for Concealed Carry Permits Vary Across the Nation*, at 5, 11 (2012) ("GAO Report"), *available at* http://www.gao.gov/assets/600/592552.pdf.

---

[4]    Census data is available at http://quickfacts.census.gov/qfd/index.html.

Plaintiffs devoted most of their categorical analysis below to defeating a straw man, arguing that "the Second Amendment applies outside the home," then claiming that the "good reason" standard "destroys" this right. RD 6-1 at 9-19, 35. What is burdened by the District's law, however, is not any broad right to carry outside the home, but something much narrower: the ability to carry a handgun in this unique, densely populated city without any specific self-defense reason.

Plaintiffs' circular reasoning—defining their "right" as precisely what the law precludes, then arguing that the law is categorically unconstitutional—could be used to evade means-ends scrutiny in any situation. A humanitarian organization could claim that, because it has a broad right to "pure political speech," its "right" to provide humanitarian speech to foreign terrorist organizations is "destroyed" by a material-aid ban. *But see Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010) (finding issue "more refined than" that). A juvenile could argue that, because "Americans enjoy a general right of free movement," his "right" is "destroyed" by a nighttime curfew. *But see Hutchins*, 188 F.3d at 538. Or a woman could argue that, because she has a broad right to obtain an abortion, her "right" to a partial-birth abortion is "destroyed" by a law banning that procedure. *But see Gonzales v. Carhart*, 550 U.S. 124, 166-67 (2007). This is not how constitutional rights are analyzed. *Cf. Michael H. v. Gerald D.*, 491 U.S. 110, 127 n.6 (1988) (explaining that substantive due process rights should be defined at "the

most specific level at which a relevant tradition protecting, or denying protection to, the asserted right can be identified") (opinion of Scalia, J., joined by Rehnquist, C.J.); *Reichle v. Howards*, 132 S. Ct. 2088, 2094 (2012) (making "particularized" constitutional right the touchstone in qualified-immunity analysis).

Even assuming the Second Amendment protects a right to carry outside the home in cities, that right is not at its core and the "good reason" standard does not "destroy" it. The standard applies only in the District, a unique jurisdiction "completely contained in a dense urban setting" filled with "critical official and symbolic buildings, monuments, and events, and high-profile public officials." JA123, 125. Of course individuals "do[] not surrender [their] Second Amendment rights upon crossing the Key Bridge," JA550 n.13, but the rights themselves always have been sensitive to context, like where a gun might be carried. The Supreme Court has made clear that limitations on carrying—even those that limit opportunities for self-defense—do not necessarily destroy a Second Amendment right. "Laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" are presumptively lawful, *Heller I*, 554 U.S. at 626, which effectively makes public carrying impossible for many people who live and work in the District. *See* 18 U.S.C. § 930 (federal facilities); D.C. Code § 7-2509.06(a) (District buildings). And courts "have affirmed categorical bans on firearm possession." *Horsley v. Trame*, 808 F.3d 1126, 1132 n.2 (7th Cir. 2015)

(citing *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) (felons)); *see, e.g.*, *Schrader v. Holder*, 704 F.3d 980, 989 (D.C. Cir. 2013) (certain common-law misdemeanants); *United States v. Carter*, 750 F.3d 462, 463 (4th Cir. 2014) (controlled-substance abusers); *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (domestic violence misdemeanants)). The District's status as the densely populated nation's capital means that laws that are a poor fit in rural areas and wilderness may justifiably apply to this entire jurisdiction.

Moreover, the "good reason" standard is not a categorical ban. It speaks not to who may carry a handgun, but *when* a handgun may be carried: after the applicant develops a non-speculative need for armed self-defense. *Cf. Heller I*, 554 U.S. at 630 (striking down law requiring firearms in the home to be kept inoperable, without an exception for self-defense). Any person could, at some point in time, find himself particularly threatened. When that happens, the District's law allows him to apply for a carry license—there is no quota or limit to the number of licenses that can be issued.

> 2.    The "good reason" standard should be measured under nothing more rigorous than intermediate scrutiny.

The Second, Third, and Fourth Circuits all apply intermediate scrutiny to the "good reason" standard because it does not completely prohibit the exercise of any core Second Amendment right. *Kachalsky*, 701 F.3d at 93 & n.17; *Drake*, 724 F.3d at 430 (finding standard beyond the scope of the Second Amendment but

32

applying intermediate scrutiny in the alternative); *Woollard*, 712 F.3d at 876. This Court has applied intermediate scrutiny to gun registration laws because they do "not severely limit" the core right, *Heller II*, 670 F.3d at 1257; a ban on assault weapons because it does not "prevent a person from keeping a suitable and commonly used weapon for protection in the home," *id.* at 1262; and a ban on firearm possession by convicted criminals because, although the burden "is certainly severe, it falls on individuals who cannot be said to be exercising the core of the Second Amendment right identified in *Heller*, *i.e.*, 'the right of law-abiding, responsible citizens to use arms in defense of hearth and home,'" *Schrader*, 704 F.3d at 989. "[T]he overwhelming majority of cases from [this Court's] sister circuits" also have "applied intermediate scrutiny to various statutes regulating firearms." *Dearth v. Lynch*, 791 F.3d 32, 39 (D.C. Cir. 2015) (Henderson, J., dissenting) (remanded for unrelated findings).

If the District's "good reason" standard implicates the Second Amendment at all, it too should be measured under this standard. Anything stricter would be inconsistent with the Supreme Court's recognition that "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller I*, 554 U.S. at 634-35. When the people adopted the Second Amendment, they understood that public carrying did not take precedence over public safety—this is why carrying was strictly regulated in populated areas. *See*

Davis, *supra*, at 13 (1774 treatise: "among any great Concourse of the People"); *e.g.*, SA19 (1818 District law: "fairs, or markets"), 55 (1786 Virginia law: "fairs or markets"), 59 (1792 North Carolina law: "fairs, markets"). Thus, even assuming the Second Amendment codified some right to publicly carry in cities without "good reason," it was not at the right's core, making anything stricter than intermediate scrutiny inappropriate. *Cf. United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011) ("[T]his longstanding out-of-the-home/in-the-home distinction bears directly on the level of scrutiny applicable.").

Indeed, strict scrutiny could not be squared with the history underlying why the District was created. In 1783, disgruntled soldiers surrounded the Continental Congress in Philadelphia. Cress, *Whither Columbia? Congressional Residence and the Politics of the New Nation*, 32 Wm. & Mary Q. 581, 587-88 (1975). Pennsylvania would not restore control, so Congress had to flee. *Id.* In response, James Madison declared that the federal government needed "complete authority at the seat of government." The Federalist No. 43. The Framers could not have intended—at the same time as it was creating this federal enclave—to restrict Congress's authority as markedly as strict scrutiny would suggest, especially when the Second Amendment did not constrain state legislatures.

Judge Leon nonetheless decided to apply strict scrutiny because "the Second Amendment protects the right to keep and bear arms *for the purpose of self-*

*defense*," and "[t]he need for self-defense is, of course, greater *outside* the home." JA558-59. But "prevent[ing] elimination of the militia," not self-defense, was "the purpose for which the right was codified." *Heller*, 554 U.S. at 599; *see United States v. Miller*, 307 U.S. 174, 178 (1939) (instructing that the Amendment "must be interpreted and applied with that end in view"). When a law does not affect the purpose for codification, lesser scrutiny should apply. *Compare McLaughlin v. Florida*, 379 U.S. 184, 191-92 (1964) (strict scrutiny for race-based classifications due to Fourteenth Amendment's historical purpose), *with Craig v. Boren*, 429 U.S. 190, 197-98 (1976) (intermediate scrutiny for gender-based classifications).

Moreover, while *Heller I* holds that "self-defense" (rather than militia participation) is "central to the Second Amendment," 554 U.S. at 628, it plainly does not hold that the core includes *any* conduct related to self-defense. If it did, the Court would not have singled out as "presumptively lawful" "prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places." *Id.* at 626. After all, felons and the mentally ill also may need to defend themselves, and there are certainly some "sensitive places"—which include government-building parking lots, *see Bonidy v. USPS*, 790 F.3d 1121, 1125 (10th Cir. 2015)—where a self-defense need may arise. Nor did *Heller II* broadly recognize a "core right of self-defense." *See*

JA557.  The laws challenged there implicated home possession, and this Court did nothing more than reiterate the core right identified in *Heller I*.  670 F.3d at 1257.

Judge Leon also held that, because home possession is a "core" right and the Second Amendment "places the right to 'keep' and to 'bear' arms on equal footing, it follows that the right to 'bear' arms for self-defense also lies at the core." JA558.  But courts must look to how constitutional text "would have been understood at the time of the ratification," *Noel Canning v. NLRB*, 705 F.3d 490, 495 (D.C. Cir. 2013), and public carrying was *not* "on equal footing" with home possession.  On the contrary, even as Northampton laws broadly limited carrying in public, the widely recognized "castle doctrine" allowed a man to "assembl[e] his Neighbours and Friends in his own House, against those who threaten to do him any Violence therein."  1 Hawkins, *Treatise of the Pleas of the Crown*, ch.63, § 8 (1716); *see* 4 Blackstone, *Commentaries* 223-24; Coke, *Institutes* 160-61.  *Heller I* thus found that the Second Amendment "surely elevates *above all other interests* the right … to use arms in defense of hearth and home."  554 U.S. at 636 (emphasis added).

The reasons for restricting public carrying in early American cities apply with even greater force today.  *See* Charles 2012, *supra*, at 48 (comparing the Framing-era gunman's ability to inflict "two deaths per minute" with the current "twelve, twenty-four, or … forty-eight").  "The risk inherent in firearms …

36

distinguishes the Second Amendment right from other fundamental rights that have been held to be evaluated under a strict scrutiny test, such as the right to marry and the right to be free from viewpoint discrimination, which can be exercised without creating a direct risk to others." *Bonidy*, 790 F.3d at 1126. Intermediate scrutiny "places the burden on the government to justify its restrictions, while also giving governments considerable flexibility to regulate gun safety." *Id.* Thus, "while the state's ability to regulate firearms is circumscribed in the home, 'outside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense.'" *Kachalsky*, 701 F.3d at 94.

None of this makes the Second Amendment a "second-class right." *See* JA571. "Many, indeed most, of the Bill of Rights guarantees do not trigger strict scrutiny." Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683, 694 (2007). Even the most burdensome content-based restrictions on commercial speech may be measured under intermediate scrutiny, for instance, because the government's "interest in preventing commercial harms justifies more intensive regulation." *Cincinnati v. Discovery Network*, 507 U.S. 410, 426 n.21 (1993); *see Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 455-56 (1978) (noting "the 'common-sense' distinction between [commercial] speech … , which occurs in an area traditionally subject to government regulation, and other varieties of speech"). And "when 'speech' and 'nonspeech' elements are combined in the same course of

conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *United States v. O'Brien*, 391 U.S. 367, 376 (1968).

So too for the free exercise of religion, where intermediate scrutiny applies to laws that ban "overt acts" that "pose[] some substantial threat to public safety, peace or order." *Sherbert v. Verner*, 374 U.S. 398, 403 (1963). And an individual's right to use private property for economic gain, protected under the Fifth Amendment, is subject to regulation to ensure it is not "injurious to the health, morals, or safety of the community." *Keystone Bituminous Coal v. DeBenedictis*, 480 U.S. 470, 489 (1987). These restrictions are "properly treated as part of the burden of common citizenship"—"[w]hile each of us is burdened somewhat by such restrictions, we, in turn, benefit greatly from the restrictions that are placed on others." *Id.* at 491.

The government has an even greater interest in regulating conduct that involves carrying a deadly weapon in a populated public place. Just as there is a "'common-sense' distinction" between commercial and noncommercial speech, *Ohralik*, 436 U.S. at 455-56, and between religious beliefs and overt acts, *Sherbert*, 374 U.S. at 403, there is a common-sense distinction between carrying a handgun in one's home or business and carrying a handgun on the crowded streets of the nation's capital. The increased risk from a handgun in the home is largely borne

by those who live in or visit that home. Not so for public carrying, with its higher potential for carnage. *See* Herz, *Gun Crazy: Constitutional False Consciousness and Dereliction of Dialogic Responsibility*, 75 B.U. L. Rev. 57, 60 n.7 (1995) ("[S]tray bullets are a particular problem in large cities.").

Public carrying also creates new potential for armed conflict, increasing the chances that "[i]ncidents such as bar fights and road rage" will "take on deadly implications," criminals will target carriers "*precisely because* they possess handguns," or "an additional person bearing a gun" will cause confusion during a police operation. *Woollard*, 712 F.3d at 879-80 (citing experts). "Were [courts] to require strict scrutiny" for firearm restrictions outside the home, they "'would likely foreclose an extraordinary number of regulatory measures, thus handcuffing lawmakers' ability to 'prevent[] armed mayhem' in public places," *Masciandaro*, 638 F.3d at 471, and "depriving them of 'a variety of tools for combating that problem,'" *id.* (quoting *Heller I*, 554 U.S. at 636).

The Framers were practical statesmen, and the rights they codified were shaped by centuries of practical considerations, including the particular threat to public safety posed by public carrying in populated areas. This is not the "freestanding 'interest-balancing' approach" rejected in *Heller I. See* JA568 n.24. Rather, the Second Amendment "is the very *product* of an interest balancing by the people." *Heller I*, 554 U.S. at 635. The people recognized the need for—or at

least the permissibility of—strict regulation of public carrying in cities because that is where it poses the greatest safety risk. This interest-balancing was codified in the Second Amendment and provides meaning to the words "bear arms."

Alternatively, and at minimum, Judge Leon committed legal error by effectively applying plaintiffs' categorical test after deciding to apply strict scrutiny instead. He recognized public safety and crime prevention as "compelling government interests," but held that the District's law would be narrowly tailored only if it was "targeted at keeping guns away from the people who are likely to misuse them or situations where they are likely to be misused." JA566, 568. The District offered considerable evidence that such restrictions—which are a routine part of shall-issue regimes—are not enough to prevent substantial increases in violent crime. *See* JA251-422. But Judge Leon refused to consider this evidence, finding the law "not … permissible" *regardless* of its efficacy, JA567, and so did not engage in a proper tailoring analysis. *See Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1671 (2015) ("[Strict scrutiny] requires that [the law] be narrowly tailored, not … 'perfectly tailored.'").

3. The "good reason" standard survives intermediate scrutiny.

*Heller II* adopted the intermediate-scrutiny test articulated in *Turner Broadcasting System v. FCC*, 512 U.S. 622 (1994) ("*Turner I*"), and 520 U.S. 180 (1997) ("*Turner II*"). 670 F.3d at 1257-59. This Court applied this same test in

*Schrader*.  Both decisions recognized that, under intermediate scrutiny, the "fit" between the challenged law and the important governmental interest "[need only] be reasonable, not perfect."  *Schrader*, 704 F.3d at 990.  It "is satisfied so long as the regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation, and the means chosen are not substantially broader than necessary to achieve that interest."  *Heller II*, 670 F.3d at 1258.

In assessing whether a law is "substantially related to an important governmental objective," *id.*, this Court "afford[s] 'substantial deference to the predictive judgments of [the legislature],'" *Schrader*, 704 F.3d at 990.  It defers both "as to the harm to be avoided" and "the remedial measures adopted for that end," *Turner II*, 520 U.S. at 196, because the legislature is "'far better equipped than the judiciary' to make sensitive public policy judgments … concerning the dangers in carrying firearms and the manner to combat those risks," *Schrader*, 704 F.3d at 990.  The courts' role is to "'assure that, in formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial evidence.'" *Heller II*, 670 F.3d at 1259.

This Court also should defer to the Council's predictive judgments relating to "fit"—whether the "good reason" standard is not substantially broader than necessary.  *Turner II* deferred to Congress's assessment of "fit" when it rejected an alternative proposed by the litigants, finding that Congress had considered the

option but made "a deliberate congressional choice to adopt the present levels of protection, to which this Court must defer." 520 U.S. at 219 (citing legislative history); *see id.* at 220-21 (similar). And in *Humanitarian Law Project*, the Supreme Court again deferred to Congress on whether a law was necessary, upholding a ban on the provision of "material support" to foreign terrorist organizations when it precluded pure speech that advanced only legitimate activities. 561 U.S. at 28-29, 33.

The "good reason" requirement is likely to survive intermediate scrutiny. The government can "justify … restrictions by reference to studies and anecdotes pertaining to different locales altogether," or "history, consensus, and 'simple common sense.'" *Lorillard Tobacco v. Reilly*, 533 U.S. 525, 555 (2001). The Council based its findings on considerable evidence, and the District will introduce even more on a full record.

a. The Council's evidence.

The Council substantiated its finding that the "good reason" standard will help prevent crime and promote public safety. It primarily relied on a 2014 Stanford University study led by Professor John Donohue III, an economist, legal scholar, and leading empirical researcher, who explained that "[t]he totality of the evidence based on educated judgments about the best statistical models suggests that right-to-carry laws are associated with substantially higher rates of aggravated

assault, rape, robbery and murder." JA135 (Committee Report); *see* JA251-358 (Donohue, *The Impact of Right to Carry Laws and the NRC Report* (2014)). Donohue and Yale Law School Professor Ian Ayres began researching the effect of right-to-carry laws in response to a 1997 study that had reported that such laws *decreased* violent crime. JA255-57 (citing Lott & Mustard, *Crime, Deterrence, and Right-to-Carry Concealed Handguns*, 26 J. Legal Stud. 1 (1997)); *see* Ayres & Donohue, *Nondiscretionary Concealed Weapons Laws*, 1 Am. L. & Econ. Rev. 436 (1999). They found the "more guns, less crime" conclusion impossible to replicate. *See*, *e.g.*, Ayres & Donohue, *Shooting Down the "More Guns, Less Crime" Hypothesis*, 55 Stan. L. Rev. 1193 (2003) ("Ayres 2003"); Donohue, *Guns, Crime, and the Impact of State Right-to-Carry Laws*, 73 Fordham L. Rev. 623 (2004).

In 2004, the National Research Council convened a panel of researchers who extended the "more guns, less crime" study to 2000; they too found no credible statistical evidence to support the conclusion. JA265-70 (citing Nat'l Research Council, *Firearms and Violence: A Critical Review* (2004)). Over the next ten years, Ayres and Donohue tested the models from these earlier studies—correcting for errors they uncovered, gathering more reliable crime data, and extending their study up to 2010. JA271-325; *see also* Ayres & Donohue, *Yet Another Refutation of the More Guns, Less Crime Hypothesis*, 6 Econ. J. Watch 35 (2009); Ayres &

Donohue, *More Guns, Less Crime Fails Again*, 6 Econ. J. Watch 218 (2009). After all this research, in 2014, Donohue concluded that right-to-carry laws were likely to result in "substantially higher rates" of violent crime. JA222-23.

Donohue acknowledged that "it is not possible to determine that there is a causal link between the passage of right-to-carry laws and crime rates." JA330. "But not being able to 'determine' with the level of certainty one strives for in academic work does not mean that one cannot offer conclusions at some lower level of certainty such as 'more probable than not.'" JA330. "Since policymakers need to act, it is more useful to offer guidance as to which evidence is likely to be most reliable than to simply reject all evidence until the highest level of certainty has been attained." JA330. And, Donohue reported, for each of the seven crime categories studied, at least one of the most-favored models demonstrated a substantial increase in crime after right-to-carry laws were enacted. JA330. One model "suggest[ed] that [right-to-carry] laws increased every crime category [except murder] by at least 8 percent," and this "likely … understate[s] the true increases in aggravated assault caused by [right-to-carry] law." JA 330-32.

The Council also relied on the predictive judgments of the legislatures of New York, New Jersey, and Maryland, all of which have found the "good reason" standard necessary to prevent crime (and had those findings upheld). *See* JA120, 127 & n.39. This evidence applies with even greater force here. Unlike those

44

states, the District has no rural or unpopulated areas—it "is completely contained in a dense urban setting," with correspondingly "higher rates of violent crime than suburbs and rural areas." JA122, 125. And "as the seat of the federal government, with its multitude of critical official and symbolic buildings, monuments, and events, and high-profile public officials," the District is "filled with sensitive places from a public safety perspective." JA123. As a result, "the likelihood of attack is higher" than in any other city, "and the challenges … are greater." JA124. The Council predicted that a significant increase in public carrying would force federal law enforcement to step up protection of thousands of high-risk targets, which could interfere with daily life and exercise of other rights through, for instance, political protest in public spaces. JA125.

The Council also relied on expert testimony from Chief Lanier and information from the Secret Service and Capitol Police explaining the District's special security concerns. *See* JA138, 141, 142. It relied on how "much of the District's violent crime is the result of gang members carrying guns" and how, regardless of the illegality of the practice, "the fact that [gang members] are carrying provokes gun violence." JA136. And it relied on common sense, finding it "undeniable" that "introducing a gun into any conflict can escalate a limited danger into a lethal situation" and that, "[w]hen the deadly force being used is a gun, the danger extends to bystanders and the public at large." JA136.

b.    The evidence the District will introduce in the district court.

In this preliminary-injunction appeal, the Court should also consider evidence the District likely will present on a full record. *See Turner I*, 512 U.S. at 667-68 (remanding for additional factual development); *Heller II*, 670 F.3d at 1259-60 (same). "An impressive body of empirical evidence now shows that state laws making it easier to carry concealed weapons in public … have had the net effect of making those states more dangerous." Henigan, *supra*, at 1201. For example, in 1998, economist Jens Ludwig tested the "more guns, less crime" theory, using juveniles (who cannot qualify for public-carry permits) as a control group, and concluded that the failure of the theory's proponents to "control[] adequately for omitted variables" such as crack cocaine, gang activity, and poverty "bias[ed]" their results. JA 360 (Ludwig, *Concealed-Gun-Carrying Laws and Violent Crime*, 18 Int'l L. Rev. L. & Econ. 239, 240 (1998)); *see* Black & Nagin, *Do 'Right to Carry' Laws Reduce Violent Crime?*, 27(1) J. Legal Stud. Studies 209 (1998) (finding the "more guns, less crime" study "highly sensitive to small changes in [its] model and sample" such that "[its] results cannot be used responsibly to formulate public policy"). Ludwig's study concluded that "shall-issue laws have resulted, if anything, in an *increase* in adult homicide rates." JA 359. Another 1998 study applied corrected models to the "more guns, less crime" data and found that, "[f]or robbery, many states experience increases in crime"

after enacting right-to-carry laws. JA380 (Dezhbakhsh & Rubin, *Lives Saved or Lives Lost? The Effects of Concealed-Handgun Laws on Crime*, 88 Am. Econ. Rev. 468 (1998)).

Judge Leon faulted the District for failing "to explain why the District's licensing scheme could not be broader and allow for more responsible, law-abiding citizens to obtain concealed carry permits … while simultaneously protecting public safety." JA567. But these "broader" standards already apply in most "shall-issue" jurisdictions, *see* GAO Report at 7-8, and are associated with the very harm the District seeks to prevent, *see* JA252. Many of the risks of public carrying have nothing to do with the conduct of the law-abiding carrier. A 2009 study of Philadelphia residents found that those who possessed a gun during an assault were 4.46 times more likely to be shot, *increasing* to 5.45 when the victim had an opportunity to resist. JA398 (Branas, *et al.*, *Investigating the Link Between Gun Possession and Gun Assault*, 99 Amer. J. Pub. Health 2034 (2009)). Handguns are often stolen and used against the carrier or used to commit a host of other crimes— indeed, "criminals often target victims '*precisely because* they possess handguns.'" *Woollard*, 712 F.3d at 879 (quoting former Baltimore Police Commissioner); *see* Ayres 2003, *supra*, at 1205 ("[S]ome estimates suggest[] that as many as one million or more guns are stolen each year."); *Heller v. District of Columbia*, 801 F.3d 264, 277 (D.C. Cir. 2015) (finding requirement that firearm registrant bring

weapon to police station "more likely" to "threat[en]" "public safety" due to "risk that the gun may be stolen en route"). And an upswing in public carrying may well encourage criminals to "shift toward greater lethality." JA390 (Cook & Ludwig, *The Social Costs of Gun Ownership*, 90 J. Pub. Econ. 379 (2006)). "Two-thirds of prisoners incarcerated for gun offenses reported that the chance of running into an armed victim was very or somewhat important in their own choice to use a gun." Cook, *et al.*, *Gun Control After* Heller, 56 UCLA L. Rev. 1041, 1081 (2009). "If increased gun carrying among potential victims causes criminals to carry guns more often themselves, or become quicker to use guns to avert armed self-defense, the end result could be that street crime becomes more lethal." *Id.*

Public carrying also complicates the relationship between police officers and the law-abiding public. Law enforcement experts in *Woollard* testified that the presence of a third person with a handgun in a confrontation between an officer and a suspect can "cause confusion as to which side … the person is on, which could lead to hesitation by the police officer," with "potentially tragic consequences" for "innocent victims," "bystanders, and police officers." 712 F.3d at 879-80. Moreover, "[i]f the number of legal handguns on the streets increased significantly, [police] officers would have no choice but to take extra precautions before engaging citizens, effectively treating encounters … that now are routine, friendly, and trusting, as high-risk stops." *Id.* at 880.

And sometimes licensed carriers with previously clean records *do* misuse their weapons. "Sadly, those incidents are not anomalies." *Peruta*, 2016 WL 3194315, \*18 (Graber, J., concurring). "Nationwide, since May 2007, concealed-carry permit holders have shot and killed at least 17 law enforcement officers and more than 800 private citizens." *Id.* (citing *Concealed Carry Killers*, Violence Policy Center, www.concealedcarrykillers.org). This includes 30 mass shootings, including the 2013 attack at the District's Navy Yard and the June 2016 attack at an Orlando nightclub. "Even if we assume that each and every one of those tragedies was less likely to occur because of the shooter's prior status as a 'law-abiding citizen,' that does not mean that [the 'good reason' standard] fails to address the problem in a reasonable way." *Id.* After all, "lawmakers are entitled to weigh the severity of the risk as well as the likelihood of its occurrence." *Id.* And, to the extent a judgment must be made on uncertain data, it is the Council's judgment that is entitled to deference, not plaintiffs' or Judge Leon's. *Heller II*, 670 F.3d at 1269.

        c.     The Council's tailoring of the "good reason" standard to accomplish its objectives.

This Court should also defer to the Council's conclusion that the "good reason" standard is not substantially more burdensome than necessary to accomplish its objectives. Intermediate scrutiny requires that "the fit … be reasonable, not perfect." *Schrader*, 704 F.3d at 990. And the District offered

49

ample evidence of reasonable fit. The Council relied on empirical evidence that public-carry laws significantly increase violent crime. JA251-358. It relied on the persuasive judgment of legislatures in New York, New Jersey, and Maryland, all of which found the "good reason" standard reasonably tailored to prevent an increase in gun violence. JA127. And it heard lay and expert witness testimony describing the District's unique security concerns. JA119-22, 135-37, 207-15.

The Council's conclusion that the "good reason" standard is reasonably tailored flows naturally from this evidence. *See* JA137 (finding that the standard "offers a reasonable, balanced approach to protecting the public safety and meeting an individual's specific need for self-defense"). If an upswing in public carrying is likely to increase the quantity and lethality of violent crime, escalate conflicts that would otherwise dissipate, and increase the chances that innocent bystanders will be shot, it is reasonable to conclude that limiting public carrying to those with a specific self-defense need will reduce these harms. And if law enforcement agencies are likely to respond to a substantial increase in public carrying by taking protective measures that interfere with the public's right to travel freely, it is reasonable to conclude that limiting public carrying to those with a specific self-defense need will discourage such measures.

Judge Leon held that, to survive strict scrutiny, the law must be "targeted at keeping guns away from the people who are likely to misuse them." JA568. But

this misunderstands the purpose of the "good reason" standard. The Council recognized that, beyond obvious suitability standards that look to criminal and mental-health records, it is difficult to predict whether a seemingly responsible person will misuse his handgun. Every citizen is law-abiding until he breaks the law, and the government cannot know in advance who will do so. *See* JA403, (Cook, *et al.*, *Criminal Records of Homicide Offenders*, 294 JAMA 598, 599 (2005) (noting that fewer than half of adults arrested for criminal homicide have prior felony convictions)). Gangs, for instance, could travel with arms carried by members who have not acquired criminal records (or they could recruit such members). *See* JA412 (2011 Minnesota report: "It is not unusual for some gang members … to have a permit to carry a firearm."). Public carrying also "may create or exacerbate accidents or deadly encounters, as the longstanding bans on private firearms in airports and courthouses illustrate." *Bonidy*, 790 F.3d at 1126; *see Woollard*, 712 F.3d at 879 (noting firearm-based escalation of "bar fights and road rage"); *cf.* Bogus, *supra*, at 445 ("The largest percentage of murders [in the United States], more than 40%, occurs during arguments."). Indeed, "the mere act of wielding a firearm raises the likelihood that nonthreatening objects will be perceived as threats." Brockmole & Witt, *Action Alters Object Identification*, 38 J. Experimental Psychology 1159, 1167 (2012). Thus, "examples abound of 'law-

abiding citizens' … who place the public safety in jeopardy." *Peruta*, 2016 WL 3194315, *18 (Graber, J., concurring).

Plaintiffs complain that the District "'has too readily foregone options that could serve its interests just as well' without unduly burdening Second Amendment rights." RD 6-1 at 34. But they have suggested no alternative that would prevent the increase in crime associated with "shall-issue" laws. *Cf. Turner II*, 520 U.S. at 222 (rejecting subsidies as a less-burdensome alternative to challenged law because plaintiff cable operators "ha[d] not proposed any particular subsidy scheme"). Instead, in accordance with their absolutist view, plaintiffs seek to bar the District from enacting *any* measure that would ensure that the public bears this risk only for individuals with a special self-defense need. They argue that the District must be a "shall-issue" regime, required to face the very dangers the Council means to prevent by enacting the "good reason" standard.

The Council properly concluded that the issuance of *any* public-carry permit, regardless of whether it is based on "good reason," increases the likelihood of public harm. At the same time, the Council understood that some individuals do have particularized needs to carry handguns for self-defense. It then engaged in tailoring that is entirely appropriate under the circumstances, and that three circuits have upheld—accepting some additional public risk, but only for individuals with these special self-defense needs. The "good reason" standard "provides a means to

determine whether the increase in risk and danger borne by the public is justified by a demonstrated risk and danger borne to the person seeking to carry." *Drake*, 724 F.3d at 437. It is "the result of a 'careful balancing of the interests involved' and not a general animus towards guns." *Kachalsky*, 701 F.3d at 97 n.22; *see Woollard*, 712 F.3d at 881 (similar). It should be upheld.

## II.   The District Court Wrongly Balanced The Equities In Plaintiffs' Favor.

A preliminary injunction serves "to preserve the relative positions of the parties until a trial on the merits." *CFGC v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). An injunction that "goes well beyond simply maintaining the status quo … is particularly disfavored." *Stanley v. USC*, 13 F.3d 1313, 1320 (9th Cir. 1994). It is a "judicially inflicted injury," and many circuits therefore make the movant's high burden even "more stringent." *O Centro Espirita Beneficente Uniao do Vegetal v. Ashcroft*, 389 F.3d 973, 978 (10th Cir. 2004) (citing cases). The requested preliminary injunction changed the status quo by barring the District from enforcing the "good reason" standard at the outset of litigation. Plaintiffs should therefore be held to an especially high standard. Their equitable showing falls short.

### A.   Plaintiffs have not shown that they will suffer irreparable harm if the "good reason" standard is enforced while litigation is pending.

"This [C]ourt has set a high standard for irreparable injury"—it "must be both certain and great," "actual and not theoretical." *CFGC v. Navy*, 534 F.3d 756, 766

(D.C. Cir. 2008). The movant must show that "the injury complained of [is] of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Wisc. Gas v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Plaintiffs, however, do not claim any "clear and present" need to carry a handgun; indeed, they premise their standing on their claim that they *cannot* demonstrate any particularized reason to fear harm and therefore cannot satisfy the "good reason" standard. JA30, 36; *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (requiring "concrete and particularized" injury); *Wisc. Gas*, 758 F.2d at 674 ("Injunctive relief 'will not be granted against something merely feared as liable to occur at some indefinite time.'").

Judge Leon found that even a temporary "loss of constitutional freedoms" "constitutes irreparable injury." JA569. But this Court has not applied this principle to Second Amendment rights, nor should it. Some constitutional rights are so intrinsically valuable that "the irreparable nature of the harm may be presumed." *CFGC*, 454 F.3d at 301 (free exercise of religion); *see Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (freedom to travel without unreasonable seizure). But the right to keep and bear arms has no intrinsic value— it is not an end in itself. *See McDonald*, 561 U.S. at 787 (acknowledging right as "instrumental" rather than "intrinsic"). Instead, as *Heller I* explains, it is "the inherent right of self-defense" that is "central to the Second Amendment." 554

U.S. at 628. Firearms are *tools* used to preserve this right, but they can serve this purpose only if a threat arises. If no self-defense occasion arises, the absence of a handgun cannot cause harm. Judge Leon found intrinsic value in the "psychic comfort" of "knowing one could protect oneself if necessary." JA570. But *Heller I* did not identify such an interest as central to the Second Amendment, and this Court should not assume one here.

In any event, such "psychic" harm carries little weight—"[i]t is the[] other prongs that will ultimately determine" whether a preliminary injunction is warranted. *CFGC*, 454 F.3d at 304; *see id.* at 298-99 (distinguishing tangible from intangible harm). A claim of intangible harm flowing from an alleged constitutional violation does "not … in any way lessen[] the burden for" the moving party. *Id.* at 304. "It merely focuses greater attention on the three other factors that indisputably enter into the preliminary injunction determination." *Id.*

## B. The preliminary injunction will irreparably harm the District and the public.

The District will be irreparably harmed, and the public interest obstructed, if it cannot enforce the "good reason" standard while litigation is pending. *Cf. Nken v. Holder*, 556 U.S. 418, 435 (2009) (recognizing that "[t]hese factors merge when the Government" is opposing a stay). The District offered empirical, expert, and other evidence that the "good reason" standard is necessary to prevent crime and promote public safety. *See* JA119-422. Judge Leon rejected this evidence, finding

that the injunction "would have *no* effect whatsoever on a veritable gauntlet of other licensing requirements." JA572. But the Council made plain why it believes the "good reason" standard promotes public safety. Moreover, most "shall-issue" regimes include these other licensing requirements, *see* GAO Report at 7-8, and nevertheless are associated with higher rates of violent crime. JA252.

Judge Leon "can only wonder what evidence, if any, the District could muster to demonstrate that the type of people who would be willing and able to successfully complete this regulatory gauntlet would nevertheless be likely to pose a safety risk to the greater community." JA572. But, as discussed, there are myriad ways in which carrying can endanger the public *even without any fault* of the carrier, and the District proffered hundreds of pages of empirical studies, expert testimony, and other evidence explaining as much. *See* pp.47-49; *e.g.*, JA136, 138, 141, 142, 395-401, 382-94. Carriers can be targeted for theft, bystanders can be hit with stray bullets, criminals can choose more lethal weaponry, police can be hindered in dangerous situations, and concerns about safety can complicate the relationship between police and the law-abiding public. *See Woollard*, 712 F.3d at 879-80. Moreover, again, some licensed carriers *do* commit crimes with their guns. *See* p.49.

District residents, through their elected representatives, decided based on a solid foundation of evidence that public carrying without "good reason" is

inconsistent with public safety.  JA136-37.  That finding is entitled to deference. *Heller II*, 670 F.3d at 1269.  The Second, Third, and Fourth Circuits concur. *Kachalsky*, 701 F.3d at 99; *Drake*, 724 F.3d at 439; *Woollard*, 712 F.3d at 879-80.

Judge Leon nevertheless held that, regardless of the District's interest, "enforcement of an unconstitutional law is always contrary to the public interest." JA571.  But the "good reason" standard is not unconstitutional.  Three circuits have upheld it, and none holds otherwise.  A colorable constitutional claim does not automatically align a moving party's interests with the public.  Instead, courts honor the "public interest in using laws enacted through the democratic process, until the laws' validity has been finally determined." *Frank v. Walker*, 769 F.3d 494, 496 (7th Cir. 2014) (noting that, after circuit courts struck state bans on same-sex marriage, the Supreme Court issued stays so that the laws remained in effect pending final resolution).  As Chief Justice Roberts explained when he stayed a decision striking a public safety law as unconstitutional, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'" *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers).

At minimum, this Court should vacate the injunction as it applies to non-plaintiff applicants, JA576, as "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano*

*v. Yamasaki*, 442 U.S. 682, 702 (1979). It also should vacate as premature the provision that the District "modify and reissue, forthwith, all … concealed carry license application materials to be consistent with [Judge Leon's] Order." JA577.

**C.    Judge Leon's balancing of the equities is not entitled to deference.**

To be sure, the district court's balancing of the equities is ordinarily entitled to deference. *FET v. Heckler*, 756 F.2d 143, 151-52 (D.C. Cir. 1985). But this Court cannot meaningfully defer to both Judge Leon in this case and Judge Kollar-Kotelly in *Wrenn*, because they reached opposite conclusions on similar requests for injunctive relief.

The Court should defer to Judge Kollar-Kotelly's balancing, because only she properly applied the law by weighing the District's evidence of "risks posed to members of the public … as a result of concealed weapons carried in public." *Wrenn* RD 54 at 30. Judge Leon acknowledged this reality in his analysis of the merits—he "agree[d] … that the District's interest in public safety is implicated by people carrying guns in public, and certainly more so than when they keep guns within the confines of their homes," but found the "good reason" standard "not … permissible" regardless of its efficacy. JA566-67. When it came to balancing the equities, however, he refused to acknowledge that the law would have *any* impact on public safety. JA572. He did not cite any evidence to support his apparent

view that District's licensing regime would be just as effective without the "good reason" standard. JA572.

This was legal error. Regardless of whether the standard will ultimately be found constitutional, the public has an interest in its enforcement while litigation is pending. It is the essential component of a scheme crafted to balance public safety with the needs of individuals particularly at risk. Without it, the District becomes a "right-to-carry" regime, despite the Council's legislative judgment, based on empirical studies, that such regimes are "associated with substantially higher rates of aggravated assault, rape, robbery and murder." JA135. Judge Leon erred when he disregarded these harms, and this error irreparably skewed his balancing of the equities. This flawed balancing is not entitled to deference, and it should not offset the deference owed to Judge Kollar-Kotelly—who properly weighed the interests of plaintiffs, the District, and the public.

## CONCLUSION

The preliminary injunction should be vacated.

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

TODD S. KIM
Solicitor General

LOREN L. ALIKHAN
Deputy Solicitor General

/s/ Holly M. Johnson
HOLLY M. JOHNSON
Assistant Attorney General
Bar Number 476331
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 600S
Washington, D.C. 20001
(202) 442-9890
(202) 715-7713 (fax)
holly.johnson@dc.gov

July 2016

## CERTIFICATE OF SERVICE

I certify that on July 6, 2016, this brief was served through the Court's ECF system to:

Charles J. Cooper
Cooper & Kirk PLLC
1523 New Hampshire Ave, NW
Washington, D.C. 20036

/s/ Holly M. Johnson
HOLLY M. JOHNSON

## CERTIFICATE OF COMPLIANCE

I further certify that this brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 14,000 words, excluding exempted parts. This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14 point.

/s/ Holly M. Johnson
HOLLY M. JOHNSON