No. 16-7067

---

## In The United States Court of Appeals
## For the District of Columbia Circuit

---

MATTHEW GRACE, *et al.*,

*Plaintiffs-Appellees*,

v.

DISTRICT OF COLUMBIA, *et al.*,

*Defendants-Appellants.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA (No. 1:15-cv-2234-RJL)

---

## BRIEF OF PLAINTIFFS-APPELLEES

---

Charles J. Cooper
David H. Thompson
Howard C. Nielson, Jr.
Peter A. Patterson
John D. Ohlendorf
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
ccooper@cooperkirk.com

*Counsel for Plaintiffs-Appellees*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), undersigned counsel certifies that:

(A) Parties and Amici. Except for the following, all parties, intervenors, and amici appearing before the district court and in this court are listed in the Brief for Appellants: DC for Democracy, DC Vote, Vincent C. Gray, League of Women Voters of the District of Columbia, National Rifle Association of America, Inc., Anthony A. Williams, and the States of California, Connecticut, Hawaii, Illinois, Iowa, Maryland, Massachusetts, New York, Oregon, and Washington.

(B) Rulings Under Review. Reference to the ruling at issue appears in the Brief for Appellants. That ruling may be found on page 530 of the Joint Appendix, but it has not yet been published in the Federal Supplement.

(C) Related Cases. This case has not previously been heard on appeal before either this court or any other court. Counsel is aware of no related cases within the meaning of Circuit Rule 28(a)(1)(C). The appeal in *Wrenn v. District of Columbia*, No. 16-7025 (D.C. Cir.), is currently pending before this Court and has been scheduled for argument before the same panel and on the same day as this case. It is not related to this case within the meaning of Circuit Rule 28(a)(1)(C) because it does not involve substantially the same parties.

Dated: August 5, 2016                     /s/ Charles J. Cooper
                                          Charles J. Cooper

                                          *Counsel for Plaintiffs-Appellees*

**CORPORATE DISCLOSURE STATEMENT**

Pink Pistols is an unincorporated association that advocates the use of lawfully owned, lawfully concealed firearms for the self-defense of the sexual minority community. Pink Pistols does not have a parent corporation, no publicly held company owns a 10% or greater ownership interest in it, and no members of the association have issued shares or debt securities to the public.

Dated: August 5, 2016                                   <u>/s/ Charles J. Cooper</u>
                                                        Charles J. Cooper

                                                        *Counsel for Plaintiffs-Appellees*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..........................................................................................v

GLOSSARY.............................................................................................................xi

INTRODUCTION ....................................................................................................1

STATEMENT OF THE ISSUES................................................................................3

PERTINENT STATUTES AND REGULATIONS ...................................................3

STATEMENT OF THE CASE...................................................................................4

I.      The District Has Repeatedly Refused To Honor Its Citizens' Second
        Amendment Rights. .......................................................................................4

II.     The District of Columbia Continues To Bar Typical, Law-Abiding
        Citizens from Bearing Arms..........................................................................5

III.    The District Denied Plaintiff Matthew Grace's Application for a
        Concealed-Carry License. ..............................................................................7

IV.     The Proceedings Below. .................................................................................7

SUMMARY OF THE ARGUMENT .........................................................................8

ARGUMENT ...........................................................................................................11

I.      Plaintiffs Are Likely To Succeed on the Merits............................................11

        A.      The Conduct Restricted by the District Lies at the Core of the
                Second Amendment. .........................................................................12

                1.      The Second Amendment's Text and History Make Clear
                        that It Fully Applies Outside the Home...................................12

3. The District's Law Imposes More than a De Minimis Limitation on Plaintiffs' Rights, Rebutting Any Presumption of Constitutionality Under *Heller II*. ...................37

B. The District's Law Is Categorically Unconstitutional. .......................38

C. The District's Law Fails Any Level of Heightened Scrutiny. ............41

1. The District Court Was Right To Apply Strict Scrutiny. .........41

2. The District's Law Fails Even Intermediate Scrutiny. .............43

II. The Balance of the Equities Favors Preliminary Injunctive Relief...............54

A. Plaintiffs Will Continue To Suffer Irreparable Harm Absent Preliminary Relief. ..............................................................54

B. The Balance of Equities and the Public Interest Both Favor Injunctive Relief. ..............................................................56

CONCLUSION ..........................................................................58

# TABLE OF AUTHORITIES[*]

**Cases**                                                                                    **Page**

*Aamer v. Obama*, 742 F.3d 1023 (D.C. Cir. 2014)...................................................11

*American Meat Inst. v. United States Dep't of Agric.*,
    760 F.3d 18 (D.C. Cir. 2014)...........................................................47

*Andrews v. State*, 50 Tenn. 165 (1871)....................................................................39

*Atwater v. City of Lago Vista*, 532 U.S. 318 (2001)...............................................17

*Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90 (1822)................................................20

*Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014) ...............................40

*Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016) .................................................16

*Center for Fair Pub. Policy v. Maricopa Cty.*, 336 F.3d 1153 (9th Cir. 2003).......44

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*,
    447 U.S. 557 (1980).........................................................................43

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290
    (D.C. Cir. 2006) ...............................................................................55

*Chune v. Piott*, 80 Eng. Rep. 1161 (K.B. 1615) ......................................................27

*City of Las Vegas v. Lujan*, 891 F.2d 927 (D.C. Cir. 1989) ...................................54

*City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002) ...............3, 10, 44

*City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986) ..............................44

*Commonwealth v. Caetano*, 26 N.E.3d 688 (Mass. 2015) .......................................16

*District 50, United Mine Workers of America v. International Union,
    United Mine Workers of America*, 412 F.2d 165 (D.C. Cir. 1969) ...................56

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ........ 1, 4, 9, 11, 12, 13, 14, 15,
                                            18, 23, 25, 28, 30, 35, 36,
                                            37, 38, 39, 42, 53, 55, 56

*Doe v. Rumsfeld*, 341 F. Supp. 2d 1 (D.D.C. 2004) ................................................57

*Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013) ....................................................47, 52

*Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1856) .........................................20

---

[*] Authorities upon which we chiefly rely are marked with asterisks.

v

*Employment Div., Dep't of Human Res. of Oregon v. Smith*,
494 U.S. 872 (1990)......................................................................40, 47

\*_Ezell v. City of Chicago_, 651 F.3d 684 (7th Cir. 2011) ...............11, 41, 55

*Fisher v. University of Texas*, 136 S. Ct. 2198 (2016) ......................47, 48

\*_Gordon v. Holder_, 721 F.3d 638 (D.C. Cir. 2013) ................10, 54, 55, 58

*Grace v. District of Columbia*, 2016 WL 2908407
(D.D.C. May 17, 2016) ................................. 14, 37, 41, 43, 52, 54, 57

\*_Heller v. District of Columbia_, 801 F.3d 264 (D.C. Cir. 2015)..............3, 10, 44, 45

\*_Heller v. District of Columbia_, 670 F.3d 1244 (D.C. Cir. 2011).......9, 11, 12, 37, 38

*In re Brickey*, 8 Idaho 597 (1902) ..........................................................35

*Jackson Women's Health Org. v. Currier*, 760 F.3d 448 (5th Cir. 2014) ..............41

*Joelner v. Village of Washington Park*, 378 F.3d 613 (7th Cir. 2004)....................44

*Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012)..........................47

*King v. Dewhurst*, 1 St. Tr. 529 (Lancaster Assize 1820) ......................................27

*McCullen v. Coakley*, 134 S. Ct. 2518 (2014) ........................................52

\*_McDonald v. City of Chicago_, 561 U.S. 742 (2010) .................9, 14, 16, 21, 24, 42

*Mills v. District of Columbia*, 571 F.3d 1304 (D.C. Cir. 2009)..............................55

*Minney v. United States Office of Pers. Mgmt.*, 130 F. Supp. 3d 225
(D.D.C. 2015) ..............................................................................................56

*Missouri ex rel. Gaines v. Canada*, 305 U.S. 337 (1938).......................................41

\*_Moore v. Madigan_, 702 F.3d 933 (7th Cir. 2012) .........................10, 13, 14, 15, 18, 23, 24, 25, 38, 48

*National Mining Ass'n v. United States Army Corps of Eng'rs*,
145 F.3d 1399 (D.C. Cir. 1998).........................................................................57

*Near v. Minnesota ex rel. Olson*, 283 U.S. 697 (1931) ..........................................40

*New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242
(2d Cir. 2015)..................................................................................................11

*New York Times Co. v. United States*, 403 U.S. 713 (1971) ................................40

\*_Nunn v. State_, 1 Ga. 243 (1846)...................................................13, 15, 20, 28, 38

*Palmer v. District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014) ....................1, 5

vi

*Peruta v. County of San Diego*, 2016 WL 3194315
(9th Cir. June 9, 2016) (en banc) ..................................................20, 27

*Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014) .............................20

*Queen v. Soley*, 88 Eng. Rep. 935 (Q.B. 1701) .........................................27

\*Rex v. Knight, 90 Eng. Rep. 330 (K.B. 1686)..........................................17, 23, 27

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) ........................41, 42

*Schad v. Borough of Mount Ephraim*, 452 U.S. 61 (1981) .....................................41

*Simpson v. State*, 13 Tenn. (1 Yer.) 356 (1833)..........................................29

\*Sir John Knight's Case, 87 Eng. Rep. 75 (K.B. 1686) ....................................26, 27

*State v. Huntly*, 25 N.C. (3 Ired.) 418 (1843) ...........................................29

*State v. Reid*, 1 Ala. 612 (1840) .........................................................20, 28

*Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707 (1981) ....................40

*Thompson v. Western States Med. Ctr.*, 535 U.S. 357 (2002) ................................47

*United States v. Carolene Prods. Co.*, 304 U.S. 144 (1938) .................................43

*United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013)......................................11

*United States v. Greeno*, 679 F.3d 510 (6th Cir. 2012) .........................................11

*United States v. Virginia*, 518 U.S. 515 (1996) ...............................................48

*Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016).......................50, 51

*Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013)............................................47

*Wrenn v. District of Columbia*, 107 F. Supp. 3d 1 (D.D.C. 2015) ..........................8

*Wrenn v. District of Columbia*, 808 F.3d 81 (D.C. Cir. 2015) ................................8

## Constitution, Statutes and Legislative Materials

\*U.S. Const. amend. II................................................................1, 8, 12, 22

D.C. Code

    § 7-2502.03(a)-(b) ...........................................................51

    § 7-2502.04 .................................................................51

    § 7-2502.07(a) ..............................................................51

    § 7-2509.02(a)(2) ...........................................................51

    § 7-2509.02(a)(3) ...........................................................51

§ 7-2509.02(a)(4)-(5) ........................................................51

§ 7-2509.02(f) ...............................................................51

§ 7-2509.07 ..................................................................57

§ 7-2509.11(1)(A) ..............................................1, 6, 7, 39

§ 7-2509.11(1)(B) ............................................................6

§ 22-4504(a) ...................................................................6

§ 22-4506(a) ...................................................................6

2 Edw. 3, 258, c. 3 (1328) ...................................24, 32

Act of Mar. 15, 1832, ch. 22, § 4, 1831 Va. Acts 21 ...............34

An Act To Punish Certain Offences Therein Named, and for Other Purposes, ch. 23, § 1, 1865 Miss. Laws 165 .....................21

D.C. Mun. Regs. tit. 24, § 2333.4 ..............................6, 7

*Hearing on Bill 20-930 Before the Comm. on the Judiciary & Pub. Safety* (Nov. 25, 2014) (statement of Tommy Wells, Chairman), *available at* http://goo.gl/d2zv0p ..................................2, 5, 6, 46, 56

## <u>Other</u>

John Adams, *First Day's Speech in Defence of the British Soldiers Accused of Murdering Attucks, Gray and Others, in the Boston Riot of 1770, in* 6 MASTERPIECES OF ELOQUENCE 2569 (Hazeltine et al. eds., 1905) .........19, 20, 23

Abhay Aneja, John J. Donohue III, & Alexandria Zhang, The Impact of Right to Carry Laws and the NRC Report (Dec. 1, 2014) (unpublished manuscript), *available at* http://goo.gl/UOzB9H ...............50

*2 WILLIAM BLACKSTONE, COMMENTARIES (Christian ed., 1794) ...........17

*4 WILLIAM BLACKSTONE, COMMENTARIES (Christian ed., 1794) ...........28

*1 WILLIAM BLACKSTONE, COMMENTARIES (St. George Tucker ed., 1803) ............18

*5 WILLIAM BLACKSTONE, COMMENTARIES (St. George Tucker ed., 1803) ............18

U.S. BUREAU OF THE CENSUS, *Table 6. Population, Housing Units, and Land Area by Urban and Rural and Size of Urban Area* (2010), https://goo.gl/2rJxen ...............................22

U.S. BUREAU OF THE CENSUS, *Table 11. Population of the 100 Largest Urban Places: 1880* (1998), http://goo.gl/WbK87R ...............35

BUREAU OF JUSTICE STATISTICS, CRIMINAL VICTIMIZATION, 2014 (2015), http://goo.gl/aQnWBV ................................................23

BUREAU OF JUSTICE STATISTICS, CRIMINAL VICTIMIZATION IN THE UNITED STATES, 2008 STATISTICAL TABLES (2010), http://goo.gl/6NAuIB ...................14

CDC, MORBIDITY & MORTALITY WEEKLY REPORT VOL. 52, FIRST REPORTS EVALUATING THE EFFECTIVENESS OF STRATEGIES FOR PREVENTING VIOLENCE: FIREARMS LAWS (Oct. 3, 2003), http://goo.gl/VqWAVM ...............49

KENNETH CHASE, FIREARMS: A GLOBAL HISTORY TO 1700 (2003) ........................26

Philip J. Cook et al., *Gun Control After* Heller, 56 UCLA L. REV. 1041 (2009) ...............................................................................48, 49

Clayton E. Cramer, *The Racist Roots of Gun Control*, 4 KAN. J.L. & PUB. POL'Y 17 (1995) ...............................................31

WILLIAM M. DARLINGTON, CHRISTOPHER GIST'S JOURNALS (1893) ......................19

Mike DeBonis, *Security, Not Street Crime, at Risk After Gun Ruling, D.C. Police Chief Cathy Lanier Says*, WASH. POST (July 30, 2014), https://goo.gl/wPYekP ........................................................................51

FBI, CRIME IN THE UNITED STATES BY STATE: 2014, Table 5, https://goo.gl/hgoZBR ......................................................................52

*FIREARMS*, MONTICELLO, https://goo.gl/W6FSpM ..................................................19

1 WALTER L. FLEMING, DOCUMENTARY HISTORY OF RECONSTRUCTION (1906) ......................................................................21

* Robert Hahn et al., *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28 AM. J. PREVENTATIVE MED. 40 (2005), http://goo.gl/zOpJFL ......................................................................49, 50

STEPHEN P. HALBROOK, FREEDMEN, THE FOURTEENTH AMENDMENT, AND THE RIGHT TO BEAR ARMS, 1866–1876 (1998) .......................................23

1 SIR MATTHEW HALE, HISTORIA PLACITORUM CORONAE (Sollom Emlyn ed. 1736) ....................................................................17

1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN (1716) ..............17

1 THE WORKS OF THOMAS JEFFERSON (letter of August 19, 1785) (H. A. Washington ed., 1884) .......................................................19

NICHOLAS J. JOHNSON & DAVID B. KOPEL ET AL., FIREARMS LAW & THE SECOND AMENDMENT (2012) ......................................................17, 18

Gary Kleck, Comments on Aneja *et al.* (2014) (Oct. 7, 2015) (unpublished manuscript), *available at* http://goo.gl/9JeuLk ....................................................50

WILLIAM LAMBARD, EIRENARCHA (1588) .............................................28

LETTER FROM ASSISTANT COMM'R FISK, H.R. EXEC. DOC. NO. 70, 39th Cong., (1st Sess. 1866) .............................................................21

1 NARCISSUS LUTTRELL, A BRIEF HISTORICAL RELATION OF STATE AFFAIRS FROM SEPTEMBER 1678 TO APRIL 1714 (1857) .............................27

\* JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS (1994) .......................26

David B. Mustard, *Comment*, *in* EVALUATING GUN POLICY 325 (Jens Ludwig & Philip J. Cook eds., 2003) ........................................48

\* NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW (Charles F. Wellford, John V. Pepper, & Carol V. Petrie eds., 2005), http://goo.gl/WO1ZNZ ..................................49, 56

*GUN LAWS*, NRA-ILA, https://goo.gl/Nggx50 .........................................48

RICHARD S. NEWMAN, THE TRANSFORMATION OF AMERICAN ABOLITIONISM (2002) ...........................................................................31

Nicholas Pedersen, *The Lost Founder: James Wilson in American Memory*, 22 YALE J.L. & HUMAN. 257 (2010) ...................................................31

WILLIAM RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA (1825) .............................................................................30

3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES (1833) ......................................................................................40

BENJAMIN OGLE TAYLOE, IN MEMORIAM: ANECDOTES AND REMINISCENCES (Washington, D.C., 1872) .................................................................19

HARLOW GILES UNGER, LION OF LIBERTY (2010) ...................................19

3 JAMES WILSON, THE WORKS OF THE HONOURABLE JAMES WILSON (1804) .........30

# GLOSSARY

CDC—Centers for Disease Control

JA—Joint Appendix

NRC—National Research Council of the National Academy of Sciences

PI—Preliminary Injunction

SA—Statutory Addendum

**INTRODUCTION**

The Second Amendment guarantees law-abiding, responsible citizens "the right … to keep and bear arms." U.S. CONST. amend. II. The District of Columbia has spent the last four decades trying to drain the Second Amendment of any meaning. It generally banned the possession of handguns—including in the home—from 1976 until the Supreme Court struck that ban down in *District of Columbia v. Heller* as flatly inconsistent with the Second Amendment. 554 U.S. 570 (2008). Following *Heller*, it generally banned carrying handguns outside the home until *that* ban was struck down as unconstitutional "under any level of scrutiny." *Palmer v. District of Columbia*, 59 F. Supp. 3d 173, 183 (D.D.C. 2014). And following *Palmer*, it enacted the present law, which continues to ban the public carrying of firearms for all D.C. residents except the special few who can demonstrate "a special need for self-protection distinguishable from the general community." D.C. CODE § 7-2509.11(1)(A).

The District's third attempt to infringe its citizens' Second Amendment rights is no more constitutional than the previous two. "The very enumeration" of the Second Amendment took "out of the hands of government … the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 634. But the District of Columbia has claimed *precisely* this power: to decide, on a case-by-case basis, whether an applicant for a license to

1

carry a handgun has, in the estimation of its officials, shown "good reason" that a license should issue. That demand is categorically irreconcilable with the Second Amendment, and it must be struck down.

Even if not categorically unconstitutional, the District's law would fail any potentially applicable level of constitutional scrutiny. While Defendants maintain that the law is necessary to "promote public safety," Br. of the Dist. of Columbia & Metro. Police Dep't Chief Cathy Lanier at 42 (July 6, 2016) ("Appellants' Br."), this is so only because the District believes that "the issuance of *any* public-carry permit … increases the likelihood of public harm." *Id.* at 52. Indeed, the District sought to restrict the issuance of public-carry permits as much as possible in light of the *Palmer* decision. As one prominent supporter stated during the debate over the current law, "there's no question" that "everyone on this council … want[s] to restrict the right of people to carry handguns in the District of Columbia." *Hearing on Bill 20-930 Before the Comm. on the Judiciary & Pub. Safety* at 45:57 (Nov. 25, 2014) (statement of Tommy Wells, Chairman) ("*Hearing on Bill 20-930*.")[1]. While the District may adopt good-faith regulations of the right to carry firearms designed to promote public safety—by, for example, requiring license applicants to pass a background check and undergo training—even under intermediate scrutiny it cannot posit that the right *itself* is a safety threat and seek to reduce its exercise.

---

[1] A video of Chairman Wells' remarks is available at http://goo.gl/d2zv0p.

*See City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 449-50 (2002) (Kennedy, J., concurring in judgment); *Heller v. District of Columbia (Heller III)*, 801 F.3d 264, 280 (D.C. Cir. 2015).

Nearly a decade after *Heller*, the District of Columbia still refuses to treat the right to keep and bear arms as a genuine constitutional right. The district court's decision enjoining the District's latest unconstitutional law should be affirmed.

## STATEMENT OF THE ISSUES

1.      Whether the Second Amendment protects a right to carry a firearm outside the home for self-defense.

2.      Whether the District of Columbia may condition the exercise of the right to bear arms on a showing that a citizen has a "good" or "proper" reason for carrying a firearm beyond self-defense.

## PERTINENT STATUTES AND REGULATIONS

Except for D.C. CODE § 22-4504, which is reproduced in Appellees' Supplemental Statutory Addendum, all applicable statutes, etc., are contained in Appellants' Statutory Addendum.

## STATEMENT OF THE CASE

### I.    The District Has Repeatedly Refused To Honor Its Citizens' Second Amendment Rights.

"Starting in 1976, … the District generally banned the possession of handguns." Appellants' Br. 2. When that ban was challenged, the District raised a variety of now-familiar arguments. "The District of Columbia is a unique place" with a "purely urban environment," it said, and the Second Amendment was best read as not applying at all to the District, since the Founders had given "[t]he federal government … complete authority over the seat of government." Br. for Pet'rs at *6, *37, *49, *Heller*, 554 U.S. 570 (No. 07-290) ("*Heller* Br.") (quotation marks omitted). Moreover, the District's handgun ban was in fact a narrow, "focused firearm restriction," a "carefully-crafted legislative solution," and the courts owed "substantial deference to [its legislature's] predictive judgment[ ]" that "banning handguns saves lives." *Id.* at *48, *49, *50 (quotation marks omitted). The Supreme Court rejected all of these arguments, striking down the District's handgun ban as per se unconstitutional. *Heller*, 554 U.S. at 634-36.

The District responded to *Heller*'s invalidation of its ban on *keeping* arms by enacting a new, absolute ban on *bearing* them. When that ban was challenged in 2009, the District advanced many of the same lines of defense. Its ban on carrying firearms in public did not "materially infringe the exercise of the 'core right' " protected by the Second Amendment, it said; the Second Amendment applied with

less stringency in the District given its "utterly unique status … as the nation's capital"; and the courts should "accord substantial deference to the predictive judgments of the legislature" that banning public arms-bearing would advance public safety. Defs.' Mot. for Summ. J. at 10, 15, 26, *Palmer v. District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014) (No. 09-cv-1482) (quotation marks omitted). Once again these arguments failed; the U.S. District Court for the District of Columbia concluded that the District's new ban was unconstitutional "under any level of scrutiny," and it struck it down. *Palmer*, 59 F. Supp. 3d at 183. The District initially appealed that ruling to this Court, but it later voluntarily dismissed its appeal.

## II. The District of Columbia Continues To Bar Typical, Law-Abiding Citizens from Bearing Arms.

The District reacted to *Palmer*'s invalidation of its ban on the public carrying of firearms by enacting the law at issue in this case. Councilmember Tommy Wells, the Chairman of the Judiciary and Public Safety Committee, condemned *Palmer* as a "draconian, poorly defined, messy, destructive, constitutional decision," and noted that "there's no question" that "everyone on this council … want[s] to restrict the right of people to carry handguns in the District of Columbia, but at the same time, we don't want to … be used by the proponents" of the Second Amendment right as "the vehicle for weakening the

handgun laws and creating a private right to a gun for America." *Hearing on Bill 20-930* at 45:57.

The law the District enacted provides that "[n]o person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, without a license issued pursuant to District of Columbia law." D.C. CODE § 22-4504(a). Chief Lanier "may" issue applicants a license to carry a firearm only "if it appears that the applicant has good reason to fear injury to his or her person or property or has any other proper reason for carrying a pistol." *Id.* § 22-4506(a). It is this requirement that Plaintiffs challenge.

The law expressly directs Chief Lanier to issue rules establishing that "good reason to fear injury … at a minimum require[s] … a showing of a *special need for self-protection distinguishable from the general community* as supported by evidence of specific threats or previous attacks that demonstrate a special danger to the applicant's life." *Id.* § 7-2509.11(1)(A) (emphasis added). Similarly, "any other proper reason for carrying a concealed pistol … shall at a minimum include types of employment that require the handling of cash or other valuable objects that may be transported upon the applicant's person." *Id.* § 7-2509.11(1)(B). Pursuant to these laws, Chief Lanier has issued rules providing that "[t]he fact that a person resides in or is employed in a high crime area shall not by itself establish a good reason to fear injury to person or property for the issuance of a concealed carry

license." D.C. Mun. Regs. tit. 24, § 2333.4. As of the date of the preliminary injunction hearing in this case, the District had approved only 61 concealed-carry license applications. PI Arg. Tr. 55, JA506.

## III. The District Denied Plaintiff Matthew Grace's Application for a Concealed-Carry License.

In August 2015, Mr. Grace applied for a District of Columbia concealed carry license. Apart from the "proper reason" standard at issue here, Mr. Grace meets all of the other requirements for a license. JA18, JA29. Mr. Grace does not, however, face "a special need for self-protection distinguishable from the general community," D.C. Code § 7-2509.11(1)(A), and accordingly, in the space on the District's form that asks the applicant to demonstrate that he has a good or proper reason to seek a license, Mr. Grace simply cited the Second Amendment, JA30. On October 19, 2015, the District denied Mr. Grace's application on the sole basis that he had failed to show a good or proper reason in support of his request for a license to bear arms. JA33.

## IV. The Proceedings Below.

On December 22, 2015, Mr. Grace filed suit against the District, alleging that the District's good-and-proper-reason requirement violates the Second Amendment and asking for preliminary and permanent injunctions against the continued application of that requirement. Mr. Grace was joined by co-plaintiff Pink Pistols, an organization of which he is a member, which advocates the use of

lawfully concealed firearms for the self-defense of the sexual minority community. JA12, JA35-36.

This litigation is not the only lawsuit against the District's limits on the right to bear arms. In *Wrenn v. District of Columbia (Wrenn I)*, 107 F. Supp. 3d 1 (D.D.C.), *vacated*, 808 F.3d 81 (D.C. Cir. 2015), Judge Frederick J. Scullin, Jr., who had presided over the *Palmer* case by designation, preliminarily enjoined enforcement of the District's current licensing law on May 18, 2015. On December 15, however, this Court vacated the order and injunction, on grounds unrelated to the merits, and withdrew the case from Judge Scullin. *Wrenn I*, 808 F.3d at 84. On remand from this Court, the *Wrenn* case was reassigned to a new judge, Judge Kollar-Kotelly, who denied the *Wrenn* plaintiffs' motion for a preliminary injunction on March 7, 2016. An appeal of that order is currently pending before this Court.

On May 17, the Judge in this case, Judge Leon, entered a preliminary injunction, ordering the District, for the duration of the litigation, to cease enforcing its good-and-proper-reason requirement and to reissue concealed-carry application materials consistent with that relief.

## SUMMARY OF THE ARGUMENT

a.     The Second Amendment guarantees that "the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. The Supreme

Court has twice affirmed, in *Heller* and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), that the core of the Second Amendment guarantee is the right to keep and bear arms for purposes of self-defense. And the abundant historical record from every relevant period confirms what is clear from the constitutional text alone: this core right applies outside the home. A contrary holding would require this Court to *repudiate* the Supreme Court's binding analysis of the Second Amendment's text, history, and purpose.

The District offers a revisionist historical narrative, according to which the Second Amendment *does not* protect the right to bear arms—at least not in dense urban areas. That contrived "urban/rural" distinction is contrary to the Second Amendment's text, which nowhere mentions what would be a massive exception to its protections in precisely the areas where its core right of armed self-defense is most sorely needed. The distinction also has no historical basis.

Accordingly, the District's law cuts to the core of the Second Amendment.

b.     Because the District's law severely restricts the right of ordinary, law-abiding citizens to carry arms for self-defense, it is unconstitutional per se. *Heller*, 554 U.S. at 634-36; *Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1266-67 (D.C. Cir. 2011). It also fails any potentially applicable level of constitutional scrutiny. The District's real goal is not some generic interest in public safety, but rather the naked desire to *eliminate as much Second Amendment*

*conduct as it can get away with*. That goal is never legitimate—even if used as an indirect means of curbing the secondary effects associated with the conduct. *See Alameda Books*, 535 U.S. at 449-50 (Kennedy, J., concurring in judgment). Indeed, this Court held as much in *Heller III*, when it struck down an earlier attempt by the District to ration its citizens' Second Amendment rights. 801 F.3d at 280. What is more, the empirical record does not provide more than a rational basis for thinking that restrictions like the District's will cause any improvement in public safety. *Moore v. Madigan*, 702 F.3d 933, 939, 942 (7th Cir. 2012).

   c. The district court did not abuse its discretion in concluding that the balance of the equities favors preliminary relief. Defendants' ongoing infringement of Plaintiffs' core constitutional rights unquestionably constitutes irreparable harm. *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013). By contrast, the District's *actual* goal—reducing the number of people permitted to exercise their right to bear arms—is entitled to *no weight at all*. And the social science has failed to show that restrictions like the District's have any public-safety benefit whatsoever. Finally, the public has a strong interest in seeing the District's unyielding efforts to undermine its citizens' Second Amendment right to bear arms finally come to an end. *See id.*

# ARGUMENT

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014).

## I.    Plaintiffs Are Likely To Succeed on the Merits.

When a law is challenged as violating the Second Amendment, this Court has held that the first question that must be answered is "whether [it] impinges upon a right protected by the Second Amendment." *Heller II*, 670 F.3d at 1252. Here, text, purpose, history, and precedent uniformly show that the District's law does.[2]

In *Heller*, after concluding that the District's ban on possessing firearms fell within the Second Amendment's historically understood scope, the Court struck it

---

[2] Defendants argue that the district court erroneously "shift[ed] the burden to the District to prove that the Second Amendment does not protect" the conduct it bars. Appellants' Br. 14. But where, as here, the government's defense is that its regulation is a "longstanding" and "presumptively lawful regulatory measure" of the kind blessed by *Heller*, 554 U.S. at 626-27 & n.26, the courts consistently have placed the burden on *the government* to prove that defense. *See, e.g.*, *New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 257 n.73 (2d Cir. 2015); *United States v. Chovan*, 735 F.3d 1127, 1137 (9th Cir. 2013); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Ezell v. City of Chicago*, 651 F.3d 684, 702-03 (7th Cir. 2011).

down as categorically unconstitutional. 554 U.S. at 636. For laws that burden conduct within the Second Amendment's scope but in a way that is "significantly less severe than the total prohibition of handguns at issue" in *Heller*, by contrast, this Court has adopted a different approach: analysis under "one or another of the familiar constitutional 'standards of scrutiny.' " *Heller II*, 670 F.3d at 1266. Like the ban on *keeping* handguns struck down in *Heller*, the District's severe restriction on *bearing* them must be invalidated categorically; and even were that not so, the law fails any level of heightened constitutional scrutiny.

### A. The Conduct Restricted by the District Lies at the Core of the Second Amendment.

#### 1. The Second Amendment's Text and History Make Clear that It Fully Applies Outside the Home.

a. The text of the Second Amendment leaves no doubt that it applies outside the home. The substance of the Second Amendment right reposes in the twin verbs of the operative clause: "the right of the people to keep *and bear* Arms, shall not be infringed." U.S. CONST. amend. II (emphasis added). Interpreting the protections of the Second Amendment as confined to the home would read the second of these guarantees—the right to bear arms—out of the Constitution's text altogether, for the right to keep arms standing alone would be sufficient to protect the right to have arms in the home. Limiting the Second Amendment to the home would thus do great violence to its text.

Furthermore, as the Court explained in *Heller*, "the natural meaning of 'bear arms' " is to " 'wear, bear, or carry … upon the person or in the clothing or in a pocket, for the purpose … of being armed and ready for offensive or defensive action in a case of conflict with another person.' " 554 U.S. at 584 (alteration in original) (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)). And because "[t]o speak of 'bearing' arms within one's home would at all times have been an awkward usage," the Constitution's explicit inclusion of the "right to bear arms thus implies a right to carry a loaded gun outside the home." *Moore*, 702 F.3d at 936.

     b.    Confining the Second Amendment's reach to the home would also be at war with its purposes. As announced by its "prefatory" clause, the Second Amendment was codified "to prevent elimination of the militia." *Heller*, 554 U.S. at 599. A right to bear arms limited to the home plainly would be ill-suited to the purpose of "the rearing up and qualifying a well-regulated militia," *id.* at 612 (quoting *Nunn v. State*, 1 Ga. 243, 251 (1846)), for if citizens could be prohibited from carrying arms in public they simply could not act as the militia at all.

     The same reasoning applies with even more force to the Second Amendment's "core lawful purpose" of safeguarding the right to "self-defense." *Id.* at 630. *Heller* held that individual self-defense is "the *central component*" of the Second Amendment right, *id.* at 599; not individual self-defense *in the home*,

but individual self-defense, *period*. The Supreme Court's subsequent decision in *McDonald* reiterates that "in *Heller*, we held that individual self-defense is the central component of the Second Amendment right." 561 U.S. at 767 (quotation marks and emphasis omitted).

As the Seventh Circuit has held, "[t]he Supreme Court has decided that the [Second Amendment] confers a right to bear arms for self-defense, which is as important outside the home as inside." *Moore*, 702 F.3d at 942. Indeed, as the district court found, if anything "[t]he need for self-defense is … greater *outside* the home than it is within it." Opinion 30, JA559. According to the latest nationwide data from the Bureau of Justice Statistics, 18.4% of violent crimes occur at or in the victim's home, while 26.5% occur on the street or in a parking lot or garage.[3] Thus, "[t]o confine the right to be armed to the home is to divorce the Second Amendment from the right of self-defense described in *Heller* and *McDonald*." *Moore*, 702 F.3d at 937.

c. Limiting the Second Amendment's scope to the home would also be flatly contrary to binding Supreme Court precedent. "*Heller* repeatedly invokes a broader Second Amendment right than the right to have a gun in one's home." *Id.* at 935-36. *Heller* squarely holds that the Second Amendment "guarantee[s] the

---

[3] BUREAU OF JUSTICE STATISTICS, CRIMINAL VICTIMIZATION IN THE UNITED STATES, 2008 STATISTICAL TABLES tbl. 61 (2010), http://goo.gl/6NAuIB.

individual right to possess and carry weapons in case of confrontation," 554 U.S. at 592; and it extensively cites and significantly relies upon *Nunn v. State*, a nineteenth-century Georgia case that "struck down a ban on carrying pistols openly" under the Second Amendment, *id.* at 612. Indeed, the bulk of *Heller*'s textual and historical analysis treats with the Second Amendment's guarantee of the right *to bear* arms, rather than the right to keep them, since the District in that case had placed significant weight on the erroneous argument that the phrase "bear arms" idiomatically referred only to the use of firearms in military service. *See id.* at 584-91.

Confining the Second Amendment to the home would also be impossible to square with *Heller*'s indication that "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" are "presumptively lawful." *Id.* at 626, 627 n.26. This statement implicitly recognizes a general right to bear arms in public; otherwise there would be no need to identify exceptions.

Depriving the Second Amendment of application outside the four walls of the home thus cannot be squared with *Heller*'s logic. As a result, it should be little surprise that at least one federal circuit court has squarely held that the right to bear arms applies outside the home, *Moore*, 702 F.3d at 942, and *no* federal court of appeals to address this issue in the wake of *Heller* has held that the Second Amendment is limited to the home.

Finally, the Supreme Court's recent decision in *Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016), provides further confirmation that the Second Amendment is not a home-bound right. The defendant in that case, Jaime Caetano, challenged her conviction for carrying a stun gun, illegal under Massachusetts law, in a public parking lot. The Massachusetts Supreme Judicial Court rejected Caetano's argument that *Heller* and *McDonald* "afford her a right under the Second Amendment to the United States Constitution to possess a stun gun *in public* for the purpose of self-defense," *Commonwealth v. Caetano*, 26 N.E.3d 688, 689 (Mass. 2015) (emphasis added), but the Supreme Court summarily vacated that judgment. And while the reasoning of both the state court and Supreme Court opinions primarily concerns whether stun guns are "Arms" protected by the Second Amendment, if that provision did not protect a right to bear arms outside the home, all that analysis would be utterly irrelevant.

d.      The historical understanding of the right to keep and bear arms strongly supports what is obvious from the Second Amendment's text: it applies outside the home.

As *McDonald* explains, "[s]elf-defense is a basic right, recognized by many legal systems from ancient times to the present day." 561 U.S. at 767. And because the need for self-defense may *arise* in public, it was recognized in England long before the Revolution that the right to self-defense may be *exercised* in public.

"Sergeant William Hawkins's widely read Treatise of the Pleas of the Crown," *Atwater v. City of Lago Vista*, 532 U.S. 318, 331 (2001), for example, explained that "the killing of a Wrong-doer … may be justified … where a Man kills one who assaults him in the Highway to rob or murder him." 1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 71 (1716); *see also* 1 SIR MATTHEW HALE, HISTORIA PLACITORUM CORONAE 481 (Sollom Emlyn ed. 1736) ("If a thief assault a true man *either* abroad *or* in his house to rob or kill him, the true man is not bound to give back, but may kill the assailant, and it is not felony." (emphasis added)).

Because the right to self-defense was understood to extend beyond the home, the right to *armed* self-defense naturally was as well. Accordingly, by the late 17th century the English courts recognized that it was the practice and privilege of "gentlemen to ride armed for their security." *Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1686). A century later, Edward Christian, a law professor at Cambridge, published an edition of Blackstone in which he noted that "every one is at liberty to keep or carry a gun, if he does not use it for the destruction of game." 2 WILLIAM BLACKSTONE, COMMENTARIES *411 n.2 (Christian ed., 1794).

That understanding was shared on this side of the Atlantic. Indeed, "about half the colonies had laws *requiring* arms-carrying in certain circumstances," such as when traveling or attending church. NICHOLAS J. JOHNSON & DAVID B. KOPEL ET

AL., FIREARMS LAW & THE SECOND AMENDMENT 106-08 (2012) (emphasis added).
Plainly, if the law imposed on individuals a civic duty to bear arms "for public-safety reasons," *Heller*, 554 U.S. at 601, the law necessarily conferred on those citizens a corresponding right to do so.

That understanding endured in the next century, both before and after the Revolution. As *Heller* noted, for example, "nine state constitutional provisions written in the 18th century or the first two decades of the 19th … enshrined a right of citizens to 'bear arms in defense of *themselves* and the state' or 'bear arms in defense of *himself* and the state,' " *Heller*, 554 U.S. at 584-85 (emphases added)—language that is not amenable to a homebound interpretation, since the need "for self-defense … is as important outside the home as inside," *Moore*, 702 F.3d at 942. Indeed, as Judge St. George Tucker observed in 1803, "In many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than an European fine gentleman without his sword by his side." 5 WILLIAM BLACKSTONE, COMMENTARIES App. n.B, at 19 (St. George Tucker ed., 1803). And Tucker made clear that Congress would exceed its authority were it to "pass a law prohibiting any person from bearing arms." 1 *id.* App. n.D, at 289.

The practices of the Founding generation confirm that the right to carry arms was well-established. George Washington, for example, was said to have had a

"custom" of riding between Alexandria and Mount Vernon with pistols holstered to his horse's saddle. BENJAMIN OGLE TAYLOE, IN MEMORIAM: ANECDOTES AND REMINISCENCES 95 (Washington, D.C., 1872). Washington also carried a firearm on an expedition into the Ohio Country. WILLIAM M. DARLINGTON, CHRISTOPHER GIST'S JOURNALS 85-86 (1893). Thomas Jefferson advised his nephew to "[l]et your gun … be the constant companion on your walks," 1 THE WORKS OF THOMAS JEFFERSON 398 (letter of August 19, 1785) (H. A. Washington ed., 1884), and Jefferson himself traveled with pistols for self-protection and designed a holster to allow for their ready retrieval, *see Firearms*, MONTICELLO, https://goo.gl/ W6FSpM. Even in defending the British soldiers charged in the Boston Massacre, John Adams conceded that, in this country, "every private person is authorized to arm himself; and on the strength of this authority I do not deny the inhabitants had a right to arm themselves at that time for their defence." John Adams, *First Day's Speech in Defence of the British Soldiers Accused of Murdering Attucks, Gray and Others, in the Boston Riot of 1770*, *in* 6 MASTERPIECES OF ELOQUENCE 2569, 2578 (Hazeltine et al. eds., 1905) ("Adams, *Boston Massacre Speech*"). And as an attorney, Patrick Henry regularly carried a firearm while walking from his home to the courthouse. HARLOW GILES UNGER, LION OF LIBERTY 30 (2010).

The District attempts to brush these examples away, contending, for instance, that Adams was merely "defend[ing] Bostonians who used their weapons

to suppress 'dangerous rioters' " and that his remarks thus do not bear on the general right to carry arms. Appellants' Br. 23. But the District has gotten its history wrong; Adams was representing *British soldiers* accused of murdering *colonists*, but Adams nevertheless acknowledged the right of *colonists* to carry arms "for their defence." Adams, *Boston Massacre Speech* 2578.

This understanding was also reflected in the contemporary judicial decisions. As the panel decision in *Peruta v. County of San Diego* concluded after an exhaustive survey of the early-American case law, although "some courts approved limitations on the manner of carry outside the home, none approved a total destruction of the right to carry in public." 742 F.3d 1144, 1160 (9th Cir. 2014), *rev'd*, 2016 WL 3194315 (9th Cir. June 9, 2016) (en banc); *see also, e.g.*, *State v. Reid*, 1 Ala. 612, 616-17 (1840); *Nunn*, 1 Ga. at 243, 249-51; *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90, 91-93 (1822).

Those who wrote and ratified the 14th Amendment in 1868 understood the right to bear arms in precisely the same way. Indeed, Chief Justice Taney recoiled so strongly in the infamous *Dred Scott* case from recognizing African Americans as citizens precisely because he understood that doing so would entitle them "to keep and carry arms wherever they went." *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393, 417 (1856).

The post-war South attempted to suppress the rights of former slaves to carry arms for their self-defense at every turn. Mississippi's notorious "Black Code," for example, forbade any "freedman, free negro or mulatto" to "keep or carry fire-arms of any kind." An Act To Punish Certain Offences Therein Named, and for Other Purposes, ch. 23, § 1, 1865 Miss. Laws 165. An ordinance enacted in several Louisiana towns provided that no freedman "shall be allowed to carry fire-arms, or any kind of weapons, within the parish, without the special written permission of his employers, approved and indorsed by the nearest and most convenient chief of patrol." 1 WALTER L. FLEMING, DOCUMENTARY HISTORY OF RECONSTRUCTION 279-80 (1906). And a series of 1866 reports to Congress from a Freedmen's Bureau Commissioner in Kentucky lamented that that State's "civil law prohibits the colored man from bearing arms," LETTER FROM ASSISTANT COMM'R FISK, H.R. EXEC. DOC. NO. 70, 39th Cong., at 233 (1st Sess. 1866), and detailed how "[o]utlaws in different sections of the State … make brutal attacks and raids upon the freedmen, who are defenceless, for the civil law-officers disarm the colored man and hand him over to armed marauders," *id.* at 239.

As the Supreme Court explained at length in *McDonald*, the Reconstruction Congress labored mightily to entomb this legacy of prejudice, *see* 561 U.S. at 770-77, an effort that culminated in the adoption of the Fourteenth Amendment, which

ensured the right of all Americans, regardless of race, to carry firearms to defend themselves.

### 2. The District Fails To Show That Its Law Falls Within an Exception to the Second Amendment's Scope.

The District claims that this wealth of evidence "does not matter" because limits on carrying firearms "in populated areas" were historically understood to fall outside the Second Amendment's reach. Appellants' Br. 14. But that argument is at war *with all* of the evidence just canvassed. If the "right of the people to … bear Arms," U.S. CONST. amend. II, *did not apply* to Americans who lived in urban areas when the Second Amendment was ratified, surely that massive exception would have been mentioned in the constitutional text; but there is no hint of it. Accordingly, the District tellingly does not spend a single sentence analyzing the Second Amendment's text.

So too with the Second Amendment's purposes. Over 80% of Americans today live in urban areas[4]—all of them, on the District's understanding, outside the scope of the right to bear arms. Far from a narrow limitation on the Second Amendment's reach, the District's urban/rural distinction would thus *gut* the right. What is more, because individuals living in urban areas experience violent crime at

---

[4] U.S. BUREAU OF THE CENSUS, *Table 6. Population, Housing Units, and Land Area by Urban and Rural and Size of Urban Area* (2010), https://goo.gl/2rJxen.

*higher* rates than those living in rural or suburban areas,[5] the right to "carry weapons in case of confrontation," *Heller*, 554 U.S. at 592, is most sorely needed *precisely* where the District says it does not apply.

And so also with the right's history. When *Rex v. Knight* described the right of "gentlemen to ride armed for their security," 90 Eng. Rep. 330, it was in the process of acquitting an individual arrested for going armed *in the city of Bristol*. *See infra* pp. 26-27. When John Adams explained that "every private person is authorized to arm himself," Adams, *Boston Massacre Speech* 2578, he was referring to private persons who had armed themselves *in the city of Boston*. And many of the discriminatory laws disarming freedmen that the Reconstruction Congress repudiated as inconsistent with the right to bear arms were enacted *by southern cities* and applied specifically within city limits. *See* Stephen P. Halbrook, Freedmen, the Fourteenth Amendment, and the Right To Bear Arms, 1866–1876 5, 11-12 (1998).

And finally, precedent: the Supreme Court in *Heller* concluded that it was irrelevant that the District's handgun ban was "limited to an urban area." 554 U.S. at 634-35. The Seventh Circuit in *Moore* held that the Second Amendment protects the rights of "a *Chicagoan* … [walking] on a sidewalk in a rough neighborhood" to

---

[5] Bureau of Justice Statistics, Criminal Victimization, 2014 10 tbl. 10 (2015), http://goo.gl/aQnWBV.

carry a firearm for self-defense. 702 F.3d at 937 (emphasis added). And even the

cases the District *relies* on were wrongly reasoned on its view of this history, since

none of the federal circuit courts that have upheld similar laws have even so much

as mentioned the District's contrived urban/rural distinction. In fact, the District

*cannot cite to a single case* that adopts its novel reading of the Second

Amendment.

Text, purpose, history, and Supreme Court precedent thus all show that the

right to bear arms belongs to *all* law-abiding citizens, not just those who live in the

countryside. The smattering of historical evidence the District and its *amici* offer

up does not come close to casting doubt on this proposition.

a. The District principally relies on the medieval "Statute of

Northampton" and the various Northampton-replicas enacted on this side of the

Atlantic. Adopted in England in the fourteenth century, that statute provided, *inter*

*alia*, that "no Man great nor small" shall "go nor ride armed by night nor by day, in

Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part

elsewhere." 2 Edw. 3, 258, c. 3 (1328). Relying on a revisionist historical narrative

advanced in a series of recent law review articles by a scholar whose anti-Second

Amendment work was relied upon by *the dissent* in *McDonald* in arguing that

*Heller*'s "historical account was flawed," 561 U.S. at 914 (Breyer, J., dissenting),

the District claims that this English statute amounted to a broad prohibition of "any

right to carry in populated public places." Appellants' Br. 15; *see also* Amicus

Curiae Br. of Everytown for Gun Safety at 1 (July 13, 2016) ("Everytown

Amicus"). But the historical record shows that, far from "prohibit[ing] carrying in

the public concourse," Appellants' Br. 21, Northampton merely limited acting to

terrify the public by carrying "dangerous and unusual" weapons or by carrying

with evil intent. *Heller*, 554 U.S. at 627. It did not bar law-abiding citizens from

carrying common arms.

Indeed, the District's misreading of Northampton has already been rejected

by the Supreme Court in *Heller*. The District's *amici* relied on an expansive

understanding of Northampton in that case, too. *E.g.*, Brief for Amici Curiae DC

Appleseed Center for Law & Justice, *et al.* at *11-*12, *Heller*, 554 U.S. 570 (No.

07-290). But the Court, citing Blackstone's discussion of Northampton, instead

interpreted it as narrowly "prohibiting the carrying of 'dangerous and unusual

weapons,' "—weapons that did not constitute "arms" within the meaning of the

Second Amendment. 554 U.S. at 625, 627. By contrast, weapons "in common use"

for lawful purposes—the "arms protected by the Second Amendment"—were not

subject to that statute. *Id.* at 623-24. To adopt the District's revisionist

interpretation of Northampton, then, this Court would need to "repudiate the

Court's historical analysis. That [a lower court] can't do." *Moore*, 702 F.3d at 935.

Even if this Court could repudiate *Heller*'s reading of Northampton, that reading is in fact the only one consistent with the historical record. To begin, it is important to note that the Statute of Northampton was enacted long before the right to keep and bear arms was recognized in England, at a time when firearms were little more than novelties. In fact, "[t]he earliest records of firearms in Europe date from 1326," KENNETH CHASE, FIREARMS: A GLOBAL HISTORY TO 1700 59 (2003)—a mere *two years* before Northampton was enacted. English views about firearms regulation in 1328 thus shed little light on the historical understanding of the Second Amendment right to bear arms.

As firearms became more common, understandings of Northampton's reach dramatically narrowed. The most explicit recognition of Northampton's limited scope was prompted by King James II's attempt to use that ancient statute to disarm his Protestant detractors. To test that power, in 1686 the King had a case brought against Sir John Knight, "a Bristol merchant and militant Anglican" who had led an effort to enforce the laws against Catholic worship. JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS 104 (1994). James had Knight prosecuted before the King's Bench for violating the Statute of Northampton by going armed "into the Church of St. Michael in Bristol in the time of Divine Service." *Id.* The jury acquitted Knight, and Chief Justice Holt interpreted Northampton as merely declaring the common-law rule against "go[ing] armed to terrify the King's

26

subjects." *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686). "[T]ho' this statute be almost gone in desuetudinem," Holt added, "yet where the crime shall appear to be malo animo"—that is, with a specific, evil intent—"it will come within the Act (tho' now there be a general connivance to gentlemen to ride armed for their security)." *Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1686) (different reporter).

The recent en banc decision by the Ninth Circuit in *Peruta* asserts without any support that Knight was acquitted "only because, as a government official, he was exempt from the statute's prohibition." 2016 WL 3194315, at *8. But *all* of the reported accounts of Chief Justice Holt's decision refer to Northampton's intent requirement, *see* 87 Eng. Rep. at 76; 90 Eng. Rep. at 330; none mention whether Knight was a government official. And while one contemporary, unofficial description of the case suggests that he was in fact a government officer, it explicitly attributes his acquittal to the fact that his carrying of arms was not done "with any ill design." 1 NARCISSUS LUTTRELL, A BRIEF HISTORICAL RELATION OF STATE AFFAIRS FROM SEPTEMBER 1678 TO APRIL 1714 389 (1857).

*Knight*'s understanding of Northampton is reflected by numerous other cases of the era, *e.g.*, *Queen v. Soley*, 88 Eng. Rep. 935, 936-37 (Q.B. 1701); *Chune v. Piott*, 80 Eng. Rep. 1161, 1162 (K.B. 1615); *King v. Dewhurst*, 1 St. Tr. 529, 601-02 (Lancaster Assize 1820), as well as by the leading contemporary legal

commentators. Blackstone, for example, interpreted the statute as proscribing "[t]he offence of *riding* or *going armed*, with *dangerous or unusual weapons*," since such conduct "terrif[ied] the good people of the land." 4 WILLIAM BLACKSTONE, COMMENTARIES *148-49 (third emphasis added). Indeed, the bulk of the primary sources the District cites *against* this narrow reading of Northampton in fact *support* it. *See, e.g.*, WILLIAM LAMBARD, EIRENARCHA 135 (1588) (cited at Appellants' Br. 19) (crime to carry weapons "which [are] *not usually worne and borne*" (emphasis added)). For example, while the District cites statements and proclamations against *concealed* carrying, Appellants' Br. 19, 21-22, that evidence merely shows what *Heller* itself recognized: that bans on carrying concealed weapons generally were considered constitutional so long as open carrying was allowed, 554 U.S. at 626; *see Nunn*, 1 Ga. at 251. The historical record thus supports the authority of the government to regulate the *manner* in which arms are carried, but not the authority to restrict law-abiding citizens from carrying arms altogether: "A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional." *Heller*, 554 U.S. at 629 (quoting *State v. Reid*, 1 Ala. at 616-17).

The early American understanding of Northampton was to the same effect. Indeed, while the District seeks support from the various early state laws

incorporating Northampton-like language, Appellants' Br. 15, the vast majority of these American laws *expressly enumerated* the limits that English cases like *Knight* recognized. Virginia's version, for example, forbade going "armed by night nor by day … *in terror of the Country*," Appellants' Statutory Addendum at 55 (July 6, 2016) (SA) (emphasis added), Massachusetts's prohibited riding or going "armed *offensively*, *to the fear or terror* of the good citizens of this Commonwealth," SA60 (emphasis added), and the District's own version applied only to going armed "in terror of the country," SA19.

The early judicial decisions interpreting these state Northampton-analogues are in accord. The Tennessee Supreme Court, for example, explained in a mid-nineteenth-century case that because the state constitution "hath said the people may carry arms," it would be impermissible to "impute to the acts thus licensed such a necessarily consequent operation as terror to the people to be incurred thereby." *Simpson v. State*, 13 Tenn. (1 Yer.) 356, 360 (1833). In like form, the North Carolina Supreme Court explained that "the carrying of a gun per se constitutes no offence," because "[f]or any lawful purpose … the citizen is at perfect liberty to carry his gun. It is the wicked purpose—and the mischievous result—which essentially constitute the crime." *State v. Huntly*, 25 N.C. (3 Ired.) 418, 422-23 (1843).

The views of contemporary commentators confirm this understanding. William Rawle wrote in his "influential treatise," *Heller*, 554 U.S. at 607, that "the carrying of arms abroad by an individual, *attended with circumstances giving just reason to fear that he purposes to make an unlawful use of them*, would be sufficient cause to require him to give surety of the peace." WILLIAM RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA 123 (1825) (emphasis added). Similarly, James Wilson, a leading Framer and Supreme Court Justice, described Northampton in his widely read Lectures on Law as reaching only the carrying of "dangerous and unusual weapons, in such a manner, as will naturally diffuse a terrour among the people." 3 JAMES WILSON, THE WORKS OF THE HONOURABLE JAMES WILSON 79 (1804).

Unable to account for any of this dispositive evidence, the District attempts to do away with it. For example, it suggests that the decisions by "courts in the Antebellum South" should be disregarded entirely because they "come from a time, place, and culture where slavery, honor, violence, and the public carrying of weapons were intertwined." Appellants' Br. 24. But to the extent this "guilt-by-association" line of reasoning is legitimate, it cuts *against* the District. While the District cites no primary-source evidence that the antebellum cases *enforcing* the Second Amendment were motivated by pro-slavery reasoning, the historical record conclusively shows such racist reasoning did indeed motivate the attempts by the

Southern states both before and after the war to *restrict* public arms-bearing. *See supra* pp. 20-21; *see also* Clayton E. Cramer, *The Racist Roots of Gun Control*, 4 KAN. J.L. & PUB. POL'Y 17 (1995).

Moreover, the District's understanding of Northampton is also contradicted by a great deal of evidence *outside* the South. To begin, clearly the "intertwin[ing]" of "slavery, honor, violence, and … public carrying," Appellants' Br. 24, does not account for the interpretation adopted by seventeenth century English judges in cases like *Rex v. Knight*. And in America, the narrower understanding, as noted above, was articulated explicitly by both William Rawle, the "longtime president" of the Pennsylvania Abolition Society who argued in the 1790s that "Pennsylvania courts could declare slavery unconstitutional," RICHARD S. NEWMAN, THE TRANSFORMATION OF AMERICAN ABOLITIONISM 4, 28-31 (2002), and James Wilson, another Pennsylvanian and prominent abolitionist, *see* Nicholas Pedersen, *The Lost Founder: James Wilson in American Memory*, 22 YALE J.L. & HUMAN. 257, 273 (2010). And the widely-understood limits on Northampton's reach were explicitly incorporated in the statutes of such ardently anti-slavery states as Massachusetts. *See* SA60.

Finally, it must be emphasized that whatever the Statute of Northampton shows, it utterly fails to support the theory the District actually advances: that the right to bear arms was historically understood as applying in the countryside but

not "crowded urban areas." Appellants' Br. 14. Northampton's text makes no distinction between rural and urban areas—in fact, it explicitly applies not only in "Fairs [and] Markets" but "in [any] part elsewhere." 2 Edw. 3, 258, c. 3 (1328).

b.    The District next points to the surety-style laws adopted in the mid-1800s by a handful of jurisdictions, including the District.[6] The District's 1857 law of this kind, for example, required any person who bore arms in public to post a deposit or "surety" "for keeping the peace" upon complaint of "any person having reasonable cause to fear an injury or breach of the peace," unless he himself could show that he had "reasonable cause to fear an assault or other injury or violence to his person, or to his family or property." SA21-22. The District's reliance on these laws is misplaced.

---

[6] In addition to its version of Northampton and this surety-style law, the District says it also "at some points bann[ed] public carrying altogether." Appellants' Br. 17. In fact, setting aside a short-lived, ambiguous law enacted in 1857—itself nearly three-quarters of a century after the Founding—the District did not generally ban public carrying until the mid-Twentieth Century. In 1857, the District enacted a law apparently forbidding "any person" to "carry or have about their persons any deadly or dangerous weapons" including a "pistol." SA24. Almost exactly a year later, the District enacted a law with a nearly-identically worded provision that applied only to *concealed* carrying. SA25. Thus, to the extent the 1857 law actually did extend beyond concealed carry, it appears to have been very short-lived. In 1892, Congress enacted a law making it illegal to carry a concealed handgun in the District but allowing open carrying unless done "with intent to unlawfully use" the firearm. SA26. Congress enacted a similar law in 1932, barring concealed-carry without a license but leaving open carrying unregulated. SA28. It was not until 1943 that this restriction on bearing concealed arms was extended to open carrying. SA33.

To begin, these laws were triggered only when some person who reasonably felt threatened lodged a complaint. SA22. Moreover, even if there was a complaint, the individual in question could nonetheless *continue to carry his firearm*, so long as he posted a surety designed to cover the potential costs of any breach of the peace. *Id.* The District's law was also accompanied by a safe-harbor provision for anyone carrying a firearm because of "reasonable cause to fear an assault or other injury" to himself, his family, or his property. *Id.*

The District attempts to read this provision as precedent for its own "good cause" requirement; but what renders the District's current law unconstitutional is not just the *standard* it incorporates but the legal consequence that *follows* when it deems an applicant to have fallen short of that standard: the complete prohibition, on penalty of criminal prosecution and imprisonment, of his right to bear arms. The District twists a provision designed to ensure that individuals with a reasonable need for self-defense would not be subject to *even a marginal* restriction on their right to bear arms into a draconian ban that prohibits *anyone* from bearing arms *at all* unless they can make this atypical showing.

In fact, to the extent the District's surety-style law establishes anything, it is that Defendants' interpretation of the Statute of Northampton cannot possibly be right. For if, as the District says, an analogue of Northampton was in force within the District from 1801 onward, Appellants' Br. 16, and if Defendants'

interpretation of that statute were accurate, why on earth would the District feel the need to enact the *additional*—and *less restrictive*—limits on public carrying found in its surety-style law? The District elsewhere *admits* that under its reading of Northampton, where a statute of that kind was in place there was "no reason" to adopt other limits on public carrying, *id.* at 18; but that reasoning *dooms* its interpretation of Northampton, since many jurisdictions had both. *Compare* SA55 *with* SA94 (Virginia), *and* SA62 *with* SA88 (Maine). The same point is underscored by the many southern laws, like those discussed above, limiting the right of freedmen to carry arms. If carrying by *everyone* was *already* illegal, under either Northampton or a surety-style law, why would an additional ban on the bearing of arms by freedmen be necessary? *Compare* Act of Mar. 15, 1832, ch. 22, § 4, 1831 Va. Acts 21 (forbidding any "free negro or mulatto" to "carry any firelock of any kind, any military weapon, or any powder or lead"), *with* SA55 (Virginia Northampton-style law), *and* SA94 (Virginia surety-style law).

Finally, like Northampton, these surety-style laws offer *no support* to the District's theory of the case: that there is a historically-established exception to the Second Amendment for regulation in urban areas. Setting aside the District itself, in every one of the States that adopted these types of laws, they applied statewide.

c.     The District (and its amicus Everytown) also relies on an odd assortment of territorial laws and city ordinances enacted during the last few

decades of the nineteenth century that banned bearing arms in public. Appellants' Br. 18. But these scattered, outlier laws hardly amount to a longstanding tradition. To begin, these laws were enacted nearly a century after the founding, so any light they shed on the original meaning of the Second Amendment is pale and indirect. *Heller*, 554 U.S. at 614. And these laws were clearly outside the mainstream of our constitutional tradition. Indeed, Idaho's law—the only one of the territorial laws cited by the District that appears to have been challenged in court—was in fact *struck down as inconsistent with the right to bear arms. In re Brickey*, 8 Idaho 597, 609 (1902).

What is more, the bulk of these ordinances were passed not by "densely populated cit[ies]" like the District, Appellants' Br. 30, but by small frontier towns in the Wild West, like Salina, Wichita, and Dodge City. Only two of the cities named by the District were in the Census Bureau's 1880 list of the 100 most populous cities in the Nation.[7] The overwhelming supermajority of populous cities—including New York, Chicago, and Boston—are not included. These outlier bans in western towns and frontier settlements hardly support the existence of a

---

[7] Nashville, Tennessee, and Syracuse, New York. U.S. BUREAU OF THE CENSUS, *Table 11. Population of the 100 Largest Urban Places: 1880* (1998), http://goo.gl/WbK87R. Everytown names two others—New Haven, Connecticut, and San Antonio, Texas—that are on this list. Everytown Amicus 19-21. It also misleadingly includes the District, based on the short-lived 1857 law discussed above. *See supra* p. 32 n.6.

historical exception to the Second Amendment's reach for regulations that apply in "densely populated cit[ies]." Appellants' Br. 30.

d.     Finally, the District makes much of its "unique" status as the seat of government "filled with critical official and symbolic buildings, monuments, and events, and high-profile public officials." *Id.* at 31 (quotation marks omitted). But the District's suggestion that it is exempt from ordinary constitutional limits was directly rejected in *Heller*. That argument was central to the District's defense of its handgun ban, *see, e.g.*, *Heller* Br. *49, and it also featured prominently in Justice Breyer's dissent, *Heller*, 554 U.S. at 696 (Breyer, J., dissenting). The *Heller* majority, of course, rejected it.

Even more astonishing, the District at one point suggests that it is *exempt from the Second Amendment altogether*, because the Founders meant to give "the federal government … complete authority at the seat of government." Appellants' Br. 34 (quotation marks omitted). Once again, this move is copied directly from the District's *Heller* playbook: the Framers endowed "Congress with plenary authority over this jurisdiction," the District argued in that case, and "[t]he Second Amendment thus has no bearing on what the District can do in the area of firearms regulation." *Heller* Br. *37, *40. But *Heller* makes clear beyond dispute that the District of Columbia must abide by the Second Amendment just like every other constitutional right.

### 3. The District's Law Imposes More than a De Minimis Limitation on Plaintiffs' Rights, Rebutting Any Presumption of Constitutionality Under *Heller II*.

Finally, even if the District's law somehow did qualify as "longstanding" and "presumptively lawful," *Heller*, 554 U.S. at 626-27 & n.26, that merely raises a "presumption" that the ban is outside the reach of the Second Amendment, *Heller II*, 670 F.3d at 1253. A plaintiff may rebut that presumption "by showing the regulation does have more than a de minimis effect upon his right." *Id.* As the district court held, the District's law substantially limits "the precise conduct, carrying arms, for the precise reason, self-defense, that the text and historical record make clear the Second Amendment was intended to protect." Opinion 26, JA555. That amounts to more than a de minimis effect on Plaintiffs' constitutional rights on any understanding.

The District contests this, arguing that infringement of a non-existing right "cannot justify Second-Amendment scrutiny, no matter how severely it is burdened." Appellants' Br. 28. True, but as a prima facie matter, the Second Amendment includes a right to carry firearms. *See Heller*, 554 U.S. at 584. And a substantial burden on the ability to carry firearms rebuts any presumption that certain arms-carrying is outside the scope of the Second Amendment. *See Heller II*, 670 F.3d at 1253. The District's argument thus lacks merit.

**B.    The District's Law Is Categorically Unconstitutional.**

Given that the Second Amendment applies outside the home, *Heller* makes the next analytical steps clear. Because the Second Amendment "elevates" its core protections "above all other interests," infringements upon its "core protection" must be held unconstitutional categorically, not "subjected to a freestanding 'interest-balancing' approach." *Heller*, 554 U.S. at 634-35. The District's wholesale prohibition on the right of typical, law-abiding citizens to bear arms for the purpose of self-defense is just such an infringement of core Second Amendment conduct. Accordingly, it is unconstitutional per se.

To be sure, this Court has concluded that "restriction[s] significantly less severe than the total prohibition of handguns at issue [in *Heller*]" should be measured under one "of the familiar constitutional 'standards of scrutiny.' " *Heller II*, 670 F.3d at 1266. But the clear implication of this careful language is that for laws that are *not* "significantly less restrictive than the outright ban on all handguns invalidated in [*Heller*]," the Supreme Court's categorical approach governs. *Id.* at 1267; *see also Moore*, 702 F.3d at 942 (striking down ban on carrying arms categorically despite circuit precedent applying levels-of-scrutiny analysis in other Second Amendment cases). And *Heller* itself makes clear that severe restrictions on carrying firearms—like those held unconstitutional in *Nunn*, 1 Ga. at 251, and

*Andrews v. State*, 50 Tenn. 165, 187 (1871)—merit the same, categorical invalidation as the handgun ban it struck down. *Heller*, 554 U.S. at 629.

The District's law is just such a severe restriction. Its demand that applicants show a "good" or "proper" reason for bearing arms that is "distinguishable from the general community," D.C. CODE § 7-2509.11(1)(A), *extinguishes* the core Second Amendment rights of *typical* citizens—who by definition cannot distinguish their need for self-defense from that of the general community. Defendants attempt to cast their law as a mere regulation on "*when* a handgun may be carried." Appellants' Br. 32. When "[a]ny person … find[s] himself particularly threatened," they say, he can then "apply for a carry license." *Id.* But the Second Amendment does not set up a race between law-abiding citizens and their assailants to the license bureau. For those whose lives or safety are being threatened, it is cold comfort to know that they could have carried a firearm for self-defense *if only they could have seen the attack coming in advance*. Surely under the Second Amendment—which protects the right to bear arms "*in case* of confrontation," *Heller*, 554 U.S. at 592 (emphasis added)—that scheme gets things exactly backwards.

Indeed, the District's demand that a citizen prove to its satisfaction that he has a good enough reason to carry a handgun is flatly inconsistent with the very nature of the Second Amendment right. The existence of that right is itself reason

enough for its exercise. It is thus no surprise that courts have rejected this kind of "ask-permission-first" regime across a wide variety of constitutional rights, reasoning that the government has failed to honor a right if it demands to know—and assess *de novo*—the reasons justifying each occasion of its exercise.

That principle is perhaps most familiar in the free speech context, where it has been understood for centuries that the most serious infringement on the right of free expression is the "prior restraint": a requirement that before you get permission to speak, you must explain to the government why what you have to say is worth hearing. *See New York Times Co. v. United States*, 403 U.S. 713, 714 (1971); *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 713-23 (1931); 3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES 732-44 (1833). It is also well-established in the free exercise context. The government cannot, for example, arrogate to itself the authority to second-guess citizens' religious judgments. While courts can determine whether an asserted religious conviction is an "honest" one, *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 716 (1981), they cannot proceed to "question the centrality" or "plausibility" of that conviction, *Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 887 (1990); *see also Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2778 (2014).

Nor is the District's law somehow "much narrower" because it applies "only in the District." Appellants' Br. 30, 31. After all, it is "a profoundly mistaken assumption" that "the harm to a constitutional right is measured by the extent to which it can be exercised in another jurisdiction." *Ezell v. City of Chicago*, 651 F.3d 684, 697 (7th Cir. 2011); *see also Missouri ex rel. Gaines v. Canada*, 305 U.S. 337, 350 (1938); *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 457 (5th Cir. 2014). If that were the case, local laws would be inoculated from nearly *any* constitutional challenge, since the defending city could almost always point to a locale nearby where the right in question could be freely exercised. As the Supreme Court has long held with respect to the First Amendment, "[o]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 76-77 (1981) (alteration omitted).

### C. The District's Law Fails Any Level of Heightened Scrutiny.

#### 1. The District Court Was Right To Apply Strict Scrutiny.

Even if this Court concludes that the District's law is not *categorically* unconstitutional, the district court was right to conclude that it must "pass muster under strict scrutiny." Opinion 36, JA565. As the Supreme Court has explained, "strict judicial scrutiny [is] required" whenever a law "impinges upon a fundamental right explicitly or implicitly protected by the Constitution." *San*

*Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973). *McDonald* squarely

holds that the Second Amendment right is "fundamental to our scheme of ordered

liberty and system of justice." 561 U.S. at 764 (emphasis omitted). Applying

anything less than strict scrutiny would relegate the Second Amendment to "a

second-class right." *Id.* at 780 (plurality).

The District's attempts to resist this conclusion are fatuous. It claims, for

example, that "lesser scrutiny should apply" because its law "does not affect the

purpose for [the Second Amendment's] codification," which was "preventing

elimination of the militia, not self-defense." Appellants' Br. 35 (brackets and

quotation marks omitted). Unsatisfied with attempting to escape the reasoning of

*Heller*, the District now apparently would have this Court ignore its holding. If that

case settled anything, surely it is that "self-defense … was the *central*

*component* of the [Second Amendment] right itself," 554 U.S. at 599, and that a

restriction on the right to keep and bear arms does not merit lesser scrutiny because

it leaves the militia intact, *see id.* at 582, 599 (Second Amendment protects "an

individual right unconnected with militia service").

The District next points to other constitutional contexts where strict scrutiny

is not applied. But the examples conjured by the District only serve to highlight

how anomalous it would be to apply anything *less* than strict scrutiny here.

Intermediate scrutiny applies to commercial speech, for example, precisely because

it is understood that the First Amendment "accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980). The reasoning of First Amendment cases applying intermediate scrutiny to certain "incidental limitations" on speech, Appellants' Br. 37-38, has no applicability to laws like the District's that directly target the exercise of a constitutional right. And the District's invocation of the lesser scrutiny that applies to the "right to use private property for economic gain," *id.*, says far more about its dim view of the Second Amendment than it does about the appropriate level of constitutional scrutiny for an enumerated, fundamental right. *See United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 & n.4 (1938).

### 2. The District's Law Fails Even Intermediate Scrutiny.

a. Ultimately the choice between strict and intermediate scrutiny is immaterial, however, since the District's ban fails either. That is so, first, as a matter of law. By the District's own telling, its law will reduce firearm violence *only by reducing the quantity of firearms in public*. As the district court held, that is "not a permissible strategy," Opinion 38, JA567—even if used as a means to the further end of increasing public safety. That conclusion follows directly from the Supreme Court's precedents in the secondary-effects area of free speech doctrine.

43

The Supreme Court has held that government restrictions on certain types of expressive conduct—most commonly, zoning ordinances that apply specifically to establishments offering adult entertainment—are subject to merely intermediate scrutiny even though they are content-based. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47-51 (1986). But this lesser scrutiny applies only so long as the *purpose and effect* of the restrictions is to reduce the negative "secondary effects" of the expression—such as the increased crime that occurs in neighborhoods with a high concentration of adult theaters—rather than to suppress the expression itself. *Id.* at 49.

Justice Kennedy's controlling[8] opinion in *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002), makes clear that in defending a restriction as narrowly tailored to further an important or substantial governmental interest, the government may not rely on the proposition "that it will reduce secondary effects by reducing speech in the same proportion." *Id.* at 449. "It is no trick to reduce secondary effects by reducing speech or its audience; but [the government] may not attack secondary effects indirectly by attacking speech." *Id.* at 450.

This Court has already embraced this kind of reasoning in the Second Amendment context, in *Heller v. District of Columbia (Heller III)*, 801 F.3d 264,

---

[8] *See, e.g.*, *Joelner v. Village of Washington Park*, 378 F.3d 613, 624 n.7 (7th Cir. 2004); *Center for Fair Pub. Policy v. Maricopa Cty.*, 336 F.3d 1153, 1161 (9th Cir. 2003).

280 (D.C. Cir. 2015). That case struck down the District's prohibition on registering more than one pistol per month. The District defended that ban as designed to "promote public safety by limiting the number of guns in circulation," based on its theory "that more guns lead to more gun theft, more gun accidents, more gun suicides, and more gun crimes." *Id.* But this Court rejected the District's simplistic more-guns, more-crime syllogism, explaining that "taken to its logical conclusion, that reasoning would justify a total ban on firearms kept in the home," and so it simply cannot be right. *Id.* In other words, the government may not adopt a law with the *design and direct effect of limiting the quantity* of conduct protected by the Second Amendment.

That is precisely what the District has done here. Its law does not regulate the *manner* of bearing arms or impose reasonable training and safety requirements. No, its purpose and effect is to *limit the number of arms borne in public*, and to the extent this leads to a reduction of gun crime, that is only a byproduct of this suppression of the quantity of core Second Amendment conduct. Indeed, this is plain from *the District's own description* of its aims. "[T]he issuance of *any* public-carry permit," the District says, "regardless of whether it is based on 'good reason,' increases the likelihood of public harm." Appellants' Br. 52. And because "an upswing in public carrying is likely to increase the quantity and lethality of violent crime," it intones, "it is reasonable to conclude that limiting public carrying

to those with a specific self-defense need will reduce these harms"—*by reducing the number of arms in public*. *Id.* at 50.

The District's motives are also clear from the history of its current law. The District draws a picture of the Council engaging in "careful balancing" between Second Amendment rights and the risk to public safety, and it suggests that it chose the "proper reason" standard because it thoughtfully concluded that it could "accept[ ] some additional public risk, but only for individuals with … special self-defense needs." *Id.* at 52, 53. In reality, of course, the District was *dragged kicking and screaming* into even this meager accommodation of "self-defense needs" after *Heller* and *Palmer* invalided its two previous attempts to "carefully balance" the costs and benefits of the Second Amendment by snuffing it out entirely. There is no evidence the District had a sudden epiphany after *Palmer* and now realizes that suppressing the quantity of Second Amendment conduct is impermissible. Indeed, the evidence is quite the opposite: as the Chairman of the Judiciary and Public Safety Committee testified, "there's no question … [that] everyone on this council … want[s] to restrict the right of people to carry handguns in the District of Columbia." *Hearing on Bill 20-930* at 48:08.

This is *precisely* the type of reasoning *Alameda Books* and *Heller III* forbid. For this reason alone, this Court should decline the District's invitation to follow the reasoning of the out-of-circuit decisions upholding laws like the District's.

Those decisions each rely on the very reasoning that *Alameda Books* and *Heller III* make impermissible. The Fourth Circuit, for example, upheld Maryland's law on the basis that it "advances the objectives of protecting public safety and preventing crime because it *reduces the number of handguns carried in public*." *Woollard v. Gallagher*, 712 F.3d 865, 879 (4th Cir. 2013) (emphasis added); *see also Drake v. Filko*, 724 F.3d 426, 439 (3d Cir. 2013); *Kachalsky v. County of Westchester*, 701 F.3d 81, 99 (2d Cir. 2012).[9] This Court should not credit a purpose so blatantly unconstitutional.

The District attempts to paint its goal in rosier hues, claiming that the law is designed to "help prevent crime and promote public safety." Appellants' Br. 42. Of course, "[t]he purpose of almost any law can be traced back to one or another of the fundamental concerns of government: public health and safety, public peace and order, defense, revenue." *Smith*, 494 U.S. at 910 (Blackmun, J., dissenting). But the government must "identify *specifically* [the] substantial interest to be achieved," if judicial scrutiny is to be meaningful, *Thompson v. Western States Med. Ctr.*, 535 U.S. 357, 374 (2002) (emphasis added); *see American Meat Inst. v. United States Dep't of Agric.*, 760 F.3d 18, 47 (D.C. Cir. 2014) ("ambiguous and amorphous interest" insufficient under intermediate scrutiny); *see also Fisher v.*

---

[9] *Drake*'s erroneous, alternative conclusion that a "justifiable need" standard was longstanding and therefore immune from constitutional scrutiny, *see* 724 F.3d at 431-44, is foreclosed by *Heller II*. *See supra* p. 37.

*University of Texas*, 136 S. Ct. 2198, 2211 (2016). Here, the District's *specific* goal is reducing the number of arms borne in public, and that goal is illegitimate.

b.      Even if these objections are set aside, the District's law still fails. To survive intermediate scrutiny, a restriction must be "substantially related to the achievement" of the government's objective. *United States v. Virginia*, 518 U.S. 515, 533 (1996). "The burden of justification is demanding and it rests entirely on the [District]." *Id.* As Judge Posner concluded after surveying "the empirical literature on the effects of allowing the carriage of guns in public," that data does not provide "more than merely a rational basis for believing that [a ban on public carriage] is justified by an increase in public safety." *Moore*, 702 F.3d at 939, 942.

This is confirmed by experience. (42 States do not restrict the carrying of firearms to a privileged few. *See Gun Laws*, NRA-ILA, https://goo.gl/Nggx50). "[M]any years of evidence across different states and time periods overwhelmingly rejects" the claim that "permit holders will use their guns to commit crimes instead of using their guns for self-defense." David B. Mustard, *Comment*, *in* EVALUATING GUN POLICY 325, 330 (Jens Ludwig & Philip J. Cook eds., 2003); *see also id.* at 330-31. As social scientists in favor of gun control have acknowledged, there would be "relatively little public safety impact if courts invalidate laws that prohibit gun carrying outside the home, assuming that some sort of permit system for public carry is allowed to stand," since "[t]he available data about permit

holders … imply that they are at fairly low risk of misusing guns." Philip J. Cook et al., *Gun Control After* Heller, 56 UCLA L. REV. 1041, 1082 (2009).

Further, even if laws that more freely grant permits have not been shown to decrease crime, there is no persuasive evidence that they *increase* crime—and that is the proposition Defendants must support. For instance, in 2004 the National Academy of Sciences' National Research Council (NRC) conducted an exhaustive review of the relevant social-scientific literature. The NRC concluded that "with the current evidence it is not possible to determine that there is a causal link between the passage of right-to-carry laws and crime rates." NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW 150 (Charles F. Wellford, John V. Pepper, & Carol V. Petrie eds., 2005), http://goo.gl/WO1ZNZ.

Similarly, in 2003 the Centers for Disease Control (CDC) convened an independent Task Force to conduct "a systematic review of scientific evidence regarding the effectiveness of firearms laws in preventing violence, including violent crimes, suicide, and unintentional injury." CDC, MORBIDITY & MORTALITY WEEKLY REPORT VOL. 52, FIRST REPORTS EVALUATING THE EFFECTIVENESS OF STRATEGIES FOR PREVENTING VIOLENCE: FIREARMS LAWS 11 (Oct. 3, 2003), http://goo.gl/VqWAVM. The CDC Task Force also concluded that the data were insufficient to support the hypothesis "that the presence of more firearms" being carried in public by licensed citizens "increases rates of unintended and intended

injury in interpersonal confrontations." Robert Hahn et al., *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28 AM. J. PREVENTATIVE MED. 40, 53 (2005), http://goo.gl/zOpJFL.

The District's primary piece of evidence in support of its hypothesis that its ban will reduce crime is an unpublished 2014 study by Abhey Aneja, John Donahue III, and Alexandria Zhang. But the 2014 Donohue study in fact *explicitly affirms* the NRC's and CDC's judgment that the evidence is not sufficient to show *any causal link* between laws limiting public carrying of firearms and crime rates. Abhay Aneja, John J. Donohue III, & Alexandria Zhang, The Impact of Right to Carry Laws and the NRC Report 80 (Dec. 1, 2014) (unpublished manuscript), *available at* http://goo.gl/UOzB9H. And in any event, a leading scholar has concluded that this study is a "misguided" one that "should be of no interest to anyone with a serious interest in the effects of gun control laws on violence." Gary Kleck, Comments on Aneja *et al.* (2014) 17 (Oct. 7, 2015) (unpublished manuscript), *available at* http://goo.gl/9JeuLk.

The lack of evidence that a law such as this advances public safety should not be surprising, because violent criminals will continue to carry guns in public regardless, leaving law-abiding citizens defenseless when confronted with criminal violence. As the Supreme Court recently held in the context of abortion restrictions, "[d]etermined wrongdoers, already ignoring existing statutes and

safety measures, are unlikely to be convinced to [change their conduct] by a new overlay of regulations." *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2313-14 (2016). Instead, the District's proper reason requirement must be examined by reference to those persons "for whom the provision is an actual rather than an irrelevant restriction," *id.* at 2320 (brackets omitted), i.e., those persons who absent the requirement would be willing and able to comply with the myriad other requirements the District imposes for obtaining a carry license, including: completing approved firearm training, D.C. CODE § 7-2509.02(a)(4)-(5); demonstrating the absence of a disqualifying mental illness, *id.* § 7-2509.02(a)(3); appearing for an in-person interview at police headquarters, *id.* § 7-2509.02(f); and meeting all the requirements for the registration of a handgun in the District, which itself is an intensive process requiring an applicant to be fingerprinted and photographed and to pass a background investigation for the presence of disqualifying conditions; *id.* §§ 7-2509.02(a)(2), 7-2502.03(a)-(b), 7-2502.04, 7-2502.07(a). It is no wonder that Chief Lanier stated, after the *Palmer* decision, that "[l]aw-abiding citizens that register firearms, that follow the rules, are not our worry." Mike DeBonis, *Security, Not Street Crime, at Risk After Gun Ruling, D.C. Police Chief Cathy Lanier Says*, WASH. POST (July 30, 2014), https://goo.gl/wPYekP. Yet these are the citizens targeted by the District's proper reason requirement.

Denying the law-abiding citizens of the District of Columbia the right to carry firearms is particularly perverse. The District's violent-crime rate dwarfs that of any State in the Union. *See, e.g.*, FBI, Crime in the United States by State: 2014, Table 5, https://goo.gl/hgoZBR. It is readily apparent that the District's carry laws are not working to deter criminals from committing violent crimes, and the District's law-abiding residents need firearms to defend themselves.

c.    Defendants' ban independently fails intermediate scrutiny because it is not properly tailored to the District's asserted goals. While laws subject to intermediate scrutiny "need not be the least restrictive or least intrusive means of serving the government's interests," they still must be narrowly tailored, possessing "a close fit between ends and means." *McCullen v. Coakley*, 134 S. Ct. 2518, 2534-35 (2014) (quotation marks omitted). Here, there is an utter lack of fit between the District's good-and-proper-reason requirement and its purported objective of public safety. As the court below held, "the fact that a person can demonstrate a heightened need for self-defense says nothing about whether he or she is more or less likely to misuse a gun." Opinion 40, JA569. "This limitation will neither make it less likely that those who meet the justifiable need requirement will accidentally shoot themselves or others, nor make it less likely that they will turn to a life of crime. Put simply, the solution is unrelated to the problem it intends to solve." *Drake*, 724 F.3d at 454 (Hardiman, J., dissenting).

Defendants argue that this "misunderstands the purpose" of its ban, and fails to credit how "difficult" it is "to predict whether a seemingly responsible person will misuse his handgun." Appellants' Br. 51. Accordingly, the District says, it "tailored the law in a different way" by "ensuring that the public bears additional risk from public carrying only for individuals with a special need to carry a handgun in public for self-defense." *Id.* at 10. But this reasoning serves only to highlight the illegitimacy of the proper reason requirement, as it treats the carrying of firearms by law-abiding citizens as a problem to be solved rather than as the exercise of a constitutional right. The Second Amendment "is the very *product* of an interest balancing by the people," *Heller*, 554 U.S. at 635, and the District is not free to second-guess the people's judgment that the benefits of the right to bear arms outweigh its costs.

The District's only response to all of this is to deride Plaintiffs' "absolutist view" of the Second Amendment. Appellants' Br. 52. But Plaintiffs are not arguing for a right to "carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. Rather, Plaintiffs are arguing for a right to carry "the quintessential self-defense weapon" in the manner favored by the District for the "core lawful purpose of self-defense." *Id.* at 629, 630. If the right to bear arms does not protect this conduct, it might as well not be in the Constitution.

## II. The Balance of the Equities Favors Preliminary Injunctive Relief.

Having concluded that Plaintiffs are likely to succeed on the merits, the district court next found that "the balance of the equities weigh heavily in [their] favor." Opinion 43, JA573. Under this Court's precedent, that conclusion must be reviewed under an "extremely deferential clear error or abuse of discretion standard," due to "the latitude the district court properly enjoys in balancing the four factors that traditionally constitute the preliminary injunction calculus." *City of Las Vegas v. Lujan*, 891 F.2d 927, 931 (D.C. Cir. 1989). The District contests that, arguing that this Court "cannot meaningfully defer to both Judge Leon in this case and Judge Kollar-Kotelly in *Wrenn*," who balanced the equities differently. Appellants' Br. 58. But courts of review defer to a lower court's discretionary balancing of the equities *precisely because* different judges may conduct the balance differently. This case and *Wrenn* are separate cases, and no authority holds that a lower court's discretionary decision is entitled to lesser deference because a judge *in a different case* exercised her discretion in a different way.

### A. Plaintiffs Will Continue To Suffer Irreparable Harm Absent Preliminary Relief.

The district court correctly held that Plaintiffs "have more than adequately demonstrated irreparable injury." Opinion 42, JA571. As this Court has explained, "although a plaintiff seeking equitable relief must show a threat of substantial and immediate irreparable injury, a prospective violation of a constitutional right

constitutes irreparable injury for these purposes." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (brackets omitted); *see also Ezell*, 651 F.3d at 699 (Second Amendment benefits from this presumption).

The District raises a variety of legal objections to the district court's weighing of this factor, all of which fail. While this Court has held that the violation of many different constitutional rights presumptively constitute irreparable injury, *see, e.g.*, *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 301-02 (D.C. Cir. 2006) (Establishment Clause), *Gordon*, 721 F.3d at 653 (Due Process Clause), *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (Fourth Amendment), Defendants ask this Court not to extend the presumption to the Second Amendment, which, they say, "has no intrinsic value" and should carry "little weight" in the equitable balance. Appellants' Br. 54, 55. But few things are more intrinsically valuable than the core Second Amendment right to protect your own life. *Chaplaincy of Full Gospel Churches*, cited by the District, is not to the contrary. That case simply and unremarkably concluded that when an intangible harm establishes irreparable injury "a preliminary injunction will not issue unless" the other three injunction factors are met, 454 F.3d at 304, and they are met here. Finally, the Second Amendment protects the right to be "armed *and ready … in a case of* conflict." *Heller*, 554 U.S. at 584 (emphasis

added). This right is violated the moment a person is *disarmed*, regardless of whether any "self-defense occasion arises." Appellants' Br. 55.[10]

## B. The Balance of Equities and the Public Interest Both Favor Injunctive Relief.

The interests weighing in the balance against this severe, ongoing harm to Plaintiffs' fundamental constitutional rights are either speculative or simply impermissible. As shown above, after all, the "interest" *actually* furthered by the District's good-and-proper-reason requirement is the desire "to restrict the right of people to carry handguns in the District of Columbia." *Hearing on Bill 20-930* at 48:08. *That* interest is *forbidden* by the Second Amendment and thus cannot have any weight in the balance of equities. Moreover, even taking the District's concerns about generic "public safety" at face value, those concerns are purely speculative. As Plaintiffs have explained, the only conclusion that can be drawn from the current social-scientific research is that "it is not possible to determine that there is a causal link between the passage of right-to-carry laws and crime rates." FIREARMS AND VIOLENCE, *supra*, at 150. And as the court below found,

---

[10] Defendants argue that Plaintiffs must "be held to an especially high standard" because the injunction in question "changed the status quo," Appellants' Br. 53, but there is no precedent within this Circuit requiring such a heightened showing. *Minney v. United States Office of Pers. Mgmt.*, 130 F. Supp. 3d 225, 231 n.6 (D.D.C. 2015). Further, the "status quo" should not be deemed to include the effectiveness of the law being challenged. *See District 50, United Mine Workers of America v. International Union, United Mine Workers of America*, 412 F.2d 165, 168 (D.C. Cir. 1969).

even if the District's good-and-proper-reason requirement is enjoined "a veritable gauntlet of other licensing requirements … would remain intact." Opinion 43, JA572. And even those who could successfully navigate this gauntlet and obtain a license would remain subject to numerous restrictions on where they could carry their firearm. *See* D.C. CODE § 7-2509.07.

Nor is the District correct that this Court "should vacate the injunction as it applies to non-plaintiff applicants." Appellants' Br. 57. In keeping with the likely facial unconstitutionality of the "proper reason" requirement, the injunction prohibits Defendants from enforcing it full-stop. It is not improper for an injunction that binds only parties to incidentally benefit non-parties in this way. As this Court has explained in the administrative-review context, "when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *National Mining Ass'n v. United States Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quotation marks and brackets omitted); *see also Doe v. Rumsfeld*, 341 F. Supp. 2d 1, 17-19 (D.D.C. 2004). The same approach should apply here. At any rate, this Court at a minimum should leave the injunction in place with respect to Plaintiff Grace and members of Pink Pistols, since the District has not shown that such an injunction would harm public safety. Finally, it

was hardly "premature," Appellants' Br. 58, for the district court to order that the District modify its application materials to ensure the injunction's effectiveness.

In short, enjoining the operation of the challenged provisions would result in licensed, vetted, and trained individuals having a general but not unrestricted right to carry handguns outside the home. This situation prevails across the Nation, and bringing it to the Nation's capital would be a boon, not a harm, to the District and its residents. Accordingly, the public interest also weighs in favor of preliminary relief. As this Court has explained, "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon*, 721 F.3d at 653.

## CONCLUSION

For the foregoing reasons, the district court's opinion and order should be affirmed.

Dated: August 5, 2016                    Respectfully submitted,

                                         s/ Charles J. Cooper
                                         Charles J. Cooper
                                         David H. Thompson
                                         Howard C. Nielson, Jr.
                                         Peter A. Patterson
                                         John D. Ohlendorf
                                         COOPER & KIRK, PLLC
                                         1523 New Hampshire Avenue, N.W.
                                         Washington, D.C.  20036
                                         (202) 220-9600
                                         ccooper@cooperkirk.com

                                         *Counsel for Plaintiffs-Appellees*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of FED. R. APP. P. 32(a)(7)(B) because this brief contains 13,995 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii) and Circuit Rule 32(e)(1).

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word 2013 in 14-point Times New Roman font.

Dated: August 5, 2016

/s/ Charles J. Cooper
Charles J. Cooper

*Counsel for Plaintiffs-Appellees*

# SUPPLEMENTAL STATUTORY ADDENDUM

# TABLE OF CONTENTS

**Page**

D.C. Code § 22-5404 ........................................................................... SSA1

**D.C. CODE § 22-4504. Carrying concealed weapons; possession of weapons during commission of crime of violence; penalty.**

(a) No person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, without a license issued pursuant to District of Columbia law, or any deadly or dangerous weapon. Whoever violates this section shall be punished as provided in § 22-4515, except that:

> (1) A person who violates this section by carrying a pistol, without a license issued pursuant to District of Columbia law or any deadly or dangerous weapon, in a place other than the person's dwelling place, place of business, or on other land possessed by the person, shall be fined not more than the amount set forth in § 22-3571.01 or imprisoned for not more than 5 years, or both; or

> (2) If the violation of this section occurs after a person has been convicted in the District of Columbia of a violation of this section or of a felony, either in the District of Columbia or another jurisdiction, the person shall be fined not more than the amount set forth in § 22-3571.01 or imprisoned for not more than 10 years, or both.

(a-1) Except as otherwise permitted by law, no person shall carry within the District of Columbia a rifle or shotgun. A person who violates this subsection shall be subject to the criminal penalties set forth in subsection (a)(1) and (2) of this section.

(b) No person shall within the District of Columbia possess a pistol, machine gun, shotgun, rifle, or any other firearm or imitation firearm while committing a crime of violence or dangerous crime as defined in § 22-4501. Upon conviction of a violation of this subsection, the person may be sentenced to imprisonment for a term not to exceed 15 years and shall be sentenced to imprisonment for a mandatory-minimum term of not less than 5 years and shall not be released on parole, or granted probation or suspension of sentence, prior to serving the mandatory-minimum sentence.

(c) In addition to any other penalty provided under this section, a person may be fined an amount not more than the amount set forth in § 22-3571.01.

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system on August 5, 2016. I certify that service will be accomplished by the appellate CM/ECF system on all parties or their counsel, except for the following who will be served by First Class USPS Mail:

Jonathan Elias Lowy
Law Office of Jonathan Lowy
2045 North 15th Street
Suite 200
Arlington, VA 22201

Charles Nichols
P.O. Box 1302
Redondo Beach, CA 90278

Walter A. Smith Jr.
DC Appleseed Center for Law and Justice
1111 14th Street, NW
Suite 510
Washington, DC 20005

Dated: August 5, 2016

/s/ Charles J. Cooper
Charles J. Cooper

*Counsel for Plaintiffs-Appellees*