No. 16-7067

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

MATTHEW GRACE, *et al.*,

*Plaintiffs-Appellees*,

v.

DISTRICT OF COLUMBIA, *et al.*,

*Defendants-Appellants.*

————————————

On Appeal from the United States District Court for the District of Columbia,
No. 1:15-cv-2234-RJL

————————————

## BRIEF FOR AMICUS CURIAE NATIONAL RIFLE ASSOCIATION OF AMERICA, INC. IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

————————————

PAUL D. CLEMENT
 *Counsel of Record*
ERIN E. MURPHY
CHRISTOPHER G. MICHEL
BANCROFT PLLC
500 New Jersey Avenue, NW
Seventh Floor
Washington, DC 20001
(202) 234-0090
pclement@bancroftpllc.com

*Counsel for Amicus Curiae National Rifle Association of America, Inc.*

August 12, 2016

**CORPORATE DISCLOSURE STATEMENT**

The National Rifle Association of America, Inc. certifies that it does not have a parent corporation and that no publicly held corporation owns more than ten percent of its stock.

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.     Parties and Amici

Except for the following, all parties, intervenors, and amici appearing before the district court and this Court are listed in the Brief for the District of Columbia and the Brief for Plaintiffs-Appellees:

Gun Owners of America, Inc., Gun Owners Foundation, U.S. Justice Foundation, Heller Foundation, and Conservative Legal Defense and Education Fund;

States of Arizona, Alabama, Arkansas, Indiana, Missouri, Montana, Nevada, Ohio, Oklahoma, South Carolina, South Dakota, Texas, Utah, West Virginia, Wisconsin, and Wyoming;

Western States Sheriffs' Association, International Law Enforcement Educators and Trainers Association, Law Enforcement Legal Defense Fund, Law Enforcement Action Network, Law Enforcement Association of America, and CRPA Foundation.

### B.     Ruling Under Review

References to the ruling at issue appear in the Brief for the District of Columbia and the Brief for Plaintiffs-Appellees.

### C.     Related Cases

This case has not been before this Court and or any other court (aside from the district court that issued the ruling under review).  The appeal in *Wrenn v. District*

*of Columbia*, No. 16-7025 (D.C. Cir.), which presents a challenge to the same law by different plaintiffs, is currently pending before this Court and has been scheduled for argument before the same panel on the same day.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES.............. ii

    A.    Parties and Amici...................................................................... ii

    B.    Ruling Under Review ............................................................... ii

    C.    Related Cases ........................................................................... ii

TABLE OF AUTHORITIES....................................................................... vi

GLOSSARY OF ABBREVIATIONS ........................................................... ix

IDENTITY AND INTEREST OF AMICUS CURIAE ......................................... 1

STATUTES AND REGULATIONS .............................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 2

ARGUMENT ......................................................................................... 4

I.    By Banning All Ordinary Citizens From Carrying A Handgun Anywhere Outside The Home, The Law Impinges Upon The Right To Bear Arms. ................................................................................ 4

    A.    The Second Amendment Extends Beyond the Home. ........................ 5

    B.    The Second Amendment Applies in Populous Urban Locations, Including the District. ................................................ 7

    C.    The Historical Record Provides No Support for the District's Effort to Exempt Itself from the Right to Bear Arms.......................... 10

    D.    The Good Reason Requirement Is Not a Presumptively Lawful "Longstanding Prohibition." ................................................ 15

II.    The Carry Law Is Invalid Under Any Form Of Constitutional Scrutiny. ...................................................................................... 18

A.	The District's Carry Law Eliminates the Right to Bear Arms for All Ordinary Law-Abiding Citizens and Is Accordingly Invalid. .............................................................................................. 19

B.	If the Court Adopts a Tier of Scrutiny, Strict Scrutiny Is Required. ........................................................................................... 22

C.	The Law Cannot Survive Either Strict or Intermediate Scrutiny. .......................................................................................... 24

CONCLUSION ..................................................................................... 28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Caetano v. Massachusetts*,
   136 S. Ct. 1027 (2016) ............................................................................6

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ....................... 2, 4, 5, 8, 9, 11, 12, 15, 19, 20, 21, 23, 27, 28

*Drake v. Filko*,
   724 F.3d 426 (3d Cir. 2013) ..................................................................26

*Ezell v. City of Chicago*,
   651 F.3d 684 (7th Cir. 2011) .................................................................18

*Graham v. Richardson*,
   403 U.S. 365 (1971) ..............................................................................24

*Heller v. District of Columbia*,
   801 F.3d 264 (D.C. Cir. 2015) ............................................... 25, 26, 27

*Heller v. District of Columbia*,
   670 F.3d 1244 (D.C. Cir. 2011) ........................... 5, 15, 16, 17, 22, 23, 24, 25, 27

*Kachalsky v. Cty. of Westchester*,
   701 F.3d 81 (2d Cir. 2012) ............................................................. 9, 27

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010) ...................................................................2, 5, 8, 9, 11

*Moore v. Madigan*,
   702 F.3d 933 (7th Cir. 2012) ................................................. 5, 6, 9, 20

*Palmer v. District of Columbia*,
   59 F. Supp. 3d 173 (D.D.C. 2014) ........................................... 2, 6, 20

*Parker v. District of Columbia*,
   478 F.3d 370 (D.C. Cir. 2007) ..............................................................19

---

*Authorities on which this brief chiefly relies are marked with an asterisk.

*Rex v. Smith*,
2 Ir. Rep. 190 (K.B. 1914) ...................................................................14

*Salina v. Blaksley*,
83 P. 619 (Kan. 1905) .......................................................................14

*\*Sir John Knight's Case*,
87 Eng. Rep. 75 (K.B. 1686) ......................................................11, 14

*State v. Huntly*,
25 N.C. 418 (1843) ...........................................................................12

*United States v. Apel*,
134 S. Ct. 1144 (2014) ......................................................................17

*Universal City Studios LLLP v. Peters*,
402 F.3d 1238 (D.C. Cir. 2005) .......................................................13

*Woollard v. Gallagher*,
712 F.3d 865 (4th Cir. 2013) ....................................................26, 27

*Woollard v. Sheridan*,
863 F. Supp. 2d 462 (D. Md. 2012) .................................................26

**Statutes**

D.C. Code §7-2509.11(1)(A) ..................................................2, 5, 7, 19

D.C. Code §22-4506(a) ....................................................................2, 5

D.C. Mun. Regs. tit. 24 §2333.2 .........................................................17

D.C. Mun. Regs. tit. 24 §2333.3 .........................................................17

**Other Authorities**

4 William Blackstone, Commentaries on the Laws of England (1769) .................11

Brief for Respondents, *McDonald v. City of Chicago*,
561 U.S. 742 (2010) (No. 08-1521).....................................................8

Brief for United States, *United States v. Miller*,
307 U.S. 174 (1939) (No. 696) ...........................................................12

Peter Hermann, *Woman Attacked in Georgetown in Attempted Sexual Assault*, Wash. Post (Aug. 3, 2016) ...................................................................6

Recording of Oral Argument, *Wrenn v. District of Columbia*, 808 F.3d 81 (2015) (No. 15-7057) ................................................. 10

Transcript of Oral Argument, *District of Columbia v. Heller*, 554 U.S. 570 (2008) (No. 07-290) ...............................................................8

William Shakespeare, Macbeth .............................................................13

# GLOSSARY OF ABBREVIATIONS

| Abbreviation | Definition |
|:---:|:---:|
| JA | Joint Appendix |
| NRA | National Rifle Association of America, Inc. |
| SA | Appellants' Statutory Addendum |

## IDENTITY AND INTEREST OF AMICUS CURIAE

The National Rifle Association of America, Inc. ("NRA") is America's oldest civil rights organization and foremost defender of the Second Amendment. Founded in 1871 by Union Army veterans, the NRA now has about five million members—and its education, training, and safety programs reach millions more. The NRA is the Nation's leading provider of firearms marksmanship and safety training for both civilians and law enforcement officers, and its self-defense seminars have helped more than 100,000 women and men develop strategies to avoid being victims of crime. The NRA has a strong interest in this case because its outcome will affect the ability of NRA members who reside in the District of Columbia to exercise their fundamental right to carry a firearm for the lawful purpose of self-defense. The NRA accordingly filed an amicus brief and presented oral argument in the district court. All parties have consented to the filing of this brief in this Court.[1]

## STATUTES AND REGULATIONS

All applicable statutes and regulations are contained in Appellants' Statutory Addendum and Appellees' Supplemental Statutory Addendum.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(c)(5), amicus certifies that this brief was not written in whole or in part by counsel for any party, and that no person or entity other than amicus, its members, and its counsel has made a monetary contribution to the preparation and submission of this brief. Pursuant to D.C. Circuit Rule 29(d), counsel certifies that this separate amicus brief is necessary because it addresses constitutional and historical matters distinct from the policy and empirical issues addressed in the other amicus briefs filed in support of plaintiffs-appellees.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The leaders of the District of Columbia are rightly concerned about violent crime, and the Constitution affords them considerable discretion in addressing this serious problem. But the Second Amendment's protection of the "right of the people to keep and bear arms" "necessarily takes certain policy choices off the table." *District of Columbia v. Heller*, 554 U.S. 570, 636 (2008). Municipal leaders, no matter how well-intentioned, cannot simply "enact any gun control law that they deem to be reasonable." *McDonald v. City of Chicago*, 561 U.S. 742, 783 (2010).

Unfortunately, the District has defied these core constitutional principles for the better part of a decade. First, the District banned handguns in the home, until that law was invalidated by *Heller*. Then, the District banned handguns outside the home, until that law was struck down by *Palmer v. District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014). Now, the District bans carrying handguns outside the home for everyone except the tiny fraction of the population that can demonstrate a "good reason" to carry, "*distinguishable from the general community*." D.C. Code §22-4506(a); *id.* §7-2509.11(1)(A) (emphasis added). In other words, the District continues to deny the right to bear arms to all ordinary law-abiding citizens—the very "people" to whom the Second Amendment right extends.

The District's defense of the law at issue here is even less persuasive than its failed efforts in *Heller* and *Palmer*. Constrained by those precedents to acknowledge

that the Second Amendment protects a right to bear arms for self-defense, and that the need for self-defense arises beyond the home, the District takes a position worthy of Orwell:  The right to bear arms extends outside the home, but only outside the District of Columbia.  The District's plea for a Second Amendment exemption based on its "urban" geography and "unique" status is nothing new; it is squarely foreclosed by *Heller* and *McDonald*, which rejected identical arguments from the District itself and the City of Chicago, respectively.  And rightly so, as the text and history of the Second Amendment make clear that it has never been limited to the countryside.  Indeed, even the District ultimately does not have the courage of its convictions on that score, as its "good reason" law is a tacit (albeit begrudging) recognition that at least *some* of its residents did not forfeit their right to bear arms when they took up residence in the Nation's capital.

The District's claim that its good reason law survives Second Amendment scrutiny is (if possible) even weaker.  The law is based on precisely the same constitutionally forbidden rationale as the laws struck down in *Heller* and *Palmer*— that guns do more harm than good, so the less of them the better—and it should meet the same fate as the laws in those cases:  invalidation without regard to the level of scrutiny.  If the Court applies one of the traditional tiers of scrutiny, strict scrutiny is plainly required given the extent of the burden:  total foreclosure of the right to bear arms for all typical law-abiding citizens.  But this case is easily resolved under

intermediate scrutiny as well. Indeed, the District itself concedes that its law is not actually tailored to keep firearms out of the hands of the people most likely to misuse them. It is simply designed to do the absolute minimum the District thinks it must do to comply with *Heller* and *Palmer*—even though, in the District's view, even that token nod to the Second Amendment will do more harm than good.

The District responds with a litany of recycled and flawed arguments, from its contention that the law does not really burden ordinary citizens because they can get a carry license after they have been attacked, to its suggestion that victims of violent crime who were carrying a gun are somehow to blame. The District insists that cities may "balance" the right to self-defense against the perceived danger of public carry. But that is precisely the approach that the Supreme Court foreclosed in *Heller* and *McDonald*, and this Court's own precedents have already correctly rejected that reasoning. The Second Amendment "is the very *product* of an interest balancing by the people," *Heller*, 554 U.S. at 635, and neither the District nor this Court has license to strike that balance anew.

## ARGUMENT

### I. By Banning All Ordinary Citizens From Carrying A Handgun Anywhere Outside The Home, The Law Impinges Upon The Right To Bear Arms.

The parties to this case dispute much, but they agree on the reach of the challenged law: By limiting carry licenses to those who can demonstrate "good reason" or "other proper reason for carrying a pistol"—defined as "special need for

self-protection *distinguishable from the general community*"—the law prevents an ordinary citizen from carrying a handgun anywhere in the District.  D.C. Code §22-4506(a); *id.* §7-2509.11(1)(A) (emphasis added).  Under any plausible reading of the constitutional right to bear arms, that sweeping restriction "impinges upon a right protected by the Second Amendment."  *Heller v. District of Columbia*, 670 F.3d 1244, 1252 (D.C. Cir. 2011) (*Heller II*).

A.     **The Second Amendment Extends Beyond the Home.**

It is now settled that the Second Amendment protects the individual "right to keep and bear arms for the purpose of self-defense," *McDonald*, 561 U.S. at 750—that is, the right "to possess and carry weapons in case of confrontation," *Heller*, 554 U.S. at 592.  The prospect of "confrontation" arises beyond the home, so under any common-sense construction of the Second Amendment, the right must extend beyond the home as well.  Indeed, the text of the Amendment confirms as much.  While the right to "keep arms" ensures that a citizen may have a gun in the home to use for self-defense, the distinct right to "bear arms" must mean that she can carry it outside the home for self-defense; otherwise, "bear" would have to mean "carry within the home," an "awkward usage" that would overlap entirely with the right to "keep" arms for self-defense.  *Moore v. Madigan*, 702 F.3d 933, 936 (7th Cir. 2012).

If anything, the need to carry a handgun for self-defense is *more likely* to arise outside the home than within.  Even if one's home is not literally a castle, it provides

a measure of protection that a person lacks when walking or driving on a deserted street in a dangerous neighborhood. As the Seventh Circuit aptly explained, "a Chicagoan is a good deal more likely to be attacked on a sidewalk in a rough neighborhood than in his apartment on the 35th floor of the Park Tower." *Moore*, 702 F.3d at 937. Likewise, a "woman who is being stalked or has obtained a protective order against a violent ex-husband is more vulnerable to being attacked while walking to or from her home than when inside." *Id.* Regrettably, the same is true in the District. *See, e.g.*, Peter Hermann, *Woman Attacked in Georgetown in Attempted Sexual Assault*, Wash. Post (Aug. 3, 2016), http://wapo.st/2asERtz. It is thus at least arguable that a woman who wants to carry a gun for protection on the streets of the District "has a stronger self-defense claim" than one who wants "to sleep with a loaded gun under her mattress." *Moore*, 702 F.3d at 937. And after *Heller* and *McDonald*, it is beyond dispute that the Second Amendment protects the former as well as the latter. "To confine the right to be armed to the home is to divorce the Second Amendment from the right of self-defense described in *Heller* and *McDonald*." *Palmer*, 59 F. Supp. 3d at 181 (quoting *Moore*, 702 F.3d at 937); *cf. Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016); *id.* at 1028 (Alito, J., concurring). For that very reason, not a single federal court of appeals has held that the Second Amendment does not apply outside the home.

**B.    The Second Amendment Applies in Populous Urban Locations, Including the District.**

Unsurprisingly given this historical and jurisprudential background, the District "does not challenge" the "assumption" that the right to bear arms must "apply somewhere outside the home." D.C.Br.28. That is no great concession considering that the District acquiesced in *Palmer* by dismissing its appeal and revising its law. Indeed, by permitting carry licenses for those who can document a "special need for self-protection," D.C. Code §7-2509.11(1)(A), the District's "good reason" law recognizes that carrying a handgun outside the home serves the constitutionally protected end of self-defense.

Implicitly acknowledging as much, the District instead takes the Orwellian position that the Second Amendment applies outside the home—but only *outside the District*. D.C.Br. 11-26, 31-32. In other words, according to the District, the constitutionally enumerated and fundamental right to bear arms exists throughout the Nation but not in the Nation's capital. The District grounds that remarkable assertion in its claim that the District is "unique" because it is "entirely urban and densely populated," "filled with thousands of high-ranking federal officials and international diplomats," and "hosts hundreds of heavily attended events each year, including political marches and protests." D.C.Br.11.

Setting aside the problem that at least two of those factors are hardly "unique" to the District, the District's claim to a Second Amendment exemption based on its

"urban" status is impossible to accept. Indeed, it is just a variation on the same argument that the Supreme Court rejected—from the same litigant, no less—in *Heller*. *See* Grace Br.4 (quoting District's brief in *Heller*); Tr. of Oral Arg. 23, *Heller*, 554 U.S. 570 (No. 07-290) (invoking "danger" of gun possession "in a densely populated urban area"); *id.* at 27 (defending law as "local legislation responsive to local needs … in the seat of the government"). As the Court explained, the District's handgun ban could not be sustained simply "because the law is limited to an urban area" in which "handgun violence is a problem." 554 U.S. at 634.

The Court rejected the same arguments yet again in *McDonald*, where the City's principal defense was premised on the particular concerns about violent crime in urban areas. Chicago, a self-described "major urban center plagued by gangs and firearms violence," argued that it should not be bound by the Second Amendment because it could "legitimately conclude that, in an urban landscape, the Second Amendment becomes the enemy of ordered liberty, not its guarantor." Br. for Resps. at 14-17, *McDonald*, 561 U.S. 742 (No. 08-1521). The Court emphatically rejected that argument. Although it readily acknowledged that "conditions and problems differ from locality to locality and that citizens in different jurisdictions have divergent views on the issue of gun control," it concluded that "local concerns" do not empower local governments to "enact any gun control law that they deem to be reasonable." 561 U.S. at 783 (plurality opinion). Instead, the Second Amendment

"*limits* (but by no means eliminates)" the discretion of local jurisdictions "to devise solutions to social problems that suit local needs and values." *Id.* at 785.

Undeterred by these back-to-back repudiations of its central theory, the District now insists that even if the right to *keep* arms applies to the District, the right to *bear* arms does not. Putting aside the absurdity of affording fundamentally different treatment to one of the twinned rights to keep and bear arms, the District's argument fails for all the same reason as the twice-rejected effort to divine an "urban" exception to the right to keep arms. The Constitution simply is not susceptible to a reading under which fundamental rights are extinguished once a city hits a certain population. Nor is *Heller*. To be sure, *Heller* noted that firearms presumptively may be banned in "sensitive places such as schools and government buildings." 554 U.S. at 626-27 & n.26. But the Court's carefully cabined reference to "schools and government buildings" cannot plausibly be read to authorize designating an "entire jurisdiction" a "sensitive place" beyond the Second Amendment's reach. D.C.Br.32. If that were allowed, populous cities or states could ban guns entirely without even facing Second Amendment scrutiny. *But see Moore*, 702 F.3d at 937 (subjecting Chicago's handgun ban to Second Amendment scrutiny); *Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 89 (2d Cir. 2012) (subjecting New York's handgun restriction to Second Amendment scrutiny).

For that matter, the District never even defines what it means by an "urban" jurisdiction, despite extensive questioning on that very issue from this Court last year. Oral Arg. Rec. 10:24-13:46, *Wrenn v. District of Columbia*, 808 F.3d 81 (2015) (No. 15-7057). To be sure, the District is a relatively small geographic area with a relatively large population, but the same could be said of many a U.S. city. The District also has more than its fair share of government buildings, but the carrying of firearms in such truly sensitive places is prohibited by laws that plaintiffs do not challenge. As a practical matter, those restrictions may make it difficult to carry a handgun in certain parts of the District, such as the area surrounding the National Mall. But to state the obvious, the District contains many neighborhoods that are nowhere near government buildings or other facilities occupied by "high-ranking federal officials and international diplomats," and that rarely host "heavily attended … political marches and protests." D.C.Br.11. And some of those residential areas are the places where the need for protection against violent crime is the greatest. The notion that residents of those areas do not possess the same constitutional rights as their neighbors in Maryland or Virginia is nothing short of absurd.

### C. The Historical Record Provides No Support for the District's Effort to Exempt Itself from the Right to Bear Arms.

Rather than make any meaningful attempt to reconcile its argument with *Heller* or *McDonald* (a case that the District cites a grand total of twice, and both times for the opposite of what the Court was actually saying in the quoted passage,

*see* D.C.Br.11, 54), the District reaches back 800 years to the medieval Statute of Northampton, which it claims commenced a long tradition of banning "carrying in the public concourse." D.C.Br.15. That argument fails on every level.

First and foremost, neither the Statute of Northampton nor any of its successors imposed anywhere near as broad a restriction as the District suggests, let alone as broad as the District imposes. After all, the English Bill of Rights—which was enacted centuries later and contains "the predecessor to our Second Amendment"—protected the right to bear arms as part of the "fundamental" and "natural right of resistance and self-preservation." *Heller*, 554 U.S. at 593-94. It would be an astonishing caveat if that right could only be exercised in the home; indeed, it is hard to imagine how a right to "self-preservation could be "fundamental" if it evaporated the moment one walked out the front door. *Id.*; *see McDonald*, 561 U.S. at 767-78.

Consistent with that common-sense conception, the statute has long been understood by courts and commentators not as a broad prohibition on carrying weapons, but rather as a specific rule against carrying "dangerous and unusual weapons," thereby "terrifying the good people of the land." 4 William Blackstone, Commentaries on the Laws of England *148-49 (1769); *see Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686) ("The Chief Justice said, that the meaning of the statute … was to punish people who go armed to terrify the King's subjects"). Early

American analogs to the statute, including the District's own law, expressly incorporated this "terror" limitation. *See* SA19; *see also State v. Huntly*, 25 N.C. 418, 418 (1843) ("A man may carry a gun for any lawful purpose ... but he cannot go about with that or any other dangerous weapon, to terrify and alarm.").

Moreover, several states enacted laws banning concealed (but not open) carry in the 19th century notwithstanding the continued existence of Northampton-style laws on the books—bans that would have been utterly redundant if, as the District claims, Northampton-style statutes already prohibited carrying firearms in public. *See* SA26. Understandably, no less an authority than Solicitor General Robert Jackson, arguing in *defense* of federal gun regulation, conceded that "it would seem doubtful" that the Statute of Northampton "was construed as broadly as its language warranted" and endorsed the construction adopted in *Sir John Knight's Case*. Br. for United States 10-11, *United States v. Miller*, 307 U.S. 174 (1939) (No. 696). And if all that were not enough, *Heller* already resolved this debate, relying on Blackstone and leading American criminal law treatises to construe the statute as "prohibiting the carrying of 'dangerous and unusual weapons.'" 554 U.S. at 627.

In response to Blackstone, the King's Bench, Solicitor General Jackson, leading criminal law treatises on both sides of the Atlantic, and *Heller*, the District offers up a handful of law review articles and cherry-picked historical anecdotes. The District bravely contends, for example, that all these authorities are wrong about

the meaning of the Statute of Northampton because reading the law to cover only the carrying of dangerous and unusual weapons in a terrifying manner would render "superfluous" the statute's exceptions for "the King's servants," "his ministers," and citizens summoned to "keep the Peace." D.C.Br.19. Setting aside that the District is in no position to ask this Court to rewrite the Supreme Court's interpretation of a statute, it is doubtful (to put it mildly) that the statute's 14th-century drafters were operating under the strict understanding of the canon against surplusage that the District appears to embrace. Far more likely, the English authors included the exception to "make assurance double sure" that, in addition to permitting the carrying weapons of for *defensive* purposes, the statute also would permit the carrying of weapons for legitimate *offensive* purposes. *Universal City Studios LLLP v. Peters*, 402 F.3d 1238, 1241-42 (D.C. Cir. 2005) (Roberts, J.) (quoting William Shakespeare, Macbeth act 4, sc. 1.).

Moreover, if the statute really did mean what the District claims it meant, then it would allow the carrying of firearms to be banned *everywhere*, as the statute did not draw any distinction between rural or urban localities, and not even the District is willing to embrace that extreme position. The statute's text provided that "no Man" shall "go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, *nor in no part elsewhere*." SA36 (emphasis added). Taken to its logical conclusion, then, the District's argument

would eviscerate the right to bear arms entirely (the very position rejected in *Moore* and *Palmer*, to which the District has acquiesced). The District attempts to alleviate this obvious problem by reading into the statute wholly unwritten exceptions for "hunting" and carrying "in the countryside." D.C.Br.23. But the far better way to reconcile the statute with the historical record is by following Solicitor General Jackson's lead in taking the King's Bench at its word when it held that the statute operated only "to punish people who go armed to terrify the King's subjects." *Sir John Knight's Case*, 87 Eng. Rep. at 76; *see also Rex v. Smith*, 2 Ir. Rep. 190, 194-204 (K.B. 1914) (reviewing statute's history and concluding that violation requires carrying "*in terrorem populi*"—to the terror of the people).

Continuing its reliance on obscure laws, the District points to scattered 19th-century municipal ordinances and territorial laws that purportedly illustrate severe restrictions on public carry in the "cities" of the Wild West. D.C.Br.17, 18, 25. As an initial matter, places like Dodge City, Kansas, and Tombstone, Arizona, were not exactly renowned as bastions of adherence to the rule of law; nor were these dusty saloon towns "urban" in any way comparable to the District today. Moreover, as the District concedes, some of the laws cited were held unconstitutional under the Second Amendment, which hardly makes them helpful precedents. *See* D.C.Br.18 n.2. Other laws were upheld only on theories of the Second Amendment that have subsequently been repudiated. *See, e.g.*, *Salina v. Blaksley*, 83 P. 619 (Kan. 1905)

(upholding city ordinance on ground that the Second Amendment does not protect an individual right). And all of this, of course, is far afield from the original public meaning of the Second Amendment in 1789. As with its reliance on the Statute of Northampton, the District's felt-need to resort to such far-fetched sources—literally at the frontier of American law—to support its assertion of an "urban" exception to the Second Amendment just underscores how divorced from historical reality its position really is.

**D.     The Good Reason Requirement Is Not a Presumptively Lawful "Longstanding Prohibition."**

As an alternative, the District argues that the "good reason" requirement is a "longstanding prohibition" that is presumptively lawful under *Heller*. D.C.Br.26. That is an uphill climb given that *Heller* enumerated several "presumptively lawful" restrictions, and neither the good reason requirement nor anything like it made the list. 554 U.S. at 626-27 & n.26. To be sure, *Heller*'s list is non-exhaustive, but as this Court has illustrated, that standard for inclusion is difficult to meet. In *Heller II*, for example, this Court found that "the basic requirement to register a handgun" was a presumptively lawful longstanding prohibition, but that other registration provisions "more akin to licensing the gun owner than to registering the gun are … novel" and therefore not presumptively constitutional. 670 F.3d at 1254-55. The Court noted, moreover, that although "some types of licensure" may be longstanding, "the District's particular requirements are novel." *Id.* at 1255 n.*.

Under that precedent, the "good reason" requirement does not come close to qualifying as a presumptively lawful longstanding prohibition. The District cites as "longstanding" predecessors 19th century laws under which a person who carried a pistol in public could, upon "complaint of any person having reasonable cause to fear an injury or breach of the peace," be ordered to "find sureties for keeping the peace for a term not exceeding six months." SA22. It is obvious from the face of such "surety laws" that they differ markedly from the good reason requirement. First, they did not prohibit anyone from carrying a firearm; they just required individuals to pay what effectively amounted to a bond if someone complained about the uses to which they were putting a firearm. And even then, the individual against whom the complaint was filed was not prohibited from carrying; he just faced forfeiture of the surety (and perhaps other consequences as well) should he breach the peace while the surety remained in place. Moreover, far from requiring an individual who wanted to carry a firearm to demonstrate reasonable cause, these laws required the *complainant* to demonstrate "reasonable cause to fear an injury or breach of the peace" by the carrier. The laws thus operated in precisely the opposite manner as the District's law, presumptively allowing someone to carry without even paying a surety unless and until reasonable cause to doubt the person's motives arose. Simply put, the surety laws do not remotely match the "District's *particular requirements*" at issue here. *Heller II*, 670 F.3d at 1255 n.* (emphasis added).

On top of that, the good reason requirement is not "de minimis" in the sense required by *Heller II*—a standard that must be satisfied *even if* a prohibition is long-standing. *Heller II* found de minimis a registration requirement that was comparable to the modest burden of registering to vote or drive a car, but not a licensing system that required an applicant to be photographed and pass a vision test. 670 F.3d at 1255. The law at issue here is much more burdensome than either of those requirements. Under the District's scheme, an applicant for a carry license must "allege, in writing, serious threats of death or serious bodily harm, any attacks on his or her person, or any theft of property from his or her person," must further "allege that the threats are of a nature that the legal possession of a pistol is necessary as a reasonable precaution against the apprehended danger," must "provide all evidence of contemporaneous reports to the police of such threats or attacks," and finally must "disclose whether or not the applicant has made a sworn complaint ... concerning any threat or attack." D.C. Mun. Regs. tit. 24 §2333.2-3. If sitting for a photograph or a vision test is too burdensome to count as de minimis, the extensive process required to satisfy the good reason requirement cannot possibly be considered de minimis. The District's argument fails, and the Second Amendment applies.[2]

---

[2] The District responds with the circular assertion that the good reason requirement does not impose more than a de minimis burden on the Second Amendment right because it does not implicate the Second Amendment right to begin with. D.C.Br.28. That "is not a legal argument; it simply assumes the conclusion." *United States v. Apel*, 134 S. Ct. 1144, 1151 (2014).

**II.  The Carry Law Is Invalid Under Any Form Of Constitutional Scrutiny.**

The District's argument that its carry law does not impinge on a Second Amendment right is unpersuasive; its argument that the law survives constitutional scrutiny borders on the frivolous.  It is the rare constitutional case in which a party asks a court to uphold a statute under heightened scrutiny but then takes the position that the law is not actually tailored to serve the stated objective.  Yet that is precisely what the District does here, insisting that granting carry licenses even to those with "good reason" does not advance public safety as effectively as a constitutionally verboten complete ban but instead (in the District's view) "increases the likelihood of public harm."  D.C.Br.52.

Of course, the root of that incoherent position is no mystery.  The District disagrees with the Supreme Court's decision in *Heller* and clings to its conviction that guns *in anyone's hands* do more harm than good.  In the District's grim view, "[e]very citizen is law-abiding until he breaks the law."  D.C.Br.51.  Hence the astonishing passages in the District's brief blaming the victims of violent crime for exercising their Second Amendment rights and candidly admitting that the District's law is the "result of a careful balancing of the interests"—almost word-for-word what *Heller* foreclosed.  D.C.Br.53.  It is difficult to imagine a more brazen "thumbing of the municipal nose at the Supreme Court."  *Ezell v. City of Chicago*, 651 F.3d 684, 711-12 (7th Cir. 2011) (Rovner, J., concurring).

**A. The District's Carry Law Eliminates the Right to Bear Arms for All Ordinary Law-Abiding Citizens and Is Accordingly Invalid.**

In some Second Amendment cases, deciding the appropriate level of scrutiny is difficult and consequential. Not so here. The District's law is so plainly aimed at suppressing the exercise of Second Amendment rights for their own sake that it "fail[s] constitutional muster" under any level of scrutiny. *Heller*, 554 U.S. at 628-29; *see also Parker v. District of Columbia*, 478 F.3d 370, 399-400 (D.C. Cir. 2007).

The Second Amendment extends, as its text provides, to "the people"—a term that "unambiguously refers to all members of the political community," except those subject to certain "longstanding prohibitions" on the exercise of the right, such as "felons and the mentally ill." *Heller*, 554 U.S. at 580, 626. In other words, the Second Amendment right belongs to all "law-abiding, responsible citizens." *Id.* at 635. Yet the District's "good reason" requirement expressly limits the right to carry a handgun for self-defense to a subset of citizens who can document "a special need for self-protection *distinguishable* from the general community." D.C. Code §7-2509.11(1)(A) (emphasis added). By definition, that means that *ordinary*, law-abiding citizens cannot exercise the right at all—just as with the handgun ban in *Heller* and the carry bans in *Palmer* and *Moore*. Put differently, the good reason requirement does not just burden the right to bear arms for ordinary law-abiding citizens; it extinguishes it, reserving it only for those facing extraordinary threats. *Heller* dictates the fate of such a "severe restriction": It "fail[s] constitutional

muster" under "any of the standards of scrutiny." 554 U.S. at 628-29; *see Moore*, 702 F.3d at 941 (invalidating carry ban "not based on degrees of scrutiny, but on ... failure to justify" the law); *Palmer*, 59 F. Supp. 3d at 182-83 (similar).

The District resists the conclusion that the law operates as a total ban on the right of ordinary law-abiding citizens to carry a handgun for self-defense, but it does so on the most implausible of grounds. In the District's view, the good reason requirement "speaks not to who may carry a handgun, but when a handgun may be carried: after the applicant develops a non-speculative need for armed self-defense." D.C.Br.32. As the District explains, "[a]ny person could, at some point in time, find himself particularly threatened. When that happens, the District's law allows him to apply for a carry license." *Id.* But that contention does not solve the District's fundamental problem. It just means that when ordinary citizens are no longer ordinary (because they face an extraordinary threat) they can then (and only then) exercise their constitutional rights. It is also wholly impractical. Telling a citizen walking the streets of a dangerous neighborhood that she can obtain a permit for self-defense *after* she is suddenly attacked by a violent criminal is a bit like telling a passenger on a cruise ship that she is free to come back to the dock to pick up a life jacket if she falls overboard.

As the district court correctly concluded, the District's position "border[s] on the frivolous." JA562. Nothing in *Heller* or any other relevant precedent remotely

suggests that the right to self-defense protected by the Second Amendment is limited to *foreseeable* confrontations or to victims of past crime. Quite the contrary, *Heller* defines the right to carry a handgun "*in case* of confrontation." 554 U.S. at 592 (emphasis added); *see id.* at 584 ("being armed *and ready* for offensive or defensive action") (emphasis added); *id.* at 595 (right to "repel force by force when the intervention of society in his behalf, may be too late to prevent an injury"). Indeed, *Heller* invalidated the District's requirement that handgun owners keep their guns inoperable in the home precisely because the requirement would preclude use of the weapon for "the purpose of *immediate* self-defense." *Id.* at 635.

If anything, the fact that the good reason requirement recognizes that carrying handguns outside the home is useful for self-defense—by grudgingly granting licenses to those with particularized need—but then denies the right to all ordinary law-abiding citizens makes the law *more* constitutionally problematic, not less. Unlike a government effort to restrict a kind of firearm or manner of carry that the government deems either unrelated to the constitutionally valid goal of self-defense or peculiarly dangerous, the D.C. carry law recognizes that the public carrying of handguns directly furthers the constitutionally valid end of self-defense. But having acknowledged that much, the law cannot limit the carrying of handguns to a subset of "the people" protected by the Second Amendment. Wholly apart from any levels-of-scrutiny approach, this effort to limit the pursuit a constitutionally protected end

by a constitutionally protected means to a subset of those protected by the Constitution is invalid. It is no different—and no more constitutional—than limiting the First Amendment to those with an extraordinarily good reason to criticize the government (as judged by the government).

**B.    If the Court Adopts a Tier of Scrutiny, Strict Scrutiny Is Required.**

If the Court decides to review the law under one of the traditional tiers of scrutiny, strict scrutiny is required. This Court has explained that a "regulation that imposes a substantial burden upon the core right of self-defense protected by the Second Amendment must have a strong justification"—*i.e.*, strict scrutiny. *Heller II*, 670 F.3d at 1257. The Court applied intermediate scrutiny in *Heller II* because the registration requirements under review did not prevent "an individual from possessing a firearm in his home or elsewhere" and the challenged "assault weapons" ban did "not prohibit the possession of" handguns, "the quintessential self-defense weapon." *Id.* at 1258, 1261-62. By contrast, the law here does both those things: It prohibits handgun possession by typical, law-abiding citizens, and it does so not just "elsewhere" but *everywhere* outside the home. If this severe restriction is not invalid on its face, it surely constitutes a "substantial burden upon the core right of self-defense" that must withstand strict scrutiny. *Id.* at 1257.

The District's contention that only intermediate scrutiny should apply relies largely on the distinction between firearms regulation in the home and firearms

regulation outside the home. Although other courts applying intermediate scrutiny have adopted this distinction, there is no basis for it in *Heller* or elsewhere. *Heller* invalidated a law that banned handgun possession in the home, but in the entirety of its nearly 50-page analysis of the scope of the Second Amendment right (as opposed to its application of the right to the challenge at hand), the Court referred to the "home" or "homestead" a grand total of three times, in each instance quoting a historical source that recognized a right to keep and bear arms to defend both one's home and one's person and family. *See* 554 U.S. at 615-16, 625. *Heller II*, moreover, bases the strict-versus-intermediate scrutiny determination on the extent of the burden on the "core right of self-defense," 670 F.3d at 1257—a right that, as discussed at length above, arises even *more frequently* outside the home than within.

The District's remaining arguments against strict scrutiny barely pass the straight-face test. The District suggests that intermediate scrutiny should apply because the Framers thought "the federal government needed complete authority at the seat of government." D.C.Br.34. Taken to its logical conclusion, that argument would give the District absolute power unconstrained by any provision of the Constitution. The District also proposes that lesser scrutiny should apply because "prevent[ing] elimination of the militia, not self-defense, was the purpose for which the [Second Amendment] right was codified." D.C.Br.35. But that position is squarely foreclosed by *Heller II*, which, as just explained, expressly ties the scrutiny

determination to the burden "core right of self-defense." 670 F.3d at 1257. Moreover, by the District's logic, strict scrutiny should not apply to classifications based on alienage or national origin because the Fourteenth Amendment was not codified to protect aliens or the foreign-born. *But see, e.g.*, *Graham v. Richardson*, 403 U.S. 365, 371-72 (1971). The District points to no authority that has adopted its position, and for good reason—none exists.

## C. The Law Cannot Survive Either Strict or Intermediate Scrutiny.

Although strict scrutiny is the only appropriate level of scrutiny, the result here would be the same under either strict or intermediate scrutiny. As this Court has explained, intermediate scrutiny requires the District to show that the challenged law "promotes a substantial governmental interest that would be achieved less effectively absent the regulation" and that "the means chosen are not substantially broader than necessary to achieve [its] interest." *Heller II*, 670 F.3d at 1258.

Considered under that standard, this is not a difficult case. The District essentially concedes the unconstitutionality of its law by admitting that it did not adopt the good reason requirement because it believed that allowing citizens who can document a special need for self-defense "promotes [the] substantial governmental interest" of protecting public safety. *Id.* Instead, the District insists that granting carry licenses to those with good reason actually "*increases the likelihood of public harm.*" D.C.Br.52 (emphasis added). In other words, the

District has drawn a line that it does not even promote its stated objective, let alone through a "means narrowly tailored to" do so. *Heller II*, 670 F.3d at 1258.

The District does not seriously dispute that its law cannot withstand any traditional form of constitutional scrutiny. Instead, the District offers the novel suggestion that the law is tailored "in a different way," D.C.Br.10, namely to begrudgingly tolerate a minimal degree of public carry in hopes of complying with *Heller* and *Palmer*. But that confuses parsimony with tailoring. At best, the law is tailored to District's objective to minimize the number of guns carried, on the theory that more guns will produce more crime. But that was precisely the rationale behind the laws rejected in *Heller* and *Palmer*. And as those decisions made clear, the Second Amendment embodies a fundamentally different view of handguns—that citizens have a right to use them for self-defense—and the District does not have a legitimate (let alone substantial or compelling) interest in suppressing the exercise of Second Amendment rights just for the sake of suppressing the exercise of Second Amendment rights. The District's insistence that its law is tailored to achieve that forbidden interest thus succeeds only in confirming the law's unconstitutionality. *Cf. Heller v. District of Columbia*, 801 F.3d 264, 280 (D.C. Cir. 2015) (*Heller III*) ("taken to its logical conclusion, [the District's] reasoning would justify a total ban on firearms kept in the home").

Put another way, the District's approach is not tailoring, but "rationing," which is fundamentally inconsistent with intermediate scrutiny. *Drake v. Filko*, 724 F.3d 426, 455 (3d Cir. 2013) (Hardiman, J., dissenting); *Woollard v. Sheridan*, 863 F. Supp. 2d 462, 474 (D. Md. 2012), *rev'd sub nom. Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013). Under intermediate scrutiny, "the government must demonstrate that alternative measures that burden substantially less [protected activity] would fail to achieve the government's interests, not simply that the chosen route is easier." *Heller III*, 801 F.3d at 277-78. But the District has not even attempted to demonstrate how alternative measures—such as regulations based on indicia of likely dangerousness or criminality—would fail to address public safety concerns. Nor has it made any effort to demonstrate that the D.C. carry law reflects even a good-faith attempt to minimize the burden on Second Amendment rights. Of course, that is because the whole point of the law is to minimize the exercise of Second Amendment rights.

To take just one example, the District worries that a broader public carry law would increase violence by allowing gang members to carry guns. D.C.Br.45. That is a fair concern. But the District never attempts to explain why measures aimed at denying carry licenses to dangerous gang members while permitting them for peaceful citizens would be ineffective. Instead, the District forges ahead with a licensing scheme that actually may make the problem worse. Under current law, the

police chief may grant a carry license to a gang member who can document good reason to fear retribution from a rival, but not to a single woman walking home at night along dangerous streets or a military veteran who returns home to find his neighborhood overrun by crime. That is a textbook example of a law that is not tailored to meet its objective.

The District's only hope for saving the law is an appeal for such heavy "deference" that intermediate scrutiny would essentially be watered down to the kind of interest-balancing test proposed by the dissenters and rejected by the majority of the Supreme Court in *Heller* and *McDonald*. D.C.Br.57; *see Heller*, 554 U.S. at 634; *McDonald*, 561 U.S. at 785. As the District notes, some circuits nevertheless appear to have adopted such an approach. D.C.Br.52-53. In *Kachalsky*, for example, the Second Circuit upheld a "good reason" law as "the result of a 'careful balancing of the interests involved.'" 701 F.3d at 97 n.22; *see Woollard*, 712 F.3d at 881. Those decisions conflict not only with the square holdings of *Heller* and *McDonald*, but also with the precedents of this Court. *Heller II* expressly held that intermediate scrutiny demands more than interest-balancing. 670 F.3d at 1265. And *Heller III* applied intermediate scrutiny to strike down firearms regulations that lacked adequate tailoring. *Heller III*, 801 F.3d at 277-78. The same result is required here.

In all events, the practical consequence of invalidating the District's good reason requirement will not be to make it an outlier jurisdiction, but rather to institute

the same licensing regime (including all the background checks, training requirements, and numerous other restrictions not challenged here) that prevails in about two-thirds of the States. More important, the legal consequence will be to reaffirm that the "very enumeration of the" Second Amendment "right takes out of the hands of government ... the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 634.

## CONCLUSION

This Court should affirm the decision of the district court.

Respectfully submitted,

s/Paul D. Clement
PAUL D. CLEMENT
 *Counsel of Record*
ERIN E. MURPHY
CHRISTOPHER G. MICHEL
BANCROFT PLLC
500 New Jersey Avenue, NW
Seventh Floor
Washington, DC 20001
(202) 234-0090
pclement@bancroftpllc.com

*Counsel for Amicus Curiae National Rifle Association of America, Inc.*

August 12, 2016

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(d) and Circuit Rule 32(e)(3) because it contains 6,995 words—less than one-half the maximum of 14,000 words authorized by Fed. R. App. P. 32(a)(7)(B)(i) for a party's principal brief—excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(e)(1).

2. This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point font.

Dated: August 12, 2016

s/Christopher G. Michel<br>
Christopher G. Michel

**CERTIFICATE OF SERVICE**

I hereby certify that on August 12, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s/Paul D. Clement</u>
Paul D. Clement