ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 20, 2016

No. 16-7067

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

MATTHEW GRACE, *ET AL.*,

*Plaintiffs-Appellees,*

v.

DISTRICT OF COLUMBIA, *ET AL.*,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Columbia

# BRIEF OF ARIZONA, ALABAMA, ARKANSAS, INDIANA, MISSOURI, MONTANA, NEVADA, OHIO, OKLAHOMA, SOUTH CAROLINA, SOUTH DAKOTA, TEXAS, UTAH, WEST VIRGINIA, WISCONSIN, AND WYOMING IN SUPPORT OF PLAINTIFFS-APPELLEES

Arizona Attorney General's Office
1275 West Washington Street
Phoenix, Arizona 85007
Phone: (602) 542-5025
Fax (602) 542-4085
keith.miller@azag.gov

MARK BRNOVICH
*Attorney General of Arizona*

JOHN R. LOPEZ IV
*Solicitor General*
KEITH MILLER
*Assistant Solicitor General*

Counsel for *Amicus Curiae* State of Arizona
Additional Counsel Listed on Inside Cover

(additional counsel continued from front cover)

LUTHER STRANGE
*Attorney General of Alabama*

LESLIE RUTLEGE
*Attorney General of Arkansas*

GREGORY F. ZOELLER
*Attorney General of Indiana*

CHRIS KOSTER
*Attorney General of Missouri*

TIMOTHY C. FOX
*Attorney General of Montana*

ADAM PAUL LAXALT
*Attorney General of Nevada*

MICHAEL DEWINE
*Attorney General of Ohio*

E. SCOTT PRUITT
*Attorney General of Oklahoma*

ALAN WILSON
*Attorney General of South Carolina*

MARTY J. JACKLEY
*Attorney General of South Dakota*

KEN PAXTON
*Attorney General of Texas*

SEAN D. REYES
*Attorney General of Utah*

PATRICK MORRISEY
*Attorney General of West Virginia*

BRAD D. SCHIMEL
*Attorney General of Wisconsin*

PETER K. MICHAEL
*Attorney General of Wyoming*

## CORPORATE DISCLOSURE STATEMENT

As states, all *amici* are governmental entities with no reportable parent companies, subsidiaries, affiliates, or similar entities under Fed. R. App. P. 26.1(a).

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ..........................................................

TABLE OF AUTHORITIES .................................................................. ii

IDENTITY OF *AMICI CURIAE* ............................................................. 1

SUMMARY OF ARGUMENT ............................................................... 2

ARGUMENT .................................................................................. 5

I.   PRIVATE CITIZENS LICENSED TO CARRY WEAPONS ARE
     LAW-ABIDING ......................................................................... 5

     A. Assertions that licensed carriers frequently murders are based on false data.

     B. Law enforcement data show that licensees are highly law-abiding.

II.  DEFENSIVE GUN USE PROMOTES VICTIM SAFETY ......................... 10

III. BROADLY, THE EXPERIENCE OF OTHER STATES SHOW
     THAT LICENSED CARRY DOES NOT CREATE CHAOS ..................... 14

     A. Licensed carry is the norm across the nation.

     B. Predictions about the supposed dangers of licensed carry have not been borne out.

CONCLUSION ................................................................................. 19

# TABLE OF AUTHORITIES

**D.C. Code**

§ 7-2509.11(1)(A) ................................................................. 2

§ 22-4506(a) ........................................................................ 2

**Other Authorities**

Branas, Charles C., *et al.*, *Investigating the Link Between Gun
    Possession and Gun Assault*, 99 Am. J. Pub. Health 2034 (2009) .............. 12, 13

Burnett, H. Sterling, *Texas Concealed Handgun Carriers:
    Law-abiding Public Benefactors*, Nat'l Center for Pol'y
    Analysis (June 2, 2000), http://www.ncpa.org/pub/ba324 ................................17

Centers for Disease Control, Task Force on Community
    Preventive Service, *First Reports Evaluating the Effectiveness
    of Strategies for Preventing Violence: Firearms Laws*,
    52 Morbidity and Mortality Weekly Rep. 11 (Oct. 3, 2003)................................14

Cramer, Clayton E. & David B. Kopel, *"Shall Issue": The New Wave of
    Concealed Handgun Permit Laws*, 62 Tenn. L. Rev. 679 (1995) .......................17

Cramer, Clayton, *Violence Policy Center's Concealed Carry Killers:
    Less Than It Appears*, available at http://ssrn.com/abstract=2095754.............. 6,7

Donohue, John, *Impact of Right to Carry Laws and the NRC Report
    (2014)………………..…………………………………………………………15

FBI, *Crime in the United States, by Volume and Rate per 100,000
    Inhabitants, 1995–2014*, Table 1,
    https://ucr.fbi.gov/crime-in-the-u.s/2014/crime-in-the-u.s.-2014/tables/table-1....8

Government Accountability Office, *States' Laws and Requirements for Concealed Carry Permits Vary Across the Nation*, GAO-12-717 (July 17, 2012), http://www.gao.gov/products/GAO-12-717 ......... 7

Kleck, Gary & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. Crim. L. & Criminology 150 (1995) ........................................................... 10

Kleck, Gary, *Targeting Guns: Firearms and their Control* (1997) ............ 10, 11, 12

Kopel, David B., *Pretend "Gun-Free" School Zones: A Deadly Legal Fiction*, 42 Conn. L. Rev. 515 (2009) ............................................................... 9

Lott, John R., Jr., *More Guns Less Crime: Understanding Crime and Gun Control Laws* 4 (3d ed. 2010). ........................................................... 12

Moody, Carlisle E. & Thomas B. Marvell, *The Debate on Shall-Issue Laws*, 5 Econ. J. Watch 269 (2008) ..................................................... 14

Moody, Carlisle E., *et al.*, *The Impact of Right-to-Carry Laws on Crime: An Exercise in Replication*, 4 Rev. of Econ. & Finance 33 (2014) ..................... 15

*National Research Council, Firearms and Violence: A Critical Review* (2005) ..................................................................... 14

Skock, Tom, *The Editor's Column: Facts Top Feelings, Change Views On Gun Issues*, The Morning J. (Feb. 6, 2011), ................................................. 16

Smith, Tom W., *A Call for a Truce in the DGU War*, 87 J. Crim. L. & Criminology. 1462 (1997) ................................................................. 10

Violence Policy Center, *Concealed Carry Killers,*
   http://concealedcarrykillers.org/ .........................................................................6

Ziezulewicz, Geoff, *Uber driver, licensed to carry gun, shoots gunman
   in Logan Square*, Chi. Trib., Apr. 20, 2015,
   http://www.chicagotribune.com/news/local/breaking/ct-uber-driver-
   shoots-gunman-met-0420-20150419-story.html. ................................................11

# IDENTITY OF *AMICI CURIAE*

Arizona, Alabama, Arkansas, Indiana, Missouri, Montana, Nevada, Ohio, Oklahoma, South Carolina, South Dakota, Texas, Utah, West Virginia, Wisconsin, and Wyoming file this brief pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure. The *Amici* States have advanced their compelling interests in promoting public safety, preventing crime, and reducing the harmful effects of firearm violence without infringing the constitutional rights of their citizens. They join this brief not in an attempt to interfere with local policy-making, but because the challenged regulation represents a policy choice that is foreclosed by the Second Amendment.

Amici States are concerned that upholding the challenged regulation would rest on an erroneous construction of the United States Constitution and would infringe on individual rights. While states may enact reasonable firearm regulations that are substantially related to the achievement of an important governmental interest, the challenged regulation does nothing to improve public safety and instead may be counterproductive.

## SUMMARY OF ARGUMENT

The District of Columbia has banned most of its law-abiding citizens from carrying firearms unless they can provide a particularized reason to exercise the right to bear arms. The Second Amendment guarantees "the individual right . . . to carry weapons in case of confrontation"—that is, to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." *District of Columbia v. Heller*, 554 U.S. 570, 592, 584 (2008) (citation and quotation marks omitted). The *Heller* Court stressed that the Constitution thus elevates the right of law-abiding citizens to use firearms and "takes certain policy choices off the table." *Id.* at 636. "The very enumeration" of the Bill of Rights took "out of the hands of government … the power to decide on a case-by-case basis whether the right is really worth insisting upon." *Id.* at 634.

The question before this Court is whether the District's refusal to issue a public-carry license to any law-abiding citizen unless the District believes, on a case-by-case basis, that the citizen has "good reason to fear injury" infringes the Second Amendment. D.C. Code § 22-4506(a). To show "good reason," an applicant must demonstrate "a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks that demonstrate a special danger to the applicant's life." D.C. Code § 7-

2509.11(1)(A). In other words, while certain special cases are exempt from the overall ban, the District denies members of the general community their Second Amendment right to carry firearms unless their lives are already directly imperiled.

The District contends that their policy is justified because it is designed to promote public safety by limiting the number of citizens authorized to carry firearms in public. This rationale is impermissible because it limits the substance of the right to bear arms, rather than merely regulates the exercise of the right. Thus, whatever level of scrutiny is applied, the District's reasoning fails to justify the profound infringement on the constitutional right.

The District enacted the current policy after consulting studies purportedly demonstrating that "right-to-carry laws" enacted in "shall-issue" states "are associated with substantially higher rates of aggravated assault, rape, robbery and murder." JA 135. According to their theory, the District believes that "[I]ntroducing a gun into any conflict can escalate a limited danger into a lethal situation," and this "danger extends to bystanders and the public at large." JA 136.

The District concludes that public firearm carriage's "higher potential for carnage" compared to possessing a firearm in one's own home justifies its regulation. App. Brief at 39. In support of its conclusion, the District relied primarily on a study by Professor John Donohue which concluded that "right-to-carry laws are associated with substantially higher rates of aggravated assault, rape,

robbery and murder." JA135. The District also asserted that common sense dictated that "introducing a gun into any conflict can escalate a limited danger into a lethal situation" and that, "[w]hen the deadly force being used is a gun, the danger extends to bystanders and the public at large." JA 136. The District contends that the equation is simple—the more firearms carried equals mayhem and chaos, regardless whether the individuals carrying weapons are law-abiding citizens.

To the contrary, more firearms—when carried by law-abiding, licensed citizens—do not lead to more crime. This is due, in part, to the fact that private citizens who acquire licenses to carry firearms publicly are, by definition, law-abiding. Second, licensed carry promotes the defensive use of firearms. The right to "carry weapons in case of confrontation" that the Supreme Court described in *Heller*, 554 U.S. at 592, promotes public safety. Defensive firearm use is a common and effective way for ordinary citizens to defend themselves from violence. Finally, the research on firearms violence tends to show that when more law-abiding citizens carry weapons with a license, crime rates either go down or remain static. Indeed, the states that allow their law-abiding citizens to carry firearms have not found themselves living in a post-apocalyptic nightmare.

In this brief, *Amici* states provide the Court with empirical evidence regarding the public policy impacts of licensed carry regimes. We rely on published academic studies, law enforcement statistics, and other official records.

The evidence is clear. State governments can allow a greater percentage of their citizens to carry firearms with a license without deleterious effects. Records from law enforcement bodies across the country show that citizens issued carry permits are much more law-abiding than the public at large.

## ARGUMENT

### I. PRIVATE CITIZENS LICENSED TO CARRY WEAPONS ARE LAW-ABIDING

#### A. Assertions that licensed carriers frequently murder are based on false data.

The Brady Center to Prevent Gun Violence paints individuals who are licensed to carry firearms as killers. The Brady Center claims in its amicus brief:

> In fact, since 2007, at least 885 people have been killed by individuals with concealed carry permits. This number includes 17 law enforcement officers.

Brady Br. at 15 (citation omitted). As of June 16, 2016, the Violence Policy Center (VPC) claimed that since 2007, 885 persons had been "killed by concealed carry

killers."[1] The assertion is, at best, misleading. In a 2012 analysis of the VPC's claims, Professor Clayton Cramer's *Violence Policy Center's Concealed Carry Killers: Less Than It Appears*, available at http://ssrn.com/abstract=2095754, carefully examines the VPC's "data" as of 2012, and exposes its unreliability:

1.    A total of 132 of the 374 deaths included (35%) were either suicides from these aggregate reports, or were known to be individual suicides, wherein the licensee killed himself without any criminal attack on others. *Id.* at 18. Carry laws, however, have no effect on whether a gun owner chooses to commit suicide.

2.    VPC included at least eight deaths (2%) where the criminal justice system found the licensee's use of a firearm lawful. *Id.* at 12.

3.    VPC included 80 deaths (21%) which took place in a licensee's home or business. *Id.* at 19, 37. Generally, states do not require a concealed carry license to possess a firearm in one's own home or business. These cases are irrelevant to "shall issue" laws.

4.    VPC included 19 deaths (5%) which occurred in "may-issue" states. Many of these involved gunfire by retired police officers, who by federal statute have a right to carry a firearm in all 50 states. 18 U.S.C. § 926B. *Id.* at 17, 37. Others involved persons who were licensed in their home states, but who were unlawfully carrying in another state that did not recognize their licenses. *Id.* at 17.

5. VPC included two deaths where the licensee did not even use a firearm to commit a crime. *Id.* at 37.

6. VPC included 26 deaths where either the only weapon, or the primary weapon used, was a long gun. *Id.* at 37. A concealed handgun carry license is irrelevant under these circumstances.

---

[1] *See* Violence Policy Center, *Concealed Carry Killers,* http://concealedcarrykillers.org/.The numbers vary over time, because this is a website, not a publication.

The VPC's "data" was simply false, compiled by labeling as "concealed carry killers" persons who engaged in lawful self-defense, people who committed suicide at home, people who did not have carry permits, and many other scenarios in which a carry permit was entirely irrelevant as a matter of law. After excluding extraneous incidents where the data was faulty or a concealed carry license was irrelevant to the death, Professor Cramer identified a total of 92 deaths. *Id.* at 38. In other words, the VPC overstated the number of deaths attributable to individuals with concealed carry licenses by more than 300%. As there has been no methodological improvement in response to Professor Cramer's analysis, the current figure, as cited by the Brady Center, is plainly unreliable.

**B. Law enforcement data show that licensees are highly law-abiding.**

While the 92 deaths confirmed by Professor Cramer's analysis are still sobering, compared to the number of licensees in the U.S. they represent a statistically minute number. According to the Government Accountability Office, there were more than 8 million active concealed carry permits as of December 31, 2011, in the 45 states that provided data.[2] The 92 deaths constitute less than one

_____

[2] Government Accountability Office, *States' Laws and Requirements for Concealed Carry Permits Vary Across the Nation*, GAO-12-717 (July 17, 2012),

murder per year per 400,000 concealed weapon licensees. Even using the VPC's inflated and unsupportable number of deaths would still translate to one murder per 100,000 concealed weapon licensees. Compared to the murder rate for the general population in the U.S., 5.2 murders per 100,000 persons,[3] it is apparent that even the VPC's flawed data demonstrate that licensed carriers of firearms account for a mere fraction of violence compared to the public as a whole.

The conclusion that concealed carry licensees are more law-abiding than the general public is also borne out by the state-level data. Though the manner in which this information is reported varies from state to state, the reports unanimously support the proposition that individuals granted concealed carry licenses obey the law and keep the peace:

---

http://www.gao.gov/products/GAO-12-717. A 2016 study found there were more than 14.5 million concealed firearm carry licensees. *Concealed Carry Permit Holders Across the United States: 2016*, Crime Prevention Research Center (July 26, 2016), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2814691.

[3] FBI, *Crime in the United States, by Volume and Rate per 100,000 Inhabitants, 1995–2014*, Table 1, https://ucr.fbi.gov/crime-in-the-u.s/2014/crime-in-the-u.s.-2014/tables/table-1. 5.2 murders per 100,000 is the average homicide rate of the years from 2007-2011 which correspond to the years of data reviewed by Professor Cramer.

*Minnesota*: One handgun crime (broadly defined to include offenses such as driving while under the influence while a handgun is in the car) per 1,423 licensees.[4]

*Michigan*: 161 charges involving handguns (including duplicate charges for one event, and charges which did not result in a conviction) in 2007 and 2008 out of an approximate Michigan population of 190,000 licensees.

*Ohio*: 142,732 permanent licenses issued since 2004, and 637 revocations for any reason, including moving out of state.

*Louisiana*: Licensee firearm misuse rate, all reasons, of less than 1 in 1,000.

*Texas*: Concealed handgun licensees are 79 percent less likely to be convicted of crimes than the non-licensee population. Only two-tenths of one percent of licensees were ever subsequently convicted of a violent crime or firearms regulation crime.

*Florida*: The data show a rate of 27 firearms crimes per 100,000 licensees.


In sum, citizens with carry licenses are much more law-abiding than the general population. The District's policy, which intentionally aims to prevent law-abiding citizens from acquiring carry permits, is empirically divorced from the stated governmental interest in preventing violent crime.

---

[4] The full data and details for Minnesota, Michigan, Ohio, Louisiana, Texas, and Florida are presented in David B. Kopel, *Pretend "Gun-Free" School Zones: A Deadly Legal Fiction*, 42 Conn. L. Rev. 515, 564-69 (2009).

## II. DEFENSIVE GUN USE PROMOTES VICTIM SAFETY

Another way in which licensed carry promotes individual safety and reduces crime is when individuals licensed to carry use their firearms to repel an attack. There have been 13 major surveys regarding the frequency of defensive gun use (DGU) in the modern United States. The surveys range from a low of 760,000 annually to a high of 3 million examples of DGU. The more recent studies, which report higher numbers, are much more methodologically sophisticated and, thus, reliable. Gary Kleck, *Targeting Guns: Firearms and their Control* 149-64, 187-89 (1997).

Gary Kleck and Mark Gertz conducted an especially thorough survey in 1993, with stringent safeguards to weed out respondents who might misdescribe or misdate a DGU incident. Kleck and Gertz identified between 2.2 and 2.5 million DGUs annually. Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. Crim. L. & Criminology 150 (1995). The Kleck/Gertz survey found that most defensive uses involved handguns, and the large majority of defensive uses did not involve firing the weapon, but merely displaying it to deter an attacker. *Id.* at 175 (80 percent of DGUs are handguns; 76 percent do not involve a shot being fired). Subsequent studies challenge Kleck's figures as too high, but still estimate the annual DGU

figure to be somewhere between 256,500 to 1,210,000 per year. Tom W. Smith, *A Call for a Truce in the DGU War*, 87 J. Crim. L. & Criminology. 1462 (1997).

Some of these defensive uses have saved more than the licensee's life. Illinois began issuing carry permits under a "shall issue" system in early 2014; the legislature had reformed the law in 2013, as a result of decisions by the Seventh Circuit and the Illinois Supreme Court. *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012); *People v. Aguilar*, 2 N.E.3d 321 (Ill. 2013). For example, on April 17, 2015, a man "opened fire on a crowd of people in Logan Square," in Chicago. An Uber driver with a carry permit fired six shots, neutralizing the attacker.[5]

Empirical data also refute the misperception that citizens licensed to carry firearms are likely to have the weapon used against them in a violent encounter. U.S. Bureau of Justice Statistics indicate that, in confrontations with criminals, 99% of licensed carry victims maintain control of their firearms. *See* Kleck, *Targeting Guns*, *supra*, at 168-69. In fact, numerous studies have found that robbery victims who resist with firearms are significantly less likely to have their property taken and are also less likely to be injured. *Id.* at 170. "Robbery and assault victims who used a gun to resist were less likely to be attacked or to suffer

---

[5] Geoff Ziezulewicz, *Uber driver, licensed to carry gun, shoots gunman in Logan Square*, Chi. Trib., Apr. 20, 2015, http://www.chicagotribune.com/news/local/breaking/ct-uber-driver-shoots-gunman-met-0420-20150419-story.html.

an injury than those who used any other methods of self-protection or those who did not resist at all." *Id.* at 171. Moreover, "victim resistance with a gun almost never provokes the criminal into inflicting either fatal or nonfatal violence." *Id.* at 174. Similarly, "rape victims using armed resistance were less likely to have the rape attempt completed against them than victims using any other mode of resistance," and defensive gun use did not increase the victim's risk of "additional injury beyond the rape itself." *Id.* at 175. Justice Department statistics reveal that the probability of serious injury from any kind of attack is 2.5 times greater for women offering no resistance than for women resisting with a gun. *See* John R. Lott, Jr., *More Guns Less Crime: Understanding Crime and Gun Control Laws* 4 (3d ed. 2010).

Indeed, it is typically necessary only for an intended victim to display a firearm, rather than pull the trigger, to prevent completion of a crime. A national survey "indicates that about 95 percent of the time that people use guns defensively, they merely have to brandish a weapon to break off an attack." *See* Lott, *More Guns Less Crime*, *supra*, at 3. Fewer than one in a thousand defensive gun uses results in the death of a criminal. *See* Kleck, *Targeting Guns*, *supra*, at 178.

A 2004 National Research Council study identified fatal flaws in the research on which amici for the District relied for the proposition that defensive

gun use does not protect crime victims. Brady Br. at 30 (citing Charles C. Branas, *et al.*, *Investigating the Link Between Gun Possession and Gun Assault*, 99 Am. J. Pub. Health 2034, 2037 (2009). Critically, that study found merely a statistical association between gun possession by "urban adults" who become crime victims and the risk of being shot; it did not purport to find a causal link. *See* Branas, *supra*, at 2037. Regardless of the effectiveness of defensive gun use, one would expect a positive statistical correlation between victim gun possession and victim injury, because those urban residents most at risk of victimization (e.g., because they reside in a dangerous neighborhood) are also the most likely to arm themselves for protection—this is known as reverse causation. Going to the doctor has an extremely high positive association with being ill, but that hardly proves that going to the doctor causes illness. In fact, the Branas study acknowledged that it "did not account for the potential of reverse causation between gun possession and gun assault." *Id.* at 2039. It further admitted that its results had no application to those citizens engaging in "regular training with guns"—precisely the training that most States reasonably require of gun-permit holders.

## III. BROADLY, THE EXPERIENCE OF OTHER STATES SHOW THAT LICENSED CARRY DOES NOT CREATE CHAOS

### A. Licensed carry is the norm across the nation.

Forty-two states already have implemented essentially the same kind of handgun carry authorization system that Appellees correctly argue the Second Amendment requires, or do not require a license to carry a firearm. These states are commonly called "shall issue" states. Five states—Arizona, Alaska, Vermont, West Virginia and Wyoming—do not require a license to carry a firearm either openly or concealed.

Thus, throughout most of the country, it is commonplace for law-abiding adults to carry handguns for self-defense. Licensed carry is not a regulatory or public safety gamble. In fact, since Texas passed its "shall issue" statute in 1995, over half the U.S. population has lived in states where non-discriminatory licensed carry laws are the norm.

The empirical data on licensed carry is extensive and the vast weight of the evidence is that non-discriminatory licensed carry laws have two results: (1) they generate statistically significant reductions in some types of violent crime; or (2) they have no statistically significant effect on violent crime. The empirical outlier is Professor John Donahue, who claims to have found a statistically significant *increase* in crime. *See* Carlisle E. Moody & Thomas B. Marvell, *The Debate on*

*Shall-Issue Laws*, 5 Econ. J. Watch 269 (2008) (review of all prior studies; the authors' original research finds that shall issue laws significantly reduce murder and burglary across all the adopting states); *National Research Council, Firearms and Violence: A Critical Review* (2005) (taking into account all prior literature and finding it impossible to draw strong conclusions from the existing literature on the causal impact); Task Force on Community Preventive Service, Centers for Disease Control, *First Reports Evaluating the Effectiveness of Strategies for Preventing Violence: Firearms Laws*, 52 Morbidity and Mortality Weekly Rep. 11 (Oct. 3, 2003) (review of multiple studies found insufficient evidence to establish a link between shall issue laws and violent outcomes); *but see* John Donohue, *The Impact of Right to Carry Laws and the NRC Report* (2014). *See also* Carlisle E. Moody et al., *The Impact of Right-to-Carry Laws on Crime: An Exercise in Replication*, 4 Rev. of Econ. & Finance 33 (2014) (replicating and checking Donohue's 2011 study and concluding "Once corrected for omitted variables, the most robust result" is that right to carry laws "significantly reduce murder . . . There is no robust, consistent evidence that RTC laws have any significant effect on other violent crimes, including assault.").

While social scientists may never achieve unanimity, the law enforcement agency data from "shall issue" jurisdictions demonstrate that licensed citizens are highly law-abiding, and at times they saves lives—sometimes a lot of lives. In

vindicating Appellees' constitutional rights, this Court need not fear the doomsday scenarios of Appellants' amici.

### B. Predictions about the supposed dangers of licensed carry have not been borne out.

The argument that shall issue laws lead inexorably to a massive, and dangerous, proliferation of firearms on the streets of America is refuted by a wealth of reliable empirical evidence and the experience of 42 states. Predictions of calamity ignore the fact that most of the citizens of the country already live in states in which actual or de facto "shall issue" laws exist.

Shall issue licensing schemes have become the norm in the United States over the past three decades—paralleling the national trend towards more scrupulous compliance with the Second Amendment. In many states, when the legislatures were considering carry license reform, opponents made alarmist predictions similar to the claims Appellants and their amici raise here.

In light of the overwhelming evidence to the contrary, these warnings are risible. For example, when Ohio's "shall issue" licensing system went into effect in 2004, there were fears that the law "would make public shoot-outs common and

fill the streets with blood."[6] Based on experience, some of the worriers have forthrightly admitted that they were wrong.[7]

John B. Holmes, then District Attorney of Harris County (which contains Houston) and Glenn White, former President of the Dallas Police Association, were strong opponents of licensed carry in Texas. Both changed their minds after watching how it worked, and seeing that their fears were incorrect. Holmes said, "I . . . [felt] that such legislation . . . present[ed] a clear and present danger to law-abiding citizens by placing more handguns on our streets. Boy was I wrong. Our experience in Harris County, and indeed statewide, has proven my initial fears absolutely groundless." As White observed, "All the horror stories I thought would come to pass didn't happen. . . . I think it's worked out well, and that says good things about the citizens who have permits. I'm a convert."[8]

Florida state legislator Ron Silver, "the leading opponent" of that state's groundbreaking "shall issue" law in 1987, said in November 1990, "There are lots

---

[6] Tom Skoch, *The Editor's Column: Facts Top Feelings, Change Views On Gun Issues*, The Morning J. (Feb. 6, 2011), http://www.morningjournal.com/article/MJ/20110206/NEWS/302069995 .

[7] *Id.*

[8] H. Sterling Burnett, *Texas Concealed Handgun Carriers: Law-abiding Public Benefactors*, Nat'l Center for Pol'y Analysis (June 2, 2000), http://www.ncpa.org/pub/ba324

of people, including myself, who thought things would be a lot worse as far as that particular situation [carry reform] is concerned. I'm happy to say they're not." John Fuller, general counsel for the Florida Sheriffs Association, stated: "I haven't seen where we have had any instance of persons with permits causing violent crimes, and I'm constantly on the lookout."[9]

The Metro Dade Police Department, out of concern with the risks of the new law, kept detailed records of every incident involving concealed weapon licensees from enactment of the new law in 1987 until August 31, 1992, when the rarity of problems caused the department to cease tracking such incidents.[10]

Significantly, no "shall issue" state has found it necessary to reinstitute a de facto ban on licensed carry. Neither have those 42 states found their regulatory schemes required "increasing the posting of armed officers, or clearing streets of all automobiles and restricting pedestrian movement except through checkpoints, tip[ping] society away from the freedom and openness we value," as the District forecasted. JA 125. It would be unusual for a policy that has worked so well for every adopting state to cause problems for the District of Columbia.

---

[9] Clayton E. Cramer & David B. Kopel, *"Shall Issue": The New Wave of Concealed Handgun Permit Laws*, 62 Tenn. L. Rev. 679, 693 (1995).

[10] *Id.* at 692-03.

## CONCLUSION

For the reasons stated above, the decision of the District Court should be affirmed.

Respectfully submitted,

MARK BRNOVICH
Attorney General of Arizona

/s/ Keith Miller
JOHN R. LOPEZ IV
Solicitor General
KEITH MILLER
Assistant Solicitor General
Arizona Attorney General's Office
1275W. Washington St.
Phoenix, Arizona 85007
Phone: (602) 542-5025
Fax: (602) 542-4085
August 12, 2016                    keith.miller@azag.gov

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT


## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

This *Amicus Curiae* brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 4,278 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This *Amicus Curiae* brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.


/s/ Keith Miller
KEITH MILLER
Attorney for *Amicus Curiae*
State of Arizona

Dated: August 12, 2016



## CERTIFICATE OF SERVICE

I certify that on August 12, electronic copies of this brief were served on all parties registered through the CM/ECF system.

/s/ Keith Miller
KEITH MILLER
Attorney for *Amicus Curiae*
State of Arizona

Dated: August 12, 2016