No. 16-7067

## In the
## United States Court of Appeals
## for the District of Columbia Circuit

MATTHEW GRACE, *ET AL.*,
*Plaintiffs-Appellees*,

v.

DISTRICT OF COLUMBIA, *ET AL.*,
*Defendants-Appellants.*

## On Appeal from the
## United States District Court for
## the District of Columbia

## Brief *Amicus Curiae* of Gun Owners of America, Inc., Gun Owners Foundation, U.S. Justice Foundation, Conservative Legal Defense and Education Fund, and Heller Foundation in Support of Plaintiffs-Appellees

MICHAEL CONNELLY
  U.S. JUSTICE FOUNDATION
  932 D Street, Suite 2
  Ramona, California 92065
Counsel for *Amicus Curiae*
  U.S. Justice Foundation

HERBERT W. TITUS*
ROBERT J. OLSON
WILLIAM J. OLSON
JEREMIAH L. MORGAN
JOHN S. MILES
  WILLIAM J. OLSON, P.C.
  370 Maple Avenue W., Suite 4
  Vienna, Virginia 22180-5615
  (703) 356-5070
Counsel for *Amici Curiae*

*Attorney of Record
August 12, 2016

# CERTIFICATE AS TO
## PARTIES, RULINGS, AND RELATED CASES

### Parties and *Amici*

Except for the following, all parties, intervenors, and *amici curiae* appearing before the district court below and this Court are listed in the Briefs for the parties: *amici curiae* Gun Owners of America, Inc., Gun Owners Foundation, U.S. Justice Foundation, Conservative Legal Defense and Education Fund, and Heller Foundation.

### Ruling under Review

References to the ruling at issue appear in the Appellants' Brief.

### Related Cases

Counsel adopt and incorporate by reference parties' statements with respect to related cases.

## CORPORATE DISCLOSURE STATEMENT

The *amici curiae* herein, Gun Owners of America, Inc., Gun Owners Foundation, U.S. Justice Foundation, Conservative Legal Defense and Education Fund, and Heller Foundation, through their undersigned counsel, submit this Corporate Disclosure Statement pursuant to Rules 26.1(b) and 29(c) of the Federal Rules of Appellate Procedure, and Rule 26.1 of the Rules of the United States Court of Appeals for the District of Columbia Circuit.

These *amici curiae* are non-stock, nonprofit corporations, none of which has any parent company, and no person or entity owns them or any part of them.

These *amici curiae* are represented herein by Herbert W. Titus, counsel of record, Robert J. Olson, William J. Olson, John S. Miles, and Jeremiah L. Morgan, of William J. Olson, P.C., 370 Maple Avenue West, Suite 4, Vienna, Virginia 22180-5615. Michael Connelly, U.S. Justice Foundation, 932 D Street, Suite 2, Ramona, California 92065, is co-counsel for *amicus curiae* U.S. Justice Foundation.

　　　　　　　　　　　*/s/ Herbert W. Titus*
　　　　　　　　　　　Herbert W. Titus

# TABLE OF CONTENTS

<u>Page</u>

Certificate as to Parties, Rulings, and Related Cases. . . . . . . . . . . . . . . . . i

Corporate Disclosure Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

Interest of *Amici Curiae*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT

I.   THE DISTRICT ERRONEOUSLY STAKED ITS ENTIRE CASE ON A FALSE
     HISTORICAL NARRATIVE. . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

     A.   The Second Amendment Protects a Broader Class of Persons. . . .  3

     B.   The Second Amendment Protects a Broader Range of
          Activities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

     C.   The Second Amendment Protects a Broader Class of Arms. . . . . 5

     D.   The Second Amendment Has Broader, Nationwide
          Application. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

     E.   The Second Amendment Restricts All Branches of
          Government. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

     F.   Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

II.  THIS COURT SHOULD REJECT THE DISTRICT OF COLUMBIA'S
     INVITATION TO BASE ITS DECISION ON  SOCIAL SCIENCE RATHER
     THAN CONSTITUTIONAL LAW. . . . . . . . . . . . . . . . . . . . . . . . 11

     A.   The Second Amendment Is Clearly Implicated. . . . . . . . . . . . 11

B. Judicial Balancing under <u>Heller II</u> Is Constitutionally Illegitimate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

C. The District's Attempt to Justify the Council's Action Falls Short. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

D. Balancing Tests Undermine Judicial Authority and Credibility. . . 16

E. The Corrupt Legacy of "The Brandeis Brief" Must Be Brought to an End. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

III. THE DISTRICT HAS STAKED ITS CASE ON UNCERTAIN PROGNOSTICATIONS, NOT PAST OR PRESENT FACTS. . . . . . . . . . . . . 24

A. The District Council Members Cannot Know the Future. . . . . . 26

B. Disarming Everyone on the Basis that Someone Might Commit a Crime Dehumanizes Gun Owners. . . . . . . . . . . . . 28

C. The District's Concealed Carry "Good Reason" Requirement Threatens Equal Protection of the Law. . . . . . . . . . . . . . . . . 29

D. It Is Impossible to Know the Extent to which Crime Prevention Actually Prevents Crime. . . . . . . . . . . . . . . . . . . 30

E. Crime Prevention Leads to False Negatives and False Positives. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

v

# TABLE OF AUTHORITIES

Page

**CONSTITUTION**
Amendment I. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
*Amendment II. . . . . . . . . . . . . . . 1, 3-5, 7, 9-11, 13, 15-16, 23, 28, 31-32

**STATUTES**
D.C. Code § 7-2509.11(1)(A). . . . . . . . . . . . . . . . . . . . . . . . . . 5

**CASES**
Brown v. Board of Education, 347 U.S. 483 (1954). . . . . . . . . . . . . . . . . 10
Caetano v. Mass., 577 U.S. ___, 136 S.Ct. 1027 (Mar. 21, 2016). . . . . . . 7
*District of Columbia v. Heller, 554 U.S. 570 (2008). . 3-6, 8-9, 13, 16-17, 31
Heller v. District of Columbia, 670 F.3d 1244 (D.C. Cir. 2011). . . . . . . . 11-14
Marbury v. Madison, 5 U.S. 137 (1803). . . . . . . . . . . . . . . 8, 11, 19, 24
McDonald v. City of Chicago, 561 U.S. 742 (2010). . . . . . . . . . . . . . . 8
Muller v. Oregon, 208 U.S. 412 (1908). . . . . . . . . . . . . . . . 20, 22-23
Plessy v. Ferguson, 163 U.S. 537 (1896). . . . . . . . . . . . . . . . . 1, 10
Robertson v. Baldwin, 165 U.S. 275 (1897). . . . . . . . . . . . . . . . . 1, 2
United States v. Masciandaro, 638 F.3d 458 (4th Cir. 2011). . . . . . . . . . . 32
United States v. Virginia, 518 U.S. 515 (1996). . . . . . . . . . . . . . . . 14
Whole Woman's Health v. Hellerstedt, 579 U.S. ___, 195 L.Ed.2d
    665 (2016). . . . . . . . . . . . . . . . . . . . . . . . . . . 13-14, 16-17

**MISCELLANEOUS**
A. Ashworth, L. Zedner, & P. Tomlin, eds., Prevention and the Limits
    of the Criminal Law (Oxford Press: 2013). . . . . . . . . . . . . . . . 27
L. Baker, Brandeis and Frankfurter (Harper and Roe: 1984). . . . . . . . . 21-22
Brief Amicus Curiae of Public Advocate of the United States, et al.,
    DeBoer v. Snyder, U.S. Court of Appeals for the Sixth Circuit
    (May 14, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . 18
F.V. Cahill, Jr., Judicial Legislation: A study in American legal theory
    (Ronald Press Co.: 1952). . . . . . . . . . . . . . . . . . . . . . . 19
G. Carey & J. McClellan, The Federalist (Liberty Fund: 2001). . . . . . . . . . 20

* Authorities upon which we chiefly rely are marked with asterisks.

David Cole, "The Difference Prevention Makes: Regulating Preventive Justice," Crim. L. & Phil. (Georgetown Univ. Law Center: 2014)............................. 27-28, 30-31

W.O. Douglas, <u>The Court Years</u> (Random House: 1980). ............. 17

1689 English Bill of Rights................................. 3-5, 7, 9

R.B. Ginsburg, "*Muller v. Oregon*: One Hundred Years Later," 45 WILLAMETTE L. REV. 359 (Mar. 30, 2009)................. 20, 23

E.D. Hirsch, Jr., <u>Validity in Interpretation</u> (Yale University Press: 1967).... 18

J.R. Lott, "Concealed Carry Permit Holders Across the United States: 2016," Crime Prevention Research Center..................... 15

M.T. Rooney, "Law as an Instrument of Social Policy — The Brandeis Theory," 22 ST. JOHN'S L. REV. 1 (Nov. 1947). ................ 22

A. Scalia and B. Garner, <u>Reading Law</u> (West: 2012)................. 8

J.G. Sutherland, <u>Statutes and Statutory Construction</u> (Callaghan and Co.: 1891)................................ 18

H. Titus, "Second Amendment: Rule by Law or Judges?" 8 LIBERTY U. L. REV. 577 (2014). ................................... 4

* Authorities upon which we chiefly rely are marked with asterisks.

**INTEREST OF *AMICI CURIAE***[1]

The *amici curiae* are nonprofit organizations, exempt from federal taxation under sections 501(c)(3) or 501(c)(4) of the Internal Revenue Code, and each is dedicated, *inter alia*, to the correct construction, interpretation, and application of the law.

**ARGUMENT**

**I.   THE DISTRICT ERRONEOUSLY STAKED ITS ENTIRE CASE ON A FALSE HISTORICAL NARRATIVE.**

Not once in their 59-page opening brief do the Appellants District of Columbia and the Metropolitan Police Chief Cathy Lanier ("the District") recite from, refer to, or otherwise apply the text of the Second Amendment to resolve this case.  Instead they have chosen to justify the District's "good reason" carry law as an atextual exception to the Second Amendment's unambiguous protections.  For that remarkable proposition, they rely solely upon the 1897 opinion of Robertson v. Baldwin, 165 U.S. 275 (1897), written by Justice Henry Billings Brown, whose major enduring judicial legacy is the now discredited

---

[1]  All parties have consented to the filing of this brief *amicus curiae*.  No party's counsel authored the brief in whole or in part.  No party or party's counsel contributed money that was intended to fund preparing or submitting the brief.  No person other than these *amici curiae*, their members or their counsel contributed money that was intended to fund preparing or submitting this brief.

"separate but equal" doctrine enshrined in <u>Plessy</u> v. <u>Ferguson</u>, 163 U.S. 537 (1896).

The District asserts that, according to Justice Brown, "[t]he Bill of Rights was crafted 'to embody certain guaranties and immunities which we had inherited from our English ancestors, and which had … been subject to certain well-recognized exceptions.'" D.C. Br. at 12. Adopting Justice Brown's view, the District wholeheartedly agrees that the Framers of the Bill of Rights had "'no intention of disregarding the exceptions, which continued to be recognized as if … formally expressed.'" *Id.*

From this starting point, the District launched into a historical account of laws enforced by "our English ancestors" against "carrying" firearms in public, beginning with the 1328 Statute of Northampton and extending to 1689, the year that "England's Parliament enacted a Declaration of Rights…." D.C. Br. at 12, 15-22. At that juncture, the District paused to announce triumphantly that the English Declaration that "Protestants 'may have arms for their defense suitable to their conditions, and as allowed by law'" is "'the predecessor to our Second Amendment.'" *Id.* at 22. The District then proceeded to declaim that the 1689 English Declaration embodies "[t]he *pre-existing* right' to bear arms codified in the Second Amendment…." *Id.* at 26. In short, the District argued that the

right protected by the Second Amendment is no different from the one protected by the 1689 English Bill of Rights.[2]

This most remarkable claim can be sustained only if the District can demonstrate that the English Declaration qualifies as a "well-recognized exception" to the much differently worded Second Amendment. The District makes no attempt to do so in its brief, and for good reason — the task is impossible in at least five respects.

## A.     The Second Amendment Protects a Broader Class of Persons.

First, the 1689 English guarantee secured the right only to "subjects which are Protestants," whereas the Second Amendment secures the right of "the People." And as the Supreme Court has reminded us, "'the people' … unambiguously refers to **all** members of the political community, **not** an unspecified **subset.**" District of Columbia v. Heller, 554 U.S. 570, 580 (2008) (emphasis added) ("Heller I"). To be sure, Heller I stated that "prohibitions on the possession of firearms by felons and the mentally ill [are] presumptively lawful." Heller I at 626. *See* D.C. Br. at 28. But that *dictum* must be read in

---

[2]  According to Justice Brown, "the right of the people to keep and bear arms (art. 2) is not infringed by laws prohibiting the carrying of concealed weapons," presumably because the right to carry was one of the hidden exceptions to the right to bear arms. Robertson at 281.

light of the <u>Heller I</u> statement with the "strong presumption that the Second Amendment right is exercised individually and **belongs** to **all** Americans." <u>Heller I</u>, 554 U.S. at 581 (emphasis added). A ban on felons possessing firearms is not based upon an unstated categorical "exception," indicating that the right secured by the Second Amendment does not extend to every American. Rather, it is based on the practice that the commission of certain acts carry with them the consequence of the loss of certain rights and privileges of citizenship, such as the right to vote, hold office, or sit on a jury. *See* H. Titus, "Second Amendment: Rule by Law or Judges?" 8 LIBERTY U. L. REV. 577, 602-03 (2014).

**B.     The Second Amendment Protects a Broader Range of Activities.**

Second, the English Declaration affirmed a singular right — to "**have** arms," whereas the Second Amendment affirms a two-fold right — "to **keep** and **bear** arms." Yet by applying its so-called "well-recognized exception" test, the District is able to miraculously shrink "keep and bear" into "have," concluding that "there is no broad, categorical 'right' to carry any time a gun is desired for self-defense...." D.C. Br. at 28. Therefore, the District insists that "the District's law does not implicate a protected right, [and] it must be upheld." *Id.* Q.E.D.! The District has, in effect, deleted "bear" from the Second

Amendment, in direct contradiction to that text. However, <u>Heller I</u> established, "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'" *Id.* at 584. *See also* Appellees' Br. at 13.

Not only has the District read the word "bear" out of the Second Amendment, it has done so at the expense of the purpose which the right to bear arms serves: "When used with 'arms'… the term has a meaning that refers to carrying for a particular purpose — confrontation … of being armed and ready for offensive or defensive action in a case of '"conflict with another person."'" <u>Heller I</u> at 584. In direct conflict with that principle, the D.C. "good reason" law would allow a person to carry a firearm only **after** — but **not before** — the weapon was needed for self-defense, by requiring a person to demonstrate "a special need for self-protection … supported by evidence of specific threats or previous attacks that demonstrate a special danger to the applicant's life." D.C. Code § 7-2509.11(1)(A). *See* Appellees' Br. at 39.

## C. The Second Amendment Protects a Broader Class of Arms.

Third, the English Declaration had three separate qualifications on "arms" — "[i] **for their defence** [ii] **suitable to their conditions** and [iii] **as allowed by law**" — whereas the Second Amendment protects "arms." While <u>Heller</u>

pronounces the virtue of the handgun in the home, the District denigrates that same firearm when carried outside the home. *See* D.C. Br. at 6. In the home, the handgun is tolerated because the "increased risk from a handgun in the home is largely borne by those who live in or visit that home." *Id.* at 38-39. Outside the home, however, the handgun allegedly poses a "higher risk for carnage[,] creat[ing] new potential for armed conflict, increasing the chances that … 'bar fights and road rage' will 'take on deadly implications,' [and] criminals will target carriers '*precisely because they possess handguns*….'" *Id.* at 39. *See also id.* at 45. Thus, the District urges this Court to accept handguns as a protected arm in the home, but otherwise to push them beyond the pale because "any increase in handgun carrying in the District's densely populated public areas would increase the risk of criminal violence and public harm." *Id.* at 9.

In <u>Heller</u>, the Supreme Court rejected the notion that circumstances determine whether a particular weapon is within the class of protected arms. Rather, it was for the people to decide whether a particular kind of firearm is "chosen by American society for [a] lawful purpose." <u>Heller I</u> at 628. Thus, the Court recently rejected a lower court decision upholding a Massachusetts law prohibiting the possession of stun guns on the ground that whether a stun gun was

a protected arm did not turn on whether the State of Massachusetts believed it to be "useful in warfare" and thus protected. *See* <u>Caetano</u> v. <u>Mass.</u>, 577 U.S. ___, 136 S.Ct. 1027 (2016). Concurring, Justice Alito explained:

> *Heller* recognized that militia members traditionally reported for duty **carrying** "the sorts of lawful weapons that they possessed at **home**," and that the Second Amendment therefore protects such weapons as a class, regardless of any particular weapon's suitability for military use. [*Id.* at 1032 (emphasis added).]

**D.     The Second Amendment Has Broader, Nationwide Application.**

Fourth, the English Declaration posited a right to "arms … suitable to their conditions," whereas the Second Amendment protects "arms." The latter word is unmodified — fixed, uniform, and universal. Yet the District would have this Court amend the Second Amendment case-by-case, depending upon the peculiar demographics of the nation's capital. Taking a page from the English Declaration that the right to have arms must be tailored "to **suit** local needs and values," the District chides U.S. District Court Judge Leon and the Appellees for taking an "absolutist view that the Constitution requires every jurisdiction in the nation — regardless of local needs and values — to allow anyone who meets threshold requirements to carry a handgun in populated public places." D.C. Brief at 7- 8. Instead, the District argues that the District of Columbia is special:

> Unlike any state, it is entirely urban and densely populated. Unlike any city, it is filled with thousands of high-ranking federal officials and international diplomats, and it hosts hundreds of heavily attended events each year, including political marches and protests. [*Id.* at 11.]

This type of argument was made by dissenting Justice Breyer in Heller I. *Id.* at 693-98 (Breyer, J., dissenting). It was rejected then; and it should be rejected now. *See* Appellees' Br. at 36.

The very notion that the Constitution means one thing in one place and circumstance, and another thing in another place and circumstance, is anathema to the very nature of a Constitution. *See* Marbury v. Madison, 5 U.S. 137, 177-78 (1803). *See also* A. Scalia and B. Garner, Reading Law, 403-410 (West: 2012). As a right of the People, the right to keep and bear arms is the same in the District (population density of 9,850 people per square mile) as in Grace, Idaho (total population of 915), because both groups of residents belong to the same political community — the United States of America. *See* McDonald v. City of Chicago, 561 U.S. 742, 783-87 (2010). *See also id.* at 838-58 (Thomas, J., concurring).

### E. The Second Amendment Restricts All Branches of Government.

Fifth, the English Declaration affirmed a right "as allowed by law," whereas the Second Amendment states that the right "shall not be infringed." The English right was permissive, existing at the discretion of the English Parliament; the right enshrined in the Second Amendment is obligatory, pre-existing even the federal Bill of Rights itself. Indeed, as even dissenting Justice Souter noted in oral argument in Heller, "the English Bill of Rights was a guarantee against the crown, and it did not preclude Parliament from passing a statute that would regulate and perhaps limit.... Here [speaking of the Second Amendment] there is some guarantee against what Congress can do."[3] Whereas the English Declaration denied power to the Crown and gave it to the Parliament, the Second Amendment denies power to all branches of government and confers it upon the People. The District ignores this textual distinction, promiscuously conducting a survey of English laws and customs, in heedless disregard of any constitutional reference point. D.C. Br. at 15-26.

---

[3] Heller I Oral Argument (Mar. 18, 2008), p. 17, ll. 4-10.

**F.  Conclusion.**

In sum, the District has built its Second Amendment analysis on Justice Henry Brown's view that the entire Bill of Rights is chock full of "well-recognized exceptions."[4]

> The object of the [fourteenth] amendment was undoubtedly to enforce the absolute equality of the two races before the law, **but** in the nature of things it could **not have been intended to abolish distinctions based upon color**.…  Laws … requiring …. their separation … have been generally, if not universally, recognized as within the competency of the state legislatures in the exercise of their **police power**.  [Plessy at 544. (emphasis added).]

It was precisely this unconstitutional philosophy that led to Justice Brown's invention of the now discredited "separate but equal" doctrine in Plessy.  *See* Brown v. Board of Education, 347 U.S. 483, 495 (1954) ("[T]he doctrine of 'separate but equal' has no place.  Separate educational facilities are **inherently unequal**." (Emphasis added.)).

By urging this Court to follow Justice Brown, the District would have it repeat the folly of manufacturing constitutional principle out of "unwritten exceptions" created by judges *ex nihilo* — quite the opposite of the task of judicial review to ensure that the legislative power does not transgress the

---

[4]  *See* D.C. Br. at 12.

Constitution as it is written, and not as a judge may desire it to be.  *See* Marbury

v. Madison, 5 U.S. at 176-77.

## II.  THIS COURT SHOULD REJECT THE DISTRICT OF COLUMBIA'S INVITATION TO BASE ITS DECISION ON SOCIAL SCIENCE RATHER THAN CONSTITUTIONAL LAW.

### A.  The Second Amendment Is Clearly Implicated.

The District urges this Court to resolve the present challenge based on the

first question of the test embraced in Heller v. District of Columbia, 670 F.3d

1244, 1252 (D.C. Cir. 2011) ("Heller II") — "whether a particular provision

impinges upon a right *protected by the Second Amendment*."  *See* D.C. Brief at

28 (emphasis original).  On that question, the District argues that "the District's

law does not implicate a protected right" and thus "must be upheld."  *Id*.

However, as detailed in Section I, *supra*, the District's historical analysis of the

English and American context of the Second Amendment is profoundly flawed

and cannot be relied upon.  Without a valid historical argument, the District must

lose on part one, as the District has offered this Court no textual analysis

whatsoever on which to base its decision.

Viewed textually, this challenge presents a simple case.  It was brought by

a member of "the People" asserting his right to "bear arms" in public.  The

District does not dispute that the plaintiffs are part of "the People," to whom the right is secured, and does not contend that they are subject to any disqualification, such as having been convicted of a felony. The District does not contest that the right to "carry" correlates to the right to "bear," or that firearms sought to be carried constitute "arms." The District asserts no proprietary control over the public locations where the arms would be carried. Thus, the Second Amendment is clearly, and profoundly, implicated — and, indeed, impermissibly "infringed." This textual analysis should mark both the beginning and the end of the Court's analysis, but unfortunately under Heller II, it does not. The second part of the Heller II test, if applied here as the District urges, would lead this Court into error.

**B.      Judicial Balancing under Heller II Is Constitutionally Illegitimate.**

Remarkably, even though the Supreme Court in Heller I denounced judicial interest balancing, this Court in Heller II adopted a two-step approach which expressly relies on judicial interest balancing: "We ask first whether a particular provision impinges upon a right protected by the Second Amendment; if it does, then we go on to determine whether the provision passes muster under the **appropriate level of constitutional scrutiny**." Heller II at 1252 (emphasis

added).  With respect to the appropriate level of scrutiny, the Court claimed that

the Supreme Court "leaves open the question what level of scrutiny we are to

apply to laws regulating firearms."  <u>Heller II</u> at 1256.  The <u>Heller II</u> panel

imported the interpretative baggage[5] of First Amendment jurisprudence,

explaining "[a]s with the First Amendment, the level of scrutiny applicable under

the Second Amendment surely 'depends on the nature of the conduct being

regulated and the degree to which the challenged law burdens the right.'"  <u>Heller</u>

<u>II</u> at 1257.  There certainly is no warrant for any such balancing tests to be

applied to a Second Amendment challenge, since the Supreme Court specifically

rejected Justice Breyer's urging that such tests be applied in <u>Heller I</u>.  In

response, Justice Scalia's opinion for the Court not only rejected, but derided

such tests as "judge-empowering."  <u>Heller I</u>, 554 U.S. at 634, 719.

Recently, Justice Thomas exposed the legal charade that lies hidden in the

Court's use of balancing tests:

> [T]he label the Court affixes to its **level of scrutiny** in assessing
> whether the government can restrict a given right — be it "rational
> basis," intermediate, strict, or something else — is increasingly a

---

[5]  At oral argument in <u>Heller I</u>, Chief Justice Roberts questioned the
application of balancing tests to the Second Amendment, describing such tests as
"baggage that the First Amendment picked up."  <u>Heller I</u> <u>Oral Argument</u> (Mar.
18, 2008), p. 44, ll. 20-21.

> **meaningless formalism**. As the Court applies whatever standard it
> likes to any given case, nothing but **empty words** separates our
> constitutional decisions from **judicial fiat**. [Whole Woman's Health
> v. Hellerstedt, 579 U.S. ___, 195 L.Ed.2d 665, 705 (2016)
> (Thomas, J., dissenting) (emphasis added).]

*See also* United States v. Virginia, 518 U.S. 515, 570 (1996) (Scalia, J.

dissenting), where Justice Scalia described balancing tests as "made-up tests" to

"displace longstanding national traditions as the primary determinant of what the

Constitution means...."

## C.    The District's Attempt to Justify the Council's Action Falls Short.

The District embraces balancing, arguing that the statute "is likely to pass

intermediate scrutiny," primarily because "[t]he Council's judgment was

supported by more than the substantial evidence needed to survive intermediate

scrutiny...." D.C. Brief at 9, 29-53. The District asserts that the second test of

Heller II is met because "the 'good reason' standard will "help prevent crime and

promote public safety." *Id*. at 42. Yet the District admits that Professor John

Donohue III, the author of a 2014 Stanford University study on which the

District relies, himself concedes that "'it is **not** possible to determine that there is

a **causal link** between the passage of right-to-carry laws and crime rates.'" D.C.

Brief at 44 (emphasis added). Despite the absence of any evidence of causality,

the District urges that it should be allowed to abridge Second Amendment rights because "'the best statistical models **suggest**[] that right-to-carry laws are **associated with** substantially higher rates of aggravated [crimes].'"  D.C. Brief at 42-43 (emphasis added).  In relying on statistical models rather than data, and correlation rather than causation, the District reveals the inherent weaknesses of the premise for the Council's action.[6]

However, the District's citation to social science literature is irrelevant, for neither that study, nor any other such study, would help this Court resolve the constitutional issue presented in this case.  The issue is not whether the Council had or reasonably believed it had "good reason" to infringe Plaintiffs' Second Amendment rights by effectively barring concealed carry.  The question is whether the Second Amendment protects the right to concealed carry irrespective of whether Professor Donohue, the District, or this Court believes that right is reasonable or not.

---

[6]  If the scope of constitutional rights is to be defined by the social science literature, why should this Court not act based on the most recent such study, which demonstrates that, from 2007-2015, the percentage of adults with concealed carry permits increased 190 percent, while the murder rate fell from 5.6 to 4.7 per 100,000 (preliminary estimates)?  *See* J.R. Lott, "Concealed Carry Permit Holders Across the United States: 2016," Crime Prevention Research Center, http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2814691.

**D.      Balancing Tests Undermine Judicial Authority and Credibility.**

The District began its discussion of the English antecedents of the Second Amendment, advancing the proposition from <u>Heller I</u> that "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them."[7]  Nevertheless, it subsequently urged the Court to sustain the challenged legislation because the Council had good reason for imposing its "good reason" requirement (D.C. Brief at 42-45), revealing that it does not genuinely believe that the Second Amendment has a fixed meaning that cannot be overridden by what may seem reasonable to modern lawmakers and judges.

Justice Thomas recently explained the limitations on the judicial function in defining constitutional rights as follows:  "[a] law either infringes a constitutional right, or not; there is no room for the judiciary to invent tolerable degrees of encroachment."  <u>Whole Woman's Health</u>, 195 L.Ed.2d at 708 (Thomas, J., dissenting).  Yet, judges who disfavor Second Amendment rights have continued to use atextual balancing tests to rationalize infringements based on ephemeral "authorities" drawn not from law, but from social science.  These judges care

---

[7]  <u>Heller I</u>, 554 U.S. at 634-35.

not one whit that <u>Heller I</u> banned use of such balancing tests in the area of the

Second Amendment where:

> [t]he very enumeration of the right takes out of the hands of government — even the Third Branch of Government — the power to decide on a case-by-case basis whether the right is *really worth* insisting upon.  A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all…. Like the First, it is the very *product* of **interest balancing by the people**…."  [<u>Heller I</u>, 554 U.S. at 634 (emphasis added).]

The American people are no longer deceived by judges[8] whose high-sounding words are designed to give the appearance of legal reasoning, while undermining the constitutional rights they claim to be supporting.[9]  As Justice Thomas urged:  "The Court should abandon the **pretense** that anything other than **policy preferences** underlies its balancing of constitutional rights and interests in any given case."  <u>Whole Woman's Health</u> at 707 (emphasis added).

---

[8]  Chief Justice Charles Evans Hughes once admitted in private, "At the constitutional level where we work, ninety percent of any decision is emotional. The rational part of us supplies the reasons for supporting our predilections." W.O. Douglas, <u>The Court Years</u> (Random House: 1980), at 8.

[9]  According to a Gallup poll, public opinion of the U.S. Supreme Court has dropped to 42 percent — its lowest point since measurement began in June 2005.  *See* Gallup, <u>U.S. Supreme Court Job Approval Rating Ties Record Low</u> (July 29, 2016).

The search for the "authorial intent"[10] of the Founders has been supplanted

by the personal policy preferences of judges,[11] tempered only by their ability to

cite either some testimony in the record, or studies by economists, psychologists,

sociologists, or other academics. So-called "experts" with whom the judge

agrees are deemed reliable, and experts who adopt the opposite view are deemed

to be not credible or not persuasive.[12] The standard to resolve such challenges is

---

[10] *See* E.D. Hirsch, Jr., <u>Validity in Interpretation</u> (Yale University Press: 1967) (Hirsch rejects the notion that "the meaning of a law is what the present judges say the meaning is" (at viii) and asserts the earlier consensus view that "a text means what its author meant" (at 1).). *See also* J.G. Sutherland, <u>Statutes and Statutory Construction</u> (Callaghan and Co.: 1891) at 311 ("It is the intent of the law that is to be ascertained, and the courts do not substitute their views of what is just or expedient….").

[11] Increasingly, Americans believe that justices decide cases based on personal opinion rather than principle. When asked "do you think the current U.S. Supreme Court justices decide their cases based on legal analysis without regard to their own personal or political views, or do you think they sometimes let their own personal or political views influence their decisions," 75 percent responded "Personal, political views," while only 16 percent responded "Just legal analysis." CBS News/New York Times Poll, June 10-14, 2015. http://www.pollingreport.com/court.htm.

[12] For a discussion of how one district judge's personal views appeared to lead him to find witnesses supporting his view fully credible, and witnesses opposing his view to be "unbelievable and not worthy of serious consideration," *see* Brief *Amicus Curiae* of Public Advocate of the United States, *et al.,* <u>DeBoer</u> v. <u>Snyder</u>, U.S. Court of Appeals for the Sixth Circuit (May 14, 2014) at 5-14. http://www.lawandfreedom.com/site/constitutional/DeBoer%20 Public%20Advocate%20amicus%20brief.pdf.

no longer the constitutional text, but the thinly veiled policy preferences and prejudices of the federal judiciary.

**E.    The Corrupt Legacy of "The Brandeis Brief" Must Be Brought to an End.**

At the beginning of our republic, Chief Justice John Marshall described the primary purpose of a written constitution as being not only to limit the exercise of legislative power, but also to curb the powers of the judiciary.  Thus, he wrote that "the framers of the Constitution contemplated that instrument, as a rule for the government of courts, as well as of the legislature."  Marbury v. Madison, 5 U.S. at 179-80.  For the second half of our nation's life, the understanding that the limits on government imposed by constitutional text are fixed has been supplanted by the notion that the text's meaning should evolve.  *See, e.g.*, F.V. Cahill, Jr., Judicial Legislation: A study in American legal theory at 3-31 (Ronald Press Co.: 1952).  But if the meaning of the text is severed from the authorial intent of the Founders, whose will is to be substituted?  That of judges, of course.

It was once thought that the judiciary "will always be the least dangerous to the political rights of the Constitution" because, as Alexander Hamilton argued, judges "have neither FORCE nor WILL, but merely judgment."

Federalist No. 78, G. Carey & J. McClellan, <u>The Federalist</u> (Liberty Fund: 2001), at 402.  But in applying "judge-empowering" balancing tests of their own making, unelected judges have freed themselves from the constraint of the constitutional text, and have become not the least, but perhaps the greatest threat to individual liberties.

To retain at least the tacit support of the People to accept judicial decisions, judges must find some authorities to cite in decisions, so as to obscure the appearance that they have usurped the People's right to define the rules by which even they are to be governed.  In the absence of supportive legal authorities, judges have come to rely on non-legal sources of data and opinion, always reserving the editorial function of selection of judicial "reasonableness." Most commentators trace this pernicious development to a non-legal Supreme Court brief filed over a century ago in <u>Muller</u> v. <u>Oregon</u>, 208 U.S. 412 (1908), by Louis D. Brandeis, before his appointment to the High Court.

In 1903, the Oregon state legislature enacted a law forbidding the employment of women in laundries, *inter alia*, for more than 10 hours in any one day.[13]  The owner of a laundry was fined $10 for requiring a female employee to

---

[13]  *See generally* R.B. Ginsburg, "*Muller v. Oregon*:  One Hundred Years Later," 45 W<small>ILLAMETTE</small> L. R<small>EV</small>. 359 (Mar. 30, 2009), https://willamette.edu/

work more than 10 hours on September 4, 1905.  *See* L. Baker, <u>Brandeis and Frankfurter</u> (Harper and Roe: 1984), at 9.  Not trusting the Oregon Attorney General, leaders of the National Consumers' League, an organization dedicated to improving working conditions, approached Boston lawyer Louis B. Brandeis to argue the case.  *Id*. at 8, 11.  Brandeis agreed, if he was invited by the Oregon attorney to represent the state, which invitation was forthcoming.  Brandeis submitted two briefs to the Supreme Court — one 24-page legal brief citing law and precedents, and a second 120-page brief which contained an eclectic collection of letters, reports and statements supportive of the proposition that limiting working hours improved woman's health.[14]  That second brief was based on material hastily assembled, largely from sources found at the Columbia University and New York Public Libraries.  Counsel for Mr. Muller filed no such policy brief, confining his arguments to matters of law.  *Id*. at 13, 15.

Justice Felix Frankfurther later admitted that the second Brandeis brief had "very little to do with what are called questions of law."  <u>Brandeis and</u>

_____

law/resources/journals/review/pdf/Volume%2045/WLR45-3_Justice_Ginsburg.pdf.

[14]  The non-legal brief was not joined in by H.B. Adams, the Attorney General of Oregon, who co-signed only the legal brief.  https://louisville.edu/law/ library/special-collections/the-louis-d.-brandeis-collection/mullertoc.pdf

<u>Frankfurter</u> at 15.  But the life's work of Louis Brandeis was, as one law review article described it, to make "Law as an Instrument of Social Policy."[15]  With the filing of that brief, "a new era had begun in constitutional law…"  *Id*. at 14.

Mr. Brandeis' non-legal brief drew significant attention in the Court's unanimous opinion, written by Justice David Josiah Brewer.  Although Justice Brewer sought to distinguish between consideration of the policy brief and resolution of the Constitutional question, his opinion reveals that they were one and the same.

> It may not be amiss, in the present case, **before** examining the **constitutional question**, to notice the course of legislation as well as expressions of **opinion from other than judicial sources**.  In the brief filed by Mr. Louis D. Brandeis, for the defendant in error, is a very copious collection of all these matters, an epitome of which is found in the margin.…[16]
>
> **Constitutional questions**, it is true, are not settled by even a consensus of present public opinion, for it is the peculiar value of a written constitution that it places in **unchanging** form limitations upon legislative action, and thus gives a **permanence** and **stability** to popular government which otherwise would be lacking.  At the same time, when a **question of fact** is debated and debatable, and the extent to which a special **constitutional limitation** goes is

---

[15]  *See* M.T. Rooney, "Law as an Instrument of Social Policy — The Brandeis Theory," 22 St. John's L. Rev. 1 (Nov. 1947), http://scholarship.law.stjohns.edu/cgi/viewcontent.cgi?article=5045&context=lawreview.

[16]  The Court's opinion included a page-long footnote summarizing the contents of the non-legal brief.

> affected by the truth in respect to that fact, a widespread and long continued belief concerning it is worthy of consideration. We take **judicial cognizance** of all matters of **general knowledge**. [Muller v. Oregon, 208 U.S. at 419-21 (emphasis added).]

Much of the social science "information" submitted by Brandeis and seemingly accepted by the Supreme Court, since has been called into serious question, if not ridicule.[17]  This should be expected, since when social science information is presented in briefs to an appellate court, there are no rules of evidence, no adversarial process, and no fixed point of reference.  The judge may freely select and rely on those authorities which seem reasonable to him — *i.e.*, predictably, those which conform to his personal views.

The District asks this Court to define the scope of the Second Amendment ratified in 1791 based on the meaning of an English Declaration from 1689, and based on the reasonableness of the Council's reliance on a speculative study published in 2014.  If the judges of this Court, who have sworn an oath to the United States Constitution, substitute the views of supposed experts, the views of the Council, or their own views for the "authorial intent" of the Founders, they have abandoned the premise upon which judicial review is based — "that courts,

---

[17] *See, e.g.*, Ginsburg at 363 (In the Brandeis Brief, "[o]ne source, for example, reported that, 'in the blood of women, so also in their muscles, there is more water than in those of men.'").

as well as other departments, are bound by that instrument" as it is written.

Marbury at 181.

## III. THE DISTRICT HAS STAKED ITS CASE ON UNCERTAIN PROGNOSTICATIONS, NOT PAST OR PRESENT FACTS.

The District bombards this Court with "common-sense" observations (D.C. Br. at 36-39) and social science studies (*id.* at 42-47), chronicling the future dangers attendant upon the carrying of firearms outside the home. On this record, the District claims that "[t]he Council **substantiated** its finding that the 'good reason' standard **will** help prevent crime and promote public safety." *Id.* at 42 (emphasis added). Thus, the District insists that its ordinance "survives constitutional scrutiny because the Council's finding that the 'good reason' is **necessary** to prevent crime and promote public safety is supported by substantial evidence and entitled to deference." *Id.* at 1 (emphasis added).

In support of this claim, the Council acknowledged that it "primarily relied" on a single study dated 2014, led by Stanford University Professor John

Donohue III,[18] "an economist, legal scholar, and leading empirical researcher, who explained that":

> "[t]he totality of the evidence based on educated judgments about the best statistical models **suggests** that right-to-carry laws always are **associated** with substantially higher rates of aggravated assault, rape, robbery, and murder." [*Id.* at 42 (emphasis added).]

However, common sense would tell us that a **suggestion** that right-to-carry laws should be **associated** with an increase in violent crime can hardly **substantiate** the Council's finding that its "good reason" ordinance **is necessary** to prevent crime or contribute to public safety. To the contrary, common sense should caution against a cause and effect assumption when it is based solely on a "guilt-by-association" line of reasoning.

Additionally, the District's case is not helped by the several cited studies that only question the validity of other studies that "more guns" results in "less crime." *See id.* at 43-47. Even if believed, such studies at best only cast doubt on the proposition that permitting carrying guns outside the home deters crime. Of course, it is one thing to allegedly disprove a hypothesis, and quite another to

---

[18] Professor John Donohue III has attained a degree of notoriety for his economic analysis which attributes reductions in crime to legalized abortion. At the same time he appears to disagree with the studies showing "more guns, less crime," he posits "more abortions, less crime." http://pricetheory.uchicago.edu/levitt/Papers/DonohueLevitt TheImpactOfLegalized2001.pdf.

prove the opposite hypothesis. As Appellees point out in their brief, "even if laws that more freely grant permits have not been shown to decrease crime, there is no persuasive evidence that they *increase* crime — and that is the proposition [the District] must support." *See* Appellees' Br. at 49.

Nevertheless, ignoring these obvious weaknesses in its case, the District's brief concocts the conclusion that:

> **If** an upswing in public carrying is likely to increase the quantity and lethality of violent crime, escalate conflicts that would otherwise dissipate, and increase the chances that innocent bystanders will be shot, it is **reasonable** to conclude that limiting public carrying to those with a specific self-defense need **will reduce** these harms. [*Id.* at 50 (emphasis added).]

With this one sentence replete with assumptions, the District invites this Court to "defer to the Council's predictive judgment." *Id.* at 41. It is an invitation that this Court should decline.

### A. The District Council Members Cannot Know the Future.

The Council's "good reason" ordinance is based upon what might happen in the future, the purpose being to prevent crime and to promote public safety, rather than to punish what anyone has done in the past. D.C. Br. at 1, 3-4, 6-7, 9-11. Proponents of such preventive measures argue that there really is **no practical difference** between a criminal prosecution and a preventive

proceeding,[19] in that both "depend on proof that is ultimately probabilistic, and therefore inescapably involves some risk of error."[20]  That is essentially the same argument that was made in the dystopian movie "Minority Report," "where 'PreCrime,' a specialized police department, apprehends [or even kills] criminals" before the criminals have a chance to commit the crime "based on foreknowledge provided by three psychics called 'precogs.'"[21]

One opponent of such preventive justice policies, David Cole of the Georgetown University Law Center, urges caution on the ground that "imposition of coercive sanctions on individuals for preventive ends are different in substantial degree and sometimes in kind from those raised by criminalizing and punishing past acts …."  Cole at 4.  He maintains that "however difficult it may be under some circumstances to determine who did what in the past, it is **not just difficult, but impossible**, to predict with anything like an equivalent degree of certainty what an individual will do in the future, at least where free

---

[19]  *See* F. Schauer, "The Ubiquity of Prevention," in A. Ashworth, L. Zedner, & P. Tomlin, eds., Prevention and the Limits of the Criminal Law at 10-22 (Oxford Press: 2013).

[20]  David Cole, "The Difference Prevention Makes: Regulating Preventive Justice," Crim. L. & Phil. (Georgetown Univ. Law Center: 2014) http://dx.doi.org/10.1007/s11572-013-9289-7 ("Cole").

[21]  *See* http://www.imdb.com/title/tt0181689/.

will is involved...." *Id*. (emphasis added). Additionally, Cole notes, "[t]he impossibility of predicting the future means that when we impose sanctions based on future concerns rather than past acts, we inevitably accept a lower standard of proof and a far greater risk of error." *Id*.

Just because the D.C. Council members fashion themselves as predictors of an uncertain future does not mean this Court should accept their prophesies as true and, on that basis, permit the infringement of the Second Amendment rights of the District's residents. The Second Amendment does not allow giving deference to such prognostications.

## B. Disarming Everyone on the Basis that Someone Might Commit a Crime Dehumanizes Gun Owners.

Preventive measures also have a deleterious effect upon the relationship between an individual citizen and the government. Again, Cole contends: "[P]unishing an individual for past acts voluntarily or intentionally undertaken does not disrespect her autonomy and free will." *Id*. In other words, treating a person as an individual with the capacity of making right and wrong choices affirms one's innate moral nature, as one created in the image of the Creator, and thus affirms the worth of each individual human being. Not only should this

principle of individual fault be respected, but also it lies at the very foundation of personal liberty.

The Council ordinance dehumanizes gun owners as if they are controlled by their guns, and not the other way around. Our nation and laws are based on just the opposite proposition that "all men are created equal" and "endowed by their Creator with certain inalienable rights," among which are "life, liberty and the pursuit of happiness." The "good reason" ordinance rests flatly upon an alien philosophy that persons who have done nothing wrong in the past may nonetheless be denied their liberties because they or others may pose a danger to themselves or others.

### C. The District's Concealed Carry "Good Reason" Requirement Threatens Equal Protection of the Law.

Because the statute at issue is specific to firearms, the statute treats gun owners as second-class citizens, subject to special rules that owners of other "dangerous" weapons — such as knives,[22] axes,[23] baseball bats, hammers, and even automobiles[24] — do not face. Laws that single out gun owners stereotype

---

[22] http://www.cnn.com/2016/07/25/world/japan-knife-attack-deaths/.

[23] http://www.cnn.com/2016/07/18/world/germany-train-stabbing/.

[24] http://www.cnn.com/2016/07/16/europe/france-attack-on-nice-isis/.

them, generalizing about the kind of persons they are, rather than treating them as individuals equal with the rest of mankind. Group-based generalizations violate principles of equal treatment, such as the war time rounding up of Japanese-Americans during World War II. Prophylactic measures taken based upon what a class of human beings — here gun owners — might do violates the "strong norm that people must be judged by their acts, not their status." Cole at 5.

**D.      It Is Impossible to Know the Extent to which Crime Prevention Actually Prevents Crime.**

Cole also argues there is "no natural check on enforcement measures [that] focus on preventing harms":

> If we adopt measures designed to prevent murders in the future, we never can know whether our initiatives have in fact prevented murders that would have happened, or whether murders would not have occurred even if we had done nothing. [*Id.*]

Typically, those who favor preventive justice adopt the view that it is "'better safe than sorry' [which] leads almost inevitably to overinvestment in prevention in times of fear." *Id*. at 6. Given the inherent uncertainty of the future, preventive measures are never enough. Indeed, every time there is a

mass shooting in America, the anti-gun lobby insists on ever stricter controls even though the controls sought would not have prevented the incident.

**E.    Crime Prevention Leads to False Negatives and False Positives.**

Finally, Cole stresses, "it is not just that we cannot know the efficacy of prevention, our assessments are likely to be systematically skewed" (*id*.):

> If we err on the side of assuming an individual does not warrant preventive measures, and he commits a terrorist act, the error is vivid and visible, – think of Willie Horton.  If, by contrast, we err on the side of caution and unnecessarily impose preventive measures on an individual, who would have done no harm had we left him alone, the "false positive" error is invisible and ultimately unknowable.  Anyone confronting such an imbalance is likely to err on the side of caution, thus leading to a high incidence of "false positives."  [*Id*. at 6.]

Summarizing this point, Cole writes that "the nature of prevention is such that there is an inevitable imbalance between false negatives – where we wrongly conclude that an individual poses no terrorist threat, and he goes on to commit a terrorist threat – and false positives where we wrongly conclude that an individual poses a terrorist threat but is in fact innocuous."  *Id*. at 5-6.

This final point is illustrated by Fourth Circuit Judge J. Harvie Wilkinson, who refused to address the question whether the <u>Heller</u> Second Amendment right extended outside the home, rationalizing that he and a fellow jurist did "not wish

to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights." *See* United States v. Masciandaro, 638 F.3d 458, 475 (4th Cir. 2011) (Wilkinson, J., concurring). Instead, Judge Wilkinson would sacrifice the Second Amendment rights of others to protect the Court from bearing any possible culpability for another's misuse of a firearm.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

*/s/ Herbert W. Titus*

_____

MICHAEL CONNELLY
  U.S. JUSTICE FOUNDATION
  932 D Street, Suite 2
  Ramona, California 92065
Counsel for *Amicus Curiae*
  U.S. Justice Foundation

HERBERT W. TITUS*
ROBERT J. OLSON
WILLIAM J. OLSON
JEREMIAH L. MORGAN
JOHN S. MILES
  WILLIAM J. OLSON, P.C.
  370 Maple Avenue West, Suite 4
  Vienna, Virginia 22180-5615
  (703) 356-5070
Counsel for *Amici Curiae*

*Attorney of record
August 12, 2016

# CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

IT IS HEREBY CERTIFIED:

1.     That the foregoing Brief *Amicus Curiae* of Gun Owners of America, Inc., *et al.*, in Support of Plaintiffs-Appellees and Affirmance complies with the type-volume limitation of Rule 32(a)(7)(B), Federal Rules of Appellate Procedure, because this brief contains 6,951 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using WordPerfect version 14.0.0.756 in 14-point CG Times.

*/s/ Herbert W. Titus*
_____
Herbert W. Titus
Attorney for *Amici Curiae*

Dated: August 12, 2016

# CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing Brief *Amicus Curiae* of Gun Owners of America, Inc., *et al.*, in Support of Plaintiffs-Appellees and Affirmance, was made, this 12th day of August 2016, by the Court's Case Management/Electronic Case Files system upon the attorneys for the parties.

*/s/ Herbert W. Titus*

_____

Herbert W. Titus
Attorney for *Amici Curiae*