**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————

MATTHEW GRACE, *et al.*,
*Plaintiffs-Appellees*,

v.

DISTRICT OF COLUMBIA, *et al.*,
*Defendants-Appellants*.

———————————

**On Appeal from an Order of the United States District Court
for the District of Columbia
Case No. 1:15-cv-02234-RJL (Judge Richard J. Leon)**

———————————

**BRIEF OF *AMICI CURIAE* WESTERN STATES SHERIFFS' ASSOCIATION,
INTERNATIONAL LAW ENFORCEMENT EDUCATORS AND TRAINERS
ASSOCIATION, (LISTING CONTINUES ON INSIDE COVER)
IN SUPPORT OF APPELLEES AND IN SUPPORT OF AFFIRMANCE**

———————————

C. D. MICHEL
MICHEL & ASSOCIATES, P.C.
180 EAST OCEAN BLVD., SUITE 200
LONG BEACH, CA 90802
(562) 216-4444
cmichel@michellawyers.com

*Counsel for CRPA Foundation*

August 12, 2016

DAN M. PETERSON
DAN M. PETERSON PLLC
3925 CHAIN BRIDGE ROAD, SUITE 403
FAIRFAX, VA 22030
(703) 352-7276
dan@danpetersonlaw.com

*Counsel for Amici Curiae*

LIST OF *AMICI* (CONTINUED)

**LAW ENFORCEMENT LEGAL DEFENSE FUND,**
**LAW ENFORCEMENT ACTION NETWORK,**
**CRPA FOUNDATION,**
**COLORADO POLICE PROTECTIVE ASSOCIATION,**
**INTERNATIONAL ASSOCIATION OF LAW ENFORCEMENT FIREARMS**
**INSTRUCTORS, AND**
**LAW ENFORCEMENT ASSOCIATION OF AMERICA**

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Western States Sheriffs' Association is a nonprofit organization which has no parent corporation. It issues no stock, and therefore no publicly held company owns 10% or more of its stock.

International Law Enforcement Educators and Trainers Association is a corporation which has no parent corporation. It issues no stock, and therefore no publicly held company owns 10% or more of its stock.

Law Enforcement Legal Defense Fund is a nonprofit organization which has no parent corporation. It issues no stock, and therefore no publicly held company owns 10% or more of its stock.

Law Enforcement Action Network is a nonprofit organization which has no parent corporation. It issues no stock, and therefore no publicly held company owns 10% or more of its stock.

CRPA Foundation is a nonprofit organization which has no parent corporation. It issues no stock, and therefore no publicly held company owns 10% or more of its stock.

Colorado Police Protective Association is a nonprofit organization which has no parent corporation. It issues no stock, and therefore no publicly held company

owns 10% or more of its stock.

International Association of Law Enforcement Firearms Instructors is a nonprofit organization which has no parent corporation. It issues no stock, and therefore no publicly held company owns 10% or more of its stock.

Law Enforcement Alliance of America is a nonprofit organization which has no parent corporation. It issues no stock, and therefore no publicly held company owns 10% or more of its stock.

/s/ Dan M. Peterson
Dan M. Peterson

Counsel for *Amici Curiae*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## Parties and *Amici*

All parties, intervenors, and *amici* appearing in this Court are listed in the Briefs for Appellants and Appellees, except for the following:

Western States Sheriffs' Association, International Law Enforcement Educators and Trainers Association, Law Enforcement Legal Defense Fund, Law Enforcement Action Network, CRPA Foundation, Colorado Police Protective Association, International Association of Law Enforcement Firearms Instructors, and Law Enforcement Alliance of America;

Gun Owners of America, Inc., Gun Owners Foundation, U.S. Justice Foundation, Heller Foundation, and Conservative Legal Defense and Education Fund;

States of Arizona, Alabama, Arkansas, Indiana, Missouri, Montana, Nevada, Ohio, Oklahoma, South Carolina, South Dakota, Texas, Utah, West Virginia, Wisconsin, and Wyoming.

## Rulings Under Review

References to the rulings at issue appear in the Briefs for Appellants and Appellees.

## <u>Related Cases</u>

*Amici* adopt the statement of related cases from the Brief of Appellees.

Counsel certifies that a separate *amicus curiae* brief is necessary for the reasons stated in the *Interest of Amici Curiae*, below.

<u>/s/ Dan M. Peterson</u>
Dan M. Peterson

Counsel for *Amici Curiae*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................i

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ........... iii

TABLE OF AUTHORITIES ................................................................. vii

INTEREST OF AMICI CURIAE............................................................1

SUMMARY OF ARGUMENT ...............................................................5

ARGUMENT ....................................................................................8

I.  THE EXPERIENCE OF 42 STATES SHOWS THAT
    LICENSED CONCEALED CARRY DOES NOT INCREASE
    CRIME OR PUBLIC DANGER ......................................................8

    A.  Fairly administered, licensed concealed carry is the norm nationally...........9

    B.  Predictions about the supposed dangers of licensed carry
        have been proven false...................................................................11

II.  LAW ENFORCEMENT PROFESSIONALS OF ALL RANKS
     STRONGLY SUPPORT LICENSED CONCEALED CARRY......................14

III. THE DISTRICT'S LAW WILL DO NOTHING TO STEM VIOLENCE,
     WHILE DEPRIVING LAW-ABIDING CITIZENS OF THEIR SECOND
     AMENDMENT RIGHT TO SELF-DEFENSE ................................17

    A.  Individuals with concealed carry permits are extremely law abiding ..........17

    B.  Firearms registrants in the District, the pool from which concealed carry
        licensees are drawn, are exceptionally law abiding......................................21

    C.  Licensed carry reduces crime.......................................................26

IV. LICENSED CARRY HAS PREVENTED MASSACRES .............................29

CONCLUSION ........................................................................................33

CERTIFICATE OF COMPLIANCE........................................................35

CERTIFICATE OF SERVICE ................................................................36

# TABLE OF AUTHORITIES

**CASES**                                                                    **Page**

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ..........................2, 33

*Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015)...............25

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ..........................2, 33

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ...................................30

*People v. Aguilar*, 2 N.E.3d 321 (Ill. 2013)..............................................30

*State v. Rosenthal*, 55 A. 610 (Vt. 1903) ................................................10

## CONSTITUTION AND STATUTES

U.S. CONST., Amend. II .....................................................3, 7, 11, 17, 18

Alaska Stat. § 11.61.220 ............................................................................9

Alaska Stat. §§ 18.65.700-18.65.810 ........................................................9

Ariz. Rev. Stat. Ann. § 4-244(30) .............................................................9

Ark. Code Ann. § 5-73-120(a) ...................................................................9

D.C. Code § 7-2502.03 ........................................................................21, 23

D.C. Code § 7-2509.02 ..............................................................................24

D.C. Code § 7-2509.02(a)(2) .....................................................................21

D.C. Code § 7-2509.11(1)(A) ......................................................................8

Idaho Code Ann. § 18-3302(3-4)................................................................9

Kan. Stat. Ann. § 75-7c03(a) ......................................................................9

Kan. Stat. Ann. § 21-6302 ...........................................................................9

Me. Rev. Stat. tit. 25, § 2001-A ..................................................................9

Miss. Code Ann. § 45-9-101(24) ..................................................................9

Mont. Code Ann. § 45-8-317 ........................................................................9

W. Va. Code § 61-7-7(c)..............................................................................10

Wyo. Stat. Ann. § 6-8-104(a)-(b)................................................................10

**OTHER AUTHORITIES**

*Armed Doctor Saved Lives in Hospital Shooting Near Philadelphia,*
*Police Chief Says*, ASSOCIATED PRESS, July 25, 2014.............................................31

Jeanne Assam, GOD, THE GUNMAN & ME (2010) ....................................................30

H. Sterling Burnett, *Texas Concealed Handgun Carriers:*
*Law-abiding Public Benefactors*, Nat'l Center for Pol'y
Analysis (June 2, 2000)........................................................................12

CNN, *Security guard who stopped shooter credits God,*
CNN.COM, Dec. 10, 2007.......................................................................30

*Concealed Handgun Permit Information Packet*,
County Sheriffs of Colorado ..................................................................19

Philip Cook & Jens Ludwig, GUNS IN AMERICA: RESULTS
OF A COMPREHENSIVE NATIONAL SURVEY OF FIREARMS
OWNERSHIP AND USE (1996) ..................................................................28

Philip J. Cook *et al.*, *The Gun Debate's New Mythical Number: How Many Defensive Uses Per Year?*, 16 J. POL'Y ANALYSIS & MGMT. 463 (1997)...........................................................28

Clayton Cramer, *Violence Policy Center's Concealed Carry Killers: Less than it Appears* ........................................................18

Clayton E. Cramer & David Burnett, *Tough Targets: When Criminals Face Armed Resistance from Citizens*, Cato Inst., Policy Analysis no. 11-12 (2012)...........................................29

Clayton E. Cramer & David B. Kopel, *"Shall Issue": The New Wave of Concealed Handgun Permit Laws*, 62 TENN. L. REV. 679 (1995)..................................................................12

Crime Prevention Research Center, *Concealed Carry Permit Holders Across the United States: 2016* ........................................17, 29

*Crime in the United States: Table 16, Rate: Number of Crimes per 100,000 Inhabitants by Population Group, 2014*, U.S. Department of Justice, Federal Bureau of Investigation ........................................17

*Crime in the United States: Table 69, Arrests by State, 2014*, U.S. Department of Justice, Federal Bureau of Investigation ................................19

Cody Derespina, *DC police chief who advocated taking down mass shooters has approved few gun permits*, FOXNEWS.COM, Nov. 24, 2015 ........32, 33

Cody Derespina, *Growing number of police chiefs, sheriffs join call to arms,* FOXNEWS.COM, Jan. 15, 2016 ........................................16

*Gunman Shot Dead Inside West Philadelphia Barbershop*, CBSPHILLY.COM, Mar. 22, 2015 ..........................................................31

Jose Juarez, *Our Quiet Rise In Handguns*, DAILY OAKLAND PR., June 27, 2004...................................................13

ix

Judy Keen & Andrea Stone, *This Month's Mass Killings a Reminder of Vulnerability,* USA TODAY, Dec. 21, 2007 ......................................30

Gary Kleck, TARGETING GUNS: FIREARMS AND THEIR CONTROL (1997) ..........26, 28

Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun,* 86 J. CRIM. L. & CRIMINOL. 150 (1995) ...................................................................27

David Kopel, *Arming the right people can save lives,* L.A. TIMES, Jan. 15, 2013 ........................................................................32

David B. Kopel, *Pretend "Gun-Free" School Zones,* 42 CONN. L. REV. 515 (2009). .................................................................20

*More might have died if doctor had not shot gunman,* PHIL. INQUIRER, July 27, 2015 .................................................................31

National Association of Chiefs of Police 28th Annual Survey (2016)...............15, 16

NRA Institute for Legislative Action, Gun Laws ....................................................10

OpenCarry.org, Open Carry....................................................................................10

PoliceOne, *Gun Policy & Law Enforcement Survey* (2013)........................14, 15, 32

Mark Segraves, *D.C. Gun Owners Must Re-Register Weapons,* NBCWASHINGTON.COM, Dec. 17, 2013..................................................................26

Tom Skoch, *The Editor's Column: Facts Top Feelings, Change Views On Gun Issues,* THE MORNING J. (Feb. 6, 2011) ............................11

Tom W. Smith, *A Call for a Truce in the DGU War,* 87 J. CRIM. L. & CRIMINOL. 1462 (1997) .................................................................28

United States Census Bureau, QuickFacts (Colorado) ......................................19, 20

United States Census Bureau, QuickFacts (District of Columbia).........................10

Violence Policy Center, *Concealed Carry Killers*.............................................17, 18

Marvin Wolfgang, *A Tribute to a View I Have Opposed,*
86 J. CRIM. L. & CRIMINOL. 188 (1995) ..................................................................27

Geoff Ziezulewicz, *Uber driver, licensed to carry gun,*
*shoots gunman in Logan Square*,  CHI. TRIB., Apr. 20, 2015..................................31

# INTEREST OF *AMICI CURIAE*[1]

## Western States Sheriffs' Association

The Western States Sheriffs' Association ("WSSA") was established in 1993, and consists of hundreds of members from 15 member states throughout the Western United States. The mission of WSSA is to assist Sheriffs and their offices with federal and state legislative issues, address policy and procedural matters, and work together to keep the office of Sheriff strong. WSSA supports the right of law-abiding citizens to carry firearms outside their homes for legitimate purposes, including lawful self-defense.

## International Law Enforcement Educators and Trainers Association

International Law Enforcement Educators and Trainers Association ("ILEETA") is an association of 4,000 professional law enforcement instructors committed to the reduction of law enforcement risk and to saving lives of police officers and the general citizenry through the provision of training enhancements for criminal justice practitioners. ILEETA has joined this brief because it recognizes that citizens who are legally licensed to carry firearms pose little or no

[1] No party's counsel authored this brief in whole or in part. No party or party's counsel, and no person other than *amici*, their members, or their counsel, contributed money that was intended to fund preparing or submitting this brief, except that partial funding will be contributed by the NRA Civil Rights Defense Fund. All parties have consented to the filing of this brief.

1

threat to law enforcement officers, but instead help improve public safety and reduce crime. ILEETA's *amicus* briefs were cited by Justice Breyer in *District of Columbia v. Heller*, and by Justices Alito and Stevens in *McDonald v. Chicago*.

## Law Enforcement Legal Defense Fund

Law Enforcement Legal Defense Fund ("LELDF") is a 501(c)(3) non-profit organization, headquartered in Alexandria, Virginia, that provides legal assistance to law enforcement officers. LELDF has aided nearly one hundred officers, many of whom have been acquitted, mostly in cases where officers have faced legal action for otherwise authorized and legal activity in the line of duty. While LELDF supports measures that will further legitimate public safety interests and protection of law enforcement officers, it does not support provisions that are ill-conceived and violate the constitutional rights of citizens.

## Law Enforcement Action Network

Law Enforcement Action Network ("LEAN") is a sister organization of LELDF, headquartered in Alexandria, Virginia, which has received 501(c)(4) status. LEAN promotes policies that protect law enforcement officers' personal and professional safety. LEAN seeks to provide insight to the Court about the negative ground level impact the challenged provisions will have on police officers, citizens, and public safety.

**CRPA Foundation**

CRPA Foundation is a non-profit 501(c)(3) corporation with headquarters in Fullerton, California. CRPA Foundation raises awareness about and defends the rights protected by the Second Amendment, promotes firearms and hunting safety, enhances marksmanship skills of those participating in the shooting sports, and educates the general public about firearms. CRPA Foundation supports law enforcement and charitable, educational, scientific, and other firearms-related public interest activities that defend the Second Amendment rights of all law-abiding Americans.

**Colorado Police Protective Association**

The Colorado Police Protective Association, established in 1922, currently has approximately 2,300 members who are certified peace officers in the State of Colorado or who are associate members. The CPPA is committed to providing input and lobbying on law enforcement related legislation, enhancing officer rights and safety, and improving resources for law enforcement personnel in Colorado. It believes that law-abiding, armed citizens can work with law enforcement to reduce crime and improve public safety.

**International Association of Law Enforcement Firearms Instructors**

The International Association of Law Enforcement Firearms Instructors, Inc. ("IALEFI") is a non-profit 501(c)(3) educational association founded in 1981 by police firearms instructors. IALEFI is dedicated to the development and operation of training programs for firearms instructors among law enforcement, security, criminal justice, and investigative agencies and organizations. IALEFI's 3,500-plus members include instructors from nearly every federal law enforcement agency, every branch of the U.S. military, and law enforcement agencies nationwide. IALEFI conducts over twenty training conferences annually throughout the country, publishes a journal (*The Firearms Instructor*) and several training manuals, one of which has been purchased by the U.S. Department of Justice and placed in the library of every federal district court. IALEFI is participating (1) because of its expertise on interactions between police and law-abiding persons with handgun carry licenses, (2) because law-abiding citizens with firearms, particularly handguns, make an important contribution to public safety by deterring or thwarting crime, (3) because lawful self-defense and deterrence of crime by citizens with handgun carry permits conserve police resources, and (4) because the carrying of handguns by law-abiding citizens is, on the whole, an aid to law enforcement, not an interference with it.

**Law Enforcement Alliance of America, Inc.**

Law Enforcement Alliance of America, Inc. ("LEAA") is a non-profit, non-partisan advocacy and public education organization founded in 1992 and made up of thousands of law enforcement professionals, crime victims, and concerned citizens. LEAA represents its members' interests by assisting law enforcement professionals and seeking criminal justice reforms that target violent criminals, not law-abiding citizens. LEAA has been an *amicus curiae* in numerous cases in the federal courts, and on the prevailing side in two United States Supreme Court cases.

Thus, *amici* are all organizations with members who are law enforcement officers or who support law enforcement officers and agencies. *Amici* believe that the perspective of front line law enforcement personnel and law enforcement organizations should be of assistance to this Court in evaluating whether any interest in public safety is actually served by the District's laws denying all but a handful of citizens the right to lawfully carry concealed firearms outside their homes.

## SUMMARY OF ARGUMENT

Rather than posing a danger to public safety, law-abiding individuals who obtain concealed carry licenses save innocent lives. This brief provides empirical evidence supporting that fact.

The adverse public safety consequences supposed by the District and its *amici* to result from non-discretionary concealed carry licensing systems have not materialized. Of the 50 states, 42 have either an objective "shall-issue" system of concealed carry licensing, or do not require any license or permit to carry concealed. Forty-five states allow open carry, and the majority do not require a permit. The District is the extreme outlier in its nearly total prohibition on carry of handguns, openly or concealed.

When states began implementing "shall-issue" systems, there were often dire predictions that violence would increase. Those fears turned out to be baseless. No state that implemented a "shall-issue" system has reverted to a highly restrictive, discretionary system or gone back to a *de facto* ban such as the District imposes.

Because law-abiding concealed carry permit holders are an aid to law enforcement, large scale surveys of law enforcement officers of all ranks, and of police chiefs and sheriffs in particular, have shown overwhelming support for concealed carry by properly licensed citizens. In particular, law enforcement officers overwhelmingly agree that concealed carry by the law-abiding helps reduce crime.

The evidence shows that individuals who obtain concealed carry permits are extremely law abiding. The rates at which they commit crimes are small fractions

of the crime rates for the public as a whole. Claims to the contrary are based on deeply faulty information published on the website of an anti-Second Amendment group. Applicants for concealed carry permits in the District are drawn from the pool of individuals who have already registered firearms. People who undergo that stringent process of registration are likely to be extraordinarily law-abiding, and data confirm that fact. Criminals, on the other hand, bypass the registration and concealed carry licensing system entirely, as shown by facts provided by the District.

Multiple well-designed studies demonstrate that defensive gun uses by citizens to prevent or defeat criminal attacks are prevalent and reduce crime. A large number of those defensive gun uses occur outside the home, and the percentage occurring outside the home has undoubtedly increased with the rapid expansion of the number of concealed carry permit holders over the past twenty years, thereby saving more lives.

Far from being responsible for mass shootings, persons able to lawfully carry firearms outside the home have prevented or cut short many criminal mass shootings. The District's Chief of Police herself recognizes that forcible intervention by civilians is the best way to take down mass shooters in the time period before law enforcement personnel can arrive.

## ARGUMENT

## I.  THE EXPERIENCE OF 42 STATES SHOWS THAT LICENSED CONCEALED CARRY DOES NOT INCREASE CRIME OR PUBLIC DANGER.

The District of Columbia prohibits its citizens from obtaining a concealed carry license unless they can show "good reason" for its issuance, which includes "a special need for self-protection distinguishable from the general community." D.C. Code § 7-2509.11(1)(A). Utilizing this standard, it deprives almost all law-abiding residents of the ability to defend themselves outside the home because, in its view, "introducing a gun into any conflict can escalate a limited danger into a lethal situation," and this "danger extends to bystanders and the public at large." Dist. Br. 3 (citing JA 136). Indeed, the District argues that:

> Without the licensing regime, [law enforcement] entities would have to account for the increased risk associated with increased carrying—a result that, the Council found, could "turn the District into a semi-police state." JA135. "[I]ncreasing the posting of armed officers, or clearing streets of all automobiles and restricting pedestrian movement except through checkpoints, tips society away from the freedom and openness we value … ." JA125.

Dist. Br. 4.

As law enforcement professionals and groups supporting law enforcement, *amici* can attest that increased carrying by properly licensed, law-abiding citizens does not create an increased risk of violence. Certainly, experience in the vast

majority of states has shown that a fair, objective system of granting concealed carry permits, without a showing of "good reason," does not require increasing the posting of armed officers, clearing streets of automobiles, restricting pedestrian movement except through checkpoints, or the creation of a "semi-police state." Crossing the Potomac into Virginia, which has such an objective system, proves the point.

**A.    Fairly administered, licensed concealed carry is the norm nationally.**

There are two major types of laws relating to carrying of firearms pursuant to a permitting or licensing system. In "shall issue" states, state or local authorities are required to issue a carry permit to any individual who meets certain objective criteria and qualifications. There is little or no discretion by the authorities as to whether the permit will be issued.[2] Eleven states do not require any kind of permit for its residents to carry a handgun concealed.[3] Of the 50 states, 42 states either do

---

[2] Connecticut has a system which is technically discretionary, but which historically has been administered in an objective fashion.  It is thus counted here as a "shall issue" state.

[3] Alaska (Alaska Stat. §§ 11.61.220, 18.65.700-18.65.810); Arizona (Ariz. Rev. Stat. Ann. § 4-244(30)); Arkansas (Ark. Code Ann. § 5-73-120(a)); Idaho (Idaho Code Ann. § 18-3302(3-4)); Kansas (Kan. Stat. Ann. §§ 75-7c03(a), 21-6302); Maine (Me. Rev. Stat. tit. 25, § 2001-A); Mississippi (Miss. Code Ann. § 45-9-101(24)); Montana (Mont. Code Ann. § 45-8-317 (Montana requires a permit to carry concealed only inside a city or town, thus exempting over 99% of the state));

not require a permit or have "shall issue" laws.[4]

In "may issue" states, the authorities are granted complete discretion as to whether a concealed carry permit will be issued, and most of these states are highly restrictive. Eight states plus the District have such systems.

Only five states generally ban open carry of loaded handguns, as the District does.[5] Forty-five states allow open carry. *Id.* The majority of those states do not require any sort of license or permit to carry handguns openly. *Id.*

The District thus has the most restrictive carry regime when compared to the 50 states, since it bans all open carry of firearms by civilians, and (so far) allows fewer than one out of every 10,000 residents the "privilege" of carrying concealed.[6] Unlike the District's nearly total ban on carrying either openly or concealed, objective "shall issue" concealed carry permit systems, and liberal open carry, are the norm nationwide. The District is the most extreme outlier.

---

Vermont (no specific statute, but constitutional right to carry is recognized pursuant to *State v. Rosenthal*, 55 A. 610 (Vt. 1903); West Virginia (W. Va. Code § 61-7-7(c)); Wyoming (Wyo. Stat. Ann. § 6-8-104(a)-(b)).

[4] See NRA Institute for Legislative Action, Gun Laws, https://www.nraila.org/gun-laws/ (interactive map).

[5] See OpenCarry.org, Open Carry, http://www.opencarry.org/maps/map-open-carry-of-a-properly-holstered-loaded-handgun/

[6] The District had issued only 61 concealed carry licenses at the time of the preliminary injunction hearing. JA 506. It had an estimated population in 2015 of 672,228. United States Census Bureau, QUICKFACTS (District of Columbia), available at http://www.census.gov/quickfacts/table/PST045215/11.

**B.    Predictions about the supposed dangers of licensed carry have been proven false.**

"Shall issue" licensing systems have spread rapidly throughout the states over the past three decades—paralleling the national trend towards more scrupulous compliance with the Second Amendment. In many states, when the legislature was considering carry license reform to make the system fair, objective, and non-arbitrary, opponents made predictions of calamity similar to the claims raised by Appellants and their *amici* in the instant case.

For example, when Ohio's "shall issue" licensing system went into effect in 2004, there were fears that the law "would make public shoot-outs common and fill the streets with blood."[7] Based on experience, some of the worriers have forthrightly admitted that they were wrong.[8]

John B. Holmes, then District Attorney of Harris County (which contains Houston) and Glenn White, former President of the Dallas Police Association, were strong opponents of licensed carry in Texas. Both changed their minds after watching how it worked, and seeing that their fears were incorrect.

---

[7] Tom Skoch, *The Editor's Column: Facts Top Feelings, Change Views On Gun Issues*, THE MORNING J. (Feb. 6, 2011), http://www.morningjournal.com/articles/2011/02/06/opinion/doc4d4e1b29419fe014211343.txt?viewmode=fullstory.

[8] Skoch, *supra* note 7.

Holmes said, "I . . . [felt] that such legislation . . . present[ed] a clear and present danger to law-abiding citizens by placing more handguns on our streets. Boy was I wrong. Our experience in Harris County, and indeed statewide, has proven my initial fears absolutely groundless." As White observed, "All the horror stories I thought would come to pass didn't happen. . . . I think it's worked out well, and that says good things about the citizens who have permits. I'm a convert."[9]

Florida state legislator Ron Silver, "the leading opponent" of that state's groundbreaking "shall issue" law in 1987, said in November 1990, "There are lots of people, including myself, who thought things would be a lot worse as far as that particular situation [carry reform] is concerned. I'm happy to say they're not." John Fuller, general counsel for the Florida Sheriffs Association, stated: "I haven't seen where we have had any instance of persons with permits causing violent crimes, and I'm constantly on the lookout."[10] The Metro Dade Police Department, out of concern with the risks of the new law, kept detailed records of every incident involving concealed weapon licensees from enactment of the new law in 1987 until August 31, 1992, when the rarity of problems caused the department to cease

---

[9] H. Sterling Burnett, *Texas Concealed Handgun Carriers: Law-abiding Public Benefactors*, Nat'l Center for Pol'y Analysis (June 2, 2000), http://www.ncpa.org/pub/ba324.

[10] Clayton E. Cramer & David B. Kopel, *"Shall Issue": The New Wave of Concealed Handgun Permit Laws*, 62 TENN. L. REV. 679, 693 (1995).

tracking such incidents.[11]

Michigan adopted a "shall issue" law in 2001. In 2004, the *Daily Oakland Press* reported on the first three years of the new law: the claims that the law "was surely a recipe for disaster" turned out to be wrong. "Law enforcement officers and local officials say Michigan's streets are no safer—or more dangerous—than they were three years ago when the law went into effect. But there have been no major incidents involving people with the permits. No accidental discharges. No murders. No anarchy."[12]

Significantly, no "shall issue" state has reverted to arbitrary licensing or a *de facto* ban on licensed carry such as the District's. Neither have those 42 states had any need to employ "semi-police state" tactics such as pedestrian checkpoints to preserve public order and safety. In short, there is no public safety benefit that would justify the District's nearly total ban on law-abiding citizens' right to carry concealed handguns outside the home.

---

[11] *Id.* at 692-03.
[12] Jose Juarez, *Our Quiet Rise In Handguns*, DAILY OAKLAND PR., June 27, 2004 (webpage link no longer available).

## II. LAW ENFORCEMENT PROFESSIONALS OF ALL RANKS STRONGLY SUPPORT LICENSED CONCEALED CARRY.

Law enforcement professionals know that, instead of leading to a "Wild West" atmosphere or blood running in the streets, licensed concealed carry by law-abiding citizens helps reduce crime, and assists police officers. That is the overwhelming opinion of experienced law enforcement personnel as revealed in a recent, large scale, national survey.

The national law enforcement organization PoliceOne conducted its *Gun Policy & Law Enforcement Survey* between March 4 and March 13, 2013, receiving 15,595 responses from verified police professionals across all ranks and department sizes.[13] Respondents were asked: "Do you support the concealed carry of firearms by civilians who have not been convicted of a felony and/or not been deemed psychologically/medically incapable?" PoliceOne Survey, Question 19. The results were overwhelming: 91.3% of the respondents selected "Yes, without question and without further restrictions," and only 8.6% were of the belief that concealed carry should be restricted to law enforcement officers, were neutral, or were unsure. This

---

[13] PoliceOne, *Gun Policy & Law Enforcement Survey* (2013) (reported at http://ddq74coujkv1i.cloudfront.net/p1_gunsurveysummary_2013.pdf ("PoliceOne Survey"). A description of the study is at http://www.policeone.com/police/products/press-releases/6188461-policeone-com-releases-survey-of-15-000-law-enforcement-professionals-about-u-s-gun-control-policies/.

widespread law enforcement support for carry by properly licensed, law-abiding citizens is based, no doubt, on the experience most of them have in the 42 states that have fair, objective licensing standards.

The respondents were also asked: "On a scale of one to five—one being low and five being high—how important do you think legally-armed citizens are to reducing crime rates overall"? *Id.*, Question 20. Over half of these law enforcement professionals (54.7%) believed legally-armed citizens should be given the top ranking score of "five." A total of 90.4% ranked legally-armed citizens as being in the range of three to five on the scale of importance. Those who believed that armed citizens were of relatively little or no importance (one to two on the ranking scale) constituted only 9.6% of respondents. *Id.*

Police leadership shares that view. The National Association of Chiefs of Police recently posted the results of their 28th Annual Survey (2016), in which survey questions were posed by mail to Chiefs of Police and Sheriffs in the United States. According to NACOP, the survey "represents a broad cross section of professional command officers involving every state and every size department."[14]

In answer to the question "Can qualified, law-abiding armed citizens help law enforcement reduce violent criminal activity?" over three-fourths (76%) said "Yes,"

_____

[14] See http://www.nacoponline.org/.

more than four times the percentage who said "No" (18.6%).[15] Regarding concealed carry specifically, the chiefs and sheriffs were asked "Does your department support nationwide recognition of state issued concealed weapon permits?" Of these law enforcement leaders, 86.4% answered "Yes," eight times as many as the 10.6% who answered "No."[16]

Chiefs of Police and Sheriffs across the country, from large cities to rural areas, have publicly recognized the value of armed citizens in aiding law enforcement and defending innocent life. In Wisconsin, Milwaukee County Sheriff David Clarke has recently stated, "I want as many law-abiding citizens to arm themselves in this county as we can get so that I have the partner that I need to beat back this sort of violence."[17] Detroit Police Chief James Craig has been a leader in urging his community to arm itself. *Id.* Law enforcement personnel cannot be everywhere, so lawfully armed citizens must constitute the first line of defense. As Polk County, Florida, Sheriff Grady Judd recently stated, "It's more important to have a gun in your hand than a cop on the phone." *Id.*

---

[15] *Id.* 5.4% were "N/A."
[16] *Id.* 2.9% were "N/A."
[17] Cody Derespina, *Growing number of police chiefs, sheriffs join call to arms,* FOXNEWS.COM, Jan. 15, 2016, http://www.foxnews.com/us/2016/01/15/growing-number-police-chiefs-sheriffs-join-call-to-arms.html.

## III. THE DISTRICT'S LAW WILL DO NOTHING TO STEM VIOLENCE, WHILE DEPRIVING LAW-ABIDING CITIZENS OF THEIR SECOND AMENDMENT RIGHT TO SELF-DEFENSE.

### A. Individuals with concealed carry permits are extremely law abiding.

To support the proposition that "more guns in public threaten public safety," one of the District's *amici* claims that "since 2007, at least 885 people have been killed by individuals with concealed carry permits." *Amicus Curiae* Brief of Brady Center to Prevent Gun Violence 15 (citing Violence Policy Ctr., *Concealed Carry Killers.*)[18] That is a little less than 100 per year. There are currently approximately 14.5 million concealed carry permit holders. Crime Prevention Research Center, *Concealed Carry Permit Holders Across the United States: 2016.*[19] How many homicides would one expect to occur annually among 14.5 million people if the general murder rate for the United States as a whole were used? The murder rate for the general population is 4.5 per 100,000 inhabitants, or 45 per million.[20] For 14.5 million people, the expected number of murders annually for the general population

---

[18] The VPC's "Concealed Carry Killers" is a website that is frequently updated, so the numbers reported are a moving target.

[19] Available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2814691.

[20] *Crime in the United States: Table 16, Rate: Number of Crimes per 100,000 Inhabitants by Population Group, 2014*, U.S. Department of Justice, Federal Bureau of Investigation, https://ucr.fbi.gov/crime-in-the-u.s/2014/crime-in-the-u.s.-2014/tables/table-16

would be 652. So even if one accepted the data provided by the anti-Second Amendment VPC, the homicide rate for concealed carry permit holders is less than one-sixth of that of the general population.[21]

But the VPC data is flawed to a point approaching the fraudulent. In 2012, one noteworthy authority analyzed in detail the VPC data up until that time. Clayton Cramer, *Violence Policy Center's Concealed Carry Killers: Less than it Appears.*[22] For example, of the 374 individuals allegedly killed by permit holders, 132 were suicides without any attack on others. Many others were cases where the person committing the crime was clearly not a licensee or the license status could not be verified; where the individual was found by the criminal justice system to be in the right, or was not even charged; where the homicide took place in the individual's home or business, where a license to carry is not generally required; where the death was accidental within the home; or there were other such errors. After excluding incidents where the data was wrong or a concealed carry license was irrelevant, Cramer's analysis found a total of only 79 incidents, resulting in 92 deaths. *Id.* at 38. In other words, the number of deaths was fewer than one-fourth

---

[21] We note also that the 14.5 million concealed carry permit holders are all adults, whereas rates for the general population include children, who rarely commit homicides. One would thus expect a higher homicide rate per 100,000 adults, but in fact the rate is drastically lower for concealed carry permit holders.

[22] Available at http://ssrn.com/abstract=2095754.

the number claimed by VPC. If that ratio is carried forward in the years after 2012, one may expect that the relevant rate of homicides by carry permit holders is on the order of one twenty-fourth of the rate of the population generally (one-sixth if VPC's figures are accepted, multiplied by one-fourth if the error rate by VPC has persisted).

In several states which issue carry licenses in an objective manner, a state agency produces annual reports of all criminal justice incidents involving concealed handgun licensees While the details of how the data are reported vary among the states, the reports unanimously show that almost all licensees are highly law-abiding.

For example, Colorado issued over 191,480 concealed handgun carry permits between 2011 and 2015.[23]  During that same period, only 1,549 were revoked, of which 1,027 (.5% of permits issued) were due to an arrest. Contrast this with the arrests of nearly 240,000 individuals in Colorado *in the year 2014 alone*,[24] constituting 4.4% of the population.[25] Data from other states are consistent:

---

[23] *See Concealed Handgun Permit Information Packet*, County Sheriffs of Colorado, http://csoc.org/ccw_application.asp.

[24] *Crime in the United States: Table 69, Arrests by State, 2014*, U.S. Department of Justice, Federal Bureau of Investigation, https://ucr.fbi.gov/crime-in-the-u.s/2014/crime-in-the-u.s.-2014/tables/table-69.

[25] Colorado had an estimated population of 5,456,574 as of July 1, 2015. United

*Minnesota*: One handgun crime (broadly defined, such as driving while under the influence if a handgun is in the car) per 1,423 licensees.[26]

*Michigan*: 161 charges of misdeeds involving handguns (including duplicate charges for one event, and charges which did not result in a conviction) in 2007 and 2008 out of an approximate Michigan population of 190,000 licensees.

*Ohio*: 142,732 permanent licenses issued since 2004, and 637 revocations for any reason, including moving out of state.

*Louisiana*: Licensee gun misuse rate, all reasons, of less than 1 in 1,000.

*Texas*: Concealed handgun licensees are 79 percent less likely to be convicted of crimes than the non-licensee population. Only 2/10 of 1 percent of licensees were ever convicted of a violent crime or firearms regulation crime.

*Florida*: The data show a rate of 27 firearms crimes per 100,000 licensees.

In sum, people with carry licenses are *much more law-abiding* than the general population.

---

States Census Bureau, QuickFacts (Colorado), available at http://www.census.gov/quickfacts/table/PST045215/08.

[26] The full data and details for Minnesota, Michigan, Ohio, Louisiana, Texas, and Florida are presented in David B. Kopel, *Pretend "Gun-Free" School Zones*, 42 CONN. L. REV. 515, 564-69 (2009).

**B.** **Firearms registrants in the District, the pool from which concealed carry licensees are drawn, are exceptionally law abiding.**

Among other requirements for obtaining a concealed carry license, the applicant must meet "all of the requirements for a person registering a firearm" pursuant to D.C. law, and must have "obtained a registration certificate for the pistol that the person is applying to carry concealed." D.C. Code § 7-2509.02(a)(2).

Thus, the pool of individuals from which concealed carry license holders is drawn consists of those who have already met the registration requirements in the District to possess a firearm. Pursuant to D.C. Code § 7-2502.03, those registration requirements include that the applicant:

1.    Be 21 years of age, or be 18 and have notarized parental permission;

2.    Not have been convicted of certain weapons offenses, or a felony in any jurisdiction;

3.    Not be under indictment for a crime of violence or a weapons offense;

4.    Not have been convicted within 5 years prior to the application of any:

    a. law regarding any narcotic or dangerous drug;

    b. violation of certain laws regarding assaults or threats;

    c. two or more violations of the Code section prohibiting fleeing in a vehicle from a law enforcement officer, or, in this or any other jurisdiction, any law

restricting driving under the influence of alcohol or drugs;

     d. intrafamily offense punishable as a misdemeanor;

     e. misdemeanor violation of certain firearms laws; or

     f. violation of stalking law.

5.     Within the previous five years has not been acquitted of any criminal charge by reason of insanity or has not been adjudicated a chronic alcoholic by any court;

6.     Within the previous five years has not been voluntarily or involuntarily committed to any mental hospital or institution;

7.     Within the previous five years has not had "a history of violent behavior";

8.     Does not appear to suffer from a physical defect which would tend to indicate that the applicant would not be able to possess and use a firearm safely and responsibly;

9.     Has not been adjudicated negligent in a firearm mishap causing death or serious injury to another human being;

10.    Is not otherwise ineligible to possess a firearm under the unlawful possession of firearms statute;

11.    Is not blind;

12.    Has not been the respondent in an intrafamily proceeding in which a civil protection order was issued against the applicant;

13.    Has not been the respondent in a proceeding in which a foreign protection order was issued against the applicant;

14.    Has completed a firearms training and safety class provided free of charge by the Chief, or undergone certain other firearms training;

15.    Has not been prohibited from possessing or registering a firearm pursuant to the statute specifying duties of registrants; and

16.    Submits voluminous information, including such things as where the firearm will be kept, whether the District or other governmental entity has revoked the applicant's license, registration certificate, or permit pertaining to any firearm, and a description of the applicant's role in any mishap involving a firearm, including the date, place, time, circumstances, and the names of the persons injured or killed, among much else. D.C. Code § 7-2502.03.

To obtain a carry permit, as opposed to mere registration of a firearm, additional requirements must be met, besides satisfying the discretionary "good reason" provisions. These include not suffering from a mental illness, or proof that the applicant has recovered from any mental illness within the past five years; completing 16 hours of firearms training by a certified instructor which covers seven specific topics; completing at least two hours of range training by a certified instructor, including shooting a qualification course of at least 50 rounds; and

obtaining a certification from the instructor that the applicant has completed the required training, and "possesses the proper knowledge, skills, and attitude to carry a concealed pistol." D.C. Code § 2509.02.

Apart from the "good reason" requirement, who will comply with all of these requirements and procedures? Criminals? Or law-abiding individuals who are extremely unlikely to misuse firearms? In a recent case regarding D.C.'s registration requirements, Defendant Lanier admitted in her deposition that criminals do not register their guns:

> Q Do most people who regularly engage in criminal activities in the District register their guns?
>
> A No.
>
> Q Drug dealers, people who engage in shootings outside nightclubs, that sort of thing, gang members?
>
> A No.
>
> Q Would [it be] correct to call the proportion of folks like that who commit those crimes and also register their guns a very tiny percentage probably?
>
> A That would be correct.

*Heller v. District of Columbia*, Case No. 14-7071, Joint Appendix 573 (Doc. No.

1510367) ("*Heller II*").[27]

Criminals who commit street crime simply bypass the registration process, so the carry licensure statutes will have zero effect on them. Those statutes will affect only the law-abiding, and the exceptionally law-abiding character of registrants was also shown in *Heller II*. In that case, data provided by the District itself showed that from 2007 through early 2013, the D.C. Metropolitan Police Department recovered more than ***12,000 unregistered firearms***. During a roughly similar time period, MPD recovered ***only 36 registered guns*** owned by private individuals and associated with crime scenes. Of those investigations, fewer than half (17) led to charges against the registered owner. ***Only two*** resulted in convictions of the registered owner of an actual crime of violence apparently involving a firearm, and only seven others resulted in any kind of conviction or sentence of probation against the registered owner.[28]

In other words, during this time period there were about 333 recovered illegal guns in the District for every single recovered registered gun (and most of the

---

[27] Reported as *Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015).
[28] Documents substantiating these data are found in the Joint Appendix in *Heller II*. Citations to the specific documents are in Appellants' Opening Brief, Case No. 14-7071, Doc. 1510366, at 6.

recovered registered guns were not used by their owners to commit a crime).[29] This indicates two things: criminals bypass registration entirely, and registrants don't commit violent crimes. Yet the D.C. carry law affects *only* the class of law-abiding registrants, and will have no law enforcement benefit at all against criminals who ignore the registration and carry laws entirely.

### C.    Licensed carry reduces crime.

Another way in which licensed carry promotes the safety of individuals and reduces crime is when individuals licensed to carry use their firearms to repel an attack. There have been more than a dozen major surveys regarding the frequency of defensive gun use (DGU) in the modern United States. The results of the surveys range from a low of 760,000 annually to a high of 3 million. The more recent studies, which report higher numbers, are much more methodologically sophisticated. GARY KLECK, TARGETING GUNS: FIREARMS AND THEIR CONTROL 149-64, 187-89 (1997).

Gary Kleck and Mark Gertz conducted an especially thorough survey in 1993, with stringent safeguards to weed out respondents who might misdescribe or

---

[29] According to Police Chief Lanier, approximately 50,000 people registered a firearm in the District between 1976 and 2010. See Mark Segraves, *D.C. Gun Owners Must Re-Register Weapons*, NBCWASHINGTON.COM, Dec. 17, 2013, http://www.nbcwashington.com/news/local/DC-Gun-Owners-Must-Re-Register-Weapons-236274341.html.

misdate a DGU story. Kleck and Gertz found results indicating between 2.2 and 2.5 million DGUs annually. Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun,* 86 J. CRIM. L. & CRIMINOL. 150 (1995).

The Kleck/Gertz survey found that most defensive uses involved handguns, and the large majority of defensive uses do not involve firing the weapon, but merely displaying it to deter an attacker. *Id.* at 175 (80 percent of DGUs are handguns; 76 percent do not involve a shot being fired).[30]

Philip Cook of Duke and Jens Ludwig of Georgetown were skeptical of

---

[30] Marvin Wolfgang, one of the most eminent criminologists of the twentieth century, reviewed Kleck's findings. He wrote:

> I am as strong a gun-control advocate as can be found among the criminologists in this country....I would eliminate all guns from the civilian population and maybe even from the police. I hate guns....
> . . .
> Nonetheless, the methodological soundness of the current Kleck and Gertz study is clear....
> . . .
> The Kleck and Gertz study impresses me for the caution the authors exercise and the elaborate nuances they examine methodologically. I do not like their conclusions that having a gun can be useful, but I cannot fault their methodology. They have tried earnestly to meet all objections in advance and have done exceedingly well.

Marvin Wolfgang, *A Tribute to a View I Have Opposed,* 86 J. CRIM. L. & CRIMINOL. 188, 191-92 (1995).

Kleck's results, and so they conducted their own survey for the Police Foundation. That survey produced an estimate of 1.46 million DGUs.[31] The National Crime Victimization Survey (NCVS), using a much less targeted approach, estimates only 108,000 DGUs a year. *See* Philip J. Cook *et al.*, *The Gun Debate's New Mythical Number: How Many Defensive Uses Per Year?*, 16 J. POL'Y ANALYSIS & MGMT. 463, 468 (1997).

The National Opinion Research Center argues that the figures from Kleck are probably too high, and from the NCVS too low; the Center argues that the actual annual DGU figure is in the range of 256,500 to 1,210,000. Tom W. Smith, *A Call for a Truce in the DGU War*, 87 J. CRIM. L. & CRIMINOL. 1462 (1997).

This Court need not determine the precise figure. All social science research shows that defensive gun use is frequent in the United States.

The estimates above relate to all defensive gun uses, whether inside or outside the home. However, Professor Kleck's research found that 26.8% of DGUs occurred in a location away from the user's home, and that another 35.9% took place in places near the defender's home (yard, carport, street adjacent to the home, etc.) GARY KLECK, TARGETING GUNS 192 (1997). The percentages of DGUs outside

---

[31] PHILIP COOK & JENS LUDWIG, GUNS IN AMERICA: RESULTS OF A COMPREHENSIVE NATIONAL SURVEY OF FIREARMS OWNERSHIP AND USE (1996).

the home are likely to be significantly larger now than when Kleck published this research, because the number of concealed carry permit holders has risen from roughly 2.7 million in 1999 to 14.5 million in 2016. Crime Prevention Research Center, *Concealed Carry Permit Holders Across the United States: 2016* 3. Thus, a fair, licensed concealed carry system will facilitate individual protection and crime reduction in the places where a large fraction of DGUs occur.

A recent survey of defensive gun use by civilians in the United States examined 4,699 such incidents gathered from news accounts and law enforcement news releases. Of these, 285 incidents identified the defender as having a carry license—a number that would have been impossible before the adoption of shall-issue laws.[32] Of course since most defensive gun uses do not result in a shot being fired, many will never be reported in the newspapers.

## IV. LICENSED CARRY HAS PREVENTED MASSACRES.

One of the *amici* for the District appears to blame mass shootings on concealed carry permit holders, when in fact such individuals almost never commit such crimes.[33] It is the nature of the news business that atrocious gun crimes are

---

[32] Clayton E. Cramer & David Burnett, *Tough Targets: When Criminals Face Armed Resistance from Citizens*, Cato Inst., Policy Analysis no. 11-12 (2012), http://www.cato.org/pubs/wtpapers/WP-Tough-Targets.pdf.

[33] *Amicus Curiae* Brief of Brady Center to Prevent Gun Violence at 2.

major national stories, whereas defensive gun uses which thwart would-be mass killers are often not reported beyond the state where they occurred. For example, on December 10, 2007, a deranged young man entered the lobby of New Life Church in Colorado Springs, Colorado, carrying two handguns, a rifle, and more than a thousand rounds of ammunition. He had murdered four people in the previous twelve hours—two of them in the church parking lot. The killer had carefully waited until a patrol car in front of the church had departed. Jeanne Assam, a member of the church who was serving as a volunteer security guard that day, drew and fired, preventing what might otherwise have been the largest mass shooting in U.S. history.[34] Colorado had become a "shall issue" state in 2003.

Illinois began issuing carry permits under a "shall issue" system in early 2014; the legislature had reformed the law in 2013, as a result of decisions by the Seventh Circuit and the Illinois Supreme Court. *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012); *People v. Aguilar*, 2 N.E.3d 321 (Ill. 2013). On April 17, 2015, a man "opened fire on a crowd of people in Logan Square," Chicago. An Uber driver

---

[34] CNN, *Security guard who stopped shooter credits God,* CNN.COM, Dec. 10, 2007, http://www.cnn.com/2007/US/12/10/colorado.shootings/; Judy Keen & Andrea Stone, *This Month's Mass Killings a Reminder of Vulnerability,* USA TODAY, Dec. 21, 2007; JEANNE ASSAM, GOD, THE GUNMAN & ME (2010). New Life Church is a megachurch; there were thousands of worshippers present in the sanctuary when the killer entered.

with a carry permit fired six shots, and stopped the attacker.[35]

Pennsylvania has been a "shall issue" state since 1989. On March 22, 2015, a man began shooting inside the Falah Barbershop in West Philadelphia. Another man, with a carry license, shot him. Philadelphia Police Captain Frank Llewellyn said, "He responded and I guess he saved a lot of people in there."[36]

On July 24, 2014, a man with a long record of violent crime, illegal gun possession, and mental illness entered a psychiatric crisis center adjoining Mercy Fitzgerald Hospital, near Philadelphia. He shot a nurse, and then opened fire against his doctor. The doctor returned fire, and stopped the killer, who had 39 unfired rounds of ammunition left. "Without a doubt, I believe the doctor saved lives," said Police Chief Donald Molineux. "Without that firearm, this guy could have went out in the hallway and just walked down the offices until he ran out of ammunition."[37]

---

[35] Geoff Ziezulewicz, *Uber driver, licensed to carry gun, shoots gunman in Logan Square*, CHI. TRIB., Apr. 20, 2015, http://www.chicagotribune.com/news/local/breaking/ct-uber-driver-shoots-gunman-met-0420-20150419-story.html.

[36] *Gunman Shot Dead Inside West Philadelphia Barbershop*, CBSPHILLY.COM, Mar. 22, 2015, http://philadelphia.cbslocal.com/2015/03/22/man-shot-dead-inside-west-philadelphia-barbershop/.

[37] *Armed Doctor Saved Lives in Hospital Shooting Near Philadelphia, Police Chief Says*, ASSOCIATED PRESS, July 25, 2014, http://www.people.com/article/armed-doctor-gun-philadelphia-hospital-shooting; *More might have died if doctor had not shot gunman*, PHIL. INQUIRER, July 27, 2015, http://www.philly.com/philly/news/20140726_Hospital_shooter_had_history_of_m

There are many more stories such as this.[38]

Again, the PoliceOne survey of more than 15,000 law enforcement professionals across the country is instructive. The respondents were asked: "What would help most in preventing large scale shootings in public?", and were given a choice of eight alternatives, including such things as better background checks, tighter gun laws, and "other." Among these eight alternatives, by far the highest percentage (28.8%) chose "More permissive concealed carry policies for civilians." PoliceOne Survey, Question 21.

Defendant Lanier agrees that citizens can take out mass shooters by force. When interviewed on the television program "60 Minutes" about mass shootings, Police Chief Lanier responded, "If you're in a position to try and take the gunman down, to take the gunman out, it's the best option for saving lives before police can get there."[39] She continued, "[M]ost active shooters kill most of the victims in 10

---

ental_illness__arrests__records_show.html.

[38] *See*, *e.g.*, David Kopel, *Arming the right people can save lives*, L.A. Times, Jan. 15, 2013, http://articles.latimes.com/2013/jan/15/opinion/la-oe-kopel-guns-resistance-nra-20130115 ("Pearl High School in Mississippi; Sullivan Central High School in Tennessee; Appalachian School of Law in Virginia; a middle school dance in Edinboro, Pa.; Players Bar and Grill in Nevada; a Shoney's restaurant in Alabama; Trolley Square Mall in Salt Lake City; New Life Church in Colorado; Clackamas Mall in Oregon (three days before Sandy Hook); Mayan Palace Theater in San Antonio (three days after Sandy Hook).") (parentheticals in original).

[39] Cody Derespina, *DC police chief who advocated taking down mass shooters has*

minutes or less, and the best police department in the country's going to be about a five-to-seven minute response." *Id.* Of course, there will be no way that citizens can stop a mass shooter in a public place if the law disarms them.

Licensed concealed carry by law-abiding citizens does not increase crime, but improves public safety and saves innocent lives by preserving the right of citizens "to use [handguns] for the core lawful purpose of self-defense." *McDonald v. City of Chicago*, 561 U.S. 742, 768 (2010) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 630 (2008)).

## **CONCLUSION**

The District Court's order granting a preliminary injunction should be affirmed.

---

*approved few gun permits*, FOXNEWS.COM, Nov. 24, 2015, http://www.foxnews.com/us/2015/11/23/dc-police-chief-who-advocated-taking-down-mass-shooters-has-approved-few-gun.html

Respectfully submitted,

/s/ Dan M. Peterson
Dan M. Peterson
Dan M. Peterson PLLC
3925 Chain Bridge Road, Suite 403
Fairfax, Virginia 22030
(703) 352-7276
dan@danpetersonlaw.com

*Counsel for Amici Curiae*

C. D. MICHEL
MICHEL & ASSOCIATES, P.C.
180 EAST OCEAN BLVD., SUITE 200
LONG BEACH, CA 90802
(562) 216-4444
cmichel@michellawyers.com

*Counsel for CRPA Foundation*

34

# CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure. According to the word count feature of the word-processing system used to prepare the brief, it contains 6,994 words, exclusive of those matters that may be omitted under Rule 32(a)(7)(B)(iii).

I further certify that the foregoing brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6). It was prepared in a proportionately spaced typeface using 14-point Times New Roman font in Microsoft Word.


/s/ Dan M. Peterson
Dan M. Peterson

Counsel for *Amici Curiae*


Date:     August 12, 2016

## CERTIFICATE OF SERVICE

I hereby certify that on August 12, 2016, an electronic PDF of the foregoing Brief of *Amici Curiae* Western States Sheriffs' Association *et al.* was uploaded to the Court's CM/ECF system, which will automatically generate and send by electronic mail a Notice of Docket Activity to all registered attorneys participating in the case. Such notice constitutes service on those registered attorneys.

/s/ Dan M. Peterson
Dan M. Peterson
