SCHEDULED FOR ORAL ARGUMENT ON SEPTEMBER 20, 2016

———————————

No. 16-7067

———————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

MATTHEW GRACE, *et al.*,
APPELLEES,

v.

DISTRICT OF COLUMBIA, *et al.*,
APPELLANTS.

———————————

ON APPEAL FROM AN ORDER OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

———————————

**REPLY BRIEF OF THE DISTRICT OF COLUMBIA AND
METROPOLITAN POLICE DEPARTMENT CHIEF CATHY LANIER**

———————————

KARL A. RACINE
Attorney General for the District of Columbia

TODD S. KIM
Solicitor General

LOREN L. ALIKHAN
Deputy Solicitor General

HOLLY M. JOHNSON
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 600S
Washington, D.C. 20001
(202) 442-9890
holly.johnson@dc.gov

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A. *Parties and amici.*—The District of Columbia and Metropolitan Police Department Chief Cathy Lanier are appellants here and defendants below. Matthew Grace and Pink Pistols are appellees here and plaintiffs below.

*Amici curiae* for appellants include The Brady Center to Prevent Gun Violence, DC Appleseed Center for Law & Justice, DC for Democracy, D.C. Vote, League of Women Voters of the District of Columbia, Anthony A. Williams, Vincent C. Gray, Everytown for Gun Safety, and the States of Maryland, California, Connecticut, Hawaii, Illinois, Iowa, Massachusetts, New York, Oregon, and Washington.

*Amici curiae* for appellees include the National Rifle Association of America, Inc., Western States Sheriffs' Association, International Law Enforcement Educators and Trainers Association, Law Enforcement Legal Defense Fund, Law Enforcement Action Network, Law Enforcement Association of America, CRPA Foundation, Gun Owners of America, Inc., Gun Owners Foundation, U.S. Justice Foundation, Heller Foundation, Conservative Legal Defense and Education Fund, Colorado Police Protective Association, International Association of Law Enforcement Firearms Instructors, Law Enforcement Association of America, and the States of Arizona, Alabama,

Arkansas, Indiana, Missouri, Montana, Nevada, Ohio, Oklahoma, South Carolina, South Dakota, Texas, Utah, West Virginia, Wisconsin, and Wyoming.

Charles Nichols filed a notice that he would participate as *amicus curiae* but does not support either party. He has not filed a brief.

B. *Rulings under review*.—The District and Chief Lanier appeal an order issued on May 17, 2016, by District Court Judge Richard J. Leon, granting plaintiffs' motion for a preliminary injunction barring the District from enforcing D.C. Code § 22-4506(a) by requiring that any applicant for a license to publicly carry a handgun demonstrate "good reason" to fear injury to his or her person or property or any other proper reason for carrying a pistol. District Court ECF Record Docket ("RD") 45, 46.

C. *Related cases*.—In February 2015, another group of plaintiffs brought an identical Second Amendment challenge to the District's "good reason" standard. *Wrenn v. District of Columbia*, 107 F. Supp. 3d 1 (D.D.C. 2015). They designated the case as "related" to an earlier lawsuit, which had been assigned to visiting Senior District Court Judge Frederick J. Scullin, Jr., so *Wrenn* was also assigned to him. *See Wrenn v. District of Columbia*, 808 F.3d 81, 83 (D.C. Cir. 2015). He preliminarily enjoined the District from enforcing the "good reason" standard against those plaintiffs. *Id.* In December 2015, this Court held that Judge Scullin

had not been properly designated to preside over the case, vacated the injunction, and returned the case to the district court for reassignment. *Id.* at 84.

In February 2016, *Wrenn* was assigned to District Court Judge Colleen Kollar-Kotelly. *Wrenn* RD37; 2/9/15 Docket Entry. The District and the *Wrenn* plaintiffs notified the judges that *Grace* and *Wrenn* were related. RD34; *Wrenn* RD42, 43. The *Grace* plaintiffs objected. RD35 at 2. Judge Leon did not transfer the case to Judge Kollar-Kotelly, and the two cases—with their pending motions for preliminary injunction—proceeded on separate tracks.

On March 7, 2016, Judge Kollar-Kotelly denied the *Wrenn* plaintiffs' motion for a preliminary injunction. *Wrenn* RD54. The *Wrenn* plaintiffs appealed, and this Court expedited the case and ordered argument to be held in September 2016. No. 16-7025, 5/4/16 Order. This Court has ordered that this appeal and the *Wrenn* appeal be heard on the same date and before the same panel. 6/8/16 Order.

# TABLE OF CONTENTS

SUMMARY OF ARGUMENT ................................................................1

ARGUMENT ....................................................................................2

    I.     Plaintiffs Are Unlikely To Prevail On The Merits.............................2

        A.     Relevant precedent overwhelmingly supports the District.........2

        B.     The "good reason" law does not implicate the Second Amendment ................................................................5

            1.     When the Second Amendment was ratified, Northampton laws generally prohibited carrying in the public concourse ........................................................6

                a.     Northampton laws applied to peaceful carrying................................................................7

                b.     Northampton laws applied to commonly owned firearms ..................................................10

                c.     Northampton laws allowed carrying in the countryside ........................................................13

            2.     Moreover, the "good reason" standard is longstanding and thus presumed constitutional..............16

            3.     In any event, plaintiffs offer insufficient evidence that the District's law implicates the Second Amendment................................................................17

        C.     Alternatively, the "good reason" standard is likely to survive constitutional scrutiny ..................................................19

            1.     The "good reason" standard should be measured under nothing more rigorous than intermediate scrutiny ........................................................19

        2.     The "good reason" standard survives intermediate scrutiny ............................................................ 23

II.    The District Court Incorrectly Balanced The Equities In Plaintiffs' Favor ........................................................... 28

CONCLUSION ................................................................................ 31

# TABLE OF AUTHORITIES*

## *Cases*

*Armour & Co. v. Wantock*, 323 U.S. 126 (1944)........................................9

*Baze v. Rees*, 553 U.S. 35 (2008).............................................................26

*Bonidy v. USPS*, 790 F.3d 1121 (10th Cir. 2015) ............................. 21, 22

*Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016) (per curiam) .............3

*CFGC v. England*, 454 F.3d 290 (D.C. Cir. 2006).......................... 28, 29

*Chune v. Piott*, 80 Eng. Rep. 1161 (K.B. 1615) ........................................8

*Commonwealth v. Caetano*, 26 N.E.3d 688 (Mass. 2015) ........................3

*District of Columbia v. Heller*,
554 U.S. 570 (2008)................................ 2, 3, 4, 5, 10, 11, 12, 13, 15, 16, 19, 20, 21

*Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013) .............................. 2, 20, 28

*Gonzales v. Carhart*, 550 U.S. 124 (2007) .............................................26

*Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015), reh'g denied,
814 F.3d 480 (D.C. Cir. 2016) ...................................................... 24, 25

*Kachalsky v. Cty. of Westchester*, 701 F.3d 81 (2d Cir. 2012).................. 2, 20, 22

*Keystone Bituminous Coal v. DeBenedictis*, 480 U.S. 470 (1987).........................22

*King v. Dewhurst*, 1 St. Tr. 529 (Lancaster Assize 1820) ........................8

*Mazaleski v. Treusdell*, 562 F.2d 701 (D.C. Cir. 1977)............................6

*Mazurek v. Armstrong*, 520 U.S. 968 (1997)..........................................28

---

\*      Authorities upon which we chiefly rely are marked with asterisks.

*McDonald v. City of Chi.*, 561 U.S. 742 (2010) ...................................................2, 29

*Mills v. District of Columbia*, 571 F.3d 1304 (D.C. Cir. 2009)....................... 28, 29

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ...............................................2, 25

*Nken v. Holder*, 556 U.S. 418 (2009) ......................................................................29

*Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978) ..........................................21

*Olsen v. DEA*, 878 F.2d 1458 (D.C. Cir. 1989) ......................................................22

*Payton v. New York*, 445 U.S. 573 (1980) .................................................................7

*Peruta v. Cty. of San Diego*,
824 F.3d 919 (9th Cir. 2016) (en banc) .................................. 5, 9, 10, 11, 13, 27, 28

*Queen v. Soley*, 88 Eng. Rep. 935 (Q.B. 1701) ........................................................8

*Robertson v. Baldwin*, 165 U.S. 275 (1897) .............................................................4

*Schrader v. Holder*, 704 F.3d 980 (D.C. Cir. 2013) ........................................ 26, 30

*Sir John Knight's Case*,
87 Eng. Rep. 75, 90 Eng. Rep. 330 (K.B. 1686) ..................................... 8, 9, 12, 14

*Stanley v. USC*, 13 F.3d 1313 (9th Cir. 1994) .........................................................28

*State v. Huntly*, 25 N.C. 418 (3 Ired. 1843) ............................................................12

*Turner Broad. Sys. v. FCC*, 520 U.S. 180 (1997)....................................................26

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011).......................... 21, 22

*United States v. O'Brien*, 391 U.S. 367 (1968) ................................................ 22, 23

*United States v. Salerno*, 481 U.S. 739 (1987)........................................................24

*Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013) ................................. 2, 20, 27

*Constitutional Provisions*

U.S. Const. amend. II ............................................... 1-7, 11-12, 16-17, 19, 21-25, 29

Md. Const. of 1776, art. III, § 1 ................................................................. 6

*Other*

3 *Works of the Honourable James Wilson* (1804) ................................... 14

4 Blackstone, *Commentaries* (1769) ...................................................... 12

4 *Masterpieces of Eloquence* (1905) ..................................................... 19

5 Blackstone, *Commentaries* (1803) ...................................................... 18

A Bill for the Office of Coroner and Constable (Mar. 1, 1882) .............................. 6

Blackerby, *The Second Part of the Justice of the Peace* (1734) ................. 7, 8, 9, 10

Blocher, *Firearm Localism*, 123 Yale L.J. 82 (2013) ........................... 15

Bond, *A Compleat Guide for Justices of Peace* (1707) ................................... 7, 9, 11

Cay, *An Abridgment of Publick Statutes In Force and Use* (1739) ................... 7, 10

Charles, *The Faces of the Second Amendment Outside the Home*,
60 Clev. St. L. Rev. 1 (2012) ................................................................... 14

Charles, *The Faces of the Second Amendment Outside the Home, Take Two*,
64 Clev. St. L. Rev. 373 (2016) ........................................... 5, 8, 9, 14, 15

Coke, *The Third Part of the Institutes of the Laws of England*
(15th ed. 1797) ............................................................................. 7, 8, 20

Cornell, *The Right to Carry Firearms Outside of the Home*,
39 Fordham Urb. L.J. 1695 (2012) ...................................................... 16

Dalton, *The Countrey Justice* (1655) .......................................................11

Davis, *The Office and Authority of a Justice of the Peace* (1774) .........................14

Dunlap, *The New York Justice* (1815) ...............................................6, 14

Gardiner, *The Compleat Constable* (1708)...............................7, 9, 10, 11

Hawkins, 1 *Treatise of the Pleas of the Crown* (1716)...................7, 8, 9, 10, 11, 12

*Heller I*, Brief of the United States, 2008 WL 157201 ...........................................20

Hennessy-Fiske, *Dallas police chief: Open carry makes things confusing during mass shootings*, L.A. Times, July 11, 2016 .................................................27

Johnson & Kopel, *Firearms Law & the Second Amendment* (2012) ...............17, 18

Lambarde, *Duties of Constables* (1614) ...................................................11

Niles, *The Connecticut Civil Officer* (1833) ...............................................6

Oldham, *Informal Lawmaking in England by the Twelve Judges in the Late Eighteenth and Early Nineteenth Century*, 29 Law & Hist. Rev. 181 (2011)...........8

Ruben & Cornell, *Firearm Regionalism and Public Carry*, 125 Yale L.J. F. 121 (2015) ...........................................................12, 13

Tucker, *View of the Constitution of the United States with Selected Writings* (1803) ...................................................................................5

Unger, *Lion of Liberty* (2010) ...............................................................18

**GLOSSARY**

| | |
|---|---|
| D.C.Br. | Brief of the District of Columbia |
| JA | Joint Appendix |
| NRABr. | Brief of *Amicus Curiae* National Rifle Association |
| Pl.Br. | Brief of Plaintiffs |
| RD | Record Document |
| SA | Statutory Addendum |

## SUMMARY OF ARGUMENT

The carrying of firearms on the District of Columbia's crowded city streets presents a threat to public safety. At issue is whether a preliminary injunction should bar the District from minimizing that threat through its "good reason" law during the pendency of this litigation. It should not.

As challengers and movants for a preliminary injunction, plaintiffs bear the burden of proving that the law infringes on a pre-existing right codified in the Second Amendment. But the historical record overwhelmingly shows that, in 1791, the people accepted the permissibility of laws restricting carrying in cities, and later accepted the permissibility of "good reason" requirements. Plaintiffs criticize the District's interpretation of these laws, but without foundation. Moreover, they do little to satisfy their own burden. Their evidence is woefully inadequate to show that the Framers intended to prevent cities from enacting measures like the District's "good reason" law, even when those measures would save lives.

Ignoring the most relevant persuasive authority, plaintiffs insist that the Supreme Court already has recognized an unmitigated right to publicly carry, and that the District's laws must therefore be subject to strict scrutiny or even categorical invalidation. But the Court has done no such thing. Indeed, consistent with the history showing that public carrying is subject to sensible regulation,

every federal circuit court to review a "good reason" law has applied nothing more stringent than intermediate scrutiny—and all have upheld these laws. The District's law also will likely survive such scrutiny, because the District drew on extensive research to carefully craft a law that protects its citizens from the adverse effects of public carrying while still allowing carrying by those with a particularized risk.

Plaintiffs have a right to challenge the District's law, but it should remain in place during the pendency of this litigation (especially given the flaws in Judge Leon's balancing of the equities). The preliminary injunction should be vacated.

## ARGUMENT

### I.  Plaintiffs Are Unlikely To Prevail On The Merits.

#### A.  Relevant precedent overwhelmingly supports the District.

Plaintiffs barely acknowledge, let alone rebut, the unanimous circuit precedent upholding "good reason" laws. *Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013); *Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013); *Kachalsky v. Cty. of Westchester*, 701 F.3d 81 (2d Cir. 2012). Tacitly recognizing the lack of support for their position, plaintiffs rely heavily on authority addressing home possession, a "core" Second Amendment right under *District of Columbia v. Heller*, 554 U.S. 570 (2008) ("*Heller I*"), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010). But "the Supreme Court has not yet addressed" whether there is a core right to publicly carry, *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012), despite

plaintiffs' attempts to stretch *Heller I* and *McDonald* that far. Although the Court has held that "self-defense" is "central to the Second Amendment," *Heller I*, 554 U.S. at 628, it has not held that an inviolable right follows any self-defense need. To the contrary, the Court singled out as "presumptively lawful" laws banning possession "by felons and the mentally ill," who may also need self-defense, and public carrying "in sensitive places," where a prospect of confrontation may arise. *Id.* at 626.

Plaintiffs' misreading of *Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016) (per curiam), is even worse. They claim it "confirm[s] that the Second Amendment is not a home-bound right." Pl.Br.16. But the Court did not even suggest this, because the challenged law was a ban on *possession* (and Massachusetts allows public carry). *See Commonwealth v. Caetano*, 26 N.E.3d 688, 689, 695 (Mass. 2015). All *Caetano* shows is that the Court will intervene to correct a misreading of *Heller I*, which it notably has refused to do in *Drake*, *Woollard*, and *Kachalsky*.

Meanwhile, plaintiffs never once acknowledge the most relevant teaching of *Heller I*—that the Second Amendment codified a "*pre-existing* right." 554 U.S. at 592. The historical record is thus critical in determining whether the right to bear arms includes a right to publicly carry a handgun in a crowded city without a particularized self-defense reason. Plaintiffs argue that this possibility is not

reflected in the Amendment's text, Pl.Br.22, but they ignore the Court's direction about how to read that text: the pre-existing "right" that was codified was already "subject to certain well-recognized exceptions" that should "continue[] to be recognized as if … formally expressed." *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897). Much as *Heller I* read "the people" as limited to "law-abiding citizens," 554 U.S. at 625, this Court should read the "right" as limited to the "venerable, widely understood" right enjoyed in the Framing era, *id.* at 605, which did not bar the regulation of public carrying in cities.

Plaintiffs hyperbolically claim this reading would "*gut*" the right because "[o]ver 80% of Americans" now live in "urban areas." Pl.Br.22&n.4. They misleadingly cite a 2010 census table dividing populations into "urban" and "rural" areas, with the former including towns of just 2,500 people. The same census indicated, unsurprisingly, that only 10% of Americans live in areas as densely populated as the 600,000+-person District.[1] Accepting the District's legal position thus would not have the broad implications plaintiffs suggest. And, in any event, plaintiffs do not challenge that the entire District qualifies as a city for relevant purposes.

---

[1]    *See*    http://factfinder.census.gov/faces/tableservices/jsf/pages/productview. xhtml?pid=DEC_10_SF1_GCTPH1.US05PR&prodType=table.

Moreover, changes in demography cannot alter the Constitution's original meaning. Courts have not expanded the meaning of the Third Amendment, for instance, as society has changed. Framing-era Americans were "an agricultural people, dispersed over immense territory." Tucker, *View of the Constitution of the United States with Selected Writings* 44 (1803). The majority "lived outside city centers, towns, and other populated enclaves." Charles, *The Faces of the Second Amendment Outside the Home, Take Two*, 64 Clev. St. L. Rev. 373, 401 (2016) ("Charles 2016").[2] They tolerated strict regulation of carrying in cities because that was where firearms were most likely to cause public harm. *Cf. Heller I*, 554 U.S. at 635 ("[The Amendment] is the very *product* of an interest balancing by the people."). This remains true today.

## B. The "good reason" law does not implicate the Second Amendment.

To prevail, plaintiffs must establish that the Second Amendment protects a right to carry in a densely populated city without a particularized self-defense need. In a footnote, plaintiffs half-heartedly defend Judge Leon's fundamental error in shifting the burden to the District, on the false premise that the District is raising a

---

[2] Plaintiffs curiously dismiss the work of historian Patrick Charles because the *McDonald* dissent relied on it. Pl.Br.24. That three Justices deemed his work reliable is hardly reason to reject it here. In any event, his publications provide thorough citations to source material, making his conclusions independently verifiable. *Cf. Peruta v. Cty. of San Diego*, 824 F.3d 919, 930 (9th Cir. 2016) (en banc) (citing Charles).

"defense." Pl.Br.11n.2. The District is instead relying on this Court's plain and sensible holding that the "plaintiff assume[s] the initial burden of showing that his conduct was constitutionally protected." *Mazaleski v. Treusdell*, 562 F.2d 701, 715 (D.C. Cir. 1977).

Plaintiffs, however, do not establish a common understanding in 1791 of a pre-existing right to carry in cities without good reason—their evidence that people sometimes carried firearms hardly establishes a *right* of this sort. Indeed, although it is plaintiffs who bear the burden, the District has presented compelling historical evidence that residents of cities, through their elected officials, have always had the right to restrict public carrying in order to promote public safety.

1.  When the Second Amendment was ratified, Northampton laws generally prohibited carrying in the public concourse.

Early American laws were largely based on English law, and England was governed by the Statute of Northampton, which banned carrying in markets, fairs, and other populated places. SA36. The Statute was in effect during the Framing era, as acknowledged by six of the original thirteen States (and then the District). SA18-19, 53-55, 58-61; Md. Const. of 1776, art. III, § 1; A Bill for the Office of Coroner and Constable (Mar. 1, 1882) (New Jersey). By the mid-1800s, four other states were similarly bound. SA62, 71; Dunlap, *The New York Justice* 8 (1815); Niles, *The Connecticut Civil Officer*, ch.14 (1833). Because these laws explicitly prohibited carrying in populated areas, where it was likely to terrify the public,

*e.g.*, SA18, a right to carry *in cities* could not have been a widely understood part of the *pre-existing* right codified in the Second Amendment.

a. Northampton laws applied to peaceful carrying.

Plaintiffs' narrow interpretation of the Statute—that it only applied to carrying with "evil intent," Pl.Br.25—cannot be squared with its explicit exception for law enforcement officials and citizens responding to a call for arms to keep the peace, SA36. Nor is there evidence that "Northampton's reach dramatically narrowed" "[a]s firearms became more common." Pl.Br.26. The Statute applied to *all* "arm[s]," not just firearms, and, to the extent one questions whether fourteenth-century drafters were concerned about surplusage, *see* NRABr.13, Framing-era analogues listed these same exceptions, *e.g.*, SA18, 58, 78, including the law drafted by Thomas Jefferson and introduced by James Madison, SA55. So did the treatises of prominent eighteenth-century scholars. *E.g.*, Bond, *A Compleat Guide for Justices of Peace* 42 (1707); Gardiner, *The Compleat Constable* 18-19 (1708); Hawkins, 1 *Treatise of the Pleas of the Crown*, ch.63, § 10 (1716); Blackerby, *The Second Part of the Justice of the Peace* 41 (1734); Cay, *An Abridgment of Publick Statutes In Force and Use*, "Arms" (1739). So did Lord Coke—"widely recognized by the American colonists 'as the greatest authority of his time on the laws of England,'" *Payton v. New York*, 445 U.S. 573, 593-94 (1980)—who added "another exception" for home defense. Coke, *The Third Part*

7

*of the Institutes of the Laws of England* 159, 161-62 (15th ed. 1797). Nor was this merely to make a self-defense right "double sure," NRABr.13, because Coke then recited a violation by a man carrying concealed *for self-defense*. Coke, *supra*, at 161-62. *Id.*; *see* Blackerby, *supra*, at 41 (same); Hawkins, *supra*, § 8 (rejecting self-defense exception). Indeed, the Statute itself (like Framing-era Northampton laws and treatises) explicitly classified these *as exceptions*, which shows that the general prohibition reached peaceful carrying.

Plaintiffs have not even tried to reconcile these exceptions with their interpretation. Instead, they rely on a few words of dicta in one of two reported versions of *Sir John Knight's Case*, 87 Eng. Rep. 75, 90 Eng. Rep. 330 (K.B. 1686).[3] This is a slender reed, considering that the case was recorded long before England recognized the doctrine of stare decisis, Oldham, *Informal Lawmaking in England by the Twelve Judges in the Late Eighteenth and Early Nineteenth Century*, 29 Law & Hist. Rev. 181, 220 n.41 (2011), when English Reports were "incomplete and deemed unreliable," Charles 2016, *supra*, at 393 n.102.

And *Knight* does not even support plaintiffs. While one reported version notes that the Statute applied "where the crime shall appear to be malo animo," that

---

[3]    Plaintiffs' other cases do not even involve the Statute's ban on public carrying. *See Queen v. Soley*, 88 Eng. Rep. 935 (Q.B. 1701) (rioting); *King v. Dewhurst*, 1 St. Tr. 529 (Lancaster Assize 1820) (unlawful assembly); *Chune v. Piott*, 80 Eng. Rep. 1161 (K.B. 1615) (false arrest).

was not a general requirement, but one specific to the defendant's aristocratic status, since the Statute allowed "gentlemen" to "ride armed for their security."  90 Eng. Rep. at 330; *see Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944) ("opinions are to be read in the light of the facts of the case").  The other reported version confirms that others could not, as public carrying was a "great offence" because it suggested that "the King w[as] not able or willing to protect his subjects."  87 Eng. Rep. at 76.

Moreover, *Knight*'s history shows the continued importance of the Statute's enumerated exceptions.  Knight had joined the Protestant mayor and alderman of Bristol to break up a Catholic mass, with guns, to arrest the priest.  Charles 2016, *supra*, at 395 & nn.114-19.  Government officials were exempt from the Statute, but Knight was indicted as "*very disloyall and Seditious*."  *Id.* at 395-96.  He "*never* rested his innocence or legal defense on preparatory armed self-defense," instead offering evidence of his "'active Loyalty' to the crown."  *Id.* at 396-97 & nn.122, 126-27.  And so he was acquitted not because his conduct lacked evil intent, but because he was deemed to deserve the protection of "a government official, … exempt from the statute's prohibition."  *Peruta*, 824 F.3d at 931.

*Knight* did not change how the Statute was interpreted by leading scholars, who continued to repeat its explicit exceptions.  *See, e.g.*, Bond, *supra*, at 42 (1707); Gardiner, *supra*, at 18-19 (1708); Hawkins, *supra*, § 10 (1716); Blackerby,

*supra*, at 41 (1734); Cay, *supra*, "Arms" (1739). Hawkins emphasized that the Statute barred carrying arms even for self-defense. Hawkins, *supra*, § 8. And Gardiner explicitly listed public terror and evil intent as elements for other crimes, but not for the Statute. Gardiner, *supra*, at 19-20.

Plaintiffs notably do not defend Judge Leon's "terrifying manner" reading of Northampton laws. JA551. Instead, they argue that these laws mention "terror" to limit their applicability to "evil intent." Pl.Br.28-30. But the same authorities that refer to public terror contain the same explicit exceptions that, as discussed, preclude such a narrow reading. *See, e.g.*, SA18, 55, 58, 78. And plaintiffs do not challenge the detailed historical record recounted in *Peruta*, which traces the widely accepted ban on "carrying *concealed*"—which cannot have required "terrifying" conduct—"back generally to the Statute of Northampton."[4] 824 F.3d at 932.

b.    Northampton laws applied to commonly owned firearms.

Citing *Heller I*, plaintiffs claim that the Statute applied only to "dangerous and unusual" weapons, while handguns are common today. Pl.Br.25. But *Heller I* did not purport to "interpret[]" the Statute. Pl.Br.25. It merely confirmed that certain weapons are not protected "arms" and can be banned altogether. 554 U.S.

---

[4]    Neither *Peruta* nor its sources suggest, as plaintiffs argue, that Northampton laws applied *only* to concealed carrying. Pl.Br.28.

at 627. To be sure, the following string of authorities includes Blackstone's discussion of the Statute. *Id.* But nothing in the decision suggests that the Court, in a decision carefully limited to address possession inside the home, meant to interpret a body of law that only applied outside the home. Indeed, such a conclusion would conflict with the very existence of Northampton laws, which would be superfluous if they did not apply to "the sorts of lawful weapons that [militia-capable citizens] possessed at home." *Id.*

Nor is the District relying simply on the 1328 Statute's text. The common understanding the Framers codified in the Second Amendment followed centuries of regulation of public carrying, including, for example, Elizabeth I's 1594 proclamation specifying that the Statute applied to "secretly small Dagges" and her 1600 proclamation specifying "Gunnes ... Pistols, Birding pieces, and other short pieces and small shot." *Peruta*, 824 F.3d at 931; *see also, e.g.*, *id.* at 931-32 (citing prohibitions on "short Dagges, and Pistols," "Steelets, pocket Daggers, pocket Dags and Pistols," and "cross-bows, little short hand-guns, and little hagbuts"); Lambarde, *Duties of Constables* 13 (1614) ("Dagges," "Pistols"); Dalton, *The Countrey Justice* 38 (1655) ("Gunnes, Dagges, or Pistols that be charged"); Bond, *supra*, at 42 ("Guns charged"); Gardiner, *supra*, at 18 ("Daggers, Guns or Pistols Charged"). Hawkins, too, who recognized that the Statute forbade going armed "with dangerous and unusual weapons, in such a manner as will naturally cause a

terror," Hawkins, *supra*, § 4, plainly included commonly owned but dangerous weapons. He explained that "Persons of Quality" could wear "common weapons for their Ornament or Defence," then noted that the Statute "allow[s] all Persons" (regardless of "Quality") "to arm themselves upon a Cry made for Arms to keep the Peace" and wear "privy Coats of Mail." *Id.* §§ 9, 10. And Blackstone likened the Statute to Athenian law, which simply barred "walk[ing] about the city in armor." 4 Blackstone, *Commentaries* 148-49.

Indeed, plaintiffs' interpretation is precluded by their own cited cases. *Knight* sustained an indictment for publicly carrying a pistol. 87 Eng. Rep. at 76; 90 Eng. Rep. at 330. And *State v. Huntly*, 25 N.C. 418 (3 Ired. 1843), explained that *all* guns are "dangerous or unusual" under Northampton laws. *Id.* at 421-22 (citing Blackstone and Hawkins).

To be sure, *Huntly* also noted that "the carrying of a gun *per se* constitutes no offence." *Id.* at 422-23. But, as with other cases decided in the mid- to late-1800s, this post-ratification analysis may illuminate the original public meaning of the Second Amendment only indirectly and should not be used as "postenactment legislative history." *Heller I*, 554 U.S. at 605; *see* Pl.Br.35 (arguing that laws from the late-1800s shed only "pale and indirect" light). These Southern cases "did not represent a national consensus" and, even in the South, their views "w[ere] not

universally held." Ruben & Cornell, *Firearm Regionalism and Public Carry*, 125 Yale L.J. F. 121, 124, 128 (2015).

             c.      Northampton laws allowed carrying in the countryside.

Finally, there is no merit to the argument that the Statute did not distinguish between cities and the countryside because, after it specifies "Fairs," "Markets," and "the presence of the Justices or other Ministers" as places where carrying is precluded, it adds "in no part elsewhere." Pl.Br.32; NRABr.13-14; SA36. Reading this last clause to mean *everywhere* would make the list of specific places superfluous. Instead, it is sensibly read, per the "ejusdem generis" canon, as applying to places similar to fairs, markets, and other places where peacekeepers preside—including cities. This reading would likewise preserve the integrity of Framing-era Northampton laws. *See, e.g.*, SA19 ("fairs, or markets, or in other places"), 55 (similar), 59 ("fairs, markets, … the presence of the Kings Justices, or other ministers, nor in no part elsewhere").

And this is how the Statute *was* read. Both Richard II in 1388 and Henry IV in 1444 issued orders describing the Statute as applying "in fairs and markets or elsewhere in presence of justices." *Peruta*, 824 F.3d at 930. And a 1419 treatise documenting the law of London, which was still in effect in 1704, stated that the Statute barred carrying in "said city or in the suburbs." *Id.*; *see Heller I*, 554 U.S. at 587 n.10.

Furthermore, in America, many Northampton laws qualified the "elsewhere" language with reference to public terror. *See, e.g.*, SA 53-54 ("or elsewhere … in Fear or Affray of … [the] People"), 55 ("or in other places, in terror of the Country"). Others used "fear," "terror," or "affray" "as a substitute for the different public locations listed in the Statute." Charles, *The Faces of the Second Amendment Outside the Home*, 60 Clev. St. L. Rev. 1, 33 n.173 (2012); *see, e.g.*, SA61, 62. These laws' inclusion of peacekeeping exceptions preclude a reading requiring terrifying conduct or evil intent. Instead, they limit the applicability of the prohibition to the public concourse, where knowledge that carrying is permitted could "naturally diffuse a terror among the people." 3 *Works of the Honourable James Wilson* 79 (1804); *see* Dunlap, *supra*, at 8 (similar). Peacekeepers could therefore "apprehend any Person who shall go or ride armed with unusual and offensive Weapons, in an Affray, *or among any great Concourse of the People*." Davis, *The Office and Authority of a Justice of the Peace* 13 (1774) (emphasis added).[5]

---

[5] Plaintiffs strangely fault the District for not citing any case focusing on how the pre-existing right functioned in cities. Pl.Br.23. But the only case *they* cite emphasized this urban/rural distinction. *See Knight*, 87 Eng. Rep. at 76 (charging Knight for carrying while "walk[ing] about the streets" of Bristol); Charles 2016, *supra*, at 396 ("Knight even testified … that he generally did not enter Bristol armed"—he "left [his sword and gun] at the end of Town when he came in, and took them thence when he went out.").

This reading is not foreclosed by *Heller I*, which rejected a "freestanding 'interest-balancing'" review of laws banning home possession, 554 U.S. at 634, not the urban/rural distinction underlying centuries of regulation of public carrying, *see* Pl.Br.23. Nor is the distinction unreasonable because urban areas experience higher crime rates. *See* Pl.Br.14, 22-23. "For although urban gun control might limit the possibilities for armed self-defense, one of its primary purposes is to lessen the need for such self-defense." Blocher, *Firearm Localism*, 123 Yale L.J. 82, 137 (2013). This has always been so. As one "prominent Elizabethan legal editor put it," the Statute "served 'not onely to preserve peace, & to eschew quarrels, but also to take away the instruments of fighting and batterie.'" Charles 2016, *supra*, at 386. The District's law is likewise crafted to reduce the need for self-defense.

Plaintiffs do not dispute that the Framing-era Northampton laws were widely adopted and enshrined in the scope of the right to bear arms. Under any reasonable reading, these laws barred individuals from carrying commonly owned firearms in the public concourse, regardless of manner or intent. Any narrower interpretation runs afoul of their enumerated exceptions, historic applicability to both concealed and open carrying, and explicit reference to populated areas where public carrying is most likely to threaten public safety.

2.  Moreover, the "good reason" standard is longstanding and thus presumed constitutional.

Numerous states in the mid- to late-1800s enacted laws that allowed public carrying by people with "reasonable cause" to fear assault. SA22, 85, 87, 88, 91, 94, 97, 101, 104, 122, 124. These longstanding laws independently create a rebuttable presumption that the District's "good reason" law is beyond the scope of the Second Amendment. *See Heller I*, 554 U.S. at 626-27 & n.26. Plaintiffs have not rebutted it.

Plaintiffs argue against this presumption because, they say, these laws are not akin to the "good reason" standard's criminal prohibition. Pl.Br.33. Civil restrictions on carrying are, however, relevant in determining the scope of the right. Moreover, these laws appear in the criminal section of the code, alongside other indisputably criminal acts, such as "threaten[ing] to kill" "or beat another." SA85, 87, 88, 91, 94, 97, 101, 104 (similar), 122, 127. Indeed, similar to probation, surety sanctions were criminal—failing to find a surety could lead to incarceration. *See, e.g.*, SA84, 90, 93, 96, 100, 123. And nothing in these laws suggests that posting a surety gave license to continue violating the law. *See id*. They were understood to forbid "go[ing] armed … without reasonable cause to apprehend an assault or violence." Cornell, *The Right to Carry Firearms Outside of the Home*, 39 Fordham Urb. L.J. 1695, 1720 & n.134 (2012).

Plaintiffs also err in suggesting that these laws demonstrate the narrow scope of the Framing-era Northampton laws. Pl.Br.33-34. These laws were enacted as part of a comprehensive criminal code, replacing a hodgepodge of statutes and common law treatises. *E.g.*, SA83-86 (replacing Massachusetts's Northampton law), 88 (Maine), 92-94 (Virginia). And, as plaintiffs note, these laws were "*less restrictive*" than Northampton laws, effectuating the electorate's desire to decriminalize public carrying for those with a particularized self-defense need. Pl.Br.34. Just as modern-day statutes easing gun restrictions say nothing about the laws they replaced, these surety laws say nothing about the scope of the Northampton laws preceding them.

3.    In any event, plaintiffs offer insufficient evidence that the District's law implicates the Second Amendment.

Quibbling with the District's evidence and mischaracterizing the District's history as "revisionist," Pl.Br.9, can get plaintiffs only so far. Even assuming that plaintiffs correctly interpret the Northampton and surety laws, they do not carry *their* burden to cite evidence that the "good reason" law implicates the pre-existing right to bear arms as it was understood in 1791.

Plaintiffs rely heavily on inapposite laws *requiring* arms-carrying in certain circumstances. Pl.Br.17-18. Public carrying under government authority has always been an exception to Northampton prohibitions. *See, e.g.*, SA55. Colonial laws requiring militia-eligible men to carry weapons to protect the public from

17

"sudden assaults … by Indeans" or "insurrections and other wicked attempts of Negroes," Johnson & Kopel, *Firearms Law & the Second Amendment* 106-08 (2012), logically shed no light on whether individuals had any right to carry for individual self-defense without government license.

Nor do plaintiffs' anecdotes of public carrying by America's founding fathers. *See* Pl.Br.18-20. As a military officer, George Washington was exempt from Virginia's Northampton law. And even if it was his "custom" to carry on the road to Mount Vernon, this was in the countryside, not the city. The same is so for his "expedition" into the Ohio wilderness. Northampton laws also allowed hunting in the countryside, which Jefferson recommended to his nephew as a "species of exercise." JA434. And although Jefferson often brought firearms "when traveling," they were usually in a locked box in his luggage, which was not prohibited by Northampton laws. Monticello, *Firearms*, https://www.monticello .org/site/research-and-collections/firearms. Patrick Henry shot game on his walk from his 1,700-acre property to the court in a rural area of Virginia. Unger, *Lion of Liberty* 30 (2010). (St. George Tucker was likewise referring to hunting when he observed that "[i]n many parts of the United States, a man no more thinks, of going out of his house … without his rifle or musket"—he was disagreeing with Blackstone's analysis of English game laws barring hunting. 5 Blackstone, *Commentaries*, App. n.B at 19 (1803).) And when John Adams defended British

soldiers' use of arms against a threatening mob of colonists, he likened their right to self-defense to a civilian's right, under the Statute of Northampton, to bear arms to suppress "dangerous rioters." JA436; *see* 4 *Masterpieces of Eloquence* 2585 (1905) ("They all stand upon equal footing in this respect.").

Plaintiffs' affirmative sources are thus quite weak. At most, they suggest that it was customary for firearms to be carried in certain circumstances. That is not sufficient to meet their burden to show that there was a "venerable, widely understood" right that covered carrying in cities without good reason. *See Heller I*, 554 U.S. at 625.

## C. Alternatively, the "good reason" standard is likely to survive constitutional scrutiny.

1. The "good reason" standard should be measured under nothing more rigorous than intermediate scrutiny.

Plaintiffs lack support for their claim that, assuming the "good reason" standard implicates the Second Amendment, categorical invalidation is appropriate. They do not respond to the District's explanation of how it is circular to define a "right" as precisely what the challenged law precludes and then argue that the law is categorically unconstitutional. D.C.Br.30-31. Instead, they incorrectly claim that *Heller I*'s citation of Southern Antebellum case law "makes clear that severe restrictions on carrying firearms … merit the same, categorical invalidation" as a handgun ban. Pl.Br.38-39. While *Heller I* approved those

courts' categorical approach for laws that fail "[u]nder any of the standards of scrutiny," it did not adopt their substantive conclusions. 554 U.S. at 628-29. The Court has never considered the existence of a right to publicly carry, much less decided a level of scrutiny for it. But several federal circuit courts have considered the question and all have concluded that the good-reason requirement should be analyzed under—and survives—intermediate scrutiny. *See Drake*, 724 F.3d at 430; *Woollard*, 712 F.3d at 876; *Kachalsky*, 701 F.3d at 93 & n.17; *see also Heller I*, Brief of the United States, 2008 WL 157201, at *8, 28 (advocating intermediate scrutiny for restrictions on home possession).

Anything stricter than intermediate scrutiny would contravene the Supreme Court's recognition that "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller I*, 554 U.S. at 634-35. The Framing-era public understood that public carrying creates unique public safety risks, and accepted the permissibility of strict regulation to minimize those harms. More than half of the Framing-era states banned carrying in the public concourse, and even more banned carrying concealed. This stands in stark contrast to the well-accepted "castle" doctrine that allowed self-defense by means prohibited in the public concourse. Coke, *supra*, at 161. Thus, public carrying has never been a "twinned right" to home defense, and has always been subjected to "fundamentally different treatment." *See* NRABr.9.

Over the next century, many broad bans on public carrying were replaced with a precursor to the "good reason" standard, allowing people to carry if they had "reasonable cause" to fear imminent harm. Almost a quarter of the population remains subject to similar laws today. The public has never demanded an inviolable right to carry that trumps public safety. Instead, it has struck a practical balance—allowing restrictions on public carrying where it is most likely to cause harm. This "interest balancing by the people" was codified in the Second Amendment. *Heller I*, 554 U.S. at 635. Strict scrutiny would disrupt that balance and be ahistorical. Indeed, most of the protections of the Bill of Rights are not reviewed under strict scrutiny, D.C.Br.37-38, and levels of scrutiny are dictated by the historical understanding of the "right" at issue, *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 455-56 (1978) (commercial speech more restricted because it "occurs in an area traditionally subject to government regulation"). The same is true of public carrying. *See United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011) ("[O]utside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense."); *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1126 (10th Cir. 2015).[6]

---

[6] There is no support for plaintiffs' wild claim that the District's arguments about the proper level of scrutiny are a request for "exemption" from the Second Amendment. Pl.Br.36. *But see* D.C.Br.31 (stating the opposite).

Citing cases challenging zoning restrictions on adult entertainment establishments, plaintiffs argue that the government cannot "directly target the exercise of a constitutional right." Pl.Br.43-44. But public carrying is not speech, and its direct impact on public safety is not comparable to the "secondary effects" of adult entertainment. Pl.Br.44; *see Kachalsky*, 701 F.3d at 91 ("We are hesitant to import *substantive* First Amendment principles wholesale into Second Amendment jurisprudence."). For centuries, governments have regulated firearms *precisely* because they are dangerous. That continues to this day. *See Bonidy*, 790 F.3d at 1126; *Kachalsky*, 701 F.3d at 99; *Masciandaro*, 638 F.3d at 470. And courts routinely reject strict scrutiny for laws that "directly target" other constitutionally protected conduct. *See Keystone Bituminous Coal v. DeBenedictis*, 480 U.S. 470, 489 (1987) (Fifth Amendment property use: coal mining causing subsidence damage); *United States v. O'Brien*, 391 U.S. 367, 376 (1968) (First Amendment symbolic speech: burning draft card). As Justice Ginsburg explained in *Olsen v. DEA*, 878 F.2d 1458 (D.C. Cir. 1989), a First Amendment "freedom to believe" is "absolute," but "[c]onduct remains subject to regulation for the protection of society." *Id.* at 1462 (religious expression: marijuana use).

2. The "good reason" standard survives intermediate scrutiny.

The "good reason" standard is not an outlier—it is the law in New York, New Jersey, Maryland, and California, which make up 23 percent of this country's population. Other circuits unanimously have found this law subject to nothing more rigorous than intermediate scrutiny because it does not completely prohibit the exercise of any core Second Amendment right. As Judge Kollar-Kotelly noted in *Wrenn*, "[t]he consistency of those results emphasizes the steep hill that [p]laintiffs have to climb at the preliminary injunction stage, where the burden is on them to make a 'clear showing' of the propriety of th[is] 'extraordinary remedy.'" RD 54 at 23.

Plaintiffs do not seriously dispute these cases and their reasoning. Instead, they astoundingly claim that the District enacted its law for an "illegitimate" purpose—to limit "the number of arms borne in public"—and that any resulting crime reduction is just a "byproduct." Pl.Br.45, 48. Even if that were true, the "Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *O'Brien*, 391 U.S. at 383.

And plaintiffs' claim that the District's motive is "illegitimate" is plainly false. The District enacted the law to "protect[] the public safety" because, under a less restrictive regime, residents would likely suffer from "substantially higher rates of aggravated assault, rape, robbery and murder." JA135, 137. This is a

substantial, indeed compelling, government interest. *United States v. Salerno*, 481 U.S. 739, 755 (1987). The promotion of public safety was not merely a byproduct, and the District's desire to protect its citizens as much as possible consistent with constitutional limits is hardly illegitimate.

That the District enacted this law after more restrictive laws were invalidated only emphasizes the consistency of its goals. District residents have long recognized that firearms pose unique risks in this densely populated nation's capital, and their elected representatives have responded by enacting laws consistent with then-existing Second Amendment jurisprudence. Indeed, the Council modeled this law on the *statewide* restrictions upheld in *Drake*, *Woollard*, and *Kachalsky*. JA120.

In the end, plaintiffs' argument that the "good reason" standard is "not a permissible strategy," Pl.Br.43, simply repeats their call for a categorical analysis which, as discussed, contradicts the historical acceptance of government regulation enshrined in the right to "bear arms." Judge Leon committed this same legal error by effectively applying plaintiffs' categorical test under the guise of strict scrutiny. JA566-68.

Relatedly, plaintiffs analogize the "good reason" law to the one-pistol-per-month law struck in *Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015) ("*Heller III*"). Pl.Br.44-45. But the "good reason" law is fundamentally different.

It imposes no quota or limit on the number of licenses that may issue. Nor does it burden the core Second Amendment right to keep arms in the home. And *Heller III* did not categorically reject the challenged law—it based its findings on the District's failure to provide evidence of "fit." *Heller v. District of Columbia*, 814 F.3d 480, 480 (D.C. Cir. 2016) (Millett, J., concurring in denial of rehearing en banc based on "shortcomings in the record").

Under a true intermediate-scrutiny analysis, the District has more than met its evidentiary burden here, and will offer more on a full record. In particular, the District has substantiated its view that its law will reduce crime and promote public safety. The Council relied on the 2014 Donohue study, the predictive judgments of the New York, New Jersey, and Maryland legislatures, expert testimony, and other evidence. JA119-358. The District has already supplemented this with additional evidence. *See* JA359-422.

Plaintiffs point to studies that found no link between public carrying and crime, but the most recent was published in 2009, long before Donohue published his advanced statistical models. Pl.Br.48-49; *see Moore*, 702 F.3d at 939 (relying on pre-Donohue studies). Plaintiffs' only evidence from this decade is a single author's self-published "comment" criticizing the Donohue study, without offering fresh conclusions of his own. Pl.Br.50. And there is no merit to plaintiffs' claim that the Donohue study "*explicitly*" denies "*any causal link*" between public

carrying and crime.  Pl.Br.50.  They simply ignore how the study explained that, although it could not establish this at "the highest level of certainty," it could "offer conclusions at some lower level of certainty such as 'more probable than not.'" JA330.  This is precisely what it did—for each of the seven crime categories studied, at least one of the most-favored models demonstrated a substantial increase in crime after right-to-carry laws were enacted.  JA330.

Especially because social scientists may disagree, this Court "afford[s] 'substantial deference to the predictive judgments of [the legislature],'" *Schrader v. Holder*, 704 F.3d 980, 990 (D.C. Cir. 2013), both as "to the harm to be avoided and to the remedial measures adopted for that end," even "with respect to conflicting … predictions," *Turner Broad. Sys. v. FCC*, 520 U.S. 180, 196, 199 (1997).  And courts "owe [a legislature's] findings an additional measure of deference out of respect for [its] authority to exercise the legislative power."  *Id.* "It is simply not [the Court's] place to choose one set of responsible empirical studies over another in interpreting the Constitution," "[n]or … to demand that state legislatures support their criminal sanctions with foolproof empirical studies." *Baze v. Rees*, 553 U.S. 35, 90 (2008) (Scalia, J., concurring); *see Gonzalez v. Carhart*, 550 U.S. 124, 163 (2007).

Plaintiffs also argue that the "good reason" standard is overly broad because it does not base licensure on "whether [the applicant] is more or less likely to

misuse a gun." Pl.Br.52. But plaintiffs have suggested no effective alternative, *see* Pl.Br.2 (suggesting just "background check[s]" and "training"), and the Council reasonably relied on empirical evidence that those suitability standards—which already apply in most "shall-issue" jurisdictions—will not prevent the harm the "good reason" standard seeks to prevent. Many of the risks of public carrying have nothing to do with the conduct of the carrier. Guns are often stolen and used to commit other crimes. *Woollard*, 712 F.3d at 879. Increased public carrying could encourage criminals to "shift toward greater lethality." JA390. And public carrying complicates the relationship between police officers and the law-abiding public. As the Dallas Police Chief put it after his officers struggled to identify a shooter targeting officers during a July 2016 protest, public carrying makes it hard to "know who the good guy is versus the bad guy." Hennessy-Fiske, *Dallas police chief: Open carry makes things confusing during mass shootings*, L.A. Times, July 11, 2016; *see Woollard*, 712 F.3d at 879-80 (describing similar problems with concealed carry).

And sometimes licensed carriers *do* misuse their weapons. *See Peruta*, 824 F.3d at 943 (Graber, J., concurring) (noting that more than 800 people have been unjustifiably killed by licensed carriers since 2007). "[E]ven if we assume that each and every one of those tragedies was less likely to occur because of the shooter's prior status as a 'law-abiding citizen,' that does not mean that [the 'good

reason' standard] fails to address the problem in a reasonable way." *Id.* It "provides a means to determine whether the increase in risk and danger borne by the public is justified by a demonstrated risk and danger borne to the person seeking to carry." *Drake*, 724 F.3d at 437.

## II. The District Court Incorrectly Balanced The Equities In Plaintiffs' Favor.

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). And where, as here, a party seeks preliminary relief that changes the status quo, this Court should hold plaintiffs to an even higher burden. *E.g.*, *Stanley v. USC*, 13 F.3d 1313, 1320 (9th Cir. 1994). Plaintiffs do not challenge the reasons for this higher standard, but argue that "the 'status quo' should not be deemed to include the effectiveness of the law being challenged." Pl.Br.56n.10. This makes no sense. Plaintiffs sued to change the status quo—to overturn a law that had been in place for over a year. And before that, the status quo was a ban on public carrying.

In any event, under either standard, the equities favor continued enforcement of the law. Importantly, plaintiffs have not demonstrated irreparable harm. Judge Leon found that even a temporary constitutional deprivation "constitutes irreparable injury." JA569. This makes sense for an intrinsic right. *CFGC v. England*, 454 F.3d 290, 301 (D.C. Cir. 2006) (free exercise of religion); *Mills v. District of*

*Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (freedom to travel without unreasonable seizure). But Second Amendment rights are instrumental, not intrinsic. *McDonald*, 561 U.S. at 787. This point is highlighted by plaintiffs' argument that "few things are more intrinsically valuable than the core Second Amendment right to protect your own life." Pl.Br.55. If "your own life" is not at risk, it retains its value regardless of whether you carry a handgun. Plaintiffs had every opportunity to introduce evidence of actual threat. Just as it would be wrong to presume irreparable harm from a Sixth Amendment deprivation absent prosecution, *see McDonald*, 561 U.S. at 787, it is wrong to presume irreparable harm from a temporary potential Second Amendment deprivation absent non-speculative physical threat.

Further, a presumption of intangible harm from plaintiffs' alleged deprivation would "merely focus[] greater attention on the three other [preliminary injunction] factors." *CFGC*, 454 F.3d at 304. And the District will be irreparably harmed, and the public interest obstructed, if it cannot enforce the "good reason" standard while litigation is pending. *Cf. Nken v. Holder*, 556 U.S. 418, 435 (2009). These harms are especially heavy here because, as the Council found, the "good reason" law is essential to public safety. Plaintiffs dismiss this concern as "purely speculative," Pl.Br.56, but the Council's finding is supported by considerable evidence, *see* JA119-422. And even if, as plaintiffs maintain, empirical research does not

establish this causal link to a degree of scientific certainty, the Council's finding is entitled to deference. *Schrader*, 704 F.3d at 990.

While Judge Leon acknowledged public-safety risks in his merits analysis, he failed to acknowledge them in balancing the equities. JA566-67. This was legal error, D.C.Br.58-59, which plaintiffs do not dispute. Regardless of whether the law ultimately survives heightened scrutiny, the public has an interest in its enforcement while litigation is pending. Without the "good reason" standard, the District becomes a "right-to-carry" jurisdiction, despite the Council's legislative judgment—based on empirical studies—that such regimes are "associated with substantially higher rates of aggravated assault, rape, robbery and murder." JA135. Judge Leon erred when he disregarded these harms in balancing the equities.

Finally, plaintiffs argue that the public has no interest in the enforcement of an unconstitutional law. Pl.Br.58. But the point of further proceedings is to see whether plaintiffs can prove this law unconstitutional. This case is in its infancy—the District has yet to conduct discovery, gather evidence, present experts, and submit a full argument to the district court. And the public has spoken through its elected representatives, who have found the "good reason" standard essential for public safety. The interests of the public and the District are aligned, and they strongly favor maintaining the status quo during litigation.

## CONCLUSION

The preliminary injunction should be vacated.

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

TODD S. KIM
Solicitor General

LOREN L. ALIKHAN
Deputy Solicitor General

/s/ Holly M. Johnson
HOLLY M. JOHNSON
Assistant Attorney General
Bar Number 476331
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 600S
Washington, D.C. 20001
(202) 442-9890
(202) 715-7713 (fax)
holly.johnson@dc.gov

August 2016

## CERTIFICATE OF SERVICE

I certify that on August 19, 2016, this brief was served through the Court's

ECF system to:

    Charles J. Cooper
    Cooper & Kirk PLLC
    1523 New Hampshire Ave, NW
    Washington, D.C. 20036

                /s/ Holly M. Johnson
                HOLLY M. JOHNSON


## CERTIFICATE OF COMPLIANCE

I further certify that this brief complies with the type-volume limitation in

Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 6,998

words, excluding exempted parts. This brief complies with the typeface and type

style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because

it has been prepared in a proportionally spaced typeface using Microsoft Word

2010 in Times New Roman 14 point.

                /s/ Holly M. Johnson
                HOLLY M. JOHNSON